**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANNON FREMGEN, MARY CHRISTOPHERSON-JUVE, DENISE DELEON, SANDRA WILDE, MICHAEL WILDER, on behalf of themselves and all others similarly situated, | No. 1:21-cv-00351-GHW-DCF |
| | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| AMAZON.COM, INC.; HACHETTE BOOK GROUP, INC; HARPERCOLLINS PUBLISHERS L.L.C.; MACMILLAN PUBLISHING GROUP, LLC; PENGUIN RANDOM HOUSE LLC; SIMON & SCHUSTER, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION ................................................................................................. 17

III.    VENUE ............................................................................................................... 19

IV.     PARTIES ............................................................................................................ 20

     A.      Plaintiffs ................................................................................................. 20

         1.      Shannon Fremgen ....................................................................... 20

         2.      Mary Christopherson-Juve .......................................................... 21

         3.      Denise DeLeon ............................................................................ 22

         4.      Sandra Wilde ............................................................................... 23

         5.      Michael Wilder ........................................................................... 23

     B.      Defendants ............................................................................................. 24

         1.      Amazon ....................................................................................... 24

         2.      Hachette ...................................................................................... 25

         3.      HarperCollins .............................................................................. 25

         4.      Macmillan ................................................................................... 26

         5.      Penguin ....................................................................................... 26

         6.      Simon & Schuster ....................................................................... 27

V.      STATEMENT OF FACT .................................................................................. 27

     A.      The Big Five's dominance in trade books. .............................................. 27

     B.      Amazon's dominance over its rival booksellers. .................................... 33

     C.      EBooks' arrival disturbed the trade publishing industry .......................... 35

     D.      As a trade publisher, Amazon benefits from the Big Five's inflated eBook prices. ......................................................................................... 45

E.      As an Ebook retailer, Amazon employs anticompetitive restraints to immunize its platform from the negative effects of the Big Five's inflated eBook prices. ................................................................................................ 47

F.      Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm competition. ................................................................ 48

VI.     INTERSTATE TRADE AND COMMERCE ....................................................... 50

VII.    RELEVANT MARKET ..................................................................................... 50

VIII.   CLASS ACTION ALLEGATIONS .................................................................... 53

IX.     ANTITRUST INJURY ...................................................................................... 56

X.      CAUSES OF ACTION  VIOLATION OF THE SHERMAN ACT ......................... 58

        FIRST CAUSE OF ACTION VIOLATION OF 15 U.S.C. § 1 .............................. 58

        SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) ................................................................. 61

JURY TRIAL DEMANDED................................................................................................ 62

PRAYER FOR RELIEF..................................................................................................... 62

010888-12/1431785 V1

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys.

## I.      INTRODUCTION

1.      Defendant Amazon.com, Inc. ("Amazon") operates the Amazon.com retail platform, which is the largest retail eBooks seller in the United States. It sells over half of all books purchased at retail in the United States.[1] Almost 90% of all eBooks are sold through its online retail platform.[2]

2.      Amazon's Co-conspirators, Defendant Hachette Book Group, Inc. ("Hachette"); Defendant HarperCollins Publishers L.L.C. ("HarperCollins"); Defendant Macmillan Publishing Group, LLC ("Macmillan"); Defendant Penguin Random House LLC ("Penguin"); and Defendant Simon & Schuster, Inc. ("Simon & Schuster"), are the five largest publishers in the United States, otherwise known collectively as the "Big Five." The Big Five produce "trade books," a term of art referring to "general interest fiction and non-fiction books," as "distinguished from 'non-trade' books such as academic textbooks, reference materials, and other texts."[3] Collectively, the Big Five account for about 80% of the trade books sold in the United States.[4]

---

[1] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 295, https://judiciary.house.gov/uploadedfiles/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Report").

[2] Matt Day and Jackie Gu, *The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-across-markets/ (estimating that Amazon controls 88.9% of the eBooks market).

[3] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

[4] Constance Grady, *Milo Yiannopoulos's book deal with Simon & Schuster, explained*, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-deal-simon-schuster-dangerous-boycott.

3.      Plaintiffs are consumers and direct purchasers from several states who frequently shop for electronic books ("eBooks") published by the Big Five. The Big Five typically sell their eBooks to consumers through booksellers' online retail platforms, like Amazon, Barnes & Noble, Kobo, and Apple Books. Defendant HarpersCollins also sells eBooks to consumers through its own website as well. When selling eBooks through an online retail platform, the Big Five typically rely on the agency model.[5] Under that model, the sales transaction occurs directly between the publisher and the retail consumer, while the eBook retailer serves merely as the publisher's sales agent in the transaction and takes a commission on every book sold.[6] Plaintiffs purchased one or more eBooks directly from the Big Five through a retail platform other than Amazon.com.

4.      Plaintiffs allege that Amazon and the Big Five agreed to price restraints that cause Plaintiffs and other consumers to overpay for eBooks purchased from the Big Five through a retail platform other than Amazon.com. Plaintiffs seek to represent a Class of consumers, who likewise purchased eBooks from the Big Five through an online bookseller other than Amazon and suffered similar overcharges.

---

[5] Constance Grady, *The 2010s were supposed to bring the ebook revolution*, Vox (Dec. 23, 2019), https://www.vox.com/culture/2019/12/23/20991659/ebook-amazon-kindle-ereader-department-of-justice-publishing-lawsuit-apple-ipad; *For the Big Five, Agency Now Holds Sway Across the Board*, Author's Guild (Sep. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/; *Amazon, HarperCollins reach multi-year publishing deal*, First Post (Apr. 14, 2015), https://www.firstpost.com/tech/news-analysis/amazon-harpercollins-reach-multi-year-publishing-deal-report-3666709.html; Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

[6] Grady; CASE AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("5.4.2017 EU Commission Decision") at 8.

010888-12/1431785 V1

5.      EBook prices have been the continuous subject of antitrust investigations in the

United States and Europe since 2011. The European Commission in the European Union ("EU

Commission") first opened proceedings in December 2011 against the Big Five and Apple to

determine whether they colluded in raising retail prices of eBooks.[7] The Department of Justice

("DOJ") and Attorneys General (AGs) from 33 states followed with their own lawsuit in this

District in early 2012.[8] Both the U.S. District Court presiding over the DOJ and AGs' lawsuit

and the EU Commission found that the Big Five had colluded with Apple to raise prices.[9] The

Big Five achieved this goal by jointly switching on a global basis from a wholesale model of

selling eBooks (where the eBook retailer determines retail prices) to an agency model (where the

publisher determines retail prices and the eBook retailer acts merely as its agent).[10] As part of

their conspiracy, the Big Five agreed to a most favored nations clause ("MFN") with Apple to

ensure that the Big Five sold their eBooks at the same prices through Apple's online store as

through all other eBook retailers, including Amazon.[11]

6.      The U.S. District Court entered consent decrees in 2012 and 2013 against the Big

Five Defendants.[12] The Big Five also reached settlements with the EU Commission on December

12, 2012, and July 25, 2013.[13] Both the consent decrees entered in the United States and the EU

Commission settlements reached in Europe required the Big Five to cease colluding with each

---

[7] 5.4.2017 EU Commission Decision at 8.

[8] House Report at 333; 5.4.2017 EU Commission Decision at 8.

[9] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 (S.D.N.Y. 2013); 5.4.2017 EU Commission Decision at 8.

[10] *Id.*

[11] *Id.*

[12] *See U.S. v. Apple, Inc., et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.

[13] 5.4.2017 EU Commission Decision at 8.

other, to refrain from employing an MFN in any of their agreements with eBook retailers for five years, and for two years to permit eBook retailers to add their own discounts to the retail prices of the Big Five's eBooks sold through the retailer's platform.[14]

7.    As the following chart shows,[15] the Big Five's eBook prices decreased substantially from 2013-2014, as long as the consent decrees prevented the Big Five from interfering with retailer discounts, but they immediately increased their prices again in 2015 after renegotiating their agency agreements with Amazon and have continued to maintain supracompetitive prices:



---

[14] 5.4.2017 EU Commission Decision at 8; *see, e.g.*, Final Judgment as to Defendants The Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), *United States v. Apple*, Case No. 12-cv-02826-DLC (S.D.N.Y.), Docket No. 259 ("Final Judgment Penguin") at 8-9, https://www.justice.gov/atr/case-document/final-judgment-defendants-penguin-group-division-pearson-plc-and-penguin-group-usa.

[14] *Id.* at 11 and 18.

[15] The chart represents the weighted average price of eBooks price for the Big Five Defendants with prices adjusted for inflation. It draws from a data sample consisting of New York Times bestsellers starting from February 13, 2011, when the first eBooks appeared on the NYT list, to December 1, 2020.

8.      Although Amazon claimed publicly that it was negotiating with the Big Five Defendants to ensure that it would continue to discount their eBook prices beyond the two-year period required under the consent decree, this did not happen. The week after announcing their respective agency contracts with Amazon, Penguin increased its eBook prices by 30.4%, HarperCollins by 29.3%, Simon & Schuster by 15.8%, Macmillan by 10.7%., and Hachette Book Group by 8.3%.

