**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE AMAZON.COM, INC. EBOOK ANTITRUST LITIGATION | Case Number: 1:21-cv-351-GHW-DCF<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION .................................................................................................. 5

III.    VENUE ................................................................................................................ 7

IV.     PARTIES ............................................................................................................. 8

        A.      Plaintiffs ................................................................................................... 8

                1.      Shannon Fremgen ......................................................................... 8

                2.      Mary Christopherson-Juve ............................................................ 9

                3.      Denise DeLeon ............................................................................. 10

                4.      Sandra Wilde ................................................................................ 10

                5.      Michael Wilder ............................................................................. 11

                6.      Jordan Sacks ................................................................................. 13

                7.      Mariacristina Bonilla ................................................................... 13

                8.      Ethan Silverman ........................................................................... 14

                9.      Jeffery Tomasulo .......................................................................... 15

                10.     Susan Cook and Jeffrey Cook ...................................................... 15

                11.     Cecily Lerner ................................................................................ 16

                12.     Lawrence Twill ............................................................................. 17

                13.     Thomas Agostino .......................................................................... 17

                14.     Robert Etten .................................................................................. 18

                15.     Janet Ackerman ............................................................................ 18

        B.      Defendants ............................................................................................. 19

                1.      Amazon ......................................................................................... 19

                2.      Hachette ........................................................................................ 19

3.    HarperCollins ................................................................. 20

4.    Macmillan ....................................................................... 20

5.    Penguin .......................................................................... 21

6.    Simon & Schuster .......................................................... 21

V.    STATEMENT OF FACTS ............................................................... 22

A.    EBooks' arrival disturbed the trade publishing industry, and the
Big Five responded by seizing control of trade eBook prices and
eliminating retailer discounts. ............................................. 22

B.    Defendants' eBook pricing practices have been the continuous
subject of antitrust investigations in the United States and Europe
since 2011. .......................................................................... 30

1.    Authorities in the United States and Europe sanctioned the
Big Five for conspiring with Apple to fix trade eBook
prices. ............................................................................. 30

2.    Astonishingly, right after they were sanctioned for
conspiring with Apple, the Big Five publishers immediately
embarked on a price-fixing scheme with Amazon. ................. 34

3.    Defendants use MFNs and similar anticompetitive
provisions to control the price of trade eBooks throughout
the U.S. market and prevent competition with the Amazon
platform in the sale of trade eBooks. ................................. 39

4.    Under pressure from the DG Comp, Amazon agreed not to
enforce its MFN and similar anticompetitive provisions in
the European eBook market. ............................................. 48

5.    Federal and state authorities investigate Amazon's
practices, including eBook sales. ...................................... 49

C.    Defendants' anticompetitive conduct significantly increased the
price of trade eBooks in the United States. ........................... 51

D.    Defendants each benefitted from the trade eBooks-price-fixing
scheme .............................................................................. 58

E.    Amazon further increases the market price of the Big Five's trade
eBooks by charging the publishers high fees to sell on the Amazon
platform. ............................................................................ 61

010888-12/1558070 V1

VI.    INTERSTATE TRADE AND COMMERCE ................................................. 62

VII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKETS ................... 62

  A.    The market for trade eBooks is the relevant product market. .............. 62

  B.    The United States is the relevant geographic market. .......................... 65

  C.    The Big Five dominate the production and sale of trade eBooks in
    the U.S. market. ................................................................................... 65

  D.    Amazon provides the dominant eBook retail platform. ....................... 68

VIII.  CLASS ACTION ALLEGATIONS ............................................................. 71

IX.    ANTITRUST INJURY ............................................................................. 74

X.     CAUSES OF ACTION ............................................................................. 76

  FIRST CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT –
    RESTRAINT OF TRADE (15 U.S.C. § 2) (ALL DEFENDANTS) .................. 76

  SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT
    – MONOPOLIZATION (15 U.S.C. § 2) (AMAZON) ....................... 81

  THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT –
    CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) (ALL
    DEFENDANTS) ................................................................................... 83

JURY TRIAL DEMANDED ................................................................................ 85

PRAYER FOR RELIEF ..................................................................................... 85

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys.

## I.    INTRODUCTION

1.     Plaintiffs are consumers and direct purchasers who shop for electronic books ("eBooks") produced and sold by the five largest publishers in the United States: Defendant Hachette Book Group, Inc. ("Hachette"); Defendant HarperCollins Publishers L.L.C. ("HarperCollins"); Defendant Macmillan Publishing Group, LLC ("Macmillan"); Defendant Penguin Random House LLC ("Penguin"); and Defendant Simon & Schuster, Inc. ("Simon & Schuster"), otherwise known collectively as the "Big Five." The Big Five publish "trade books," a term of art referring to "general interest fiction and non-fiction books," as "distinguished from 'non-trade' books such as academic textbooks, reference materials, and other texts."[1] Collectively, the Big Five account for about 80% of the trade books sold in the United States.[2]

2.     Each Plaintiff purchased one or more trade eBooks directly from the Big Five. The Big Five typically sell their trade eBooks to consumers through online retail platforms, like the ones operated by Defendant Amazon.com, Inc. ("Amazon") or its retail rivals, like Barnes & Noble, Kobo, and Apple Books. Defendant HarperCollins also sells trade eBooks to consumers through its own website. When selling them through online retail platforms, the Big Five do so

---

[1] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

[2] Constance Grady, *Milo Yiannopoulos's book deal with Simon & Schuster, explained*, Vox (Jan. 3, 2017), https://www.vox.com/culture/2017/1/3/14119080/milo-yiannopoulos-book-deal-simon-schuster-dangerous-boycott; Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

under the agency model.[3] Under that model, the sales transaction is carried out directly between

the publisher and the retail consumer (like Plaintiffs), while the eBook retailer (like Amazon or

its competitors) serves merely as the publisher's sales agent in the transaction and gets a

commission for each book sold.[4] So, whether purchased on the publisher's own website (like

HarperCollins) or through an eBook retailer's online platform, consumers who purchase the Big

Five's trade eBooks are direct purchasers from the Big Five.

      3.     Defendant Amazon operates the largest retail platform for the sale of eBooks in

the United States. Almost 90% of all eBooks are sold through its online retail platform.[5] Amazon

also dominates in print sales, selling over half of all print books purchased at retail in the United

States.[6]

---

[3] Constance Grady, *The 2010s were supposed to bring the ebook revolution*, Vox (Dec. 23, 2019), https://www.vox.com/culture/2019/12/23/20991659/ebook-amazon-kindle-ereader-department-of-justice-publishing-lawsuit-apple-ipad; *For the Big Five, Agency Now Holds Sway Across the Board*, Author's Guild (Sep. 9, 2015), https://www.authorsguild.org/industry-advocacy/for-the-big-five-agency-now-holds-sway-across-the-board/; *Amazon, HarperCollins reach multi-year publishing deal*, First Post (Apr. 14, 2015), https://www.firstpost.com/tech/news-analysis/amazon-harpercollins-reach-multi-year-publishing-deal-report-3666709.html; Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

[4] *Id.*; *see also* Text of public letter from Macmillan CEO John Sargent, MobyLives (Jan. 30, 2010), https://www.mhpbooks.com/text-of-public-letter-from-macmillan-ceo-john-sargent; European Commission, Directorate General for Competition, Case AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("5.4.2017 DG Comp. Decision") at 8.

[5] Matt Day and Jackie Gu, *The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-across-markets/ (estimating that Amazon controls 88.9% of the eBooks market).

[6] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 295, https://judiciary.house.gov/uploadedfiles/investigation_of_competition_in_digital_markets_majority_staff_report_and_recommendations.pdf ("House Report").

4.      Together, Defendants raised trade eBook prices to supracompetitive levels by entering into agency agreements combined with an anticompetitive most favored nations clause (MFN) and similar anticompetitive provisions designed to control the prices paid for trade eBooks purchased from the Big Five throughout the market. Under their agreements, the Big Five set their own high prices for their eBooks on the Amazon platform and agree—subject to penalties from Amazon—not to sell at a lower price or to offer a better product selection on any platform that competes with Amazon. Defendants' agreements to eliminate retailer discounting and immunize Amazon from competition from other eBook retail platforms are highly effective. Immediately after announcing their respective agency contracts with Amazon, Penguin increased its trade eBook prices by 30.4%, HarperCollins by 29.3%, Simon & Schuster by 15.8%, Macmillan by 10.7%, and Hachette Book Group by 8.3%. Prices for trade eBooks have remained elevated above what they would have been in a competitive market. Defendants' supracompetitive prices have lowered consumer demand and depressed sales in the trade eBook market.

5.      Defendants' anticompetitive conduct has caused and continues to cause Plaintiffs and the Class(es) (defined below) to overpay for trade eBooks.

6.      Amazon's and the Big Five's continued anticompetitive use of MFNs to restrain competitive pricing in the sale of trade eBooks is astonishingly brazen in light of repeated investigations into Defendants' practices. A decade ago, the Big Five conspired with Apple to raise trade eBook prices via agency agreements and MFNs. This conduct led to concurrent investigations by federal and state prosecutors in the United States and by the European Commission's Directorate General for Competition (the "DG Comp"), which resulted in orders prohibiting the publishers from entering into MFNs in connection with the sale of eBooks on

either continent for a period of five years. In the United States, the Big Five paid $166 million in settlements and Apple $450 million to the consumer class action that initiated the proceedings.[7] Yet in 2015—in disregard to existing orders—the Big Five re-entered into agency agreements with Amazon that impose highly restrictive MFNs or notification provisions that mirror the illegal price restraints used in the Apple conspiracy to eliminate retailer discounting and ensure that no rival retail platform can differentiate itself from, or otherwise compete with, Amazon.

7.      Beginning in 2015, the DG Comp investigated Amazon's anticompetitive MFNs and similar provisions and found that they harmed competition in the distribution and sale of eBooks in European markets.[8] Here in the United States, the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust Committee") launched an investigation into Amazon along with other dominant technology platforms. Like the DG Comp, the House Antitrust Committee concluded in its October 2020 report that Amazon's use of MFNs was harmful to competition.[9] Separately, the Connecticut Attorney General's office is conducting its own investigation into Amazon's eBook business.[10]

8.      Despite multiple investigations and censure for the use of anticompetitive MFNs and similar provisions in the sale and distribution of trade eBooks, Amazon and the Big Five have employed and continue to employ the same devices to again fix the retail price of trade eBooks in violation of Section 1 of the Sherman Act. Like the illegal agreements between Apple

---

[7] *In re Electronic Books Antitrust Litig.*, 639 F. App'x 724, 726-27 (2d Cir. 2016).

[8] 5.4.2017 DG Comp. Decision at 8.

[9] House Report at 295.

[10] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

and the Big Five, Amazon's agreements with the Big Five are anticompetitive because they have "removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved [Amazon] of the need to compete on price, and allowed the [Big Five] to raise the prices for their e-books, which they promptly did[.]"[11] The harm caused by Defendants' supracompetitive prices persists and will not abate unless Amazon and the Big Five are stopped.

9.      By fixing the retail price of trade eBooks and preventing competition from its eBook retail rivals, Defendant Amazon has willfully acquired and maintained its monopoly power in the U.S. retail trade eBook market. Such conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

10.      Plaintiffs and the Class(es) seek monetary recovery, including treble damages, for all overcharges incurred by the Class(es) as defined herein. Plaintiffs and the Class(es) have standing to recover damages under Section 4 of the Clayton Act because Defendants' anticompetitive use of MFNs and similar provisions has materially and proximately injured Plaintiffs and the Class(es) by reducing their choices as consumers and causing them to pay supracompetitive prices for trade eBooks.

11.      Further, Plaintiffs and the Class(es) seek a nationwide injunction that terminates the ongoing violations alleged in this Complaint. Plaintiffs have standing under Section 16 of the Clayton Act because they are threatened with impending future harm in the form of additional overcharges and reduced consumer choice.

## II.      JURISDICTION

12.      This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, pursuant to 28 U.S.C. § 1331 and § 1337(a), and 15 U.S.C. § 15(a) and § 26.

---

[11] *Apple*, 952 F. Supp. 2d at 694.

13.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

14.     Plaintiffs are residents of Arizona, California, Connecticut, Florida, Iowa, Minnesota, New York, Texas, and Virginia, who purchase trade eBooks from the Big Five through Amazon or its retail rivals. Plaintiffs were harmed and injured financially because of Defendants' conduct, as described further herein.

15.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S. Code § 22, because Defendants reside in this District or may be found or transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[12] It has five warehouses in New York, including two in Manhattan.[13] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[14] Amazon owns eight office properties in Manhattan,

---

[12] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 9, 2019), https://ww, w.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[13] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United States; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[14] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where are Amazon Books stores located in New York?, Bing,

most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[15] Amazon has engaged in an illegal, anticompetitive scheme to monopolize the trade eBook market that was directed at, and had the direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

16.     Exercising personal jurisdiction is also appropriate under Section 302(a) of New York's long-arm statute because Amazon transacts business in the State of New York, directly or through agents, such that it has sufficient minimum contacts with New York. In addition to the business it transacts in New York City, Plaintiffs aver on information and belief that Amazon's sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and therefore rise to the level of substantial solicitation necessary to satisfy the minimum contacts required to support this Court's exercise of personal jurisdiction over Amazon.

## III.    VENUE

17.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants reside, transact business, are found, or have agents in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants are subject to the Court's personal jurisdiction with respect to the civil action in question and therefore reside in this District and under 28 U.S.C. § 1391(b)(2) because a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

---

https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F& cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.

[15] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*. NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-space.html.

