**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AMAZON.COM, INC. EBOOK
ANTITRUST LITIGATION

Case No. 1:21-cv-351-GHW-DCF

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PUBLISHER DEFENDANTS' MOTION**
**TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

169920430

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

I.     SUMMARY OF COMPLAINT ...................................................................................2

     A.    The Parties, the Alleged Market, and the Publisher Defendants' Lack of Market Power ...................................................................................................2

     B.    The "Conspiracy" Allegations and "Supporting" Facts .................................3

II.    ARGUMENT ..............................................................................................................6

     A.    Plaintiffs Fail to Adequately Allege a Horizontal Antitrust Conspiracy Under Section 1 of the Sherman Act .............................................................6

          1.    Plaintiffs' Complaint Alleges No Direct Evidence of an Actual Agreement among the Publisher Defendants .................................8

          2.    Plaintiffs' Complaint Lacks Allegations Sufficient to Support a Plausible Inference of a Horizontal Agreement Among the Publisher Defendants ....................................................................12

               a.    Plaintiffs' Allegations of Parallel Conduct by the Publisher Defendants Do Not Give Rise to a Plausible Inference of a Conspiracy ...............................................12

               b.    Plaintiffs Allege No "Plus Factors" that Support the Inference of a Conspiracy ............................................16

               c.    Each Publisher Defendant Had an Independent Economic Incentive to Enter into an eBook Distribution Agreement with Amazon .......................................................18

     B.    Plaintiffs Fail to Plead a Plausible Sherman Act Section 1 Claim Under the Rule of Reason ........................................................................................19

          1.    Plaintiffs Have Not Pleaded Facts Showing Any Actual Harm to Competition ...........................................................................21

          2.    Plaintiffs Fail to Allege or Offer Any Evidence that Any Publisher Defendant Has Market Power in Any eBook Market ...............................22

          3.    Plaintiffs Plead No Other Grounds Suggesting that Each Publisher Defendant's Agreement with Amazon Harmed Competition ...................23

     C.    Plaintiffs Do Not Adequately Allege a Conspiracy to Monopolize Claim Under Section 2 of the Sherman Act ........................................................24

III.   CONCLUSION.........................................................................................................25

169920430

# TABLE OF AUTHORITIES

## Cases

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)............................................................................16, 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................7, 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................7, 8, 9, 12

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013).............................................................. *passim*

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)............................................................................20

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ............................................................................20

*Chambers v. Time Warner*, Inc.
  282 F.3d 147 (2d Cir. 2002)............................................................................5

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) ............................................................................20

*Delta Air Lines, Inc. v. Bombardier, Inc.*,
  No. 1:20-CV-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) ............................5

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)............................................................................5

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
  129 F.3d 240 (2d Cir. 1997)............................................................................24

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)............................................................................20

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)............................................................................20

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004)............................................................................25

*Giraldo v. Kessler*,
  694 F.3d 161 (2d Cir. 2012)............................................................................5

*Halebian v. Berv*,
644 F.3d 122 (2d Cir. 2011)..................................................................................5

*Hinds Cnty. v. Wachovia Bank N.A..*,
790 F. Supp. 2d 106 (S.D.N.Y. 2011)..................................................................11

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
602 F.3d 237, 255 (3d Cir. 2010)..........................................................................8

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)..................................................................................11

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................................16

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F. Supp. 3d 380 (S.D.N.Y. 2019)................................................................7, 8

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .........................................................................10, 11

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016)...........................................................7, 9, 11

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995)......................................................................20, 21, 22

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)............................................................................................20

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)..........................................................................20, 23

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)................................................................................20

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006)..................................................................................5

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)........................................................................8, 17, 18

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018)..................................................................................20

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)........................................................................................20

- iii -

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
 801 F.3d 412 (4th Cir. 2015) ................................................................................7, 8

*Shak v. JPMorgan Chase & Co.*,
 156 F. Supp. 3d 462 (S.D.N.Y. 2016)........................................................................24

*Starr v. Sony BMG Music Ent.*,
 592 F.3d 314 (2d Cir. 2010).............................................................................12, 19

*State Oil Co. v. Khan*,
 522 U.S. 3 (1997)..................................................................................................20

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
 454 F. Supp. 2d 62 (E.D.N.Y. 2006) .......................................................................20

*United States v. Apple*,
 791 F.3d 290 (2d Cir. 2015).............................................................................15, 20

*United States v. Apple*,
 952 F. Supp. 638 (S.D.N.Y. 2013)...................................................................13, 15

## Other Authorities

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
 ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶¶ 1421a, 1421b1 (4th ed.
 2020) ....................................................................................................................13

169920430

## PRELIMINARY STATEMENT

The Consolidated Amended Class Action Complaint ("Complaint" or "CAC") attempts—but fails—to allege facts sufficient to support the inference that the Publisher Defendants[1] conspired with each other and Defendant Amazon.com, Inc. ("Amazon") in 2014 and 2015 to prevent others from competing with Amazon for the sale of electronic books ("eBooks").  Rather than supporting an inference of conspiracy, the facts alleged in the Complaint at most suggest that the Publisher Defendants, facing similar market forces, entered into separate contracts with Amazon that allegedly included similar terms—certain parity provisions that purportedly advantaged Amazon in the marketplace.  In essence, Plaintiffs allege that each Publisher Defendant—at different times over the course of nine months—made similar choices to ensure that they could continue to sell eBooks through Amazon, the largest eBook platform in the United States.  These allegations simply describe lawful conduct no more remarkable than individual pedestrians putting up their umbrellas in a rainstorm and cannot support an inference of conspiracy. They certainly do not support the facially implausible conspiracy Plaintiffs ask the Court to infer—that the Publisher Defendants conspired to insulate Amazon from competition, an objective entirely contrary to the Publisher Defendants' economic interests, individually and collectively.

The Complaint is also devoid of any plausible allegations that the Publisher Defendants coordinated their activities or contractual agreements with each other.  To the contrary, the Complaint acknowledges a central fact inconsistent with even the notion of a conspiracy:  during the time period of the alleged conspiracy, the U.S. Department of Justice ("DOJ") and multiple state attorneys general scrutinized each Publisher Defendant's eBook agreements with Amazon

---

[1]    The Publisher Defendants are Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), Macmillan Publishing Group, LLC ("Macmillan"), Penguin Random House LLC ("PRH"), and Simon & Schuster, Inc. ("Simon & Schuster").

and all key communications between the Publisher Defendants related to eBooks under the terms of consent decrees.  It is not plausible to infer a conspiracy hatched under such close oversight. Moreover, had DOJ or the states found evidence of any antitrust violation, they could have sought relief for violation of the consent decrees.  As the public record shows, they did not.

