**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE AMAZON.COM, INC. EBOOK ANTITRUST LITIGATION |
|---|

Case Number 1:21-cv-00351-GHW-DCF

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF AMAZON'S MOTION TO DISMISS**
**<u>PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.    The *Apple* Litigation. .................................................................................2

    B.    Plaintiffs' Current Allegations. ................................................................4

LEGAL STANDARD ............................................................................................................5

ARGUMENT .........................................................................................................................8

I.      PLAINTIFFS' CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW. ...................8

    A.    Plaintiffs Fail to Allege a Hub-and-Spoke Conspiracy...........................9

    B.    The First and Third Causes of Action Cannot Be Recast as Alleging a Series of Conspiracies in Restraint of Trade and/or To Monopolize...................14

    C.    Plaintiffs Fail to Allege that Defendants Had the Specific Intent to Monopolize the eBook Market. ........................................................16

II.    PLAINTIFFS' MONOPOLIZATION CLAIM IS CONTRADICTED BY THE CENTRAL FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT, AND FAILS AS A MATTER OF LAW. ...........................................................17

    A.    Plaintiffs' Conclusory Assertion that Amazon Possesses Monopoly Power is Contradicted by the Amended Complaint's Core Factual Allegations. .............18

    B.    Plaintiffs Fail to Allege Amazon's Individual Share of the Alleged Market. ..................................................................................19

III.   PLAINTIFFS LACK STANDING. ...................................................................21

    A.    Plaintiffs' Claims Based on Purchases From Non-Amazon Retailers are Barred by the *Illinois Brick* Doctrine....................................................21

    B.    Plaintiffs Lack Standing to Bring Indirect Purchaser Claims Under *AGC*............23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
  181 F.3d 216 (2d Cir. 1999)......................................................................15, 16, 21

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ...............................................................................7, 12

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)......................................................................................21, 22, 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................................5, 8

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)......................................................................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................... *passim*

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)....................................................14, 15, 16, 19

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)................................................................................................9, 14

*Carson Optical, Inc. v. eBay, Inc.*,
  202 F. Supp. 3d 247 (E.D.N.Y. 2016) ...............................................................18

*Consol. Terminal Sys. v. ITT World Commc'ns*,
  535 F. Supp. 225 (S.D.N.Y. 1982) .....................................................................20

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ...............................................................6, 15, 16, 22

*Drug Emporium, Inc. v. Blue Cross of W. New York, Inc.*,
  104 F. Supp. 2d 184 (W.D.N.Y.2000) ...............................................................21

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006)...................................................................................17

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
  504 U.S. 451 (1992)...............................................................................................20

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989)..............................................................................20

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)..........................................................................18, 19

*Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.*,
  516 F. Supp. 2d 324 (D. Del. 2007)................................................................16

*Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.*,
  602 F.3d 237 (3d Cir. 2010)...............................................................................6

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)..............................................................................21, 22, 23

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) ...........................................................................22

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)....................................................................10, 12, 13

*In re: Inclusive Access Course Materials Antitrust Litig.*,
  No. 20-md-2946-DLC, 2021 WL 2418333 (S.D.N.Y. June 14, 2021) ..............8, 10

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ...................................................................6, 10, 11

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016).......................................................... *passim*

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987)...........................................................................16

*Kansas v. UtiliCorp United Inc.*,
  497 U.S. 199 (1990)........................................................................................23

*Laumann v. National Hockey League*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012).............................................................22

*Mayor and City Council of Baltimore, MD v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).......................................................................... *passim*

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
  467 F.3d 283 (2d Cir. 2006).................................................................23, 24, 25

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ................................................................7, 8, 15, 21

*Real Selling Grp. LLC v. ESN Grp., Inc.*,
    No. 20-cv-1468, 2021 WL 535748 (S.D.N.Y. Feb. 12, 2021) ................................17

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................19

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................7

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) ................................................................7, 8, 18

*United States v. Apple*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013) ............................................................3, 12

*United States v. Apple*,
    791 F.3d 290 (2d Cir. 2015) .................................................................. *passim*

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................................7

*Virgin Atl. Airways, Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ........................................................................20

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) ........................................................................23

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ................................................................13, 14

## STATUTES

15 U.S.C. § 1 ...................................................................................... *passim*

15 U.S.C. § 2 ...................................................................................... *passim*

# INTRODUCTION

Plaintiffs allege that five of the largest publishers[1] of electronic books ("eBooks") have forged an illogical conspiracy to collectively instill monopoly power in a single downstream retailer, Amazon.com, Inc. ("Amazon").  If true, Plaintiffs' conspiracy allegation would mean that the Publisher Defendants got together to create a monopolist retailer with whom they would then have to deal.  Further reinforcing the implausibility of this theory, this would have happened while still under supervision from the Department of Justice ("DOJ") after allegedly conspiring with Apple to *reduce* Amazon's eBook sales.  Plaintiffs' Amended Complaint contains no factual allegations that credibly explain why Defendants would enter into such a conspiracy, let alone demonstrate that they carried it out.  Instead, Plaintiffs' Amended Complaint is built upon conclusory allegations interspersed with alleged facts that are more consistent with independent conduct than they are with a conspiracy.  Plaintiffs' allegations are contrary to reality and fail to state a claim.

First, Plaintiffs fail to allege facts plausibly showing that Amazon's agreements with individual eBook publishers are the product of a conspiracy involving all defendants acting collectively.[2]  The allegations in the Amended Complaint give no basis to infer such a conspiracy, and at best support an inference that publishers engaged in lawful, parallel decision-making in response to common conditions in the marketplace.  As the Amended Complaint alleges, each publisher had its own independent reasons to seek to retain control over the retail prices for their own eBooks through an "agency" distribution relationship with Amazon.  No

---

[1]    Penguin Random House LLC ("PRH"), Simon & Schuster ("S&S"), Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers, LLC ("HarperCollins"), and Macmillan Publishing Group, LLC ("Macmillan") (collectively, the "Publisher Defendants").

[2]    Notably, each agreement between Amazon and an eBook publisher would affect a share of the alleged market that is too small to give rise to antitrust concerns when analyzed individually.

facts alleged in the Amended Complaint support the conclusory allegation that those individual contracts, agreed to months apart from one another, all resulted from a vast conspiracy amongst Amazon and the Publisher Defendants.  Contrary to Plaintiffs' allegation that Defendants signaled to one another the terms of their respective agreements, none of the public statements cited by Plaintiffs contain any discussion of the core terms that they characterize as the product of a conspiracy.

