UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

IN RE AMAZON.COM, INC. EBOOK
ANTITRUST LITIGATION,

<u>**REPORT AND RECOMMENDATION**</u>

21-cv-00351 (GHW) (VF)

-------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO THE HONORABLE GREGORY H. WOODS, United States District Judge**

This is a putative antitrust class-action lawsuit brought by Plaintiffs, 15 individuals who purchased electronic books ("eBooks") between 2017 and 2021, against Defendants Amazon.com, Inc. ("Amazon"), and the five largest book publishers in the United States— Hachette Book Group, Inc., HarperCollins Publishers L.L.C, Macmillan Publishing Group, LLC, Penguin Random House LLC, and Simon & Schuster, Inc. (collectively, the "Publishers"). Plaintiffs assert three claims: a claim against all Defendants for unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; a claim against Amazon for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and a claim against all Defendants for conspiracy to monopolize in violation of Section 2 of the Sherman Act against all Defendants. Defendants moved to dismiss the Consolidated Amended Class Action Complaint ("CAC") under Federal Rule of Civil Procedure 12(b)(6). <u>See</u> ECF Nos. 96, 98. For the reasons that follow, I respectfully recommend that Defendants' motions be **GRANTED**.

# BACKGROUND

A. <u>Factual Background</u>[1]

Plaintiffs are "consumers and direct purchasers" who have purchased eBooks produced and sold by the five largest publishers in the United States: Defendants Hachette Book Group, Inc.; HarperCollins Publishers L.L.C.; Macmillan Publishing Group, LLC; Penguin Random House LLC; and Simon & Schuster, Inc. (collectively, the "Publishers"). CAC ¶¶ 1-2, 18-38. Defendant Amazon operates the largest retail platform for the sale of eBooks in the United States, accounting for almost 90% of all eBooks sold nationwide. <u>Id.</u> ¶¶ 2-3, 33, 131, 166, 187. Thirteen of the named Plaintiffs purchased "trade" eBooks through eBook retailers other than Amazon.[2] <u>Id.</u> ¶¶ 18-20, 23-32. Two of the named Plaintiffs purchased trade eBooks through Amazon's retail platform, as well as through other retailers. <u>Id.</u> ¶¶ 21-22. Plaintiffs bring this action on behalf of themselves and others who have purchased trade eBooks at inflated prices as a result of Defendants' unlawful conduct. <u>Id.</u> ¶¶ 4-5, 133, 147, 149.

Amazon is an "online retail giant" that is vertically integrated—active upstream as a publisher (with its own publishing labels) and downstream as an eBook retailer. <u>Id.</u> ¶ 33. Amazon sells more books than any other single retail outlet in history. <u>Id.</u> ¶ 127. Although 25 years ago there were around 4,000 independent bookstores in the United States, today, there are fewer than 2,000 and economic power in the market is concentrated in the hands of one bookseller. <u>Id.</u>

---

[1] The following facts are taken from the CAC unless otherwise noted and are taken to be true for purposes of this motion. <u>LaFaro v. New York Cardiothoracic Group, PLLC</u>, 570 F.3d 471, 475 (2d Cir. 2009).

[2] "Trade books" is a term of art referring to "general interest fiction and non-fiction books," distinguished from "non-trade books" like academic textbooks or reference materials. CAC ¶¶ 1, 114 (quoting <u>United States v. Apple Inc.</u>, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013)).

The Publishers are the five largest publishers in the United States and together they account for about "80% of the trade books sold in the United States." Id. ¶¶ 1, 122, 166, 187. Collectively, the Publishers are responsible for many of the biggest titles in fiction and nonfiction, including the vast majority of New York Times Bestsellers. Id. ¶ 124. By 2006, the Publishers "accounted for [90%] of total sales" of trade publications. Id.

Typically, the Publishers sell "trade eBooks" to consumers through online retail platforms, such as the platform operated by Amazon or its retail rivals, including Barnes & Noble and Apple Books.[3] Id. ¶ 2. When selling eBooks through online retail platforms, like Amazon, the Publishers use the "agency model." Id. ¶¶ 2, 148. Under the "agency model," the sales transaction is carried out directly between the publisher and the retail consumer (like each Plaintiff here) and the eBook retailer (like Amazon or its competitors) serves as the publisher's "sales agent" in the transaction. Id. ¶¶ 2, 47, 75, 148. Under this model, the publisher sets the price of its eBooks and the retailer is paid a commission for each sale. Id. ¶ 47. The agency model does not permit the eBook retailer to discount the price of the eBook unilaterally. Id. ¶¶ 47, 148.

1. The conspiracy in Apple[4]

When Amazon's Kindle launched in 2007, it was the first e-reader to gain widespread commercial acceptance, and Amazon quickly became the market leader in the sale of eBooks

---

[3] HarperCollins also sells trade eBooks directly to consumers through its own website. CAC ¶ 2.

[4] Plaintiffs' complaint includes numerous allegations concerning conduct by the Publishers that was the subject of two antitrust lawsuits—one commenced by the United States and 33 States, United States v. Apple, Inc., 791 F.3d 290 (2d Cir. 2015) and 952 F. Supp. 2d 638 (S.D.N.Y. 2013), and a related class action for damages brought by individual consumers, In re Elec. Books Antitrust Litig. ("eBooks"), 639 F. App'x 724 (2d Cir. 2016). See, e.g., CAC ¶ 56 (referencing both actions). At various points throughout the CAC, Plaintiffs cite to decisions by the courts in those actions.

and eBook readers. Id. ¶ 39. Until 2010, the Publishers sold trade eBooks to retailers under the same century-old wholesale pricing model they used for print books. Id. ¶ 40. Under the "wholesale model," the Publishers sold titles at wholesale to retailers, who could then discount from the suggested retail prices as they saw fit. Id.

Amazon achieved market dominance in trade eBooks under this pricing model by charging just $9.99 for many new release and bestselling trade eBooks—a price which "roughly matched" the wholesale price of many of the Publishers' trade eBooks. Id. ¶ 40. To compete with Amazon, other eBook retailers also adopted a $9.99 or lower retail price for many trade eBook titles. Id. Between 2008 and 2010, eBooks "made enormous sales gains of 1,260%." Id.

The success of trade eBooks made the Publishers anxious, because they feared that Amazon's $9.99 price point would hurt their profits. Id. ¶ 41. In the short term, the Publishers believed that the low price point was eating into sales of their more profitable hardcover trade books. Id. And in the long term, the Publishers feared that consumers would grow accustomed to trade eBooks priced at $9.99 and would expect comparable prices for print books. Id. The Publishers also feared Amazon's "growing power in the trade book industry" and were worried that Amazon would render the Publishers obsolete if it began negotiating directly with authors and literary agents for book rights. Id. ¶ 42. To counter Amazon's "growing power," the Publishers "determined that they needed to force Amazon to abandon its discount pricing model." Id. To do so, each Publisher reached out to Amazon in the hopes of convincing Amazon to change the low $9.99 price point. Id. ¶ 43.

When Amazon refused the Publishers' entreaties, the Publishers "recognized the importance of coordinating their efforts to raise prices" and "develop a common strategy" in the industry. Id. ¶ 44. Senior executives from each Publisher met quarterly, in private and without

lawyers present. Id. Because the Publishers "did not compete with each other on price," they "felt no hesitation in freely discussing Amazon's prices with each other and their joint strategies for raising those prices." Id. In the Apple litigation, the Court found that "[w]hile no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could." Id. (quoting Apple, 952 F. Supp. 2d at 651).

Frustrated by Amazon's initial unwillingness to collude at that time, the Publishers turned to Apple to end the discounting of trade eBook prices. Id. ¶ 45. Apple was interested because it believed that it would generate even more revenue than selling digital music, given its upcoming launch of the iPad, as long as it could sell trade eBooks profitably. Id. In December 2009, Apple and the Publishers began discussions to raise the price of eBooks above $9.99. Id. ¶ 46. Apple knew that the Publishers were eager to raise the $9.99 price point for all trade eBooks, and that they were willing to coordinate their efforts to achieve that goal. Id.

Apple and the Publishers agreed to raise the price of eBooks above $9.99 using a new sales model—the "agency model." Id. ¶ 46. Under the agreement, Apple received a 30% commission for hosting the sale. Id. ¶ 48. Although the Publishers stood to make less money on each sale under the agency model than they would under the wholesale model, agreeing to Apple's proposal would accomplish their overarching long-term goal of retaking control of pricing from the eBook retailers. Id. Initially, some of the Publishers objected to the agency model. Id. ¶ 49. To force their hand, Apple introduced a "Most Favored Nations" ("MFN") clause in the proposed agreements that would ensure that the Publishers' trade eBooks would be sold on Apple's eBooks store for the lowest retail price available in the marketplace. Id.

MFNs are common devices that guarantee buyers will get the lowest prices or best terms from their suppliers, by getting the supplier to agree to treat them as favorably as any of their

other customers. Id. ¶¶ 49, 75. Apple's use of an MFN for a retail price was a unique feature of its eBook agency agreements: it went beyond Apple reducing costs and guaranteed that eBooks in Apple's eBook store would be sold for the lowest retail price available in the marketplace. Id. ¶ 49. By combining the MFN "with the pricing tiers," Apple allowed the Publishers to set the retail prices of their eBooks, while at the same time guaranteeing that Apple would never have to compete on price because if another retailer sold at a lower price, the Publishers would have to lower their price on Apple's eBook store. Id. Consequently, the MFN not only ensured that no eBook retailer could underprice Apple, but also enabled the Publishers' collective action. Id. ¶ 50. In that regard, the Second Circuit in the Apple litigation explained that "'[t]he MFNs in Apple's Contracts created a set of economic incentives' which 'were only attractive to the Publisher Defendants to the extent they acted collectively.'" Id. (quoting Apple, 791 F.3d at 320). "The Second Circuit added, 'By the very act of signing a Contract with Apple containing an MFN Clause, then, each of the Publisher Defendants signaled a clear commitment to move against Amazon [and the industry practice of retail discounting], thereby facilitating their collective action.'" Id. (quoting Apple, 791 F.3d at 317).

Despite the significant reduction in revenue that the Publishers would receive for each trade eBook sold under the agency model, Apple played to the Publishers' long-term interest in raising trade eBook prices to protect the prices of print trade books. Id. ¶ 51. Through a coordinated effort, the Publishers forced Amazon to accept the agency model by threatening to withhold publication of their trade eBooks for seven months after their release as print publications. Id. ¶ 52. Between March and June 2010, Amazon finalized agency agreements with the Publishers; those agreements included a "model parity" clause that gave Amazon the option to return to a wholesale model of distribution if the publisher agreed to a wholesale distribution

arrangement with any other eBook retailer. Id. The Publishers also adopted an agency model with Barnes & Noble and made it clear to Google, who entered the eBook market at the same time as Apple, that they would be unwilling to enter a non-agency agreement with Google. Id. ¶ 53.

In the short term, the plan paid off for Apple and the Publishers. Id. ¶ 55. There was a significant and pervasive increase in trade eBook prices. Id. ¶ 54. Although the Publishers lost eBook revenue under the agency model, they offset their losses by raising the prices of their hardcover books. Id. ¶ 55.

