**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMAZON.COM, INC. EBOOK ANTITRUST LITIGATION | Case Number 1:21-cv-00351-GHW-VF |

**AMAZON.COM, INC.'S RESPONSE TO PLAINTIFFS' OBJECTION TO**
**MAGISTRATE JUDGE FIGUEREDO'S REPORT & RECOMMENDATION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

LEGAL STANDARD................................................................................................................2

ARGUMENT ............................................................................................................................3

I.      PLAINTIFFS FAILED TO PLEAD A HORIZONTAL CONSPIRACY...........................3

        A.      The *Apple* Conspiracy Does Not Satisfy Plaintiffs' Burden...................................3

        B.      Plaintiffs Do Not Allege "Direct Evidence" of a Hub-and-Spoke
                Conspiracy. ......................................................................................................5

        C.      Plaintiffs Failed to Plead Indirect Evidence of a Horizontal Conspiracy. ..............7

                1.      Plaintiffs Did Not Validly Allege that the Publisher Defendants
                        Acted Against their Individual Self-Interest. ................................................7

                2.      Plaintiffs Did Not Validly Allege that Defendants had a Common
                        Motive to Collude. .......................................................................................9

                3.      Prior Collusive Conduct and Alleged Governmental Investigations
                        do not Make the Alleged Conspiracy Plausible.........................................10

                4.      Plaintiffs Have Not Validly Alleged Market Concentration, but
                        even if They Had, it Would Not Support a Plausible Inference of
                        Conspiracy. ................................................................................................12

                5.      Alleged Price Increases Do Not Support an Inference of
                        Conspiracy. ................................................................................................14

                6.      Alleged Notice Provisions Do Not Support an Inference of
                        Conspiracy. ................................................................................................15

                7.      Sequential Contracts Do Not Plausibly Suggest a Conspiracy.................16

                8.      Plaintiffs Do Not Allege Facts Plausibly Supporting an
                        Opportunity to Collude Under the Watchful Eye of Regulators................17

II.     PLAINTIFFS FAIL TO ALLEGE VERTICAL AGREEMENTS IN RESTRAINT
        OF TRADE UNDER THE RULE OF REASON.............................................................18

III.    PLAINTIFFS' NEW MONOPOLIZATION ARGUMENTS ARE MERITLESS. ..........21

IV.     PLAINTIFFS FAIL TO ALLEGE THE INTENT REQUIREMENTS OF A
CONSPIRACY TO MONOPOLIZE. ................................................................................23

V.     INDIRECT PURCHASER PLAINTIFFS LACK STANDING TO SUE
AMAZON. .......................................................................................................................24

CONCLUSION ............................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Apex Oil Co. v. DiMauro,*
   822 F.2d 246 (2d Cir. 1987)................................................................................23

*Apple, Inc. v. Pepper,*
   139 S.Ct. 1514 (2019)..............................................................................23, 25

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..............................................................................................15

*B.C.B.S. United of Wis. v. Marshfield Clinic,*
   65 F.3d 1406 (7th Cir. 1995) ...............................................................................9

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)......................................................................................7, 13, 14

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,*
   985 F. Supp. 2d 612 (S.D.N.Y. 2013)..............................................................19, 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)..............................................................................................14

*Chen v. New Trend Apparel, Inc.,*
   8 F. Supp. 3d 406 (S.D.N.Y. 2014)......................................................................3

*Dickson v. Microsoft Corp.,*
   309 F.3d 193 (4th Cir. 2002) ......................................................................6, 18, 25

*Fortner Enterprises v. U.S. Steel Corp.,*
   394 U.S. 495 (1969)..............................................................................................20

*H.L. Hayden Co. of NY, Inc. v. Siemens Med. Sys., Inc.,*
   672 F. Supp. 724 (S.D.N.Y. 1987)......................................................................23

*In re ATM Fee Antitrust Litig.,*
   686 F.3d 741 (9th Cir. 2012) ...............................................................................25

*In re Elevator Antitrust Litig.,*
   502 F.3d 47 (2d Cir. 2007)..............................................................................8, 9

*In re Flat Glass Antitrust Litig.,*
   385 F.3d 350 (3d Cir. 2004)................................................................................14

*In re Foreign Exch. Benchmark Rate Antitrust Litig.*,
   No. 13-cv-7789-LGS, 2022 WL 294118, *12 (S.D.N.Y. Feb. 1 2022)....................................24

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ........................................................................8, 9, 15

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016)........................................................................5

*Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*,
   812 F.2d 786 (2d Cir. 1987)........................................................................23

*Laumann v. NHL*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012)...................................................................6, 25

*Litovich v. Bank of Am. Corp.*,
   568 F. Supp. 3d 398 (S.D.N.Y. 2021)........................................................................14

*Mayor and City Council of Baltimore, MD v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...............................................................6, 7, 8, 13, 16

*Ocean State Phys. Health Plan, Inc. v. B.C.B.S. of R.I.*,
   883 F.2d 1101 (1st Cir. 1989)........................................................................9

*Ravi v. Citigroup Glob. Mkts. Holdings, Inc.*,
   No. 1:21-cv-02223-GHW, 2022 WL 92775 (S.D.N.Y. Jan. 10, 2022) .......................2, 10, 12

*Sitts v. Dairy Farmers of Am., Inc.*,
   417 F. Supp. 3d 433 (D. Vt. 2019)........................................................................20

*Starr v. Sony BMG Music, Entertainment*,
   592 F.3d 314 (2d Cir. 2010)...............................................................7, 13, 14, 16

*Toys "R" Us v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ........................................................................22

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   676 F.2d 1291 (9th Cir. 1982) ........................................................................20

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015)................................................................. *passim*

iv

*United States v. Apple, Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013).........................................................................3, 4, 16, 17

*United States v. Gladden*,
  394 F. Supp. 3d 465 (S.D.N.Y. 2019).........................................................................3, 20, 21, 22

## STATUTES

Fed. R. Civ. P. 15(a)(2)...........................................................................................................25

15 U.S.C. § 1...........................................................................................................................19

28 U.S.C. § 636(b)(1) ..........................................................................................................2, 3

## INTRODUCTION

Plaintiffs' Objection ("Obj."), ECF 166, to Magistrate Judge Figueredo's Report & Recommendation ("R&R"), ECF 161, is meritless and should be overruled.

Plaintiffs' lead argument—waived since it is newly raised in this Court—is that the alleged conspiracy started more than a dozen years ago in the *Apple* case and is still ongoing, such that all Plaintiffs need to do to plausibly allege the existence of an agreement in restraint of trade is to "*swap out* 'Apple' for 'Amazon' in" the Court's findings from that case.  Obj., at 15; *see also id.* at 3-4 (repeatedly inserting "[Amazon]" into case quotations discussing Apple's former conduct); *id.* at 7-8 (arguing, for the first time, that the *Apple* conspiracy is ongoing).[1]  But Amazon is not Apple, this is not the *Apple* case, and Rule 8 demands more than parroting the findings made in a different case involving different parties engaged in different alleged conduct.  Indeed, the absurdity of Plaintiffs' argument is illustrated by the fact that in *Apple*, Amazon was the *target* of the alleged conspiracy.[2]

Plaintiffs' remaining arguments are largely based on mischaracterizing or ignoring Magistrate Judge Figueredo's actual reasoning, relevant caselaw, and the allegations of the Consolidated Amended Complaint ("CAC"), ECF 67.  For example, Plaintiffs introduce their Objection by falsely asserting that their claims arise from most-favored-nations ("MFN") clauses allegedly existing in distribution agreements that Amazon and the Publisher Defendants negotiated in 2015.  Obj., 1 & n.1.  But Plaintiffs conceded in their brief before the Magistrate Judge (and in the CAC) that MFNs were not included in those agreements, and that what Plaintiffs are actually complaining about are mere "notification provisions" that they contend allowed Amazon to make

---

[1]    In this Response, all emphases are added unless otherwise indicated.