9.      As the following chart illustrates, Amazon's Co-conspirators raised prices by increasing the price point for new releases and by consolidating eBook prices to fewer price buckets. During the Apple conspiracy in 2011-12, the Big Five priced 80% of their eBooks within just four price buckets. This roughly doubled in 2013 through 2014, when DOJ ensured competitive eBook pricing by enforcing the consent decrees entered against the Big Five Co-conspirators. After entering into their agreements with Amazon in 2015, the Big Five Defendants gradually reverted to using three or four price buckets by 2018 and through the present:



Number of Price Buckets Covering 80% of Price Points

10.    During the DOJ enforcement of the consent decrees, the Big Five eBook prices had the greatest price diversity in 2014. After adjusting for inflation, eBook prices for books clustered around $12 and only about 5% of titles sold for about $15, whereas in 2020, which represents greater price conformity, 55% of titles sold for about $15 and less than 5% sold around $12:





11.     Had Defendants only raised prices on Amazon.com, consumers would be free to shop for lower-priced eBooks on other retailer sites. Instead, Amazon and the Big Five agreed to a price restraint that prevents lower eBook prices on other eBook retailer sites.

12.     In June 2015, the EU Commission again investigated anticompetitive conduct in the eBooks market and found that Defendant Amazon employed MFNs with eBook publishers and similar provisions in its agreements with the Big Five (who were at that time prevented by their settlements with the EU Commission from employing MFNs in their contracts).[16] The EU Commission found that the MFNs and analogous provisions found in the Big Five contracts had probable anticompetitive effects.[17] Amazon and the EU Commission reached a settlement in 2017 that prohibited Amazon from enforcing its MFNs and similar provisions for a five-year

---

[16] 5.4.2017 EU Commission Decision at 4-5.
[17] 5.4.2017 EU Commission Decision at 20-38, 43.

period in the European Economic Area.[18] Amazon's settlement with the EU Commission had no effect on Amazon's and the Big Five's practices in the United States.

13.     The House Judiciary Committee began investigating Amazon in 2019 as part of a broader investigation of competition in the digital markets, led by the Subcommittee on Antitrust, Commercial, and Administrative Law.[19] After a 16-month investigation, the House Judiciary Committee issued a report and recommendations. Among its findings, the Committee determined that Amazon's use of MFN provisions in its agreements with book publishers harms competition in the retail book market, including the eBook market.[20]

14.     In comparison to physical books, publishers sell eBooks at high prices, and consumers do not actually benefit from the cost reduction that comes from low printing and distribution expenses.[21] Amazon charges high commissions and other costs to publishers, including the Big Five, which in turn significantly increases the retail price of the eBooks they sell on Amazon.com.[22] One way that Amazon increases the cost of selling eBooks is by tying its distribution services, *i.e.*, helping customers find and purchase eBooks on the Amazon platform, collect payment, and deliver the book electronically, with its advertising services, which are designed to maximize the placement of advertisements to consumers at various points of the

---

[18] *Id.* at 39, 41-42.

[19] House Report at 6.

[20] *Id.* at 295.

[21] Analyst opinion, https://www.statista.com/outlook/213/109/ebooks/united-states#market-users.

[22] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020), https://publishers.org/wpcontent/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf.

search and purchase experience.[23] Amazon drives up the Big Five's cost of doing business on Amazon.com by manipulating the "discovery tools to make a publisher's books difficult to find without the purchase of advertising or refuses distribution unless the publisher also purchases advertising."[24]

15.     In a competitive market, the Big Five could sell eBooks at a lower price on their own websites or through Amazon's retail competitors that offer lower commissions and fees. But the Big Five agree not to do this so that they could maintain supracompetitive eBook prices. This market "stranglehold," which the Defendants agreed to confer on Amazon, prevents Amazon's current eBook retail competitors from expanding their market share and reduces the incentive of potential eBook retail competitors from entering the market.[25] Defendants' anticompetitive agreements have the intent and effect of injuring consumers by eliminating the price competition that Amazon.com would otherwise face and by raising eBook prices sold through Amazon's retail rivals above the price that the eBooks would be sold in the absence of this restraint.

16.     Because Defendants have not made the terms of their agreements public, Plaintiffs rely on public disclosures, including news reports, submissions to the House Judiciary Committee and the findings of the EU Commission and House Judiciary Committee. These reports describe the contractual devices that Amazon employs in its agreements with publishers to fix book prices and prevent competition from rival booksellers.

17.     In general, MFNs entitle the buyer to the lowest price or best terms that the supplier offers to any other buyer, but that is not how the MFN operates in Amazon's contracts with the Big Five Defendants. The Big Five rely on the agency model to sell their eBooks, which

---

[23] *Id.*

[24] *Id.*

[25] House Report at 295.

- 9 -

means that Amazon is not a buyer and the Big Five are not its suppliers. "Amazon," the House

Judiciary Committee observes, "has a history of using MFN clauses to ensure that none of its

suppliers or third-party sellers can collaborate with an existing or potential competitor to make

lower-priced or innovative product offerings available to consumers."[26] Although Amazon

changed the name and specific mechanisms over the years, the Committee found that Amazon

has continuously imposed contract provisions that effectively function as MFNs on book

publishers.[27] Amazon uses these provisions to prevent "publishers from partnering with any of

Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book

distribution."[28] Because of Amazon's market power in the retail eBook market, these contractual

requirements prevent Amazon's actual and potential retail rivals from introducing different

business models, offering promotional advantages, or offering customers lower prices on their

own.[29] The House Judiciary Committee's findings echo the conclusions of the EU Commission a

few years earlier.[30]

18.     **Business-model parity**: The EU Commission reports that Amazon employs the

"Business model parity clause" in its contracts with the Big Five and other eBook publishers.[31]

This clause requires the Big Five to notify Amazon of the distribution of their eBooks through

alternative business models and offer to Amazon the same material terms and conditions as any

other eBook retailer, even if the retailer operates under a different business model.[32] Examples of

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 295-96.

[30] 5.4.2017 EU Commission Decision.

[31] *Id.* at 9 and 12.

[32] *Id.* at 9.

alternative business models include subscriptions, streaming, rentals, book clubs, bundling of eBooks with the sale of print books, and reduced prices for partial downloads.[33] The clause therefore creates an anticompetitive disincentive for the Big Five Defendants to support and invest in alternative new and innovative business models.[34] This, in turn, reduces Amazon's eBook retail competitors' ability and incentive to develop alternative business models and differentiate their eBook offerings through these innovations.[35] It likewise deters the entry of new eBook retail rivals or the expansion of Amazon's existing retail rivals, which collectively weakens competition in the eBook retail market and strengthens Amazon's already-dominant position in that market.[36]

19.      **Selection parity**: Because of Amazon's eBook market dominance, its retail competitors need to provide additional value to consumers, for example in the form of differentiated content or early releases of eBooks because even temporarily offering content that is unavailable on Amazon would increase competition in the retail distribution of eBooks.[37] In a competitive market, the Big Five Defendants would have a financial incentive to incur the added investment cost of developing innovative products for exclusive release by Amazon's retail competitors or to offer them exclusive early releases, so that Amazon's competitors would gain market share and weaken Amazon's bargaining power over the Big Five.[38] But Amazon includes a selection parity provision in all its contracts with publishers, including the Big Five, which requires them to provide their eBooks for sale on Amazon.com at the earliest date available to

---

[33] *Id.*

[34] *Id.* at 22.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 30.

[38] *Id.* at 29-30.

other eBook retailers and include all the same features as eBooks available through Amazon's retail competitors.[39] It also requires that a publisher intending to sell an eBook anywhere in the marketplace that is not primarily text (*e.g.*, contain illustrations, graphics, or additional content) must notify Amazon and provide all assistance and materials that would be reasonably required for Amazon to create an equivalent eBook of that title. This global requirement of compatibility with Amazon's eBook readers effectively eliminates any economic incentive the Big Five Defendants have to develop innovative eBooks that might be read on a more technologically savvy platform.[40] Amazon's selection parity clause hurts consumers by inducing publishers to keep their eBook functionalities simple, which eliminates the more interactive and advanced functions that might otherwise be available through Amazon's eBook retail competitors.[41] It harms the retail competition because it forecloses a significant avenue for retailers to compete with Amazon by differentiating the product or making it available earlier.[42]

20.     **Notification provisions**: When the Big Five renegotiated their contracts with Amazon in approximately 2015, the consent decrees prevented them from having MFNs in their eBook contracts. Until about 2017, while they were still subject to this prohibition, Amazon and the Big Five agreed to notification provisions that served the same function as the prohibited MFN provisions (*i.e.*, Amazon's agency price parity, promotion price parity, discount pool, wholesale price parity and agency commission parity provisions discussed below).

21.     In this interim period, the Big Five's retail-price-notification clauses required them each to notify Amazon if their agency price on Amazon was higher than the retail price

---

[39] *Id.* at 10, 27.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 31.