## IV.   PARTIES

**A.   Plaintiffs**

**1.   Shannon Fremgen**

18.   Shannon Fremgen is a resident of Denton, Texas. She buys trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. Fremgen purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform:

a.   From Hachette she purchased *Smokescreen* on November 28, 2019, for $14.99, *The Persuasion* on August 24, 2020, for $13.99, and *Chaos* for $14.99 on September 1, 2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

b.   From HarperCollins she purchased *After Sundown* on August 24, 2020, for $12.99, *Mystere Parish Complete Collection* on December 5, 2020, for $12.99, and *Death Echo* for $7.99 on May 12, 2020, all prices equal to or higher than the price of the same eBooks sold through the Amazon platform.

c.   From Macmillan she purchased *The Full Series, the Complete Collection* on December 14, 2020, for $41.55, *Hindsight* on January 7, 2020, for $14.99, and *Dark Tribute* for $9.99 on October 15, 2019, all prices equal to the price of the same eBooks sold through the Amazon platform.

d.   From Penguin she purchased *Twisted Twenty-Six* on January 1, 2020, for $13.99, *Burn* on November 2, 2020, for $8.99, and *Vision Impossible* on November 12, 2019, for $7.99, all prices equal to the price of the same eBooks sold through the Amazon platform.

e.   From Simon & Schuster she purchased *Labyrinth* on October 12, 2019, for $14.99, *Deadlock* on July 28, 2020, for $14.99, and *Fortune and Glory* on November 12, 2019,

also for $14.99, all prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Fremgen has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 2.  Mary Christopherson-Juve

19.  Mary Christopherson-Juve is a resident of Yuma, Arizona. She buys trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. Christopherson-Juve purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform:

a.  From Hachette she purchased for $14.99 each *Where the Crawdads Sing* on July 12, 2019, *The Guardians* on October 21, 2019, and *Camino Winds* on May 5, 2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

b.  From HarperCollins she purchased *The Order* on July 20, 2020, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

c.  From Macmillan she purchased *The Defense* on November 21, 2019, for $14.99 and *The Wednesday Group* on July 13, 2020, for $7.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

d.  From Penguin she purchased for $14.99 each *The 19th Christmas* on December 13, 2019, *The Summer House* on July 3, 2020, and *Untamed* on August, 17, 2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

- 9 -

e.        From Simon & Schuster she purchased *Storm Front* on October 31, 2019, for $8.99, *Bad Blood* on February 16, 2020, for $9.99, and *Bloody Genius* on February 21, 2020, for $14.99, all prices equal to the price of the same eBooks sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Christopherson-Juve has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**3.        Denise DeLeon**

20.        Denise DeLeon is a resident of Dysart, Iowa. She buys trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. DeLeon purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including her purchase of *Turbo Twenty-Three* from Penguin on September 14, 2020, for $2.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreements prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. DeLeon has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**4.        Sandra Wilde**

21.        Sandra Wilde is a resident of New York City. She buys trade eBooks from the Big Five through Amazon and through  Apple Books. Trade eBooks Ms. Wilde purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform:

a.        From HarperCollins she purchased *Since We Fell* on January 29, 2021, for $9.99, a price equal to the price of the same eBook sold through the Amazon platform.

b.        From Penguin she purchased *How Did I Get Here* on January 16, 2021, for $14.99, and *That Old Country Music* on January 21, 2021, for $11.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Wilde also purchased eBooks through Amazon's platform, *e.g.,* On December 3, 2018, she bought *The Skeptics' Guide to the Universe: How to Know What's Really Real in a World Increasingly Full of Fake* from Hachette for $15.99; on July 13, 2020, she bought *Too Much and Never Enough: How My Family Created the World's Most Dangerous Man* from Simon & Schuster for $14.99; on January 18, 2020, she bought *A Very Stable Genius: Donald J. Trump's Testing of America* from Penguin for $15.99; on March 5, 2021, she bought *A Member of the Club: Reflections on Life in a Racially Polarized World* from HarperCollins for $5.99, a price inflated by Defendants' anticompetitive agreement to prevent retailer discounting on any platform. She has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 5.    Michael Wilder

22.    Michael Wilder is a resident of Bradenton, Florida. He buys trade eBooks from the Big Five through Amazon and through Apple Books on behalf of himself and his family. Trade eBooks Mr. Wilder purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform:

- 11 -

a.  From Hachette he purchased *Rather Be the Devil* on February 15, 2017, for $13.99 and *When the Music's Over* on July 2, 2018, for $10.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

b.  From HarperCollins he purchased *Manic* on June 6, 2017, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform, and *The Price of Love and Other Stories* on November 24, 2018, also for $10.99, a price higher than the price of the same eBook sold through the Amazon platform.

c.  From Macmillan he purchased for $2.99 each *The Collapsing Empire* on December 31, 2017, and *The First Patient* on April 5, 2018, both prices equal to the price of the same eBooks sold through the Amazon platform.

d.  From Penguin he purchased for $14.99 each *Empire's End: Aftermath (Star Wars)* on April 7, 2017, and *All We Ever Wanted* on August 10, 2018, both prices equal to the price of the same eBooks sold through the Amazon platform.

e.  From Simon & Schuster he purchased *Deep Freeze* on October 17, 2017, for $14.99 and *The North Water* on September 12, 2018, for $3.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Wilder also purchased eBooks through Amazon's platform, *e.g.,* on February 25, 2019, he bought *The Fall of Carthage: The Punic Wars 265-146BC* from Hachette for $3.99 and on August 5, 2020, he bought *The Virtues of War: A Novel of Alexander the Great* from Penguin for $5.99, both prices inflated by Defendants' anticompetitive agreement to prevent retailer discounting on any platform. He has been injured and will continue to be injured by paying more for the Big Five's

- 12 -

trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 6. Jordan Sacks

23. Jordan Sacks is a resident of Arlington, Virginia. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Sacks purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including his purchase of *All the Light We Cannot See* from Simon & Schuster on June 3, 2018, for $12.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Sacks has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 7. Mariacristina Bonilla

24. Mariacristina Bonilla is a resident of Norwalk, Connecticut. She purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. Bonilla purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold through the Amazon platform:

   a.      From HarperCollins she purchased *The Hurricane Sisters* on May 21, 2020, for $11.49, a price equal to the price of the same eBook sold through the Amazon platform.

   b.      From Macmillan she purchased *A Week at the Shore* on June 24, 2020, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

- 13 -

c.          From Penguin she purchased *Neighbors* on January 6, 2021, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Bonilla has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 8.     Ethan Silverman

25.     Ethan Silverman is a resident of New York City. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Silverman purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform:

a.          From HarperCollins he purchased *10% Happier* on January 27, 2021, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform.

b.          From Penguin he purchased *Never Eat Alone* on July 6, 2018, for $14.99 and *Compelling People* on January 2, 2021, for $12.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Silverman has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

- 14 -

### 9. Jeffery Tomasulo

26.     Mr. Tomasulo is a resident of Norwalk, Connecticut. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Tomasulo purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including his purchase of *The Explosive Child* from HarperCollins on April 9, 2020, for $13.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Tomasulo has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein

### 10. Susan Cook and Jeffrey Cook

27.     Susan Cook and Jeffrey Cook are residents of Goodyear, Arizona. They purchase trade eBooks from the Big Five through Apple Books through Susan Cook's account. Trade eBooks the Cooks purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

a.      From Hachette, the Cooks purchased for $14.99 each, *Two Kinds of Truth* on October 31, 2017, and *Daylight* on November 19, 2020, prices equal to the same eBooks sold through Amazon.

b.      From Macmillan, they purchased for $14.99 each, *Secrets in Death* on September 4, 2017, and *Golden in Death* on February 16, 2020, prices equal to the same eBooks sold through the Amazon platform.

- 15 -

c.        From Penguin, they purchased for $14.99 each, *The Midnight Line* on November 10, 2017, and *A Time for Mercy* on October 19, 2020, prices equal to the same eBooks sold through the Amazon platform.

d.        From Simon & Schuster, they purchased *Fear* for $15.99 on September 12, 2018, and *Total Power* for $14.99 on September 19, 2020, prices equal to the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. The Cooks have been injured and will continue to be injured by paying more for the Big Five's trade eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 11.    Cecily Lerner

28.    Cecily Lerner is a resident of Encino, California. She purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks she purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including her purchase of *Pachinko* from Hachette on January 2, 2020, for $9.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Lerner has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 12.    Lawrence Twill

29.     Lawrence Twill is a resident of Sarasota, Florida. He and his wife purchase trade eBooks from the Big Five through Apple Books through his wife's account. Trade eBooks Mr. Twill purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

        a.          From Penguin, he purchased *Little Fires Everywhere* on April 19, 2018, for $13.99 and *The Widow* on June 9, 2019, for $9.99, prices equal to the same eBooks sold through the Amazon platform.

        b.          From Simon & Schuster, he purchased *Manhattan Beach* for $14.99 on October 25, 2017, a price equal to the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Twill has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 13.    Thomas Agostino

30.     Thomas Agostino is a resident of Boynton Beach, Florida. He purchases trade eBooks from the Big Five through Barnes & Noble through his wife's account. Trade eBooks Mr. Agostino purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including *A New Earth*, which he purchased from Penguin on July 9, 2018, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Agostino has been injured and will continue to be injured by paying more for the

- 17 -

Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 14.   Robert Etten

31.   Robert Etten is a resident of Roseville, Minnesota. He purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Mr. Etten purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including:

    a.    From Hachette, he purchased *The Inn* on September 12, 2019, for $14.99, a price equal to the same eBook sold through the Amazon platform.

    b.    From Penguin, he purchased *Robert Ludlum's The Bourne Evolution* on July 28, 2020, for $14.99, a price equal to the same eBook sold through the Amazon platform.

    c.    From Simon & Schuster, he purchased *Spymaster* (Scot Harvath Series #17) for $14.99 on February 11, 2018, a price equal to the same eBook sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Etten has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 15.   Janet Ackerman

32.   Janet Ackerman is a resident of Brooklyn, New York. She purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Ms. Ackerman purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

a.        From Hachette, she purchased *The Slaughterman's Daughter* on March 5, 2021, for $14.99, a price equal to the same eBook sold through the Amazon platform.

b.        From HarperCollins, she purchased *The Exiles* on September 4, 2020, for $14.99, a price equal to the same eBook sold through the Amazon platform.

c.        From Simon & Schuster, she purchased *Too Much and Never Enough* for $14.99 on July 16, 2020, a price equal to the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Ackerman has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

## B.        Defendants

### 1.        Amazon

33.        Amazon is an online retail giant with its principal headquarters in Seattle, Washington and with facilities and employees throughout the United States, including in this District. Amazon is vertically integrated and is active upstream as a publisher, with its own imprints (*i.e.*, publishing labels), and downstream as an eBook retailer. Amazon sells eBooks and offers eBook reading subscription services to its retail customers in New York and throughout the United States on the Amazon platform. Amazon also operates Amazon Publishing, a division of Amazon that publishes books and competes with the Big Five Defendants.

### 2.        Hachette

34.        Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing

brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

### 3.    HarperCollins

35.    Defendant HarperCollins is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins's authors are winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

### 4.    Macmillan

36.    Defendant Macmillan is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Macmillan is part of a global trade-publishing group operating worldwide, with trade publishing companies in the United States, Germany, the United Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the U.S.: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press; and Tor/Forge.

Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, and the Printz Award.

### 5.   Penguin

37.     Defendant Penguin is a leading U.S. trade publisher, organized under the laws of Delaware, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With a rich history dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275 independent publishing imprints and brands on five continents. Penguin publishes 15,000 new titles annually and sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include more than 80 Nobel Laureates and hundreds of the most widely read authors across the world.

### 6.   Simon & Schuster

38.     Defendant Simon & Schuster is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. It publishes 2,000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing, and Simon & Schuster Audio and international companies in Australia, Canada, India, and the United Kingdom. Simon & Schuster brings the works of its authors, which include, among others, Dale Carnegie, Sharon M. Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway, and Stephen King, to more than 200 countries and territories. Its books and authors have been winners of the Pulitzer Prize, National Book Award, National Book Critics

- 21 -

Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin

announced plans to acquire Simon & Schuster; the proposed merger would create a single

publishing house with a market share of approximately 50% of all trade books published.[16]

## V.    STATEMENT OF FACTS

**A.    EBooks' arrival disturbed the trade publishing industry, and the Big Five responded by seizing control of trade eBook prices and eliminating retailer discounts.**

39.    When Amazon's Kindle launched in 2007, it was the first e-reader to gain

widespread commercial acceptance, and Amazon quickly became the market leader in the sale of

eBooks and eBook readers.[17]

40.    Until 2010, the Big Five sold trade eBooks through the same century-old

wholesale pricing model they used for print books.[18] Under this model, publishers sell titles at

wholesale to retailers, which could then discount from the suggested retail prices as they saw

fit.[19] Amazon achieved market dominance in trade eBooks under this model by charging just

$9.99 for many new release and bestselling trade eBooks, which roughly matched the wholesale

price of many of the Big Five's trade eBooks.[20] To compete with Amazon, other eBook retailers

also adopted a $9.99 or lower retail price for many trade eBook titles.[21] Between 2008 and 2010,

---

[16] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[17] *Apple*., 952 F. Supp. 2d at 648-49.

[18] Greg Sandoval, *Apple lawyers put judge in ebook antitrust case on defensive*, The Verge (Jun. 3, 2013), https://www.theverge.com/2013/6/3/4380652/apple-lawyers-put-judge-in-ebook-antitrust-case-on-defensive.

[19] Jeffrey A. Trachtenberg, *E-Book Sales Fall After New Amazon Contracts*, Wall Street Journal (Sept. 3, 2015 https://www.wsj.com/articles/e-book-sales-weaken-amid-higher-prices-1441307826.

[20] *Apple*, 952 F. Supp. 2d at 649.