Beyond failing to allege any evidence of coordination between the Publisher Defendants, Plaintiffs fail to sufficiently allege that any Publisher Defendant's agreement with Amazon affected competition market-wide or that any Publisher Defendant has market power in Plaintiffs' alleged relevant market.

For these reasons, Plaintiffs' claims against the Publisher Defendants fail and should be dismissed.

## I.  SUMMARY OF COMPLAINT

### A.  The Parties, the Alleged Market, and the Publisher Defendants' Lack of Market Power

*The Parties*.  The named Defendants are five publishers and Amazon.  CAC ¶¶ 33–38. Plaintiffs allege that Amazon is the dominant eBook retailer in the United States, controlling nearly 90% of eBook sales.  CAC ¶¶ 3, 131, 166.  Each Publisher Defendant contracts with Amazon in order to sell its eBooks to the large number of readers who purchase eBooks through Amazon's platform.  *See* CAC ¶ 131.

Plaintiffs are alleged purchasers of eBooks published by the Publisher Defendants (CAC ¶¶ 1–2) who purport to represent classes of individuals that allegedly bought one or more eBooks "on or after January 14, 2017" sold by a Publisher Defendant "via an agency model through any retail e-commerce channel in the United States," including through Amazon or its retail competitors.  CAC ¶¶ 14, 18–32, 133.

*The Alleged Market*.  Plaintiffs allege that the retail sale of trade eBooks in the United

States is a relevant market.  CAC ¶ 113.  Trade books are distinct from non-trade books, such as reference and academic books.  CAC ¶ 114.  Plaintiffs define eBooks as "digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them."  CAC ¶ 116.

*Market Power*.  Plaintiffs allege that Amazon is the dominant eBook retailer and has market power because it sells 90% of eBooks in the United States.  CAC ¶¶ 131, 166, 176, 187.  Plaintiffs fail to allege any individual Publisher Defendant's market share, but gloss over this deficiency by alleging that the Publisher Defendants have market power because they collectively "account for" about 80% of trade books sold in the United States.  CAC ¶¶ 1, 113, 166, 187.

### B.     The "Conspiracy" Allegations and "Supporting" Facts

The crux of the Complaint is that Amazon has harmed competition in the alleged trade eBook market through its inclusion of most favored nation clauses ("MFNs") and other parity-like provisions in its eBook agreements with the Publisher Defendants.  Plaintiffs assert that Amazon's renegotiation of its eBook agency agreements with each Publisher Defendant at different points over the course of 2014 and 2015 was part of a conspiracy to enhance Amazon's market power and increase trade eBook prices.  CAC ¶¶ 4–5, 62, 65–71, 190.  Despite the fact that enhancing Amazon's alleged market power is entirely contrary to the Publisher Defendants' interests, Plaintiffs claim that the Publisher Defendants coordinated to reach similar agreements with Amazon to do just that.

In support of these claims, the Complaint offers the following allegations, none of which support a plausible inference of any such conspiracy and many of which directly contradict Plaintiffs' conspiracy allegations.

*2012–2013 Apple Litigation*.  To frame their "conspiracy" claims, Plaintiffs make strained comparisons to a decade-old litigation involving an alleged conspiracy among Apple and five of

the then six largest book publishers in the United States to support the entry of a new competitor to "counter Amazon's growing power" in the industry. *See* CAC ¶¶ 6, 41–45. The Complaint offers no plausible explanation for why the Publisher Defendants would do an about-face and now conspire to further entrench Amazon's market position—because there is no plausible explanation.

*The Publisher Defendants' 2014–2015 Negotiations with Amazon.* In 2014 and 2015, each Publisher Defendant independently renegotiated its eBook agreement with Amazon. CAC ¶¶ 62, 67–71. Each of these agreements operates under an agency model whereby the publisher sets eBook prices and Amazon, acting as the publisher's agent, takes a commission on each eBook sale. CAC ¶ 47.

Each of the Publisher Defendants' agreements with Amazon allegedly includes MFN clauses and other parity provisions. CAC ¶¶ 74–87. Nothing in the Complaint indicates that any such provisions were included as a result of coordination among the Publisher Defendants. Plaintiffs do not allege that the Publisher Defendants agreed to any provisions with Amazon on the understanding that any other publisher would do so. Rather, the Complaint merely indicates that each Publisher Defendant entered into a separate, vertical eBook agreement with Amazon. The Complaint elsewhere alleges that Amazon has a history of imposing MFN and parity provisions (CAC ¶¶ 76, 107) in agreements with its commercial counterparties and has "immense" bargaining power over the Publisher Defendants. CAC ¶ 106. In fact, the Complaint claims that publishers told the House Judiciary Committee during its investigation of these practices that the MFN provisions "reinforce[d] Amazon's stranglehold and control over book distribution" and left publishers "completely handcuffed from stimulating platform competition." CAC ¶ 76.

The Complaint also alleges that this facially implausible conspiracy was put into effect in 2014 and 2015 under the watchful eyes of DOJ's Antitrust Division and several state attorneys

- 4 -

general.  *See* CAC ¶¶ 56–57.  To settle DOJ's and the states' claims in the *Apple* litigation, the

Publisher Defendants entered consent decrees that obligated each publisher to submit each eBook

agreement they entered into during the relevant period—including those at issue here—to DOJ

and the states for their review.  *See* Final Judgment as to Defendant Verlagsgruppe Georg von

Holtzbrinck GmbH & Holtzbrinck Publishers, LLC d/b/a Macmillan, § IV.D (Aug. 12, 2013)

("Macmillan DOJ Final Judgment"); Final Judgment as to Defendants The Penguin Group, A

Division of Pearson PLC, and Penguin Group (USA), Inc., § IV.D (May 17, 2013) ("Penguin DOJ

Final Judgment"); Final Judgment as to Defendants Hachette, HarperCollins, and Simon &

Schuster, § IV.D (Sept. 6, 2012) ("Hachette, HarperCollins, and Simon & Schuster DOJ Final

Judgment") (referenced in CAC ¶ 57 n.65).[2]  This close government oversight over the Publisher

Defendants' eBook contracting during the relevant period undermines any plausible inference of

conspiracy among the Publisher Defendants.