Second, Plaintiffs allege that Amazon illegally obtained and abused monopoly power in the sale of trade eBooks.  This allegation is squarely contradicted by the facts asserted in the Amended Complaint, which demonstrate that the *Publisher Defendants*—not Amazon—are the sellers of eBooks in Amazon's store since Amazon is merely acting as an agent for the Publisher Defendants under the challenged agreements.  Amazon cannot be found to have monopolized an alleged market based on allegations that it neither controls prices nor even sells the majority of the products.

Third, and finally, Plaintiffs lack standing to sue Amazon for purchases of eBooks from other non-Amazon retailers.  All but two of the named Plaintiffs disavow purchasing any eBooks from Amazon.  Instead, they purchased eBooks through other retailers whose own prices were allegedly increased indirectly by Amazon's agreements with the Publisher Defendants.  Under two distinct legal doctrines, Plaintiffs in that remote position have no standing to sue Amazon based on products they did not purchase from Amazon.

For all of these reasons Plaintiffs' Amended Complaint should be dismissed.

## BACKGROUND

### A.    The *Apple* Litigation.

Amazon's commitment to low-cost pricing of eBooks helped to popularize the format, enhanced competition, and led to significant consumer benefits.  This low-price commitment

also brought Amazon into conflict with the largest publishing houses (the "Publisher

Defendants"), who "feared that Amazon's $9.99 price point would hurt their profits."  ECF 67,

Am. Compl. ¶¶ 39, 41-43.

The Publisher Defendants' actions in response to Amazon's eBooks pricing became the

subject of federal and state government litigation in which this Court found that Apple conspired

with the Publisher Defendants "to eliminate retail price competition in order to raise e-book

prices. . . ."  *United States v. Apple*, 952 F. Supp. 2d 638, 647 (S.D.N.Y.), *aff'd* 791 F.3d 290 (2d

Cir. 2015).  As the Court explained, "[p]rior to April 2010, the Publishers distributed print and

digital books through a wholesale pricing model, in which a content provider sets a list price

(also known as a suggested retail price) and then sells books and e-books to a retailer—such as

Amazon—for a wholesale price, which is often a percentage of the list price." *Id.* at 649.  "The

retailer then offers the book and e-book to consumers at whatever price it chooses." *Id.*

Amazon's re-sale eBook prices were frequently well below the prices for identical print book

titles, a practice that the Publisher Defendants "feared . . . would have a number of pernicious

effects on their profits, both in the short run and long-term." *Id.*

The crux of the alleged scheme that Apple coordinated was to force Amazon off of the

wholesale pricing model, and onto a new "agency model" that would allow the publishers to set

higher prices for eBooks.  Am. Compl. ¶¶ 46-47; *Apple*, 952 F. Supp. 2d at 657-67.  Under the

agency model, the publisher sets its own price and sells eBooks directly to retail consumers,

while the retailer serves as the publisher's sales agent and collects a commission on each sale.

Am. Compl. ¶¶ 2, 47; *see also Apple*, 952 F. Supp. 2d at 648 (on the agency model, "a publisher

sets the retail price and the retailer sells the e-book as its agent").  In that sales model, the

retailer-agent does not have the discretion to discount the publisher-principal's list price.  *Ibid.*

Following a bench trial, Judge Cote found that Apple coordinated a horizontal agreement among the Publisher Defendants to collectively force Amazon onto this agency model, and that this agreement constituted a "horizontal price-fixing conspiracy." *Apple*, 952 F. Supp. 2d at 692-94.

Prior to trial in *Apple*, the Publisher Defendants settled and entered into consent decrees that, *inter alia*, prohibited them for a period of five years from entering into eBook distribution agreements with any retailer, including Amazon, containing price Most Favored Nation ("MFN") clauses, and subjected their contracts to compliance review by the Antitrust Division of the Department of Justice. *See* Am. Compl. ¶ 57 & nn. 65-66 (citing consent decrees). The consent decrees further provided that for a period of two years, the Publisher Defendants would not enter into any agreements that prohibited a retailer from discounting the retail prices of eBooks sold through its store. *Id.* While those consent decrees required the negotiation of new distribution agreements for the period 2013-2014, at different intervals beginning in 2015 the Publisher Defendants were each permitted to return to the agency distribution model. *Id.*

### B.   Plaintiffs' Current Allegations.

From 2014 through June 2015, Amazon engaged in protracted negotiations for new eBook distribution agreements with each of the Publisher Defendants to take effect following the expiration of their existing agreements. Am. Compl. ¶¶ 62-71. Ultimately, each of the agreements restored the agency distribution model, the same distribution model that the publishers entered with other retailers of eBooks. *Id.* ¶¶ 2, 47, 55, 62-71. As a result, "[t]he sales transaction occurs directly between the publisher and the retail consumer." *Id.* ¶ 47.

Plaintiffs allege that the agency distribution agreements between Amazon and individual Publisher Defendants each contain identical price MFN provisions, and that the agreements are part of an overarching hub-and-spoke conspiracy among Amazon and all of the Publisher Defendants to collectively raise eBook prices and make Amazon a monopolist in an alleged

market for trade eBooks.  Am. Compl. ¶¶ 4, 74-87.  In other words, Plaintiffs claim that the
Publisher Defendants, having agreed with the DOJ and various State Attorneys General to
resolve claims that they conspired with Apple to fight *against* Amazon's competitive business
practices regarding eBooks, now have purportedly entered into a new conspiracy *with* Amazon to
bolster and cement Amazon as a monopolist, all while being subject to antitrust oversight and
compliance review by the DOJ.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A]
plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than
labels and conclusions, and a formulaic recitation of a cause of action's elements will not do[.]"
*Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above
the speculative level[.]"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged."  *Iqbal,* 556 U.S. at 678.  "If the Court can infer no more than 'the mere
possibility of misconduct' from the factual averments—that is, if the well-pleaded allegations of
the complaint have not 'nudged plaintiffs' claims across the line from conceivable to
plausible'—dismissal is appropriate."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 356-57
(S.D.N.Y. 2016) (quoting *Iqbal*, 556 U.S. at 679-80).