2.   Defendants' eBook pricing practices and antitrust investigations in the United States and Europe

In December 2011, the European Commission's Directorate General for Competition ("DG Comp") opened proceedings against the Publishers and Apple to determine whether they colluded in raising retail prices of trade eBooks. Id. ¶¶ 6, 56. In August 2011, a consumer class action was filed in this District raising the same allegations. Id. Subsequently, in early 2012, the Department of Justice and Attorneys General from 33 states brought their own enforcement actions in this District. Id.

Under the consent decrees imposed by the Justice Department following the Apple litigation, entered in 2012 and 2013, the Publishers agreed to terminate their contracts with Apple and any other eBook retailer that restricted the retailer's ability to discount eBooks. Id. ¶ 57. For a two-year period, the Publishers agreed to allow retailers to discount eBook prices and offer promotions to customers. Id. And for a five-year period, the consent decrees prohibited the Publishers from entering into any agreement with an eBook retailer that contained an MFN clause. Id. ¶¶ 6, 57.

Following a bench trial in this District, the Court found that Apple and the Publishers had engaged in a *per se* illegal horizontal price-fixing agreement, which had the intent and effect of eliminating price competition in the trade eBook market and increasing the retail price of trade eBooks. Id. ¶ 58 (citing Apple, 952 F. Supp. 2d at 694). The court found that Apple had "made a conscious commitment to join a scheme with the Publisher Defendants to raise the prices of e-books," and that it was only through "the coordinated effort and conscious commitment of the Publisher Defendants and Apple," that they were able to "effect a significant increase in the retail price of e-books." Id. (quoting Apple, 952 F. Supp. 2d at 697). The court entered a $450 million judgment against Apple and enjoined it from entering into any agreements with the Publishers that would prevent it from lowering eBook prices beyond the two-year deadline imposed by the consent decrees. Id. ¶¶ 6, 58. The Second Circuit affirmed the district court's decision. Id. ¶ 58.

In Europe, the DG Comp likewise found that the Publishers had colluded with Apple to raise prices. Id. ¶ 59. Separately, regulators in the United Kingdom and Germany investigated the anticompetitive effects of MFNs in Amazon's agreements with third-party retailers to sell on Amazon's platform. Id. ¶ 60. Those investigations found that Amazon's "horizontal price-fixing" agreement acted as a barrier to market entry for new competitors and hindered the expansion of existing competitors in the market. Id. Amazon capitulated and agreed not to employ MFNs in its third-party seller agreements in the European market. Id.; see also id. ¶ 88.

In 2019, the House Antitrust Committee investigated Amazon and other large technology companies. Id. ¶¶ 7, 91-93. The Committee concluded that Amazon's use of MFNs was harmful to competition. Id. ¶ 7. The Federal Trade Commission is also investigating Amazon, and there is a pending investigation by the Connecticut Attorney General focusing on Amazon's agreements with publishers. Id. ¶¶ 7, 94.

3.   <u>The Publishers agreements with Amazon at issue in this action</u>

In 2015, the Publishers entered into new agency agreements with Amazon. <u>Id.</u> ¶¶ 62-63,

81. That year, the requirement imposed by the consent decrees, requiring the Publishers to permit

retailer discounting of trade eBooks expired (other than as to Apple). <u>Id.</u> ¶ 62. The Publishers

"promptly reintroduced" the agency model by renegotiating their agreements with Amazon,

reclaiming the right to set prices. <u>Id.</u> Three of the five CEOs of the Publishers who had led those

companies during the Apple conspiracy were still leading their respective companies when the

Publishers entered into the 2015 agency agreements with Amazon. <u>Id.</u> ¶¶ 63-64.

"Defendants coordinated their price increases yet again." <u>Id.</u> ¶ 65. As in <u>Apple</u>, the

Publishers publicly disclosed that each Publisher "received the same deal" with Amazon. <u>Id.</u>

Specifically, in October 2014, Amazon and Simon & Schuster disclosed that they had reached a

deal. <u>Id.</u> ¶ 67. The Simon & Schuster CEO, in a public letter to authors and agents, noted that

Simon & Schuster had secured, "with some limited exceptions," control over the price of its

trade eBooks. <u>Id.</u>  In November 2014, Amazon and Hachette issued a joint statement when their

negotiations concluded, stating: "Hachette will have responsibility for setting consumer prices of

its e-books, and will also benefit from better terms when it delivers lower prices for readers." <u>Id.</u>

¶ 68. In December 2014, Macmillan issued a public letter announcing its deal with Amazon,

stating that Macmillan and Amazon had negotiated an "agency model for e-books," and that all

"our other retailers will also be on the agency model, leaving Apple as the only retailer which is

allowed unlimited discounting." <u>Id.</u> ¶ 69. The statement from Macmillan continued: "This odd

aberration in the market will cause us to occasionally change the digital list price of your books

in what may seem to be random fashion. I ask for your forbearance. *We will be attempting to*

*create even pricing as best we can*." <u>Id.</u> (emphasis in original).

9

In April 2015, HarperCollins announced its agency model agreement with Amazon for the sale of eBooks. Id. ¶ 70. In 2015, when Amazon was negotiating an agreement with Penguin, an Amazon spokesperson stated: "I can say that we have long-term deals in place already with the other four major publishers and we would accept any similar deal with Penguin Random House UK." Id. ¶ 71. Penguin disclosed that it had also negotiated an agency model agreement with Amazon for trade eBooks in June 2015. Id.

The terms of the consent decrees that prohibited the Publishers from agreeing to MFNs in the sale of trade eBooks remained in effect until 2017 or 2018 (depending on the publisher). Id. ¶¶ 62, 78. While the Publishers were still subject to this prohibition, Amazon and the Publishers agreed to notification provisions that served the same function as the prohibited MFN provisions. Id. ¶¶ 78, 103. The Publishers disclosed their agency agreements with Amazon but not the MFN and similar anticompetitive clauses that ensured that no retailer could compete with Amazon on price and product availability. Id. ¶ 73. These provisions came to light when the DG Comp reopened its investigation into anticompetitive conduct in the eBook market in June 2015. Id.

The notification provisions required the Publishers to notify Amazon (1) if the price of an eBook on Amazon was higher than the retail price charged by a competing eBook retailer; or (2) if the Publishers offered promotional pricing or content to another eBook retailer that they had not offered to Amazon. Id. ¶ 79. Once notified of the availability of an eBook at a lower price, Amazon typically requested that the same lower retail price be charged on its retail platform, and if the Publishers did not comply, Amazon would retaliate or threaten to retaliate against them. Id. These clauses functioned like an MFN in that they allowed Amazon to prevent other retail platforms from undercutting the Publishers' eBook prices on the Amazon platform. Id. When the consent decrees no longer prohibited MFNs in the Publishers contracts (around 2017), "Amazon

and the [Publishers] agreed to some or all of Amazon's explicit MFN provisions (*i.e.*, Amazon's agency price parity, promotion price parity, discount pool provision, wholesale price parity, and agency commission parity provisions)." Id. ¶¶ 80-83.

Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers. Id. ¶¶ 75, 107. Although Amazon has changed the name and specific mechanisms over the years, findings by the House Judiciary Committee concluded that Amazon has "continuously imposed contract provisions that effectively function as MFNs on book publishers." Id. ¶¶ 74, 76. Given Amazon's "market power in the retail eBook market," the contractual requirements prevent Amazon's actual and potential retail rivals from introducing different business models, offering promotional advantages, or offering customers lower prices on their own. Id. ¶ 76. In addition to affecting prices, the MFNs and similar provisions also reduce "consumer choice," in part because of "switching costs" incurred by customers who buy eBooks outside of Amazon's "closed Kindle ecosystem." Id. ¶ 77.

Because trade eBooks do not require printing, storage, or shipping, Defendants' marginal cost for producing and distributing each additional eBook is "close to zero." Id. ¶ 95. In a competitive market, lower production costs should significantly reduce eBook prices, yet low production costs have not significantly lowered trade eBook prices in comparison to print trade books. Id. Instead, Defendants "anticompetitive agreements" caused higher prices and lower output in the trade eBook market. Id. The week after their respective agency contracts with Amazon took effect, Penguin increased its eBook prices by 30.4%, HarperCollins by 29.3%, Simon & Schuster by 15.8%, Macmillan by 10.7%, and Hachette by 8.3%. Id. ¶¶ 98-99. The

Publishers raised prices by increasing the price point for new releases and by consolidating the price of trade eBooks to fewer price buckets. Id. ¶ 100.

The Publishers' prices had "the greatest price diversity" in 2014, at a time when the consent decrees required the Publishers to allow retailer discounting. Id. ¶ 101. Had the Publishers only raised prices on the Amazon platform without imposing an MFN or similar provision in their 2014 or 2015 agency agreements with Amazon, consumers would be free to shop for lower-priced trade eBooks on other retailer sites, like Barnes & Noble. Id. ¶ 103. To avoid such competition and secure higher prices of trade eBooks market-wide, Amazon and the Publishers employed MFNs and/or similar provisions that enabled the Publishers to set prices and ensured that prices would increase on all retail platforms. Id. This agreement also "immunize[d]" Amazon from competition. Id. ¶ 105.

In a competitive market, the Publishers could sell eBooks at a lower price on their own websites or through Amazon's retail competitors that offer lower commissions and fees. Id. ¶ 105. Similarly, in a competitive market, it would be in each Publishers' "own economic self-interest to expand their share of the retail sales of their eBooks and diversify their distribution." Id. ¶ 149. But the Publishers "have agreed not to do this" because it suits their goal of maintaining "supracompetitive trade eBook prices" in the U.S. market. Id. ¶¶ 105, 149. Because the Publishers agree not to sell their trade eBooks at a lower price on any other retail platform (like Barnes & Noble), the high price on Amazon's platform leads to higher prices in the entire U.S. market. Id. ¶¶ 111, 149.

As the largest retailer of both print books and eBooks, the "bargaining power that Amazon wields" over the Publishers is "immense." Id. ¶ 106. In negotiating with the Publishers, Amazon could have retained its right to discount their eBooks. Id. But Amazon commits to

waive discounting and to let the Publishers set their own high prices because it faces no competition from other eBook retailers on price or product availability. Id. Through restraints like MFN clauses in its contracts with the Publishers, Amazon "has acquired and maintained its monopoly power." Id. ¶ 107.

    4.   <u>Defendants' market power in the relevant market</u>

The CAC alleges that the relevant market is "the retail sale of trade eBooks in the United States"—a market where Amazon and the Publishers have "market power." Id. ¶¶ 113, 121-23, 165-66, 176, 187. Trade books represent a distinct product market from non-trade books and self-published books. Id. ¶ 114. Within the market for trade books, there is a distinct product market for the retail sale of trade eBooks. Id. ¶¶ 115-19. Amazon "enjoys nearly 90%" of the eBook market—a market share that creates "an inference of market power." Id. ¶¶ 131-32, 176, 187. The Publishers' "trade books account for about 80% of all trade book sales in the United States." Id. ¶ 187.