[2]    *See United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) (*Apple II*) ("Apple . . . organiz[ed] a cartel of Publisher Defendants to move against Amazon").

"requests" for lower prices.  ECF 123, at 12-13, 19; CAC ¶¶ 78-79.  Plaintiffs briefly acknowledge that when they use the term "MFN" what they really mean is "notice provision," Obj., 17, but they nevertheless default to using the misleading term "MFN" nearly two dozen times.  Plaintiffs' refusal to accurately describe their own claims speaks volumes about their lack of merit.

Plaintiffs also ignore the substantive reasons for Magistrate Judge Figueredo's rejection of their monopolization allegations, and falsely suggest that the Second Circuit already decided "[a]s a matter of law" that Amazon is a monopolist.  Obj., 24.  In fact, Plaintiffs are quoting from the arguments of the *dissent* in the *Apple* case, *id.* (quoting *Apple II*, 791 F.3d at 342 (Jacobs, J., dissenting)), and they provide no support for the fallacious claim that if "the *Defendant Publishers sell* 80% of trade eBooks on the Amazon platform," Obj., at 24 n.16, that somehow makes *Amazon* a monopolist in the alleged market for the "retail sale of trade eBooks in the United States."  CAC ¶ 113.  As the Magistrate Judge concluded, a monopolization claim cannot be based on attributing "the *same* percentage of eBooks sales in the *same* relevant market" to both Amazon and the Publisher Defendants.  R&R, at 52 (emphasis in original).  The CAC consistently alleges that the Publisher Defendants are responsible for selling the majority of trade eBooks sold at retail, *see, e.g.,* CAC ¶¶ 2, 47, 149, making it impossible that Amazon monopolized that same market.

For these and other reasons, as discussed more fully herein, Plaintiffs' Objection should be rejected, and the R&R, should be adopted in its entirety.

## LEGAL STANDARD

"A district court reviewing a magistrate judge's report and recommendation 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.'"  *Ravi v. Citigroup Glob. Mkts. Holdings, Inc.*, No. 1:21-cv-02223-GHW, 2022 WL 92775, *1 (S.D.N.Y. Jan. 10, 2022) (quoting 28 U.S.C. § 636(b)(1)).  "When a party timely objects to a magistrate's report and recommendation, a district court reviews *de novo* 'those portions of the

report or specified proposed findings or recommendations to which objection is made.'" *Id*. "But where 'the party makes only frivolous, conclusory or general objections, or simply reiterates her original arguments, the Court reviews the report and recommendation only for clear error.'" *Id.* (quoting *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 416 (S.D.N.Y. 2014)).   New arguments that were not first presented to the Magistrate Judge are forfeited in an objection.   *See United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019).

## ARGUMENT

## I.   PLAINTIFFS FAILED TO PLEAD A HORIZONTAL CONSPIRACY.

### A.   The *Apple* Conspiracy Does Not Satisfy Plaintiffs' Burden.

Plaintiffs' first contention is that the Magistrate Judge erred by not concluding that Judge Cote's factual findings in the *Apple* case independently suffice to "plead a violation of Section 1 of the Sherman Act" because the "Publisher Defendants never disavowed or abandoned" that earlier conspiracy.   Obj., 6-7 (citing *United States v. Apple, Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013) (*Apple I*)).   The Court need not entertain that implausible argument; Plaintiffs forfeited it by failing to present it to the Magistrate Judge.   *See Gladden*, 394 F. Supp. 3d at 480 ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." (quotations omitted)).[3]

On the merits, Plaintiffs' new argument should be rejected out of hand.   The CAC does not allege that Plaintiffs are victims of a continuing conspiracy that has existed since 2010.   To the

---

[3]      In their 47-page Consolidated Opposition to Defendants' Motions to Dismiss, ECF 123, Plaintiffs never argued that the conspiracy they were attempting to allege was a continuation of the same conspiracy from *Apple* that had resulted in judicial consent decrees entered against the Publisher Defendants, an injunction against Apple, and civil settlements with a class of consumer plaintiffs.   To the contrary, their brief expressly drew a distinction between an agreement that the Publisher Defendants reached "*previously* . . . with Apple," and new agreements that they were attempting to allege had been formed with Amazon.   ECF 123, at 1, 23-24.   Likewise, Plaintiffs made no such contention during the hearing conducted by the Magistrate Judge.   *See* ECF 159.

contrary, it extolls civil settlements, consent decrees, and an injunction that collectively required the Publisher Defendants by 2013 "to terminate their contract with Apple and any other eBook retailer that restricted the retailers' ability to discount eBooks." CAC ¶ 57. While Plaintiffs now reverse their position and decry the consent decrees as containing inadequate "temporary restrictions," Obj., at 7, they were calibrated by the Department of Justice (and upheld by the Second Circuit) as measures "'sufficient' to restore competition." *Apple II*, 791 F.3d at 312. Those measures ended the conspiracy at issue in *Apple*.

Plaintiffs' argument also fundamentally ignores the origins and goals of the *Apple* conspiracy. As Judge Cote found, Amazon introduced "the first e-reader to gain widespread commercial acceptance," and "quickly became the market leader in the sale of e-books and e-book readers." *Apple I*, 952 F. Supp. 2d at 648-49. By 2010, "[t]he Publishers . . . feared Amazon's growing power in the book distribution business" and "determined that they needed to force Amazon to abandon its discount pricing model." *Id.* at 649-50. Apple played into those fears and presented itself as a potential solution to the Publishers' "Amazon problem." *Id.* at 661 n.19. During a series of meetings with publishers, "Apple conveyed . . . that it hoped to be able to begin selling e-books through an e-bookstore within the next 90 days as a feature on a new web-enabled machine,"—the iPad—but also said that it would only do so "if it got all of the major Publishers to sign on" to a business model that would be profitable for Apple. *Id* at 656. Ultimately, Apple convinced the publishers to agree to its "proposal that the entire e-book industry be converted to an agency model—with higher prices for e-books, a 30% commission for Apple and no retail price competition." *Id.* at 661. After five of the six largest publishers signed agreements with Apple, "the coordinated pressure on Amazon began at once." *Id.* at 678.