010888-12/1431785 V1

charged via any competing eBook retailer.[43] The Big Five's promotion-notification provisions likewise obliged each of them to notify Amazon if they offered any promotional agency price or promotional content to an eBook retailer competing with Amazon and that the Big Five had not also offered to Amazon.[44] These clauses functioned like an MFN in that they allowed Amazon to prevent other retail platforms from undercutting the Big Five's eBook prices on Amazon.com.[45] Once notified of the availability of its Co-conspirators' eBooks at lower prices, Amazon typically "requested" that the same low retail price or promotional agency price charged on the platform of the competing eBook retailer would also be offered on Amazon.com.[46] If the publisher did not comply with Amazon's "request," Amazon retaliated or threatened to retaliate by removing the buy button for one or several of the publisher's eBooks on its platform, by excluding the publisher's eBooks from all promotional activity, by removing the pre-order buttons or by prominently displaying banners for alternative eBooks in an attempt to dissuade potential buyers from purchasing the publisher's eBook.[47] If they ever resisted, the Big Five stopped quickly and began turning down promotions proposed by Amazon's retail competitors because they would need to provide the same terms to Amazon.[48] These notification provisions are anticompetitive because they eliminated any incentive for the Big Five to offer lower prices or better terms to any of Amazon's competitors or new entrants.[49]

---

[43] 5.4.2017 EU Commission Decision at 11.

[44] *Id.*

[45] *Id.* at 36.

[46] *Id.*

[47] *Id.* and n.55.

[48] *Id.* at 37.

[49] *Id.*

22.     **MFNs**: Since about 2017 the consent decrees no longer prohibit MFNs in the Big Five contracts. Rather than relying on the notification provisions, it is believed that Amazon and the Big Five agreed to some or all of Amazon's MFN provisions (*i.e.*, Amazon's agency price parity, promotion price parity, discount pool provision, wholesale price parity and agency commission parity provisions discussed below).[50]

23.     **Agency-price parity**: Currently and since at least 2015, in the United States, the Big Five have agency agreements with Amazon.[51] The EU Commission reports that Amazon's contracts with publishers that operate under the agency model include an agency-price-parity provision.[52] The agency price is the price the Big Five publisher sets or, if discounting is permitted, the discounted price charged by an eBook retailer for the sale of an eBook to a consumer under an agency agreement.[53] The agency-price-parity provision requires the Big Five to set the eBook price for books they sell through Amazon no higher than the eBook price charged on eBook retail platforms that compete with Amazon.com. This clause harms consumers by increasing Amazon's dominance as the platform for eBook sales and raising the Big Five Defendants' eBook prices. If this clause did not exist, the Big Five would have a financial incentive to lower their eBook prices on rival platforms that charge lower commissions than Amazon and steer more sales to those platforms, thereby increasing the publishers' overall revenues and profits and evading Amazon's "stranglehold" over them.[54] The Big Five

---

[50] *See* House Report at 295 ("Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.").

[51] *See* sources cited *infra* n.5.

[52] 5.4.2017 EU Commission Decision at 32.

[53] *Id.* at 10 n.17.

[54] *Id.* at 34; House Report at 295.

Defendants also have an agency-commission-parity clause that requires the Big Five to provide Amazon a commission that is equal to or greater than the commission the Big Five Defendants pay to Amazon's retail competitors, so conversely the Big Five Defendants cannot diversify their distribution channels by offering Amazon's competitors a better commission.[55]

24. **Promotion-price parity**: Agency agreements also include a promotion-price-parity clause that requires the Big Five to provide Amazon any promotional agency price, promotional wholesale price, or promotional content that they offer to any other eBook retailer. The clause is anticompetitive because it gives the Big Five Defendants an incentive to prohibit Amazon's retail rivals from offering promotional eBook prices.[56]

25. **Discount pool**: The discount pool clause provides Amazon yet another way to enforce its MFN, whenever a competing eBook retailer offers a lower retail price than the publisher price on Amazon.com.[57] The clause relates to a "pool" of credits that Amazon may use at its discretion. If any eBook the publisher sells triggers this clause, Amazon may discount the agency price for that title or any other eBook title the publisher sells on Amazon.com.[58] Amazon calculates the pool based on the differences between the agency prices the Big Five charge for their eBooks on Amazon.com and any lower prices available through any other eBook retailer.[59] It then multiplies the difference in price by the number of units sold through Amazon for the

---

[55] *Id.* at 11.

[56] *Id.* at 32. Amazon also has a wholesale price parity clause with publishers that sell at wholesale. This clause ensures that the publisher cannot offer Amazon the same title on the same date for a higher wholesale or retail price. *Id.* at 30. However, the Big Five have agency agreements with Amazon.

[57] *Id.* at 35 n.54.

[58] *Id.* at 32.

[59] *Id.*

010888-12/1431785 V1

duration of the time that the price on Amazon exceeded the competitor's price.[60] This clause is anticompetitive because it prevents Amazon's retail rivals from competing on price and eliminates the discounts that would otherwise be available to consumers.

26. At the conclusion of the European Commission's two-year investigation, Amazon agreed not to enforce its MFN and similar provisions in Europe. It affirmed that for the next five years it would no longer require its publishers in the European market to provide Amazon equal or better terms than their offers to its rival booksellers. It also affirmed that it would no longer require European publishers to pass on information to Amazon about its rival booksellers' alternative or new business models, release dates, catalogue of eBooks, the features of their eBooks, promotions, agency price, agency commission and wholesale price.[61] Commissioner Margrethe Vestager said that Amazon's consent to withdrawing its MFN and similar anticompetitive provisions will "open the way for publishers and [booksellers] to develop innovative services for eBooks, increasing choice and competition to the benefit of European consumers."[62]

27. Amazon's and the Big Five's continued anticompetitive use of MFNs in the United States is astonishingly brazen. Less than a decade ago, the DOJ and EU engaged in high-profile enforcement actions against the Big Five and Apple for their use of anticompetitive MFNs in the trade eBooks market. And even more recently, the EU investigated Amazon in 2015, and found that its own use of anticompetitive MFNs and similar provisions harmed competition in eBook sales. Despite multiple investigations and censure for the use of anticompetitive MFNs and similar provisions, Amazon and the Big Five have engaged and

---

[60] *Id.* at 35.

[61] *Id.*

[62] *Id.*

continue to employ the same devices in a conspiracy to fix the retail price of trade eBooks in violation of Section 1 of the Sherman Act.

28.     Amazon's agreement with its Co-conspirators is an unreasonable restraint of trade that prevents competitive pricing and causes Plaintiffs and other consumers to overpay when they purchase eBooks from the Big Five through an eBook retailer that competes with Amazon. That harm persists and will not abate unless Amazon and the Big Five are stopped; Plaintiffs seek a nation-wide injunction under the Clayton Act to enjoin Defendants Amazon and the Big Five from enforcing this price restraint.

29.     Amazon's conduct also violates Section 2 of the Sherman Act. Amazon has obtained monopoly power in the U.S. retail trade eBook market, where it accounts for 90% of all eBook sales. Through its conspiracy with the Big Five Co-conspirators, Defendant Amazon has willfully acquired its monopoly power in the U.S. retail trade eBook through anticompetitive conduct, fixing the retail price of trade eBooks and causing supracompetitive prices for eBooks sold by or through Amazon's eBook retailer rivals. Such conduct is an abuse of monopoly power in violation of Section 2.

30.     Plaintiffs seek injunctive relief and monetary recovery under the Clayton Act for all overcharges incurred by the Class.

## II.     JURISDICTION

31.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

32.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse

010888-12/1431785 V1

citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

33.     Plaintiffs are residents of Texas, Arizona, Iowa, New York, and Florida, who purchase eBooks from the Big Five through one or more of Amazon's rival booksellers. Plaintiffs were harmed and injured financially because of Defendants' conduct, as described further herein.

34.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, because they reside in this District or may be found or transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[63] It has five warehouses in New York, including two in Manhattan.[64] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout

---

[63] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[64] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States ; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

Manhattan.[65] Amazon has eight office properties in Manhattan, most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[66]

35.     Exercising personal jurisdiction is also appropriate under Section 302(a) of New York's long-arm statute because Amazon transacts business in the State of New York, directly or through agents, such that it has sufficient minimum contacts with New York. In addition to business it transacts in New York City, Plaintiffs aver on information and belief that Amazon's sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of substantial solicitation necessary to satisfy the minimum contacts required to support this Court's exercise of personal jurisdiction over Amazon.

### III.     VENUE

36.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

---

[65] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where are Amazon Books stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F&cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.

[66] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*. NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-space.html.