[21] *Id.*

in the years immediately following Amazon's release of the Kindle and the Kindle 2, eBooks made enormous sales gains of 1,260%.[22]

41.     But the tremendous success of trade eBooks made the Big Five anxious. They feared that Amazon's $9.99 price point would hurt their profits. In the short-term, the publishers believed that the low price point was eating into sales of their more profitable hardcover trade books, which they often priced at thirty dollars or more, and in the long-term, they feared that consumers would grow accustomed to trade eBooks priced at $9.99 and would expect comparable prices for print books.[23]

42.     The Big Five also feared Amazon's growing power in the trade book industry and were worried that Amazon would render them obsolete by negotiating directly with authors and literary agents for rights.[24] To counter Amazon's growing power, the Big Five determined that they needed to force Amazon to abandon its discount pricing model. As Hachette bluntly put it, they had to prevent Amazon's "wretched $9.99 price point becoming a de facto standard."[25] Simon & Schuster likewise described it as the "basic problem: how to get Amazon to change its pricing" and move off its $9.99 price point, and Macmillan referred to Amazon's price policy as "book devaluation to $9.99."[26]

43.     Each of the Big Five reached out to Amazon in the hopes of changing the low $9.99 price point. In February 2009, Penguin told Amazon that "their 9.99 model" was "not a

---

[22] Jenny Shank, *The Year in Reading: Print Books, Magazines, Newsletters Hold Their Own In 2015*. Mediashift.org (Dec. 28, 2015) http://mediashift.org/2015/12/the-year-in-reading-print-books-magazines-newsletters-hold-their-own-in-2015/.

[23] *Apple*, 952 F. Supp. 2d at 649.

[24] *Id.*

[25] *Id.* at 650, 653.

[26] *Id.* at 650.

good sustainable one."[27] HarperCollins warned Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers."[28] In March 2009, Macmillan met with Amazon to likewise express concern with the $9.99 price point and indicated that "all the pubs" were talking about it.[29] In June 2009, Simon & Schuster told Amazon that the $9.99 price point was "a mistake" and "terrible for the business."[30] In early December 2009, Hachette told Amazon that its $9.99 pricing posed a "big problem" for the industry, but that if Amazon would raise trade eBook prices by even one or two dollars, it would "solve the problem."[31]

44.     When Amazon refused their entreaties, the publishers recognized the importance of coordinating their efforts to raise prices. One publisher's internal memo stated that, "the industry needs to develop a common strategy."[32] The publishers had regular opportunities to conspire, as the senior executives for each of the publishers meet on a quarterly basis in private dining rooms in New York restaurants without lawyers present.[33] At the bench trial against Apple, the publishers' CEOs testified that they "did not compete with each other on price" and thus "felt no hesitation in freely discussing Amazon's prices with each other and their joint strategies for raising those prices."[34] The court found that "[w]hile no one Publisher could effect

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *United States v. Apple, Inc.*, 791 F.3d 290, 300 (2d Cir. 2015).

[33] *Apple*, 952 F. Supp. 2d at 651.

[34] *Id.* (paraphrasing the witnesses' testimony).

an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could."[35]

45.     Frustrated by Amazon's initial unwillingness to collude at that time, the Big Five turned to Apple to put an end to discounting trade eBook prices. Apple expressed immediate interest. As long as it could sell trade eBooks profitably, Apple anticipated that it would generate even more revenue than selling digital music, where Apple dominated.[36] Apple believed that the iPad, which it would launch in 2010, would be a transformational e-reader. In contrast to the existing black-and-white e-readers, the iPad would display not only text but also illustrations and photographs in color on a backlit screen, and would have audio and video capabilities, which would enhance the eBook reading experience.[37]

46.     Beginning on December 8, 2009, Apple's team contacted the Big Five to set up meetings the following week to discuss an "extremely confidential" subject. Apple made it clear that it would be trying to meet with each of the Big Five.[38] Even before it met with any of the Big Five publishers, Apple already knew that the publishers were eager to raise the $9.99 price point for all trade eBooks, and that they were willing to coordinate their efforts to achieve that goal.[39] To bring the Big Five publishers to the table, therefore, Apple offered to raise the price above $9.99. Over the course of the next few weeks, Apple and the Big Five agreed that to make this happen, the Big Five would have to adopt the agency model.

---

[35] *Id.* at 665.

[36] *Id.* at 654-56.

[37] *Id.* at 655.

[38] *Id.*

[39] *Id.* at 656.

47.     Crucially, under the agency model, *publishers set the price* of their eBooks and retailers—acting as agents for the publisher—take a commission on the sale.[40] The sales transaction occurs directly between the publisher and the retail consumer.[41] The agency model does not permit the retailer-agent to discount the price unilaterally.[42]

48.     Under the agreement, Apple received a 30% commission for hosting the sale.[43] The Big Five stood to make less money on each sale under the agency model than they would under the wholesale model, but agreeing to Apple's proposal would accomplish their overarching long-term goal: retaking control of pricing back from the eBook retailers.[44]

49.     Initially, some of the Big Five objected to the agency model. To force their hand, Apple's in-house counsel introduced an MFN clause in the proposed agreements that would ensure that the Big Five's trade eBooks would be sold on Apple's eBooks store for the lowest retail price available in the marketplace.[45] MFNs are common devices that allowed companies to get the lowest prices from their suppliers, by getting the seller to agree to treat them as favorably

---

[40] *See Apple*, 791 F.3d at 303 ("Unlike a wholesale model, in an agency relationship the publisher sets the price that consumers will pay for each ebook. Then, rather than the retailer paying the publisher for each ebook that it sells, the publisher pays the retailer a fixed percentage of each sale. In essence, the retailer receives a commission for distributing the publisher's ebooks.").

[41] Supra *The 2010s were supposed to bring the ebook revolution*; DG Comp Decision at 8.

[42] Sarah Boyle, *What Is the Agency Model for Ebooks? Your Burning Questions Answered*, Publishing Trendsetter (May 1, 2012), http://publishingtrendsetter.com/industryinsight/simple-explanation-agency-model/.

[43] *Apple*, 952 F. Supp. 2d at 658-62.

[44] *Apple*, 791 F.3d at 305 ("Under Apple's initial agency model—with price caps but no MFN Clause—the publishers already stood to make less money per ebook with Apple. Because Apple capped the ebook price of a $25 hardcover at $12.99 and took 30% of that price, publishers could only expect to make $8.75 per sale. But what the publishers sacrificed in short-term revenue, they hoped to gain in long-term stability by acquiring more control over pricing and, accordingly, the ability to protect their hardcover sales.").

[45] *Apple*, 952 F. Supp. 2d at 662.

as any of their other customers. Apple had used an MFN in one of its music agreements before, but it had purchased the music under a wholesale model, where Apple demanded the lowest price and best terms from its supplier. Apple's use of an MFN *for a retail price* was a unique feature of its eBook agency agreements: it went beyond Apple's reducing costs and guaranteed that eBooks in Apple's e-bookstore would be sold for the lowest retail price available in the marketplace.[46] By combining the MFN with the pricing tiers, Apple allowed the Big Five to set the retail prices of their eBooks, while at the same time guaranteeing that Apple would never have to compete on price because if another retailer sold at a lower price, the publishers would have to lower their price on Apple's eBook store.[47] As a practical matter, the Big Five would need to adopt an agency model with other eBook retailers, including Amazon, to prevent retail price competition.[48]

50.     The MFN not only ensured that no eBook retailer could underprice Apple, it also enabled the Big Five's collective action. As the Second Circuit explained, "[t]he MFNs in Apple's Contracts created a set of economic incentives" which "were only attractive to the Publisher Defendants to the extent they acted collectively."[49] The Second Circuit added, "By the very act of signing a Contract with Apple containing an MFN Clause, then, each of the Publisher Defendants signaled a clear commitment to move against Amazon [and the industry practice of retail discounting], thereby facilitating their collective action."[50]

---

[46] *Id.*

[47] *Id.*

[48] *Id.* at 663.

[49] *Apple*, 791 F.3d at 320.

[50] *Id.* at 317.

51.    Apple and the Big Five ultimately agreed to cap trade eBook prices at $12.99 for new release titles with hardcover list prices of $30 or under and set a $14.99 price cap for new release titles with hardcover list prices above $30. For eBooks other than new releases, the price cap was set at $9.99.[51] Despite the significant reduction in revenue the Big Five would receive for each trade eBook sold under the agency model, Apple played to the Big Five's long-term interest in raising trade eBook prices to protect the prices of print trade books.[52] Notably, Defendants Hachette and Macmillan agreed to the terms with Apple despite their legal concerns about "price matching" under the MFNs.[53]

52.    Through a coordinated effort, the Big Five forced Amazon to accept the agency model by threatening to withhold publication of their trade eBooks for seven months after their release as print publications.[54] At the same time, Macmillan CEO John Sargent tried to create the impression that the company had acted alone and that the other Big Five Defendants had followed of their own accord, when he publicly disclosed his negotiations with Amazon.[55] After Amazon's unsuccessful attempt at retaliation, which temporarily devalued its stock, Amazon acceded to the Big Five's demands, but not before Amazon filed a complaint with the FTC.[56] Between March and June of 2010, Amazon finalized agency agreements with all of the Big Five. Each of the Big Five's agreements with Amazon included a "model parity" clause. This gave

---

[51] *Apple*, 952 F. Supp. 2d at 667.

[52] *Id.* at 665.

[53] *Id.* at 674.

[54] *Id.* at 679-80.

[55] *Id.* at 680.

[56] *Id.* at 680-81.

Amazon the option to return to a wholesale model of distribution if the publisher agreed to a wholesale distribution arrangement with any other eBook retailer.[57]

53.     Google entered the eBook market at the same time as Apple. The Big Five made it clear to Google that their agreements with Apple made them "unwilling to enter into non-agency agreements with Google."[58] The Big Five also adopted an agency model with Barnes & Noble.[59]

54.     The effect was a significant and pervasive increase in trade eBook prices. As the following graph indicates, when Apple's eBook store opened in April 2010, trade eBook prices soared for the four publishers that finalized their agency agreements with Amazon in March (first vertical line), while Penguin's price increases followed within a few weeks of executing its June 2010 agreement with Amazon (second vertical line).[60]

---

[57] *Id.* at 681.

[58] *Id.* at 686.

[59] *Id.* at 657, 675, 700.

[60] The graph is included in the Court's 2013 order following a bench trial. *Id.* at 683. The bottom flat line (G) represents the average prices of non-major publishers, who were not a part of the conspiracy. Random House (line F), then separate from Defendant Penguin, also did not join in the conspiracy and its average prices remained around $8. Although it later followed suit and adopted an agency model and raised prices, too. *Id.* at 683 and 685.



55.     In the short term, the plan paid off for Apple and the Big Five. Apple seized 22%

of the eBook market in the first two months of operation.[61] And while the Big Five lost eBook

revenue under the agency model, they offset their losses by raising the prices of their hardcover

books.[62]  However, it was not long before Apple and the Big Five faced the legal consequences

of their collusion.

**B.     Defendants' eBook pricing practices have been the continuous subject of antitrust**
        **investigations in the United States and Europe since 2011.**

      **1.     Authorities in the United States and Europe sanctioned the Big Five for**
        **conspiring with Apple to fix trade eBook prices.**

56.     The DG Comp first opened proceedings in December 2011 against the Big Five

and Apple to determine whether they colluded in raising retail prices of trade eBooks.[63] The Big

Five already faced a consumer class action filed in this District in August 2011 that raised the

---

[61] Marco Tabini, *Apple grabs 22 percent of eBook market with iBooks* Macworld (Jun. 7,
2010), https://www.macworld.com/article/1151813/ibooks.html.

[62] *Apple*, 952 F. Supp. 2d at 683.

[63] 5.4.2017 DG Comp. Decision at 8.

same allegations. The DOJ and Attorneys General from 33 states followed with their own enforcement actions in this District in early 2012.[64]

57.     Rather than risking an adverse judgment, the Big Five settled claims in the United States and Europe. Under the terms of consent decrees with the DOJ entered in 2012 and 2013, the Big Five agreed to terminate their contract with Apple and any other eBook retailer that restricted the retailers' ability to discount eBooks.[65] For a period of two years, the Big Five agreed that they would permit eBook retailers to discount eBook prices and to offer promotions to encourage consumers to purchase eBooks and for a five-year period the Big Five agreed not to enter into any agreement with an eBook retailer that contained a Price MFN for the sale of eBooks.[66] The Big Five agreed to the same restrictions in Europe under their settlements with DG Comp on December 12, 2012, and July 25, 2013.[67]

58.     After a 20-day bench trial against Apple in this District, the court found that Apple and the Big Five had engaged in a *per se* illegal horizontal price fixing agreement, which had the intent and effect of eliminating price competition in the trade eBook market and increasing the retail price of trade eBooks.[68] The evidence showed that Apple "made a conscious commitment to join a scheme with the Publisher Defendants to raise the prices of e-books" and that it was only through "the coordinated effort and conscious commitment of the Publisher Defendants and Apple" that the defendants were able to "effect a significant increase in the retail

---

[64] *Apple*, 791 F.3d at 296.

[65] *See U.S. v. Apple, Inc.*, *et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.; *e.g.*, Final Judgment Penguin at 8-9.

[66] *Id.* at 11 and 18.

[67] 5.4.2017 DG Comp. Decision at 8.

[68] *Apple*, 952 F. Supp. 2d at 694.

prices of e-books."[69] The court also held in the alternative that the plaintiffs had proved an unreasonable restraint on trade under the rule of reason by demonstrating that the agreements "removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved Apple of the need to compete on price, and allowed the [the Big Five] to raise the prices for their e-books, which they promptly did[.]"[70] The court entered a $450 million judgment against Apple and enjoined it from entering into any agreements with the Big Five that would prevent it from lowering eBook prices beyond the 2-year deadline imposed by their consent decrees, and the Second Circuit affirmed on appeal.[71] Judge Livingston, who wrote the Second Circuit panel's majority opinion affirming Apple's liability, separately opined that the evidence was also sufficient to hold Apple liable under the quick look analysis.[72]

59.    In Europe, the DG Comp likewise found that the Big Five had colluded with Apple to raise prices.[73] The price-fixing conspiracy found by the District Court and DG Comp consisted of the Big Five switching to an agency model and agreeing to an MFN with Apple to ensure that the Big Five sold their trade eBooks at the same prices through Apple's online store as through all other eBook retailers, including Amazon.[74]

60.    Separately, in 2012, regulators at the U.K. Office of Fair Trading (OFT) and regulators at Germany's Federal Cartel Office, the Bundeskartellamt, concurrently investigated

---

[69] *Id.* at 697.