Having offered no evidence of any direct communication between the Publisher

Defendants, Plaintiffs attempt to support their inference of conspiracy using a handful of articles

and public statements released at different times throughout 2014 and 2015 as evidence that the

---

[2]     In ruling on a motion to dismiss, courts may consider facts from "documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[T]he complaint is deemed to include . . . any statements or documents incorporated in it by reference.").  Even if documents are not considered incorporated by reference, a court may consider them where they are "integral" to the complaint because the complaint relies heavily on their terms and effect. *See Chambers*, 282 F.3d at 153.  As this Court has recognized, where such documents contradict the allegations of the complaint, "the documents control, and the Court need not accept the allegations within the complaint as true."  *Delta Air Lines, Inc. v. Bombardier, Inc.*, No. 1:20-CV-3025-GHW, 2021 WL 1163702, at *10 (S.D.N.Y. Mar. 25, 2021) (internal quotations omitted).  Here, the Publisher Defendants request that the Court consider the final judgments because they are incorporated by reference into and integral to the Complaint.  Plaintiffs rely on the termination of certain judgment terms to support the beginning of the alleged conspiracy (*see* CAC ¶¶ 57 n.65, 62), but other judgment terms directly contradict the plausibility of any such conspiracy.  Plaintiffs will not be harmed by the Court considering the judgments at this stage because they are public records; Plaintiffs had the opportunity to rely on the judgments in their entirety in drafting their Complaint.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  Alternatively, because the final judgments are public records and relied on in the Complaint, the Publisher Defendants request that the Court take judicial notice of the judgments.  *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012); *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).

Publisher Defendants were "signaling" to one another that they would all enter an agency agreement with Amazon. CAC ¶¶ 65–71, 159. However, the Complaint acknowledges that none of these articles or statements include details about any alleged MFN clause or other provisions in the agreements. CAC ¶ 73.

   ***Recent Government Investigations into Amazon.*** Finally, Plaintiffs discuss at length recent and ongoing government investigations into Amazon's eBook sales and contracting practices in the United States and Europe. CAC ¶¶ 73, 88–94. Plaintiffs note that the Publisher Defendants have received subpoenas in conjunction with a Connecticut Attorney General investigation. CAC ¶ 94. But these investigations focus on Amazon, not the Publisher Defendants (CAC ¶ 7); Plaintiffs do not allege facts related to any current investigation targeting any Publisher Defendant.

## II.   ARGUMENT

### A.   Plaintiffs Fail to Adequately Allege a Horizontal Antitrust Conspiracy Under Section 1 of the Sherman Act

   Plaintiffs attempt to frame the Publisher Defendants' vertical distribution agreements with Amazon as a horizontal antitrust conspiracy violating Section 1 of the Sherman Act. In fact, Plaintiffs challenge nothing more than a series of individually negotiated vertical agreements separately entered into at different points in time between certain eBook publishers and Amazon, the largest eBook retailer. CAC ¶¶ 3, 67–71.

   This Court has already rejected the argument that these publishers' acceptance of similar terms in separately negotiated agreements with Amazon supports an inference of conspiracy. *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013) (internal citation omitted) ("Under *Monsanto*, '[i]t is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms . . . .'"). The Complaint

- 6 -

alleges no facts to suggest that anything has changed since that case was decided. To the contrary, it alleges that Amazon has continued to operate the largest eBook platform in the United States—the Kindle. CAC ¶¶ 39, 131. The Publisher Defendants—like all publishers that wish to sell eBooks to Kindle users—must enter into agreements with Amazon in order to sell eBooks to those users. Thus, as this Court held in *Bookhouse*, no inference of conspiracy may arise from the unsurprising fact that each Publisher Defendant, consistent with its individual interests, ultimately agreed to a contract with Amazon.

Plaintiffs' Complaint fails to allege sufficient facts to support a plausible antitrust conspiracy claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A plausible claim must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "If the Court can infer no more than 'the mere possibility of misconduct' from the factual averments—that is, if the well-pleaded allegations of the complaint have not 'nudged plaintiffs' claims across the line from conceivable to plausible'—dismissal is appropriate." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 357 (S.D.N.Y. 2016) (citing *Iqbal*, 556 U.S. at 679–680).

An antitrust conspiracy claim must contain either specific factual allegations of an "actual agreement" among the defendants or "enough factual matter (taken as true) to suggest an agreement was made"; "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556, 564. Plaintiffs must also state "a coherent explanation for each defendant's participation in the alleged conspiracy." *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (internal citations omitted). "[A] complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *Id.*; *see, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir.

2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group.").

The Complaint lacks any factual allegations that would constitute direct evidence, or even create an inference, of a horizontal conspiracy among the Publisher Defendants.  Nor does it offer any "coherent explanation" for each Publisher Defendant's participation in an alleged conspiracy that would harm that publisher.  *See In re Mexican Gov't Bonds*, 412 F. Supp. 3d at 388.  Because of these critical pleading failures, Plaintiffs' claims against the Publisher Defendants should be dismissed for failing to state a claim.

### 1. Plaintiffs' Complaint Alleges No Direct Evidence of an Actual Agreement among the Publisher Defendants

Plaintiffs' Complaint does not contain any allegations supporting an actual horizontal agreement among the Publisher Defendants.  *See Twombly*, 550 U.S. at 564 (rejecting a conspiracy claim lacking "any independent allegation of actual agreement").  A plaintiff, for example, may provide evidence of a recorded phone call in which two competitors agreed to fix prices.  *See Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  Here, the only explicit agreements referenced in Plaintiffs' allegations are vertical agreements independently entered into between Amazon and each Publisher Defendant over the course of nine months. Standing alone, vertical agreements between individual suppliers and their distributor do not support a horizontal conspiracy claim even if they contain similar terms.  *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010).  Plaintiffs fail to offer evidence that these agreements were entered into under anything other than ordinary, arms-length negotiations between Amazon and each Publisher Defendant individually.