Plaintiff's First and Third Causes of Action require well-pleaded allegations of a
conspiracy between and among Amazon and all of the Publisher Defendants.  To allege such a
conspiracy, "[a] statement of parallel conduct, even conduct consciously undertaken, needs some
setting suggesting the agreement necessary to make out a § 1 [Sherman Act] claim; without that

further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory" and does not state a claim. *Twombly*, 550 U.S. at 557. "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015); *Apple*, 791 F.3d at 314 ("[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'") (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)). In contrast, where a plaintiff alleges only that various entities "enter into separate agreements with a common defendant, but . . . have no connection with one another," the allegations fail to support the existence of "a single, general conspiracy." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (describing so-called "rimless wheel" conspiracy allegations). Such allegations describe only a series of vertical agreements that must be evaluated individually. *Id.* at 203-05.

"The ultimate existence of an 'agreement' under antitrust law, however, is a legal conclusion, not a factual allegation." *Mayor and City Council of Baltimore, MD v. Citigroup, Inc.*, 709 F.3d 129, 135-36 (2d Cir. 2013). "A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Id.* at 136. "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws." *Id.* "Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Id.* "[A] complaint may, alternatively, present circumstantial facts

supporting the inference that a conspiracy existed . . . 'on the basis of conscious parallelism . . . accompanied by circumstantial evidence and plus factors.'" *Id*. (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id*. However, "even if a plaintiff alleges . . . 'plus factors'—these facts must still lead to an inference of conspiracy." *Id*. at 137. "Such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Id*. (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)).

Plaintiff's Second Cause of Action requires well-pleaded allegations of illegal monopolization by Amazon in violation of Section 2 of the Sherman Act. "The offense of monopoly under [Section 2] of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The latter element requires a plaintiff to allege that "the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002). "Monopoly power, also referred to as market power, is the power to control prices or exclude competition." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) (internal quotations and citations omitted). "A firm possesses market power when it has the ability to

raise price by restricting output." *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 377 (citing *PepsiCo*, 315 F.3d at 107); *see also Tops Markets*, 142 F.3d at 98 (same).

"Market power may be proven directly by evidence of the control of prices or the exclusion of competition." *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 377. "However, in most cases this type of direct evidence is absent, in which case the plaintiff must rely on indirect proof," such as proof of a dominant share of the relevant market. *Id.* at 377-78.

## ARGUMENT

## I.   PLAINTIFFS' CONSPIRACY CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs' allegations that Defendants conspired to restrain trade and monopolize an eBook market (First and Third Causes of Action)[3] fail to meet the plausibility standard set forth in *Twombly* and *Iqbal* and must be dismissed as a matter of law for three independent reasons. First, Plaintiffs fail to adequately allege a hub-and-spoke conspiracy among the Defendants, because there are no plausible facts suggesting that the Publisher Defendants reached horizontal agreements among themselves. The only plausible inference from the facts alleged in the Amended Complaint is that each of the Publisher Defendants separately reached a vertical agreement with Amazon. Second, Plaintiffs cannot save their conspiracy claims by recasting them as a series of separate vertical conspiracies, because none of the individual Defendants control a sufficient share of the market to have market power capable of achieving an anticompetitive effect. Finally, Plaintiffs fail to allege that Defendants had the specific intent to monopolize the alleged eBook market, as required to state a claim under § 2 of the Sherman Act.

---

[3]   Plaintiffs caption the First Cause of Action as a claim under § 2 of the Sherman Act, but the allegations appear to relate to a § 1 claim for restraint of trade. The allegations are insufficient, however, to state a claim under either provision of the statute. *See* Op. & Order, *In re: Inclusive Access Course Materials Antitrust Litig.*, No. 20-md-2946-DLC, 2021 WL 2418333, *13 (S.D.N.Y. June 14, 2021) ("In deciding whether there is concerted action, courts routinely apply the same analysis under both Sections 1 and 2.").

### A.     Plaintiffs Fail to Allege a Hub-and-Spoke Conspiracy.

In the First Cause of Action, Plaintiffs purport to allege an overarching conspiracy among all of the Defendants to "prevent competitive pricing of trade eBooks by switching to an agency model and agreeing to anticompetitive MFNs and anticompetitive provisions that functioned the same as MFNs." Am. Compl. ¶ 153.  In the Third Cause of Action, Plaintiffs claim that the Defendants conspired to make Amazon a monopolist in an alleged eBook market in the U.S. through the same underlying conduct. *Id.* ¶¶ 184-93.  According to Plaintiffs, the "purpose and effect" of the agency agreements between each of the Publisher Defendants and Amazon is to achieve a monopoly by ensuring "that Defendants control trade eBook prices throughout the U.S. market and that Amazon faces no competition from other eBook retailers in terms of price and product availability." *Id.* ¶ 190.

Plaintiffs' First and Third Causes of Action fail to allege the existence of an agreement in restraint of trade.  There are no facts plausibly supporting the existence of an agreement among the Publisher Defendants to coordinate their distribution of eBooks.  At most, Plaintiffs allege that the Publisher Defendants engaged in parallel conduct by entering into the "same anti-competitive agency agreements with MFNs[.]" Am. Compl. ¶ 156.  However, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.  "Even 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Id.* at 553-54 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)); *see also Apple*, 791 F.3d at 315 ("Parallel action is not, by itself, sufficient to prove the existence of a conspiracy; such behavior could be the result of 'coincidence, independent responses to common stimuli, or mere interdependence

unaided by an advance understanding among the parties.'" (quoting *Twombly*, 550 U.S. at 556 n.4)); *Musical Instruments*, 798 F.3d at 1193 ("*Twombly* takes into account the economic reality that mere parallel conduct is as consistent with agreement among competitors as it is with independent conduct in an interdependent market.").