### B.   <u>Procedural Background</u>

On January 14, 2021, Plaintiffs filed a Class Action Complaint against Amazon and the Publishers (ECF No. 1) and subsequently filed an Amended Class Action Complaint on February 4, 2021 (ECF No. 7). The parties filed a joint stipulation and order for consolidation on May 24, 2021, proposing to consolidate seven related actions in this District. ECF No. 66.

On June 2, 2021, Plaintiffs filed the Consolidated Amended Class Action Complaint. ECF No. 67. The CAC asserts three causes of action: a claim against all Defendants under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that the Publishers colluded with Amazon to raise the retail price of trade eBooks, eliminate retailer discounting of eBooks, and immunize Amazon from competition (CAC ¶¶ 4, 151-172); a claim against Amazon under Section 2 of the

Sherman Act, 15 U.S.C. § 2, alleging that Amazon, through its anticompetitive agreements with the Publishers, willfully acquired and maintained its monopoly power in the U.S. retail market for trade eBooks; (CAC ¶¶ 9, 173-83); and a claim against all Defendants for conspiracy to monopolize, 15 U.S.C. § 2, alleging that the Publishers demonstrated a specific intent to confer monopoly power on Amazon by agreeing to immunize it from competition from other eBook retailers (CAC ¶¶ 184-93).

On September 17, 2021, the Publishers and Amazon separately moved to dismiss the CAC. ECF Nos. 96, 98. On November 1, 2021, Plaintiffs filed their opposition to the motions to dismiss. ECF No. 123. The Publishers and Amazon filed their separate reply briefs on December 1, 2021. ECF Nos. 136, 137. The Court held oral argument on the motions on July 27, 2022.

## DISCUSSION

A. <u>Motion to Dismiss</u>

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This Rule does not countenance pleadings that are conclusory; it requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 182 (2d Cir. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). Where the well-pleaded facts in a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that 'the pleader is entitled to relief.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556.

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 403 (2d Cir. 2014) (quoting Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555, 570) (internal quotation marks, alteration, and citation omitted).

B. Antitrust Standing

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws and entitles '[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust trust laws' to treble damages for those injuries."

Gatt Commc'ns, Inc. v. PMC Assocs., LLC, 711 F.3d 68, 75 (2d Cir. 2013) (quoting 15 U.S.C.

§ 15) (alterations in original). To have standing to enforce a violation of Sections 1 and 2 of the

Sherman Act, a private plaintiff must have "suffered 'antitrust injury' and be a 'proper party' to

bring suit." Laumann v. Nat'l Hockey League, 907 F. Supp. 2d 465, 477-78 (S.D.N.Y. 2012)

(quoting Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110-11 (1986)). "In making this

determination a court must 'evaluate the plaintiff's harm, the alleged wrongdoing by the

defendants, and the relationship between them.'" Id. at 478 (quoting Associated Gen. Contractors

v. California State Council of Carpenters, 459 U.S. 519, 535 (1983)).

"Congress did not intend antitrust laws to provide a remedy in damages for all injuries

that might conceivably be traced to an antitrust violation." Associated Gen. Contractors, 459

U.S. at 534 (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14 (1972)) (internal

quotation marks omitted). Consequently, it is generally the case that "only direct purchasers have

standing to bring civil antitrust claims." Simon v. KeySpan Corp., 694 F.3d 196, 201 (2d Cir.

2012) (citing Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)). The Supreme Court has

"consistently stated that the immediate buyers from the alleged antitrust violators may maintain a

suit against the antitrust violators," but "indirect purchasers who are two or more steps removed

from the violator in a distribution chain may not sue." Apple Inc. v. Pepper, 139 S.Ct. 1514,

1520 (2019) (internal quotation marks and citation omitted). This "indirect-purchaser rule" stems

from the Supreme Court's decision in Illinois Brick, which "established a bright-line rule that

authorizes suits by direct purchasers but bars suits by indirect purchasers." Id. (citation omitted).

Two named Plaintiffs purchased eBooks directly from Amazon through its online

platform, as well as from Amazon's retail competitors. CAC ¶¶ 21b-22e. Thirteen other named

Plaintiffs did not purchase their eBooks from Amazon; they only purchased eBooks from other

retail platforms. CAC ¶¶ 18-20, 23-32. Relying on Illinois Brick, Amazon argues that Plaintiffs lack standing to sue Amazon for alleged injuries suffered by Plaintiffs who purchased eBooks through retail platforms other than Amazon. See Amazon's Br. at 21-23 (ECF No. 99). Amazon does not challenge Plaintiffs' standing for the eBook purchases made through Amazon's retail platform.

For any eBooks purchased on a retail platform other than Amazon, Plaintiffs are indirect purchasers and thus "must show why Illinois Brick does not bar their claims for damages" against Amazon based on those purchases. Laumann, 907 F. Supp. 2d at 480-81 (applying Illinois Brick to reason that plaintiffs, who based their claims on purchases of television programming, had to demonstrate standing to assert claims against defendants from whom they had not purchased such programming). Plaintiffs argue that these claims fall under the co-conspirator exception to Illinois Brick. Pl.'s Br. at 44-45 (ECF No. 123).

Some courts have recognized an exception to Illinois Brick where "the consumer plaintiff is a direct purchaser from the dealer who . . . has conspired illegally with the manufacturer with respect to the very price paid by the consumer." Laumann, 907 F. Supp. 2d at 481 (quoting In re ATM Fee Antitrust Litig., 686 F.3d 741, 750 (9th Cir. 2012)) (alterations in original). The Second Circuit, however, has not endorsed or adopted that exception. See Laumann, 907 F. Supp. 2d at 481 (recognizing that the Second Circuit has not addressed the issue and that "those circuits that have addressed it have not taken a uniform view" of the exception's scope). As such, in this Circuit, Plaintiffs cannot avail themselves of the co-conspirator exception and thus the bright-line rule established by Illinois Brick applies. Under that rule, any eBook purchases made by Plaintiffs from a retail platform other than Amazon are indirect purchases that do not give Plaintiffs standing to assert a claim against Amazon. In any

case, even if Plaintiffs could avail themselves of the co-conspirator exception in this Circuit, it would not apply to the circumstances alleged here because, as discussed in the following section, the CAC does not plausibly allege the existence of a price-fixing conspiracy among the Publishers. See infra Section C.

C. Sherman Act Section 1 Claim

In Count I of the CAC, Plaintiffs allege that the Publishers and Amazon conspired to raise eBook prices and limit retail competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[5] See CAC ¶¶ 151-72. Section 1 of the Sherman Act outlaws "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

Antitrust law distinguishes between vertical and horizontal price restraints. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988). "[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" Apple, 791 F.3d at 314 (quoting Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir. 2010)). "These arrangements consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along

_____

[5] Plaintiffs caption their First Cause of Action as a claim under Section 2 of the Sherman Act. See CAC, page 76. It is nevertheless apparent from the allegations pled in support of that claim that Plaintiffs are alleging a violation of Section 1 of the Sherman Act. Moreover, in addressing the First Cause of Action in their brief, Plaintiffs characterize the claim as raising a violation of Section 1.

with the [vertical agreements] except on the understanding that the other spokes were agreeing to the same thing.'" Id. (quoting VI Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402c (3d ed. 2010)) (alterations and emphasis in original). "Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) (citing Apple, 791 F.3d at 314).

To state a claim under Section 1, a plaintiff must allege (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason." Meyer v. Kalanick, 174 F. Supp. 3d 817, 822 (S.D.N.Y. 2016) (quoting Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993)). An antitrust conspiracy in violation of Section 1 of the Sherman Act requires proof of joint or concerted action as opposed to unilateral action. Anderson News, 680 F.3d at 183.

"The crucial question" in a case raising a violation of Section 1 is "whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)) (alteration in original). To establish a conspiracy in violation of Section 1, the circumstances of the alleged conspiracy "must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Monsanto Co. v. Spray–Rite Service Corp., 465 U.S. 752, 764 (1984) (internal citation and quotation marks omitted). "No formal agreement is required to constitute an antitrust conspiracy." Ross v. Am. Express Co., 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014),

19

aff'd sub nom. Ross v. Citigroup, Inc., 630 F. App'x 79 (2d Cir. 2015), as corrected (Nov. 24,

2015). Rather, the "essential combination or conspiracy in violation of the Sherman Act may be

found in a course of dealings or other circumstances as well as in any exchange of words." Am.

Tobacco Co. v. United States, 328 U.S. 781, 809-10 (1946). Courts examine the existence of a

conspiracy "as a whole" taking into consideration the totality of the evidence, as opposed to

"dismembering it and viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon

Corp., 370 U.S. 690, 699 (1962); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d

Cir. 2012).

An unlawful agreement may be proven through direct or circumstantial evidence.

Monsanto, 465 U.S. at 764. Circumstantial evidence of a conspiracy is evidence "that reasonably

tends to prove that the [defendant] and others had a conscious commitment to a common scheme

designed to achieve an unlawful objective" Id. (internal quotation marks and citation omitted).

Because conspiracies, by their nature, tend to form in secret, such unlawful agreements "nearly

always must be proven through inferences that may fairly be drawn from the behavior of the

alleged conspirators." Anderson News, 680 F.3d at 183 (citation omitted).

"Under Twombly, parallel conduct, such as competitors adopting similar policies around

the same time in response to similar market conditions, may constitute circumstantial evidence of

anticompetitive behavior." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186,

1193 (9th Cir. 2015) (citing Twombly, 550 U.S. at 553-54). But a complaint that merely alleges

parallel conduct among defendants—even consciously parallel conduct—does not state a claim

under Section 1. See Twombly, 550 U.S. at 553-54. That is because "parallel conduct or

interdependence, without more," is behavior that is "consistent with conspiracy, but just as much

in line with a wide swath of rational and competitive business strategy unilaterally prompted by

common perceptions of the market." Id. at 554; Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (explaining that "alleging parallel conduct alone is insufficient, even at the pleading stage" to state a Section 1 claim); In re Musical Instruments, 798 F.3d at 1193-94 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation.") (internal quotation marks and citations omitted); Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013). Instead, allegations of parallel conduct "gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557 (international quotation marks, alteration, and citation omitted); see also Iqbal, 556 U.S. at 678.

At the pleading stage, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement." Twombly, 550 U.S. at 557; Starr, 592 F.3d at 323; In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). This standard does not require a plaintiff to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." Anderson News, 680 F.3d at 184. A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence. Id. at 189-90. But a statement of facts that is "merely consistent" with an agreement will not suffice. Twombly, 550 U.S. at 557. A complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556.

1.   Concerted Action

   a.   *Direct Evidence of a Conspiracy*

As direct evidence of concerted action among Defendants, Plaintiffs rely solely on the

vertical agency agreements between each Publisher and Amazon. Pl.'s Br. at 5-6. Pointing to the

Second Circuit's decision in Apple, Plaintiffs argue that the "Apple court held that such a

contractual arrangement . . . constituted an illegal price-fixing scheme in violation of Section 1."