4

It makes absolutely no sense to suggest, as Plaintiffs now do, that the above-described conspiracy "set the stage for" the Publisher Defendants to collude *with* Amazon to monopolize a market *against* Apple and other competing eBook retailers.   Obj., 7.   Just as any antitrust conspiracy represents a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Apple II*, 791 F.3d at 315, Judge Cote found that Apple and certain publishers consciously committed to a scheme to fix prices as part of helping Apple successfully launch its new iBookstore and iPad as alternatives to Amazon's Kindle Store and Kindle E-Reader.   To the extent that Plaintiffs are attempting to allege the current group of Publisher Defendants subsequently reached an agreement to help Amazon at the expense of Apple and other eBook retailers, *see, e.g.,* CAC ¶ 161, that would quite plainly be a *different* common scheme with a *different* objective.   None of Judge Cote's findings from the *Apple* case plausibly support the conclusion that the Publisher Defendants made any such commitment.   If anything, they provide ample reason to reject that conclusion as inherently implausible.

### B.   Plaintiffs Do Not Allege "Direct Evidence" of a Hub-and-Spoke Conspiracy.

Plaintiffs next argue that the Magistrate Judge erred by concluding that Plaintiffs failed to allege "direct evidence" of a hub and spoke conspiracy.   Obj., 8-12.   Plaintiffs' arguments fail.

First, Plaintiffs suggest that the Magistrate Judge erred by relying upon Judge Forrest's "decision in [*In re Zinc Antitrust Litigation*] for the applicable standard" requiring a "'horizontal agreement among the various spokes with each other.'"   Obj., 8 (quoting *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016)).   But that standard is the same one established by the Second Circuit in *Apple II.   See* R&R, at 19 (citing both *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 376, and *Apple II*, 791 F.3d at 314).   As the Second Circuit explained, "the 'hub-and-spoke' metaphor is somewhat inaccurate—the plaintiff must also prove the existence of a 'rim' to the wheel in the form of an *agreement among the horizontal competitors*."   *Apple II*, 791 F.3d at 314

n.15 (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002)).  Plaintiffs'
argument that they need not allege facts supporting the existence of a horizontal agreement among
the Publisher Defendants, Obj., 9, is contrary to the established law in the Second Circuit.[4]

Second, Plaintiffs argue that the Magistrate Judge erroneously "assumed contrary to
Plaintiffs' well-pled allegations that the [publishing] industry had irretrievably ended the
wholesale model . . . *contra* CAC ¶¶ 66-72, 80, 82, 106." Obj., 9.  But none of the cited paragraphs
remotely contradicts any statement in the R&R; each merely describes the type of contract that
Amazon and individual publishers ultimately agreed to following protracted negotiations.[5]  More
importantly, the Magistrate Judge's conclusion that by "2014 or 2015, the industry had already
made the switch to agency pricing," R&R, at 33, is well-supported by Plaintiffs' allegations, *see,
e.g.,* CAC ¶ 53 (alleging that both Google and Barnes & Noble also sold eBooks under an agency
model); *id.* ¶ 69 (describing "Apple as the *only retailer* which [was] allowed unlimited
discounting" as of 2015).  Indeed, Plaintiffs conceded during argument that they were "*assuming
for the purpose of this motion that the defendants are correct*, that they still had an agency
arrangement with Amazon and potentially with other retailers" in the period immediately
preceding the at-issue agreements.  ECF 159 at 64:8-15.  It was not error for the Magistrate Judge
to make a finding that is both supported by the CAC, and consistent with what Plaintiffs said they
assumed to be true for purposes of the motion.[6]

---

[4]      Plaintiffs' related citation to *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012), Obj., 9, is not
inconsistent, but even if it were, it would be superseded by the Second Circuit's later decision in *Apple II*.

[5]      Paragraph 66 merely alleges that by July 2014, Amazon had "changed its tune" on whether to support or
oppose the agency model of distribution, while paragraphs 67 through 72 purport to describe negotiations occurring
over the course of nine months that ultimately resulted in an agency agreement.  See CAC ¶¶ 62-72.  None of those
paragraphs alleges anything at all about the distribution models that were in place at the time those contracts were
negotiated.  Likewise, paragraphs 80, 82, and 106 of the CAC allege wholly unrelated points.

[6]      A third argument—that Publishers acted inconsistent with their unilateral self-interest, Obj., 10—does not
relate to "direct" evidence at all.  *See Mayor and City Council of Baltimore, MD v. Citigroup, Inc*., 709 F.3d 129,
136 (2d Cir. 2013).  Because Plaintiffs repeat that argument in section II.C.1, it is addressed below.  *Infra* at 8-9.

For all of these reasons, Plaintiffs' argument that they validly alleged "direct evidence" of a hub-and-spoke conspiracy, Obj., 8-12, must be rejected.

### C.  Plaintiffs Failed to Plead Indirect Evidence of a Horizontal Conspiracy.

Plaintiffs' third argument in support of their Section 1 claim is that they "adequately allege[d] circumstantial evidence of a horizontal conspiracy" based upon certain purported "plus factors." Obj., 12. That argument is meritless. The Magistrate Judge correctly concluded that Plaintiffs' asserted "plus factors"—whether considered individually or collectively—fail to suggest the existence of a conspiracy. R&R, at 42.

Before addressing the individual alleged "plus factors," Plaintiffs incorrectly argue that the R&R, "acknowledge[ed] that Plaintiffs adequately plead[ed] [six] plus factors" and that under *Starr v. Sony BMG Music, Entertainment*, 592 F.3d 314 (2d Cir. 2010), "it is legal error to conclude that adequately pleaded plus factors are inadequate circumstantial evidence" of a conspiracy. Obj., 13. That is neither what the Magistrate Judge concluded, nor is it the law. To the contrary, as discussed more fully below, the Magistrate Judge correctly determined that most of Plaintiffs' attempts to plead plus factors were facially inadequate. R&R, at 22-43. Moreover, as the Second Circuit explained in *Mayor and City Council of Baltimore*, "even if a plaintiff alleges . . . 'plus factors'—these facts must still lead to an inference of conspiracy." 709 F.3d at 137; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a "formulaic recitation of a cause of action's elements" do not state a claim). Plaintiffs' allegations do not support a plausible inference of conspiracy.

### 1.  Plaintiffs Did Not Validly Allege that the Publisher Defendants Acted Against their Individual Self-Interest.

Plaintiffs' first asserted plus factor is that "[i]t was against the unilateral competitive self-interest of each Publisher Defendant to restrain its ability to compete and further entrench

Amazon's dominance."  Obj., 14.  Plaintiffs' allegations fail to establish that plus factor.  The Publisher Defendants' entry into agency pricing agreements giving them control over the retail prices of their own eBooks, was conduct wholly consistent with their alleged unilateral interests.  *See* CAC ¶¶ 51, 157; R&R, at 29-31.  There is nothing about the agency distribution model that required any of the Publisher Defendants to exercise their pricing authority in a manner that was unwise, anticompetitive, or contrary to their individual self-interests.  They allegedly regarded retailers' (and, in particular, Amazon's) discounting of eBooks to be an existential threat to their industry, *id.* ¶ 157, and it is accordingly fully rational behavior for them each to have negotiated towards agency pricing agreements that gave them control over retail discounting.[7]  Nothing about that behavior is suggestive of a conspiracy, as each Publisher Defendant individually holds that same interest.  *See Mayor and City Council of Baltimore*, 709 F.3d at 137; *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).