## IV.    PARTIES

**A.    Plaintiffs**

**1.    Shannon Fremgen**

37.    Shannon Fremgen is a resident of Denton, Texas. She regularly purchases eBooks from Barnes & Noble. Ms. Fremgen also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed through the Amazon.com platform. Many of the eBooks Ms. Fremgen purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon.com platform:

a.    From Hachette she purchased *Smokescreen* on November 28, 2019, for $14.99, *The Persuasion* on August 24, 2020, for $13.99, and *Chaos* for $14.99 on September 1, 2020, all prices equal to the price of the same book sold through the Amazon.com platform.

b.    From HarperCollins she purchased *After Sundown* on August 24, 2020, for $12.99, *Mystere Parish Complete Collection* on December 5, 2020, for $12.99, and *Death Echo* for $7.99 on May 12, 2020, all prices equal to or higher than the price of the same book sold through the Amazon.com platform.

c.    From Macmillan she purchased *The Full Series, the Complete Collection* on December 14, 2020, for $41.55, *Hindsight* on January 7, 2020, for $14.99, and *Dark Tribute* for $9.99 on October 15, 2019, all prices equal to the price of the same book sold through the Amazon.com platform.

d.    From Penguin she purchased *Twisted Twenty-Six* on January 1, 2020, for $13.99, *Burn* on November 2, 2020, for $8.99, and *Vision Impossible* on November 12, 2019, for $7.99, all prices equal to the price of the same book sold through the Amazon.com platform.

e.    From Simon & Schuster she purchased *Labyrinth* on October 12, 2019, for $14.99, *Deadlock* on July 28, 2020, for $14.99, and *Fortune and Glory* on November 12, 2019,

also for $14.99, all prices equal to the price of the same book sold through the Amazon.com platform.

Amazon's anticompetitive agreement with the Big Five prevented the price competition with Amazon.com that would have resulted in a lower market price for these books. Ms. Fremgen has been injured and will continue to be injured by paying more for the Big Five's eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**2.    Mary Christopherson-Juve**

38.    Mary Christopherson-Juvee is a resident of Yuma, Arizona. She regularly purchases eBooks from Barnes & Noble. Ms. Christopherson-Juve  also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed through the Amazon.com platform. Many of the eBooks Ms. Christopherson-Juve purchased from the Big Five through Amazon's rival eBook retailer, they were also sold by the Big Five through the Amazon.com platform:

a.    From Hachette she purchased *Where the Crawdads Sing* on July 12, 2019, for $14.99, *The Guardians* on October 21, 2019, and *Camino Winds* on May 5, 2020, for $14.99 each, prices equal to the price of the same book sold through the Amazon.com platform.

b.    From HarperCollins she purchased *The Order* on July 20, 2020, for $14.99, a price equal to the price of the same book sold through the Amazon.com platform.

c.    From Macmillan she purchased *The Defense* on November 21, 2019, for $14.99 and *The Wednesday Group* on July 13, 2020, for $7.99, both prices equal to the price of the same book sold through the Amazon.com platform.

d.        From Penguin she purchased *The 19th Christmas* on December 13, 2019, for $14.99, *The Summer House* on July 3, 2020, and *Untamed* on August, 17, 2020, for $14.99 each, a price equal to the price of the same book sold through the Amazon.com platform.

e.        From Simon & Schuster she purchased *Storm Front* on October 31, 2019, for $8.99, *Bad Blood* on February 16, 2020, for $9.99, and *Bloody Genius* on February 21, 2020, for $14.99, all prices equal to the price of the same book sold through the Amazon.com platform. Defendants' anticompetitive agreement prevented the price competition with Amazon.com that would have resulted in a lower market price for these books. Ms. Christopherson-Juve has been injured and will continue to be injured by paying more for the Big Five's eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 3.        Denise DeLeon

39.        Denise DeLeon is a resident of Dysart, Iowa. She regularly purchases eBooks from Barnes & Noble. Ms. DeLeon also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed through the Amazon.com platform. Ms. DeLeon purchased eBooks from the Big Five through Amazon's rival eBook retailer, including her purchase of *Turbo Twenty-Three* from Penguin on September 14, 2020, for $2.99, a price equal to the price of the same book sold through the Amazon.com platform. Defendants' anticompetitive agreement prevented the price competition with Amazon.com that would have resulted in a lower market price for these books. Ms. DeLeon has been injured and will continue to be injured by paying more for the Big Five's eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**4.     Sandra Wilde**

40.     Sandra Wilde is a resident of New York City. She purchases eBooks from Apple Books. Ms. Wilde also shops on the Amazon.com platform, but she is not making any claims relating in any way to any products or services sold or distributed through the Amazon.com platform. Many of the eBooks Ms. Wilde purchased from the Big Five through Amazon's rival eBook retailer, they also sold through the Amazon.com platform:

  a.  From HarperCollins she purchased *Since We Fell* on January 29, 2021, for $9.99, a price equal to the price of the same book sold through the Amazon.com platform.

  b.  From Penguin she purchased *How Did I Get Here* on January 16, 2021, for $14.99, and *That Old Country Music* on January 21, 2021, for $11.99, both prices equal to the price of the same book sold through the Amazon.com platform.

Defendants' anticompetitive agreement prevented the price competition with Amazon.com that would have resulted in a lower market price for these books. Ms. Wilde has been injured and will continue to be injured by paying more for the Big Five's eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**5.     Michael Wilder**

41.     Michael Wilder is a resident of Bradenton, Florida. He regularly purchases eBooks from Apple Books on behalf of himself and his family. Mr. Wilder also shops on the Amazon.com platform, but he is not making any claims relating in any way to any products or services sold or distributed through the Amazon.com platform. Many of the eBooks Mr. Wilder purchased from the Big Five Defendants through Amazon's rival eBook retailer, they also sold through the Amazon.com platform:

a.       From Hachette he purchased *Rather Be the Devil* on February 15, 2017, for $13.99 and *When the Music's Over* on Monday, July 2, 2018, for $10.99, both prices equal to the price of the same books sold through the Amazon.com platform.

b.       From HarperCollins he purchased *Manic* on June 6, 2017, for $10.99, a price equal to the price of the same book sold through the Amazon.com platform, and *The Price of Love and Other Stories* on November 24, 2018, for $10.99, a price higher than the price of the same book sold through the Amazon.com platform.

c.       From Macmillan he purchased *The Fix* on April 17, 2017, for $14.99 and *The First Patient* on April 5, 2018, for $2.99, both prices equal to the price of the same books sold through the Amazon.com platform.

d.       From Penguin he purchased *Empire's End: Aftermath (Star Wars)* on April 7, 2017, for $14.99, and *All We Ever Wanted* on August 10, 2018, for $14.99, both prices equal to the price of the same book sold through the Amazon.com platform.

e.       From Simon & Schuster he purchased *Deep Freeze* on October 17, 2017, for $ 14.99 and *The North Water* on September 12, 2018, for $3.99, both prices equal to or higher than the price of the same book sold through the Amazon.com platform. Defendants' anticompetitive agreement prevented the price competition with Amazon.com that would have resulted in a lower market price for these books. Mr. Wilder has been injured and will continue to be injured by paying more for the Big Five's eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

## B.       Defendants

### 1.       Amazon

42.       Amazon is an online retailer giant with its principal headquarters in Seattle, Washington and with facilities and employees scattered throughout the United States, including

in this District. Amazon is vertically integrated and is active upstream as a publisher, with its own imprints, and downstream as an eBook retailer. Amazon sells eBooks and offers eBook reading subscription services to its retail customers in New York and throughout the United States from the Amazon.com platform. Amazon also operates Amazon Publishing, a division of Amazon that publishes books and competes with the Big Five Defendants.

### 2.   Hachette

43.     Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

### 3.   HarperCollins

44.     Defendant HarperCollins is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages, and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins' authors are winners of the Nobel Prize, the

Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

### 4.     Macmillan

45.     Defendant Macmillan is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Macmillan is part of a global trade-publishing group operating worldwide, with trade publishing companies in the United States, Germany, the United Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the US: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press and Tor/Forge. Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, and the Printz Award.

### 5.     Penguin

46.     Defendant Penguin is a leading U.S. trade publisher, organized under the laws of Delaware, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With a rich history dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275 independent publishing imprints and brands on five continents and contains books and products for readers of all ages at every stage of life. Penguin publishes 15,000 new titles annually and sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include more than 80 Nobel Laureates and hundreds of the world's most widely read authors.

6.    **Simon & Schuster**

47.    Defendant Simon & Schuster is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. It publishes 2000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing and Simon & Schuster Audio and international companies in Australia, Canada, India and the United Kingdom. Simon & Schuster proudly brings the works of its authors, which include, among others, Dale Carnegie, Sharon Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway and Stephen King, to more than 200 countries and territories. Its books and authors have been winners of the Pulitzer Prize, National Book Award, National Book Critics Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately 50% of all trade books published.[67]

## V.    STATEMENT OF FACT

A.    **The Big Five's dominance in trade books.**

48.    The market in trade eBooks is defined by the trade publishers that produce them. Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of the New York Times bestsellers.[68] The Big Five's dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing

---

[67] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[68] *United States v. Apple, Inc*., 791 F.3d 290, 298 (2d Cir. 2015).

houses, consisting of vast numbers of subsidiary publishers or "imprints," as the following

illustrations demonstrate[69]:

49.     Hachette: [70]



---

[69] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259-1263 (May 2019).

[70] The Big Five US Trade Book Publishers, Almossawi (June 20, 2016), https://almossawi.com/big-five-publishers [https://perma.cc/W49V-PEGP].