[70] *Id.* at 694.

[71] *In re Electronic Books Antitrust Litigation*, 639 F. App'x 724, 726 (2d Cir. 2016). This prohibition began upon entry of the order and expired at different times for each of the Big Five Defendants. *Apple*, 791 F.3d at 336.

[72] *Apple*, 791 F.3d at 329-30.

[73] 5.4.2017 DG Comp. Decision at 8.

[74] *Id.*; *Apple*, 952 F. Supp. 2d at 663-65.

010888-12/1558070 V1

the anticompetitive effect of MFNs in Amazon's agreements with third-party retailers to sell on

its platform.[75] Concerned that Amazon's clause could drive up online prices for consumers, OFT

opened a formal investigation after receiving "numerous complaints" that Amazon prohibited its

third-party sellers from selling their products at lower prices through other online outlets,

including their own websites.[76] At the conclusion of its investigation, the Bundeskartellamt

found that Amazon's "horizontal price-fixing" agreement acts as a "barrier[] to market entry for

new competitors and hinder[s] the expansion of existing competitors in the market."[77] It further

found that the MFN is "a hardcore restriction in that it limits price-setting behaviour, [which]

cannot be seen either as an indispensable restriction, or as an appropriate way of involving

consumers with regard to its price-raising effect." Instead, the MFN "results in safeguarding

Amazon's large own-account share of sales as a competitor and the extensive reach of

amazon.de, which cannot be attacked by competing platforms." [78] Faced with these findings,

Amazon capitulated and agreed not to employ MFNs in its third-party seller agreements in the

---

[75] Dan Prochilo, UK May Drop Antitrust Probe into Amazon Pricing Policy, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy. OFT closed in 2014 and was succeeded by the newly created Competition and Markets Authority.

[76] Id.

[77] Bundeskartellamt, Amazon removes price parity obligation for retailers on its Marketplace platform (Dec. 9, 2013) ("12.3.13 Bundeskartellamt Decision"), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf?__blob=publicationFile&v=2.

[78] Id.

European market.[79] Having achieved their goal, OFT and the Bundeskartellamt closed their investigations in November 2013.[80]

61.     Amazon remained undeterred. Tellingly, not long after its concession to European authorities, Amazon presented a slide in a 2014 presentation, entitled "Risk Analysis", that advised company members to "Test the Boundaries of what is allowed by law."[81] Despite having disavowed its MFNs in one context, Amazon nonetheless employed MFNs in the eBook markets—including in North America, Germany, and the U.K.

**2.     Astonishingly, right after they were sanctioned for conspiring with Apple, the Big Five publishers immediately embarked on a price-fixing scheme with Amazon.**

62.     The terms of the consent decrees that prohibited the Big Five from agreeing to MFNs in the sale of trade eBooks remained in place until 2017 or 2018 (depending on the publisher). But the requirement that the Big Five permit retailer discounting of trade eBooks expired (other than Apple) in 2015.[82] Upon expiration, the Big Five promptly reintroduced the agency model by renegotiating their agreements with Amazon, thus reclaiming the right to set prices.[83]

---

[79] *Id.*

[80] *Id.*; OFT, *Amazon online retailer: investigation into anticompetitive Practices*, https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices.

[81] Aditya Kalra, *Amazon documents reveal company's strategy to dodge India's regulators*, Reuters (Feb. 17, 2021), https://www.reuters.com/investigates/special-report/amazon-india-operation/; see also Aditya Kalra, *India antitrust body says Reuters story corroborates evidence in probe of Amazon*, Reuters (March 19, 2021), https://www.reuters.com/article/us-amazon-com-india-idUSKBN2BB1UF.

[82] The Court's injunction against Apple prohibited it from contractually waiving discounts with the Big Five for an additional one to three years, depending on the publisher.

[83] *Supra* Trachtenberg; *The 2010s were supposed to bring the ebook revolution*; *For the Big Five, Agency Now Holds Sway Across the Board*; *see also* Amazon, HarperCollins reach multi-year publishing deal, First Post (Apr. 14, 2015), https://www.firstpost.com/tech/news-

63.     Some of the same individuals were involved in both sets of agreements. Five

top executives from the Big Five were pivotal to the conspiracy with Apple: David Shanks,

CEO of Penguin; Carolyn Reidy, President and CEO of Simon & Schuster; Brian Murray,

CEO of HarperCollins; John Sargent, CEO of Macmillan; and David Young, Chairman and

CEO of Hachette.[84] In 2015, at the time the Big Five entered new agency agreements with

Amazon, three of those five executives were still leading their companies.[85]

64.     Notably, one of these individuals, Macmillan CEO Sargent, publicly sought to

justify his company's collusion with Apple as procompetitive because it chipped away at

Amazon's eBook monopoly.[86] Yet he had no qualms about entering into the same arrangement

with Amazon, which both raised trade eBook prices *and* guaranteed Amazon's monopoly.

Indeed, the only "irony" that Sargent found in this arrangement is that despite Macmillan's

best efforts "to create even pricing as best we can," the court's injunction permitted Apple to

continue discounting Macmillan's eBooks through October 2017.[87]

---

analysis/amazon-harpercollins-reach-multi-year-publishing-deal-report- 3666709.html; Laura
Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014),
https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

[84] *Apple*, 952 F. Supp. 2d at 655-60.

[85] Paul St. John Mackintosh, *E-book Sales and Writers Be Damned! Simon & Schuster CEO
Carolyn Reidy Loves the New Status Quo Created by Big Publishing,* Teleread (Sept. 30, 2015),
https://teleread.com/big-publishing-assimilates-digital-print/index.html (indicating that Reidy
was CEO of Simon & Schuster in 2015); *Leadership Team*, Harper Collins Publishers,
https://www.harpercollins.com/pages/worldwide-leadership-team (last visited Feb. 11, 2021)
(indicating that Murray has been CEO of Harper Collins since 2008); Sarah Weinman, *People:
Weisberg Named President of Macmillan Publishers US*, Publishers Lunch (Nov. 19, 2015),
https://lunch.publishersmarketplace.com/2015/11/people-weisberg-named-president-of-
macmillan-publishers/ (noting that Sargent was CEO of Macmillan in 2015).

[86] Message from John Sargent to authors and agents (Apr. 11, 2012),
https://www.tor.com/2012/04/11/a-message-from-john-sargent/.

[87] Laura Owen, Macmillan, too, returns to agency pricing with Amazon, Gigaom (Dec. 18,
2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

65.     Defendants coordinated their price increases yet again. Just as during the *Apple* conspiracy, when Apple made it clear that it provided the same terms for each of the Big Five Defendants, Defendants here likewise publicly disclosed that each of the Big Five received the same deal with Amazon.

66.     Previously, Amazon had "yelled, screamed, and threatened" in response to the Big Five's demand in 2010 that Amazon adopt an agency model to sell trade eBooks.[88] But Amazon changed its tune when it began negotiating with Simon & Schuster and Hachette in July 2014.[89] Publicly, Amazon advocated for lower eBook prices, but tellingly it no longer insisted on retailer discounting.[90]

67.     **October 2014:** When Amazon and Simon & Schuster disclosed the first deal in October 2014, Simon & Schuster CEO Carolyn Reidy made no secret in her public letter to authors and agents that Simon & Schuster secured "with some limited exceptions," control over the price of its trade eBooks[91] As indicated by Plaintiffs' purchases, Simon & Schuster set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy. Not surprisingly, eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Simon & Schuster's customers.

---

[88] Greg Sandoval, *Apple ebooks trial: Amazon 'yelled ... and threatened' when publishers tried to control prices*, The Verge (Jun. 6, 2013), https://www.theverge.com/2013/6/6/4398648/apple-ebooks-trial-amazon-yelled-when-publishers-tried-to-control-prices.

[89] S&S, Amazon Agree on 'Version' of Agency Pricing, Publishers Weekly (Oct. 21, 2014), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/64461-s-s-amazon-agree-on-version-of-agency-pricing.html.

[90] Laura Owen, *In Amazon/Hachette deal, ebook agency pricing is a winner*, Gigaom (Nov. 14, 2014), https://gigaom.com/2014/11/14/in-amazonhachette-deal-ebook-agency-pricing-is-a-winner/.

[91] *Supra S&S, Amazon Agree on 'Version' of Agency Pricing.*

68.     **November 2014:** Amazon and Hachette issued a joint statement at the conclusion of their negotiations in November 2014, stating: "Hachette will have responsibility for setting consumer prices of its e-books, and will also benefit from better terms when it delivers lower prices for readers."[92] Defendants' promise of lower prices was false. Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Hachette's customers. As indicated by Plaintiffs' purchases, Hachette set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

69.     **December 2014**: In his public letter announcing Macmillan's December 2014 deal, Sargent was even more explicit about the terms of the deal and its effects on market prices, stating that Macmillan had negotiated an "agency model for e-books" with Amazon and that all "our other retailers will also be on the agency model, leaving Apple as the only retailer which is allowed unlimited discounting."[93] He continued:

> This odd aberration in the market will cause us to occasionally change the digital list price of your books in what may seem to be random fashion. I ask for your forbearance. *We will be attempting to create even pricing as best we can.*[94]

Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Macmillan's customers. As indicated by Plaintiffs' purchases, Macmillan set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

---

[92] Jillian D'Onfro, *Amazon and Big-5 Publisher Hachette Finally end their Pricing War*, Business Insider (Nov. 13, 2014), https://www.businessinsider.com/amazon-hachette-agreement-2014-11.

[93] *Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age,"* The Authors Guild (Dec. 19, 2014), https://www.authorsguild.org/industry-advocacy/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/.

[94] *Id.* (emphasis added).

70.     **April 2015:** HarperCollins also announced an agreement to proceed under an agency model for eBooks when it finalized its deal with Amazon in April 2015.[95] It also disclosed that it would set the eBook prices of most new releases at $14.99, considerably higher than the $9.99 favored by Amazon and consistent with the cap the Big Five Defendants set for new releases in the *Apple* conspiracy.[96] Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for HarperCollins customers. As indicated by Plaintiffs' purchases, HarperCollins set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

71.     **June 2015:** While negotiations with Penguin were underway, Amazon's spokesperson, Tarek El-Hawary, made clear that the deal would be the same: "I can say that we have long-term deals in place already with the other four major publishers and we would accept any similar deal with Penguin Random House UK."[97] Penguin disclosed that it, too, negotiated an agency model for trade eBooks when it concluded its deal with Amazon in June 2015. It also revealed that it would sell new releases at $12.99 or $13.99, much higher than Amazon's preferred $9.99 price under the wholesale model but within the range the Big Five Defendants set for new releases in the *Apple* conspiracy.[98] Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Penguin's customers.

---

[95] *No Authors Held Hostage as HarperCollins and Amazon Come to Terms*, The Authors Guild (Apr. 16, 2015), https://www.authorsguild.org/industry-advocacy/no-authors-held-hostage-as-harpercollins-and-amazon-come-to-terms/.

[96] *Id.*

[97] *Supra For the Big Five, Agency Now Holds Sway Across the Board*.

[98] *Id.*

72.     Publicly, the Author's Guild sided with the publishers because its members feared that Amazon's low prices would reduce their royalties.[99] But authors, whose standard royalty is 25% of the publisher's proceeds, would in most cases earn more under the wholesale model.[100] For example, a publisher that charges a $10 wholesale price for an eBook provides a $2.50 royalty even if the eBook sells for $9.99 at retail. But to earn the same royalty under the agency model, where the retail platform (like Amazon) keeps at least 30% of the retail price, the publisher would have to charge at least $14.29, a price likely to generate far fewer sales.

73.     Notably, Defendants disclosed the agency agreement but not the MFN and similar anticompetitive clauses that ensured that no retailer could compete with Amazon on price and product availability. These provisions would come to light, however, when the DG Comp reopened its investigation into anticompetitive conduct in the eBook market in June 2015. At the conclusion of its two-year investigation, the DG Comp found that Defendant Amazon employed MFNs with eBook publishers and similar provisions in its agreements with the Big Five (who were at that time prevented by their settlements with the DG Comp from employing MFNs in their contracts).[101] The DG Comp found that the MFNs and analogous provisions found in the Big Five contracts had probable anticompetitive effects.[102]

**3.      Defendants use MFNs and similar anticompetitive provisions to control the price of trade eBooks throughout the U.S. market and prevent competition with the Amazon platform in the sale of trade eBooks.**

74.     Because Defendants have not made their agreements public, Plaintiffs rely on public disclosures about the terms of their agreements, including news reports, submissions to

---

[99] *Id.*

[100] *Id.*

[101] 5.4.2017 DG Comp. Decision at 4-5.

[102] 5.4.2017 DG Comp. Decision at 20-38, 43.

the House Judiciary Committee, and the findings of the DG Comp and House Judiciary Committee. These reports describe the contractual devices that Defendants employ to fix trade eBook prices and prevent competition from Amazon's retail rivals in the sale of trade eBooks.

75.     In general, MFNs entitle the buyer to the lowest price or best terms that the supplier offers to any other buyer, but that is not how the MFN operates in Amazon's contracts with the Big Five Defendants.[103] The Big Five rely on the agency model to sell their eBooks, which means that Amazon is not a buyer and the Big Five are not its suppliers. "Amazon," the House Judiciary Committee observes, "has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers."[104]

76.     Although Amazon changed the name and specific mechanisms over the years, the Committee found that Amazon has continuously imposed contract provisions that effectively function as MFNs on book publishers.[105] The House Judiciary Committee found:

> The anticompetitive effects of Amazon's use of MFN clauses are particularly pronounced in the book market. According to a book publisher, Amazon used its market power in print and e-book sales to force a price MFN on it and other book publishers. As the publisher explained, the result has been that "publishers are completely handcuffed from stimulating platform competition

---

[103] *See Apple*, 952 F. Supp. 2d at 662.