Indeed, Plaintiffs' Complaint contains no allegations of any communications between any two Publisher Defendants even suggesting a horizontal agreement.  The facts Plaintiffs plead here

are as insufficient as the allegations this Court rejected in *Bookhouse*.  There, the plaintiffs alleged that oral discussions or agreements "may have" occurred among the Publisher Defendants related to their digital rights management software agreements with Amazon, which allegedly prevented the plaintiffs from competing with Amazon for the sale of eBooks.  *Bookhouse*, 985 F. Supp. 2d at 618.  This Court held that such allegations fail to meet *Twombly* because they do "no more than raise theoretical possibilities" of an agreement.  *Id*.

Plaintiffs here do not allege that there were *any* direct communications among the Publisher Defendants.  Instead, Plaintiffs simply offer isolated fragments of statements allegedly made by the Publisher Defendants' executives in news articles over the course of nine months to suggest that the Publisher Defendants publicly signaled through third-party publications their intent to enter an agency agreement.  CAC ¶¶ 64–71.  Yet none of the cited statements indicate *anything* about *any* of the terms that Plaintiffs claim are anticompetitive.  CAC ¶ 73.  At best, these statements indicate that each Publisher Defendant entered into an agreement with Amazon at a distinct point in time, which does no more than "raise theoretical possibilities" of a conspiracy. *See Bookhouse*, 985 F. Supp. 2d at 618.

Plaintiffs also fail to plead facts showing any "specific time, place, or person" involved in any alleged horizontal agreement.  *Twombly*, 550 U.S. at 565 n.10; *see In re Zinc*, 155 F. Supp. 3d at 368 (dismissing an antitrust complaint that did "not clearly identify who precisely made th[e] agreement, when it was made, where it was made, or its terms").  In *Bookhouse*, this Court held that plaintiffs failed to plead a conspiracy where they did not specify who participated in the "hypothetical discussions or agreements" among the defendants, instead alleging only that the communications "may have involved 'one or more' of the Publishers and Amazon." *Bookhouse*, 985 F. Supp. 2d at 618.  Here too, Plaintiffs fail to specify *any* individuals involved in *any*

169920430

discussion among the Publisher Defendants or between a Publisher Defendant and Amazon.
Rather, Plaintiffs simply assert that three of the Publisher Defendants had the same CEOs in 2012
as they had in 2015 (CAC ¶ 63) and indicate that certain of the Publisher Defendants' executives
stated publicly or to authors the rather unsurprising news that they had entered into an agreement
with Amazon.  CAC ¶¶ 64–71.

Take each of the Publisher Defendants' purported "signaling" statements in turn.  *First*,
the only alleged statements from Simon & Schuster and Hachette and one of the alleged statements
from Macmillan at most indicate that these three publishers independently entered into agency
agreements with Amazon at different times in 2014.  CAC ¶¶ 67–69.[3]  *Second*, Plaintiffs fail to
provide any "signaling" statement linked to a specific executive at HarperCollins or PRH at any
point in time.  *See* CAC ¶¶ 70–71.  The quote Plaintiffs cite to suggest that PRH signaled that it
would enter a "similar deal" with Amazon relates to eBook sales in the United Kingdom, not the
United States, and was made by an Amazon representative, not anyone at PRH.  *See* CAC ¶ 71.

Further, the chronology of the statements indicates that the Publisher Defendants entered
into agency agreements with Amazon over the course of nine months, not contemporaneously.
The non-contemporaneous adoption of similar agreements by the Publisher Defendants reveals
nothing more than "similar reaction[s] to similar pressures."  *In re Musical Instruments & Equip.
Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015).  All of the Publisher Defendants were dealing
with the same important customer, Amazon, which allegedly controls 90% of eBook sales.  CAC
¶ 131.  Given this similar market pressure, allegations that the Publisher Defendants may have

---

[3]  Plaintiffs attempt to suggest that Macmillan's CEO's separate statement to its authors about "attempting
to create even pricing" somehow provides evidence of a horizontal agreement among the Publisher Defendants.  *See*
CAC ¶¶ 64, 69.  It does not.  This statement merely reflects that Macmillan could not assure *its authors* that their
eBooks would be consistently priced across retail channels because Apple retained the ability to independently
discount off Macmillan's list prices through October 2017 under Macmillan's consent decree with DOJ.

adopted similar agreements over an extended period of time "[do] not raise the specter of collusion." *In re Musical Instruments & Equip.*, 798 F.3d at 1196.

Finally, to the extent that Plaintiffs imply that each Publisher Defendant's independent decision to enter an agreement with Amazon with allegedly similar terms *by itself* implies a horizontal agreement, they are wrong.  As the Supreme Court has made clear and this Court found in *Bookhouse*, a plaintiff must establish that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Bookhouse*, 985 F. Supp. 2d at 619 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  Plaintiffs' Complaint, which at most alleges independent contracting unsupported by evidence of any communications between the Publisher Defendants, fails to meet this standard.  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (rejecting the argument that parallel contracting conduct, including "similarities in contractual language," alone evinces a conspiracy).

Nor do Plaintiffs' allegations support a hub-and-spoke conspiracy.  "A hub-and-spoke conspiracy is simply a collection of vertical and horizontal agreements." *In re Musical Instruments & Equip.*, 798 F.3d at 1192.  "[T]o plead a cognizable hub-and-spoke conspiracy, [Plaintiffs] must allege not only a vertical agreement between the hub . . . and the spokes . . . but also a horizontal agreement among the competitors that form the spokes." *In re Zinc*, 155 F. Supp. 3d at 376.  Because Plaintiffs fail to plead any horizontal agreement among the Publisher Defendants, their allegations amount to nothing more than a rimless wheel, which is insufficient to show a hub-and-spoke conspiracy.  *Id.* at 376–377.

In sum, because the Complaint lacks any evidence of a horizontal agreement among the Publisher Defendants, it should be dismissed.  *See Hinds Cnty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 116 (S.D.N.Y. 2011).