Plaintiffs' attempts to allege coordinated action are conclusory and insufficient.  First, Plaintiffs allege that the Publisher Defendants had a "common motive to collude."  Am. Compl. ¶¶ 157, 162.  Contrary to that allegation, the Amended Complaint makes clear that each of the Publisher Defendants believed that Amazon's eBook pricing practices were a threat to their short- and long-term profitability.  Am. Compl. ¶¶ 42-43.  No coordination is required for the Publisher Defendants to each observe common market conditions and independently decide that they each needed to pursue agency agreements with Amazon to "control" their respective eBook pricing.  *Id.* ¶ 157.  "[T]wo firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures."  *Musical Instruments*, 798 F.3d at 1193.  Common reactions to common market pressures do not create an inference of a conspiracy.  *Id.* at 1193-94; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals.").

Judge Cote recently reached this conclusion in *Inclusive Access Course Materials*, where the Plaintiffs alleged that textbook publishers had a common motive to conspire to adopt a "digital textbook regime" in order to "protect their historical prices and market shares."  2021 WL 2418333, at *9.  The court recognized that:

> [t]his argument confuses two phenomena.  While the [Complaint] describes a commercial environment that would motivate any textbook publisher to independently consider the advantages of adopting a digital textbook regime . . . it does not describe an environment that encouraged or required them to conspire with each other to do so.  After all, a motive to innovate is different than a motive to

conspire.  At best, the [Complaint] describes conscious parallelism, and that is insufficient to plead that the Publisher Defendants conspired with each other.

*Id.*  The same conclusion applies here.

As the Amended Complaint alleges, "[e]ach of the Big Five Defendants has a motive to enter into agency pricing as a means to control trade eBook pricing in the industry."  Am. Compl. ¶ 157.  That self-interest does not depend upon coordinated action.  Any individual Publisher Defendant that negotiated an agency agreement with Amazon would, as a result, retain "control" over the prices of its own eBooks, and that fact would be just as true if it was the *only* publisher to negotiate such an agreement as it would be if all five of the Publisher Defendants did so.  Because each agency agreement independently fulfilled the self-interest of the publisher who negotiated that agreement, there is no basis for inferring coordinated behavior among the respective publishers who entered into such agreements.  *See Apple*, 791 F.3d at 318 (basis for inferring conspiracy is alleged conduct that is "*contrary to the [conspirators]' individual self-interest* but consistent with their collective interest") (emphasis added); *Musical Instruments*, 798 F.3d at 1195 (finding no basis to infer conspiracy where parallel business decisions were "self-interested"); *Mayor and City Council of Baltimore*, 709 F.3d at 137 (alleged "plus factors" must "lead to an inference of conspiracy").  Indeed, as the Amended Complaint alleges, the Publisher Defendants *also* insisted upon an agency business model for other retailers of eBooks, including Google and Barnes & Noble, *see* Am. Compl. ¶ 53, underscoring that the use of that model is consistent with their individual self-interest.

Plaintiffs attempt to paper over this hole in their Amended Complaint by alleging that each individual publisher may not have been able to achieve its *optimal price increase* by acting unilaterally.  *See* Am. Compl. ¶ 162.  The possibility that each publisher could realize greater price increases if other publishers acted similarly, however, is a classic description of the type of

shared incentives that can be expected to lead to lawful, parallel decision-making. *See Mayor and City Council of Baltimore*, 709 F.3d at 137. In any event, that allegation fails to address the relevant issue. The alleged "parallel conduct" is each publisher's entry "into the same . . . agency agreements with MFNs[.]" Am. Compl. ¶ 156. Even if it were true that a publisher acting alone could not have raised its eBook prices as much as it may have wanted, that does not make it against any publisher's interest to unilaterally enter into an agency distribution agreement that gives it greater control over eBook pricing. "[T]hese asserted facts lead to only one plausible inference: these are 'actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement.'" *Mayor and City Council of Baltimore*, 709 F.3d at 137 (quoting *Apex Oil Co.*, 822 F.2d at 254); *see also Elevator Antitrust Litig.*, 502 F.3d at 51 (alleged "similarities in contract language" reflected only parallel conduct that was insufficient to state a claim).

Plaintiffs attempt to frame their allegations as supporting the same inference of conspiracy that was found in the *Apple* case, *see* Am. Compl. ¶¶ 6, 100, 156, 161, but that is not remotely true. In that case, the contracts the publishers signed with Apple would have caused them to earn *even less* revenue because Apple's retail prices were guaranteed to match the Amazon prices that the publishers already considered to be too low, and the publishers' share of that price would be further reduced by Apple's commission. *Id.* ¶¶ 48, 51. As a result, the agreements with Apple did not make sense "unless [they] moved all of their [re]tailers to an agency model and raised e-book prices in all of those e-bookstores." *Apple*, 952 F. Supp. 2d at 662. In the short run, those agreements "deprived each of [the publishers] of a stream of expected revenue from the sale of e-books on the wholesale model," and would harm "their near-term financial interests" unless and until they were able to collectively achieve "an 'abrupt shift'

12

from the past model for the distribution of e-books." *Id.* at 693.  The publishers then made

identical demands of Amazon "within days of each other." *Id.*  The inference of conspiracy

therefore arose because the publishers were simultaneously acting contrary to their own

individual self-interest, but consistent with their long-term coordinated interests. *Id.*

Here, in contrast, there is no alleged conduct that is contrary to the individual interests of

any publisher, and their actions were separated by months.  Am. Compl. ¶¶ 67-71.  Each

publisher already had a form of agency agreement with Amazon and other retailers at the time

the 2015 contracts were negotiated.  Signing a new agency agreement with Amazon would not

lead any publisher to incur either a short- or long-term loss absent some coordinated action.

Rather, the Amended Complaint alleges that "[e]ach of the Big Five Defendants has a motive to

enter into agency pricing as a means to control trade eBook pricing in the industry" and "[e]ach

has rejected retailer discounting of its own eBooks . . . as a threat to the publishing industry."

Am. Compl. ¶ 157.  The allegation that each publisher entered into an agreement that conformed

with those interests is an allegation that is as consistent with independent conduct as it is with

conspiracy, and therefore fails to meet the *Twombly* standard.  *Mayor and City Council of

Baltimore*, 709 F.3d at 137; *Elevator Antitrust Litig.*, 502 F.3d at 51.