Id. Thus, because Defendants are alleged to have entered into the same type of agreement here,

Plaintiffs contend that the agreements themselves are "direct evidence of Defendants' conspiracy

to restrain trade." Id. Plaintiffs misread the Second Circuit's decision in Apple. To be sure, the

agreements in Apple, which contained a combination of agency pricing and MFN clause,

violated Section 1 of the Sherman Act. But as the Second Circuit made clear, it was the

particular circumstances that surrounded the execution of those agreements and supported a

finding of concerted action between the Publishers and Amazon that rendered the agreements

unlawful.

In Apple, the Second Circuit acknowledged that agreements with MFN clauses "though

surely proper in many contexts, can be misused to anticompetitive ends." 791 F.3d at 320

(internal quotation marks and citation omitted). "Under the right circumstances, an MFN can

facilitate anticompetitive horizontal coordination by reduc[ing] [a company's] incentive to

deviate from a coordinated horizontal arrangement." Id. (quoting Jonathan B. Baker, Vertical

Restraints with Horizontal Consequences: Competitive Effects of "Most–Favored–Customer"

Clauses, 64 Antitrust L.J. 517, 520–21 (1996)) (internal quotation marks omitted; alteration in

original). Those circumstances existed in Apple, as the Court found. It was specifically because

of the "particular circumstances of [that] case," that the "contract terms" offered by Apple

"created a set of economic incentives pursuant to which the Contracts were only attractive to the Publisher Defendants to the extent they acted collectively." Id. But as the Court expressly noted, "[t]hat these contract terms had such an effect under the particular circumstances of this case— and therefore furnish *part of the evidence* of Apple's agreement with the Publisher Defendants— says nothing about their broader legality." Id. (emphasis added). The Court went on to state that "[i]t should be self-evident that our analysis is informed by the particular context in which Apple's contract terms were deployed." Id. Apple's use of otherwise lawful contract terms to incentivize and ensure collective action by the Publishers rendered the agency agreements between Apple and the Publishers in that case an unlawful restraint of trade.

That conclusion is also evident from the district court's analysis in Apple, which similarly made clear that the terms of the agency agreements between Apple and the Publishers were not inherently unlawful. As that court stated, "[t]he Plaintiffs do not argue, and this Court has not found, that the agency model for distribution of content, or any one of the clauses included in the Agreements, or any of the identified negotiation tactics is inherently illegal." United States v. Apple, 952 F. Supp. 2d 638, 698 (S.D.N.Y. 2013). The court further explained that "entirely lawful contracts may include an MFN, price caps, or pricing tiers." Id. But it was evidence showing that Apple and the Publishers had engaged in a "conscious commitment" to use those "business practices" to "eliminate retail price competition in order to raise retail prices" that rendered the agreements unlawful. Id.

In short, the distribution agreements between the Publishers and Amazon reflect contract terms that are not inherently unlawful. The mere fact that the Publishers entered into those agreements with Amazon is not direct evidence of a conspiracy to fix eBook prices and eliminate retail competition.

b. *Circumstantial Evidence of a Conspiracy*

Where, as here, there is no direct evidence of an agreement to conspire, parallel conduct can be probative evidence of unlawful collusion. Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir. 1987). "The line separating conspiracy from parallelism is indistinct[.]" Gelboim v. Bank of Am. Corp., 823 F.3d 759, 781 (2d Cir. 2016). But a conspiracy "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil, 822 F.2d at 253 ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor & City Council, 709 F.3d at 136 (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544). Such plus factors are "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might [lead a court to] infer the existence of an agreement." Id. at 136, n. 6.

The CAC contains the following allegations of parallel conduct by the Publishers. See Starr, 592 F.3d at 323 (listing factual allegations that showed "parallel conduct"). First, between 2014 and 2015, upon the expiration of some of the terms of the consent decrees imposed upon the Publishers following the Apple litigation, each Publisher entered into separate agreements with Amazon that included agency pricing for trade eBooks and allowed the Publishers to determine the retail price of trade eBooks. CAC ¶¶ 4, 62. Second, those agreements contained

MFN clauses, which allowed Amazon to get the lowest price for trade eBooks from the Publishers because the Publishers agreed to treat Amazon as favorably as any other retailer. CAC ¶¶ 4, 49, 73, 75, 78-80. And third, immediately after the agreements between the Publishers and Amazon went into effect, the Publishers each increased the prices of their eBooks. CAC ¶¶ 4, 96, 98-100.

To place that parallel conduct in a context that plausibly suggests a preceding agreement among the Publishers, Plaintiffs identified several plus factors that they argue plausibly suggest that the Publishers were not merely acting independently: (1) without collective involvement, the agency pricing model was against each Publisher's independent business interests (Pl.'s Br. at 20-21); (2) the Publishers and Amazon shared twin motives to collude (Pl.'s Br. at 19-20); (3) the Publishers have a history of collusive price-fixing and Amazon is under investigation by regulators (Pl.'s Br. at 23-25); (4) the market for eBooks is concentrated (Pl.'s Br. at 19); (5) the Publishers raised eBook prices despite no rise in costs (Pl.'s Br. at 21-23); and (6) Defendants attempted to hide the existence of the MFN clauses in the agency agreements (Pl.'s Br. at 25). I consider each purported plus factor in turn and cumulatively to determine whether Plaintiffs have alleged nonconclusory facts sufficient to state a claim under Section 1.

### Action Against Self-Interest by the Publishers

Plaintiffs argue that collective action made the agency agreements with Amazon attractive because otherwise the agreements were not in each Publisher's own self-interest. Pl.'s Br. at 20-21. The CAC alleges that the Publishers "acted against their own self-interest by agreeing to agency agreements with Amazon that contained the MFNs and similar anticompetitive provisions, since those agreements and provisions caused them to lose revenue." CAC ¶ 158. To support the allegation that an agreement containing agency pricing and an MFN

clause would result in lost revenues for a Publisher absent collective action, the CAC relies on the Second Circuit's reasoning in Apple. The CAC alleges that "[t]he MFNs in Apple's Contracts created a set of economic incentives" which "were only attractive to the Publisher Defendants to the extent they acted collectively." CAC ¶ 50. The economic incentive referenced by the Second Circuit in Apple was more fully fleshed out by the Honorable Denise L. Cote in her decision on defendants' motion to dismiss in eBooks, a putative class-action that followed Apple and was based on the same conduct.

In eBooks, Judge Cote concluded that the complaint plausibly alleged that "no Publisher Defendant would have signed an agency agreement with Apple absent a firm understanding with its rivals that they would do the same." In re Elec. Books Antitrust Litig. ("eBooks"), 859 F. Supp. 2d 671, 684 (S.D.N.Y. 2012). In reaching that conclusion, Judge Cote explained why such an agreement was against each Publisher's self-interest without collective action. To do so, she posited a hypothetical "counterfactual universe" where each Publisher would have assumed "that if it signed an Agency Agreement [with Apple], it would be doing so on its own." Id. at 683 (quoting Starr, 592 F.3d at 327). As Judge Cote explained:

> Each Publisher Defendant in this scenario would face a similar cost-benefit calculus. The benefits would primarily consist of the opportunity to sell eBooks in Apple's iBookstore, and a reduction in the cannibalization of that publisher's hardcover sales by its eBook sales on the iPad. Because the majority of publishers would still be selling under the wholesale model, however, most eBooks in the market as a whole would still cost $9.99.

> The costs of such a unilateral switch to the agency model would be substantial. The publisher would be selling its eBooks at a higher price than its competitors and would therefore be losing market share. This loss in market share would in all likelihood have been large. Random House gained significant market share from the Publisher Defendants during the months between their adoption of the agency model and Random House's capitulation. The eBook sales by Random House increased 250 percent in 2010 as it continued to sell them at $9.99. At the same time that an individual publisher would be losing market share, it would be taking in less revenue per sale because of Apple's 30 percent commission. In addition,

26

> the publisher would probably lack the leverage to force Amazon to accept the agency model. Potentially, then, this publisher would be barred from selling its eBooks to Amazon.

Id. at 683-84. Plaintiffs seek to apply that reasoning here, arguing that the "same conclusion" reached in Apple applies to support a plausible inference that the Publishers "did not act . . . in their own economic interest" (CAC ¶ 158) in signing agency agreements with Amazon that contained MFN clauses. Pl.'s Br. at 15, 21. Plaintiffs, however, ignore the changed economic reality that followed the Apple conspiracy.

Before the Publishers colluded with Apple in 2010—to force Amazon to switch to agency pricing—the Publishers "sold trade eBooks through the same century-old wholesale pricing model they used for print books." CAC ¶ 40; see also Apple, 791 F.3d at 298. Because the entire industry was pricing eBooks using a wholesale model, a single Publisher's switch to agency pricing would not have "compel[ed] Amazon to abandon" wholesale pricing but it would have led to "decreased revenue per sale" and lost market share for any Publisher that made the switch to agency pricing alone. eBooks, 859 F. Supp. 2d at 683-84; see also CAC ¶¶ 42-52. Indeed, it was the "common interest" shared by Apple and the Publishers, "in ensuring an industry-wide response that would force Amazon to accept higher eBook prices," that motivated the conspiracy in Apple. See eBooks., 11-MD-2293 (DLC), Consolidated Amended Class Action Compl. ¶¶ 119, 121; see also Apple, 791 F.3d at 316-17; CAC ¶¶ 41-44, 49.

By contrast, in 2014 or 2015, when the agency agreements at issue here were negotiated by Defendants, agency pricing was being used for the sale of eBooks. Agency pricing for eBooks was specifically permitted by the consent decrees following the Apple litigation. See Hachette, HarperCollins, Simon & Schuster Consent Decree Sec. VI, ¶ B; Macmillan Consent Decree Sec.

27

VI, ¶ B; Penguin Random House Consent Decree Sec. VI, ¶ B.[6] And as the parties indicated at

oral argument, agency pricing was being used when the new agreements between the Publishers

and Amazon were negotiated in 2014 and 2015.[7] Tr. at 21-23. Thus, unlike in <u>Apple</u>, in 2014 and

2015, the Publishers were not attempting to force an industry-wide shift in pricing policy from

the wholesale model in place at the time of <u>Apple</u>. Further, there are no allegations in the CAC

that the Publishers would have had to change the pricing model used by Amazon or another

eBook retailer for agency pricing to be economically beneficial for an individual Publisher, as

was the case at the time of <u>Apple</u>. <u>Apple</u>, 791 F.3d at 304-05. Given the significant change in

market circumstances, it cannot plausibly be inferred that the economic incentives that led to

collective action in <u>Apple</u> were similarly present at the time of the conspiracy alleged here.