Importantly, an inference of conspiracy does not arise whenever some action could be profitably taken as a group.  Rather, the inference arises from conduct that is "contrary to the [conspirators'] individual self-interest but consistent with their collective interest."  *Apple II*, 791 F.3d at 318.  Here, the adoption of an agency distribution model is so fundamentally self-interested on the part of each Publisher Defendant that the existence of a series of such agreements does not suggest coordinated action.  *Id.*[8]

Likewise, nothing about individual Publisher Defendants' alleged decisions to grant concessions to Amazon in connection with entering into those agency pricing agreements, Obj.,

---

[7]     As alleged in the CAC, Amazon did negotiate for the ability to further discount eBooks under defined circumstances using a discount pool.  *See* CAC ¶ 83.

[8]     *See also Elevator Antitrust Litig.*, 502 F.3d at 51 ("Similar contract terms can reflect similar bargaining power and commercial goals"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (finding no basis to infer conspiracy where parallel business decisions were 'self-interested'").

10, 14, plausibly suggests a conspiracy.[9]   Even if those concessions "further entrench[ed] Amazon's dominance," *id.*,—something that is far from established by the CAC's allegation that Publishers were required to "notify Amazon if their agency price on Amazon was higher than the retail price charged via any competing eBook retailer," CAC ¶ 79—there is no plausible explanation for why the Publisher Defendants would have viewed that "dominance" as a desirable outcome to pursue collectively.   "That the Publishers all acted similarly . . . in 'response to [] market pressure is [a] hallmark of independent parallel conduct—not collusion.'"   R&R, at 31 (quoting *Musical Instruments*, 798 F.3d at 1196; citing *Elevator Antitrust Litig.*, 502 F.3d at 51).

## 2.   Plaintiffs Did Not Validly Allege that Defendants had a Common Motive to Collude.

Plaintiffs baselessly argue that "[t]he Magistrate Judge acknowledged that Publisher Defendants had" a common motive to collude "and thus erred in finding that this factor favored Defendants." Obj., 14. To the contrary, on the page cited by Plaintiffs (which nominally addresses a different alleged plus factor), the Magistrate Judge concluded that collusion was *not necessary* because the "Publishers could 'achieve their goal of controlling trade eBook prices *by acting alone*.'"[10]   *Compare* R&R, at 29, *with* Obj., 14.   Likewise, in the section of the R&R, which expressly addresses the existence of an alleged motive to collude, the Magistrate Judge appropriately found that "the allegations in the CAC demonstrate that Defendants could have fulfilled [their alleged] motives through consciously parallel behavior without prior agreement."

---

[9]        As discussed above, *supra* at 1-2, those alleged terms were not price MFNs and they accordingly did not mandate that the Publisher Defendants set the same eBook price in Amazon's store as they or others charged in competing eBook retail outlets. *Cf.* Obj., 10.  However, even if those clauses had been price MFNs, that would not have made them illegal.  R&R, at 5-6; *see Apple II*, 791 F.3d at 319-20 (MFNs are generally "lawful contract terms" but had been misused in service of a conspiracy); *B.C.B.S. United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.) ("'Most favored nations' clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers."); *Ocean State Phys. Health Plan, Inc. v. B.C.B.S. of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) (similar).

[10]       Plaintiffs misleadingly omitted the phrase "by acting alone" from their quotation of the R&R, completely changing its meaning to support their argument.

R&R, at 31.  That conclusion is eminently correct.  Any publisher that wanted to "control" the retail price of its own eBooks, Obj., 14, would achieve that goal upon signing its own bilateral agency pricing agreement whether or not any other publisher did the same.  That publishers would take that step individually is supported by the CAC's clear allegation that the first publishers to agree to terms with Amazon allegedly did so as much as eight months before other publishers. *Compare* CAC ¶¶ 67-68 (alleging that Simon & Schuster ("S&S") and Hachette signed agreements with Amazon in October and November 2014, respectively), *with id.* ¶¶ 70-71 (alleging that HarperCollins and Penguin Random House ("PRH") signed agreements in April and June 2015, respectively).

The Magistrate Judge also correctly rejected Plaintiffs' argument that they had alleged facts from which it could plausibly be concluded that "the Publishers would have been motivated to participate in a conspiracy that further entrenched Amazon's dominance as an eBook retailer." R&R, at 32.  As the Court noted, it was "Amazon's 'growing power in the trade book industry' that had previously motivated the Publishers to collude with Apple," *id.* (quoting CAC ¶ 42), and "[t]he CAC alleges no facts from which one could plausibly infer that the Publishers would benefit from immunizing Amazon from competition," *id.* at 33.  Plaintiffs' short shrift argument, which does little more than falsely claim the Magistrate Judge decided this issue in their favor, Obj., 14, gives no basis for overturning those conclusions as erroneous, let alone clearly erroneous.  *See Ravi*, 2022 WL 92775 at *1 ("conclusory" objections are reviewed "only for clear error").

### 3. Prior Collusive Conduct and Alleged Governmental Investigations do not Make the Alleged Conspiracy Plausible.

Contrary to Plaintiffs' assertions, the Magistrate Judge did not "disregard[] the Publisher Defendants' participation in the *Apple* conspiracy . . . on the ground that it was 'illegal behavior elsewhere in time or place.'" Obj., 14 (quoting R&R, at 33).  Plaintiffs are presenting a misleading

10

quotation taken out of context.  The Magistrate Judge's reference to "illegal behavior elsewhere in time or place" is merely a quotation from the Areeda & Hovenkamp treatise, which the Magistrate Judge included in the R&R, as a "see also" citation in a brief paragraph explaining how this asserted plus factor "[g]enerally" is applied.  R&R, at 33.  However, the Court's rejection of Plaintiffs' argument was not based solely or even primarily upon those generally stated principles, but rather, upon a specific and detailed analysis of the allegations in *Apple* and their probity of the very different conspiracy alleged in this case.  *Id.* at 33-34.

As the Magistrate Judge concluded, "even if a prior conspiracy were probative of a present conspiracy," the "unique circumstances surrounding the *Apple* conspiracy" does not "plausibly suggest a conspiracy among the Publishers again here."  R&R, at 33.  That conclusion is entirely correct.  As discussed above, the catalyst for the *Apple* conspiracy was Apple's weighing of a decision whether to commence selling eBooks, something it told the major publishers it would only do if they all agreed to financial terms that included shifting the entire industry to agency pricing.  *Supra*, at 4-5.  Five of the six largest publishers at the time (all except for Random House), agreed to those terms, and swiftly adopted agency agreements not only with Apple, but also with Amazon, Google, and Barnes & Noble.  *See* CAC ¶¶ 46-47, 52, 53.  Eventually, Random House "followed suit and adopted an agency model," CAC ¶ 54 n.60, by which point the six largest publishers and at least four major retailers had all adopted the agency pricing model for eBooks. As the Magistrate Judge rightfully concluded, this "shift in pricing strategy that had motivated the Publishers to act collectively in *Apple*" had already been accomplished by the time the agreements at-issue were negotiated in 2014-15, and no longer could serve as a catalyst for collective action. R&R, at 33; *see also* ECF 159, at 64:8-15 (reflecting Plaintiffs' assumption that the shift to agency had already occurred).