50.    HarperCollins:[71]



51.    MacMillan[72]



---

[71] *Id.*

[72] *Id.*

52.    Penguin[73]



[73] *Id.*

53.    Simon & Schuster: [74]



54.    HarperCollins was originally founded in 1817 as J. and J. Harper, which eventually became Harper & Brothers and then Harper & Row.[75] Hachette's American roots began as Little, Brown and Company, founded in 1837.[76] In the 1920s, Penguin, a leading British publishing house, acquired multiple imprints from formerly independent publishers, such as Viking, Putnam, and Dutton.[77] Simon and Schuster was founded in 1924, and it has been variously owned by Marshall Field, Gulf + Western, Viacom, and CBS Corporation and is soon to be acquired by Penguin.[78] Large publishing companies began to dominate the market in the 1930s and by 1950, it became "concentrated in a relatively few houses."[79]

55.    In the 1960s, Random House bought Alfred A. Knopf, Inc.; the Crowell-Collier Publishing Company acquired the Macmillan Company; and Henry Holt & Co., Rinehart & Co.,

---

[74] *Id.*

[75] *Supra* Lee.

[76] *Id.*

[77] *Id.*

[78] *Id.*; Alexandra Alter and Edmund Lee, *Penguin Random House to Buy Simon & Schuster*, NYT (Nov. 25, 2020), https://www.nytimes.com/2020/11/25/books/simon-schuster-penguin-random-house.html.

[79] *Supra* Lee.

and the John C. Winston Company merged; Time Warner acquired Little, Brown and Company, and this combination was eventually absorbed by Hachette Book Group.[80] Consolidation reached a fevered pitch in the 1980s. Between November 1985 and November 1986 alone, there were fifty-seven major publishing acquisitions.[81] News Corp. acquired Harper & Row in 1987, which formed HarperCollins after it acquired William Collins & Sons in 1990.[82] In the 2000s, Hachette, which is owned by a French media conglomerate, expanded rapidly into English-language books, buying Hodder Headline and Warner Books.[83] By 2006, the six largest U.S. trade book publishers (the current Big Five) accounted for ninety percent of total sales.[84] In 2013, Penguin merged with Random House, producing a combined group that now controls approximately twenty-five percent of the English-language publishing market, and is poised with the pending merger with Simon & Schuster to control 30%.[85]

56.     On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately a third of all trade books published.[86] News Corp Chief Executive Robert Thomson said in a statement. "This literary leviathan would have 70% of the U.S. literary and general fiction market."[87]

---

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*; *Supra* Alter & Lee.

[86] AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposed-sale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, *Penguin to buy Simon & Schuster, create publishing giant*, Associated Press (Nov. 25, 2020, https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp-89ec475bd7783fea199a378c60261f8b.

[87] Jordans & Italie.

010888-12/1431785 V1

57.     Fewer and fewer trade publishers can compete with the Big Five (soon to be Big Four). Houghton Mifflin Harcourt recently announced that it, too, was exploring a sale of its trade publishing division, potentially with Macmillan or Hachette.[88]

**B.     Amazon's dominance over its rival booksellers.**

58.     Amazon sells more books than any other single retail outlet in history.[89] Twenty-five years ago, there were around four thousand independent bookstores in the U.S., and many functioned as local cultural centers, where people browsed and exchanged ideas.[90] Today, there are fewer than two thousand, and the economic power is concentrated in the hands of one bookseller.[91] Barnes & Noble, the second largest retail bookseller and former chief nemesis of independent bookstores, has long been in decline, closing 150 outlets over the past decade.[92] Amazon's rise in the book industry is even more pronounced in the eBook market, where it enjoys nearly 90% of the market and its closest competitor, Apple, has a distant 6% share:[93]

---

[88] *Supra* Alter & Lee.

[89] Porter Anderson, *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market,* Publishing Perspectives (Aug.17, 2020), https://publishingperspectives.com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

[90] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words.

[91] Amy Watson, Number of independent bookstores in the U.S. 2009-2019, Statista (Oct 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

[92] Larry Light, The Barnes & Noble Buyout: A Godsend for Book Readers and Investors, Forbes (Jun. 24, 2019), https://www.forbes.com/sites/lawrencelight/2019/06/24/the-barnes-noble-buyout-a-godsend-for-book-readers-and-investors/?sh=70936407ef8f.

[93] *Supra* Day and Gu.



59.     One distinct difference between Amazon and its rival booksellers is that Amazon treats books as a commodity, like toothpaste or tennis rackets.[94] While other booksellers pique their customers' curiosity and stimulate new interests, Amazon caters to its customers' existing or analytically predicted needs or desires. According to the market research firm Codex Group, readers browsing in a traditional bookstore discover new books they would like to read at about three times the rate they do while shopping on Amazon.[95] Even though it dominates the book market, Amazon accounts for only 7% of new book discovery, while local bookstores, shunted to the periphery of the book market, account for 20% of new discoveries.[96]

60.     This is not a coincidence. Amazon founder and former hedge fund manager, Jeff Bezos, did not start an online bookstore out of a love of books. Shel Kaphan, Bezos's former deputy, explains that Mr. Bezos's decision to start Amazon as a bookstore "was totally based on

---

[94] *Id.*

[95] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS (Nov 29. 2016), https://ilsr.org/amazons-monopoly/ at 27.

[96] *Id.*

the property of books as a product."[97] Books are easy to ship, hard to break, and there are far too many of them, in and out of print, to sell even a fraction of them at a physical store.[98]

61.     According to a New York literary agent, books were Amazon's version of "a gateway drug."[99] Long before Google found a way to commoditize consumer data, Amazon recognized that it was the key to the new economy and that selling books was the optimal way to gather detailed, consumer preference data, particularly from affluent, educated shoppers.[100] John Sargent, the former chief executive of Macmillan, noted that Amazon was never just a bookstore: "Books were going to be the way to get the names and the data. Books were [Amazon's] customer-acquisition strategy."[101] After collecting data on millions of customers, Amazon would figure out how to sell everything else.[102]

## C.     EBooks' arrival disturbed the trade publishing industry.

62.     When Amazon's Kindle launched in 2007, it was the first e-reader to gain widespread commercial acceptance, and Amazon quickly became the market leader in the sale of eBooks and eBook readers.[103] Through 2009, Amazon dominated the eBook retail market, selling nearly 90% of all eBooks. Amazon gained market share by charging just $9.99 for many New Release and bestselling eBooks. To compete with Amazon, other eBook retailers also adopted a $9.99 or lower retail price for many eBook titles.[104] At the time, the Big Five distributed both print and digital books through a wholesale pricing model, whereby the

---

[97] *Supra* Packer.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648-49 (S.D.N.Y. 2013).

[104] *Id.* at 649.

publisher set the list or suggested retail price and then sold the eBooks to a retailer for a wholesale price, which was often a percentage of the list price. To reflect the many cost savings associated with the distribution and sale of eBooks, *e.g.*, no cost for the printing, storage, packaging, shipping, or return of eBooks, publishers typically set their wholesale price for eBooks at a 20% discount from the equivalent print book.[105] The retailer was then free to sell the eBook to consumers at whatever price it chose. With a digital book discount, Amazon's $9.99 price point roughly matched the wholesale price of many of its eBooks.[106]

63.     The Big Five feared that Amazon's $9.99 price point would hurt their profits. In the short-term, the Publishers believed the low price point was eating into sales of their more profitable hardcover books, which were often priced at thirty dollars or more, and in the long-term, they feared that consumers would grow accustomed to eBooks priced at $9.99 and would expect comparable prices for print books.[107]

64.     The Big Five also feared Amazon's growing power in the book industry and were worried that Amazon would render them obsolete by negotiating directly with authors and literary agents for rights.[108] To counter Amazon's growing power, the Big Five determined that they needed to force Amazon to abandon its discount pricing model. As Hachette bluntly put it, they had to prevent Amazon's "wretched $9.99 price point becoming a de facto standard."[109] Simon & Schuster likewise described it as the "basic problem: how to get Amazon to change its

---

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.* at 650, 653.

pricing" and move off its $9.99 price point, and Macmillan referred to Amazon's price policy as "book devaluation to $9.99."[110]

65.     Each of the Big Five expressed its frustration to Amazon about its $9.99 pricing. In February 2009, Penguin told Amazon that "their 9.99 model" was "not a good sustainable one."[111] HarperCollins similarly warned Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers."[112] In March 2009, Macmillan met with Amazon to likewise express concern with the $9.99 price point and indicated that "all the pubs" were talking about it.[113] In June 2009, Simon & Schuster told Amazon that the $9.99 price point was "a mistake" and "terrible for the business."[114] In early December 2009, Hachette told Amazon that its $9.99 pricing posed a "big problem" for the industry, but that if Amazon would raise eBook prices by even one or two dollars, it would "solve the problem."[115]

66.     Frustrated by Amazon's initial unwillingness to play ball at that time, the Big Five turned to Apple to put an end to discounting eBook prices. Apple willingly complied because it recognized that selling eBooks was potentially even more lucrative than selling digital music, where Apple dominated.[116] Apple believed that the iPad, which it would launch in 2010, would be a transformational e-reader. In contrast to the existing black-and-white e-readers, the iPad would display not only text but also illustrations and photographs in color on a backlit screen and would have audio and video capabilities, which would enhance the eBook reading experience.[117]

---

[110] *Id.* at 650.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.* at 654-55.