[104] House Report at 295.  *See also* 12.3.13 Bundeskartellamt Decision (discussed *supra*). The harmful effect of Amazon's anticompetitive agreements with its third-party sellers in the United States is the subject of a separate consumer antitrust class action lawsuit. *Frame-Wilson v. Amazon*, Case No. 2:20-cv-00424-RAJ (W.D. Wash) (filed March 19, 2020). In August of 2020, the Competition Bureau Canada announced its own investigation to determine whether any Amazon policies "impact third-party sellers' willingness to offer their products for sale at a lower price on other retail channels, such as their own websites or other online marketplaces." Competition Bureau, https://www.canada.ca/en/competition-bureau/news/2020/08/competition-bureau-seeks-input-from-market-participants-to-inform-an-ongoing-investigation-of-amazon.html.

[105] House Report at 295.

because Amazon's price MFN causes publishers to incur significant financial penalties if they offer Amazon's rivals better pricing." Another publisher told the Subcommittee that "Amazon always has and still does require MFNs." According to this publisher, the MFN provisions prevent publishers from partnering with any of Amazon's competitors and reinforces Amazon's "stranglehold" and "control" over book distribution. Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.[106]

Because of Amazon's market power in the retail eBook market, these contractual requirements prevent Amazon's actual and potential retail rivals from introducing different business models, offering promotional advantages, or offering customers lower prices on their own.[107] The House Judiciary Committee's findings echo the conclusions of the DG Comp and the Bundeskartellamt a few years earlier.[108]

77.     The MFN and similar provisions in the Defendants' agreements not only affect prices; they also reduce consumer choice. Some users of Amazon's Kindle e-reader face switching costs, if they buy trade eBooks outside of Amazon's closed Kindle ecosystem. Others have simply become accustomed to purchasing from the retail giant. To induce potential customers to switch away from Amazon, competing eBook retailers need to provide additional value to consumers, for example in the form of lower prices or differentiated content or early

---

[106] *Id.* (footnotes omitted).

[107] *Id.* at 295-96.

[108] 5.4.2017 DG Comp. Decision; 12.3.13 Bundeskartellamt Decision.

releases of eBooks.[109] As discussed it greater detail below, Defendants' agreements methodically shut down every one of these avenues to competition.[110]

78.     **Notification provisions**: When the Big Five renegotiated their contracts with Amazon in approximately 2015, the consent decrees prevented them from having explicit MFNs in their eBook contracts. Until about 2017, while they were still subject to this prohibition, Amazon and the Big Five agreed to notification provisions that served the same function as the prohibited MFN provisions.

79.     In this interim period, the Big Five's retail-price-notification clauses required them each to notify Amazon if their agency price on Amazon was higher than the retail price charged via any competing eBook retailer.[111] The Big Five's promotion-notification provisions likewise obliged each of them to notify Amazon if they offered any promotional agency price or promotional content to an eBook retailer competing with Amazon and that the Big Five had not also offered to Amazon.[112] These clauses functioned like an MFN in that they allowed Amazon to prevent other retail platforms from undercutting the Big Five's eBook prices on the Amazon platform.[113] Once notified of the availability of the Big Five's eBooks at lower prices, Amazon typically "requested" that the same low retail price or promotional agency price charged on the platform of the competing eBook retailer would also be offered on the Amazon platform.[114] If

---

[109]  5.4.2017 DG Comp. Decision at 31.

[110]  *Id.* at 38 (". . . Amazon's Parity Clauses cover practically all the potential avenues a competing E-book Retailer may attempt to use in order to differentiate itself against Amazon. . . .").

[111]  *Id.* at 11.

[112]  *Id.*

[113]  *Id.* at 36.

[114]  *Id.*

the publisher did not comply with Amazon's "request," Amazon retaliated or threatened to retaliate by removing the buy button for one or several of the publisher's eBooks on its platform, by excluding the publisher's eBooks from all promotional activity, by removing the pre-order buttons or by prominently displaying banners for alternative eBooks in an attempt to dissuade potential buyers from purchasing the publisher's eBooks.[115] If they ever resisted, the Big Five stopped quickly and began turning down promotions proposed by Amazon's retail competitors because they would need to provide the same terms to Amazon.[116] These notification provisions are anticompetitive because they eliminated any incentive for the Big Five to offer lower prices or better terms to any of Amazon's competitors or new entrants.[117]

80.    **MFNs**: Since about 2017 the consent decrees no longer prohibit MFNs in the Big Five contracts. Since then, rather than relying on the notification provisions, it is believed that Amazon and the Big Five agreed to some or all of Amazon's explicit MFN provisions (*i.e.*, Amazon's agency price parity, promotion price parity, discount pool provision, wholesale price parity, and agency commission parity provisions discussed below).[118] Like the anticompetitive MFN Amazon uses to block third-party sellers on its platform "from offering lower prices to consumers on other retail sites," Defendants' MFNs not only raise trade eBook prices on the Amazon platform, but also all other retail eBook platforms.[119]

---

[115] *Id.* and n.55.

[116] *Id.* at 37.

[117] *Id.*

[118] *See* House Report at 295 ("Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.").

[119] *Id.* at 296; *see also* 12.3.13 Bundeskartellamt Decision (discussed *supra*) (finding that this provision functions as "horizontal price-fixing" agreement).

81.     **Agency-price parity**: Currently and since at least 2015, in the United States, the Big Five have agency agreements with Amazon. The DG Comp reports that Amazon's contracts with publishers that operate under the agency model include an agency-price-parity provision.[120] The agency price is the price the Big Five publisher sets or, if discounting is permitted, the discounted price charged by an eBook retailer for the sale of an eBook to a consumer under an agency agreement.[121] The agency-price-parity provision requires the Big Five to set the price for eBooks they sell through Amazon no higher than the price charged on eBook retail platforms that compete with the Amazon platform. This clause harms consumers by increasing Amazon's dominance as the platform for trade eBook sales and by raising the Big Five Defendants' trade eBook prices. If this clause did not exist, the Big Five would have a financial incentive to lower their eBook prices on rival platforms that charge lower commissions than Amazon and steer more sales to those platforms, thereby increasing the publishers' overall revenues and profits and evading Amazon's "stranglehold" over them.[122] The Big Five Defendants also have an agency-commission-parity clause that requires the Big Five to provide Amazon a commission that is equal to or greater than the commission the Big Five Defendants pay to Amazon's retail competitors, so conversely the Big Five Defendants cannot diversify their distribution channels by offering Amazon's competitors a better commission.[123]

82.     **Promotion-price parity**: Agency agreements also include a promotion-price-parity clause that requires the Big Five to provide Amazon any promotional agency price, promotional wholesale price, or promotional content that they offer to any other eBook retailer.

---

[120] 5.4.2017 DG Comp. Decision at 32.

[121] *Id.* at 10 n.17.

[122] *Id.* at 34; House Report at 295.

[123] 5.4.2017 DG Comp. Decision at 11.

The clause is anticompetitive because it gives the Big Five Defendants an incentive to prohibit Amazon's retail rivals from offering promotional eBook prices.[124]

83.     **Discount pool**: The discount pool clause provides Amazon yet another way to enforce its MFN whenever a competing eBook retailer offers a lower retail price than the publisher price on the Amazon platform.[125] The clause relates to a "pool" of credits that Amazon may use at its discretion. If the sale of any of the publisher's eBooks triggers this clause, Amazon has the right to discount the agency price for the specific title that triggered the clause or any other eBook title the publisher sells on the Amazon platform.[126] Amazon calculates the pool based on the differences between the agency prices the Big Five charge for their eBooks on the Amazon platform and any lower prices available through any other eBook retailer.[127] It then multiplies the difference in price by the number of units sold through Amazon for the duration of the time that the price on Amazon exceeded the competitor's price.[128] This clause is anticompetitive because it prevents Amazon's retail rivals from competing on price and eliminates the discounts that would otherwise be available to consumers.

84.     Defendants also employ non-price provisions that limit consumer choices and restrict competition from Amazon's eBook retailer rivals.

---

[124] *Id.* at 32. Amazon also has a wholesale price parity clause with publishers that sell at wholesale. This clause ensures that the publisher cannot offer Amazon the same title on the same date for a higher wholesale or retail price. *Id.* at 30. However, the Big Five have agency agreements with Amazon.

[125] *Id.* at 35 n.54.

[126] *Id.* at 32.

[127] *Id.*

[128] *Id.* at 35.

85. **Selection parity**: Because of Amazon's eBook market dominance, its retail competitors need to provide additional value to consumers, for example in the form of differentiated content or early releases of trade eBooks because even temporarily offering content that is unavailable on Amazon would increase competition in the retail distribution of trade eBooks.[129] In a competitive market, the Big Five Defendants would have a financial incentive to incur the added investment cost of developing innovative products for exclusive release by Amazon's retail competitors or to offer them exclusive early releases, so that Amazon's competitors would gain market share and weaken Amazon's bargaining power over the Big Five.[130] But Amazon includes a selection parity provision in all its contracts with publishers, including the Big Five, which requires them to provide their trade eBooks for sale on the Amazon platform at the earliest date available to other eBook retailers and to include all the same features as trade eBooks available through Amazon's retail competitors.[131] It also imposes a burden on a publisher intending to sell an eBook anywhere in the marketplace that is not primarily text (*e.g.*, contain illustrations, graphics, or additional content) to notify Amazon and provide all assistance and materials that would be reasonably required for Amazon to create an equivalent eBook of that title.

86. This global requirement of compatibility with Amazon's eBook readers effectively eliminates any economic incentive the Big Five Defendants would otherwise have to develop innovative eBooks that might be read on a more technologically advanced platform.[132] Amazon's selection parity clause hurts consumers by inducing publishers to keep their eBook

---

[129] *Id.* at 30.

[130] *Id.* at 29-30.

[131] *Id.* at 10, 27.

[132] *Id.*

functionalities simple, which eliminates the more interactive and advanced functions that might otherwise be available through Amazon's eBook retail competitors.[133] It harms retail competition because it forecloses a significant avenue for retailers to compete with Amazon by differentiating the product or making it available earlier.[134]

87.     **Business-model parity**: The DG Comp reports that Amazon employs the "Business model parity clause" in its contracts with the Big Five and other eBook publishers.[135] This clause requires the Big Five to notify Amazon of the distribution of their eBooks through alternative business models and offer to Amazon the same material terms and conditions as any other eBook retailer, even if the retailer operates under a different business model.[136] Examples of alternative business models include: subscriptions, streaming, rentals, book clubs, bundling of eBooks with the sale of print books, and reduced prices for partial downloads.[137] The clause therefore creates an anticompetitive disincentive for the Big Five Defendants to support and invest in alternative new and innovative business models.[138] This, in turn, reduces Amazon's eBook retail competitors' ability and incentive to develop alternative business models and differentiate their eBook offerings through these innovations.[139] It likewise deters the entry of new eBook retail rivals and the expansion of Amazon's existing retail rivals, which collectively

---

[133] *Id.*

[134] *Id.* at 31.

[135] *Id.* at 9 and 12.

[136] *Id.* at 9.

[137] *Id.*

[138] *Id.* at 22.

[139] *Id.*

weakens overall competition in the trade eBook retail market and serves only to reinforce Amazon's already-dominant position in that market.[140]

       **4.**       **Under pressure from the DG Comp, Amazon agreed not to enforce its MFN and similar anticompetitive provisions in the European eBook market.**

       88.       At the conclusion of the DG Comp's two-year investigation, Amazon agreed not to enforce its MFN and similar provisions in the European eBook market. Amazon affirmed that for the next five years it would no longer require its publishers in the European market to provide Amazon equal or better terms than their offers to its rival booksellers. It also affirmed that it would no longer require publishers in the European market to provide information to Amazon about its rival booksellers' alternative or new business models, release dates, catalogue of eBooks, eBook features, promotions, agency prices, agency commissions and wholesale prices.[141]

       89.       Commissioner Margrethe Vestager said that Amazon's consent to withdrawing its MFN and similar anticompetitive provisions will "open the way for publishers and [booksellers] to develop innovative services for eBooks, increasing choice and competition to the benefit of European consumers."[142]

---

[140] *Id.*

[141] 5.4.2017 DG Comp. Decision at 35.  *See also* 5.4.2017 DG Comp. Commitments Decision, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4393_3.pdf.

[142] 5.4.2017 DG Comp. Decision at 35.



90.    Amazon's settlement with the DG Comp had no effect on Amazon's and the Big

Five's practices in the United States.

**5.    Federal and state authorities investigate Amazon's practices, including eBook sales.**

91.    In June 2019, the House Antitrust Committee began a year-long investigation that

led to seven hearings on digital markets, touching on issues like data privacy, innovation, the free

press, and competition. At one of the hearings in late July 2020, Amazon CEO Jeff Bezos

testified in person at a hearing, titled "Online Platforms and Market Power, Part 6: Examining

the Dominance of Amazon, Apple, Facebook, and Google." In a written statement, the presiding

Chair expressed concerns that Amazon's dominance in "online marketplace sales" presents a risk

that a single action by that company could "affect hundreds of millions of us in profound and

lasting ways."[143]

---

[143] *Supra* Press Release (Jul. 29, 2020).

92.     On October 5, 2020, the House Antitrust Committee issued its findings. The Committee concluded that Amazon "serves as a gatekeeper over a key channel of distribution," the U.S. online retail market,[144] and that it "uses its gatekeeper position to maintain its market power" and "to further entrench and expand" its dominance.[145] The Committee compared Amazon's monopoly power and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[146]

93.     The report, which also examined the marketplace dominance of two other large tech companies, relied on 1,287,997 documents and communications; testimony from 38 witnesses; a hearing record that spans more than 1,800 pages; 38 submissions from 60 antitrust experts from across the political spectrum; and interviews with more than 240 market participants, former employees of the investigated platforms, and other individuals totaling thousands of hours.[147] Notably, over the Committee's objection, the companies withheld critical "documents that were produced to antitrust authorities in ongoing investigations, or that related to the subject matter of these ongoing investigations."[148]

94.     Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in several states.[149] The pending investigation

---

[144] House Report at 6, 15.