2. **Plaintiffs' Complaint Lacks Allegations Sufficient to Support a Plausible Inference of a Horizontal Agreement Among the Publisher Defendants**

Plaintiffs' Complaint also lacks circumstantial evidence of parallel conduct and plus factors sufficient to support a plausible Section 1 conspiracy claim.  To state a Section 1 claim based on parallel conduct, the allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement" or a "meeting of the minds."  *Twombly*, 550 U.S. at 556– 557 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

"[A]llegations of parallel conduct that could 'just as well be independent action' are not sufficient to state a [Section 1] claim."  *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 327 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 557).  Plaintiffs must plead facts showing that parallel conduct would "*probably not result from* . . . independent responses to common stimuli . . . ."  *Twombly*, 550 U.S. at 556 n.4 (emphasis added); *see also Iqbal*, 556 U.S. at 679–680 (citing *Twombly*, 550 U.S. at 567, 570) (complaint must be dismissed where the "well-pleaded facts" taken in context do "not plausibly suggest an illicit accord because [they are] not only compatible with, but indeed [are] more likely explained by, lawful, unchoreographed free-market behavior").

a. **Plaintiffs' Allegations of Parallel Conduct by the Publisher Defendants Do Not Give Rise to a Plausible Inference of a Conspiracy**

Plaintiffs' allegations of parallel conduct—or as frequently, non-parallel conduct—cannot give rise to a plausible inference of a conspiracy among the Publisher Defendants.  Plaintiffs fail to allege facts that place the Publisher Defendants' conduct in a context that plausibly suggests a preceding horizontal agreement or a meeting of the minds among the Publisher Defendants.

*Past Alleged Conspiracy Between Apple and the Publisher Defendants*.  To support their claims, Plaintiffs attempt to use the Publisher Defendants' alleged conspiracy with Apple in the

- 12 -

169920430

early 2010s to concoct a new conspiracy between the Publisher Defendants and Amazon. Plaintiffs cannot infer a conspiracy here based on any past alleged conspiracy. *See* PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1421a ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy."), ¶ 1421b1 (4th ed. 2020). The facts here are starkly different from the Apple eBook antitrust cases. Those 10-year-old cases contained many allegations of simultaneous communications among the Publisher Defendants to combat Amazon and switch to an agency model for selling eBooks. In contrast, Plaintiffs here offer no factual allegations of *any* communication between any two Publisher Defendants related to their eBook agreements with Amazon.

Indeed, the facts presented in the Apple eBook cases undercut Plaintiffs' claims here. Plaintiffs' attempt to cast the Publisher Defendants' alleged conspiracy with Apple as support for their alleged conspiracy with Amazon is inherently illogical. As Judge Cote emphasized in *Apple*, the alleged conspiracy between Apple and the Publisher Defendants derived from Apple taking advantage of the Publisher Defendants' well-known concerns about Amazon's market strength and pricing strategy. *United States v. Apple*, 952 F. Supp. 2d 638, 648 (S.D.N.Y. 2013). Aware of this dynamic, Apple allegedly used the Publisher Defendants' frustration with Amazon and fear of "Amazon's growing power" (CAC ¶¶ 42, 45) to demand that the Publisher Defendants move eBook sales from a wholesale model to an agency model. *See* CAC ¶ 49. Apple allegedly pushed the Publisher Defendants to adopt the agency model in order to take pricing power away from Amazon. *See Apple*, 952 F. Supp. 2d at 659 ("Apple concluded that it needed to eliminate all retail price competition.").

Here, Plaintiffs allege that the Publisher Defendants have conspired to do exactly what they have resisted for over a decade—"immunize" Amazon from competition and solidify Amazon's market position.  *See* CAC ¶¶ 4, 190.  The alleged conspiracy between the Publisher Defendants and Apple is not evidence of any motive, intent, or meeting of the minds to conspire with Amazon. On the contrary, the purported motive of the Publisher Defendants' alleged conspiracy with Apple was to "*counter Amazon's growing power*."  CAC ¶ 42 (emphasis added).  The Complaint does nothing to explain this inconsistency, and it contains no facts indicating how the Publisher Defendants could conceivably benefit from helping Amazon gain market power.  Plaintiffs' conclusory and illogical allegations regarding the Apple eBook cases contradict Plaintiffs' entire theory of conspiracy.

**The Publisher Defendants' 2014 and 2015 eBook Agreements with Amazon**.  The Publisher Defendants' 2014 and 2015 eBook agreements with Amazon reflect only lawful contracting, not an unlawful conspiracy.  Plaintiffs' claim relies on the entirely implausible theory that the Publisher Defendants tacitly colluded under DOJ's nose, during a period when DOJ simultaneously reviewed all their eBook agreements and any communications with each other related to eBook strategy.  This simply defies logic.

Under their consent decrees with DOJ, the Publisher Defendants were prohibited from restricting eBook retailers' ability to discount the retail price of their eBooks for two years and from entering an agreement with an eBook retailer that contained a price MFN for five years.  CAC ¶ 57.  During the five-year life of their DOJ consent decrees, the Publisher Defendants were required to submit to DOJ any new or modified eBook agreement with Apple, Amazon, or other eBook retailers.  *See* Macmillan DOJ Final Judgment § IV.D; Penguin DOJ Final Judgment § IV.D; Hachette, HarperCollins, and Simon & Schuster DOJ Final Judgment § IV.D (CAC ¶ 57

n.65).   Under these consent decrees, the Publisher Defendants also were required to submit quarterly logs to DOJ listing all oral and written communications with any other Publisher Defendant related to plans or strategy for eBook distribution or sales. *Id.* § VII.I.

DOJ reviewed the eBook agreements that the Publisher Defendants entered into with Amazon in 2014 and 2015.   And DOJ reviewed all communications among the Publisher Defendants related to plans or strategy for eBook distribution or sales during the life of their consent decrees.   If DOJ had uncovered evidence of ongoing collusion among the Publisher Defendants or believed that any term in a Publisher Defendant's agreement with Amazon violated that publisher's consent decree, it could have sought relief under that publisher's final judgment or brought another case.   As the public record shows, it did neither.

Finally, to the extent that Plaintiffs suggest that the Publisher Defendants' agency model agreements, or any alleged MFNs therein, are inherently illegal, this Court has rejected that contention.   In *Apple*, this Court expressly noted that "entirely lawful contracts may include an MFN, price caps, or pricing tiers." *Apple*, 952 F. Supp. 2d at 698.   In affirming the *Apple* decision, the Second Circuit further clarified that the challenged agency "[c]ontracts themselves were [not] independently unlawful," even with the MFNs.   *United States v. Apple, Inc.*, 791 F.3d 290, 316 (2d Cir. 2015).