Plaintiffs also allege that the Publisher Defendants had the opportunity to collude because

"as each of the Big Five Defendants entered into the same agreements with Amazon, they

publicly signaled to the others that the agreement provided agency pricing."  Am. Compl. ¶¶ 159,

162.  Plaintiffs are exaggerating the contents of these alleged statements, none of which disclose

the MFNs that allegedly are the core element of a conspiracy.  *Id.* ¶¶ 64-71.  And in any event,

these sorts of public acknowledgements are hardly a basis upon which to infer the existence of a

conspiracy.  *See, e.g., Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1306-07 (11th

Cir. 2003) (businesses' public disclosure of the rationale for major policy decisions were "legitimate communication[s] within the market" and not a basis to infer a conspiracy orchestrated through "signaling"); *id.* at 1310 ("None of the actions . . . that appellants label 'signals' tend to exclude the possibility that the primary players in the tobacco industry were engaged in rational, lawful, parallel pricing behavior[.]").  Indeed, as the Second Circuit has emphasized, it is commonplace for firms in concentrated industries to have "a high level of interfirm *awareness*," which lawfully may inform their respective business strategies.  *Mayor and City Council of Baltimore*, 709 F.3d at 139; *see also Twombly*, 550 U.S. at 553 (parallel action is "a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions'") (quoting *Brooke Grp. Ltd.*, 509 U.S. at 227).

In short, Plaintiffs have not sufficiently alleged any "plus factors" that would allow the Court to infer that the Publisher Defendants' alleged parallel conduct was the result of a conspiracy among and between the Publisher Defendants.  For that reason, the First and Third Causes of Action should be dismissed.

B.      **The First and Third Causes of Action Cannot Be Recast as Alleging a Series of Conspiracies in Restraint of Trade and/or To Monopolize.**

Lacking valid hub-and-spoke conspiracy claims, Plaintiffs may argue that their claims can move forward as allegations of five distinct vertical conspiracies in restraint of trade and/or to monopolize.  But that argument has previously been rejected by this Court, and should be rejected again on the same basis:  no single publisher holds sufficient market share for an individual vertical arrangement with Amazon to have anticompetitive effect.  *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013).

"[V]ertical agreements on pricing, which are created between parties at different levels of a market structure," such as the agency agreements alleged between Amazon and each of the five Publisher Defendants, "are unlawful only if an assessment of market effects, known as the rule-of-reason analysis, reveals that they unreasonably restrain trade." *Apple*, 791 F.3d at 313.  In *Bookhouse*, Plaintiffs brought claims against Amazon and a similar group of publishers for violations of Sections 1 and 2 of the Sherman Act.  985 F. Supp. 2d at 616.  As in this case, the plaintiffs in *Bookhouse* did not allege the market share of any individual publisher, which was fatal to their claims.  Judge Rakoff held:

> [Plaintiffs] have failed to allege market power.  In particular, plaintiffs allege that Amazon holds 60% of the e-book retailing market and (inferentially) that the Publishers collectively hold 60% of the e-book publishing market.  Multiplying these percentages together, any unlawful arrangement between the Publishers collectively and Amazon would affect only 36% of the U.S. e-book market. . . . Plaintiffs do not allege each individual Publisher's market share, but if the collective share is 60%, each of the six Publishers holds 10% of the market on average.  Thus, any individual vertical agreement between a Publisher and Amazon would affect only around 6% of the U.S. e-book market, a share far too small to suggest an ability to charge super-competitive prices.

985 F. Supp. 2d at 622; *see also AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 229 (2d Cir. 1999) ("Indeed, we have held that a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power."); *PepsiCo*, 315 F.3d at 109 ("[A] 64 percent market share is insufficient to infer monopoly power.").

Applying the *Bookhouse* analysis to Plaintiffs' estimate that the Publisher Defendants in this case collectively account for 80% of the relevant market, Am. Compl.  ¶¶ 1, 166, demonstrates that they are too small for any individual agreement to restrain trade or create a monopolist.[4]  *Bookhouse*, 985 F. Supp. 2d at 622; *Dickson*, 309 F.3d at 208 (affirming the

---

[4]     Even under Plaintiffs' own allegations, this estimate is likely substantially inflated.  The alleged 80% share is an estimate of "all trade book sales."  It thus includes both print and eBooks, contrary to Plaintiffs' alleged

dismissal of Section 1 and 2 conspiracy claims in part because the Plaintiffs had not alleged that

the parties to the vertical agreements at issue had sufficient market power for the agreements to

have an anticompetitive effect).  Assuming without conceding that Plaintiffs' 80% estimate is

correct, each Publisher Defendant would on average hold 16% of the market.[5]  If, as alleged,

Amazon accounts for 88.9% of US eBook sales, Am. Compl. ¶ 3 n.5, then "any individual

vertical agreement between a Publisher and Amazon" would on average affect just over 14% of

the U.S. eBook market, "a share far too small to suggest an ability to charge super-competitive

prices." *Bookhouse*, 985 F. Supp. 2d at 622; *AD/Sat*, 181 F.3d at 229.  Such agreements are not

capable of conferring monopoly power on Amazon. *Bookhouse*, 985 F. Supp. 2d at 622;

*Dickson*, 309 F.3d at 211 ("[W]ithout allegations regarding the market power or share of

[defendants] in the [relevant] market, [plaintiff] is unable to show a conspiracy to monopolize

under § 2.").  Therefore any attempt by Plaintiffs to recast their allegations as a series of separate

unlawful vertical agreements must fail as a matter of law.

### C.   Plaintiffs Fail to Allege that Defendants Had the Specific Intent to Monopolize the eBook Market.

Plaintiffs' conspiracy to monopolize claims should also be dismissed because Plaintiffs

do not plausibly allege that the Publisher Defendants actually intended to make Amazon a

monopolist. *See Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 796 (2d

Cir. 1987) ("[A] plurality of actors sharing . . . an intent [to monopolize] is required

under section 2."); *see also Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.*, 516 F.

Supp. 2d 324, 342 (D. Del. 2007) (dismissing claims because the plaintiffs had not pled facts

---

relevant market.  While Amazon is using Plaintiffs' estimates for purposes of this motion, it does not agree that Plaintiffs have properly defined a relevant market or accurately estimated any defendant's share of such market.

[5]     While Plaintiffs allege that the largest publisher, Penguin Random House, accounts for 25% of the "English-language publishing market," Am. Compl. ¶ 124, this number is also likely inflated because it goes far beyond a purported U.S. eBook market.

from which it could reasonably be inferred that the defendants had formulated the intent to maintain one party's monopoly).