       To suggest collusion among the Publishers, it must be that "no reasonable [Publisher]

would have entered into an agency pricing agreement with Amazon that contained an MFN

clause without assurances that all other [Publishers] would enter into similar agreements." <u>In re

Musical Instruments</u>, 798 F.3d at 1195; <u>see also</u> <u>eBooks</u>, 859 F. Supp. 2d at 684. The CAC,

however, demonstrates that there were ample reasons for the Publishers to independently want to

secure a distribution agreement with Amazon. Taking all facts in the CAC as true, an inference

that naturally arises given the changed industry circumstances is that each Publisher had an

---

[6] The consent decrees are referenced in the complaint and their terms were relied on by Plaintiffs in drafting the allegations in the complaint. CAC ¶¶ 57-58, 62, 78, 80, 100-01. For that reason, the consent decrees may be considered by the Court on this motion to dismiss. <u>See</u> <u>Cortec Indus., Inc. v. Sum Holdings</u>, 949 F.2d 42, 47 (2d Cir. 1991) (explaining that as part of a Rule 12(b)(6) motion a court may consider any document incorporated by reference into the complaint).

[7] <u>See also</u> CAC ¶ 53 (alleging that Google and Barnes & Noble had also adopted agency pricing).

independent economic incentive to both want agency pricing and a distribution agreement with Amazon, even absent a preexisting agreement to act collectively.

First, agency pricing would have allowed the Publishers to control the retail prices of eBooks. CAC ¶¶ 42, 47, 52, 157. As the CAC makes clear, each Publisher had an independent interest in controlling the price of its own eBooks. CAC ¶¶ 51, 157. Additionally, the changed market circumstances following the <u>Apple</u> conspiracy meant that the Publishers could "achieve their goal of controlling trade eBook prices by acting alone" (CAC ¶ 162), because they did not need to force Amazon to abandon the wholesale pricing model, as agency pricing was already in place.

Moreover, as the CAC alleges, Amazon "operates the largest retail platform for the sale of eBooks in the United States," accounting for nearly "90% of all eBooks sold through its online retail platform." CAC ¶¶ 3, 131; <u>see also</u> <u>id.</u> ¶ 76 (noting "Amazon's market power in the retail eBook market"). Amazon is a dominant retailer in the eBook industry. CAC ¶ 161. It "sells more books than any other single retail outlet in history" and, because of the decrease in the number of independent booksellers, the market is "concentrated" with "economic power" in "the hands of one bookseller," Amazon. CAC ¶ 127. Additionally, "as the largest retailer of both print books and eBooks, the bargaining power that Amazon wields over the [Publishers] is immense." CAC ¶ 106. Indeed, Amazon's significance as a retail partner to the Publishers is readily apparent from public statements relied on in the CAC. CAC ¶¶ 68, 70-71. In one statement, Amazon is described as "one of [the] most important bookselling partners" of the publisher, Hachette. CAC ¶ 68 (citing Jillian D'Onfro, <u>Amazon and Big-5 Publisher Hachette Finally end their Pricing War, Business Insider</u> (Nov. 13, 2014), available at https://www.businessinsider.com/amazon-hachette-agreement2014-11). Another statement notes

that Amazon had successfully "slowed sales of Hachette authors' books while" Hachette and

Amazon were negotiating an agreement. CAC ¶ 70 (citing <u>No Authors Held Hostage as</u>

<u>HarperCollins and Amazon Come to Terms</u>, The Authors Guild (Apr. 16, 2015), available at

https://www.authorsguild.org/industry-advocacy/no-authors-heldhostage-as-harpercollins-and-

amazon-come-to-terms/). And yet another statement explains that Hachette's "sales plummeted

when Amazon, as a negotiating ploy, disfavored Hachette books in search results and slowed

delivery times." CAC ¶ 71 (citing <u>For the Big Five, Agency Now Holds Sway Across the Board,</u>

<u>Author's Guild</u> (Sep. 9, 2015), available at https://www.authorsguild.org/industryadvocacy/for-

the-big-five-agency-now-holds-sway-across-the-board/).

      As all of this demonstrates, the Publishers were dealing with a crucial retailer who could

have "ostensibly exercised its considerable market power to demand," for its own benefit, the

inclusion of an MFN clause in the agreements. <u>In re Musical Instruments</u>, 798 F.3d at 1196. And

as the CAC alleges, Amazon "has a history of using MFN clauses" and "has continuously

*imposed*" such contract provisions in agreements with its suppliers. CAC ¶¶ 75-76 (emphasis

added).

      Each Publisher could have rationally concluded that it was in its own self-interest to

reach an agency agreement with Amazon, a crucial bookselling partner, to preserve its ability to

distribute eBooks through the largest retailer in the United States, even if it required acceding to

Amazon's request for an MFN clause. And, because the Publishers compete in a concentrated

market (CAC ¶ 127) with a single dominant retailer (CAC ¶¶ 127, 131), each Publisher could

have rationally expected that the other Publishers would have reached the same conclusion about

the need to secure an agreement with Amazon, whether or not a preexisting agreement among

the Publishers existed. <u>See</u> <u>In re Musical Instruments</u>, 798 F.3d at 1195 ("An action that would

seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism."); Twombly, 313 F. Supp. 2d at 189 ("Without some motivation that would make conspiring to reach a result far more effective or profitable than allowing natural self-interest to persuade each [defendant] independently to reach the same decision, there is no reason to infer a conspiracy."). That the Publishers all acted similarly—and entered into similar agency agreements with Amazon—in "response to this market pressure is hallmark of independent parallel conduct—not collusion." In re Musical Instruments, 798 F.3d at 1196; see also In re Elevator Antitrust Litig., 502 F.3d at 51 ("Similar contract terms can reflect similar bargaining power and commercial goals.").

*Common Motive to Conspire*

As additional support for the allegation that Defendants "coordinated their price increases" (CAC ¶ 65), Plaintiffs point to Defendants' "shared twin motives" to collude. See Pl.'s Br. at 19. The CAC alleges that "Amazon has a motive to dominate its retail competitors, which it achieves by including MFNs," and the Publishers have "a motive to enter into agency pricing as a means to control trade eBook pricing." CAC ¶ 157. As just discussed, however, the allegations in the CAC demonstrate that Defendants could have fulfilled those twin motives through consciously parallel behavior without prior agreement. Each Publisher, "cognizant of—and reacting to—similar market pressures," could have anticipated that the other Publishers would have "arrive[d] at identical decisions independently" concerning the necessity of selling its eBooks through Amazon. In re Musical Instruments, 798 F.3d at 1193. And Amazon, because it is a dominant retailer (CAC ¶¶ 3, 106, 127, 131), could have bargained hard to force the Publishers to accept an MFN clause.

Further, Plaintiffs' allegation that the Publishers have an interest in setting and controlling the retail price of their eBooks is at bottom an interest in maximizing their potential profits—an interest universally shared by all businesses. See In re Musical Instruments, 798 F.3d at 1194-95 n.8 ("Common motive for increased profits always exists."). That motive always exists and would arise even without a conspiracy among the Publishers or with Amazon. See Twombly, 550 U.S. at 556 n.4 (noting that parallel conduct that would result from "independent responses to common stimuli" does not state a § 1 claim); Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1049 (9th Cir. 2008) ("Allegations of fact that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead" a § 1 violation.). Nevertheless, accepting that motive as true, the CAC itself demonstrates that the Publishers could have achieved their interest in controlling eBook prices without a preceding agreement. See supra pp. 27-31.

Additionally, although Plaintiffs were not required to allege that Amazon and the Publishers shared "identical motives," Apple, 791 F.3d at 317, it is telling that the CAC offers no plausible explanation for why the Publishers would have been motivated to participate in a conspiracy that further entrenched Amazon's dominance as an eBook retailer. Even if the objective of the conspiracy here was eliminating retail price discrimination and controlling eBook prices (CAC ¶ 157), a necessary byproduct of that conspiracy was to "guarantee Amazon's monopoly" (CAC ¶ 64). But it was Amazon's "growing power in the trade book industry" that had previously motivated the Publishers to collude with Apple. CAC ¶ 42; see also Apple, Inc., 952 F. Supp. 2d at 649 ("The Publishers also feared Amazon's growing power in the book distribution business."). In the Apple conspiracy, the Publishers feared that "if Amazon became powerful enough, it could demand lower wholesale prices from the [Publishers] or allow

32

authors to publish directly with Amazon, cutting out the publishers entirely." 791 F.3d at 299-300. And since the Apple conspiracy, Amazon's dominance as an eBook retailer has grown. See, e.g., CAC ¶ 71 (public statement notes that Amazon caused Publisher's sales to "plummet" as a negotiating tactic). The CAC alleges no facts from which one could plausibly infer that the Publishers would benefit from immunizing Amazon from competition.

### Prior Collusive Conduct by the Publishers & Government Investigations into Amazon

Next, Plaintiffs rely on the Publishers' prior conspiracy with Apple and the existence of government investigations as additional plus factors from which to infer collective action. CAC ¶¶ 94, 104; Pl.'s Br. at 19, 23-25. Generally, a "prior conspiracy is not alone probative of present collusion." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and their Application, ¶ 1421b1 (4th ed. 2022); see also id. ¶ 1421a ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy.").

Nevertheless, even if a prior conspiracy were probative of a present conspiracy, the Publishers' conduct in the Apple conspiracy does not "render more plausible" Plaintiffs' allegations that the Publishers colluded with Amazon, Plaintiffs' argument to the contrary notwithstanding (Pl.'s Br. at 23). Because of the unique circumstances surrounding the Apple conspiracy, the Publishers' prior "willingness" to collude (CAC ¶ 104), does not, standing alone, plausibly suggest a conspiracy among the Publishers again here. In 2014 or 2015, the industry had already made the switch to agency pricing—the shift in pricing strategy that had motivated the Publishers to act collectively in Apple. See Apple, 791 F.3d at 316 ("[I]n order to receive the perceived benefit of Apple's proposed Contracts, the Publisher Defendants had to switch Amazon to an agency model as well—something no individual publisher had sufficient leverage to do on its own."); see also id. at 316 (explaining that Apple's proposed contracts with the

33

Publishers were attractive to the Publishers "only if they collectively shifted their relationships with Amazon to an agency model"). Here, the CAC itself suggests that the Publishers' assent to agency agreements with Amazon containing MFN clauses was rational business behavior in light of Amazon's market dominance and the existence of agency pricing at the time of those agreements. See supra pp. 28-31.

Moreover, although Plaintiffs rely on the existence of government investigations into *Amazon's* conduct (CAC ¶¶ 88, 94) as a further plus factor (Pl.'s Br. 24), those investigations cannot raise a plausible inference that the *Publishers* colluded, as the allegations in the CAC make clear that the investigations concerned conduct by Amazon, not the Publishers. See Starr, 592 F.3d at 319, 324 (citing fact of government investigations as a plus factor, but where the investigations concerned all of the defendants).[8]

### *Concentrated Market*

As another plus factor, Plaintiffs also point to the fact that the market for eBooks is concentrated. Pl.'s Br. at 19. The CAC alleges that Amazon controls about 90% of the retail market for eBooks in the United States and the Publishers account for about 80% of the trade books sold in the United States. CAC ¶¶ 1, 131. Pointing to the decline in the number of independent booksellers, the CAC further alleges that "economic power in the market is concentrated in the hands of one bookseller." CAC ¶ 127.