If anything, the Magistrate Judge could have gone further and noted that a second objective of the conspiracy—persuading Apple to launch a competing eBook store—had also been accomplished, notwithstanding the injunction that blocked Apple from receiving the financial terms it originally insisted upon as a pre-condition to entry.  *See* CAC ¶¶ 55, 62.  For that reason as well, the "unique circumstances surrounding the *Apple* conspiracy," R&R, at 33, no longer existed to motivate collusion on the part of the Publisher Defendants.

Plaintiffs offer no meaningful rebuttal to these points.  Their facile suggestion that "[a]ll the Court need to do [sic] is swap out 'Apple' for 'Amazon' in the Report and Recommendation's recitation of the *Apple* case," Obj., 15, fails to grapple with the very specific objectives that each of the parties had in that case, or with the changed circumstances that existed by the time the agreements now at-issue were negotiated, R&R, at 33-34.  The conflicting business interests described in the *Apple* case and in the CAC are neither so fungible nor so malleable that the names of parties can simply be "swap[ped] out," Obj., at 15, to create a coherent motive to conspire.

Finally, Plaintiffs do not contest at all the Magistrate Judge's conclusion that "although Plaintiffs rely on the existence of government investigations into *Amazon's* conduct (CAC ¶¶ 88, 94) as a further plus factor, those investigations cannot raise a plausible inference that the *Publishers* colluded[.]" R&R, at 34 (emphasis in original).  Accordingly, that portion of the R&R, is to be reviewed only for clear error, of which there is none.  *See Ravi*, 2022 WL 92775 at *1.

### 4.     Plaintiffs Have Not Validly Alleged Market Concentration, but even if They Had, it Would Not Support a Plausible Inference of Conspiracy.

Plaintiffs interpret the R&R, as having "acknowledge[d]" both the existence of a concentrated eBooks market, "and that such market concentration is a plus factor."  Obj., 15. Taken as a whole, however, the R&R does not support the former interpretation, and the latter statement is an incomplete and inaccurate description of the Magistrate Judge's recommendation.

The Magistrate Judge considered Plaintiffs' factual allegations about market concentration, *see* R&R, at 34, but stopped short of making any findings in that regard because even if the market were found to be concentrated, "Plaintiffs have cited to no case where the existence of a concentrated market, by itself, was sufficient to infer parallel conduct resulting from a preexisting agreement." *Id.* at 35 (citing *Mayor & City Council of Baltimore*, 709 F.3d at 139).  Notably, in another part of the R&R, the Magistrate Judge correctly observed that "the CAC does not provide any allegations concerning the market share of each individual Publisher in the relevant market of trade eBooks," including because its allegations of their alleged 80% *collective* market share improperly "includes print books" contrary to the eBook trade market Plaintiffs have sought to define. *Id.* at 47 & n.12 (citing CAC ¶¶ 1, 115, 117, 166).  In the absence of any valid allegations of the Publisher Defendants' individual or collective shares of the alleged relevant market, the Magistrate Judge could not have found "market concentration" on the Publisher side of the alleged market for the retail sale of trade eBooks.[11]  Moreover, any alleged concentration on Amazon's side of a trade eBooks market would be irrelevant to Plaintiffs' arguments about this alleged plus factor since they were based on market concentration of the publishers.  *See* ECF 123 at 19 (arguing only that concentration "on the *seller side* is a condition propitious to collusion").

In any event, the Magistrate Judge correctly found that this factor, even if validly alleged, would do more to undermine an inference of conspiracy than to support it because firms in a concentrated market are more likely to engage in parallel behavior without prior agreement.  *See* R&R, at 35 (citing *Mayor & City Council of Baltimore*, 709 F.3d at 139); *see also Twombly*, 550

---

[11]     Plaintiffs' citation to *Starr*, Obj., 15-16, underscores the point.  Plaintiffs argue that they "have alleged" that the four largest eBook publishers necessarily hold "at least 64%" of the relevant market.  *Id.* at 16 & n.7. But not only is that alleged share significantly less than that held by the four leading firms in *Starr* (who collectively held 80% of the relevant market), *Starr*, 592 F.3d at 323, it is a share of the entire trade book market, a *different* market than trade eBook market alleged in the CAC.  *See* R&R at 47 n.12.

U.S. at 553-54 (lawful parallel action is "a common reaction of 'firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)); *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 432 (S.D.N.Y. 2021) (allegation of market concentration was not "suggestive of a conspiracy and therefore [did] not count as a plus factor; rather, it is suggestive of mere interdependent conduct").[12]

### 5.  Alleged Price Increases Do Not Support an Inference of Conspiracy.

Plaintiffs next argue that the Magistrate Judge erred by finding that their allegations of a "rise in eBook prices, without an attendant rise in costs" failed to support an inference of conspiracy. Obj., 16. But as the Magistrate Judge found, R&R, at 35, Plaintiffs' argument ignores their own allegations that the Publishers considered Amazon-set prices to be damaging to their *overall* business by reducing "more profitable" print book sales, and lowering long-term expectations about what a book should cost. *See* CAC ¶¶ 41-43, 51. Indeed, the CAC describes the "tremendous success of trade eBooks" as a reason that Publisher Defendants were "*anxious*." *Id.* ¶ 41.

Plaintiffs' related argument that price increases would not occur absent a price-fixing conspiracy, Obj., 16, fails for the same reasons as the previous alleged plus factor. Under the "theory of interdependence . . . firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004). In fact, it is common for firms that have the ability to observe the actions of their competitors to "'follow

---

[12]   Plaintiffs rely upon *Starr* to contend that market concentration is a plus factor. Obj., 15-16. But in *Starr*, a greater degree of market concentration was just one among several bases for the court's finding that the plaintiff had plausibly alleged a conspiracy, including that competitors jointly adopted inferior technology that "'nobody in their right mind' would want to use" absent a conspiracy. 592 F.3d at 324.  No comparable allegations exist in this case.

the leader' . . . without any prior agreement." *Musical Instruments*, 798 F.3d at 1195.  Here, the CAC alleges just such an opportunity.  According to Plaintiffs' allegations, the two publishers who allegedly raised their eBook prices by the largest amount, first did so *months* after the other publishers are alleged to have successfully raised their prices.  *See* CAC ¶ 99.  As the Magistrate Judge found, such conduct "creates an inference just as consistent with rational business behavior as it is with concerted action."  R&R, at 35 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009)).

### 6.    Alleged Notice Provisions Do Not Support an Inference of Conspiracy.

Plaintiffs make the unfounded argument that just because *they say* a contractual "notice provision" functions as the equivalent of an MFN, it was an act of concealment to include that provision in each Publisher Defendant's respective contracts with Amazon.  Obj., 17.  As alleged in the CAC, these provisions literally just "required [each Publisher] to *notify* Amazon if their agency price on Amazon was higher than the retail price charged via any competing eBook retailer."  CAC ¶ 79.  Plaintiffs do not coherently explain how such provisions "disguised" anything.  They created an obligation for one party to provide notice to the other in certain circumstances, and are thus accurately described as notice provisions.  How that could "disguise" some other promise that is nowhere to be found in the parties' agreements, Obj., 17, is a mystery.