[117] *Id.* at 655.

67.     Beginning on December 8, 2009, Apple's team contacted the Big Five to set up meetings the following week to discuss an "extremely confidential" subject. Apple made it clear that it would be trying to meet with each of the Big Five.[118] Even before it met with any of the Publishers on December 15, Apple already knew that they were eager to raise the $9.99 price point for eBooks, and that they were willing to coordinate their efforts to achieve that goal.[119] To entice the Big Five, Apple offered to raise the price of eBooks above $9.99. Over the course of the next few weeks, Apple and the Big Five agreed that to make this happen, the Big Five would have to adopt the agency model, whereby the publishers would set the prices and sell the books and Apple would receive a 30% commission for hosting the sale.[120]

68.     Initially, some of the Big Five objected to the agency model. To force their hand, Apple's in-house counsel introduced an MFN clause in the proposed agreements that would ensure that the Big Five's eBooks would be sold in Apple's eBookstore for the lowest retail price available in the marketplace.[121] Apple had used an MFN in one of its music agreements before, but it had purchased the music under a wholesale model. Apple's use of an MFN *for a retail price* was a unique feature of its eBook agency agreements.[122] By combining the MFN with the pricing tiers, Apple allowed the Big Five to set the retail prices of their books, while at the same time guaranteeing that Apple would never have to compete on price because if another retailer sold at a lower price, the publishers would have to lower their price at Apple's eBookstore.[123] As

---

[118] *Id.*

[119] *Id.* at 656.

[120] *Id.* at 658-62.

[121] *Id.* at 662.

[122] *Id.*

[123] *Id.*

a practical matter, the Big Five would need to adopt an agency model with other eBook retailers to prevent retail price competition.[124]

69.     They ultimately agreed to cap eBook prices at $12.99 for New Release titles with hardcover list prices of $30 or under and set a $14.99 price tier cap for New Release titles with hardcover list prices above $30, with incremental price tier increases for every $5 increase in the hardcover list price above $30. For books other than New Releases, the price cap was set at $9.99.[125] Notably, the revenue the Big Five would receive per eBook sold through the Apple store was substantially less than what it was currently receiving under its wholesale arrangements. But Apple played to Big Five's long-term interest in raising eBook prices to protect the prices of print books.[126]

70.     The Big Five forced Amazon to accept the agency model by threatening to withhold publication of their eBooks by seven months after release of their print publications.[127] After an unsuccessful attempt at retaliation, which temporarily devalued Amazon's stock, it acceded to their demands and filed a complaint with the FTC.[128] By the end of March 2010, Amazon had completed agency agreements with four of the Big Five publishers and completed that last one in June 2010. Each of the new agreements included a "model parity" clause. This gave Amazon the option to return to a wholesale model of distribution if the publisher agreed to a wholesale distribution arrangement with any other eBook retailer.[129]

---

[124] *Id.* at 663.

[125] *Id.* at 667.

[126] *Id.* at 665.

[127] *Id.* at 679-80.

[128] *Id.* at 680-81.

[129] *Id.* at 681.

71.    Google entered the eBook market at the same time as Apple. The Big Five made it clear to Google that their Agreements with Apple made them "unwilling to enter into non-agency agreements with Google."[130] The Big Five also adopted an agency model with Barnes & Noble.[131]

72.    The effect was this sudden and uniform price increase, as the following graph indicates.[132] When Apple's eBookstore opened in April 2010, eBook prices soared for the four publishers that finalized their agency agreements in March. Penguin's price increases followed within few weeks of executing its agreement with Amazon.[133]



---

[130] *Id.* at 686.

[131] *Id.* at 657, 675, 700.

[132] The graph is included in the Court's 2013 order following a bench trial. *Id.* at 683. The bottom flat line represents the average prices of non-major publishers, who were not a part of the conspiracy. Random House, then separate from Defendant Penguin, also did not join in the conspiracy and its average prices remained a steady $8. Although it later followed suit and adopted an agency model and raised prices, too. *Id.* at 685.

[133] *Id.* at 683.

010888-12/1431785 V1

73.     In the short term, the plan paid off for Apple and the Big Five. Apple seized 22% of the eBooks market in the first two months of operation.[134] And while the Big Five lost eBook revenue under the agency model, they offset their losses by raising the prices of their hardcover books.[135]

74.     However, it was not long before Apple and the Big Five faced the legal consequences of their collusion. In December 2011, they faced a class action in this District, and in Europe, the EU Commission opened its own investigation. Several months later, the DOJ and 37 attorneys general brought their own enforcement actions. After a bench trial against Apple in this District, the court found that Apple and the publishers had engaged in a *per se* illegal horizontal price fixing agreement, which had the intent and effect of eliminating price competition in the eBook market and increasing the retail price of eBooks.[136] The court entered a $450 million judgment against Apple.

75.     Rather than proceeding to trial, the Big Five entered into consent decrees with the DOJ, which required them to terminate their agreements with Apple and to terminate any agreement with other eBook retailers that restricted the retailers' ability to discount eBooks.[137] For a period of two years, the Big Five agreed that they would permit eBook retailers to discount eBook prices and to offer promotions to encourage consumers to purchase eBooks and for a five-year period they agreed not to enter into any agreement with an eBook retailer that contains a Price MFN in the sale of eBooks.[138] In Europe, the Big Five likewise agreed to a two-year

---

[134] Marco Tabini, *Apple grabs 22 percent of eBook market with iBooks* Macworld (Jun. 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.

[135] *Apple Inc*., 952 F. Supp. 2d at 683.

[136] *Apple Inc*., 952 F. Supp. 2d at 694.

[137] *See, e.g.*, Final Judgment Penguin at 8-9.

[138] *Id.* at 11 and 18.

"cooling off" period, in which the Big Five agreed to allow retailers to discount their eBooks and to a five-year period, in which they would not include MFNs in their contracts.

76.     During the two-year cooling off period between 2013 and 2015, eBooks enjoyed competitive pricing once again, but prices increased as soon as the publishers renewed their agency agreements with Amazon, and in 2015 the Big Five priced newly-published eBooks at a higher price point than eBooks published during the cooling off period.

77.     Each of the Big Five's eBook prices follow this general historical pattern, as the following charts demonstrate:











010888-12/1431785 V1

**D.      As a trade publisher, Amazon benefits from the Big Five's inflated eBook prices.**

78.      According to an informed source, Amazon's deteriorating relations with publishers offended Bezos's ideal of "seamless" commerce.[139] "The company despises friction in the marketplace," according to the Amazon insider. "It's easier for us to sell books and make books happen if we do it our way and not deal with others. It's a tech-industry thing: 'We think we can do it better.'"[140] And so in 2009, during the apex of its hostilities with the Big Five, Amazon established Amazon Publishing, which is now "a leading publisher of commercial and literary fiction, nonfiction, and children's books."[141]

79.      Peter Hildick-Smith, CEO of the book-industry analysis firm the Codex Group estimates that Amazon Publishing puts out 1,100 titles a year.[142] Estimating sales for those 1,100 titles is difficult because Amazon's proprietary methods of distribution obscure the sales figures from the third-party researchers who determine best-seller lists.[143] Amazon cryptically reveals only that at least 36 of its authors have sold at least a million books.[144] Best-selling author Dean Koontz has a five-book deal with Amazon Publishing.[145] One imprint, Amazon Crossing, is the largest publisher of translated fiction in the United States.[146] Two books published by Amazon Publishing have won literary awards and hundreds of others have been nominated.[147]Amazon

---

[139] *Supra* Packer.

[140] *Id.*

[141] Amazon Publishing, https://amazonpublishing.amazon.com/about-us.html.

[142] *Supra* Montgomery.

[143] *Id.*

[144] Amazon Publishing.

[145] *Supra* Montgomery.

[146] *Id.*

[147] *Id.*

currently operates 16 imprints (*i.e.*, publishing labels) and has nine offices around the world[148]:



80.     Amazon benefits from the Big Five's high prices because it faces less price competition in the eBook trade publication market.

**E.     As an Ebook retailer, Amazon employs anticompetitive restraints to immunize its platform from the negative effects of the Big Five's inflated eBook prices.**

81.     As the largest print and eBook retailer, Amazon's bargaining power with the Big Five is immense. It could have retained its right to discount their eBooks, but it agreed to let them set their own inflated prices in exchange for high commissions and the Big Five's guarantee that no other eBook retailer could offer their eBooks at a lower price or better terms.

82.     According to the House Judiciary Committee, Amazon has always employed MFNs or their equivalents in its contracts with trade publishers.[149] The EU Commission makes clear that even when the Big Five were prohibited from having MFNs in their eBook contracts, they and Amazon got around that restriction by employing notification provisions that had precisely the same effect.[150]

83.     Whether using MFN clauses (business-model-parity, agency-price-parity, agency-commission-parity, price-promotion-parity, selection-parity, or discount-pool provisions) or notice provisions, the objective is always the same: to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[151] Through these restraints, Amazon has acquired and maintained its monopoly power.[152] Competitors lack any incentive to offer promotional advantages or alternative business models, like eBook rentals, to gain a following because Amazon demands

---

[148] Amazon Publishing.