[145] *Id*. at 6.

[146] *Id*.

[147] *Id*. at 7.

[148] *Id*.

[149] House Report at 253; Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

by the Connecticut Attorney General focuses on Amazon's agreements with publishers, and each of the Big Five publishers received a subpoena in 2019 pursuant to that investigation.[150]

## C.   Defendants' anticompetitive conduct significantly increased the price of trade eBooks in the United States.

95.     Because trade eBooks do not require printing, storage, or shipping, Defendants' marginal cost for producing and distributing each additional eBook is close to zero.[151] In a competitive market, lower production costs should significantly reduce eBook prices, yet low production costs have not significantly lowered trade eBook prices in comparison to print trade books.[152] Defendants' anticompetitive agreements cause higher prices and lower output in the trade eBook market.

96.     While Amazon claimed that its renegotiated agreements gave the Big Five incentives to set prices low, the Wall Street Journal reported that the deals led to *higher* prices for the Big Five's trade eBooks.[153] Codex Group, a book-industry analysis firm, reported in 2015 that trade eBook prices from the Big Five cost, on average, $10.81, while all other eBooks on the Amazon platform had an average price of $4.95.[154] In another telling example, Amazon sold the newly released James Patterson's thriller *Invisible* in eBook format for the heavily discounted price of $8.99 in 2014, but when his thriller *Alert* debuted in 2015—after Mr.

---

[150] Trachtenberg and Mattioli.

[151] Analyst opinion, https://www.statista.com/outlook/213/109/ebooks/united-states#market-users.

[152] *Id.*

[153] *Supra* Trachtenberg.

[154] *Id*.

Patterson's publisher, Hachette, signed the agency agreement with Amazon—the *Alert* eBook sold for $14.99.[155]

97.     Publishing executives acknowledge that the "higher e-book prices, resulting from the Amazon deals, are discouraging purchases."[156] Book sales data analyzed by Nielsen Book (now known as NPD BookScan) confirms this. It finds that the "return of agency pricing by the Big Five trade houses in 2015 raised e-book prices by an average of $3, leveling off at about $8 per book. *That jump in prices coincided with the downturn in e-book sales for traditional publishers*. And while *e-book prices for the Big Five were rising*, prices for self-published books were settling in at about $3."[157]

98.     Defendants' anticompetitive agreements had immediate effect. The week after their respective agency contracts with Amazon took effect, Penguin increased its eBook prices by 30.4%, HarperCollins by 29.3%, Simon & Schuster by 15.8%, Macmillan by 10.7%, and Hachette Book Group by 8.3%.

99.     As the following charts demonstrate, the Big Five eBooks experienced competitive pricing only when the Big Five permitted retailers to discount them. But as soon as the Big Five entered into their combined agency and MFN agreements, first with Apple and now with Amazon, they raised trade eBook prices and maintained them at supracompetitive levels for the duration of those agreements[158]:

---

[155] *Id.*

[156] *Id.*

[157] Jim Milliot, *The Bad News About E-books*, Publishers Weekly (Jan. 20, 2017), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/72563-the-bad-news-about-e-books.html (emphasis added).

[158] The charts represent the weighted average eBook price for each of the Big Five with prices adjusted for inflation. The charts draw from a data sample consisting of New York Times





bestsellers starting from February 13, 2011, when the first eBooks appeared on the NYT list, to December 1, 2020.







100.    Defendants raised prices by increasing the price point for new releases and by
consolidating trade eBook prices to fewer price buckets. During the Apple conspiracy in 2011-
12, the Big Five priced 80% of their eBooks within just four price buckets. This roughly doubled
in 2013 through 2014, when the DOJ ensured competitive trade eBook pricing by enforcing the
consent decrees entered against the Big Five Co-conspirators. After entering into their
agreements with Amazon in 2015, the Big Five Defendants gradually reverted to using three or
four price buckets by 2018 and through the present, as illustrated by the following chart:



101.   The Big Five eBook prices had the greatest price diversity in 2014, while the consent decrees required them to allow retailer discounting. After adjusting for inflation, trade eBook prices in 2014 clustered around $12 and only about 5% of titles sold for around $15, whereas in 2020, which represents greater price conformity, 55% of titles sold for around $15 and less than 5% sold around $12:





102.    One market observer, writing in 2018, estimated an average price increase of

$5 per title and concluded that eBook sales were low because "many people find that paying

$15.00 to $22 for a Kindle book, is too expensive."[159] He remarked, "The primary reason for this is due to *Amazon not being able to set the digital price anymore, the publishers are doing that*."[160]

103.     Crucially, the agreements between Amazon and each of the Big Five publishers did more than simply return to an agency model. Had Defendants only raised prices on the Amazon platform without imposing an MFN or similar provision, consumers would be free to shop for lower-priced trade eBooks on other retailer sites (like Barnes & Noble, Apple, or Kobo). To avoid such competition and secure higher trade eBook prices marketwide, Amazon and the Big Five have employed MFNs and/or similar provisions that enabled the Big Five to set prices and ensured that prices would increase on all retail platforms.

### D.     Defendants each benefitted from the trade eBooks-price-fixing scheme.

104.     The *Apple* case demonstrates the Big Five's motivation to raise trade eBook prices and their willingness to agree to an MFN with a major eBook retailer to achieve that result. The DG Comp makes clear that even when the Big Five were prohibited from having MFNs in their eBook contracts, they and Amazon got around that restriction by employing notification provisions that had precisely the same effect.[161]

105.     In a competitive market, the Big Five could sell eBooks at a lower price on their own websites or through Amazon's retail competitors that offer lower commissions and fees.[162] But the Big Five have agreed not to do this because it suits their goal of maintaining

---

[159] Michael Kozlowski, *Are ebooks too expensive in 2018?*, GoodEReader (May 14, 2018), https://goodereader.com/blog/e-book-news/are-ebooks-too-expensive-in-2018.

[160] *Id.*

[161] 5.4.2017 DG Comp. Decision at 11.

[162] See House Report at 6 (recognizing that Amazon has the power to charge "exorbitant fees" and impose "oppressive contract terms" on the businesses that rely on its platform); Letter

supracompetitive trade eBook prices throughout the U.S. market. As part of the arrangement, the Big Five immunize Amazon from competition.

106.    Conversely, as the largest retailer of both print books and eBooks, the bargaining power that Amazon wields over the Big Five is immense. In negotiating with the Big Five, Amazon could have retained its right to discount their eBooks. But Amazon commits to waive discounting and to let the Big Five set their own high prices because it faces no competition from other eBook retailers on price or product availability.

107.    According to the House Antitrust Committee, Amazon has always employed MFNs or their equivalents in its contracts with trade publishers.[163] Whether using MFN clauses (business-model-parity, agency-price-parity, agency-commission-parity, price-promotion-parity, selection-parity, or discount-pool provisions) or notice provisions, the objective is always the same: to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce "Amazon's 'stranglehold' and 'control' over book distribution."[164] Through these restraints, Amazon has acquired and maintained its monopoly power.[165] Competitors lack any incentive to offer promotional advantages or alternative business models, like eBook rentals, to gain a following because Amazon demands that the Big Five offer that same option on the

---

from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020), https://publishers.org/wpcontent/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf. ("Maria A. Pallante *et al.* Letter") at 3 (providing examples of high fees Amazon charges to publishers that increases book prices).

[163] *Id.* at 295-96.

[164] *Id.*

[165] *Id.*

Amazon platform.[166] This results in higher consumer prices, fewer technical innovations in Ebooks, and fewer innovations in the business of distributing eBooks.[167]

108.    Amazon also benefits from its price-fixing agreement as a competing trade publisher. Amazon Publishing identifies itself as "a leading publisher of commercial and literary fiction, nonfiction, and children's books."[168] It has nine offices around the world and currently operates 16 imprints.[169] One imprint, Amazon Crossing, is the largest publisher of translated fiction in the United States.[170] Two books published by Amazon Publishing have won literary awards and hundreds of others have been nominated.[171]

109.    The Codex Group estimates that Amazon Publishing puts out 1,100 titles a year.[172] Estimating sales for Amazon titles is difficult because Amazon's proprietary methods of distribution obscure the sales figures from the third-party researchers who determine best-seller lists.[173] But best-selling author Dean Koontz has a five-book deal with Amazon Publishing.[174] And Amazon touts at least 36 authors as having sold a million or more books.[175]

---

[166] 5.4.2017 DG Comp. Decision at 20-38, 43.

[167] *Id.*

[168] Amazon Publishing, https://amazonpublishing.amazon.com/about-us.html.

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] *Supra* Montgomery.

[173] *Id.*

[174] *Id.*

[175] Amazon Publishing.

110.     Raising the price of the Big Five's eBooks benefits Amazon's publishing business. Secure in the knowledge that the Big Five will not engage in a trade eBook price war, Amazon can maintain sales of its own publications without significantly lowering its prices.

**E.     Amazon further increases the market price of the Big Five's trade eBooks by charging the publishers high fees to sell on the Amazon platform.**

111.     Amazon drives up the Big Five's cost of doing business on the Amazon platform and therefore the retail price of their trade eBooks by tying its distribution services to the purchase of advertising.[176] Although Defendants already give Amazon a substantial commission (circa 30%) on each eBook sale, that fee does cover the basic service of "helping customers find and purchase books on the Amazon platform[.]"[177] In order for their eBooks to be easily found on its massive platform, Amazon charges publishers additional fees for advertising services. "Amazon manipulates the discovery tools to make a publisher's books difficult to find without the purchase of advertising or refuses distribution unless the publisher also purchases advertising."[178]  Because the Big Five agree not to sell their trade eBooks at a lower price on any other retail platform (like Barnes & Noble, Apple, or Kobo), the high price on the Amazon platform leads to higher prices throughout the U.S. marketplace, injuring Plaintiffs and Class members, who purchase from Amazon's retail rivals.

---

[176] Maria A. Pallante *et al.* Letter at 3; *see also* Dana Mattioli and Joe Flint, *How Amazon Strong-Arms Partners Using Its Power Across Multiple Businesses*, WSJ (Apr. 14, 2021), https://www.wsj.com/articles/amazon-strong-arms-partners-across-multiple-businesses-11618410439.

[177] Maria A. Pallante *et al.* Letter at 3.

[178] *Id.*

## VI.   INTERSTATE TRADE AND COMMERCE

112.   Defendants' acts as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Defendants publish, sell or facilitate sales of trade eBooks across, and without regard to, state lines.

## VII.   DEFENDANTS' MARKET POWER IN THE RELEVANT MARKETS

113.   The relevant market for purposes of this action is the retail sale of trade eBooks in the United States. Amazon and the Publisher Defendants have market power in this market.

### A.   The market for trade eBooks is the relevant product market.

114.   Trade books represent a distinct product market from non-trade books, such as reference and academic books.[179] They also represent a distinct product market from self-published books. Whereas a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution.[180] Trade publishers are highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they do review.[181] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publisher's considerable investment in that process.

---

[179] *Apple*, 952 F. Supp. 2d at 648 n.4.

[180] Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[181] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published.

115.    Within the trade book market, there is also a distinct product market for the retail sale of trade eBooks that is separate from retail distribution of trade print books and trade audio books.[182]

116.    Products' functional interchangeability typically depends on the products' physical characteristics.[183] Courts and economists typically define the boundaries of a market by reference to products' functional substitutability, and products' physical characteristics often determine their functional substitutability.[184] In this case, eBooks are digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them. Thus, eBooks do not have a physical presence the way a print book does. They differ from audio books, which may be physical or digital, but are made for listening, not visual reading. These distinguishing characteristics affect the substitutability of print books and audio books in the supply or demand for eBooks.[185]

117.    From both a demand side and a supply side analysis, trade print books and trade audio books are also not sufficiently strong substitutes to warrant their inclusion in the same product market as trade eBooks.[186]

118.    The DG Comp found that, as regards demand-side substitutability, consumers are unlikely to switch from trade eBooks to print versions in case of a 5-10% increase in the retail price of eBooks because overall, even with a 5-10% increase of their retail price, eBooks would

---

[182] *Apple*, 952 F. Supp. 2d at 694 n.60 (defining the relevant market as trade eBooks in the United States); 5.4.2017 DG Comp. Decision at 14.

[183] 2 Federal Antitrust Law § 10.2 (2020).

[184] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

[185] 5.4.2017 DG Comp. Decision at 14.

[186] *Id.*

generally be priced significantly lower than print books.[187] Consumer preferences also play an important role in distinguishing the two formats. For example, the DG Comp's investigation of the eBook market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book, including: (i) eBooks are easier to carry than print books when travelling; (ii) eBooks have functionalities not available for print books, such as the possibility to change the type and size of the font; (iii) eBooks can support interactive features such as video or music add-ons, dictionaries, and links to information about the subject matter of the book or the author; and (iv) eBooks can be purchased and downloaded immediately at any time.[188] The DG Comp also noted that a significant number of titles are only, or more readily, available in the eBook format.[189]

119.    To find significant supply-side substitutability, print book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The DG Comp found that this was not the case. The distribution of print books entails important investments in distribution, warehousing, and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[190] A traditional print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[191]

---

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

120.     The DG Comp found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[192] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

**B.     The United States is the relevant geographic market.**

121.     The relevant geographic market is the United States. Like most ecommerce, the eBook market operates nationwide. Much of the sales activity in that market occurs through nationwide channels, including Amazon's online sales platforms and those of its eBook retail competitors.

122.     The Big Five sell their trade eBooks throughout the United States.

123.     EBook retailers located outside of the United States are unable to constrain trade eBook pricing in the United States.