***Recent Government Investigations into Amazon***.   The alleged government investigations into *Amazon's* conduct provide no evidence of the *Publisher Defendants* conspiring among each other.   Plaintiffs have not alleged that any Publisher Defendant is a target of any current antitrust investigation, much less any facts that would necessitate any such hypothetical investigation. Neither the 2015 European Commission investigation nor the 2019 U.S. House investigation into Amazon (CAC ¶¶ 88–93) supports any inference that the Publisher Defendants engaged in

anticompetitive behavior by entering agency agreements with Amazon.  To the contrary, the European Commission decision and U.S. House report focus entirely on Amazon's position and conduct in the market.  CAC ¶¶ 7, 88, 91 (indicating that only Amazon was under investigation). The reports do not implicate or take issue with the Publisher Defendants' conduct in any way.

Similarly, the reported investigations into Amazon's practices by the Federal Trade Commission and certain state attorneys general do not support the inference that the Publisher Defendants engaged in any anticompetitive behavior by entering agreements with Amazon.  CAC ¶ 94.  Likewise, the fact that the Publisher Defendants may have received a *third-party* subpoena from the Connecticut Attorney General as part of its investigation of Amazon is not evidence that the Publisher Defendants are under investigation.  CAC ¶ 94; *see In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (rejecting plaintiffs' attempt to use an ongoing DOJ antitrust investigation to support conspiracy claims as the investigation "carrie[d] no weight in pleading an antitrust conspiracy claim").  Alleged investigations into Amazon's conduct cannot be imputed to the Publisher Defendants.

> **b.** **Plaintiffs Allege No "Plus Factors" that Support the Inference of a Conspiracy**

Where Plaintiffs allege only parallel conduct, they must "show the existence of additional circumstances, often referred to as 'plus factors,'" to support their conspiracy claim.  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  Plus factors may include evidence of a motive to enter a conspiracy, a high level of interfirm communications, or actions contrary to the Publisher Defendants' self-interest.  *Id.* at 254.

Plaintiffs do not sufficiently plead any "plus factors" supporting an inference of conspiracy. *First*, there are no factual allegations that the Publisher Defendants had a motive or intent to help Amazon monopolize any eBook market.  Plaintiffs offer only unsupported allegations that the

Publisher Defendants intended to confer monopoly power on Amazon (CAC ¶ 190) and entered into agreements with Amazon with the intent to maintain supracompetitive eBook prices and eliminate Amazon's eBook retailer rivals' ability and incentive to compete with Amazon.  CAC ¶¶ 105, 177.  These allegations, as noted above, are contradicted by other allegations in the Complaint, which illustrate the Publisher Defendants' intent to maintain their ability to sell eBooks through Amazon and their interest in promoting greater competition to foster alternative channels to reach customers.  Like the plaintiffs in *Bookhouse*, Plaintiffs here posit a counterintuitive conspiracy among sellers to deprive themselves of sales channels and to create or strengthen an alleged downstream monopolist.  For such a counterintuitive conspiracy claim to survive a motion to dismiss, it must be accompanied by facts from which a conspiracy could be plausibly inferred. The Complaint offers none.

*Second*, as explained above, Plaintiffs plead no facts showing any interfirm communications among the Publisher Defendants, much less a "high level" of interfirm communications.  *See Apex Oil*, 822 F.2d at 254.  Even if the Publisher Defendants' alleged parallel contracting and the isolated public statements Plaintiffs cite led to a "high level of interfirm *awareness*," this alone cannot support an antitrust conspiracy claim as a matter of law.  *Mayor & City Council of Balt.*, 709 F.3d at 139–140.

*Third*, as explained in more detail below, Plaintiffs' allegations that entering into eBook agency agreements with Amazon went against the economic self-interest of each Publisher Defendant are contradicted by Plaintiffs' other allegations and are meritless.  *See* CAC ¶ 158.  Each Publisher Defendant was motivated to reach an agreement with the retailer that allegedly accounts for "nearly 90%" of all eBook sales (CAC ¶ 131)—anything else would be illogical, if not suicidal. *See Mayor & City Council of Balt.*, 709 F.3d at 137 (rejecting an antitrust conspiracy claim based

on conduct that could have "just as easily turn[ed] out to have been rational business behavior"). Plaintiffs fail to plausibly explain why a Publisher Defendant agreeing to Amazon's terms would not serve its business interests.

###### c. Each Publisher Defendant Had an Independent Economic Incentive to Enter into an eBook Distribution Agreement with Amazon

Plaintiffs wrongly, and without explanation, generally allege that the Publisher Defendants did not act "unilaterally or independently, or in their own economic interests" by entering into eBook distribution agreements with Amazon that allegedly contain MFNs and other parity-like provisions. CAC ¶ 158. As Plaintiffs' Complaint shows, each Publisher Defendant had a strong independent economic incentive to enter into an eBook agreement with Amazon, even if the agreement may have contained terms that the Publisher Defendant disliked.

Each Publisher Defendant acted unilaterally in its own self-interest in entering into an agreement with Amazon to (1) preserve its ability to distribute eBooks through the largest eBook retailer in the United States and (2) compete for deals with authors. Each Publisher Defendant—like virtually all other publishers—relies heavily on Amazon to sell eBooks. Given that Amazon allegedly controls nearly 90% of eBook sales (CAC ¶ 131), losing access to Amazon as a distribution channel would severely constrain each Publisher Defendant's ability to sell eBooks. If a Publisher Defendant did not distribute eBooks through Amazon, it would be unable to secure deals with authors because it could not provide authors access to the millions of consumers purchasing eBooks through Amazon's platform. Given these dynamics, each Publisher Defendant's decision to sign an eBook distribution agreement with Amazon was entirely rational.

It is thus unsurprising that each Publisher Defendant, exercising its independent business judgment, ultimately agreed to an eBook distribution agreement with Amazon on terms acceptable to Amazon. Plaintiffs themselves allege that "as the largest retailer of both print books and eBooks,

- 18 -

the bargaining power that Amazon wields over the [Publisher Defendants] is immense."  CAC ¶ 106.  In fact, they allege that if a Publisher Defendant does not comply with Amazon's terms, "Amazon retaliate[s] or threaten[s] to retaliate" against the Publisher Defendant.  CAC ¶ 79.  These allegations defeat any inference that in 2014 and 2015 each Publisher Defendant did anything other than independently determine that being able to sell eBooks to Kindle users, even on the terms sought by Amazon, would better serve readers and the Publisher Defendant's independent business interests than declining to enter an agreement.