The sole allegation regarding the Publisher Defendants' intent to confer a monopoly on Amazon states that "Defendants demonstrated a specific intent to confer monopoly power upon Amazon by agreeing to immunize it from competition from any other eBook retailers."  Am. Compl. ¶ 190.  But that conclusory allegation is unsupported by any facts plausibly explaining why any of the Publisher Defendants, much less all of them, would actively seek to make one eBook retailer into a monopolist.  Just as "any seller of a product . . . would prefer multiple competing buyers," *E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23, 30 (2d Cir. 2006), the Publisher Defendants have no plausible interest in creating a downstream monopolist retailer of their books.  *Id.*; *see also Real Selling Grp. LLC v. ESN Grp., Inc.*, No. 20-cv-1468, 2021 WL 535748, *4-*5 (S.D.N.Y. Feb. 12, 2021) (attempted monopolization claim was implausible because the defendant "has no anticompetitive incentive to reduce the number of entities reselling its products").

Indeed, Plaintiffs' allegations are even less plausible than in the ordinary case, because the Amended Complaint also alleges that the same group of publishers formerly conspired to *reduce* Amazon's sales.  *See* Am. Compl. ¶ 55.  Nothing in the Amended Complaint plausibly explains why the Publisher Defendants' collective interest would be advanced by a conspiracy to make Amazon a monopolist.

## II.  PLAINTIFFS' MONOPOLIZATION CLAIM IS CONTRADICTED BY THE CENTRAL FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT, AND FAILS AS A MATTER OF LAW.

Plaintiffs' Second Cause of Action alleges that "Amazon has willfully acquired and maintained . . . monopoly power in the U.S. retail market for trade eBooks and substantially foreclosed competition in this market by unlawful and improper means," in violation of Section

2 of the Sherman Act.  *See* Am. Compl. ¶ 177.  In support of its allegation, Plaintiffs aver that

Amazon "*controls* about 90% of eBook sales," and that it has the "power to raise trade eBook

prices above that which would be charged in a competitive market."  *Id.* ¶ 176.  Plaintiffs'

allegations fail to state a claim for unlawful monopolization under the Sherman Act for several

reasons.

### A.  Plaintiffs' Conclusory Assertion that Amazon Possesses Monopoly Power is Contradicted by the Amended Complaint's Core Factual Allegations.

Plaintiffs' monopolization claim is incoherent and contradicts the Amended Complaint's

core factual contentions.  It cannot simultaneously be true that the Big Five Publisher Defendants

*directly control* "ninety percent of total sales" of eBooks, Am. Compl. ¶ 124, while Amazon also

"controls about 90% of eBook sales," *id.* ¶ 176.  Furthermore, according to Plaintiffs, the

Publisher Defendants—not Amazon— "set the price" at which their eBooks are sold.  *Id.* ¶ 148;

*see also id.* ¶¶ 2, 47.  These core allegations consequently cannot satisfy the most basic

requirement of monopoly power:  the ability "to control prices or exclude competition."  *Tops*

*Markets*, 142 F.3d at 97-98.

"Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated

to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion

to dismiss."  *Carson Optical, Inc. v. eBay, Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016)

(internal quotations and alteration omitted).  Instead, the Court validly may disregard "attenuated

allegations" that are "contradicted . . . by more specific allegations" of fact.  *Hirsch v. Arthur*

*Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995).  Here, that attenuated allegation is the bald

assertion that Amazon controls 90% of the alleged relevant market because purportedly "90% of

all eBooks are sold through [Amazon's] online retail platform."  Am. Compl. ¶¶ 3, 176.  This

allegation is entitled to no weight because it is contradicted by repeated, explicit allegations that

a significant percentage of eBooks sold through Amazon's store are not controlled by Amazon at all, but are instead exclusively under the control of individual Publisher Defendants. *Id.* ¶ 47 ("Crucially, under the agency model, *publishers set the price* of their eBooks and . . . [the] sales transaction occurs directly between the publisher and the retail consumer"); *id.* ¶¶ 2, 148 (same). In the face of those repeated allegations, Plaintiffs' bare and conclusory allegation that Amazon "controls" 90% of all eBook sales is implausible and unable to state a claim upon which relief can be granted. *Hirsch*, 72 F.3d at 1095; *Twombly*, 550 U.S. at 555.

 **B.** **Plaintiffs Fail to Allege Amazon's Individual Share of the Alleged Market.**

 Plaintiffs cannot label Amazon a monopolist by aggregating the Publisher Defendants' own "direct" sales with sales of other eBooks sold by Amazon in its capacity as a competing publisher and retailer.[6] *Cf.* Am. Compl. ¶ 33 (alleging that "Amazon is vertically integrated and is active upstream as a publisher, with its own imprints (i.e., publishing labels)" through which it "competes with the Big Five Defendants"). Under clear Second Circuit precedent, only Amazon's own sales as a publisher and independent retailer count towards its alleged market share. Plaintiffs fail to explicitly allege Amazon's individual share of the market, but the Amended Complaint implies that Amazon's own sales account for at most 10% of the purported eBook market. As a matter of law, that is too small to qualify as a monopoly.

 Section 2 of the Sherman Act prohibits unlawful monopolization by a *singular* entity, not a collection of entities. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) ("While § 1 of the Sherman Act forbids contracts or conspiracies in restraint of trade or

---

[6] Amazon disagrees that eBooks constitute their own relevant antitrust market. *See Bookhouse*, 985 F. Supp. 2d at 621 (alleged market was inadequate because "print books are an obvious potential substitute for e-books"). However, even assuming the truth of Plaintiffs' market definition allegations, the Amended Complaint fails to state a claim upon which relief can be granted.

commerce, § 2 addresses the actions of single firms that monopolize or attempt to monopolize.");
*Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 265 (2d Cir. 2001) ("Market power is defined as 'the ability of a *single seller* to raise price[s] and restrict output.'") (quoting *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (emphasis added)). Accordingly, the Second Circuit and other courts have squarely held that multiple sellers' market shares may not be "'*combined* . . . in order to sustain a charge of monopolization or attempted monopolization[.]'" *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (quoting *Consol. Terminal Sys. v. ITT World Commc'ns*, 535 F. Supp. 225, 228-29 (S.D.N.Y. 1982)) (emphasis in original); *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 382 ("[N]umerous district courts . . . have repeatedly rejected . . . a shared monopoly theory").