In Starr, the existence of a concentrated market was one of several plus factors that the Second Circuit determined collectively supported an inference of conspiracy. See id., 592 F.3d at 323-24. Here, however, the CAC falls short of plausibly alleging other plus factors, like motive

---

[8] See In re Digital Music Antitrust Litig., 06-MD-1780 (LAP), Second Consolidated Amended Complaint, ¶¶ 106-07 (complaint in Starr alleging existence of investigations into all defendants' conduct).

and conduct against self-interest, and Plaintiffs have cited to no case where the existence of a concentrated market, by itself, was sufficient to infer that parallel conduct resulted from a preexisting agreement. Cf. Mayor & City Council, 709 F.3d at 139 (noting that in a "concentrated market" firms may have "shared economic interests" and "interdependence" with regards to price and other decisions).

### *An Increase in Prices Absent a Rise in Costs*

Next, Plaintiffs rely on the rise in eBook prices, without an attendant rise in costs, to further support the plausibility of a conspiracy among the Publishers. Pl.'s Br. at 21-22; CAC ¶¶ 95, 98. But the CAC makes clear that the Publishers wanted control of eBook prices. CAC ¶¶ 157, 162. And the fact that the Publishers each raised prices creates an inference just as consistent with rational business behavior as it is with concerted action. See Iqbal, 556 U.S. at 668 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitled to relief.") (internal quotation marks and citation omitted).

### *Defendants Attempted to Hide their MFN clauses*

Plaintiffs also point to an attempt by Defendants to avoid antitrust scrutiny by hiding the MFN clauses in the 2014 or 2015 agency agreements. Pl.'s Br. at 25. The CAC alleges that "Defendants disclosed the agency agreement but not the MFN and similar anticompetitive clauses that ensured that no retailer could compete with Amazon on price and product availability." CAC ¶ 73. Evidently recognizing that the consent decrees barred the use of an MFN clause in the agency agreements, the CAC alleges that the Publishers and Amazon "agreed to notification provisions that served the same function as the prohibited MFN provisions." CAC ¶¶ 78-79.

Relying on <u>Starr</u>, Plaintiffs argue that this is a plus factor that suggests a preceding agreement among Defendants. Pl.'s Br. at 18-19. But the inference of a preceding agreement that could plausibly be drawn from the allegations in <u>Starr</u> does not similarly arise here. In <u>Starr</u>, the complaint alleged that the MFN clause was hidden in "a secret side letter"—not the agreement itself—and the CEO of one of the defendants expressly stated that the MFN was put in the secret side letter because "there [were] legal/antitrust reasons why it would be [a] bad idea to have MFN clauses in any, or certainly all, of these agreements." 592 F.3d at 319 (citing relevant paragraphs in the complaint). Under those circumstances, the Second Circuit determined that such conduct raised a suggestion of a preceding agreement among the defendants. <u>Id.</u> at 323-24.

Here, there was no side letter; the notification provision that functioned as an MFN clause was in the agreement itself. CAC ¶ 79. Further, Defendants knew that the agreements would be (and were in fact) reviewed by the Justice Department as part of the consent decrees. <u>See</u> Hachette, HarperCollins, Simon & Schuster Consent Decree Sec. IV, ¶ D; Macmillan Consent Decree Sec. IV, ¶ D; Penguin Random House Consent Decree Sec. IV, ¶ D; <u>see also</u> Tr. at 40, 88-89. That the MFN clause (or its equivalent) was in the agency agreement itself, coupled with the certainty that the agreements would be reviewed by the Justice Department, does not plausibly suggest that the Publishers attempted to hide the existence of the MFN clauses from antitrust regulators.

### <u>Similar Agreements were Executed between the Publishers and Amazon within the Span of Months</u>

Plaintiffs argue that the Publishers' adoption of identical agency pricing agreements with Amazon within the span of months and the public statements concerning those agreements are additional circumstantial evidence of a tacit agreement to collude (CAC ¶¶ 65, 67-71, 159). Pl.'s Br. at 8-13. The CAC points to certain public statements by Amazon and the Publishers to

support an allegation that each Publisher knew that the other Publishers were receiving the "same deal" from Amazon. CAC ¶¶ 65, 67-71, 159. The public statements relied on in the complaint, one concerning each Publisher, were issued between October 2014 and June 2015.

In October 2014, Simon & Schuster publicly announced that it had reached a new sales agreement with Amazon. CAC ¶ 67, n.91. The public statement does not mention an MFN clause. Nor does the statement mention agency pricing specifically or any other term of the agreement. Instead, the announcement states that "the deal gives [Simon & Schuster] 'with some limited exceptions,' control over the price of its books." Id.

In November 2014, a Business Insider article discussed the pricing war between Hachette and Amazon. CAC ¶ 68 n.92. The article cites to a joint press release from Amazon and Hachette that states, "Hachette will have responsibility for setting consumer prices of its e-books, and will also benefit from better terms when it delivers lower prices for readers." Id. Like the earlier statement by Simon & Schuster, this statement also does not mention that the agreement contained an MFN clause, and nor does it discuss any of the terms of the agreement or reference agency pricing specifically.

In December 2014, Macmillan's CEO announced that Macmillan had agreed to a "multiyear agreement with Amazon for the sale of both print books and e-books." CAC ¶ 69. The statement indicates that the deal would "allow the publisher to set its own prices" for eBooks using "the agency model." Id. This statement, too, does not mention the inclusion of an MFN clause in the agreement or any of the terms of the agreement, besides agency pricing.

Two more public statements are cited in the CAC—a statement concerning HarperCollins in April 2015 and a statement relating to Penguin Random House in June 2015. CAC ¶¶ 70-71. The April 2015 statement indicates that HarperCollins reached an agreement for agency pricing

that "appear[s] to resemble those arrived at by Simon & Schuster . . . Hachette . . . and

Macmillan." CAC ¶ 70. The statement does not mention an MFN clause in the agreement or any

other terms of that agreement.

Last, the June 2015 statement indicates that Penguin Random House signed a deal with

Amazon that allowed for its eBooks to be sold "under a version of the 'agency' sales model,

which allows the publisher (as opposed to the retailer) to set the prices of its e-books, subject to

certain reported exceptions and incentives to keep prices low." CAC ¶ 71. This statement, too,

does not mention MFN clauses or any specific terms of the agreement, other than agency pricing.

Drawing all plausible inferences in Plaintiffs' favor, as I must, it is plausible to infer from

those statements that each Publisher knew that the other Publishers were negotiating agreements

with Amazon that used agency pricing and contained MFN clauses (or their equivalent), given

the allegations in the CAC that the Publishers previously had such agreements with Amazon and

Amazon had a history of demanding such clauses in its distribution contracts. See CAC ¶¶ 6, 52,

76, 78-79, 107. But even so, the public statements merely demonstrate parallel conduct by the

Publishers. The fact that the Publishers entered into similar agreements with Amazon over the

span of eight months does "not constitute 'plausible grounds to infer an agreement' by the

Publishers to conspire because, while that conduct 'is consistent with conspiracy, [it is] just as

much in line with a wide swath of rational and competitive business strategy unliterally

prompted by common perceptions of the market.'" In re Elevator Antitrust Litig., 502 F.3d at 51

(quoting Twombly, 550 U.S. at 554, 556) (alteration in original); see also Theatre Enters., 346

U.S. at 541 ("[T]his Court has never held that proof of parallel business behavior conclusively

establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act

offense."). As already discussed, see supra 28-31, the CAC provides ample reasons to explain the

Publishers' conduct absent a preceding agreement, without suggesting any plausible reason to infer a conspiracy. For this reason, Plaintiffs' reliance on Interstate Circuit v. United States, 306 U.S. 208 (1939), is misplaced. Pl.'s Br. at 14-15.

In Interstate Circuit, the defendants consisted of a group of film distributors and a separate group of film exhibitors. Interstate Circuit was one of the exhibitors, and it held a monopoly over the exhibition of movies in first-run theaters in various Texas cities. See 306 U.S. at 214-15. Interstate's general manager sent identical letters to eight branch managers of the distributor companies; each letter included the names of all eight companies as addressees and proposed identical deal terms. Id. at 215-17. Each film distributor was thus simultaneously made aware that its competitor was considering an identical proposal by Interstate. Id. at 222 ("[E]ach of the distributors knew that the proposals were under consideration by the others."); id. at 226 ("Each distributor was advised that the others were asked to participate."). Further, the distributors had a "strong motive for concerted action" because "without substantially unanimous action . . . there was a risk of a substantial loss of the business," due to the nature of the proposal by Interstate, which would have "constituted an important departure from prior" pricing "practice" by the theatres. Id. at 217-18, 222.

"Key to Interstate Circuit's conspiracy finding was its determination that each distributor's decision to accede to Interstate's demands would have been economically self-defeating unless the other distributors did the same." In re Insurance Brokerage Antitrust Litig., 618 F.3d 300, 331 (3d Cir. 2010). Here, the allegations in the CAC do not lead to a plausible inference that a Publisher acting alone to sign an agency agreement with Amazon would have suffered any loss. See supra pp. 28-31. To the contrary, the CAC provides ample legitimate business reasons for the Publishers to have decided to go it alone in reaching an agency

agreement with Amazon. Thus, even if one infers from the public statements between November 2014 and June 2015 (CAC ¶¶ 67-71) that each Publisher knew that the other Publishers were considering identical proposals from Amazon, the allegations do not give rise to a plausible inference that the Publishers had to act collectively or otherwise suffer a loss of business or revenue.

### Opportunity to Collude

The CAC alleges that the Publishers had an opportunity to collude. CAC ¶ 159. The CAC also alleges that the Publishers were under consent decrees with the Department of Justice, entered in 2012 and 2013, as a result of the Apple litigation. CAC ¶¶ 57-58. The consent decrees required the Publishers, until 2015, to permit eBook retailers to discount eBook prices and to offer promotions to encourage consumers to purchase eBooks. CAC ¶¶ 57, 62. Additionally, the Publishers were prohibited from entering into any agreement with an eBook retailer that contained a "Price MFN" for the sale of eBooks for a period of five years, until 2017 or 2018, depending on the Publisher. CAC ¶¶ 57, 62.

Significantly, in 2014 or 2015, when the complaint alleges that the unlawful agreements with Amazon were being negotiated by the Publishers (CAC ¶¶ 62, 67-71)—and, by extension, when the Publishers necessarily would have reached an agreement to collude amongst themselves or with Amazon—any nonprivileged communication related to eBook strategy among the Publishers was reviewed by the Department of Justice pursuant to the consent decrees. See Hachette, HarperCollins, Simon & Schuster Consent Decree Sec. VII, ¶ I; Macmillan Consent Decree Sec. VII, ¶ I; Penguin Consent Decree Sec. VII, ¶ I. The Publishers were required to submit quarterly logs to the Justice Department, listing all oral and written nonprivileged communications with any other Publisher related to plans or strategy for eBook

distribution or sales. Id. What's more, the Publishers were required to submit to the Justice Department any new or modified eBook agreement with Apple, Amazon, or other eBook retailer. Id., Sec. IV, ¶ D. And the Justice Department reviewed the 2014 or 2015 agency agreements between the Publishers and Amazon that are the subject of the claims here. See Tr. at 40, 88-89.