The Magistrate Judge appears to have accepted for the sake of argument Plaintiffs' characterization of what these notice provisions functionally achieved, *see* R&R, at 35-36, but rightfully concluded that there could be no deception when the provision at issue "was in the agreement itself" notwithstanding Defendants' knowledge that their "agreements would be (and were in fact) reviewed by the Justice Department as part of the consent decrees."  *Id.* at 36.  Unlike the case to which Plaintiffs draw a tortured analogy, Obj., 17, "there was no side letter" creating rights or obligations inconsistent with the plain language of the agreement reviewed by regulators. The suggestion that Defendants somehow hid an "MFN" in plain sight by submitting their

contracts to regulators using language that accurately described one party's obligation to "notify" the other party in certain circumstances, *id.*, is frivolous.

### 7.    Sequential Contracts Do Not Plausibly Suggest a Conspiracy.

Plaintiffs wrongfully characterize the Magistrate Judge's discussion of the timeline under which the agency distribution agreements were negotiated as a "digression from her analysis of *Starr* plus factors." Obj., 17.  To the contrary, that analysis was necessary and appropriate to determine whether any of the alleged plus factors was suggestive of a conspiracy under all of the circumstances of this case.  *See Mayor & City Council of Baltimore*, 709 F.3d at 137 ("even if a plaintiff alleges . . . 'plus factors'—these facts must still lead to an inference of conspiracy").

As the Magistrate Judge found, any inference of conspiracy in this case is weakened considerably by a negotiation timeline that started in July 2014, produced the first challenged agreement that October, and the last agreement in June 2015—nearly a year after Amazon's negotiations started.  *See* R&R, at 37; CAC ¶¶ 66-71.  Plaintiffs argued in their brief below that the Publisher Defendants "had to act collectively to achieve their goals and could not afford to act alone," ECF 123 at 15, but that conclusory statement cannot be reconciled with the reality that even after S&S signed its agency agreement with Amazon, CAC ¶ 67, four others had not, and some of their ongoing negotiations with Amazon were so contentious that they are described as a "war" in materials cited in the CAC, *id.* ¶ 68 n.92.  As the Magistrate Judge found, that protracted timeline supports only the inference that the "Publishers . . . decided to go it alone in reaching agency agreements with Amazon."  R&R, at 39-40.

Indeed, the timeline in this case stands in marked contrast to the timeline for negotiations that occurred in the case Plaintiffs strive so hard to analogize this one to:  *Apple*.  In that case, Apple negotiated concurrently with all of the publishers, making clear that an industry-wide agreement was critical to its willingness to open an eBook store at all.  *Apple I*, 952 F. Supp. 2d at

656.  By January 16, 2010, four of the six biggest publishers had notified Apple of their willingness to enter into agency distribution agreements under terms that had largely been agreed to.  *Id.* at 668.  "In separate conversations on January 20 and over the next few days, the Publisher Defendants *all* told Amazon that they wanted to change to an agency distribution model with Amazon."  *Id.* at 672.  Although Amazon attempted to resist those changes, it quickly realized that it was facing a united front and "announced on its website on Sunday, January 31, that it would 'capitulate and accept' Macmillan's agency terms."  *Id.* at 680-81.  Agency agreements with other publishers followed soon thereafter.  *Id.* at 682.

The inference of conspiracy that Judge Cote and the Second Circuit found to be evidenced by those facts, stemmed largely from the recognition that each publisher would lose money under its contracts with Apple until Amazon had been shifted onto an agency model, and their swift, uniform pursuit of that goal was therefore consistent with a prior agreement to make that change collectively.  *Apple II*, 791 F.3d at 316-17.  The nearly simultaneous timing of such a drastic change in business practices by so many publishers is far more suggestive of a conspiracy than a series of protracted negotiations playing out over the course of a year, and illustrates why the same inferences cannot be made in this case.

### 8.    Plaintiffs Do Not Allege Facts Plausibly Supporting an Opportunity to Collude Under the Watchful Eye of Regulators.

Plaintiffs complete their plus factors analysis with a section that is most notable for what it does not contain:  a single citation to any alleged facts in the CAC.  Obj., 18.  The Magistrate Judge acknowledged Plaintiffs' conclusory allegation that "Defendants had opportunities to collude."  R&R, at 41 (quoting CAC ¶ 159).  But she also correctly observed that the CAC "provides no factual support to underlie that conclusion," *id.*, and that it is undermined by remedial measures that, among other things, required the Publisher Defendants "to submit [to DOJ]

quarterly logs" of their communications with other publishers, *id.* at 40, as well as advanced drafts of any distribution agreements they intended to enter into, *id.* at 41.

In response, Plaintiffs make no attempt at identifying well-pleaded allegations in the CAC substantiating that the Publisher Defendants had an opportunity to collude under those circumstances.  Instead, they devote most of their briefing to unsupported rhetoric about why "[g]overnment oversight" should not be seen as determinative, Obj., 18, without identifying any facts that could carry their burden of proving this alleged plus factor.

For all of those reasons, Plaintiffs' CAC fails to allege a plausible horizontal price-fixing conspiracy, and the Magistrate Judge's recommendation to dismiss that claim should be adopted.

## II.  PLAINTIFFS FAIL TO ALLEGE VERTICAL AGREEMENTS IN RESTRAINT OF TRADE UNDER THE RULE OF REASON.

Plaintiffs argue that even if this Court agrees that they failed to plead the existence of a horizontal agreement among the Publisher Defendants, their Sherman Act Section 1 claim may nevertheless proceed by "[a]ggregating" the market effects of each individual distribution agreement to assess whether, collectively, they restrain trade.  Obj., 21-23.  That is not the law. As the Fourth Circuit explained in *Dickson*—in a holding that the Second Circuit has since cited with approval—the obligation to evaluate the competitive impact of individual agreements on their own is a necessary corollary to the rule that proof of a "hub-and-spoke" conspiracy requires an agreement among the horizontal competitors making up the spokes.  *Dickson*, 309 F.3d at 211. "[T]o hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference."  *Id.*; *see also Apple II*, 791 F.3d at 314 n.15 (citing *Dickson* as establishing that "the plaintiff must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors").

Plaintiffs' aggregation argument also fundamentally ignores the nature of the prohibition contained in Section 1 of the Sherman Act.  That statute prohibits only "contract[s], combination[s] . . . , or conspirac[ies] in restraint of trade."  15 U.S.C. § 1.  The reason that a series of vertical agreements, each individually lawful, may nevertheless sometimes be condemned as unlawful under the "hub-and-spoke" doctrine, is that the horizontal agreement connecting each of the spokes is *itself* an agreement in restraint of trade in violation of Section 1.  *See, e.g.*, *Apple II*, 791 F.3d at 319-20 (explaining that "vertical agreements, lawful in the abstract, can in context be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel") (quotation omitted); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013) (discussing Section 1's prohibitions).  By removing any need to show that there was a further agreement in restraint of trade, Plaintiffs' argument would simply condemn agreements that are "lawful in the abstract" without more.