[149] House Report at 295-96.

[150]  5.4.2017 EU Commission Decision at 11.

[151] House Report at 295-96.

[152] *Id.*

that the Big Five offer that same option on Amazon.com.[153] This results in fewer innovative products or business models and higher prices for eBooks consumers.[154]

**F.    Amazon is the subject of a government investigation for possible antitrust violations, including whether it uses its relationship with its third-party sellers to harm competition.**

84.    The EU Commission investigated Amazon's MFNs in its contracts with eBook publishers over a two-year period, beginning in 2015. The Commission raised numerous concerns relating to Amazon's MFNs and notification clauses, which serve the same purpose as its MFNs. The Commission found that Amazon used these clauses to shrink existing competitors' market share and prevent potential competitors from entering the market.

85.    In June 2019, the House Judiciary Committee began a year-long investigation that led to seven hearings on digital markets, touching on issues like data privacy, innovation, the free press and competition. As part of that investigation, the Committee requested documents and information on Amazon's market share and closest competitors in numerous submarkets of the U.S. retail and ecommerce retail markets.[155] At one of the hearings in late July 2020, Amazon CEO Jeff Bezos testified in person at a hearing entitled "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," where the Committee raised concerns about Amazon's market power and whether it gives an unfair advantage over third-party merchants when it competes with them to sell similar products on its own platform. In a written statement, the presiding Chair expressed concerns that Amazon's

---

[153] 5.4.2017 EU Commission Decision at 20-38, 43.

[154] *Id.*

[155] Letter from U.S. House of Representatives Committee on the Judiciary to Jeff Bezos, Amazon CEO (Sept. 13, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

dominance in "online marketplace sales" presents a risk that a single action by that company could "affect hundreds of millions of us in profound and lasting ways."[156]

86.     On October 5, 2020, the Committee issued a report. The Committee concluded that Amazon "serves as a gatekeeper over a key channel of distribution," the U.S. online retail market,[157] and that by controlling access to the online retail market, it wields tremendous power, which it can abuse "by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on" it.[158] It also "uses its gatekeeper position to maintain its market power and "to further entrench and expand" its dominance.[159] The Committee compared Amazon's monopoly power and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[160]

87.     The report, which also investigated the marketplace dominance of two other large tech companies, relied on 1,287,997 documents and communications; testimony from 38 witnesses; a hearing record that spans more than 1,800 pages; 38 submissions from 60 antitrust experts from across the political spectrum; and interviews with more than 240 market participants, former employees of the investigated platforms, and other individuals totaling thousands of hours.[161] Notably, over the Committee's objection, the companies withheld critical "documents that were produced to antitrust authorities in ongoing investigations, or that related to the subject matter of these ongoing investigations."[162]

---

[156] *Supra* Press Release (Jul. 29, 2020).

[157] House Report at 6, 15.

[158] House Report at 6.

[159] *Id.*

[160] *Id.*

[161] *Id.* at 7.

[162] *Id.*

88.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in California, Washington, and New York.[163]

89.     According to Gene Kimmelman, the president of Public Knowledge, a Washington-based consumer advocacy group: "This should be a wake-up call to both Google and Amazon to behave themselves because it at least shows that the Justice Department and FTC are thinking about them."[164]

## VI.     INTERSTATE TRADE AND COMMERCE

90.     Defendants' acts as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Defendants publish, sell or facilitate sales of trade eBooks across, and without regard to, state lines.

## VII.     RELEVANT MARKET

91.     The antitrust injuries alleged herein, including harm to consumers, have occurred in the U.S. retail market for trade eBooks. Amazon and its Co-conspirators' agreed price restraints unreasonably restrain these markets. Plaintiffs seek relief on behalf of themselves and other purchasers, who purchase trade eBooks from one or more of the Big Five Co-conspirators through retail channels other than the Amazon.com platform.

92.     Defendants' restraints on competition directly impact the U.S. retail market for trade eBooks, as alleged herein.

93.     Trade books represent a distinct product market from non-trade books, such as reference and academic books.[165] They also represent a distinct product market from self-

---

[163] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[164] *Id.*

[165] *Apple*, 952 F. Supp. 2d at 648 n.4.

published books. Whereas a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution.[166] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[167] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publisher's considerable investment in that process.

94.     Within the trade book market, there is also a distinct product market for the retail sale of trade eBooks that is separate from retail distribution of trade print books and trade audio books.[168]

95.     Products' functional interchangeability typically depend on the products' physical characteristics.[169] EBooks are digital products for visual reading. They have different physical characteristics from print books, which are physical items. They are also different from audio books, which may be physical or digital but are made for listening, not visual reading. These distinguishing characteristics affect the substitutability of print books and audiobooks in the supply or demand for eBooks.[170]

---

[166] Leigh Shine, *Calculating the Odds of Getting A Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[167] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

[168] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 694 n.60 (S.D.N.Y. 2013) (defining the relevant market as trade eBooks in the United States); 5.4.2017 EU Commission Decision at 14.

[169] 2 Federal Antitrust Law § 10.2 (2020).

[170] 5.4.2017 EU Commission Decision at 14.

96.     From both a demand side and a supply side analysis, trade print books and trade audiobooks are also not sufficiently strong substitutes to warrant their inclusion in the product market of which trade eBooks form a part.[171]

97.     The EU commission found that, as regards demand-side substitutability, consumers are unlikely to switch from eBooks to print versions in case of a 5-10% increase in the retail price of eBooks because overall, even with a 5-10% increase of their retail price, eBooks would generally be priced significantly lower than print books.[172] Consumer preferences also play an important role in distinguishing the two formats. For example, the EU Commission's investigation of the eBooks market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book include: (i) eBooks are easier to carry than print books when travelling, (ii) eBooks have functionalities not available for print books, such as the possibility to change the type and size of the font; (iii) eBooks can support interactive features such as video or music add-ons, dictionaries, and links to information about the subject matter of the book or the author, and (iv) eBooks can be purchased and downloaded immediately at any time.[173] The EU commission also noted that a significant number of titles are only, or more readily, available in the eBook format.[174]

98.     To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The EU commission found that this was not the case. The distribution of print books entails important

---

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

investments in the distribution, warehousing and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[175] A traditional print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[176]

99.     The EU Commission found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[177] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

100.     Defendants sell their trade eBooks throughout the United States. The relevant geographic market is therefore the United States.

## VIII.   CLASS ACTION ALLEGATIONS

101.     Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief against Defendants pursuant to federal antitrust law on behalf of the members of the following Class:

> All persons who, on or after January 14, 2017, purchased in the United State one or more eBooks sold by the Big Five Publishers via an agency model through any other retail e-commerce channel in the United States other than the Amazon.com platform.

---

[175] *Id.*

[176] *Id.*

[177] *Id.*

102.     In the alternatively, if the Big Five Defendants are determined to be the intended third-party beneficiaries of Barnes & Noble's mandatory arbitration clause, Plaintiffs propose the following subclasses:

103.     Plaintiffs Fremgen, Christopherson-Juvee, and DeLeon would seek to represent a subclass of consumers who purchase the Big Five eBooks through Barnes & Noble and would assert claims on behalf of themselves and the proposed subclass against Amazon only:

> All persons who, on or after January 14, 2017, purchased in the United State one or more eBooks sold by the Big Five Publishers via an agency model through Barnes & Noble.

104.     Plaintiffs Wilde and Wilder would seek to represent the following subclass and assert claims against all Defendants:

> All persons who, on or after January 14, 2017, purchased in the United State one or more eBooks sold by the Big Five Publishers via an agency model through any other retail e-commerce channel in the United States other than the Amazon.com platform or Barnes & Noble.

105.     Excluded from the proposed Classes are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

106.     **Numerosity:** Members of the proposed Classes are so numerous that joinder is impracticable. Plaintiffs believe that there are millions of members of the proposed Classes geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

107.     **Typicality:** Plaintiffs' claims are typical of the claims of other members of the proposed Classes. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Classes.

108.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Classes both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the members of the proposed Classes they seek to represent.

109.    **Commonality:** Questions of law and fact common to the members of the proposed Classes predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Classes and members of the proposed Classes share a common injury. Thus, determining damages with respect to the Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Classes are inherent in Defendants' wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Classes arose from the same anticompetitive conduct alleged herein.

110.    There are common questions of law and fact specific to the Classes that predominate over any questions affecting individual members, including:

    i.  Whether Amazon and the Big Five unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that the Big Five would not sell their eBooks to consumers or allow other retailers to sell them at a price lower than what they offered at the Amazon.com platform;

    ii.  Whether Defendants have unlawfully monopolized the U.S. retail eBook market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

    iii.  Whether competition in the U.S. retail eBook submarket has been restrained and harmed by Amazon's monopolization of this market;

    iv.  Whether Plaintiffs and Class members have been damaged by Defendants' conduct;

    v.  The amount of any damages; and

vi.   The nature and scope of injunctive relief necessary to restore a competitive market.