**C.     The Big Five dominate the production and sale of trade eBooks in the U.S. market.**

124.     Together, the Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of New York Times bestsellers.[193] Their dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing houses, consisting of vast numbers of subsidiary publishers or "imprints." By 2006, the six largest U.S. trade book publishers (the current Big Five) accounted for ninety percent of total

---

[192] *Id.*

[193] *Apple*, 791 F.3d at 298.

sales. [194] In 2013, Penguin merged with Random House, producing a combined group that now controls approximately twenty-five percent of the English-language publishing market.[195]

125.    On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger would create a single publishing house with approximately a third of all trade books published.[196] News Corp Chief Executive Robert Thomson said in a statement, "This literary leviathan would have 70% of the U.S. literary and general fiction market."[197]

126.    The following illustrations demonstrate the number of subsidiary publishers or imprints that would be consolidated under one roof if the merger is approved:[198]

---

[194] Peter Lee, *Reconceptualizing the Role of Intellectual Property Rights in Shaping Industry Structure*, 72 Vand. L. Rev. 1197, 1259-1263 (May 2019).

[195] *Id.*

[196] *AG Statement on Proposed Sale of Simon & Schuster and Its Ramifications for Authors*, The Authors Guild, https://www.authorsguild.org/industry-advocacy/ag-statement-on-proposed-sale-of-simon-schuster-and-its-ramifications-for-authors/; Frank Jordans and Hillel Italie, *Penguin to buy Simon & Schuster, create publishing giant*, Associated Press (Nov. 25, 2020, https://apnews.com/article/stephen-king-publishing-john-irving-media-jonathan-karp-89ec475bd7783fea199a378c60261f8b.

[197] *Supra* Jordans & Italie.

[198] *Supra* Lee.



010888-12/1558070 V1



## D.    Amazon provides the dominant eBook retail platform.

127.    Amazon sells more books than any other single retail outlet in history.[199] Twenty-five years ago, there were around 4,000 independent bookstores in the U.S., and many functioned as local cultural centers, where people browsed and exchanged ideas.[200] Today, there are fewer than 2,000, and economic power in the market is concentrated in the hands of one bookseller.[201]

128.    While other booksellers pique their customers' curiosity and stimulate new interests, Amazon caters to its customers' existing or analytically-predicted needs or desires. According to Codex Group, readers browsing in a traditional bookstore discover new books they

---

[199] Porter Anderson, *US Publishers, Authors, Booksellers Call Out Amazon's 'Concentrated Power' in the Market,* Publishing Perspectives **(**Aug.17, 2020), https://publishingperspectives.com/2020/08/us-publishers-authors-booksellers-call-out-amazons-concentrated-power-in-thebook-market/.

[200] George Packer, *Cheap Words*, New Yorker (Feb.17 & 24, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words.

[201] Amy Watson, Number of independent bookstores in the U.S. 2009-2019, Statista (Oct 29, 2019), https://www.statista.com/statistics/282808/number-of-independent-bookstores-in-the-us/.

would like to read at about three times the rate they do while shopping on Amazon.[202] Even though it dominates the book market, Amazon accounts for only 7% of new book discovery, while local bookstores, shunted to the periphery of the book market, account for 20% of new discoveries.[203]

129.     The foregoing certainly occurs by design, as Amazon founder and a former hedge fund manager, Jeff Bezos, did not start an online bookstore out of a love of books. Amazon treats books as a commodity, like toothpaste or tennis rackets.[204] Mr. Bezos's decision to start Amazon as a bookstore was, according to Shel Kaphan, Bezos's former deputy, "totally based on the property of books as a product."[205] Books are easy to ship, hard to break, and there are far too many of them, in and out of print, to sell even a fraction of them at a physical store.[206] EBooks have the added advantage that they require no shipping or physical storage space.

130.     According to a New York literary agent, books were Amazon's version of "a gateway drug."[207] Long before Google found a way to commoditize consumer data, Amazon recognized that it was the key to the new economy and that selling books was the optimal way to gather detailed, consumer preference data, particularly from affluent, educated shoppers.[208] John Sargent, the former CEO of Macmillan, noted that Amazon was never just a bookstore, "Books were going to be the way to get the names and the data. Books were [Amazon's] customer-

---

[202] Stacy Mitchell and Olivia LaVecchia, *Report: Amazon's Monopoly*, ILRS (Nov 29. 2016), https://ilsr.org/amazons-monopoly/ at 27.

[203] *Id.*

[204] *Supra* Day and Gu.

[205] *Supra* Packer.

[206] *Id.*

[207] *Id.*

[208] *Id.*

acquisition strategy."[209] After collecting data on millions of customers, Amazon would figure out how to sell everything else.[210]

131.    Amazon's rise in the book industry is even more pronounced in the eBook market, where it enjoys nearly 90% of the market and its closest competitor, Apple, has a distant 6% share:[211]



132.    Market shares as large as Amazon's create an inference of market power. Its market power is durable because barriers to entry make entry by new competitors difficult.[212] The large base of Kindle e-readers that already exists around the world operates as a barrier to entry for other eBook retailers.[213] Further, effective entry into or expansion in the eBook market

---

[209] *Id.*

[210] *Id.*

[211] *Supra* Day and Gu.

[212] 5.4.2017 DG Comp. Decision at 33 (finding that such barriers exist and exacerbate "the potential foreclosure effect" of the MFN).

[213] *Id.* at 19-20.

would require competing retail platforms to be able to differentiate their products or services, including by offering lower prices, innovative distribution methods, or innovative products. As the allegations in this complaint make clear, Amazon's MFNs and similar provisions make such competition impossible.

## VIII.   CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action on behalf of themselves and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive relief against Defendants pursuant to federal antitrust law on behalf of the members of the following Class:

> All persons who, on or after January 14, 2017, purchased in the United States one or more eBooks sold by the Big Five Publishers via an agency model through any retail e-commerce channel in the United States.

134.    In the alternative, if the Big Five Defendants are determined to be the intended third-party beneficiaries of Barnes & Noble's mandatory arbitration clause for any purchases through the Barnes & Noble platform,[214] Plaintiffs propose the following Subclasses:

135.    Plaintiffs Fremgen, Christopherson-Juve, DeLeon, Bonilla, Lerner, Agostino, and Etten would seek to represent a Subclass of consumers who purchase Big Five's eBooks through Barnes & Noble and would assert claims on behalf of themselves and the following proposed subclass against Amazon only:

> All persons who, on or after January 14, 2017, purchased in the United States one or more eBooks sold by the Big Five Publishers via an agency model through the Barnes & Noble platform.

---

[214] *See* Barnes & Noble, Digital Content Terms of Sale, https://www.barnesandnoble.com/h/digital-content-terms-of-sale#7.

136.    Plaintiffs Wilde, Wilder, Sacks, Silverman, Tomasulo, Twill, Ackerman, and Jeffrey and Susan Cook would seek to represent the following Subclass and assert claims against all Defendants:

> All persons who, on or after January 14, 2017, purchased in the United States one or more eBooks sold by the Big Five Publishers via an agency model through any retail e-commerce channel in the United States other than the Barnes & Noble platform.

137.    Excluded from the proposed Class(es) are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members, judicial officers and their personnel, and all governmental entities.

138.    **Numerosity:** Members of the proposed Class(es) are so numerous that joinder is impracticable. Plaintiffs believe that there are millions of members of the proposed Class(es) geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

139.    **Typicality:** Plaintiffs' claims are typical of the claims of other members of the proposed Class(es). The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Class(es).

140.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed Class(es) both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class(es), and their interests do not conflict with the interests of the members of the proposed Class(es) they seek to represent.

141.    **Commonality:** Questions of law and fact common to the members of the proposed Class(es) predominate over questions that may affect only individual Class members

because Defendants have acted on grounds generally applicable to the Class(es), and members of

the proposed Class(es) share a common injury. Thus, determining damages with respect to the

Class(es) as a whole is appropriate. The common applicability of the relevant facts to claims of

Plaintiffs and the proposed Class(es) are inherent in Defendants' wrongful conduct because the

overcharge injuries incurred by Plaintiffs and each member of the proposed Class(es) arose from

the same anticompetitive conduct alleged herein.

142.    There are common questions of law and fact specific to the Class(es) that

predominate over any questions affecting individual members, including:

 i.   Whether Amazon and the Big Five unlawfully contracted, combined, or conspired
      to unreasonably restrain trade in violation of section 1 of the Sherman Act by
      agreeing that the Big Five would not sell their eBooks to consumers or allow other
      retailers to sell them at a price lower than what they offered at the Amazon
      platform;

 ii.  Whether Defendants have unlawfully monopolized the U.S. retail trade eBook
      market, including by way of the contractual terms, policies, practices, mandates,
      and restraints described herein;

 iii. Whether competition in the U.S. retail trade eBook market has been restrained and
      harmed by Defendants' conduct in this market;

 iv.  Whether Plaintiffs and Class members have been damaged by Defendants'
      conduct;

 v.   The amount of any damages; and

 vi.  The nature and scope of injunctive relief necessary to restore a competitive market.

143.    **Prevention of inconsistent or varying adjudications:** If prosecution of myriad

individual actions for the conduct complained of were undertaken, there likely would be

inconsistent or varying results. This would have the effect of establishing incompatible standards

of conduct for the Defendants. Certification of Plaintiffs' proposed Class(es) would prevent these

undesirable outcomes.

- 73 -

144.     **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Class(es). Accordingly, final injunctive relief is appropriate respecting the Class(es) as a whole.

145.     **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Class(es) could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, it ensures the uniformity of decisions on the subject of this complaint.

## IX.     ANTITRUST INJURY

146.     Defendants, through their unlawful conduct alleged herein, increase the retail prices of trade eBooks throughout the U.S. market, reduce consumer choices, and cause antitrust injury to trade eBook direct purchasers in the form of overcharges. Plaintiffs and members of the proposed Class(es) have sustained, and continue to sustain, significant losses from overcharges directly caused by Defendants' anticompetitive activity. Plaintiffs will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiffs and members of the proposed Class(es) will incur future overcharges in their direct purchases of trade eBooks.

147.     Plaintiffs and Class members are direct purchasers who purchase trade eBooks from the Big Five Defendants at prices inflated by Defendants' anticompetitive conduct.

- 74 -

148.    The Big Five employ an agency model to sell their eBooks. Under the agency model, the publishers set the price, and retailers—acting as agents for the publisher—take a commission on the sale to readers.[215] The agency model does not permit the retailer-agent to discount the price unilaterally, *e.g.*, to offer books at a two-for-one price or lower the price of a book through any membership or loyalty program.[216]

149.    Plaintiffs and members of the proposed Class(es) overpay when they buy eBooks directly from the Big Five. As required by the MFNs, when the Big Five sell their eBooks through an agency model (or also in the case of Defendant HarperCollins through its own website), they sell at a retail price that is equal to or higher than the price they sell their eBooks on the Amazon platform. In a competitive market, it would be in each of the Big Five Defendants' own economic self-interest to expand their share of the retail sales of their eBooks and diversify their distribution. It would also serve the Big Five Defendants' interests—in a competitive market—to allow Amazon's retail rivals to develop alternative business models that cost less to consumers, but increase the Big Five's revenue. Offering Amazon's retail rivals special edition or enhanced eBooks would also attract new customers, increase sales, and reduce the Big Five's dependency on Amazon. Similarly, in a competitive market, avoiding the commissions charged by Amazon and selling through their own websites at a greater discount or allowing Amazon's retail rivals to add their own discounts and promotions to steer more sales to their platforms would also serve the Big Five's economic self-interest. But Defendants have agreed not to do this, so as to preserve the supracompetitive prices of the Big Five's eBooks.

---

[215] Andrew Albanese, *Will the Agency Model Survive? Hachette, Amazon and the future of agency pricing,* Publishers Weekly (May 16, 2014), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/62349-will-the-agency-model-survive.html.

[216] *Id.*; *supra* Boyle.

Plaintiffs and Class members who purchase directly from the Big Five Defendants through Amazon's retail rivals are harmed because they pay prices fixed by Defendants and without the benefit of discounts, promotions, and potentially lower-cost alternative business models that would exist in a competitive market, where these agreed restraints did not exist.

150.     Because Defendants continue to adhere to their anticompetitive agreements, Plaintiffs and Class members are reasonably likely to incur future overcharges for the Big Five's eBooks. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendants' violations of antitrust laws, including their unreasonable restraints against trade and Amazon's monopolization of trade eBooks retail distribution, as alleged herein.

## X.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE
### (15 U.S.C. § 2) (ALL DEFENDANTS)

151.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

152.     Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class(es) described above. Plaintiffs seek damages and injunctive relief.

153.     Defendants, by and through their officers, directors, employees, agents and other representatives, have entered into unlawful agreements, combinations, and conspiracies in restraint of trade. Specifically, Defendants have mutually and unlawfully agreed to prevent competitive pricing of trade eBooks by switching to an agency model and agreeing to anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs, including the business-model-parity provision, the selection-parity clause, the retail-price-notification provision, the agency-price-parity provision, the agency-commission-parity provision, the promotion-parity provision, and the discount-pool provision. These unlawful

agreements have unreasonably restrained price competition among retailers for trade eBook sales by ensuring that the Big Five's eBooks sold at the same prices through Amazon's retail platform as through all other eBook retailers.

154.    Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints whether a *per se*, "quick look," or rule of reason standard applies.

155.    **Per se**: All Defendants are trade publishers and horizontal competitors in the publication and sale of trade eBooks.

156.    Defendants engaged in parallel conduct by entering into the same anticompetitive agency agreements with MFNs that the court in this District had previously found to be a *per se* violation of Section 1 of the Sherman Act. Defendants' agreements are *per se* violations because they were formed for the purpose and with the effect of raising the price of trade eBooks even if they had not explicitly agreed on the prices to be charged. Further, the Big Five Defendants set their prices along the same ranges they previously agreed to under the *Apple* conspiracy.