No Publisher Defendant needed to collude with any other Publisher Defendant to protect its business interests.  To ensure access to this critical eBook sales channel, it made sense for each Publisher Defendant to contract with Amazon even if other Publisher Defendants declined to do so.  *See Starr*, 592 F.3d at 327 (citing AREEDA & HOVENKAMP ¶ 1415a (2d ed. 2003)) (indicating that plaintiffs must "allege[] behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'").  Indeed, if other Publisher Defendants had not contracted with Amazon, those who did would have had access to Kindle users that their competitors lacked.  Thus, far from needing other publishers to make their distribution agreements with Amazon work, each Publisher Defendant had an incentive to "go it alone."

Finally, the facts Plaintiffs allege do not support a plausible inference that the Publisher Defendants acted against their own self-interest in agreeing to agency agreements with Amazon that contained MFNs because those agreements "caused them to lose revenue."  CAC ¶ 158.  Indeed, in many respects, Plaintiffs' other allegations negate this claim.

## B.   Plaintiffs Fail to Plead a Plausible Sherman Act Section 1 Claim Under the Rule of Reason

Plaintiffs fail to allege facts that support a plausible Section 1 rule of reason claim challenging the Publisher Defendants' vertical distribution agreements with Amazon.  With very

limited exceptions, which are not applicable here, vertical agreements are analyzed under the rule of reason.[4]  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007); *Apple*, 791 F.3d at 321.  Under the rule of reason, each vertical agreement is analyzed separately. *See Leegin*, 551 U.S. at 886 (noting that a rule of reason analysis must "study the reasonableness of an individual restraint in light of the real market forces at work").

To show a rule of reason violation, Plaintiffs must, among other things, show that any single Publisher Defendant's agreement with Amazon harmed competition in the entire relevant market.[5]  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018).  A plaintiff can show harm to competition by offering direct evidence of actual harm to competition in the market as a whole.  *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127–128 (2d Cir. 1995).  Alternatively, a plaintiff can "demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).  Plaintiffs fail to allege facts showing harm to

---

[4]    Plaintiffs allege that a quick-look approach is appropriate for analyzing the Publisher Defendants' vertical distribution agreements with Amazon.  CAC ¶¶ 154, 165–171.  It is not.  Courts routinely reject requests for a quick-look analysis where a fact-intensive review of the challenged conduct is necessary to assess the likelihood of anticompetitive effects.  *See FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013); *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137–138 (9th Cir. 2011); *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 513–514 (4th Cir. 2002).  Here, the agreements in question are not so plainly anticompetitive that a detailed market analysis is unnecessary.  *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317–318, 334 (2d Cir. 2008).

[5]    To prevail on a Section 1 claim under the rule of reason here, a plaintiff must show harm to competition between trade eBook publishers ("interbrand competition"), not just "an adverse effect on competition among different sellers of the same product ('intrabrand' competition)."  *K.M.B. Warehouse Distribs., Inc.*, 61 F.3d at 127; *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013) ("[I]nhibitions on intrabrand competition . . . lie far from . . . core § 1 violations."); *Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 72 (E.D.N.Y. 2006) (explaining that if the alleged restraint "does not prevent competing brands' access to the market in whatever quantities customers demand, it is unclear that [it] imposes any negative restriction on competition in the market whatsoever").

competition either way.

      **1.**      **Plaintiffs Have Not Pleaded Facts Showing Any Actual Harm to Competition**

Plaintiffs allege that each Publisher Defendant's individual eBook agreement with Amazon contains MFNs and other parity-like provisions that Plaintiffs claim have restrained competition, resulting in anticompetitive effects. *See* CAC ¶¶ 74–87. But Plaintiffs fail to plead facts showing that these alleged provisions have harmed competition. Instead, Plaintiffs provide misleading pricing charts created from cherry-picked data and unsupported legal conclusions, which allegedly show that each Publisher Defendant increased its prices for certain "New York Times bestsellers." CAC ¶¶ 98–101. Even assuming *arguendo* that Plaintiffs' "data sample" of "New York Times bestsellers" is a suitable proxy for the alleged trade eBook market—which it is not—the relevant consideration is not whether any Publisher Defendant raised its own price, but whether any Publisher Defendant's conduct caused other publishers to raise their prices or resulted in market-wide price increases. *See K.M.B. Warehouse Distribs.*, 61 F.3d at 127–128. Plaintiffs offer no plausible allegations of any such price effects.

Further, Plaintiffs fail to plead facts showing actual harm to consumers or the alleged class of eBook purchasers who purchased a Publisher Defendant's eBook through any retailer in the United States. Plaintiffs' allegations of harm to the class are speculative, predicated on a series of unsupported assumptions that but-for each Publisher Defendant's agreement with Amazon, Plaintiffs would have paid less for eBooks or had access to new, innovative pricing options for eBooks. But Plaintiffs offer no plausible allegations that this would have occurred. Similarly, Plaintiffs attempt to imply pricing harm through their misleading charts, but they offer no plausible allegations tying these purported pricing trends to coordination among the Publisher Defendants.

Finally, Plaintiffs' allegations that each of the Publisher Defendant's individual agreements

with Amazon reduced choice for eBooks available to consumers is an unsupported legal conclusion.  CAC ¶¶ 10, 77, 84, 146.  The Complaint does not allege any facts demonstrating any reduction of eBook choice as a result of any Publisher Defendant's agreement with Amazon.

> **2.    Plaintiffs Fail to Allege or Offer Any Evidence that Any Publisher Defendant Has Market Power in Any eBook Market**

The Publisher Defendants could not have restrained competition in any alleged eBook market because they individually lack market power in any eBook market.  If a plaintiff, like Plaintiffs here, cannot show an actual adverse effect on competition, "it must at least establish that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide."  *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (internal quotation marks and citation omitted).  "Market power may be shown by evidence of specific conduct indicating the defendant's power to control prices or exclude competition" or "market share may be used as a proxy for market power." *Id.*

Simply put, Plaintiffs offer no evidence that any Publisher Defendant has market power in any eBook market.  Plaintiffs do not plead any facts that show that any Publisher Defendant can control pricing or exclude competition in any eBook market.  And Plaintiffs fail to plead that any Publisher Defendant individually has a sufficiently large market share to infer market power.  In the absence of facts plausibly supporting a horizontal conspiracy, Plaintiffs cannot sum the Publisher Defendants' market shares to show that the Publisher Defendants have market power collectively.  *See Bookhouse*, 985 F. Supp. 2d at 622.  No individual Publisher Defendant has a market share sufficient to infer market power in the purported trade eBook market.