Plaintiffs' Amended Complaint relies on precisely that sort of improper aggregation. With one exception, Plaintiffs fail to allege the distinct market share held by any of the Publisher Defendants individually; instead, their sales are combined into a collective estimate that together they account for 90% of "U.S. trade book" sales." *See* Am. Compl. ¶ 124.[7] Likewise, the Amended Complaint contains no allegation of the market share accounted for by Amazon's own independently-published and controlled eBook sales, *id.* ¶ 33, as distinct from the sales of the Publisher Defendants. Instead, it estimates a market share that is based on *all* eBooks "sold through" Amazon's bookstore, *id.* ¶ 3, without regard for whether those sales are made *by Amazon*, or instead by one of the Publisher Defendants "directly." *Id.* ¶¶ 2, 47, 149.

Furthermore, Plaintiffs' allegations about the scale of the Publisher Defendants' own sales demonstrate that any residual market share left over for direct sales by Amazon would not

---

[7]     The one exception is PRH, which Plaintiff estimates to control "approximately twenty-five percent of the English-language publishing market." Am. Compl. ¶ 124. As explained above, this allegation is inconsistent with the alleged relevant market. *Supra* n. 4.

qualify as a monopoly.  According to Plaintiffs, the Publisher Defendants collectively control 90% of trade eBook sales, implying no more than 10% of the market is available for Amazon and other sellers.  Am. Compl. ¶ 124.  Courts have rejected monopolization claims based on alleged market shares greater than that.  *See AD/SAT*, 181 F.3d at 229 ("Indeed, we have held that a 33 percent market share does not approach the level required for a showing of dangerous probability of monopoly power."); *PepsiCo*, 315 F.3d at 109 ("[A] 64 percent market share is insufficient to infer monopoly power."); *Drug Emporium, Inc. v. Blue Cross of W. New York, Inc.*, 104 F. Supp. 2d 184, 189 (W.D.N.Y. 2000) ("Lower courts have rejected . . . market shares between 30 percent and 40 percent as inadequate to demonstrate market power.").  Plaintiffs fail to allege that Amazon has a sufficient share of the market to be considered a monopolist.

Plaintiffs cannot state a valid claim for monopolization of an alleged market for "the retail sale of trade eBooks in the United States," Am. Compl. ¶ 113, while simultaneously alleging that it is the Publisher Defendants, not Amazon, that sells eBooks to consumers, *id.* ¶ 148.  Because Amazon does not directly control the prices charged in the relevant market, it cannot be considered a monopolist in that market.  *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 379.[8]

## III.     PLAINTIFFS LACK STANDING.

### A.     Plaintiffs' Claims Based on Purchases From Non-Amazon Retailers are Barred by the *Illinois Brick* Doctrine.

---

[8]     In the Rule 26(f) submission, Plaintiffs signaled their intention to argue that the Supreme Court's decision in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), endorses the proposition that a sales agent can be deemed a monopolist based upon the market share held by its principals.  *See* ECF 82, at 7.  That contention is meritless.  The issue in *Pepper* was limited to whether the *Illinois Brick* direct purchaser rule denied standing to Plaintiffs who purchased applications directly from Apple at prices set by others. *See* 139 S. Ct. at 1522 (rejecting "Apple's effort to transform *Illinois Brick* from a direct purchaser rule to a 'who sets the price' rule").  The Court expressly disclaimed addressing any other issues:  "At this early pleadings stage of the litigation, we do not assess the merits of the plaintiffs' antitrust claims against Apple, nor do we consider any other defenses Apple might have." *Id.* at 1519.

Each of the Plaintiffs who originally filed Complaints in this matter took pains to allege that they did not purchase any products from Amazon directly, but instead, solely purchased eBooks from the Publisher Defendants through retailers *other than* Amazon.  *See, e.g., Fremgen* Compl., ECF 1, ¶ 116 (disclaiming any allegation relating to sales made through Amazon's website).  While two of the individual Plaintiffs now allege that they have purchased at least some eBooks from Amazon's store, they along with the remaining thirteen Plaintiffs still base claims on purchases of eBooks from the Publisher Defendants through retailers other than Amazon.  *See* Am. Compl. ¶¶ 18-32.[9]  All Plaintiffs lack standing to sue Amazon for alleged injuries that they incurred, if at all, in their status as purchasers from non-Amazon retailers because their claims are impermissibly remote and speculative.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977) (only direct purchasers from an antitrust violator can sue for damages based on an alleged overcharge); *Pepper*, 139 S. Ct. at 1520 (re-affirming same).

Plaintiffs may argue that an exception to the *Illinois Brick* rule permits indirect purchasers to bring claims against the alleged co-conspirators of the seller with whom they directly dealt.  *Cf.* Am. Compl. ¶ 172 (alleging that "Defendants have directly injured Plaintiffs and Class members by causing them to pay more for the Big Five's eBooks.").  There is a circuit split on the availability of this so-called "co-conspirator exception," and the Second Circuit has not endorsed or adopted this exception.  Nevertheless, the better reasoned side of the split rejects that exception outside of the limited (and inapposite) context of claims predicated on a horizontal price-fixing conspiracy.  *See Dickson*, 309 F.3d at 215; *In re ATM Fee Antitrust Litig.*, 686 F.3d

---

[9]      Only plaintiffs Wilde and Wilder allege the purchase of eBooks through Amazon in addition to purchases from other retailers. *Id.* ¶¶ 21, 22.  Plaintiffs' claims based on purchases from non-Amazon retailers are hereafter referred to as the Indirect Purchaser Claims.