Against this backdrop of government oversight, the CAC alleges that "Defendants had opportunities to collude." CAC ¶ 159. But the CAC provides no factual support to underlie that conclusion.[9] Instead, the CAC provides ample reason to suggest the absence of such an opportunity to collude. This is in stark contrast to the facts alleged in eBooks and Starr. The complaint in eBooks was replete with allegations of communications among the Publishers and the Publishers and Apple. See 859 F. Supp. 2d at 675-76, 682-83; see also Apple, 791 F.3d at 300, 302; Anderson News, 680 F.3d at 187-88 (reciting detailed allegations in the complaint concerning various meetings and communications among the defendants that occurred in the preceding two-week period prior to the alleged unlawful agreement in restraint of trade). Similarly, in Starr, there were allegations from which one could infer that the defendants had an opportunity to "communicate about pricing, terms, and use restrictions." Starr, 592 F.3d at 318. Here, the CAC contains no allegations whatsoever of interfirm communications between the

---

[9] For this reason, Meyer v. Kalanick, 174 F. Supp. 3d 817 (S.D.N.Y. 2016), relied on by Plaintiffs (Br. at 16) is distinguishable. In Meyer, the allegations in the complaint suggested that the defendants would have had an opportunity to confer and reach agreement. See 174 F.3d at 821, 823, 825 (discussing allegations concerning meetings among the Uber drivers that suggested Uber drivers had "many opportunities to meet" and reach agreement); see also Meyer v. Kalanick, No. 15 Civ. 9796, Am. Compl. ¶¶ 41, 92, ECF No. 26; PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm., 530 F. Supp. 3d 301, 335-38 (S.D.N.Y. 2021) (discussing allegations concerning interlocking membership on boards and frequent joint meeting attendance which created an "opportunity to conspire"); Barry's Cut Rate Stores Inc. v. Visa, Inc., 05-MD-1720 (MKB) (JO), 2019 WL 7584728, at *33 (E.D.N.Y Nov. 20, 2019) (discussing actual email communications between representatives of the defendants which suggested a "tacit agreement" and "a conscious commitment to a common scheme[.]").

Publishers or between the Publishers and Amazon. And, because communications among the Publishers concerning eBook "plans or strategies" were being monitored by the Justice Department, it is not plausible to infer, absent more factual detail, that the Publishers even had an opportunity to discuss or coordinate taking collusive action concerning their agency agreements with Amazon.

In a further attempt to suggest an opportunity to collude, the CAC alleges that "[s]ome of the same individuals [at the Publishers] were involved in both sets of agreements"—that is, in the agency agreements with Apple and later Amazon. CAC ¶ 63. More specifically, in 2014 or 2015, three of the five Publishers had the same Chief Executive Officers as were leading those companies during the time that they colluded with Apple. CAC ¶ 63. But the CAC contains no allegations that any of these individuals from only three of the five Publishers had any communications with Amazon or the other Publishers about a conspiracy to control eBook prices and eliminate retail price competition. And the CAC is silent as to the two Publishers with CEOs that were not leading those companies at the time of the Apple conspiracy. In any case, given that all five Publishers were under the oversight of the Justice Department in 2014 or 2015, it is not plausible to infer, from the mere allegation that some of the CEOs remained in place between the Apple conspiracy and 2015, that the Publishers, either amongst themselves or with Amazon, had meetings or conversations where they discussed concerted action.

In short, whether viewed individually or collectively, the CAC alleges plus factors that are no more consistent with a conspiracy than with rational behavior independently adopted by the Publishers acting within a concentrated market. Stated otherwise, the CAC fails to describe an environment that encouraged or required collective action by the Publishers in order for them to accept agency pricing and want to distribute through Amazon. It thus provides no reason to

believe that Defendants' parallel conduct was reflective of any preceding agreement. To the contrary, the allegations in the CAC suggest that "[n]o agreement would be necessary for [the Publishers] to be relatively certain to reap the alleged added benefits to be gained from parallel action." Twombly, 313 F. Supp. 2d at 184; cf. Apple, 791 F.3d at 305 (explaining that in the conspiracy with Apple, "[b]oth sides needed a critical mass of publishers to achieve their goals"). Plaintiffs thus have not posited behavior "that would plausibly contravene each [Publisher's] self-interest in the absence of similar behavior by rivals." Starr, 592 F.3d at 327 (internal citation omitted). Instead, the parallel behavior alleged in the complaint has "an obvious alternative explanation." Twombly, 550 U.S. at 567. Accordingly, because Plaintiffs have not adequately alleged that Defendants conspired to violate Section 1 of the Sherman Act, I recommend that the First Cause of Action be dismissed.

    2.  Unreasonable Restraint of Trade

The crux of Plaintiffs allegations in the CAC are that the Publishers participated in a horizontal conspiracy to limit retail competition and increase eBook prices. Plaintiffs' failure to plead a collusive agreement moots the issue of whether such an agreement would amount to an unreasonable restraint of trade. Nevertheless, I reach the question for the sake of completeness of this Report and Recommendation.

"For over 100 years, the courts have understood the Sherman Act only to prohibit 'unreasonable' restraints on trade." United States v. Visa U.S.A., Inc., 344 F.3d 229, 237-38 (2d Cir. 2003) (citing Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 342-43 (1982)). Courts generally evaluate unreasonable restraints on trade under two categories of analysis. Some conduct is prohibited because it is deemed unreasonable *per se*. State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). Other conduct is outlawed only after evaluation under the "rule of reason." Id.

Application of *per se* rules is limited to restraints "that would always or almost always tend to restrict competition and decrease output.'" Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). "Generally speaking, price-fixing agreements or agreements to divide markets that are horizontal in nature—meaning that the parties to the agreement are competitors at the same level of the market structure—are *per se* unlawful." eBooks, 859 F. Supp. 2d at 682 (internal quotation marks and citations omitted).

If Plaintiffs had pled sufficient facts from which to plausibly infer a horizontal price-fixing conspiracy among the Publishers, or a hub-and-spoke conspiracy among the Publishers and Amazon, the agreement would be *per se* unlawful. See eBooks, 859 F. Supp. 2d at 685 ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is . . . *per se* unlawful.".); id. at 692 ("A horizontal agreement to fix or raise prices is *per se* unreasonable."); see also Apple, 791 F.3d at 329 (noting that "*per se* condemnation" would be appropriate for the conspiracy between the Publishers and Apple).

As an alternative, Plaintiffs argue that their individual vertical agreements with Amazon plausibly allege a Section 1 claim under the rule-of-reason analysis. Pl.'s Br. at 33-39. Most antitrust claims are evaluated under the "rule of reason," "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." State Oil, 522 U.S. at 10. "Vertical price restraints—meaning price-fixing agreements among 'persons at different levels of the market structure,' such as manufacturer and a distributor—are subject to the rule of reason." eBooks, 859 F. Supp. 2d at 682 (quoting

44

Anderson News, 680 F.3d at 182); see also Leegin, 551 U.S. at 893; Apple, 791 F.3d at 313;

Ohio v. Am. Express Co., 138 S. Ct. 2274, 2284 (2018).

Under the rule of reason, a plaintiff seeking to prove an antitrust violation must initially

show that the challenged action adversely effected competition as a whole in the relevant market.

Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998). To show an adverse

effect on competition, a plaintiff "may offer direct evidence of harm to competition by proving

higher prices, reduced output, or lower quality in the market as a whole." MacDermid Printing

Sols. LLC v. Cortron Corp., 833 F.3d 172, 182 (2d Cir. 2016). Alternatively, a plaintiff "may

demonstrate an adverse effect indirectly by establishing that the alleged conspirators had

sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that

the challenged behavior' has harmed competition." Id. (quoting Tops Mkts., 142 F.3d at 97); see

also Am. Express Co., 138 S. Ct. at 2284. "Market power" is the "ability of a single seller to

raise price[s] and restrict output." Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d

256, 265 (2d Cir. 2001) (alteration in original, citation omitted); see also U.S. v. E. I. du Pont de

Nemours & Co., 351 U.S. 377, 391 (1956) ("[Market] power is the power to control prices or

exclude competition.").

For the rule-of-reason analysis, Plaintiffs allege that the relevant market is the retail

market for trade eBooks in the United States. CAC ¶ 113. Plaintiffs have attempted to plead an

adverse effect on competition in two ways: through allegations that prices in the market for trade

eBooks increased shortly after each Publisher entered into its respective agency agreement with

Amazon (CAC ¶¶ 97-101); and through allegations that the Publishers possess market power in

the relevant market (CAC ¶¶ 113, 124, 166, 187). If each Publisher's vertical agreement with

Amazon were subjected to a rule-of-reason analysis, the allegations in the CAC would fail to state a Section 1 claim for two reasons.

First, Plaintiffs' allegations fail to plausible allege that any single Publisher's agreement with Amazon harmed competition in the entire relevant market. See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 127-28 (2d Cir. 1995) (explaining that under a rule-of-reason analysis the adverse effect on competition must be to "the relevant market as a whole"). The CAC alleges that each Publisher raised the price of its trade eBooks after each Publisher executed an agency agreement with Amazon. CAC ¶¶ 98-101. The CAC also alleges that under agency pricing, each Publisher has control of the price of only its own eBooks. See, e.g., CAC ¶ 47. To plead harm to the relevant market as a whole, the CAC must allege facts from which to plausibly infer that one Publisher's individual agreement with Amazon had a market-wide effect on trade eBook prices. Stated differently, because each Publisher controls only its own prices, there must be a basis to plausibly infer that one Publisher's agreement with Amazon caused the other Publishers to raise their prices. Absent some evidence of coordination, however, there are no plausible allegations in the CAC from which to infer that a single Publisher's agreement with Amazon led to a market-wide price increase for trade eBooks.

Plaintiffs argue that a plausible inference of a market-wide price increase can be drawn from allegations that the Publishers "control 80% of the trade book market" and that "all of the Publishers" raised prices in the "immediate aftermath" of their agency agreements with Amazon. Pl.'s Br. at 36. But this argument, as Plaintiffs implicitly acknowledge, relies on a finding of concerted action among the Publishers.[10] Plaintiffs point to no case that permits reliance on the

---

[10] See Pl.'s Br. 36 (arguing that "because such price increases would result in loss of market share for any Publisher Defendant acting alone, this parallel pricing conduct reflects coordination among Publisher Defendants").

"aggregate effects" of the Publishers individual conduct where the allegations in the complaint do not support an inference of concerted action.[11] Cf. Bookhouse, 985 F. Supp. 2d at 622 ("In the absence of a horizontal conspiracy, grouping the Publishers' market share together is inappropriate."). Further, to the extent Plaintiffs rely on the price increase of an individual Publisher to show a market-wide effect, the CAC does not provide any allegations concerning the market share of each individual Publisher in the relevant market of trade eBooks.[12] The CAC provides only the market share of the Publishers collectively. See CAC ¶ 166. Without knowing each Publisher's share of the market, it cannot be determined whether a single Publisher's price increase could have had a market-wide impact.