Plaintiffs' implicit suggestion that aggregation is somehow more proper "against Amazon" than against the Publisher Defendants, Obj., 21-23, is particularly meritless on the facts alleged in this case.  At bottom, the alleged anti-competitive conduct Plaintiffs are seeking to aggregate is that Amazon agreed with five separate publishers that they may each determine the retail prices of their own eBooks sold in Amazon's store.  CAC ¶¶ 66-71.  If each such agreement would be lawful from the perspective of the individual publisher who thereby wields control over prices in a small portion of the alleged eBook market, on what basis could they be deemed illegal as to Amazon, who wields no control over the prices of those same eBooks?

The cases cited by Plaintiffs, Obj., 22 n.12, do not support any such aggregated claim.  As the Magistrate Judge noted, "[a]ll of the cases cited by Plaintiffs are inapposite" because they involve vastly different alleged wrongdoing assessed under different legal frameworks, such as

exclusive dealing arrangements, group boycotts, or monopolization claims.  R&R, at 47 n.11.
Such cases are inapposite because "[t]he vertical agreements here . . . do not limit any Publisher's
ability to sell its eBooks through retailers other than Amazon."  *Id.*[13]

Finally, Plaintiffs offer no effective rebuttal to two other conclusions reached by the
Magistrate Judge, both of which are fatal to its claims.  First, while Plaintiffs assert that they have
adequately alleged adverse effects through increases in eBook prices, Obj., 20, they fail to address
the Magistrate Judge's response that the allegations of the CAC only speak to whether individual
publishers made changes to "the price of [their] own eBooks," which does not show the requisite
"market-wide price increase" necessary for a rule of reason claim.  R&R, at 46.  Plaintiffs' silence
concedes the point.

Second, Plaintiffs do not contest the Magistrate Judge's conclusion that the CAC fails to
allege the individual shares held by any particular publisher in the alleged relevant market, and
consequently fails to show that any agreement considered individually affects enough commerce
to plausibly restrain trade.  R&R, at 48 (citing *Bookhouse*, 985 F. Supp. 2d at 622).  Instead,
Plaintiffs concentrate all of their arguments on the spurious claim that they may aggregate the
alleged effects of contracts without showing that they are joined by a common purpose, Obj., 21-
23, thereby effectively conceding their inability to challenge any one agreement on its own terms.

---

[13]         In addition to the cases cited by the Magistrate Judge, Plaintiffs cite new authority that the Magistrate Judge
had no opportunity to consider.  Obj., 21-22; *but see Gladden*, 394 F. Supp. 3d at 480 (newly-made arguments are
waived).  Plaintiffs' new cases are also inapposite.  *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d
1291 (9th Cir. 1982), Obj., 22, nn.11-12, was an exclusive dealing case, and is distinguishable on the same grounds
as other decisions discussed by the Magistrate Judge.  R&R, at 47 n.11.  Similarly, *Fortner Enterprises v. U.S. Steel
Corp.*, 394 U.S. 495 (1969), Obj., 21, did not involve the aggregation of multiple, independently lawful agreements.
Rather, it was a tying case involving a single illegal policy of tying offers of credit to development projects, and the
Court pointed to the total number of *transactions* (not contracts) to determine that the tie had a substantial effect on
interstate commerce.  394 U.S. at 501-02.  Finally, the plaintiffs in *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp.
3d 433 (D. Vt. 2019), Obj., 1-2, 22, alleged that a wide array of different conduct was undertaken in service of a *single*,
overarching conspiracy to monopsonize in violation of section two of the Sherman Act.  417 F. Supp. 3d at 470-71.

## III.   PLAINTIFFS' NEW MONOPOLIZATION ARGUMENTS ARE MERITLESS.

Plaintiffs monopolization arguments should not be considered because they were not made before the Magistrate Judge.  *Gladden*, 394 F. Supp. 3d at 480.  Should the Court address those arguments anyway, it should reject them.

In the briefing before the Magistrate Judge, Plaintiffs were strident that their allegation was that Amazon was a monopolist because it "'enjoys nearly 90%' of the *retail* eBook market."  ECF 123, at 42.  They rejected as "not pass[ing] the laugh test" Amazon's position that this 90% statistic was implausible as a matter of law, because it conflicted with Plaintiffs' other allegation that when it comes to eBooks sold under an agency relationship, the *publisher* (not Amazon) was the one responsible for setting the price and making the sale "directly" to consumers.  *Id.*; *cf.* ECF 99, at 18 (citing CAC ¶¶ 2, 47 & 148).  Now that the Magistrate Judge has identified the same inconsistency, R&R, at 51-52, Plaintiffs belatedly seek to change their tune.

Plaintiffs' new argument is that there is no inconsistency between the statements that the "Defendant Publishers sell 80% of trade eBooks" and "Amazon has a 90% market share," Obj., 24 n.16, because 90% of eBook retail sales occurred "*on the Amazon platform*" —without regard for whether Amazon or a Publisher Defendant was the seller.  *Id.* at 24 (emphasis in original).  But that sleight-of-hand cannot rescue Plaintiffs' monopolization claim because it ignores the distinction that the Magistrate Judge properly recognized:  Amazon cannot have monopoly power where it does not have the ability to control the prices for goods sold by others in its store.  R&R, 51-52.[14]  That conclusion logically follows because the market Plaintiffs allege to have been monopolized is one for the "retail sale of trade eBooks in the United States."  CAC ¶ 113.  The

---

[14]     Accordingly, the Magistrate Judge correctly concluded that a monopolization claim cannot be based on attributing "the same percentage of eBooks sales in the same relevant market" to both Amazon and the Publisher Defendants.  R&R, at 52 (emphasis in original).

antitrust injury that they claim comes "in the form of overcharges" on the "retail price of trade eBooks," *id.* ¶ 146, and the damages they seek to recover are based on that "overcharge." *Id.* ¶ 172. Had Plaintiffs argued below that their monopolization theory did not depend upon the volume of sales made *by* Amazon in its capacity as a retail seller of trade eBooks in the United States at prices *it* set, but was instead predicated upon Amazon's role as a sales agent of the Publishers, Obj., 24, Amazon could equally have responded that Plaintiffs' argument does not pass the laugh test. Among other fatal problems with Plaintiffs' new theory are the following:

- Plaintiffs, alleged consumers of eBooks, lack standing to allege that Amazon provided a monopolist's share of sales agent services to publishers. Plaintiffs do not, and could not, allege that they participate in any market for the consumption of sales agent services, nor that they have been overcharged for any such services;

- To the extent that Plaintiffs are alleging that Amazon has monopolized a market for the provision of sales agent services, that market is different from the one alleged in the CAC, ¶ 113, and Plaintiffs fail to identify the definition of that market, its size, the share that Amazon supposedly possesses, or the illegal mechanisms through which it obtained or maintained a monopolist's share of that market; and

- Plaintiffs have not alleged antitrust injury resulting from any purported monopolization of that alleged market, because the CAC contains no facts plausibly linking their alleged "overcharge" on the retail price of trade eBooks, to any act taken by Amazon in its capacity as a sales agent.