111.   **Prevention of inconsistent or varying adjudications:** If prosecution of myriad

individual actions for the conduct complained of were undertaken, there likely would be

inconsistent or varying results. This would have the effect of establishing incompatible standards

of conduct for the Defendants. Certification of Plaintiffs' proposed Classes would prevent these

undesirable outcomes.

112.   **Injunctive relief:** By way of its conduct described in this complaint, Defendants

have acted on grounds that apply generally to the proposed Classes. Accordingly, final injunctive

relief is appropriate respecting the Classes as a whole.

113.   **Predominance and superiority:** This proposed class action is appropriate for

certification. Class proceedings on these facts and this law are superior to all other available

methods for the fair and efficient adjudication of this controversy, given that joinder of all

members is impracticable. Even if members of the proposed Classes could sustain individual

litigation, that course would not be preferable to a class action because individual litigation

would increase the delay and expense to the parties due to the complex factual and legal

controversies present in this matter. Here, the class action device will present far fewer

management difficulties, and it will provide the benefit of a single adjudication, economies of

scale, and comprehensive supervision by this Court. Further, it ensures the uniformity of

decisions on the subject of this complaint.

## IX.   ANTITRUST INJURY

114.   Defendants, through their unlawful conduct alleged herein, increase the prices of

eBooks offered through retail channels that compete with Amazon, reduce consumer choices,

and cause antitrust injury to retail eBook purchasers in the form of overcharges. Plaintiffs and

members of the proposed Classes have sustained, and continue to sustain, significant losses from

overcharges directly caused by Defendants' anticompetitive activity. Plaintiffs will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiffs and members of the proposed Classes will incur future overcharges in their direct purchases of trade eBooks.

115.    Plaintiffs and the Class members are direct purchasers who purchase trade eBooks from the Big Five Defendants through retail platforms that compete with Amazon at a price inflated by Defendants' price restraint.

116.    The Big Five employ an agency model to sell their eBooks. Under the agency model, the publishers set the price, and retailers—acting as agents for the publisher—take a commission on the sale to readers.[178] The agency model does not permit the retailer-agent to discount the price unilaterally, *e.g.*, to offer books at a two-for-one price or lower the price of a book through any membership or loyalty program.[179]

117.    Plaintiffs and members of the proposed Classes overpay when they buy eBooks directly from the Big Five through any retail eBook platform that competes with Amazon. As required by the MFN, when the Big Five sell their eBooks through an agency model (or also in the case of Co-conspirator HarperCollins through its own website), they sell at a retail price that is equal to or higher than the price they sell their eBooks on Amazon.com. In a competitive market it would be in the Big Five Defendants' economic self-interest to expand their share of the retail sales of their eBooks and diversify their distribution. In a competitive market it would also serve the Big Five Defendants' interest to allow Amazon's retail rivals to develop

---

[178] Andrew Albanese, *Will the Agency Model Survive? Hachette, Amazon and the future of agency pricing,* Publishers Weekly (May 16, 2014), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/62349-will-the-agency-model-survive.html.

[179] *Id.*

alternative business models that cost less to consumers but increase the Big Five's revenue.

Offering Amazon's retail rivals special edition or enhanced eBooks would also attract new

customers, increase sales, and reduce the Big Five's dependency on Amazon. Similarly, in a

competitive market, avoiding the commissions charged by Amazon and selling through their

own websites at a greater discount or allowing Amazon's retail rivals to add their own discounts

and promotions to steer more sales to their platforms would also serve the Big Five's economic

self-interest. But Defendants have agreed not to do this, so as to preserve the supracompetitive

prices of the Big Five's eBooks. Plaintiffs and class members who purchase directly from

Amazon's Co-conspirators through Amazon's retail rivals are harmed because they pay prices

fixed by Defendants and without the benefit of discounts, promotions, and potentially lower-cost

alternative business models that would exist in a competitive market, where these agreed

restraints did not exist.

118.   Because Defendants continue to adhere to their anticompetitive agreement,

Plaintiffs and Class members are reasonably likely to incur future overcharges for the Big Five's

eBooks. Both the actual harm and the threat of future harm are cognizable antitrust injuries

directly caused by Defendants' violations of antitrust laws, including their unreasonable

restraints against trade and Amazon's monopolization of the eBooks retail distribution, as

alleged herein.

**X.   CAUSES OF ACTION**

**VIOLATION OF THE SHERMAN ACT**

**FIRST CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C. § 1**

119.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

120.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed Classes described above. Plaintiffs seek damages and injunctive relief.

121.    Plaintiffs and members of the Classes are not making any claims against Defendant Amazon relating in any way to any products or services sold or distributed by or through the Amazon.com platform.

122.    The relevant product market is the U.S. retail market for trade eBooks.

123.    In violation of Section 1 of the Sherman Antitrust Act, Amazon and the Big Five Defendants agreed to various anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs, including the business-model-parity provision, the selection-parity clause, the retail-price-notification provision, the agency-price-parity provision, the agency-commission-parity provision, the promotion-parity provision, and the discount-pool provision.

124.    These anticompetitive agreements have an open and obvious adverse effect on competition. They ensure that Amazon.com faces no competition in the price or availability of trade eBooks, no competition from other competing business models (like rental, bundling with physical books, book clubs, streaming, or reduced prices for partial downloads), and no competition from retailers that support enhanced eBooks with features not supported by Amazon's Kindle readers. By preventing Amazon's eBook retailer competitors from offering superior products or superior prices, Defendants increase the market price of the Big Five's eBooks and limit the number of meaningful choices consumers have in the sale of these eBooks.

125.    Defendants' anticompetitive agreements have actual detrimental effects, *i.e.*, less competitive pricing and greater product conformity.

- 59 -

126.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

127.    Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these anticompetitive agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and thereby harmed Plaintiffs and the proposed Classes.

128.    Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints under a "quick look" or rule of reason standard.

129.    Defendants possess market power. Amazon controls about 90% of the retail market for trade eBooks. The Big Five Defendants' sales account for about 80% of the trade publications. That Defendants have market power in the U.S. retail eBook market for trade publications is also evident from their power to raise prices above those that would be charged in a competitive market.

130.    There is no legitimate, pro-competitive business justification for Defendants' anticompetitive agreements or any justification that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

131.    Plaintiffs and the members of the proposed Classes have been injured and will continue to be injured in their businesses and property by paying more for the Big Five's eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts. Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations

alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendants' unreasonable restraint of trade.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
## (15 U.S.C. § 2)

132.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

133.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed Classes described above. Plaintiffs seek damages and injunctive relief.

134.    Plaintiffs and members of the proposed Classes are not making any claims against Amazon relating in any way to any products or services sold or distributed by or through the Amazon.com platform.

135.    The relevant product market is the U.S. retail market for trade eBooks.

136.    Amazon possesses market power in the relevant market, where it controls about 90% of trade eBook sales. That Defendant has market power is also evident from its power to raise trade eBook prices above that which would be charged in a competitive market.

137.    Through its conspiracy with the Big Five, Amazon has willfully acquired and maintained its monopoly power in the relevant market by unlawful and improper means, including preventing Amazon's eBook retailer rivals from gaining market share and dissuading potential rivals from entering the market. Defendants entered into anticompetitive agreements with the intent and effect of 1) ensuring that the Big Five's eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on Amazon.com; 2) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; 3) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, book rentals and partial downloads; and 4)

eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

138.    Plaintiffs and members of the proposed Classes are direct purchasers because they directly purchase eBooks from the Big Five Defendants through a U.S. ecommerce retail channel that competes with the Amazon.com platform.

139.    Plaintiffs and members of the proposed Classes have been injured and will continue to be injured in their businesses and property by paying more for the Big Five Co-conspirators' eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

140.    Plaintiffs and members of the proposed Classes are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY TRIAL DEMANDED

141.    Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.      Judgment against Defendants for the damages sustained by Plaintiffs and the proposed Classes, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

E.      Pre-judgment and post-judgment interest on such monetary relief;

F.      Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-competitive practices described and requested herein;

G.      The costs of bringing this suit, including reasonable attorneys' fees; and

H.      All other relief to which Plaintiffs and members of the proposed Classes may be entitled at law or in equity.

DATED this 4th day of February, 2021          Respectfully submitted,

By: /s/ Nathaniel Tarnor
     Nathaniel Tarnor (4742797)
HAGENS BERMAN SOBOL SHAPIRO LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: 212-752-5455
Facsimile: 917-210-3980
Nathant@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
Barbara A. Mahoney (*pro hac vice* forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Joseph M. Vanek (*pro hac vice* forthcoming)
Paul E. Slater(*pro hac vice* forthcoming)
Eamon P. Kelly (*pro hac vice* forthcoming)
Alberto Rodriguez (*pro hac vice* forthcoming)
Blake Sercye (*pro hac vice* forthcoming)
jvanek@sperling-law.com
pes@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com
bsercye@sperling-law.com

*Attorneys for Plaintiffs and the Proposed Class*