157.    Defendants share a common motive to collude. Defendant Amazon has a motive to dominate its retail competitors, which it achieves by including MFNs or similar provisions to ensure that no rival retail platform can differentiate itself from, or otherwise compete with, Amazon. Each of the Big Five Defendants has a motive to enter into agency pricing as a means to control trade eBook pricing in the industry. Each has rejected retailer discounting of its own eBooks and denounced the practice as a threat to the publishing industry. And each has previously colluded with a retail platform operator to control trade eBook prices throughout the U.S. market by entering into agency agreements with MFNs.

158.    Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these anticompetitive agreements, which substantially,

unreasonably, and unduly restrain trade in the relevant market, and thereby harmed and continue to harm Plaintiffs and the proposed Class(es). The Big Five Defendants acted against their own self-interest by agreeing to agency agreements with Amazon that contained the MFNs and similar anticompetitive provisions, since those agreements and provisions caused them to lose revenue. Defendant Amazon acted against its own self-interest in adopting agency agreements that it previously rejected as harmful to its customers. All Defendants have an interest in generating sales in the trade eBook market, yet Defendants' supracompetitive prices have depressed sales in this market.

159.    Defendants had opportunities to collude. For example, as each of the Big Five Defendants entered into the same agreement with Amazon, they publicly signaled to the others that the agreement provided agency pricing. Defendant Amazon also publicly stated that it had offered the same terms to each of the Big Five.

160.    Authorities in the United States and Europe have launched multiple investigations into Defendants' conduct in the eBook market and have found their agency agreements with MFNs to be anticompetitive. The House Antitrust Committee and the DG Comp also found at the conclusion of their respective investigations into Amazon's MFNs and similar anticompetitive provisions in its agreements with eBook publishers, including the Big Five, that Amazon's agreements harm consumers and competition in the U.S. and European eBook markets.

161.    Plaintiffs also allege a hub and spoke conspiracy supporting a horizontal price fixing agreement. Defendant Amazon is the dominant retail platform, through which the Big Five sell their trade eBooks. Like Apple before it, Amazon serves as the central, common contractual party (*i.e.*, the hub) through which the Defendants carried out their common scheme

to control trade eBook prices throughout the U.S.market and ensure that Amazon's retail competitors could not differentiate themselves in terms of price or offerings by entering into agency agreements with MFNs and similar provisions.

162.    Defendants publicly signaled the terms of their agreement. Each Big Five Defendant participated in the unlawful scheme because it knew that the other Big Five Defendants had entered into the same anticompetitive agreement with Amazon and because its participation was contingent upon the participation of the others. The Big Five Defendants knew that consumers had grown accustomed to the low prices afforded by competitive pricing under the wholesale model and that they could not achieve their goal of controlling trade eBook prices by acting alone. For example, it would not be sustainable for Defendant HarperCollins to raise its new releases to $15.99, if retailers were free to sell new releases of the other Big Five Defendants for $9.99.

163.    Defendant Amazon participated in and facilitated the horizontal agreement among the Big Five Defendants by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the Big Five Defendants that it was offering each of them a similar deal.

164.    For purposes of Plaintiffs' allegations of a *per se* violation, it is not necessary to prove a relevant market or adverse effects in such market.

165.    **Quick look/rule of reason**: To the extent Defendants' conduct is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation, the relevant product market is the retail market for trade eBooks. The relevant geographic market is the entire United States.

- 79 -

166.     Defendants possess market power within the relevant market. Amazon controls about 90% of the retail market for eBooks in the United States. The Big Five Defendants' sales account for about 80% of the trade publications in the United States. That Defendants have market power in the U.S. retail market for trade eBooks is also evident from their power to raise prices above those that would be charged in a competitive market.

167.     Defendants' agreements have an open and obvious adverse effect on competition. They ensure that the Amazon platform faces no competition in the price or availability of trade eBooks, no competition from other competing business models (like rental, bundling with physical books, book clubs, streaming, or reduced prices for partial downloads), and no competition from retailers that support enhanced eBooks with features not supported by Amazon's Kindle e-readers. By preventing Amazon's eBook retailer competitors from offering superior products or superior prices, Defendants increase the market price of the Big Five's eBooks and limit the number of meaningful choices consumers have in their consumption of trade eBooks.

168.     Defendants' anticompetitive agreements have actual detrimental effects in the relevant market, *i.e.*, less competitive pricing and greater product conformity.

169.     An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

170.     Defendants' agreement to 1) eliminate retailer discounting, 2) relieve Amazon of the need to compete on price, and 3) allow the Big Five to raise their eBook prices (which the Big Five acted upon), also violates Section 1 under the rule of reason.[217]

---

[217] *Apple*, 952 F. Supp. 2d at 694.

010888-12/1558070 V1

171.    There is no legitimate, pro-competitive business justification for Defendants'
anticompetitive agreements. Even if there were some conceivable justification, the agreements
are broader than necessary to achieve such a purpose. The anticompetitive effects outweigh any
such procompetitive justifications.

172.    **Injury:** Defendants' combinations and conspiracy have raised trade eBook prices
and deprived Plaintiffs and the members of the proposed Class(es) of free and fair competition in
the retail market for trade eBooks. Defendants have directly injured Plaintiffs and Class members
by causing them to pay more for the Big Five's eBooks than they would have paid or would pay
in the future in the absence of Defendants' unlawful acts. Plaintiffs and the proposed Class(es)
are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and
to recover three times the amount of their overcharge damages directly caused by Defendants'
unreasonable restraint of trade.

<u>SECOND CAUSE OF ACTION</u>
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**(15 U.S.C. § 2) (AMAZON)**

173.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

174.    Plaintiffs bring this claim on their own behalf and on behalf of the proposed
Class(es) described above. Plaintiffs seek damages and injunctive relief.

175.    The relevant market is the U.S. retail market for trade eBooks.

176.    Amazon possesses market power in the relevant market, where it controls about
90% of eBook sales. That Amazon has market power is also evident from its power to raise trade
eBook prices above that which would be charged in a competitive market.

177.    Through its anticompetitive agreements with the Big Five, Amazon has willfully
acquired and maintained its monopoly power in the U.S. retail market for trade eBooks and
substantially foreclosed competition in this market by unlawful and improper means, including

preventing Amazon's eBook retailer rivals from gaining market share and dissuading potential rivals from entering the market. Defendants entered into anticompetitive agreements with the intent and effect of 1) ensuring that the Big Five's eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on the Amazon platform; 2) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; 3) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and 4) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

178.    Amazon's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

179.    Amazon's monopolization conspiracy has injured and will continue to injure competition in this market.

180.    Amazon has acted with the specific intent of monopolizing the retail market for trade eBooks in the United States.

181.    Amazon's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

182.    Plaintiffs and members of the proposed Class(es) have been injured and will continue to be injured in their businesses and property by paying more for the Big Five Defendants' eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

183.     Plaintiffs and members of the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE
## (15 U.S.C. § 2) (ALL DEFENDANTS)

184.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

185.     Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class(es) described above. Plaintiffs seek damages and injunctive relief.

186.     The relevant market is the U.S. retail market for trade eBooks.

187.     Defendants possess market power in the relevant market. As the dominant online retail platform, Amazon controls about 90% of all eBook sales. The Big Five's trade books account for about 80% of all trade book sales in the United States. That Defendants have market power is also evident from their power to raise trade eBook prices above that which would be charged in a competitive market. Notably, in the *Apple* case, which addressed the same market and the same collusive conduct, the court found that the Big Five and Apple had the power to raise trade eBook prices above a competitive level even though Apple was a new entrant to the eBook market and never achieved Amazon's market dominance.

188.     Amazon's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

189.     Amazon's monopolization conspiracy has injured and will continue to injure competition in the U.S. retail market for trade eBooks.

190.     Defendants demonstrated a specific intent to confer monopoly power upon Amazon by agreeing to immunize it from competition from any other eBook retailers. Defendants acted in concert and took steps in furtherance of their conspiracy by executing and adhering to agency contracts with an MFN or similar anticompetitive provisions that functioned

the same as an MFN. The purpose and effect of these agreements is to ensure that Defendants control trade eBook prices throughout the U.S. market and that Amazon faces no competition from other eBook retailers in terms of price and product availability.

191.     Through Defendants' conspiracy, Amazon has acquired and maintained its monopoly power in the relevant market as the dominant online retail platform for trade eBook sales by unlawful and improper means, including preventing Amazon's eBook retailer rivals from gaining market share and dissuading potential rivals from entering the market. Defendants entered into anticompetitive agreements with the intent and effect of 1) ensuring that the Big Five's eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on the Amazon platform; 2) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; 3) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and 4) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation. Defendants' actions have directly caused higher prices and fewer consumer choices in the trade eBook market.

192.     Plaintiffs and members of the proposed Class(es) have been injured and will continue to be injured in their businesses and property by paying more for the Big Five Co-conspirators' eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts.

193.     Plaintiffs and members of the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## JURY TRIAL DEMANDED

194.     Plaintiffs hereby demand a trial by jury of all the claims asserted in this

Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under

Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class

Representatives and their counsel of record as Class Counsel, and direct that notice of this action,

as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class(es),

once certified;

B.     Adjudication that the acts alleged herein constitute unlawful restraints of trade in

violation of the Sherman Act, 15 U.S.C. § 1;

C.     Adjudication that the acts alleged herein constitute monopolization in violation of

the Sherman Act, 15 U.S.C. § 2;

D.     Judgment against Defendants for the damages sustained by Plaintiffs and the

proposed Class(es), and for any additional damages, penalties and other monetary relief provided

by applicable law, including treble damages;

E.     Pre-judgment and post-judgment interest on such monetary relief;

F.     Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-

competitive practices described and requested herein;

G.     The costs of bringing this suit, including reasonable attorneys' fees; and

H.     All other relief to which Plaintiffs and members of the proposed Class(es) may be

entitled at law or in equity.

DATED this 2nd day of June, 2021   Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
  Steve W. Berman (*pro hac vice*)
Barbara A. Mahoney (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the Proposed Class*

Joseph M. Vanek (*pro hac vice*)
Paul E. Slater(*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
Blake Sercye (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
pes@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com
bsercye@sperling-law.com

*Counsel for Plaintiffs and the Proposed Class*

Linda P. Nussbaum
Bart D. Cohen
Marc E. Foto
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor New York, NY 10036
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
mfoto@nussbaumpc.com

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

*Counsel for Jordan Sacks*

Neil L. Glazer
William E. Hoese
Douglas A. Abrahams
Zahra R. Dean
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
nglazer@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com
zdean@kohnswift.com

Michael L. Roberts
Morgan Hunt
ROBERTS LAW FIRM US, PC
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us
morganhunt@robertslawfirm.us

Gary M. Klinger
MASON LIETZ & KLINGER, LLP
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gklinger@masonllp.com

*Counsel for Mariacristina Bonilla*

Kellie Lerner, Bar No. (4446472)
Meegan Hollywood
David Rochelson
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
mhollywood@robinskaplan.com
drochelson@robinskaplan.com

Adam Frankel
GREENWICH LEGAL ASSOCIATES LLC
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
afrankel@grwlegal.com

*Counsel for Ethan Silverman and Jeffrey Tamasulo*

Gregory B. Linkh (GL 0477)
Brian P. Murray (BM-9954)
Lee Albert (*pro hac vice* application forthcoming)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite. 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com
glinkh@glancylaw.com
lalbert@glancylaw.com

Eugene A. Spector
Jeffrey J. Corrigan (NY No. 2372654)
William G. Caldes
Jeffrey L. Spector
Diana J. Zinser
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420 Philadelphia,
Pennsylvania 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
espector@srkattorneys.com
jcorrigan@srkattorneys.com
bcaldes@srkattorneys.com
jspector@srkattorneys.com
dzinser@srkattorneys.com

Steven A. Kanner (*pro hac vice* application
forthcoming)
Douglas A. Millen (*pro hac vice* application
forthcoming)
Brian M. Hogan (*pro hac vice* application
forthcoming)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

W. Joseph Bruckner (*pro hac vice* application forthcoming)
Heidi S. Silton (*pro hac vice* application forthcoming)
Brian D. Clark (*pro hac vice* application forthcoming)
Jessica N. Servais (*pro hac vice* application forthcoming)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com
jnservais@locklaw.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, L.P.A.
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com

Michael J. Boni (*pro hac vice* application forthcoming)
Joshua D. Snyder (*pro hac vice* application forthcoming)
John E. Sindoni (*pro hac vice* application forthcoming)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

- 90 -

David P. McLafferty (*pro hac vice* application forthcoming)
McLAFFERTY LAW FIRM, P.C.
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

*Counsel for Jeffrey Cook, Susan Cook, and Cecily Lerner*

Jeffrey S. Abraham
ABRAHAM, FRUCHTER & TWERSKY, LLP
One Penn Plaza
Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
jabraham@aftlaw.com

Richard B. Brualdi
THE BRUALDI LAW FIRM P.C.
29 Broadway, Suite 2400
New York, NY 10006
Telephone: (212) 952-0602
Facsimile: (212) 952-0608
rbrualdi@brualdilawfirm.com

Adam Frankel
GREENWICH LEGAL ASSOCIATES LLC
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
afrankel@grwlegal.com

*Counsel for Lawrence Twill and Thomas Agostino*

Gregory B. Linkh
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite. 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

- 91 -

Garrett D. Blanchfield
Brant D. Penney
REINHARDT WENDORF & BLANCHFIELD
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Counsel for Robert Etten*

Kevin Landau
Brett Cebulash
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile: (212) 931-0703
klandau@tcllaw.com
bcebulash@tcllaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Simon Bahne Paris, Esquire
Patrick Howard, Esquire
SALTZ, MONGELUZZI & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Fax: (215) 496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Janet Ackerman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2021, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Clerk of the Court will transmit a Notice of Electronic Filing to all ECF registrants.

_/s/ Steve W. Berman_

STEVE W. BERMAN