The few allegations about the Publisher Defendants' purported market shares rely on irrelevant, speculative statements.  For example, Plaintiffs rely on a 2015 statistic to claim that the Publisher Defendants collectively account for 80% of the market for trade books.  CAC ¶¶ 1, 166,

187.  As explained, Plaintiffs here cannot sum the Publisher Defendants' market shares to show market power.  *See Bookhouse*, 985 F. Supp. 2d at 622.  In any case, this market share statistic is irrelevant because Plaintiffs allege a "trade eBooks" market, not an "all trade books" market, which would also include print trade books and other trade book formats.  CAC ¶ 113.

Even assuming *arguendo* that the market shares Plaintiffs cite are relevant to their alleged "trade eBooks" market, these purported shares do not show that any Publisher Defendant has market power.  Absent a conspiracy, each Publisher Defendant's eBook agreement with Amazon could affect only the fraction of the market represented by that publisher's sales through Amazon. *See Bookhouse*, 985 F. Supp. 2d at 622.  Plaintiffs do not allege each individual Publisher Defendant's market share, but if their collective share was 80% (*see* CAC ¶ 1), each of the five Publisher Defendants would have a 16% market share on average.[6]  Assuming, as Plaintiff alleges, that Amazon holds 90% of the "eBook" market (CAC ¶ 131), any individual vertical agreement between a Publisher Defendant and Amazon would on average affect only 14.4% (i.e., 16% x 90%) of the U.S. trade eBook market, "a share far too small to suggest an ability to charge super-competitive prices."  *See Bookhouse*, 985 F. Supp. 2d at 622.

### 3.   Plaintiffs Plead No Other Grounds Suggesting that Each Publisher Defendant's Agreement with Amazon Harmed Competition

Even if Plaintiffs could show that any Publisher Defendant had market power, Plaintiffs would still need to show "other grounds to believe that the defendant's behavior will harm competition market-wide."  *MacDermid*, 833 F.3d at 183.  Other grounds may include the "inherently anticompetitive nature of a defendant's behavior" and whether the behavior reduces

---

[6]     Plaintiffs' assertion that PRH would control half of the market for trade books in the United States after acquiring Simon & Schuster (CAC ¶ 38) is a red herring.  This transaction has not closed, and this unsupported share figure tells the Court nothing about the alleged market shares or market power of PRH or Simon & Schuster today, much less when the alleged conspiracy purportedly started in 2014 and 2015.

consumer choice or "significantly restrict[s] competitors' ability to enter the relevant market and compete." *Id*. at 183–184.  Plaintiffs can show no "other ground" supporting an inference that each Publisher Defendant's individual eBook agreement with Amazon has harmed competition. As explained above, each Publisher Defendant's independent decision to enter into a vertical agreement to distribute its eBooks through Amazon is not inherently anticompetitive, and Plaintiffs have failed to plead facts showing that these agreements limit consumer choice or have significantly restricted other eBook retailers' ability to compete.

### C. Plaintiffs Do Not Adequately Allege a Conspiracy to Monopolize Claim Under Section 2 of the Sherman Act

Plaintiffs' Section 2 conspiracy claim against the Publisher Defendants is no more credible than their Section 1 conspiracy claim.  To state a claim for conspiracy to monopolize, Plaintiffs must allege "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize."  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997).  Plaintiffs fail to sufficiently plead these elements because they do not allege facts plausibly showing any agreement among the Publisher Defendants or any intent to entrench Amazon's market position.

*First*, Plaintiffs fail to "allege facts that would provide 'plausible grounds to infer an agreement'" or any acts in furtherance of a conspiracy.  *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 491 (S.D.N.Y. 2016) (quoting *In re Elevator*, 502 F.3d at 50).  Plaintiffs do not allege direct evidence of an agreement or circumstantial evidence sufficient to infer an agreement. As discussed in Section II.A, Plaintiffs provide inadequate support for their vague claim that the Publisher Defendants had "opportunities to collude" among themselves.  CAC ¶ 159.  Plaintiffs' "evidence" of an agreement comprises public articles and statements released around the time each Publisher Defendant agreed to its eBook contract with Amazon in 2014 or 2015 and the fact that

three of the five CEOs who led the Publisher Defendants when they entered into agency agreements with Apple in 2010 were still serving in that role in 2015.  CAC ¶¶ 63, 67–71, 159.  Just as these allegations are insufficient to infer an agreement under Section 1 of the Sherman Act, they are also insufficient under Section 2.

*Second*, Plaintiffs also fail to plausibly allege the additional requirement that any Publisher Defendant had a specific intent to confer monopoly power on Amazon.  This is fatal to Plaintiffs' Section 2 conspiracy claim because "lack of intent by one party . . . precludes a conspiracy to monopolize."  *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).  The Section 1 analysis above, as well as Plaintiffs' own allegations, informs the Section 2 analysis here—Plaintiffs' counterintuitive conspiracy allegations offer no logical reason why any Publisher Defendant would want to assist Amazon in monopolizing any eBook market.  To the contrary, Plaintiffs allege that the Publisher Defendants would like to "diversify their distribution," not preserve Amazon's alleged eBook retail monopoly.  CAC ¶ 149.  Plaintiffs further allege that the Publisher Defendants have long "feared Amazon's growing power in the trade book industry"; indeed, the alleged conspiracy between certain Publisher Defendants and Apple arose out of the Publisher Defendants' desire to counter that power.  CAC ¶ 42.  Having alleged these facts, which undermine any basis for inferring their contrived conspiracy, Plaintiffs present no plausible reason why the Publisher Defendants would completely change course and now conspire to solidify Amazon's alleged dominant position—and no facts indicating that the Publisher Defendants did so.

## III.  <u>CONCLUSION</u>

For these reasons, the Publisher Defendants' motion to dismiss should be granted, and Plaintiffs' Consolidated Amended Class Action Complaint should be dismissed with prejudice.

169920430