741, 752 (9th Cir. 2012).  Because no such conspiracy has plausibly been alleged here, the

"bright-line" rule of *Illinois Brick* forecloses the Indirect Purchaser Claims against Amazon.[10]

## B.     Plaintiffs Lack Standing to Bring Indirect Purchaser Claims Under *AGC*.

Plaintiffs also lack standing for any claims based on purchases from retailers other than

Amazon because they are not "efficient enforcers" of the antitrust laws.  *See Paycom Billing*

*Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290, 293-94 (2d Cir. 2006) (citing *Assoc.*

*Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)

("*AGC*")).  Under *AGC*, courts are required to consider several non-exclusive factors including:

> (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an
> identifiable class of persons whose self-interest would normally motivate them to
> vindicate the public interest in antitrust enforcement"; (3) the speculativeness of the
> alleged injury; and (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative recoveries.

*Id.* at 290-91 (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66

(2d Cir. 1988)).  "The weight to be given the various factors will necessarily vary with the

circumstances of particular cases."  *Id.* (quotation and alteration omitted).

In *Paycom*, the Second Circuit held that an antitrust plaintiff lacked standing for reasons

that by analogy lead to an absence of standing in this case.  The plaintiff, Paycom, was an online

merchant that facilitated "Mastercard" credit card transactions between consumers and other

online retailers.  467 F.3d at 287.  It alleged that certain rules imposed by Mastercard reduced

---

[10]     Judge Scheindlin reached a contrary conclusion in *Laumann v. National Hockey League*, 907 F. Supp. 2d
465, 481-83 & nn. 87-93 (S.D.N.Y. 2012) (applying co-conspirator exception but noting the absence of Second
Circuit authority).  Subsequent to that decision, however, the Supreme Court revisited the *Illinois Brick* rule, and
again emphasized the importance of rejecting judicially-created exceptions.  "Our decision in *Illinois Brick*
established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."
*Pepper*, 139 S.Ct. at 1520.  "The bright-line rule of *Illinois Brick*, as articulated in that case and as we reiterated in
[*Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (1990)], means that indirect purchasers who are two or more steps
removed from the antitrust violator in a distribution chain may not sue."  *Id.* at 1521.  "As we said in *UtiliCorp* . . .
the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick*
'apply with equal force' in every individual case."  *Id.* at 1524 (quoting *UtiliCorp*, 497 U.S. at 216).  "We should not
engage in 'an unwarranted and counterproductive exercise to litigate a series of exceptions.'"  *Id.* (quoting *UtiliCorp*,
497 U.S. at 217).

competition between Mastercard and other charge card companies.  *Id.* at 287-88.  Paycom alleged that, in the absence of those rules, "increased competition from Discover and American Express would in turn have caused MasterCard to adopt policies more favorable to [plaintiff]."  *Id.* at 293.  On those alleged facts, the Second Circuit found that Paycom "fail[ed] to satisfy any of the 'efficient enforcer' factors," and did not have standing to bring its claim.  *Id.*

"First," the court held, "the injuries claimed by Paycom are indirect."  *Id.*  "Competing payment-card network service providers like Discover and American Express were the entities directly harmed," and "any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express."  *Id.*  "Second, the extent of Paycom's losses . . . [were] also highly speculative."  *Id.*  "No one can state that, absent the [challenged rules], increased competition from Discover and American Express would have forced MasterCard to adopt policies more favorable to Paycom."  *Id.*  Finally, the court held that it "would be virtually impossible to apportion damages between Discover and American Express, which suffered direct injuries, and the millions of merchants, like Paycom, that . . . might have been indirectly harmed."  *Id.* at 294.

Plaintiffs in this case lack standing for all of the same reasons.  First, their claimed injuries are indirect and attenuated.  Plaintiffs' theory is that absent the alleged "agency agreements with MFNs," Am. Compl. ¶ 156, other retailers would "be able to differentiate their products or services, including by offering lower prices, innovative distribution methods, or innovative products," *id.* ¶ 132.  The inability to offer those lower prices and innovations allegedly has prevented Amazon's competitors from "gain[ing] market share and weaken[ing] Amazon's bargaining power."  *Id.* ¶ 85; *see also id.* ¶ 80 ("Defendants' MFNs not only raise trade eBook prices on the Amazon platform, but also all other retail eBook platforms").

Accordingly, under the allegations of the Amended Complaint, the entities most directly affected by the alleged conduct are other competing retailers of eBooks, and any injuries sustained by Plaintiffs as consumers from those sites are indirect and derivative.  *Paycom*, 467 F.3d at 293.

Second, Plaintiffs' alleged injuries are highly speculative in that they depend upon an assumption that absent the challenged conduct, other parties outside Plaintiffs' control would have engaged in competition that would have lowered eBook prices at other retailers.  *See* Am. Compl. ¶¶ 80, 156.  As in *Paycom*, Plaintiffs cannot know that any such competition would have occurred.  After all, one of Plaintiffs' core allegations is that the Publisher Defendants are motivated by a desire to "control" eBook prices and prevent discounts that they consider to be long-term threats to their business model, *id.* ¶¶ 42-43, 157, and it is therefore entirely plausible that they would use agency distribution agreements to set the same eBooks prices at all retailers whether or not there are MFNs in any of those agreements.  To the extent Plaintiffs allege otherwise, they are engaged in rank speculation.

Finally, Plaintiffs' claims present all of the same problems of apportionment and potential double-recovery that existed in *Paycom*.  Assuming the truth of Plaintiffs' allegations, the Court would need to distinguish between the alleged injuries sustained by two separate levels of the chain of distribution (retailers and individual customers), creating obvious risks of duplicative recovery.  For that reason as well, Plaintiffs are not efficient enforcers of the antitrust laws, and their claims should be dismissed. *Paycom*, 467 F.3d at 293.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' Consolidated Amended Complaint should be dismissed as against Amazon.

Dated:  September 17, 2021                          Respectfully submitted,

                                                                        /s/ John E. Schmidtlein

25

John E. Schmidtlein (*Pro Hac Vice*)
Jonathan B. Pitt (S.D.N.Y. Bar No. jp0621)
Carl R. Metz (*Pro Hac Vice*)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel.: (202) 434-5000
Fax: (202) 434-5029
JSchmidtlein@wc.com
JPitt@wc.com
CMetz@wc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Memorandum of Law in support of

Amazon's Motion to Dismiss Plaintiffs' Consolidated Amended Complaint has been filed and

served upon counsel of record via ECF electronic notification.


 Dated:  September 17, 2021

Respectfully Submitted,

 /s/ John E. Schmidtlein

John E. Schmidtlein (*Pro Hac Vice*)