Second, Plaintiffs have not adequately alleged that any individual Publisher had market power in the relevant market. If a plaintiff is unable to show market power through direct evidence of anticompetitive effects, a plaintiff may show market power indirectly through evidence of a firm's large percentage share of the relevant market. Tops Mkts., 142 F.3d at 98;

---

[11] All of the cases cited by Plaintiffs are inapposite. Pl.'s Br. at 37-38, n.112. Standard Oil Co. v. United States, 337 U.S. 293, 294-95 (1949), concerned "exclusive supply contracts" challenged under Section 3 of the Clayton Act. Likewise, United States v. Microsoft Corp., 253 F.3d 34, 68-70 (D.C. Cir. 2001), concerned "exclusive dealing agreements" between Microsoft and various internet-access providers. Similarly, In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019), concerned, in part, "a concerted refusal to deal or group boycott." Here, the CAC makes clear that the vertical agreements between Amazon and each Publisher did not preclude the Publishers from selling their own eBooks through other retail outlets or directly to consumers. See CAC ¶¶ 2, 18-19, 53. The vertical agreements here are thus unlike the exclusive dealing agreements at issue in the cases relied on by Plaintiffs because the agreements do not limit any Publisher's ability to sell its eBooks through retailers other than Amazon. Finally, Am. Express Co., 138 S. Ct. at 2288-90, does not address the question of whether one can aggregate market share to indirectly show market power.

[12] Although the CAC alleges that the "relevant market" is "the retail sale of *trade eBooks* in the United States" (CAC ¶ 113), the CAC provides the collective market share of the Publishers in "*trade books*," a category which also includes print books (CAC ¶¶ 1, 115, 117, 166).

see also Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 937 (7th Cir. 2000). The CAC alleges that

the Publishers collectively account for 80% of the "trade books" sold in the United States. CAC

¶¶ 1, 166. Applying the analysis used by the court in Bookhouse, if the Publishers' collective

share of the market is 80%, then each of the five Publishers would have an approximate 16%

share of the market. See id., 985 F. Supp. 2d at 622 (where allegations accounted for only the

Publishers' collective market share, the court divided the collective share by the number of

Publishers to determine the average market share of each Publisher). If Amazon holds 90% of

the eBook market (CAC ¶ 131), then any individual vertical agreement between a Publisher and

Amazon would on average affect only 14.4% of the trade eBook market.[13] See Bookhouse, 985

F. Supp. 2d at 622 (multiplying an individual Publisher's market share by the market share of

Amazon to determine what percentage of the relevant market would be affected by "any

individual vertical agreement between a Publisher and Amazon"). That share is far too small to

suggest an ability to cause an adverse effect on competition market-wide. Id. (concluding that

where "individual vertical agreement" would affect only "around 6% of the U.S. e-book market,"

the share was "too small to suggest an ability to charge super-competitive prices"); see also

PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 109 (2d Cir. 2002) ("[A] 64 percent market share

is insufficient to infer monopoly power."); AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181

F.3d 216, 229 (2d Cir. 1999) ("[W]e have held that a 33 percent market share does not approach

the level required for a showing of dangerous probability of monopoly power.").

      For the reasons discussed, I recommend that the Sherman Act claim in Count I of the

CAC be dismissed. Count III of the CAC alleges a Conspiracy to Monopolize claim under

---

[13] The 14.4% figure is arrived at by multiplying Amazon's 90% market share by the 16% market share of an individual Publisher.

Section 2 of the Sherman Act. That claim also requires allegations from which to plausibly infer "concerted action" among the Publishers. See Electronics Communications Corp. v. Toshiba Am. Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997). Because the CAC fails to plausibly allege the existence of a conspiracy, for all of the reasons discussed, I recommend that Count III also be dismissed.

D.   Sherman Act Section 2 Claim

In Count II of the CAC, Plaintiffs allege that Amazon monopolized the retail market for trade eBooks in the United States. CAC ¶¶ 173-83. Amazon attacks the sufficiency of the allegations in the CAC on the sole ground that Plaintiffs have not plausibly pled that Amazon has monopoly power in the relevant market. Amazon Br. at 18-21. For the reasons that follow, I recommend that this claim be dismissed because Plaintiffs' allegations are insufficient to plead the existence of monopoly power in the relevant market.

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C. § 2. To state a claim for monopolization under Section 2, a plaintiff must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." PepsiCo, Inc., 315 F.3d at 105; Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004). "Inherent to the second element, there must be a showing of anticompetitive conduct." In re Term Commodities Cotton Futures Litig. ("Cotton Futures I"), No. 12 Civ. 5126 (ALC) (KNF), 2013 WL 9815198,

at *23 (S.D.N.Y. Dec. 20, 2013); on reconsideration in part, 2014 WL 5014235 (S.D.N.Y. Sept.

30, 2014).

    1.   Monopoly Power

    "Monopoly power is the power to control prices or exclude competition." Geneva

Pharms., 386 F.3d at 500 (internal quotation marks and citations omitted); see also United States

v. Grinnell, 384 U.S. 563, 571 (1966). The possession of monopoly power can be shown through

(1) "direct evidence of anticompetitive effects," or (2) "by defining a relevant market and

showing defendants' excess market share." In re Tether and Bitfinex Crypto Asset Litig., No. 19

Civ. 9236 (KPF), 2021 WL 4452181, at *211 (S.D.N.Y. Sept. 28, 2021) (citation omitted); see

also In re Keurig Green Mountain, 383 F. Supp. 3d at 225 (explaining that a plaintiff can plead

monopoly power "directly through allegations of control over prices or the exclusion of

competition, or it may be inferred from a defendant's large share of the relevant market")

(citation omitted).

    In cases alleging a violation of Section 2, "plaintiffs commonly rely on indirect evidence

of a defendant's monopoly power, based on proof of market share, 'because direct measures are

often difficult or impossible to prove.'" Shak v. JPMorgan Chase & Co., 156 F. Supp. 3d 462,

482 (S.D.N.Y. 2016) (quoting Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d

Cir. 2006)). "To allege monopoly power by this means, a plaintiff must satisfactorily allege both

a plausible definition of a relevant market and excess market share in that market." Shak, 156 F.

Supp. 3d at 482. "[W]ithout a definition of [the relevant] market there is no way to measure the

defendant's ability to lessen or destroy competition." In re Keurig Green Mountain, 383 F. Supp.

at 225 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455-56 (1993)). "Because

market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss

for failure to plead a relevant product market." Todd, 275 F.3d at 199-200 (citing Found. for

Interior Design Educ. Research v. Savannah Coll. of Art & Design, 244 F.3d 521, 531 (6th Cir.

2001) ("Market definition is a highly fact-based analysis that generally requires discovery.")).

For purposes of the Sherman Act, "the relevant market is the area of effective

competition within which the defendant operates." Concord Assoc. L.P. v. Entertainment

Properties Trust, 817 F.3d 46, 52 (2d Cir. 2016) (internal quotation marks and citation omitted).

The relevant market has two components: "a product market and a geographic market." Id. The

relevant product market consists of "products that have reasonable interchangeability for the

purposes for which they are produced—price, use and qualities considered." United States v. E.I.

du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); see also Shak, 156 F. Supp. 3d at 482

(explaining that the relevant market is defined as "all products reasonably interchangeable by

consumers for the same purposes") (internal quotation marks and citation omitted).

Here, Plaintiffs have failed to adequately plead that Amazon possesses monopoly power

in the relevant market, a necessary element of a Section 2 claim. To plead the existence of

monopoly power, Plaintiffs rely on indirect evidence—specifically, Amazon's share of the

relevant market. Pl.'s Br. at 42. Plaintiffs defined the "relevant market" as the "U.S. retail market

for trade eBooks." CAC ¶ 175. As to that market, the CAC alleges that Amazon controls "90%

of eBook sales." CAC ¶ 176; see also id. CAC ¶¶ 3, 127, 131, 166. The CAC further alleges that

"Amazon has market power" because it has the "power to raise trade eBook prices above that

which would be charged in a competitive market." CAC ¶ 176. Both of those allegations are

contradicted by other allegations in the CAC.

To the extent Plaintiffs rely on Amazon's ability to raise prices to plead the existence of

monopoly power, the CAC itself alleges that, under the agency model, Amazon does not "set the

price" of eBooks sold through its platform and cannot unilaterally discount that price. CAC ¶ 47.

Instead, the Publishers determine the price and Amazon acts only as an agent, collecting a

commission on each transaction. CAC ¶¶ 2, 47, 148. The CAC also alleges that the Publishers

account for between 80% and 90% of trade book sales in the United States—approximately the

same percentage of sales attributed to Amazon. Compare CAC ¶¶ 124, 166 with id. ¶¶ 3, 176. It

cannot be that Amazon and the Publishers both simultaneously account for the *same* percentage

of eBooks sales in the *same* relevant market.

To establish Amazon's share of the relevant market, Plaintiffs are relying on eBook sales

for which Amazon does not set the price and acts merely as an agent to the seller (the

Publishers). But Plaintiffs cite to no case to support the proposition that a monopoly claim

against Amazon can be based on sales for which Amazon acts only as an agent to the seller.

Apple Inc. v. Pepper, 139 S. Ct. 1514 (2019), upon which Plaintiffs rely (Pl.'s Br. at 42), is

distinguishable for two reasons.

First, the Court in Pepper did not consider the question raised by Plaintiffs' here—

namely, whether a sales agent can be deemed a monopolist based on the market share held by its

principals. Instead, the Supreme Court considered a single issue: whether the Illinois Brick direct

purchaser rule denied standing to Plaintiffs who had purchased "apps" from Apple's App Store

at prices set by the app developer and not Apple. 139 S. Ct. at 1519-20. Further, the Court

expressly stated that it was not "assess[ing] the merits of the plaintiffs' antitrust claims against

Apple" nor was it "consider[ing] any other defenses Apple might have." Id. at 1519.

Second, Pepper is distinguishable on its facts. As the Court explained, "[b]y contract and

through technological limitations, the App Store is the only place where iPhone owners may

lawfully buy apps." Id. Consequently, in Pepper, Apple controlled the only retail outlet where the

plaintiffs, iPhone owners, could purchase an app for their iPhone. Conversely, the allegations in the CAC demonstrate that there are multiple retail outlets where consumers can purchase eBooks; in fact, many of the named Plaintiffs purchased an eBook from a retail platform other than Amazon. CAC ¶¶ 18-20, 32, 53. Thus, even if one could construe Pepper as implying that a monopoly claim against a sales agent could be based on the market shares of the principal, it does not necessarily follow that Pepper would apply to the facts alleged here, where Amazon is not the lone retail outlet for the relevant product.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendants' Motions to Dismiss be

**GRANTED**.

Date: August 3, 2022

    New York, New York

Respectfully submitted,

_____
VALERIE FIGUEREDO
United States Magistrate Judge

## <u>NOTICE</u>

**Plaintiffs shall have fourteen days, and Respondent shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).**

**Plaintiffs shall have fourteen days to serve and file any response. Respondent shall have fourteen days to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Gregory H. Woods at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and served on the other parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Woods. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).**