Plaintiffs' late change in theory deprived the Magistrate Judge of a fair opportunity to address their "sales agent" arguments, which should be rejected as a result. *Gladden*, 394 F. Supp. 3d at 480.

Plaintiffs also baselessly argue that "direct" proof of monopoly power exists from Amazon's ability to negotiate for the *notice* provisions that they euphemistically describe as "MFN provisions." Obj., 24-25. But the lone case Plaintiffs cite, *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), involved instead a *group boycott* in violation of Section 1 of the Sherman Act, *id.* at 933, and the Court expressly held that the boycotters did not need to show market power "as high as it would require in a case [for monopolization] under Sherman Act § 2," *id.* at 936. For that

reason, as well as those discussed above, *supra* § I.C.6., the existence of "notice provisions" in Defendants' distribution contracts is neither "direct" nor "indirect" proof of a monopoly.[15]

## IV.   PLAINTIFFS FAIL TO ALLEGE THE INTENT REQUIREMENTS OF A CONSPIRACY TO MONOPOLIZE.

Relying upon non-binding and out-of-circuit authority, Plaintiffs erroneously argue that "there is no requirement to allege [a horizontal agreement between the Publisher Defendants] for purposes of pleading a conspiracy-to-monopolize claim, and the Magistrate Judge erred in recommending one." Obj., 26 (citing R&R, at 48-49). Plaintiffs could not be more wrong. In the Second Circuit, there is a requirement to allege facts supporting the specific intent of all parties to an alleged agreement to monopolize, and the CAC completely fails to satisfy that essential element.

In the Second Circuit, a conspiracy-to-monopolize claim requires a well-pleaded allegation that there is "a plurality of actors *all* of whom share the intent to transform one of them into a monopolist. "[T]o establish a conspiracy to monopolize under section 2, . . . at a minimum . . . the circumstances must be such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987) (quotation and alterations omitted). "Plaintiff's theory fails because it does not reasonably establish that any individual defendant except [one] intended to create a monopoly; a plurality of actors sharing such an intent is required under section 2." *Id.* at 796; *see also Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (same); *H.L. Hayden Co. of NY, Inc. v. Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 734 (S.D.N.Y. 1987) (same). Plaintiffs' lone citation, Obj., 26-27

---

[15]     Plaintiffs' arguments based on *Apple, Inc. v. Pepper*, 139 S.Ct. 1514 (2019), *see* Obj., 25-26, merely restate their arguments before the Magistrate Judge and should be rejected for the reasons she articulated. *See* R&R, 52-53.

(citing *In re Foreign Exch. Benchmark Rate Antitrust Litig.*, No. 13-cv-7789-LGS, 2022 WL 294118, *12 (S.D.N.Y. Feb. 1, 2022)), does not involve an alleged conspiracy to monopolize.

Plaintiffs do not argue that they have met these specific intent requirements, and their argument that doing so is unnecessary, Obj., 26-27, effectively concedes their inability to allege facts from which it could plausibly be concluded that *all* of the alleged conspirators had a meeting of the minds to make Amazon a monopolist. For all of the reasons discussed above, the existence of such an intention is inherently implausible in the context of Publisher Defendants who are alleged to fear Amazon's low prices and purported influence over eBook sales, and nothing in the CAC plausibly explains why they would have desired to make Amazon a monopolist.

## V.    INDIRECT PURCHASER PLAINTIFFS LACK STANDING TO SUE AMAZON.

Finally, the Magistrate Judge properly recommended dismissal of that portion of Plaintiffs' claims which are based upon the sale of eBooks in other stores. Obj., 27; R&R, at 15-18.[16]

Should the Court address the issue of indirect purchaser standing, it should adopt the Magistrate Judge's recommendation and supportive reasoning. Plaintiffs make two arguments. First, they contend that all Plaintiffs allegedly are direct purchasers *from the Publisher Defendants*, and that if there is a co-conspirator exception to the *Illinois Brick* doctrine, then "every Plaintiff has standing to sue all members of the antitrust conspiracy for their overcharge damages[.]" Obj., 28. But that argument ignores that *with respect to Amazon*, those Plaintiffs have no relationship of any kind, much less a direct one, and the Magistrate Judge found no basis to infer the existence of any conspiracy among Amazon and the Publishers. R&R, at 17-18. Plaintiffs' response—that "Amazon entered into [separate] price-fixing agreements with each Publisher Defendant," Obj.,

---

[16]    The Court need not address this issue at all to the extent that it upholds the Magistrate Judge's other recommendations, all of which are dispositive of Plaintiffs' claims and applicable to all Plaintiffs.

30 n.24—finds no support in the CAC.  Agency agreements that permit publishers to set retail eBook prices unilaterally cannot remotely be characterized as a form of vertical "price-fixing."

Second, Plaintiffs argue that that the Magistrate Judge erred in failing to recognize the existence of a judicially-created co-conspirator exception to the *Illinois Brick* rule, notwithstanding that no such exception has been recognized by the Second Circuit.  Obj., 29-30; R&R, at 17-18.  But two other Circuits have issued opinions *rejecting* the existence of that exception outside the context of horizontal price-fixing agreements.  *See Dickson*, 309 F.3d at 215; *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 752 (9th Cir. 2012).  And the Supreme Court has since reiterated its preference for a "bright-line rule of *Illinois Brick*" and has discouraged courts from the "unwarranted . . . exercise to litigate a series of exceptions" to that rule.  *Pepper*, 139 S.Ct. at 1524 (quotation omitted).[17]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Objection should be overruled, and the Magistrate Judge's Report & Recommendation, ECF 161, adopted in full.  The CAC should be dismissed without further leave to amend.  *See* Indiv. R. Prac. (Civ.), R. 3(D); Fed. R. Civ. P. 15(a)(2).


Dated:  September 14, 2022                         Respectfully submitted,


                                                   /s/ John E. Schmidtlein

---

[17]     Plaintiffs correctly identify *Laumann v. NHL*, as non-binding adverse authority in this District, just as Amazon itself did before the Magistrate Judge.  Obj., 30 n.25; *see* ECF 99, at 23 n.10.  However, the other cases they cite, Obj., 30 n.25, did not recognize any co-conspirator exception to *Illinois Brick* and are therefore inapposite.

John E. Schmidtlein (*Pro Hac Vice*)
Jonathan B. Pitt (S.D.N.Y. Bar No. jp0621)
Carl R. Metz (*Pro Hac Vice*)

WILLIAMS & CONNOLLY LLP
680 Maine Street, S.W.
Washington, DC 20024
Tel.: (202) 434-5000
Fax: (202) 434-5029
JSchmidtlein@wc.com
JPitt@wc.com
CMetz@wc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing AMAZON.COM, INC.'S RESPONSE TO

PLAINTIFFS' OBJECTION TO MAGISTRATE JUDGE FIGUEREDO'S REPORT &

RECOMMENDATION has been filed and served upon counsel of record via ECF electronic

notification.


Dated:  September 14, 2022

Respectfully Submitted,

/s/ John E. Schmidtlein
John E. Schmidtlein (*Pro Hac Vice*)