**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AMAZON.COM, INC. EBOOK
ANTITRUST LITIGATION

Case Number: 1:21-cv-351-GHW-VF

**SECOND CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

<u>Page</u>

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION .................................................................................................. 11

III.   VENUE ............................................................................................................... 13

IV.   PARTIES ............................................................................................................ 13

    A.    Plaintiffs ................................................................................................. 13

        1.     Shannon Fremgen ..................................................................... 13

        2.     Mary Christopherson-Juve ....................................................... 14

        3.     Denise DeLeon .......................................................................... 15

        4.     Sandra Wilde ............................................................................. 16

        5.     Michael Wilder ......................................................................... 17

        6.     Jordan Sacks .............................................................................. 18

        7.     Mariacristina Bonilla ................................................................ 19

        8.     Ethan Silverman ........................................................................ 19

        9.     Jeffery Tomasulo ....................................................................... 20

        10.    Susan Cook and Jeffrey Cook ................................................... 20

        11.    Cecily Lerner ............................................................................ 21

        12.    Lawrence Twill .......................................................................... 22

        13.    Thomas Agostino ...................................................................... 22

        14.    Robert Etten .............................................................................. 23

        15.    Janet Ackerman ......................................................................... 24

    B.    Defendants ............................................................................................. 24

        1.     Amazon ..................................................................................... 24

2.      Hachette ................................................................. 25

3.      HarperCollins ......................................................... 25

4.      Macmillan .............................................................. 26

5.      Penguin .................................................................. 26

6.      Simon & Schuster .................................................. 26

V.   STATEMENT OF FACTS .................................................................. 27

A.   Amazon uses its market dominance to extract a supracompetitive
     transaction fee for each sale on its retail-transaction platform. .......................... 27

B.   Amazon uses its market dominance to shield itself from
     competition through agency agreements with the Big Five................................. 29

C.   Amazon's supracompetitive transaction fee and Parity Clauses
     cause supracompetitive consumer prices. ........................................... 45

D.   Amazon has responsibility for the supracompeititve eBook prices
     charged by the Big Five. ........................................................ 56

E.   The Big Five bear responsibility for the supracompetitive prices
     and Amazon's current market dominance. ........................................ 59

     1.      The Big Five previously conspired with Apple to fix trade-
             eBook prices.................................................................. 60

     2.      Authorities in the United States and Europe sanctioned the
             Big Five for their price-fixing conspiracy to fix trade-
             eBook prices................................................................. 67

     3.      After they were sanctioned for conspiring with Apple, the
             Big Five immediately embarked on a price-fixing scheme
             with Amazon. ................................................................ 71

     4.      Under pressure from the European Commission, Amazon
             agreed not to enforce its MFN and similar anticompetitive
             provisions in the European eBook market. ............................... 77

     5.      Federal and state authorities investigate Amazon's
             practices, including eBook sales. ........................................ 79

     6.      The District Court for the D.C. Circuit Finds continuing
             collusion among the Big Five. .............................................. 80

F.      Defendants each benefitted from the trade eBooks-price-fixing scheme ................................................................................ 82

VI.     INTERSTATE TRADE AND COMMERCE ................................................. 84

VII.    DEFENDANTS' MARKET POWER IN THE RELEVANT MARKETS .................... 84

A.      There is a distinct retail market for trade eBooks. ............................... 85

B.      Within the retail market for trade eBooks, there is a two-sided market for trade-eBook platform transactions. .................................... 88

C.      The United States is the relevant geographic market(s). .................... 89

D.      Amazon dominates the relevant market ............................................. 89

VIII.   CLASS ACTION ALLEGATIONS ............................................................. 92

IX.     ANTITRUST INJURY ............................................................................. 95

X.      CAUSES OF ACTION ............................................................................. 97

FIRST CAUSE OF ACTION  VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION (15 U.S.C. § 2) (AMAZON) ........................................... 97

SECOND CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE (15 U.S.C. § 2) (AMAZON) ....................... 99

THIRD CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2) (ALL DEFENDANTS) .................................................................................... 101

FOURTH CAUSE OF ACTION VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE (15 U.S.C. § 1) (ALL DEFENDANTS) .................................................................................... 104

JURY TRIAL DEMANDED ............................................................................... 115

PRAYER FOR RELIEF ..................................................................................... 115

010888-12/2075606 V1

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys.

## I.    INTRODUCTION

1.    Amazon dominates the retail market for the sale of trade eBooks, accounting for nearly 90% of such sales.[1] Amazon sells its own trade eBooks and the trade eBooks of other publishers,[2] including the Big Five[3] publishers that publish the vast majority of trade books, i.e., "general interest fiction and non-fiction books."[4]

---

[1] Matt Day and Jackie Gu, *The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-across-markets/ (estimating that Amazon controls 88.9% of the eBooks market); Investigation of Competition in Digital Markets, Staff Report, 2020, p. 255 n.1561 (stating that in "the eBook market" Amazon accounts "for around 88% of total annual unit sales") (quoting the Digital Competition Expert Panel Report at 30).

[2] While Amazon is the direct seller of eBooks to consumers on its Kindle platform, the Big Five also are direct sellers. Under the agency agreements between the Big Five and Amazon, the eBooks are sold on Amazon's Kindle platform, and consumers make their payments on the Kindle platform. But Amazon accepts those payments as an agent of the Big Five, which are responsible for providing the eBook content and setting the price of the transaction. And after deducting its transaction fees in accordance with the agency agreements, Amazon remits the consumers' payments to the Big Five.

[3] Plaintiffs use the term "Big Five" or "Publisher Defendants" to refer to the five largest publishers in the United States: Defendants Hachette Book Group, Inc. ("Hachette"); HarperCollins Publishers L.L.C. ("HarperCollins"); Macmillan Publishing Group, LLC ("Macmillan"); Penguin Random House LLC ("Penguin"); and Simon & Schuster, Inc. ("Simon & Schuster"). Collectively, the Big Five publishes approximately 80% of all trade books, including 90% of best sellers. Dorany Pineda, Freddy Brewster, *Stephen King testified against publishing's biggest merger. What you need to know about the antitrust trial*, Los Angeles Times (Aug. 2, 2022) https://www.latimes.com/entertainment-arts/books/story/2022-08-02/stephen-king-testified-against-publishings-biggest-merger-what-you-need-to-know-about-the-antitrust-trial; Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag.com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/.

[4] *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 648 n.4 (S.D.N.Y. 2013).

2.      For the trade eBooks of the Big Five and some other publishers, Amazon employs an agency model and provides a retail-transaction platform (i.e., the Kindle platform) for use by other trade-eBook publishers and by consumers. On the publisher side of the platform, Amazon makes the publishers' eBooks available for sale at prices set by the publishers. On the consumer side, when a consumer purchases an eBook on the Kindle platform, Amazon distributes the eBook to the consumer in exchange for the consumer's payment to Amazon of the transaction price, comprising the publisher-set sales price and Amazon's own transaction fee. Amazon completes the transaction by deducting its transaction fee from the consumer's payment and remitting the remainder to the publisher.

3.      Amazon's transaction fee (i.e., commission) for each sale of a trade eBook on its Kindle platform is at least 30% and, routinely exceeds 40% for trade eBooks published by the Big Five that sell for more than $9.99.

4.      Amazon's transaction fees vastly exceed Amazon's transaction costs. On average it costs Amazon only $0.06 to deliver each eBook[5] plus Amazon's low transaction processing costs.[6] For example, when Amazon sells a $10 eBook, its cost as a percentage of the sales price is a small fraction of even the 30% "transaction fee," earning Amazon a return greater than 300%. In a but-for competitive market, Amazon could not earn such a supracompetitive profit without losing sales to a competitor and experiencing reduced profits.

---

[5] Amazon, *eBook Royalties*, https://kdp.amazon.com/en_US/help/topic/G200644210 (explaining that "[a]verage delivery costs are $0.06 per unit sold").

[6] Amazon offers its own transaction processing service to third-parties for  transactions on their own websites.   *See* Amazon, *Amazon Pay fees*, https://pay.amazon.com/help/201212280. One can infer that Amazon's own transaction processing costs are substantially less that the 2.9% plus $0.30 for Mobile and web-based payment transactions Amazon charges other for Amazon Pay.

5.      There are numerous competitors and potential competitors with competing eBook distribution platforms—including well-known platforms from Google, Apple, Barnes & Noble, and Kobo, smaller platforms like Smashwords, and publishers like HarperCollins that distribute eBooks directly. Multiple startups have also attempted to enter and compete with Amazon. Yet Amazon has been able to both maintain its market share and extract its supracompetitive transaction fee by exercising its market power to block competition.

6.      Multiple investigative bodies and academics agree that Amazon has monopoly power and has used that power to foreclose retail eBook competition. For example, the nation's leading antitrust authority, Professor Herbert Hovenkamp, in a written statement to the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial and Administrative Law (the "House Antitrust Committee"), stated that Amazon's "very large proportion of the eBook market" made it possible to consider Amazon a monopolist and that, in any event, Amazon's market power "is very likely sufficient for [antitrust] offenses such as … most-favored-nations agreements" to be shown.[7] And the European Commission (through its Directorate General for Competition) found that Amazon has monopoly power (which is called "dominance" in EU antitrust parlance) in the market for the retail distribution of English-language eBooks.[8]

7.      To preserve its market dominance, Amazon has coerced eBook publishers into entering into contractual provisions that foreclose competition on price or product availability.

---

[7] Statement of Herbert Hovenkamp, 17 April 2020 to the House Judiciary Inquiry into Competition in Digital Markets, at 4. Other academic supports this conclusion about Amazon's use of platform MFN. *See infra* Section V.C.

[8] European Commission, Directorate General for Competition, Case AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf ("EC Decision") ¶ 56.

010888-12/2075606 V1

Because Amazon is the "largest retailer in the United States," even the Big Five feel "market pressure to distribute through Amazon" and to "acced[e] to Amazon's request" to insulate Amazon from platform competition and maintain Amazon's monopoly power in that market.[9] The Big Five have entered into these contractual restraints even though they claim not to "benefit from immunizing Amazon from competition" and instead are motivated to abate "Amazon's dominance as an eBook retailer."[10] Yet the publisher agreements with Amazon accomplish the exact opposite, resulting in reduced choice, stifled innovation, decreased output, and increased price in the transaction market for the sale of trade eBooks to consumers.

8.      For starters, Amazon's agency agreements with eBook publishers, including the Big Five, contain provisions that operate to prevent publishers from offering their trade eBooks for sale on other electronic platforms, including their own platform, at a price below the price charged when the consumer purchases the trade eBook on the Amazon platform. As publishers testified to the United States House Committee investigating competition among technology platforms, "Amazon always has and still does require MFNs [most-favored-nations clauses]."[11] The "provisions prevent publishers from partnering with any of Amazon's competitors and reinforces Amazon's 'stranglehold' and 'control' over book distribution."[12]

9.      Moreover, Amazon's publisher agreements include other far-reaching provisions to shield Amazon's retail-transaction platform from competition. Together with the MFNs, the provisions fall into four categories: (i) Notification Provisions that contractually obligate a

---

[9] Publisher Obj. Response at 10 (ECF 167).

[10] *Id*. at 22.

[11] House Judiciary Committee, Investigation of Competition in Digital Markets, Oct. 5, 2020 at 248, https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf ("House Report").

[12] *Id*.

publisher to notify Amazon of the price-related and non-price-related terms offered by or to other platforms for selling eBooks at retail; (ii) a Business Model Parity Clause that obligates publishers to notify and offer to Amazon the terms for the distribution of eBooks under a given business model as a result of that publisher's distribution of eBooks under that business model; (iii) Selection Parity Clauses that contractually obligate the eBook publisher to make any eBooks or related features and functionality available on eBook platforms; and (iv) express Retail Price Parity Clauses (i.e., MFNs) that preclude the eBook publisher from offering its trade eBooks on any competing platform at a lower price than the price offered on Amazon, thereby foreclosing price competition on eBook platforms.[13]

10.     The European Commission uses the term "Parity Clauses" to collectively describe these clauses.[14] The European Commission found that Amazon systematically employs the Parity Clauses in its eBook distribution agreements with publishers to (i) extinguish the normal and highly procompetitive incentive and ability of eBook publishers to compete against each other on price, quality, and features; and (ii) extinguish the normal and highly procompetitive incentive of electronic platforms to compete against each other, including on the commission rate charged for the retail delivery and distribution of trade eBooks.[15]

11.     In the absence of the Parity Clauses, Amazon would have faced increased price and other forms of competition from alternative electronic platforms and would have been forced to lower its excessive commissions in order to induce eBook publishers to reduce to the

---

[13] EC Decision, Sec. 4.5.2-4.5.7.

[14] *Id*. ¶ 35.

[15] *Id*. ¶ 36. Amazon has created a template for its agreements with publishers, and the template, which often used as the basis for negotiations with publishers, includes all the Parity Clauses. *Id*. ¶ 38. So while the ultimate wording may vary to some degree, the Parity Clauses are similar across all of Amazon's eBook distribution agreements with different publishers. *Id*. ¶ 38.

competitive level the prices they set for purchases made on the Amazon platform. Under normal competitive conditions, eBook publishers could drop the prices they charge for trade eBooks on competing electronic platforms in return for the electronic platform's comparable reduction of its commission rate below Amazon's 30%-plus transaction fee. Such an action would benefit the eBook publishers, the consumers, and the competing electronic platforms. The eBook publishers would benefit because their price reduction would be offset by the lower transaction fees and would lead to increased sales as consumers switch to their lower-priced eBooks. Consumers would benefit from lower prices. And the competing electronic platforms would benefit because the lower prices offered on their platforms for the identical eBook would allow them to take transaction volume away from Amazon and increase their market shares.

12.     The Parity Clauses, however, prevent the eBook publishers from (among other things) lowering their prices on competing electronic platforms in return for lower transaction fees. Under the Parity Clauses, any eBook publisher that lowers its price on a competing electronic platform must lower its price by the same amount on Amazon's platform. The competing electronic platform would, therefore, receive no competitive advantage or additional sales in return for its lower transaction fee and would not be able to chip away at Amazon's market share. At the end of the day, in order to lower its price on competing platforms, the eBook publisher would also have to lower its price on Amazon, even though Amazon continued to charge the same exorbitant 30%-plus transaction fee. As a result, eBook publisher's sales would not sufficiently increase to offset its loss of revenue and the eBook publisher would lose money by implementing the price cut on both Amazon and the competing, lower-cost rival platform. Without the incentive of increasing profits by making the price cut and shifting volume

to the rival, lower-cost platform, high prices to consumers and Amazon's continued dominance are ensured.

13.     In the absence of the usual competitive pressures and incentives, each eBook publisher knows that, if all publishers raise prices to account for Amazon's high commission, none of them would be able to reduce its prices on competing platforms to take sales volume from other eBook publishers. Thus, after signing the Amazon agreements, each of the Big Five significantly raised the prices paid by the retail consumers. Penguin increased its trade eBook prices by 30%; HarperCollins by 29.3%; Simon & Schuster by 15.87%; MacMillan by 10.7%; and Hachette by 8.3%. Prices for trade eBooks have remained elevated above what they would have been in a competitive market. At least one contemporary study found that, controlling for other variables, Amazon's agreements with the Big Five increased the price of eBooks overall by 14%. Defendants' supracompetitive prices have also lowered consumer demand and depressed sales in the trade eBooks market, which have flattened since Defendants' anticompetitive behavior.

14.     In a competitive environment, prices would have been substantially lower. Because of the low cost to Amazon to process each transaction and  deliver an eBook on its Kindle platform, the competitive commission rate that would have prevailed in the absence of Amazon's anticompetitive conduct is substantially less than the 30%-plus transaction fee it actually charges. Competing platforms have tried to offer lower transaction prices, innovative business models, and other pro-competitive terms. But competing electronic platforms cannot gain any competitive advantage by attracting consumers with lower rates, because publishers are precluded from setting lower prices by Amazon's anticompetitive Parity Clauses.[16]

---

[16] House Report at 248.

15.     Moreover, this case involves more than just the anticompetitive vertical agreements between Amazon and eBook publishers, including the Big Five. It also involves a horizontal agreement among the Big Five, facilitated and joined by Amazon, to execute agency agreements with MFNs and other Parity Clauses and thereby suppress horizontal price competition for the sale of trade eBooks to consumers. This horizontal agreement can be inferred from the circumstantial evidence of plus factors alleged in this complaint, including (as just addressed) that it would have been contrary to the self-interest of each of the Big Five to enter into such an agreement with Amazon unless it knew and understood that the other four members of the Big Five would also execute the agreement—in which case the collective action would redound to the benefit of all the Big Five by eliminating the ability and procompetitive incentive to engage in horizontal price competition. If an eBook publisher entered into the MFN and Parity Clauses with Amazon, but other competing eBook publishers did not, that eBook publisher would be at a significant competitive disadvantage. The other eBook publishers could profitably cut their prices on competing platforms in response to that platform's lower transaction fees. If the eBook publisher with the Amazon agreement does not also cut its prices, it will lose sales to its competitors. But if it does match their price cuts on competing platforms, it will also have to cut its price on Amazon, where the vast bulk of its sales are made and where it will receive no cost reduction, causing it to suffer profit reduction on every Amazon sale. This is why it is detrimental to the self-interest of every eBook publisher to be bound by the Amazon MFN and Parity Clauses unless the other eBook publishers are also so bound. Then none of them are likely to cut prices. In fact, as explained below, they are likely to raise and actually have raised prices.

16.     Finally, Defendants' anticompetitive conduct has caused and continues to cause Plaintiffs (and the Classes defined below) to overpay for trade eBooks.

17.     Indeed, Amazon's continued anticompetitive use of Parity Clauses to restrain competitive pricing, innovation, and output in the trade eBook market is brazen in light of repeated investigations into Defendants' practices. A decade ago, the Big Five conspired with Apple to raise trade eBook prices via agency agreements and MFNs. Their conduct led to concurrent investigations by federal and state prosecutors in the United States and by the European Commission's Directorate General for Competition, and those investigations resulted in orders prohibiting the publishers from entering into MFNs in connection with the sale of eBooks on either continent for a period of five years. In the United States, the Big Five paid $166 million in settlements, and Apple paid $450 million to the consumer class action that initiated the proceedings.[17] Yet in 2015—in disregard of existing orders—the Big Five entered agency agreements with Amazon that impose highly restrictive Parity Clauses that mirror the illegal price restraints used in the Apple conspiracy to eliminate retailer discounting and ensure that no rival retail platform can differentiate itself from, or otherwise compete with, Amazon.

18.     Beginning in 2015, the European Commission investigated Amazon's anticompetitive Parity Clauses and found that they harmed competition in the distribution and sale of eBooks in European markets.[18] Here in the United States, the House Antitrust Committee launched an investigation into Amazon along with other dominant technology platforms. Like the European Commission, the House Antitrust Committee concluded in its October 2020 report

---

[17] *In re Electronic Books Antitrust Litig.*, 639 F. App'x 724, 726–27 (2d Cir. 2016).

[18] EC Decision at 8.

that Amazon's use of MFNs was harmful to competition.[19] Separately, the Connecticut Attorney General's office is conducting its own investigation into Amazon's eBook business.[20]

19.    Despite multiple investigations and censure for the use of anticompetitive MFNs and similar provisions in the sale and distribution of trade eBooks, Amazon and the Big Five have employed and continue to employ the same devices to again fix the retail price of trade eBooks in violation of Sections 1 and 2 of the Sherman Act. Like the illegal agreements between Apple and the Big Five, Amazon's agreements with the Big Five are anticompetitive because they have "removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved [Amazon] of the need to compete on price, and allowed the [Big Five] to raise the prices for their e-books, which they promptly did[.]"[21] The harm caused by Defendants' supracompetitive prices persists and will not abate unless Amazon and the Big Five are stopped.

20.    By fixing the retail price of trade eBooks and preventing competition from its eBook retail rivals, Defendant Amazon has willfully acquired and maintained its monopoly power in the U.S. retail trade eBook market. Such conduct is an abuse of monopoly power in violation of Section 2 of the Sherman Act.

21.    Plaintiffs and the Classes seek monetary recovery, including treble damages, for all overcharges incurred by the Classes as defined herein. Plaintiffs and the Classes are eBook consumers who directly purchase the Big Five's eBooks on the retail platforms of Amazon and its competitors at prices inflated by Defendants' anticompetitive conduct. They are direct

---

[19]  House Report at 248.

[20] Jeffrey A. Trachtenberg and Dana Mattioli, *Connecticut Investigating Amazon's E-Book Business*, Wall Street Journal (Jan. 13, 2021).

[21] *Apple*, 952 F. Supp. 2d at 694.

purchasers both from the retail platforms (to which they directly make their payment, including the supracompetitive fee charged to complete the transaction on the retail platform) and from the eBook publishers (from which they directly purchase the eBooks through the retail platforms at supracompetitive prices). They have standing to recover damages under Section 4 of the Clayton Act because Defendants' anticompetitive use of MFNs and similar provisions has materially and proximately injured Plaintiffs and the Classes by reducing their choices as consumers and causing them to pay the supracompetitive prices.

22.     Further, Plaintiffs and the Classes seek a nationwide injunction that terminates the ongoing violations alleged in this Complaint. Plaintiffs have standing under Section 16 of the Clayton Act because they are threatened with impending future harm in the form of additional overcharges and reduced consumer choice.

## II.     JURISDICTION

23.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, 28 U.S.C. § 1331 and § 1337(a), and 15 U.S.C. § 15(a) and § 26.

24.     This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

25.     Plaintiffs are residents of Arizona, California, Connecticut, Florida, Iowa, Minnesota, New York, Texas, and Virginia, who purchase trade eBooks from the Big Five through Amazon or its retail rivals. Plaintiffs were harmed and injured financially because of Defendants' conduct, as described further herein.

26.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S. Code § 22, because Defendants reside in this District or may be found or

transact business in this District. Each of the Big Five Defendants have headquarters and operate their businesses in this District. Amazon likewise may be found or transacts business in this District. Amazon has over 8,000 employees in its New York City work force, including many who work at its Manhattan office space.[22] It has five warehouses in New York, including two in Manhattan.[23] It also owns and operates four Amazon Books stores and eight cashier-free Go-stores in locations throughout Manhattan.[24] Amazon owns eight office properties in Manhattan, most of which are clustered in Midtown, including the iconic Lord & Taylor building on Fifth Avenue.[25] Amazon has engaged in an illegal, anticompetitive scheme to monopolize the trade eBook market that was directed at, and had the direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

27.     Exercising personal jurisdiction is also appropriate under Section 302(a) of New York's long-arm statute because Amazon transacts business in the State of New York, directly or through agents, such that it has sufficient minimum contacts with New York. In addition to the

---

[22] Ed Shanahan, *Amazon Grows in New York, Reviving Debate Over Abandoned Queens Project*, NYT (Dec. 6, 2019), https://www.nytimes.com/2019/12/06/nyregion/amazon-hudson-yards.html.

[23] https://en.wikipedia.org/wiki/List_of_Amazon_locations#United_States; Ben Fox Rubin, *Why Amazon built a warehouse inside a Midtown Manhattan office tower*, CNET (Dec. 21, 2015), https://www.cnet.com/news/why-amazon-built-a-warehouse-inside-a-midtown-manhattan-office-tower/.

[24] Where are Amazon Go stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+go+stores+in+new+york&qs=NW&pq=where+are+amazon+go+stores+in+new+&sc=5-34&cvid=29EA099E9F8E4797A844A8DCA5842069&FORM=QBLH&sp=1&ghc=1; Where are Amazon Books stores located in New York?, Bing, https://www.bing.com/maps?q=where+are+amazon+books+stores+located+in+new+york%3F&cvid=1f533e8508ec4a378125b0ed5e3fc0cb&FORM=ANAB01&PC=U531.

[25] Matthew Haag, *Manhattan Emptied Out During the Pandemic. But Big Tech Is Moving In*. NYT (Nov. 9, 2020), https://www.nytimes.com/2020/10/13/nyregion/big-tech-nyc-office-space.html.

business it transacts in New York City, Plaintiffs aver on information and belief that Amazon's

sales to its customers in New York State represent at least 5% of Amazon's U.S. sales and

therefore rise to the level of substantial solicitation necessary to satisfy the minimum contacts

required to support this Court's exercise of personal jurisdiction over Amazon.

### III.    VENUE

28.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §

22, because Defendants reside, transact business, are found, or have agents in this District.

Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendants

are subject to the Court's personal jurisdiction with respect to the civil action in question and

therefore reside in this District and under 28 U.S.C. § 1391(b)(2) because a substantial portion of

the affected interstate trade and commerce described in this Complaint was carried out in this

District.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Shannon Fremgen**

29.     Shannon Fremgen is a resident of Denton, Texas. She buys trade eBooks from the

Big Five through Barnes & Noble. Trade eBooks Ms. Fremgen purchased from the Big Five

through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon

platform:

a.      From Hachette she purchased *Smokescreen* on November 28, 2019, for

$14.99, *The Persuasion* on August 24, 2020, for $13.99, and *Chaos* for $14.99 on September 1,

2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

b.      From HarperCollins she purchased *After Sundown* on August 24, 2020, for

$12.99, *Mystere Parish Complete Collection* on December 5, 2020, for $12.99, and *Death Echo*

- 13 -

for $7.99 on May 12, 2020, all prices equal to or higher than the price of the same eBooks sold through the Amazon platform.

        c.        From Macmillan she purchased *The Full Series, the Complete Collection* on December 14, 2020, for $41.55, *Hindsight* on January 7, 2020, for $14.99, and *Dark Tribute* for $9.99 on October 15, 2019, all prices equal to the price of the same eBooks sold through the Amazon platform.

        d.        From Penguin she purchased *Twisted Twenty-Six* on January 1, 2020, for $13.99, *Burn* on November 2, 2020, for $8.99, and *Vision Impossible* on November 12, 2019, for $7.99, all prices equal to the price of the same eBooks sold through the Amazon platform.

        e.        From Simon & Schuster she purchased *Labyrinth* on October 12, 2019, for $14.99, *Deadlock* on July 28, 2020, for $14.99, and *Fortune and Glory* on November 12, 2019, also for $14.99, all prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Fremgen has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 2.    Mary Christopherson-Juve

30.    Mary Christopherson-Juve is a resident of Yuma, Arizona. She buys trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. Christopherson-Juve purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform:

a.        From Hachette she purchased for $14.99 each *Where the Crawdads Sing* on July 12, 2019, *The Guardians* on October 21, 2019, and *Camino Winds* on May 5, 2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

b.        From HarperCollins she purchased *The Order* on July 20, 2020, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

c.        From Macmillan she purchased *The Defense* on November 21, 2019, for $14.99 and *The Wednesday Group* on July 13, 2020, for $7.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

d.        From Penguin she purchased for $14.99 each *The 19th Christmas* on December 13, 2019, *The Summer House* on July 3, 2020, and *Untamed* on August, 17, 2020, all prices equal to the price of the same eBooks sold through the Amazon platform.

e.        From Simon & Schuster she purchased *Storm Front* on October 31, 2019, for $8.99, *Bad Blood* on February 16, 2020, for $9.99, and *Bloody Genius* on February 21, 2020, for $14.99, all prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Christopherson-Juve has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 3.    Denise DeLeon

31.    Denise DeLeon is a resident of Dysart, Iowa. She buys trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. DeLeon purchased from the Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including her purchase of *Turbo Twenty-Three* from Penguin on September 14, 2020, for $2.99,

a price equal to the price of the same eBook sold through the Amazon platform. Defendants'
anticompetitive agreements prevented the price competition with the Amazon platform that
would have resulted in a lower market price for these eBooks. Ms. DeLeon has been injured and
will continue to be injured by paying more for the Big Five's trade eBooks than she would have
paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 4.  Sandra Wilde

32.     Sandra Wilde is a resident of New York City. She buys trade eBooks from the Big
Five through Amazon and through Apple Books. Trade eBooks Ms. Wilde purchased from the
Big Five through Amazon's rival eBook retailer were also sold by the Big Five through the
Amazon platform:

> a.      From HarperCollins she purchased *Since We Fell* on January 29, 2021, for
$9.99, a price equal to the price of the same eBook sold through the Amazon platform.

> b.      From Penguin she purchased *How Did I Get Here* on January 16, 2021,
for $14.99, and *That Old Country Music* on January 21, 2021, for $11.99, both prices equal to
the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon
platform that would have resulted in a lower market price for these eBooks. Ms. Wilde also
purchased eBooks through Amazon's platform, *e.g.,* On December 3, 2018, she bought *The
Skeptics' Guide to the Universe: How to Know What's Really Real in a World Increasingly Full
of Fake* from Hachette for $15.99; on July 13, 2020, she bought *Too Much and Never Enough:
How My Family Created the World's Most Dangerous Man* from Simon & Schuster for $14.99;
on January 18, 2020, she bought *A Very Stable Genius: Donald J. Trump's Testing of America*
from Penguin for $15.99; on March 5, 2021, she bought *A Member of the Club: Reflections on
Life in a Racially Polarized World* from HarperCollins for $5.99, a price inflated by Defendants'

anticompetitive agreement to prevent retailer discounting on any platform. She has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 5.    Michael Wilder

33.    Michael Wilder is a resident of Bradenton, Florida. He buys trade eBooks from the Big Five through Amazon and through Apple Books on behalf of himself and his family. Trade eBooks Mr. Wilder purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform:

    a.    From Hachette he purchased *Rather Be the Devil* on February 15, 2017, for $13.99 and *When the Music's Over* on July 2, 2018, for $10.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

    b.    From HarperCollins he purchased *Manic* on June 6, 2017, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform, and *The Price of Love and Other Stories* on November 24, 2018, also for $10.99, a price higher than the price of the same eBook sold through the Amazon platform.

    c.    From Macmillan he purchased for $2.99 each *The Collapsing Empire* on December 31, 2017, and *The First Patient* on April 5, 2018, both prices equal to the price of the same eBooks sold through the Amazon platform.

    d.    From Penguin he purchased for $14.99 each *Empire's End: Aftermath (Star Wars)* on April 7, 2017, and *All We Ever Wanted* on August 10, 2018, both prices equal to the price of the same eBooks sold through the Amazon platform.

e.        From Simon & Schuster he purchased *Deep Freeze* on October 17, 2017, for $14.99 and *The North Water* on September 12, 2018, for $3.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Wilder also purchased eBooks through Amazon's platform, *e.g.,* on February 25, 2019, he bought *The Fall of Carthage: The Punic Wars 265-146BC* from Hachette for $3.99 and on August 5, 2020, he bought *The Virtues of War: A Novel of Alexander the Great* from Penguin for $5.99, both prices inflated by Defendants' anticompetitive agreement to prevent retailer discounting on any platform. He has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 6.        Jordan Sacks

34.        Jordan Sacks is a resident of Arlington, Virginia. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Sacks purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including his purchase of *All the Light We Cannot See* from Simon & Schuster on June 3, 2018, for $12.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Sacks has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

010888-12/2075606 V1

### 7.    Mariacristina Bonilla

35.    Mariacristina Bonilla is a resident of Norwalk, Connecticut. She purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Ms. Bonilla purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold through the Amazon platform:

      a.    From HarperCollins she purchased *The Hurricane Sisters* on May 21, 2020, for $11.49, a price equal to the price of the same eBook sold through the Amazon platform.

      b.    From Macmillan she purchased *A Week at the Shore* on June 24, 2020, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

      c.    From Penguin she purchased *Neighbors* on January 6, 2021, for $14.99, a price equal to the price of the same eBook sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Bonilla has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 8.    Ethan Silverman

36.    Ethan Silverman is a resident of New York City. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Silverman purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform:

      a.    From HarperCollins he purchased *10% Happier* on January 27, 2021, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform.

b.        From Penguin he purchased *Never Eat Alone* on July 6, 2018, for $14.99 and *Compelling People* on January 2, 2021, for $12.99, both prices equal to the price of the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Silverman has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**9.    Jeffery Tomasulo**

37.    Mr. Tomasulo is a resident of Norwalk, Connecticut. He purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Mr. Tomasulo purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including his purchase of *The Explosive Child* from HarperCollins on April 9, 2020, for $13.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Tomasulo has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein

**10.    Susan Cook and Jeffrey Cook**

38.    Susan Cook and Jeffrey Cook are residents of Goodyear, Arizona. They purchase trade eBooks from the Big Five through Apple Books through Susan Cook's account. Trade eBooks the Cooks purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

a.      From Hachette, the Cooks purchased for $14.99 each, *Two Kinds of Truth* on October 31, 2017, and *Daylight* on November 19, 2020, prices equal to the same eBooks sold through Amazon.

b.      From Macmillan, they purchased for $14.99 each, *Secrets in Death* on September 4, 2017, and *Golden in Death* on February 16, 2020, prices equal to the same eBooks sold through the Amazon platform.

c.      From Penguin, they purchased for $14.99 each, *The Midnight Line* on November 10, 2017, and *A Time for Mercy* on October 19, 2020, prices equal to the same eBooks sold through the Amazon platform.

d.      From Simon & Schuster, they purchased *Fear* for $15.99 on September 12, 2018, and *Total Power* for $14.99 on September 19, 2020, prices equal to the same eBooks sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. The Cooks have been injured and will continue to be injured by paying more for the Big Five's trade eBooks than they would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**11.      Cecily Lerner**

39.      Cecily Lerner is a resident of Encino, California. She purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks she purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including her purchase of *Pachinko* from Hachette on January 2, 2020, for $9.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon

- 21 -

platform that would have resulted in a lower market price for these eBooks. Ms. Lerner has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 12. Lawrence Twill

40.     Lawrence Twill is a resident of Sarasota, Florida. He and his wife purchase trade eBooks from the Big Five through Apple Books through his wife's account. Trade eBooks Mr. Twill purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

   a.     From Penguin, he purchased *Little Fires Everywhere* on April 19, 2018, for $13.99 and *The Widow* on June 9, 2019, for $9.99, prices equal to the same eBooks sold through the Amazon platform.

   b.     From Simon & Schuster, he purchased *Manhattan Beach* for $14.99 on October 25, 2017, a price equal to the same eBook sold through the Amazon platform.

   Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Twill has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### 13. Thomas Agostino

41.     Thomas Agostino is a resident of Boynton Beach, Florida. He purchases trade eBooks from the Big Five through Barnes & Noble through his wife's account. Trade eBooks Mr. Agostino purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including *A New Earth*, which he

purchased from Penguin on July 9, 2018, for $10.99, a price equal to the price of the same eBook sold through the Amazon platform. Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Agostino has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

**14.    Robert Etten**

42.    Robert Etten is a resident of Roseville, Minnesota. He purchases trade eBooks from the Big Five through Barnes & Noble. Trade eBooks Mr. Etten purchased from the Big Five Defendants through Amazon's rival eBook retailer were also sold by the Big Five through the Amazon platform, including:

a.    From Hachette, he purchased *The Inn* on September 12, 2019, for $14.99, a price equal to the same eBook sold through the Amazon platform.

b.    From Penguin, he purchased *Robert Ludlum's The Bourne Evolution* on July 28, 2020, for $14.99, a price equal to the same eBook sold through the Amazon platform.

c.    From Simon & Schuster, he purchased *Spymaster* (Scot Harvath Series #17) for $14.99 on February 11, 2018, a price equal to the same eBook sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Mr. Etten has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than he would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

- 23 -

### 15. Janet Ackerman

43. Janet Ackerman is a resident of Brooklyn, New York. She purchases trade eBooks from the Big Five through Apple Books. Trade eBooks Ms. Ackerman purchased from the Big Five Defendants through Amazon's rival eBook retailer, were also sold by the Big Five through the Amazon platform, including:

    a. From Hachette, she purchased *The Slaughterman's Daughter* on March 5, 2021, for $14.99, a price equal to the same eBook sold through the Amazon platform.

    b. From HarperCollins, she purchased *The Exiles* on September 4, 2020, for $14.99, a price equal to the same eBook sold through the Amazon platform.

    c. From Simon & Schuster, she purchased *Too Much and Never Enough* for $14.99 on July 16, 2020, a price equal to the same eBook sold through the Amazon platform.

Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks. Ms. Ackerman has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than she would have paid or would pay in the future in the absence of Defendants' unlawful acts, as set forth herein.

### B. Defendants

#### 1. Amazon

44. Amazon is an online retail giant with its principal headquarters in Seattle, Washington and with facilities and employees throughout the United States, including in this District. Amazon is vertically integrated and is active upstream as a publisher, with its own imprints (*i.e.*, publishing labels) that generate over $100 million annually, and downstream as an eBook retailer. Amazon sells eBooks and offers eBook reading subscription services to its retail customers in New York and throughout the United States on the Amazon platform. Amazon also

operates Amazon Publishing, a division of Amazon that publishes books and competes with the Big Five Defendants.

### 2.    Hachette

45.    Defendant Hachette is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Hachette has been publishing books since 1837, and its publishing brands currently include Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; Public Affairs; Orbit; FaithWords; and Center Street. Hachette's books and authors have garnered major awards including Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes. Hachette's bestselling authors have been published all over the world and include David Baldacci, Michael Connelly, Malcolm Gladwell, Elin Hilderbrand, N. K. Jemisin, Stephenie Meyer, James Patterson, J.K. Rowling, Nicholas Sparks, Rick Steves, Donna Tartt, and Malala Yousafzai.

### 3.    HarperCollins

46.    Defendant HarperCollins is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With over two hundred years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages and has a print and digital catalog of more than 200,000 titles. Writing across dozens of genres, HarperCollins's authors are winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize.

### 4. Macmillan

47.     Defendant Macmillan is a leading U.S. trade publisher, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. Macmillan is part of a global trade-publishing group operating worldwide, with trade publishing companies in the United States, Germany, the United Kingdom, Australia, South Africa, and India. Macmillan operates eight divisions in the U.S.: Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt and Company; Macmillan Audio; Macmillan Children's Publishing Group; St. Martin's Press; and Tor/Forge. Its writers, including, among others, Jeff VanderMeer, Senator Elizabeth Warren, James Comey, Orson Scott Card, and Paul Beatty, come from a vast array of literary backgrounds and have won awards including the Caldecott Medal, the Nobel Prize, the Man Booker Prize, the Pulitzer Prize, the National Book Award, and the Printz Award.

### 5. Penguin

48.     Defendant Penguin is a leading U.S. trade publisher, organized under the laws of Delaware, having its principal place of business in New York City, and is qualified to do business and is doing business in the State of New York and in this District. With a rich history dating back to the 1800s, Penguin's expansive publishing portfolio includes nearly 275 independent publishing imprints and brands on five continents. Penguin publishes 15,000 new titles annually and sells close to 800 million print, audio, and eBooks annually. Penguin's many authors include more than 80 Nobel Laureates and hundreds of the most widely read authors across the world.

### 6. Simon & Schuster

49.     Defendant Simon & Schuster is a leading U.S. trade publisher, organized under the laws of New York, having its principal place of business in New York City, and is qualified

to do business and is doing business in the State of New York and in this District. It publishes 2,000 titles annually in numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Books, Gallery Books, Pocket Books, Adams Media, Simon & Schuster Children's Publishing, and Simon & Schuster Audio and international companies in Australia, Canada, India, and the United Kingdom. Simon & Schuster brings the works of its authors, which include, among others, Dale Carnegie, Sharon M. Draper, Jennifer Egan, Joseph Heller, Ernest Hemingway, and Stephen King, to more than 200 countries and territories. Its books and authors have been winners of the Pulitzer Prize, National Book Award, National Book Critics Circle Award, Newbery Medal, and Caldecott Medal. On November 25, 2020, Penguin announced plans to acquire Simon & Schuster; the proposed merger, which the District Court for the D.C. Circuit blocked, would have created a single publishing house with a market share of approximately 50% of all trade books published.[26]

## V.     STATEMENT OF FACTS

**A.     Amazon uses its market dominance to extract a supracompetitive transaction fee for each sale on its retail-transaction platform.**

50.     When Amazon's Kindle launched in 2007, it was the first e-reader to gain widespread commercial acceptance, and Amazon quickly became the market leader in the sale of eBooks and eBook readers.[27]

---

[26] John Maher, *PRH Purchase of S&S Draws Objections*, Publishers Weekly (Nov. 30, 2020), https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/85005-first-reactions-to-s-s-sale.html.

[27] *Apple*, 952 F. Supp. 2d at 648–49.

51.     Today, nearly 90% of trade-eBook sales occur on Amazon's retail transaction platform (i.e., the Kindle),[28] on which Amazon sells its own eBooks and the eBooks of other publishers, including the Big Five.

52.     On the publisher side of its retail transaction platform, Amazon makes the eBooks of the Big Five available for sale at publisher-set prices. On the consumer side, when a consumer purchases an eBook on the Kindle platform, Amazon distributes the eBook to the consumer in exchange for the consumer's payment of the price posted on Amazon (i.e., the publisher-set sales price inclusive of Amazon's own transaction fee). Amazon completes the transaction by retaining its transaction fee from the consumer's payment and remitting the publisher's portion of the sale price.

53.     Amazon's transaction fee (i.e., commission) for each sale of a trade eBook on its Kindle platform is at least 30% and routinely exceeds 40% for the trade eBooks published by the Big Five that sell for more than $9.99.[29]

54.     Amazon's transaction fees vastly exceed Amazon's transaction cost. For example, it only costs Amazon an average of $0.06 to deliver each eBook[30] plus Amazon's low transaction

---

[28] Matt Day and Jackie Gu, *The Enormous Numbers Behind Amazon's Market Reach*, Bloomberg (Mar. 27, 2019), https://www.bloomberg.com/graphics/2019-amazon-reach-across-markets/, (estimating that Amazon controls 88.9% of the eBooks market); Investigation of Competition in Digital Markets, Staff Report, 2020, at 255 n.1561 (stating that in "the eBook market" Amazon accounts "for around 88% of total annual unit sales") (quoting the Digital Competition Expert Panel Report at 30).

[29] The allegation of a transaction fee above 40% is a conservative estimate, based on additional investigation and inferred from available information. When the Big Five sought to increase prices above $9.99, Amazon wanted to share in the monopoly rents and increased its commission rates to approach the publishers' standard wholesale distribution charge for print books (i.e., 46%).  Indeed, for self-published authors, Amazon has publicly disclosed that it charges a 65% commission on books priced above $9.99.

[30] Amazon, *eBook Royalties*, https://kdp.amazon.com/en_US/help/topic/G200644210 (explaining that "[a]verage delivery costs are $0.06 per unit sold").

processing costs.[31] Thus when Amazon sells a $10 eBook, its cost as a percentage of the sales price is a small fraction of even a 30% "transaction fee," earning Amazon a return well north of 300%. In a but-for competitive market, Amazon would charge a reduced transaction fee in response to competition, and consumers would have paid lower prices.

**B.    Amazon uses its market dominance to shield itself from competition through agency agreements with the Big Five.**

55.    While there are numerous competitors and potential competitors with competing electronic platforms, including Google, Apple, Barnes & Noble, and Kobo (as well large publishers like HarperCollins that have the resources and capability to distribute eBooks directly), Amazon has been able to both maintain its market share and extract such a high transaction fee by exercising its market power to block competition. Because Amazon is the "largest retailer in the United States," even the Big Five feel "market pressure to distribute through Amazon" and to "acced[e] to Amazon's request" to insulate Amazon from platform competition and maintain Amazon's monopoly power in that market.[32]

56.    Amazon has secured agreements with each of the Big-Five publishers that foreclose competition from rival platforms. The Big Five publish many of the biggest names in fiction and non-fiction, including the vast majority of New York Times bestsellers.[33] Their dominance can be attributed to a long history of mergers and acquisitions that has led to five giant publishing houses, consisting of vast numbers of subsidiary publishers or "imprints." Collectively the Big Five publish 80% of all trade eBooks. The largest two of the Big Five are

---

[31] *Supra* note 5.

[32] ECF 167 at 10.

[33] *United States v. Apple*, 791 F.3d 290, 298 (2d Cir. 2015).

Penguin Random House and HarperCollins. During the relevant period, Penguin Random House sold at least 30% to 35% of trade eBooks.[34]

57.     Because Defendants have not made their agreements public, Plaintiffs rely on public disclosures about the terms of their agreements, including news reports, submissions to the House Antitrust Committee, and the findings of the European Commission and House Antitrust Committee. These reports describe the contractual devices that Defendants employ to fix trade eBook prices and prevent competition from Amazon's retail rivals in the sale of trade eBooks.

58.     The most notable of these provisions are the most-favored-nations provisions ("MFNs") that operate to prohibit publishers from offering their trade eBooks for sale on other electronic platforms at a price below the price charged when the consumer purchases the trade eBook on the Amazon platform. In general, MFNs entitle the buyer to the lowest price or best terms that the supplier offers to any other buyer, but that is not how the MFN operates in Amazon's contracts with the Big Five Defendants.[35] The Big Five rely on the agency model to sell their eBooks, which means that Amazon is not a buyer and the Big Five are not its suppliers. "Amazon," the House Antitrust Committee observes, "has a history of using MFN clauses to

---

[34] Plaintiff infers Penguin Random House's eBook market share exceeds 30% to 35% from *inter alia* reports showing that Penguin Random House has a 37% share of the trade book market, *see* Thad McIlroy, *What the Big 5's Financial Reports Reveal About the State of Traditional Book Publishing*, Book Business (Aug. 5, 2016), https://www.bookbusinessmag .com/post/big-5-financial-reports-reveal-state-traditional-book-publishing/, and outpaces the other Big-Five in terms of eBook publishing. https://www.statista.com/statistics/1089422/ leading-book-publishers-title-count-us/.

[35] *See Apple*, 952 F. Supp. 2d at 662.

ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential

competitor to make lower-priced or innovative product offerings available to consumers."[36]

59.    While Amazon has changed the name and specific mechanisms over the years, the

House Antitrust Committee found that Amazon has continuously imposed contract provisions

that effectively function as MFNs on book publishers.[37] The Committee found, with respect to

the trade eBooks market, that "Amazon's price MFN causes publisher to incur significant

penalties if they offer Amazon's rivals better pricing":

> The anticompetitive effects of Amazon's use of MFN clauses are
> particularly pronounced in the book market. According to a book
> publisher, Amazon used its market power in print and e-book sales
> to force a price MFN on it and other book publishers. As the
> publisher explained, the result has been that "publishers are
> completely handcuffed from stimulating platform competition
> because Amazon's price MFN causes publishers to incur
> significant financial penalties if they offer Amazon's rivals better
> pricing." Another publisher told the Subcommittee that "Amazon
> always has and still does require MFNs." According to this
> publisher, the MFN provisions prevent publishers from partnering
> with any of Amazon's competitors and reinforces Amazon's
> "stranglehold" and "control" over book distribution. Although
> Amazon has changed the name and specific mechanisms over the
> years, it appears that the company continues to impose contract

---

[36] House Report at 248. *See also* Bundeskartellamt Case Report, *Amazon removes price parity obligation for retailers on its Marketplace platform*, at 3 (Dec. 9, 2013) ("BKartA Decision"), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Kartellverbot/2013/B6-46-12.pdf?__blob=publicationFile&v=2.

The harmful effect of Amazon's anticompetitive agreements with its third-party sellers in the United States is the subject of a separate consumer antitrust class action lawsuit. *Frame-Wilson v. Amazon*, Case No. 2:20-cv-00424-RAJ (W.D. Wash) (filed March 19, 2020). In August of 2020, the Competition Bureau Canada announced its own investigation to determine whether any Amazon policies "impact third-party sellers' willingness to offer their products for sale at a lower price on other retail channels, such as their own websites or other online marketplaces." Competition Bureau, https://www.canada.ca/en/competition-bureau/news/2020/08/competition-bureau-seeks-input-from-market-participants-to-inform-an-ongoing-investigation-of-amazon.html.

[37] House Report at 248.

provisions that effectively function as MFNs on book publishers.[38]

60.    Likewise, the European Commission's investigation revealed that Amazon's agency agreements contain "Parity Clauses" (the Commission's term to collectively describe the MFN and similar provisions) designed to insulate Amazon from retail platform competition.[39] The Parity Clauses fall into four categories: the (1) Business Model Parity Clause; (2) Selection Parity Clauses; (3) Retail Price Parity Clauses; and (4) Notification Provisions.

### *Business Model Parity Clause*

61.    Amazon consistently uses the Business Model Parity Clause in its distribution agreements to reduce publisher "incentives to support and invest in alternative new and innovative business models."[40] The Business Model Parity Clause reduces "Amazon's competitors' ability and incentives to compete on price or to develop and differentiate their e-book offerings through such business models."[41] As a result, it weakens competition at the eBook distribution level and maintains Amazon's monopoly power in the relevant market(s).[42] It also hinders the emergence of alternative business models for the distribution of eBooks.[43]

62.    The Business Model Parity Clause reduces publishers' incentives to support, and invest in, new and innovative business models for all eBook retail platforms, including the

---

[38] *Id.* (footnotes omitted).

[39] EC Decision ¶ 22.

[40] *Id.* ¶¶ 75, 77.

[41] *Id.* ¶ 75.

[42] *Id.* ¶ 76.

[43] *Id.* ¶ 78.

publishers' own platforms.[44] In this way, the parity clause serves as a horizontal restraint between Amazon and publishers with respect to respective distribution platforms.

63.     In addition, the Business Model Parity Clause affects horizontal competition throughout the entire distribution market because the parity provision reduces the ability and incentives for eBook retailer platforms competing with Amazon to develop alternative business models.[45]

64.     These anticompetitive effects are not theoretical. The European Commission found evidence that "the Business Model Parity Clause had prevented the emergence and/or development of alternative models with competitors including: (i) print and e-book bundles; (ii) pay-as-you-read and book club models (where readers do not necessarily have to acquire the e-book for an unlimited period of time, but are rather given a license to access only parts thereof); (iii) subscription models; and (iv) applications for smartphones giving access to ebooks versions of classics."[46]

65.     Publishers "have an interest in experimenting with alternative business models, for example with smaller E-book Retailers on a smaller scale (one country/region), or on a selection of their catalogue (children books, classics), or targeting only certain customers groups, without having to test such business models on a larger scale for the mass market."[47]

66.     Thus, "E-book Suppliers become reluctant to support alternative business models."[48] Then, "anticipating that E-book Suppliers would not support alternative business

---

[44] *Id.* ¶¶ 78, 80.

[45] *Id.* ¶ 78.

[46] *Id.* ¶ 79.

[47] *Id.* ¶ 81(1).

[48] *Id.* ¶ 85(1).

models, competing E-book Retailers would have little incentives to invest in developing them."[49] And "even in instances where an alternative business model is launched, the E-book Supplier's obligation to grant the same business model to Amazon is likely to diminish the competing E-book Retailer's incentives to invest into already-developed alternative business models."[50]

67.      In other words, because of the Business Model Parity Clause, eBook retailers "anticipate that Amazon will also have access to an E-book Supplier's inputs for alternative business models" and "would also know that Amazon could free-ride on its proposed business model given the E-book Supplier's obligation to inform Amazon about the material terms of such models."[51] In fact, "[t]he Commission's investigation has shown that even the mere notification of an alternative business model may discourage new entry as Amazon would be able to freeride on the new entrant's investments and ideas and launch the same or similar service itself."[52]

68.      All of this discourages eBook retail platform competitors from entering the market, because "[l]aunching a new or innovative business model different from other market participants provides E-book Retailers with an advantage that is often critical for successful entry into the market."[53] A number of potential entrants in the eBook platform market have been prevented from entering because of the inability and unwillingness of publishers to license their

---

[49] *Id.* ¶ 85(2).

[50] *Id.* ¶ 85(3).

[51] *Id.* ¶ 85(3).

[52] *Id.* ¶ 89(1).

[53] *Id.* ¶89(1).

catalogue to them for alternative business models.[54] "This reduces the intensity of competition at the e-book distribution level," leading to "higher e-book prices and less choice."[55]

69.      It also results in higher market share and more market power for Amazon.[56] Indeed, the European Commission found that Amazon is able to use its dominance to extract supracompetitive profits from the market as a whole by stagnating platform competition through the use of its parity clauses.[57]

### ***Selection Parity Clauses***

70.      Selection Parity Clauses include a host of restraints that require publishers to afford Amazon priority with respect to title, date, and feature availability. Publishers are restrained from offering unique titles through Amazon's competitors, and from selling titles on competing platforms, unless they are offered on Amazon. Likewise, publishers cannot offer distinct eBook features on competing platforms and must affirmatively assist Amazon in creating eBook formats to match those that may be offered on competing platforms.[58]

71.      Amazon knows, and the European Commission found, that "even a short window of exclusivity granted by an E-book Supplier to an E-book Retailer may have a significant impact on sales volumes for that E-book Retailer."[59] Accordingly, Amazon employs the Selection Parity Clauses to eliminate such competition.

---

[54] *Id*. ¶89(2).

[55] *Id*. ¶ 89.

[56] *Id*. ¶ 90.

[57] *Id*. ¶ 81(2).

[58] *Id*. ¶ 91.

[59] *Id*. ¶ 110.

72.     The European Commission found that Amazon's Selection Parity Clauses "reduce innovation, quality and choice to the detriment of consumers" and "result in higher prices."[60] This is because Selection Parity Clauses reduce the incentives of market participants—including publishers and platforms—to develop eBooks that are not primarily text and prevent the differentiation of eBooks through innovative features or functions.[61]

73.     The Selection Parity Clauses have the effect of weakening competition among retail platforms and deter entry and expansions by retail platforms.[62] They also reduce the incentives of publishers to develop and invest in enhanced or highly illustrated eBooks.[63] "[D]eveloping enhanced or highly illustrated e-books with E-book Retailers competing with Amazon for their e-book readers or electronic devices could allow Ebook Suppliers to increase the strength of those E-book Retailers relative to Amazon and to promote entry and/or expansion. This may reduce their dependence on Amazon and improve their bargaining position."[64]

74.     Creating multiple versions of an eBook in different eBook formats may significantly increase development costs, particularly for enhanced or highly illustrated titles.[65] Even though those costs may be shared between the publisher and Amazon, the European Commission found that, in practice, publishers often prefer to produce the Amazon version of the eBook themselves and thus to incur the development costs to ensure good quality results and to

---

[60] *Id.* ¶¶ 92-93.

[61] *Id.* ¶ 92.

[62] *Id.* ¶ 93.

[63] *Id.* ¶ 97.

[64] *Id.* ¶ 99.

[65] *Id.* ¶ 101.

maintain the author's control over the final product.[66] Developing multiple versions in different formats increases the publisher's costs, making the development process unprofitable in comparison to the expected revenue, particularly for some highly illustrated eBooks such as those for children or young adults.[67]

75.     Evidence uncovered by the Commission further indicated that the obligation to assist Amazon and ensure that every version the publisher releases is compatible with Amazon's eBook readers can be burdensome, particularly for certain enhanced or highly illustrated titles because it requires cost and working time investments from E-book Suppliers.[68] And in certain cases the creation of an Amazon-compatible version may not be technically feasible.[69]

76.     As a result, the European Commission found the following anti-competitive effects with respect to publishers from the Selection Parity Clauses:

a.   "E-book Suppliers are likely to refrain from producing enhanced or highly illustrated eBooks in the first place in order to avoid having the obligation to also produce a version compatible with Amazon's eBook readers (or to bear the cost of providing assistance and materials to Amazon in that regard)." As an example, the Commission cited "evidence in the Commission's file show[ing] that for a number of highly illustrated print books eBook versions have not been produced for this reason."[70]

b.   "E-book Suppliers are likely to be induced to keep functionalities of enhanced ebooks simple and avoid interactive and more advanced functions for all E-book

---

[66] *Id.* ¶ 101.

[67] *Id.* ¶ 101.

[68] *Id.* ¶ 101.

[69] *Id.* ¶ 101.

[70] *Id.* ¶ 102.

- 37 -

Retailers in order to avoid the creation of a specific version for Amazon's ebook readers."[71]

    c.  "E-book Suppliers may delay the release of eBooks for competing E-book Retailers, as in light of the Selection Parity Clauses E-book Suppliers may feel compelled to develop first a version that is compatible with Amazon's devices."[72]

77.    The European Commission also found that the Selection Parity Clauses affect horizontal competition among retail platforms.[73] In particular, the Selection Parity Clauses weaken competition and deter entry and expansion by limiting the ability of platforms to differentiate eBook offerings on their platform.[74] Consumers are thus deprived of highly illustrated or enhanced eBooks that would otherwise be offered exclusively or earlier on competing eBook platforms.[75]

78.    This restraint prevents competing platforms from increasing sales by means of exclusive non-price promotions, exclusive content, or differentiated product offerings such as titles, special editions, or release dates.[76] Because publishers are restricted by the Selection Parity Clauses from offering non-price promotional projects to eBook distribution platforms, they "have reduced incentives to engage in such projects at all."[77] As the European Commission

---

[71] *Id.* ¶ 102.

[72] *Id.* ¶ 102.

[73] *Id.* ¶ 104.

[74] *Id.* ¶ 104.

[75] *Id.* ¶ 105(1).

[76] *Id.* ¶¶ 106, 108.

[77] *Id.* ¶ 109.

found, "retail competition at the e-book distribution level was likely weakened both in the short run and in the long run."[78]

79.     The anticompetitive effects also extend to the platforms themselves, who "have reduced incentives to invest in developing e-books or new editions (for example in cooperation with E-book Suppliers)."[79] Because competing eBook platforms know that additional sales triggered by their non-price related promotional activities would be made by Amazon as a result of the Selection Parity Clauses, these platforms do not engage in non-price promotional activities in the first place.[80]

80.     Yet such promotional activities are exactly what is necessary to overcome the costs of switching from the Amazon platform to a competing platform. As the European Commission found, "to induce potential customers to switch away from Amazon, competing E-book Retailers need to provide additional value to consumers, for example in the form of differentiated content or early releases of e-books":

> Buying e-books outside of Amazon's closed Kindle ecosystem may effectively impose a substantial burden ("switching costs") on the users of Amazon's Kindle e-reader. Therefore, to induce potential customers to switch away from Amazon, competing E-book Retailers need to provide additional value to consumers, for example in the form of differentiated content or early releases of e-books.[81]

81.     The anticompetitive effects of the Selection Parity Clauses not only maintain Amazon's monopoly power, but they also increase it by causing competing platforms to exit the

---

[78] *Id.* ¶ 109.

[79] *Id.* ¶ 110.

[80] *Id.* ¶ 110.

[81] *Id.* ¶ 112.

market.[82] This maintenance of Amazon's monopoly power results in higher prices and reduced choice in the market as a whole.[83]

### *Retail Price Parity Provisions*

82.     Amazon also employs several contractual clauses to foreclose retail price competition among competing distribution platforms:

a.     Agency Price Parity Clause. "[T]he Agency Price Parity Clause typically contractually obliges an E-book Supplier to set an agency price on Amazon that is no higher than the agency price charged on the platforms of, or by, competing E-book Retailers other than Amazon."[84]

b.     Promotion Price Parity Clause. "The Promotion Parity Clause rules out the possibility to temporarily set a lower retail price on the platform of a competing E-book Retailer (or requires the E-book Supplier to offer an equivalent promotion to Amazon)."[85]

c.     Discount Pool Provision. "[T]he Discount Pool Provision provides that Amazon has the ability to set a discounted price which is not above the cheapest retail price of any e-book distributed by that E-book Supplier via competing E-book Retailers."[86]

83.     Together, the European Commission refers to these pricing parity provisions as the "Retail Price Parity Provisions."[87] The European Commission found that "any of them is

---

[82] *Id.* ¶ 113.

[83] *Id.* ¶ 114.

[84] *Id.* ¶ 118.

[85] *Id.* ¶ 118.

[86] *Id.* ¶ 118.

[87] *Id.* ¶ 115.

directly or indirectly capable of ensuring price parity of retail prices among competing E-book Retailers."[88]

84.    Amazon utilizes Retail Price Parity Provisions to deter entry and expansion of competing distribution platforms, which in turn allows Amazon to obtain higher prices from consumers and increased commissions from publishers.[89] A potential entrant or a competing eBook distribution platform could normally attempt to increase its market share by charging a lower commission to publishers, to induce them to set lower retail prices and, hence, attract buyers.[90] But the Retail Price Parity Provisions prohibit publishers from setting lower retail prices (compared to those on Amazon) on any competing platform.[91]

85.    The Retail Price Parity Provisions limit the ability of a competing platform to attract buyers by offering lower retail prices than those on Amazon, thereby deterring entry and expansion while maintaining and increasing Amazon's monopoly power.[92] By preventing publishers from making available to competing platforms lower prices (compared to those on Amazon), Amazon prevents competing platforms from being able to offer customers advantages which would induce them to overcome the costs associated with switching away from Amazon.[93]

---

[88] *Id*. ¶ 118. The European Commission found that the Discount Pool Provision, regardless of wording or variation, has the same anticompetitive effects as the Agency Price Parity Clause in that it "ensure[s] retail price parity" and "replicate the effect of an Agency Price Parity Clause." *Id*. ¶¶ 132–35.

[89] *Id*. ¶¶ 116–17.

[90] *Id*. ¶ 122.

[91] *Id*. ¶ 122.

[92] *Id*. ¶ 122.

[93] *Id*. ¶ 123.

This prevents the entry or expansion eBook retail platforms and maintains Amazon's monopoly power in the market.[94]

86.     The Retail Price Parity Provisions also stifle competition for the commissions charged by eBook platforms.[95] As the European Commission found, "where Retail Price Parity Provisions are in place, E-book Retailers' incentives to compete on commission are limited" because "a competing E-book Retailer can no longer expect to attract customers from Amazon by offering lower rates of commission to E-book Suppliers."[96]

87.     The Retail Price Parity Provisions thus lead to higher consumer prices paid by consumers to the eBook platforms.[97] They also reduce the volume of eBooks sold on competing platforms and in the market as a whole.[98]

88.     "[W]ith Retail Price Parity Provisions in place, Amazon has the incentive to charge higher rates of commission, as E-book Suppliers cannot steer customers away from Amazon by setting a lower retail price on competing E-book Retailers' platforms that charge a lower rate of commission."[99] To the contrary, "[i]nstead of raising the retail price exclusively on Amazon as a consequence of higher rates of commission, E-book Suppliers will have to raise the retail price of their e-books uniformly on all E-book Retailers' platforms."[100] In other words, Amazon would "benefit from a higher commission and at the same time would not have to fear a

---

[94] *Id.* ¶¶ 123, 126.

[95] *Id.* ¶ 128.

[96] *Id.* ¶ 129.

[97] *Id.* ¶¶ 128, 131.

[98] *Id.* ¶ 129.

[99] *Id.* ¶130.

[100] *Id.* ¶ 130.

substantial loss of consumers, as the latter would also face higher retail prices at competing E-book Retailers."[101]

### *Price Notification Provisions*

89.     When the Big Five renegotiated their contracts with Amazon in approximately 2015, the consent decrees prevented them from having explicit MFNs in their eBook contracts. Until about 2017, while they were still subject to this prohibition, Amazon and the Big Five agreed to notification provisions that served the same function as the prohibited MFN provisions.

90.     Amazon includes "notice" provisions in its eBook distribution agreements, the purpose for which is to prevent any competitor retail platform from gaining volume and sales through lower prices:

> a.     Retail Price Notification Provision. The Retail Price Notification Provision obliges the publisher to notify Amazon if the agency price on Amazon is higher than the retail price charged on any competing eBook platform, including the publisher's own retail platform.[102]

> b.     Promotion Notification Provision. The Promotion Notification Provision obliges a publisher to notify Amazon if it offers any promotional agency price or promotional content to an eBook platform competing with Amazon.[103]

91.     The European Commission found that, "[o]nce notified by an E-book Supplier on the basis of those provisions, Amazon typically requests from that Ebook Supplier that the same low retail price or promotional agency price that is charged on the platform of the competing E-

---

[101] *Id*. ¶ 130.

[102] *Id*. ¶ 137.

[103] *Id*. ¶ 137.

Book Retailer is also offered to Amazon."[104] The notification provisions function as full-fledged price parity (or in US-parlance MFN) provisions because Amazon explicitly threatens to punish publishers if they do not accede to such requests by Amazon.[105]

92.     Amazon has numerous threats at its disposal to induce publishers to avoid even temporarily lower prices on competing platforms.[106] Such measures could be implemented swiftly, without any need of approval by the publisher and without terminating any agreement, which makes them very credible threats to induce publishers to modify their prices on Amazon.[107]

93.     The European Commission found that "the Retail Price Notification Provision and the Promotion Notification Provision and Amazon's policy to request parity result in anti-competitive effects which are very similar to those of the Retail Price Parity Provisions."[108] Several eBook publishers admitted that they were hindered from offering lower prices or promotions on the platforms of E-book Retailers competing with Amazon.[109] Similarly, publishers "turned down" proposed promotions from eBook retailers "because of the concern that such promotions would have to be notified to Amazon."[110]

94.     Consumers have therefore paid higher prices on competing platforms then they would otherwise had paid without the Notification Provisions.[111]

---

[104] *Id.* ¶ 137.

[105] *Id.* ¶ 138.

[106] *Id.* ¶ 138.

[107] *Id.* ¶ 138.

[108] *Id.* ¶ 139.

[109] *Id.* ¶ 143.

[110] *Id.* ¶ 142.

[111] *Id.* ¶ 143.

### *Additional Notification Provisions*

95.     Amazon's agreements with publishers contain certain non-price related Notification Provisions. Those additional Notification Provisions obligate the publisher to notify Amazon if (i) the publisher distributes eBooks with an eBook retail platform under a given business model other than Amazon's; (ii) the publisher makes a given eBook available for sale (in exchange for payment or for free) through an eBook retail platform and either does not also make such eBook available for sale through Amazon or makes it available through Amazon at a different date or time; or (iii) the publisher makes available a particular feature, functionality, usage rule, element or content for a particular eBook for an eBook retail platform that the publisher does not also make available for Amazon.

96.     Amazon integrates these non-price-related Notification Provisions in the relevant parity clauses (for example, Business Model Parity Clause or Selection Parity Clauses) in their distribution agreements.[112]

## C.     Amazon's supracompetitive transaction fee and Parity Clauses cause supracompetitive consumer prices.

97.     Economists studying price parity clauses in platform agreements have found that such clauses "generally harm competition."[113] In particular, "MFNs employed by online platforms can harm competition by keeping prices high and discouraging entry."[114] As one study explained, the price parity clauses "tend to raise fees charged by platforms and prices

---

[112] *Id.* at ¶ 34.

[113] J. Baker & Fiona Scott Morton, Antitrust Enforcement Against Platform MFNs, 127 Yale LJ 2176, 2178 (2018). See also *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, 2018 U.S. Dist. LEXIS 220574, at *88 (S.D.N.Y. Dec. 26, 2018) (The "presence of . . . 'most favored nation' provisions[] raises antitrust scrutiny, even if they may have certain procompetitive effects.").

[114] Baker & Morton, *supra* note 113, at 2201.

charged by sellers," and they "disadvantage potential platform entrants—especially those with low-end business models—by eliminating an entrant's ability to win customers away from incumbent platforms through lower prices."[115] Another study concluded that platform MFNs (or, as called in the study, wide price-parity clauses or wide PPCs) "undermine competition," are "never good for consumers or overall welfare," and should not be allowed at all.[116]

98.     As predicted by economic literature, Amazon's MFN and other Parity Clauses have resulted in supracompetitive transaction fees and higher retail prices paid by consumers.

99.     One way economists evaluate a firm's supracompetitive fee is by comparing the firm's economic-profit rate to the firm's but-for competitive economic-profit rate. By that measure, Amazon economic-profit rate on the eBook transactions far exceeds the rate of economics profits obtained by comparable firms and platforms or even, for that matter, by Amazon itself in other markets. Amazon's transaction fee vastly exceeds Amazon's transaction cost, which on average is only $0.06 to deliver each eBook[117] plus Amazon's low transaction processing costs.[118] For example, when Amazon sells a $10 eBook, its delivery cost as a percentage of the sales price is $0.06—meaning that a 30% transaction fee is many times Amazon's transaction cost, earning Amazon a return greater than 300%. By comparison, a recent study evaluated the economic-profit rates of 13,342 U.S. and non-U.S. firms in the

---

[115] Andre Boik & Kenneth S. Corts, The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry, 59 J.L. & Econ. 105, 107 (2016).

[116] Chengsi Wang & Julian Wright 51 Rand J. Econ. 1, 51–52 (2020).

[117] Amazon, *eBook Royalties*, https://kdp.amazon.com/en_US/help/topic/G200644210 (explaining that "[a]verage delivery costs are $0.06 per unit sold").

[118] *Supra* note 5.

period 1999 through 2010.[119] The economic-profit rate at the 95th percentile is 16.9%.[120]

Amazon's profit on its 30%-plus transaction fee far exceeds that rate by any measure.

100.     Competing eBook platforms also provide a yardstick for a competitive but-for transaction fee. For example, the eBook platform Smashwords charges a 15% transaction fee for eBook transactions on its platform.[121] Likewise, Aerbook Retail, an eBook transaction platform that leverages social media, charged a 15% transaction fee before it was acquired by a major book distributor.[122] Even Google and Apple—companies that have significant clout in other contexts—charge a flat 30% transaction fee for all eBooks sold on their platforms, which while lower than Amazon, are still grossly inflated because they have no incentive to lower such fees due to Amazon's Parity Clauses eliminating platform competition.

101.     In sum, in a but-for competitive world, Amazon would be expected to earn a much lower competitive economic return, on the order of 15% or lower, which is a fraction of Amazon's actual-world transaction fee.

102.     Consistent with that conclusion, and contrary to Amazon's baseless assertion that its publisher agreements give the Big Five an incentive to set prices low, Amazon's agreements had the immediate effect of the Big Five raising their prices to account for Amazon's supracompetitive transaction fees.

---

[119] Williams, M. Baek, G., Park, L., Zhao, W. (2016), "Global Evidence on the Distribution of Economic Profit Rates," *Physica A*, vol. 458, pp. 356-363.

[120] *Id.* at 358, Table 1.

[121] Smashwords, *FAQ*, https://www.smashwords.com/about/supportfaq#pricing.

[122] Calvin Reid, *Aerbook Turns Social Media Into a Virtual Bookstore*, Publishers Weekly (Mar. 14, 2014), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/61453-aerbook-turns-social-media-into-a-virtual-bookstore.html.

103.   Under their consent decrees in the United States and their parallel settlements with the European Commission, the Big Five were allowed to continue their agency model, but for five years they were prohibited from entering into a price MFN with any retail bookseller, and for two years they were prohibited from interfering with eBook retailers' price competition that lowered the eBook prices (i.e., the retailers applying their own discounts to reduce the prices set by the Big Five). When the European Commission investigated Amazon's eBook contracts, including with the Big Five, it found that Amazon and the Big Five had successfully evaded the MFN prohibition by implementing notification provisions that Amazon designed to have the same effect as explicit MFNs.

104.   So from about late 2012 (when the consent decrees took effect) until 2015 (when the Big Five's agreements with Amazon with functional MFNs took effect), eBook pricing reflected competition. The source of the competition was not the Big Five but instead retail platforms that competed with each other to make sales and gain market share by lowering the prices of eBooks sold through their platforms.

105.   This competitive pricing, spurred on by eBook retailers, came to an abrupt halt when the Big Five's contracts with Amazon took effect in 2015. While "[n]o court can presume to know the proper price of an ebook," before and after pricing gives a very clear picture of eBook pricing in a competitive market. [123]

106.   Pricing data shows that the week after the Big Five's respective contracts with Amazon took effect, Penguin increased its eBook prices by 30.4%, HarperCollins by 29.3%, Simon & Schuster by 15.8%, Macmillan by 10.7%, and Hachette Book Group by 8.3%. And at

---

[123] *Apple,* 791 F.3d at 328–29.

least one study found that, controlling for other variables, Amazon's agreements with the Big

Five increased the price of eBooks on Amazon's platform by 14%.

107.     Likewise, the Wall Street Journal reported the deals led to *higher* prices for the

Big Five's trade eBooks.[124] Codex Group, a book-industry analysis firm, reported in 2015 that

trade eBook prices from the Big Five cost, on average, $10.81, while all other eBooks on the

Amazon platform had an average price of $4.95.[125] In another telling example, Amazon sold the

newly released James Patterson's thriller *Invisible* in eBook format for the heavily discounted

price of $8.99 in 2014, but when his thriller *Alert* debuted in 2015—after Mr. Patterson's

publisher, Hachette, signed the agency agreement with Amazon—the *Alert* eBook sold for

$14.99 (i.e., a 67% higher price).[126]

108.     Publishing executives acknowledge that the "higher e-book prices, resulting

from the Amazon deals, are discouraging purchases."[127] Book sales data analyzed by Nielsen

Book (now known as NPD BookScan) confirms this. It finds that the "return of agency pricing

by the Big Five trade houses in 2015 raised e-book prices by an average of $3, leveling off at

about $8 per book. *That jump in prices coincided with the downturn in e-book sales for

traditional publishers*. And while *e-book prices for the Big Five were rising*, prices for self-

published books were settling in at about $3."[128]

---

[124] Trachtenberg, *supra* note 20.

[125] *Id*.

[126] *Id*.

[127] *Id*.

[128] Jim Milliot, *The Bad News About E-books*, Publishers Weekly (Jan. 20, 2017), https://www.publishersweekly.com/pw/by-topic/digital/retailing/article/72563-the-bad-news-about-e-books.html (emphasis added).

109.   As the following charts demonstrate, the Big Five eBooks experienced competitive pricing only when retail platforms could differentiate on price. But as soon as the Big Five entered into their combined agency and MFN agreements, first with Apple and now with Amazon, they raised trade eBook prices and maintained them at supracompetitive levels for the duration of those agreements[129]:



---

[129] The charts represent the weighted average eBook price for each of the Big Five with prices adjusted for inflation. The charts draw from a data sample consisting of New York Times bestsellers starting from February 13, 2011, when the first eBooks appeared on the NYT list, to December 1, 2020.





010888-12/2075606 V1





010888-12/2075606 V1

110.    Defendants raised trade eBook prices by increasing the price point for new releases and by consolidating prices to fewer price buckets. During the conspiracy in 2011 and 2012, the Big Five priced 80% of their eBooks within just four price buckets. This roughly doubled in 2013 through 2014, when the DOJ ensured competitive trade eBook pricing by enforcing the consent decrees entered against the Big Five Co-conspirators and protecting competitive pricing by the retail platforms.

111.    After entering into their agreements with Amazon in 2015, the Big Five Defendants gradually reverted to using three or four price buckets by 2018 and through the present, as illustrated by the following chart:



112.    The Big Five eBook prices had the greatest price diversity in 2014, while the consent decrees required them to allow retailer discounting. After adjusting for inflation, trade eBook prices in 2014 clustered around $12 and only about 5% of titles sold for around $15,

whereas in 2020, which represents greater price conformity, 55% of titles sold for around $15 and less than 5% sold around $12:





113.     One market observer, writing in 2018, estimated an average price increase of $5 per title over the preceding few years and concluded that eBook sales were low because "many people find that paying $15.00 to $22 for a Kindle book, is too expensive."[130] In that same period, eBook sales declined by 24%.

114.     Crucially, the agreements between Amazon and each of the Big Five relied on a functional MFN, which eliminated competitive pricing across all retail eBook platforms. Had Defendants only raised prices on the Amazon platform without MFNs or similar parity clauses, Amazon would have faced competition from companies that operate well-known and resourced platforms for selling eBooks and that have established and substantial bases of consumers, including Google, Apple, and Barnes & Noble. Amazon also would have faced competition from other eBook platforms including Kobo and Smashwords. All those competing platforms would have been incentivized, in the absence of Amazon's MFNs and other parity provisions, to compete by offering lower commissions and better products.

115.     Likewise, Amazon would have faced competition from each of the Big Five that had sufficient scale and inclination to establish their own eBook transaction platforms with costs comparing to Amazon's own low transaction costs. Indeed, HarperCollins actually operates its own eBook transaction platform, and each of the other Big Five publishers explored potentially operating their own eBook platforms—either by establishing such a platform itself or by using white-labeled eBook platforms (including, for example, BookShout, which is an eBook platform that charged lower fees but failed to gain sufficient market share in the face of Amazon's anticompetitive conduct and eventually was absorbed by a leading book distributor).

---

[130] Michael Kozlowski, *Are ebooks too expensive in 2018?*, GoodEReader (May 14, 2018), https://goodereader.com/blog/e-book-news/are-ebooks-too-expensive-in-2018.

**D.      Amazon has responsibility for the supracompeititve eBook prices charged by the Big Five.**

116.      Like Apple before it, Amazon "heard [the Big Five's] unanimous condemnation of the $9.99 price point and desire to raise e-book prices."[131] For example, "Macmillan made no secret of its intention to raise prices. [Macmillan CEO] Sargent wrote to [Amazon's Vice president of Kindle] Grandinetti on February 2, [2010] that '[w]e can not budge on the final price that the consumers pay for our books. . . . That is the very heart of the agency model, and it is why we are doing this. . . . [W]e can not give up control of price.'"[132]

117.      For a time Amazon defended the retailers' competitive pricing of trade eBooks. As late as 2014, Amazon publicly argued that higher eBook prices could not be justified: "With an e-book there's no printing, no overprinting, no need to forecast, no returns, no lost sales due to out-of-stock, no warehousing costs, no transportation costs, and there is no secondary market – e-books cannot be resold as used books," so "E-books can be and should be less expensive."[133] And Amazon warned that higher priced eBooks depress consumer demand: "For every copy an e-book would sell at $14.99, it would sell 1.74 copies if compared at $9.99. So, for example, if customers would buy 100,000 copies of a particular e-book at $14.99, then customers would buy 174,000 copies of that same book at $9.99. Total revenue at $14.99 would be $1,499,000. Total revenue at $9.99 is $1,738,000."[134]

118.      In Apple's case, the retailer colluded with the Big Five because it "wanted to announce a well-stocked iBookstore" in record time; "it wanted to avoid competing with

---

[131] *Apple*, 952 F. Supp. 2d at 691.

[132] *Id.*

[133] Kozlowski, *supra* note 130.

[134] *Id.*

Amazon, an arch rival in the market, on the basis of price; and it wanted a guaranteed profit on any new business it entered. To accomplish these goals, Apple was willing to offer the Publisher Defendants a roadmap for raising retail e-book prices well above Amazon's $9.99 price point."[135]

119.    Despite their different positions in the market (Apple as new entrant and Amazon as the dominant retailer), Amazon had a similar motive for colluding with the Big Five. Before Apple arrived on the scene, Amazon sought to maintain its monopoly by competing on price, but the Apple conspiracy made clear that the Big Five could freely confer monopoly power on Amazon without the need to compete. By permitting the Big Five to raise trade eBook prices and eliminating retail price competition, Amazon could maintain or expand its monopoly share without risking its market share or losing profits. As the European Commission found, Amazon loaded its eBook contracts with parity provisions that exceeded the restrictions Apple imposed and prevented other retailers from competing with Amazon, not only on price, but also on product offering and promotions. These provisions increased Amazon's dominance as the primary retail platform from which to purchase eBooks, while reducing consumer choice, increasing consumer prices, and depressing output.

120.    According to the House Antitrust Committee, Amazon has always employed MFNs or their equivalents in its contracts with trade publishers.[136] And the objective of the MFNs and other Parity Clauses (including the notification provisions) is always the same: to prevent "publishers from partnering with any of Amazon's competitors" and to reinforce

---

[135] *Apple*, 952 F. Supp. 2d at 692.

[136] House Report at 248–49.

"Amazon's 'stranglehold' and 'control' over book distribution."[137] Through its MFNs and other

Parity Clauses, Amazon has acquired and maintained its monopoly power.[138] Competitors lack

any incentive to offer promotional advantages or alternative business models, like eBook rentals,

because Amazon demands that the Big Five offer the same options on the Amazon platform.[139]

The result is higher consumer prices, fewer technical innovations in eBooks, and fewer

innovations in the business of distributing eBooks.[140]

121.    Amazon's price-fixing agreements with the Big Five are part of a larger pattern

of price-fixing as a means of controlling retail competition.[141] For example, with its suppliers

on Amazon Marketplace, Amazon employs a minimum-margin-guarantee clause, which

penalizes suppliers if their other distributors (Amazon's online retail competitors) sell the same

products at lower prices than Amazon and, in turn, forces the suppliers to adopt minimum resale

policies that harm consumers.[142] And with its 2.4 million third-party sellers on Amazon

---

[137] *Id.*

[138] *Id.*

[139] *Supra* Section V.B.

[140] *Id.*

[141] House Report at 28. *See also* BKartA Decision, *supra* note 36. The harmful effect of Amazon's anticompetitive agreements with its third-party sellers in the United States is the subject of a separate consumer antitrust class action lawsuit. *Frame-Wilson v. Amazon*, Case No. 2:20-cv-00424-RAJ (W.D. Wash) (filed March 19, 2020). In August of 2020, the Competition Bureau Canada announced its own investigation to determine whether any Amazon policies "impact third-party sellers' willingness to offer their products for sale at a lower price on other retail channels, such as their own websites or other online marketplaces." Competition Bureau, https://www.canada.ca/en/competition-bureau/news/2020/08/competition-bureau-seeks-input-from-market-participants-to-inform-an-ongoing-investigation-of-amazon.html.

[142] House Report at 225, Questions for the Record from the Honorable David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, Questions for David Barnett, Founder and CEO, PopSockets, https://docs.house.gov/meetings/JU/JU05/20200117/110386/HHRG-116-JU05-20200117-QFR007.pdf. The harmful effect of Amazon's anticompetitive agreements with its suppliers in

---

Marketplace, Amazon uses an MFN provision to prevent the third-party sellers from selling at lower prices on competing online retail marketplaces—an arrangement that is outlawed by German antitrust authorities because it "constitutes horizontal price fixing" between competing online retailers.[143] Amazon currently employs a "Fair Price Policy" on Amazon Marketplace, described as a "thinly-veiled MFN," which prevents "competition from other marketplaces and does not result in lower prices for consumers as Amazon has claimed."[144] Each of these agreements increases consumer prices, while immunizing Amazon from competition and thus reinforcing its dominance.

122.     Amazon bears responsibility for the higher eBook prices that Plaintiffs and class members pay. It is Amazon's agreement with the Publisher Defendants' "to fix prices . . . that violates the Sherman Act," and the "imposition of high prices pursuant to [that] illicit agreement" is the consequence.[145] It does not matter that the Big Five set the specific prices of their eBooks without consulting with Amazon because fixing prices "by one member of a group, pursuant to express delegation, acquiescence, or understanding, is just as illegal as the fixing of prices by direct, joint action."[146]

**E.     The Big Five bear responsibility for the supracompetitive prices and Amazon's current market dominance.**

123.     The Big Five assert that they do not "benefit from immunizing Amazon from competition" and, instead, that they are motivated to abate "Amazon's dominance as an eBook

---

the United States is the subject of a separate consumer antitrust class action lawsuit. *Brown v. Amazon*, No. 2:22-cv-00965-JHC (W.D. Wash) (filed Jul. 13, 2022).

[143] BKartA Decision, *supra* note 36, at 3.

[144] House Report at 249.

[145] *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 399 (2d Cir. 2002).

[146] *United States v. Masonite Corp.*, 316 U.S. 265, 275–76 (1942).

retailer."[147] Yet the Big Five's agreements with Amazon accomplish the exact opposite, resulting in reduced choice, stifled innovation, decreased output, and increased price in the transaction market for the sale of trade eBooks. And, far from innocent victims they claim to be, the Big Five are responsible for introducing a system that is a direct and continuing result of their conspiracy to fix eBook prices.

### 1. The Big Five previously conspired with Apple to fix trade-eBook prices.

124.    It is true that Amazon's early dominance of the retail market for eBooks had made the Big Five anxious. Recall that, when eBooks were introduced, the industry still operated under the wholesale model, not the agency model, and Amazon set a $9.99 price point that the Big Five feared would hurt their profits. In the short-term, the publishers believed that the low price point was eating into sales of their more profitable hardcover trade books, which they often priced at thirty dollars or more, and in the long-term, they feared that consumers would grow accustomed to trade eBooks priced at $9.99 and would expect comparable prices for print books.[148]

125.    The Big Five also feared Amazon's growing power in the trade book industry and were worried that Amazon would render them obsolete by negotiating directly with authors and literary agents for rights.[149] To counter Amazon's growing power, the Big Five determined that they needed to force Amazon to abandon its competitive pricing model. As Hachette bluntly put it, they had to prevent Amazon's "wretched $9.99 price point becoming a de facto standard."[150] Simon & Schuster likewise described it as the "basic problem: how to get Amazon to change its

---

[147] ECF 167 at 22.

[148] *Apple*, 952 F. Supp. 2d at 649.

[149] *Id.*

[150] *Id.* at 650, 653.

pricing and move off its $9.99 price point," and Macmillan referred to Amazon's price policy as "book devaluation to $9.99."[151]

126.     Each of the Big Five reached out to Amazon in the hopes of changing the low $9.99 price point. In February 2009, Penguin told Amazon that "their 9.99 model was not a good sustainable one."[152] HarperCollins warned Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers."[153] In March 2009, Macmillan met with Amazon to likewise express "concern with the $9.99 price point, and indicated that all the pubs were talking about it."[154] In June 2009, Simon & Schuster told Amazon that the $9.99 price point was "a mistake" and "terrible for the business."[155] In early December 2009, Hachette told Amazon that its "$9.99 pricing posed a big problem for the industry," but that if Amazon would raise trade eBook prices "by even one or two dollars it would solve the problem."[156]

127.     When Amazon refused their entreaties, the publishers recognized the importance of coordinating their efforts to raise prices. One publisher's internal memo stated that, "the industry needs to develop a common strategy."[157] The publishers had regular opportunities to conspire, as the senior executives for each of the publishers meet on a quarterly basis in private dining rooms in New York restaurants without lawyers present.[158] At the bench trial against Apple, the publishers' CEOs testified that they "felt no hesitation in freely discussing Amazon's

---

[151] *Id.* at 650.

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *United States v. Apple, Inc.*, 791 F.3d 290, 300 (2d Cir. 2015).

[158] *Apple*, 952 F. Supp. 2d at 651.

prices with each other and their joint strategies for raising those prices."[159] The court found that "[w]hile no one Publisher could effect an industry-wide shift in prices or change the public's perception of a book's value, if they moved together they could."[160]

128.    Frustrated by Amazon's initial unwillingness to collude at that time, the Big Five turned to Apple to put an end to competitive trade eBook prices. Apple expressed immediate interest. As long as it could sell trade eBooks profitably, Apple anticipated that it would generate even more revenue than selling digital music, where Apple dominated.[161] Apple believed that the iPad, which it would launch in 2010, would be a transformational e-reader—because, in contrast to the existing black-and-white e-readers, the iPad would display not only text but also illustrations and photographs in color on a backlit screen, and would have audio and video capabilities, which would enhance the eBook reading experience.[162]

129.    On December 8, 2009, Apple's team contacted the Big Five to set up meetings the following week to discuss an "extremely confidential" subject. Apple made it clear that it would be trying to meet with each of the Big Five.[163] Even before meeting with the Big Five, Apple already knew that the publishers were eager to raise the $9.99 price point for all trade eBooks, and that they had to coordinate their efforts to achieve that goal.[164] To bring the Big Five to the table, therefore, Apple offered a way to collectively raise the price above $9.99. Over the course

---

[159] *Id.* (paraphrasing the witnesses' testimony).

[160] *Id.* at 665.

[161] *Id.* at 654–56.

[162] *Id.* at 655.

[163] *Id.*

[164] *Id.* at 656.

of the next few weeks, Apple and the Big Five agreed that to make this happen, the Big Five

would have to adopt the agency model.

130.    Under the agreement, Apple received a 30% commission for providing the

transaction platform.[165] The Big Five stood to make less money on each sale under the agency

model than they would under the wholesale model, but agreeing to Apple's proposal would

accomplish their overarching long-term goal: raising prices.[166]

131.    Initially, some of the Big Five objected to the agency model. To force their hand,

Apple's in-house counsel introduced an MFN clause in the proposed agreements that would

ensure that the Big Five's trade eBooks would be sold on Apple's eBooks store for the lowest

retail price available in the marketplace.[167] MFNs are common devices that allowed companies

to get the lowest prices from their suppliers, by getting the seller to agree to treat them as

favorably as any of their other customers. Apple had used an MFN in one of its music

agreements before, but it had purchased the music under a wholesale model, where Apple

demanded the lowest price and best terms from its supplier. Apple's use of an MFN *for a retail*

*price* was a unique feature of its eBook agency agreements: it did not reduce Apple's costs but,

instead, guaranteed that eBooks in Apple's e-bookstore would set the floor for consumers on all

eBook retail platforms.[168] By combining the MFN with the pricing tiers, Apple allowed the Big

---

[165] *Id*. at 658–62.

[166] *Apple*, 791 F.3d at 305 ("Under Apple's initial agency model—with price caps but no MFN Clause—the publishers already stood to make *less* money per ebook with Apple. Because Apple capped the ebook price of a $25 hardcover at $12.99 and took 30% of that price, publishers could only expect to make $8.75 per sale. But what the publishers sacrificed in short-term revenue, they hoped to gain in long-term stability by acquiring more control over pricing and, accordingly, the ability to protect their hardcover sales.").

[167] *Apple*, 952 F. Supp. 2d at 662.

[168] *Id.*

Five to set the retail prices of their eBooks, while at the same time guaranteeing that Apple

would never have to compete on price because if another retailer sold at a lower price, the

publishers would have to lower their price on Apple's eBook store.[169] As a practical matter, the

Big Five would need to adopt an agency model with other eBook retailers, including Amazon, to

prevent retail price competition.[170]

132.    The MFN not only ensured that no eBook retailer could underprice Apple, it also

enabled the Big Five's collective action. As the Second Circuit explained, "[t]he MFNs in

Apple's Contracts created a set of economic incentives" that "were only attractive to the

Publisher Defendants to the extent they acted collectively."[171] The Second Circuit added: "By the

very act of signing a Contract with Apple containing an MFN Clause, then, each of the Publisher

Defendants signaled a clear commitment to move against Amazon [and the industry practice of

retail discounting], thereby facilitating their collective action."[172]

133.    Apple and the Big Five ultimately agreed to cap trade eBook prices at $12.99 for

new release titles with hardcover list prices of $30 or under and set a $14.99 price cap for new

release titles with hardcover list prices above $30. For eBooks other than new releases, the price

cap was set at $9.99.[173] Despite the significant reduction in revenue the Big Five would receive

for each trade eBook sold under the agency model, Apple played to the Big Five's long-term

---

[169] *Id.*

[170] *Id.* at 663.

[171] *Apple*, 791 F.3d at 320.

[172] *Id.* at 317.

[173] *Apple*, 952 F. Supp. 2d at 667.

interest in raising trade eBook prices.[174] Notably, Defendants Hachette and Macmillan agreed to the terms with Apple despite their legal concerns about "price matching" under the MFNs.[175]

134.    Through a coordinated effort, the Big Five forced Amazon to accept the agency model by threatening to withhold publication of their trade eBooks for seven months after their release as print publications.[176] At the same time, Macmillan CEO John Sargent tried to create the impression that the company had acted alone and that the other Big Five Defendants had followed of their own accord, when he publicly disclosed his negotiations with Amazon.[177] After Amazon's unsuccessful attempt at retaliation, which temporarily devalued its stock, Amazon acceded to the Big Five's demands,[178] but not before Amazon filed a complaint with the FTC. Between March and June of 2010, Amazon finalized agency agreements with all of the Big Five. Each of the Big Five's agreements with Amazon included a "model parity" clause. This gave Amazon the option to return to a wholesale model of distribution if the publisher agreed to a wholesale distribution arrangement with any other eBook retailer.[179]

135.    Google entered the eBook market at the same time as Apple. The Big Five made it clear to Google that their agreements with Apple made them "unwilling to enter into non-agency agreements with Google."[180] The Big Five also adopted an agency model with Barnes & Noble.[181]

---

[174] *Id.* at 665.

[175] *Id.* at 674.

[176] *Id.* at 679–80.

[177] *Id.* at 680.

[178] *Id.* at 680–81.

[179] *Id.* at 681.

[180] *Id.* at 686.

[181] *Id.* at 657, 675, 700.

136.    The effect was a significant and pervasive increase in trade eBook prices. As the following graph indicates, when Apple's eBook store opened in April 2010, trade eBook prices soared for the four publishers that finalized their agency agreements with Amazon in March (first vertical line), while Penguin's price increases followed within a few weeks of executing its June 2010 agreement with Amazon (second vertical line).[182]



137.    In the short term, the plan paid off for Apple and the Big Five. Apple seized 22% of the eBook market in the first two months of operation and the Publisher Defendants increased their eBook prices immediately.[183] But the Publisher Defendants sold 12.9% fewer eBooks[184]

---

[182] The graph is included in the Court's 2013 order following a bench trial. *Id.* at 682. The bottom flat line (G) represents the average prices of non-major publishers, who were not a part of the conspiracy. Random House (line F), then separate from Defendant Penguin, also did not join in the conspiracy and its average prices remained around $8, although it later followed suit and adopted an agency model and raised prices, too. *Id.* at 682 and 685.

[183] Marco Tabini, *Apple grabs 22 percent of eBook market with iBooks* Macworld (Jun. 7, 2010), https://www.macworld.com/article/1151813/ibooks.html.

[184] *Apple*, 791 F.3d at 310.

while concurrent sales of the lone holdout in the conspiracy, Random House (then separate from

Penguin), increased by 41%.[185] The Publisher Defendants also lost eBook revenue under the

agency model, which they offset in part by raising the prices of their hardcover books.[186]

138.     It was not long, however, before Apple and the Big Five faced the legal

consequences of their collusion.

**2.     Authorities in the United States and Europe sanctioned the Big Five for their price-fixing conspiracy to fix trade-eBook prices.**

139.     The European Commission first opened proceedings in December 2011 against

the Big Five and Apple to determine whether they colluded in raising retail prices of trade

eBooks.[187] The Big Five already faced a consumer class action filed in this District in August

2011 that raised the same allegations. The DOJ and 33 states and territories followed with their

own enforcement actions in this District in early 2012.[188]

140.     Rather than risking an adverse judgment, the Big Five settled claims in the United

States and Europe. Under the terms of consent decrees with the DOJ entered in 2012 and 2013,

the Big Five agreed to terminate their contract with Apple and any other eBook retailer that

restricted the retailers' ability to discount eBooks.[189] For a period of two years, the Big Five

agreed that they would permit eBook retailers to discount eBook prices and to offer promotions

to encourage consumers to purchase eBooks, and for a five-year period the Big Five agreed not

to enter into any agreement with an eBook retailer that contained a Price MFN for the sale of

---

[185] *Apple*, 952 F. Supp. 2d at 684–85.

[186] *Apple*, 952 F. Supp. 2d at 683.

[187] EC Decision ¶ 19.

[188] *Apple*, 791 F.3d at 296.

[189] *See U.S. v. Apple, Inc.*, *et al.*, Department of Justice, https://www.justice.gov/atr/case/us-v-apple-inc-et-al.; *e.g.*, Final Judgment Penguin at 8–9.

eBooks.[190] The Big Five agreed to the same restrictions in Europe under their settlements with European Commission on December 12, 2012, and July 25, 2013.[191]

141.    But while the Big Five extricated themselves from the proceedings by agreeing to the final judgments and the temporary restrictions imposed by the judgments, the Big Five were never required (and never did) admit guilt or otherwise repudiate their horizontal price-fixing conspiracy. To the contrary, the judgments were explicit that the Big Five "d[id] not constitute any admission by Settling Defendants that the law has been violated."[192] Indeed, "at trial" and under oath, the Publisher Defendants denied "that they discussed the Apple Agreement with one another . . . or that those conversations occurred at all, in the face of overwhelming evidence to the contrary[.]"[193]

142.    As for Apple, after a 20-day bench trial in this District, the court found that Apple and the Big Five engaged in a *per se* illegal horizontal price fixing agreement, which had the intent and effect of eliminating price competition in the trade eBook market and increasing the retail price of trade eBooks.[194] The evidence showed that Apple "made a conscious commitment to join a scheme with the Publisher Defendants to raise the prices of e-books" and that it was only through "the coordinated effort and conscious commitment of the Publisher Defendants and Apple" that the defendants were able to "effect a significant increase in the retail prices of e-books."[195] The court also held in the alternative that the plaintiffs had proved an unreasonable

---

[190] *Id.* at 11 and 18.

[191] EC Decision ¶ 19.

[192] Final Judgments of Hachette, HarperCollins, and Simon & Schuster (9/6/12); *see also* Final Judgment of Penguin (5/17/13) (same); Final Judgment of MacMillan (8/12/13) (same).

[193] *Apple*, 952 F. Supp. 2d at 693 n.59.

[194] *Apple*, 952 F. Supp. 2d at 694.

[195] *Id.* at 697.

restraint on trade under the rule of reason by demonstrating that the agreements "removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved Apple of the need to compete on price, and allowed the [the Big Five] to raise the prices for their e-books, which they promptly did[.]"[196] The court entered a $450 million judgment against Apple and enjoined it from entering into any agreements with the Big Five that would prevent it from lowering eBook prices beyond the 2-year deadline imposed by their consent decrees, and the Second Circuit affirmed on appeal.[197] Judge Livingston, who wrote the Second Circuit panel's majority opinion affirming Apple's liability, separately opined that the evidence was also sufficient to hold Apple liable under the quick look analysis.[198]

143.    In Europe, the European Commission likewise found that the Big Five had colluded with Apple to raise prices.[199] The price-fixing conspiracy found by the District Court and European Commission consisted of the Big Five switching to an agency model and agreeing to an MFN with Apple to ensure that the Big Five sold their trade eBooks at the same prices through Apple's online store as through all other eBook retailers, including Amazon.[200]

144.    Separately, in 2012, regulators at the U.K. Office of Fair Trading (OFT) and regulators at Germany's Federal Cartel Office, the Bundeskartellamt ("BKartA"), concurrently investigated the anticompetitive effect of MFNs in Amazon's agreements with third-party

---

[196] *Id.* at 694.

[197] *In re Electronic Books Antitrust Litig.*, 639 F. App'x 724, 726 (2d Cir. 2016). This prohibition began upon entry of the order and expired at different times for each of the Big Five Defendants. *Apple*, 791 F.3d at 336.

[198] *Apple*, 791 F.3d at 329–30, 339–40.

[199] EC Decision ¶ 19.

[200] *Id.*; *Apple*, 952 F. Supp. 2d at 663–65.

retailers to sell on its platform.[201] Concerned that Amazon's clause could drive up online prices for consumers, OFT opened a formal investigation after receiving "numerous complaints" that Amazon prohibited its third-party sellers from selling their products at lower prices through other online outlets, including their own websites.[202] At the conclusion of its investigation, BKartA found that Amazon's "horizontal price-fixing" agreement acts as a "barrier[] to market entry for new competitors and hinder[s] the expansion of existing competitors in the market."[203] It further found that the MFN is "a hardcore restriction in that it limits price-setting behaviour, [which] cannot be seen either as an indispensable restriction, or as an appropriate way of involving consumers with regard to its price-raising effect."[204] Instead, the MFN "results in safeguarding Amazon's large own-account share of sales as a competitor and the extensive reach of amazon.de, which cannot be attacked by competing platforms."[205] Faced with these findings, Amazon capitulated and agreed not to employ MFNs in its third-party seller agreements in the European market.[206] Having achieved their goal, OFT and BKartA closed their investigations in November 2013.[207]

---

[201] Dan Prochilo, *UK May Drop Antitrust Probe into Amazon Pricing Policy*, Law360(Aug. 29, 2013), https://www.law360.com/articles/468842/uk-may-drop-antitrust-probe-into-amazon-pricing-policy. OFT closed in 2014 and was succeeded by the newly created Competition and Markets Authority.

[202] *Id.*

[203] BKartA Decision, *supra* note 36, at 3.

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] *Id.*; OFT, *Amazon online retailer: investigation into anticompetitive Practices*, https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices.

145.    Amazon remained undeterred. Tellingly, not long after its concession to European authorities, Amazon presented a slide in a 2014 presentation, titled "Risk Analysis," which advised company members to "Test the Boundaries of what is allowed by law."[208] Despite having disavowed its MFNs in one context, Amazon nonetheless employed MFNs in the eBook markets—including in North America, Germany, and the U.K.

### 3.    After they were sanctioned for conspiring with Apple, the Big Five immediately embarked on a price-fixing scheme with Amazon.

146.    The terms of the consent decrees that prohibited the Big Five from agreeing to MFNs in the sale of trade eBooks remained in place until 2017 or 2018 (depending on the publisher). But the requirement that the Big Five permit retailer discounting of trade eBooks expired (other than Apple) in 2015.[209] Upon expiration, the Big Five promptly reintroduced the agency model by renegotiating their agreements with Amazon, thus reclaiming the right to set prices in furtherance of their ongoing conspiracy.[210]

147.    Some of the same individuals were involved in both sets of agreements. Five

---

[208] Aditya Kalra, *Amazon documents reveal company's strategy to dodge India's regulators*, Reuters (Feb. 17, 2021), https://www.reuters.com/investigates/special-report/amazon-india-operation/; see also Aditya Kalra, *India antitrust body says Reuters story corroborates evidence in probe of Amazon*, Reuters (March 19, 2021), https://www.reuters.com/article/us-amazon-com-india-idUSKBN2BB1UF.

[209] The Court's injunction against Apple prohibited it from contractually waiving discounts with the Big Five for an additional one to three years, depending on the publisher.

[210] Trachtenberg, *supra* note 20; Constance Grady, *The 2010s were supposed to bring the ebook revolution*; It never quite came (Dec. 23, 2019), https://www.vox.com/culture/2019/12/23/20991659/ebook-amazon-kindle-ereader-department-of-justice-publishing-lawsuit-apple-ipad; Authors Guild, *For the Big Five, Agency Now Holds Sway Across the Board* (Sep. 9, 2015), https://authorsguild.org/news/for-the-big-five-agency-now-holds-sway-across-the-board/; *see also* First Post, *Amazon, HarperCollins reach multi-year publishing deal* (Apr. 14, 2015), https://www.firstpost.com/tech/news-analysis/amazon-harpercollins-reach-multi-year-publishing-deal-report-3666709.html; Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

top executives from the Big Five were pivotal to the conspiracy with Apple: David Shanks, CEO of Penguin; Carolyn Reidy, President and CEO of Simon & Schuster; Brian Murray, CEO of HarperCollins; John Sargent, CEO of Macmillan; and David Young, Chairman and CEO of Hachette.[211] In 2015, at the time the Big Five entered new agency agreements with Amazon, three of those five executives were still leading their companies.[212]

148.    Notably, one of these individuals, Macmillan CEO Sargent, publicly sought to justify his company's collusion with Apple as procompetitive because it chipped away at Amazon's eBook monopoly.[213] Yet he had no qualms about entering into the same arrangement with Amazon, which both raised trade eBook prices *and* guaranteed Amazon's monopoly. Indeed, the only "irony" that Sargent found in this arrangement is that despite Macmillan's best efforts "to create even pricing as best we can," the court's injunction permitted Apple to engage in platform competition through October 2017.[214]

149.    Defendants coordinated their price increases yet again. Just as during the *Apple* conspiracy period, when Apple made it clear that it provided the same terms for each of the Big Five Defendants, Defendants here likewise publicly disclosed that each of the Big Five

---

[211] *Apple*, 952 F. Supp. 2d at 646, 655–60.

[212] Paul St. John Mackintosh, *E-book Sales and Writers Be Damned! Simon & Schuster CEO Carolyn Reidy Loves the New Status Quo Created by Big Publishing,* Teleread (Sept. 30, 2015), https://teleread.com/big-publishing-assimilates-digital-print/index.html (indicating that Reidy was CEO of Simon & Schuster in 2015); *Leadership Team*, HarperCollins Publishers, https://www.harpercollins.com/pages/worldwide-leadership-team (last visited Feb. 11, 2021) (indicating that Murray has been CEO of HarperCollins since 2008); Sarah Weinman, *People: Weisberg Named President of Macmillan Publishers US*, Publishers Lunch (Nov. 19, 2015), https://lunch.publishersmarketplace.com/2015/11/people-weisberg-named-president-of-macmillan-publishers/ (noting that Sargent was CEO of Macmillan in 2015).

[213] Message from John Sargent to authors and agents (Apr. 11, 2012), https://www.tor.com/2012/04/11/a-message-from-john-sargent/.

[214] Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

received the same deal with Amazon.

150.    Previously, Amazon had "yelled, screamed, and threatened" in response to the Big Five's demand in 2010 that Amazon adopt an agency model to sell trade eBooks.[215] But Amazon changed its tune when it began negotiating with Simon & Schuster and Hachette in July 2014.[216] Publicly, Amazon advocated for lower eBook prices, but tellingly it no longer insisted on platform price competition.[217]

151.    **October 2014:** When Amazon and Simon & Schuster disclosed the first deal in October 2014, Simon & Schuster CEO Carolyn Reidy made no secret in her public letter to authors and agents that Simon & Schuster secured "with some limited exceptions," control over the price of its trade eBooks.[218] As indicated by Plaintiffs' purchases, Simon & Schuster set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy. Not surprisingly, eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Simon & Schuster's customers.

152.    **November 2014:** Amazon and Hachette issued a joint statement at the conclusion of their negotiations in November 2014, stating: "Hachette will have responsibility for setting consumer prices of its e-books, and will also benefit from better terms when it

---

[215] Greg Sandoval, *Apple ebooks trial: Amazon 'yelled ... and threatened' when publishers tried to control prices*, The Verge (Jun. 6, 2013), https://www.theverge.com/2013/6/6/4398648/apple-ebooks-trial-amazon-yelled-when-publishers-tried-to-control-prices.

[216] Publishers Weekly, *S&S, Amazon Agree on 'Version' of Agency Pricing* (Oct. 21, 2014), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/64461-s-s-amazon-agree-on-version-of-agency-pricing.html.

[217] Laura Owen, *In Amazon/Hachette deal, ebook agency pricing is a winner*, Gigaom (Nov. 14, 2014), https://gigaom.com/2014/11/14/in-amazonhachette-deal-ebook-agency-pricing-is-a-winner/.

[218] Publishers Weekly, *supra* note 216.

delivers lower prices for readers."[219] Defendants' promise of lower prices was false. Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for Hachette's customers. As indicated by Plaintiffs' purchases, Hachette set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

153.    **December 2014**: In his public letter announcing Macmillan's December 2014 deal, Sargent was even more explicit about the terms of the deal and its effects on market prices, stating that Macmillan had negotiated an "agency model for e-books" with Amazon and that all "our other retailers will also be on the agency model, leaving Apple as the only retailer which is allowed unlimited discounting."[220] He continued:

> This odd aberration in the market will cause us to occasionally change the digital list price of your books in what may seem to be random fashion. I ask for your forbearance. *We will be attempting to create even pricing as best we can.*[221]

Eliminating platform price competition and immunizing Amazon from competition has resulted in higher eBook prices for Macmillan's customers. As indicated by Plaintiffs' purchases, Macmillan set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

---

[219] Jillian D'Onfro, *Amazon and Big-5 Publisher Hachette Finally end their Pricing War*, Business Insider (Nov. 13, 2014), https://www.businessinsider.com/amazon-hachette-agreement-2014-11.

[220] Laura Owen, *Macmillan, too, returns to agency pricing with Amazon*, Gigaom (Dec. 18, 2014), https://gigaom.com/2014/12/18/macmillan-too-returns-to-agency-pricing-with-amazon/.

[221] *Id.* (emphasis added).

154.   **April 2015:** HarperCollins also announced an agreement to proceed under an agency model for eBooks when it finalized its deal with Amazon in April 2015.[222] It also disclosed that it would set the eBook prices of most new releases at $14.99, considerably higher than the $9.99 favored by Amazon and consistent with the cap the Big Five Defendants set for new releases in the *Apple* conspiracy.[223] Eliminating retailer discounts and immunizing Amazon from competition has resulted in higher eBook prices for HarperCollins customers. As indicated by Plaintiffs' purchases, HarperCollins set its prices within the range the Big Five Defendants set for trade eBooks in the *Apple* conspiracy.

155.   **June 2015:** While negotiations with Penguin were underway, Amazon's spokesperson, Tarek El-Hawary, made clear that the deal would be the same: "I can say that we have long-term deals in place already with the other four major publishers and we would accept any similar deal with Penguin Random House UK."[224] Penguin disclosed that it, too, negotiated an agency model for trade eBooks when it concluded its deal with Amazon in June 2015. It also revealed that it would sell new releases at $12.99 or $13.99, much higher than the market $9.99 price but within the range the Big Five Defendants set for new releases in the *Apple* conspiracy.[225] Eliminating platform price competition and immunizing Amazon from competition has resulted in higher eBook prices for Penguin's customers.

---

[222] *No Authors Held Hostage as HarperCollins and Amazon Come to Terms*, The Authors Guild (Apr. 16, 2015), https://www.authorsguild.org/industry-advocacy/no-authors-held-hostage-as-harpercollins-and-amazon-come-to-terms/.

[223] *Id.*

[224] Jennifer Rankin, *Amazon and Penguin Random House said to be in dispute* (May 25, 2015), https://www.theguardian.com/books/2015/may/25/amazon-and-penguin-random-house-said-to-be-in-dispute.

[225] Author's Guild, *Simon & Schuster's Agreement with Amazon Points the Way Back to Agency Pricing* (Oct. 21, 2014), https://authorsguild.org/news/simon-schusters-agreement-with-

156.     Publicly, the Author's Guild sided with the publishers because its members feared that low prices would reduce their royalties.[226] But authors, whose standard royalty is 25% of the publisher's proceeds—a royalty that was itself uniformly lowered through the collective conduct of the Big Five[227]—would in most cases earn more under the wholesale model. For example, a publisher that charges a $10 wholesale price for an eBook provides a $2.50 royalty even if the eBook sells for $9.99 at retail. But to earn the same royalty under the agency model, where the retail platform (like Amazon) keeps at least 30% of the retail price, the publisher would have to charge at least $14.29, a price likely to generate far fewer sales.

157.     Notably, Defendants disclosed the agency agreement but not the MFN and similar anticompetitive clauses that ensured that no retail platform could compete with Amazon on price and product availability. These provisions would come to light, however, when the European Commission reopened its investigation into anticompetitive conduct in the eBook market in June 2015.

158.     At the conclusion of its two-year investigation, the European Commission found that Defendant Amazon employed MFNs with eBook publishers and similar provisions in its agreements with the Big Five (who were at that time prevented by their settlements with the European Commission from employing MFNs in their contracts).[228] The European Commission

---

amazon-points-the-way-back-to-agency-pricing/#:~:text=October%2021%2C%202014%20Simon%20%26%20Schuster%20and%20Amazon,Trachtenberg%20of%20the%20Wall%20Street%20Journal%20%28subscription%20required%29..

[226] *Id.*

[227] "[D]uring the early years of e-books, publishers uniformly shifted e-book royalty rates from 50 percent to 25 percent, thereby reducing authors' compensation." *United States v. Bertelsmann SE & Co.*, No. CV 21-2886-FYP, 2022 WL 16949175, at *27–28 (D.D.C. Nov. 7, 2022) (explaining that "the case portrays an industry already prone to collusion").

[228] EC Decision ¶ 2.

found that the MFNs and analogous provisions found in the Big Five contracts had probable anticompetitive effects.[229]

4.     **Under pressure from the European Commission, Amazon agreed not to enforce its MFN and similar anticompetitive provisions in the European eBook market.**

159.     In response to the European Commission's findings that the Parity Clauses impede competition, Amazon agreed to "not enforce or otherwise rely upon any Business Model Parity Clause, Agency Commission Parity Clause, Agency Price Parity Clause, Features Parity Clause, Promotion Parity Clause, Selection Parity Clause, Wholesale Price Parity Clause or Notification Provision contained in agreements between Amazon and E-book Suppliers for the sale of e-books to consumers in the EEA."[230]

160.     Amazon therefore has been required to compete with other retail platforms in the European markets, and in the past five years, eBook revenue and output has increased in the European markets. For example, Hachette, Penguin Random House, HarperCollins, Pan Macmillan, Bloomsbury, and Simon and Schuster collectively sold 54.5 million consumer eBooks through United Kingdom retailers in 2020, up from 47.2 million in 2019. And while prices in the United States for eBooks have risen dramatically, Amazon cut the price of Kindle eBooks in May 2020 in the United Kingdom.

161.     By contrast, growth has lagged in the U.S. market, which remain beset by the Parity Clauses. Annual growth in the United States has been steadily declining, falling another 5% in 2021.  Over the next five years growth is projected to be meager and not exceed 1% per year.

---

[229] *See supra* Section V.B.

[230] EC Decision ¶ 159.

162.    In European markets, easy access to a wide selection of eBook libraries via applications or online services is growing internet consumption, resulting in low-cost alternatives to traditional delivery methods. In addition, eBook-related services like e-lending have aided in the acceptance of eBooks throughout the region, and various partnerships and new business models in the European market are driving growth in the market. For example:

- Youboox, a Swedish-owned streaming services for French digital books, is partnering with Fyctia and Wave Audio to develop a format that combines eBooks and audiobooks.[231]

- ePagine has developed an innovative solution that allow over 1,000 French bookstores the ability to sell eBooks through their own platform, and for purchasers of those books to lend their eBooks up to 29 times across different reader formats.[232]

- The European market is seeing an expansion of subscription services—including, for example, through an Italian subscription program called Kobo Plus. In collaboration with Mondadori Store, the subscription provides book readers unlimited access to thousands of eBook and Kobo Audiobook titles for EUR 9,99 per month. Digital content can be read on the Kobo apps for Android or IOS, and the Kobo Sage, Libra 2, and Elipsa can be used to read or listen to digital content.[233]

163.    By contrast, in the United States, the Big Five have had limited dealings with eBook subscription services resulting in the lack of current best-sellers being available through any type of innovative business model.

---

[231] The New Publishing Standard, *Nextory-owned Youboox launches Switch, a 'new' format that combines ebook and audio book. Let's call it an audio ebook*, https://thenewpublishing standard.com/2021/12/02/nextory-owned-youboox-launches-switch-a-new-format-that-combines-ebook-and-audiobook-lets-call-it-an-audio-ebook.

[232] Globe World News Echo, *How to Loan an E-Book to Twenty-Nine Friends*, https://globeecho.com/news/europe/france/how-to-loan-an-e-book-to-twenty-nine-friends/.

[233] Global Newswire, *Europ E-Book Market - Growth, Trends, COVID-19 Impact, and Forecasts (2022 - 2027)*, https://www.globenewswire.com/news-release/2022/04/22/2427135/0/en/Europe-E-Book-Market-Growth-Trends-COVID-19-Impact-and-Forecasts-2022-2027.html.

5.      **Federal and state authorities investigate Amazon's practices, including eBook sales.**

164.    In June 2019, the House Antitrust Committee began a year-long investigation that led to seven hearings on digital markets, touching on issues like data privacy, innovation, the free press, and competition. At one of the hearings in late July 2020, Amazon CEO Jeff Bezos testified in person at a hearing, titled "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google." In an opening statement, the presiding Chair expressed concerns that Amazon's dominance in "online marketplace sales" presents a risk that a single action by that company could "affect hundreds of millions of us in profound and lasting ways."[234]

165.    On October 5, 2020, the House Antitrust Committee issued its findings. The Committee concluded that Amazon "serves as a gatekeeper over a key channel of distribution," the U.S. online retail market,[235] and that it "uses its gatekeeper position to maintain its market power" and "to further entrench and expand" its dominance.[236] The Committee compared Amazon's monopoly power and abuse of its power to "the kinds of monopolies we last saw in the era of oil barons and railroad tycoons."[237]

166.    The report, which also examined the marketplace dominance of two other large tech companies, relied on 1,287,997 documents and communications; testimony from 38 witnesses; a hearing record that spans more than 1,800 pages; 38 submissions from 60 antitrust experts from across the political spectrum; and interviews with more than 240 market

---

[234] Chairman of House Antitrust Committee, Press Release (Jul. 29, 2020).

[235] House Report, *supra* note 11, at 1.

[236] *Id.*

[237] *Id.* at 2.

010888-12/2075606 V1

participants, former employees of the investigated platforms, and other individuals totaling thousands of hours.[238] Notably, over the Committee's objection, the companies withheld critical "documents that were produced to antitrust authorities in ongoing investigations, or that related to the subject matter of these ongoing investigations."[239]

167.    Amazon also faces an investigation by the Federal Trade Commission and antitrust scrutiny by state attorneys general offices in several states.[240] The pending investigation by the Connecticut Attorney General focuses on Amazon's agreements with publishers, and each of the Big Five received a subpoena in 2019 pursuant to that investigation.[241]

**6.    The District Court for the D.C. Circuit Finds continuing collusion among the Big Five.**

168.    On October 31, 2022, the District Court for the District of Columbia ruled in favor of the DOJ in the DOJ's civil antitrust lawsuit to block Penguin Random House's proposed $2.2 billion acquisition of Simon & Schuster.[242]

169.    The court's decision followed a thirteen-day trial in August 2022 after the DOJ, in November 2021, sued to stop the merger under Section 7 of the Clayton Act.

170.    With the benefit of a full record, the court observed that "[t]he Big Five have achieved their market dominance in part by acquiring other publishers, contributing to a trend

---

[238] *Id*. at 3.

[239] *Id*.

[240] *Id*. at 111; Press Release, Fed. Trade Comm'n, *FTC to Examine Past Acquisitions by Large Technology Companies* (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[241] Trachtenberg, *supra* note 20.

[242] *United States v. Bertelsmann SE & Co.*, No. CV 21-2886-FYP, 2022 WL 16949715 (D.D.C. Nov. 7, 2022).

toward consolidation in the industry."[243] The court found that "[i]n the publishing market for anticipated top-selling books, the Big Five publishers hold 91 percent of the market share, while smaller publishers collectively hold only 9 percent."[244]

171.    The court concluded that there was "an undeniable trend in consolidation in the publishing industry," observing that "[c]oordinated effects are likelier in concentrated markets."[245]

172.    This market concentration is unlikely to change because "barriers to entry are high in the publishing business."[246] As the court observed: "The best proof that would-be new competitors face formidable barriers to entry is the stability of market shares in the industry: No publisher has entered the market and become a strong competitor against the Big Five in the past thirty years."[247]

173.    Based on the conspiracy uncovered in Apple, the court found that as between the Big Five, "history of successful cooperation establishes a precondition to effective collusion — mutual trust and forbearance."[248] According to the court, "[t]he [Apple] case portrays an industry already 'prone to collusion.'"[249]

174.    Indeed, the court found that the Big Five were colluding with respect to eBooks, noting that "during the early years of e-books, publishers uniformly shifted e-book royalty rates from 50 percent to 25 percent, thereby reducing authors' compensation."[250]

---

[243] *Id.*, at *2.

[244] *Id.*, at *13.

[245] *Id.*, at *27.

[246] *Id.*, at *33.

[247] *Id.*

[248] *Id.*, at *27.

[249] *Id.*

[250] *Id.*, at *28.

175.    The court validated that the Big Five consistently choose collusion over acting in their unilateral self-interests: "Thus, in an industry where the competition to acquire anticipated top sellers is intense, the competing publishers nevertheless choose, almost always, not to gain advantage by offering more favorable contract terms. This phenomenon bespeaks a tacit agreement among the publishers to compete only on the basis of advance level because it collectively benefits them not to yield on other contract terms."[251]

176.    The court followed established law, which explains that "a highly persuasive historical act of cooperation between competitors supports the theory that coordination would likely take the form of mutual recognition that neither firm has an interest in an overall race to free."[252]

177.    In enjoining the merging publishers, the court held that "[t]he *Apple* case provides the backdrop for trends in the industry that appear to demonstrate that the Big Five are already engaging in tacit collusion or parallel accommodating conduct when acquiring books."[253]

178.    The Court ruled that "the Big Five publishers have engaged in tacit coordination that is profitable for those involved" and that "coordinated conduct already appears to be rampant."[254]

**F.    Defendants each benefitted from the trade eBooks-price-fixing scheme.**

179.    The *Apple* case demonstrates the Big Five's motivation to raise trade eBook prices and their willingness to collectively agree to an MFN with a major eBook retailer to

---

[251] *Id.*

[252] *Id.* (internal quotations omitted).

[253] *Id.*

[254] *Id.*

010888-12/2075606 V1

achieve that result, which none could achieve alone. Indeed, it would be against their self-interests to do so unilaterally as they would lose sales to other publishers. The European Commission makes clear that even when the Big Five were prohibited from having MFNs in their eBook contracts, they and Amazon got around that restriction by employing notification provisions that had precisely the same effect.[255]

180.     In a competitive market, the Big Five could sell eBooks at a lower price on their own websites or through Amazon's retail rivals that offer lower commissions and fees.[256] But the Big Five have agreed not to do this because it suits their goal of maintaining supracompetitive trade eBook prices throughout the U.S. market. As part of the arrangement, the Big Five immunize Amazon from competition.

181.     Conversely, as the largest retailer of both print books and eBooks, the bargaining power that Amazon wields over the Big Five is immense. In negotiating with the Big Five, Amazon could have retained its right to discount their eBooks. But Amazon commits to waive discounting and to let the Big Five set their own high prices because it faces no competition from other eBook retailers on price or product availability.

182.     Amazon also benefits from its price-fixing agreement as a competing trade publisher. Amazon Publishing identifies itself as "a leading publisher of fiction, nonfiction, and children's books."[257] It currently operates 17 imprints, and hundreds of its books have been nominated for literary awards.[258]

---

[255] EC Decision ¶¶ 33, and n.20, 36, 114 and n.49.

[256] *See* House Report, *supra* note 10, at 6 (recognizing that Amazon has the power to charge "exorbitant fees" and impose "oppressive contract terms" on the businesses that rely on its platform).

[257] Amazon Publishing, https://amazonpublishing.amazon.com/about-us.html.

[258] *Id.*

183.     In 2019, the Codex Group estimated that Amazon Publishing puts out 1,100 titles

a year.[259] And while estimating sales for Amazon titles is difficult because Amazon's proprietary

methods of distribution obscure the sales figures from the third-party researchers who determine

best-seller lists, best-selling author Dean Koontz has a five-book deal with Amazon

Publishing.[260] Amazon also touts having more than 80 authors sell a million or more books.[261]

184.     Raising the price of the Big Five's eBooks benefits Amazon's publishing

business. Secure in the knowledge that the Big Five will not engage in a trade eBook price war,

Amazon can maintain sales of its own publications without significantly lowering its prices.

## VI.     INTERSTATE TRADE AND COMMERCE

185.     Defendants' acts as alleged in this complaint were within the flow of, and

substantially affected, interstate commerce. Defendants publish, sell or facilitate sales of trade

eBooks across, and without regard to, state lines.

## VII.     DEFENDANTS' MARKET POWER IN THE RELEVANT MARKETS

186.     The relevant product market for purposes of this action is the two-sided market

for the retail distribution of trade eBooks. This is a platform-transaction market in which

electronic platforms (such as Amazon's Kindle platform) compete against each other to execute

transactions between trade eBook publishers and retail consumers. In the alternative, the relevant

product market in this case is the one-sided market in which electronic platforms (such as

Amazon's Kindle platform) compete against other electronic platforms to provide retail

distribution services to trade eBook consumers. The relevant geographic market for both the one-

---

[259] Blake Montgomery, *The Amazon Publishing Juggernaut* (Aug. 8, 2019),
https://www.theatlantic.com/technology/archive/2019/08/amazons-plan-take-over-world-publishing/595630/.

[260] *Id.*

[261] Amazon Publishing, *supra* note 257.

sided and two-sided relevant product markets is the United States, and Amazon has market and monopoly power in both of those alleged product markets.

A.      **There is a distinct retail market for trade eBooks.**

187.    Trade books represent a distinct product from non-trade books, such as reference and academic books.[262] They also represent a distinct product from self-published books. While a self-published author fronts all costs and is responsible for the content and marketing, trade publishers receive the rights to sell an author's book in exchange for covering all aspects of editing, publication, marketing, and distribution. Trade publishers are thus highly selective. They do not read 95% of the manuscripts they receive and publish only about 1% of the manuscripts they review.[263] The selection, editing, and promotional process is an expensive undertaking, and trade books represent the publishers' considerable investment in that process.

188.    Within the trade book market, there is also a distinct product market for the retail sale of trade eBooks that is separate from retail distribution of trade print books and trade audio books.[264]

189.    Products' functional interchangeability typically depends on the products' physical characteristics.[265] Courts and economists typically define the boundaries of a market by reference to products' functional substitutability, and products' physical characteristics often

---

[262] *Apple*, 952 F. Supp. 2d at 648 n.4.

[263] Odds Of Being Published - Fiction Writer's Mentor, http://www.fiction-writers-mentor.com/odds-of-being-published; Leigh Shine, *Calculating the Odds of Getting a Traditional Publisher*, Medium (Dec. 22, 2016), https://medium.com/publishizer/calculating-the-odds-of-getting-a-traditional-publisher-798b1c7b94b0.

[264] *Apple*, 952 F. Supp. 2d at 694 n.60 (defining the relevant market as trade eBooks in the United States); EC Decision ¶ 44 (distinguishing between markets for eBooks and audiobooks).

[265] 2 Federal Antitrust Law § 10.2 (2020).

determine their functional substitutability.[266] In this case, eBooks are digital products that require a special device, such as Amazon's Kindle or Barnes & Noble's Nook, to read them. Thus, eBooks do not have a physical presence the way a print book does. They differ from audio books, which may be physical or digital, but are made for listening, not visual reading. These distinguishing characteristics affect the substitutability of print books and audio books in the supply or demand for eBooks.[267]

190.    From both a demand side and a supply side analysis, trade print books and trade audio books are also not sufficiently strong substitutes to warrant their inclusion in the same product market as trade eBooks.[268]

191.    The European Commission found that, as regards demand-side substitutability, consumers are unlikely to switch from trade eBooks to print versions in case of a 5% to 10% increase in the competitive retail price of eBooks because overall, even with a 5% to 10% increase of their retail price, eBooks would generally be priced significantly lower than print books.[269] Consumer preferences also play an important role in distinguishing the two formats. For example, the European Commission's investigation of the eBook market showed that important consumer considerations determine whether the consumers will purchase an eBook instead of a print version of a book, including: (i) eBooks are easier to carry than print books when travelling; (ii) eBooks have functionalities not available for print books, such as the possibility to change the type and size of the font; (iii) eBooks can support interactive features

---

[266] Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 562 (5th Ed.).

[267] EC Decision ¶¶ 43–44.

[268] *Id.*

[269] *Id.* ¶ 43.

such as video or music add-ons, dictionaries, and links to information about the subject matter of the book or the author; and (iv) eBooks can be purchased and downloaded immediately at any time.[270] The European Commission also noted that a significant number of titles are only, or more readily, available in the eBook format.[271]

192.    To find significant supply-side substitutability, print-book retailers and eBook retailers would have to be able to enter each other's markets quickly and easily. The European Commission found that this was not the case. The distribution of print books entails important investments in distribution, warehousing, and logistics, whereas eBooks distribution requires mainly set-up and maintenance of an online distribution platform, which is a very different type of investment.[272] A traditional print bookstore cannot switch from selling print books to eBooks without acquiring significant tangible and intangible assets, incurring additional investments and making strategic decisions with the immediacy required to allow for a finding of significant supply-side substitutability, and the same holds true for an eBook retailer switching to print sales.[273]

193.    The European Commission found that audio books are distinct from both print books and eBooks, notably in terms of (i) pricing at wholesale and retail level and (ii) their typical end consumer and mode of consumption.[274] Because print books and audio books are not reasonable substitutes, the retail eBook market is a distinct market.

---

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.* ¶ 44.

**B.      Within the retail market for trade eBooks, there is a two-sided market for trade-eBook platform transactions.**

194.    Because retail transaction platforms mediate between buyers and sellers, they operate what economists call a "two-sided platform," which, "[a]s the name implies, … offers different products or services to two different groups who both depend on the platform to intermediate between them."[275]

195.    Retail transaction platforms are a particular type of two-sided platform. "These platforms facilitate a single, simultaneous transaction between participants" and cannot transact a sale with a participant on one side of the platform without simultaneously transacting the sale with a participant on the other side.[276] In this case, the retail transaction platforms mediate transactions between willing buyers and eBook sellers. On Amazon's Kindle platform, for example, a sale does not occur until a consumer agrees to purchase an eBook from a publisher or other seller listing on the platform.

196.    EBook retail transaction platforms, including Amazon's Kindle platform, exhibit what economists call "indirect network effects"—meaning participation on one side of the platform affects demand on the other side of the platform. For example, the more consumers an eBook platform has, the more appealing the platform is to eBook publishers, and on the other side of the platform, the more sellers an eBook platform has, the more appealing the platform is to eBook consumers. The opposite is also true: few consumers will lead to greater difficulty in attracting sellers, and fewer sellers will lead to greater difficulty in attracting consumers.[277] In

---

[275] *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018).

[276] *Id.* at 2286.

[277] *See Apple*, 952 F. Supp. 2d at 692 (noting that Apple "would only move forward" with its iBookstore "if a critical mass of the major publishing houses agreed to its agency terms" and thus ensured its success).

short, as the number of eBook publishers on a platform goes up the demand by consumers for the use of that platform also goes up; and as the number of consumers who use a particular eBook platform goes up the demand by eBook publishers for the use of that platform goes up, as well.

197.    The two-sided retail transaction platform market for trade eBooks includes other trade eBook retail transaction platforms in addition to Amazon Kindle, including the eBook platforms of Barnes & Noble, Apple, Google, and Kobo. Transaction markets that sell other trade book formats or non-trade eBooks are not reasonably close substitutes for trade-eBook retail transaction platforms and do not constrain Amazon's pricing power in the alleged relevant market(s).

**C.      The United States is the relevant geographic market(s).**

198.    The relevant geographic market is the United States. Like most ecommerce, the eBook market operates nationwide. Much of the sales activity in that market occurs through nationwide channels, including Amazon's online sales platforms and those of its eBook retail competitors.

199.    The Big Five sell their trade eBooks throughout the United States.

200.    EBook retailers located outside of the United States are unable to constrain trade eBook pricing in the United States.

**D.      Amazon dominates the relevant market.**

201.    Amazon's rise in the book industry is even more pronounced in the eBook market, where it enjoys nearly 90% of the market and its closest competitor, Apple, has a distant 6% share:[278]

---

[278] Day, *supra* note 1.



202.    Market shares as large as Amazon's create an inference of market and monopoly power. Its market and monopoly power is durable because barriers to entry make entry by new competitors difficult.[279] The large base of Kindle e-readers that already exists operates as a barrier to entry for other eBook retailers.[280] Effective entry into or expansion in the eBook market would require competing retail platforms to be able to differentiate their products or services, including by offering lower prices, innovative distribution methods, or innovative products. Amazon's Parity Clauses make such competition impossible.

203.    Indeed, for each eBook sale on its transaction platform, Amazon charges a transaction fee that vastly exceeds the cost to Amazon of executing the transaction. On the sale of a $10 eBook, Amazon's transaction fee is at least 50 times greater than its delivery cost. Under normal competitive conditions, eBook publishers could drop the prices they charge for trade eBooks on competing platforms in return for the electronic platform's comparable

---

[279] EC Decision ¶ 125 (finding that such barriers exist and exacerbate "the potential foreclosure effect" of the MFN).

[280] *Id.* ¶ 65.

reduction of its transaction fee below Amazon's supracompetitive fee. Because the price reduction would be offset by a comparable reduction in the transaction fee, the net proceeds to the eBook publisher would stay the same, but the reduction in the price paid by the consumer would increase the eBook publisher's sales and market share and result in greater profitability.

204.    But through its Parity Clauses, Amazon has maintained its supracompetitive transaction fees. Its ability to do so—despite its exceedingly low marginal cost for distributing eBooks on its platform, its economic-profit rate that is well in excess of the economic-profit rate earned at the 95th percentile of all firms, and the incentives eBook publishers would have in a competitive market to lower their eBook prices on other platforms in exchange for lower transaction fees—demonstrates its market and monopoly power.

205.    Amazon has used its market and monopoly power to substantially foreclose competition in the market by unlawful and improper means, including preventing competing eBook retailers from gaining market share and dissuading potential competitors from entering the market. Defendants entered into agreements that included the anticompetitive Parity Clauses described herein with the intent and effect of (a) ensuring that eBooks sold by or through Amazon's eBook retailer rivals were sold at prices that were no lower than the prices on the Amazon platform; (b) diminishing the incentives of Amazon's eBook retailer rivals from lowering their prices for transactions on their platforms; (c) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; (d) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and (e) eliminating Amazon's

current and potential eBook retailer competitors' ability and incentives to develop innovative

eBook products with greater functionality, *e.g.*, adding illustrations and animation.

206.    In short, whether the market is viewed as a two-sided market for trade-eBook

transaction platforms or a one-sided retail market in which Amazon provides retail distribution

services to consumers, the result is the same. Amazon's anticompetitive conduct has led higher

consumer prices, lower market output, and fewer consumer choices.

## VIII.   CLASS ACTION ALLEGATIONS

207.    Plaintiffs bring this action on behalf of themselves and as a class action under the

Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking damages and injunctive

relief against Defendants pursuant to federal antitrust law on behalf of the members of the

following Class:

> All persons who, on or after January 14, 2017, purchased in the
> United States one or more eBooks sold by the Big Five Publishers
> via an agency model through any retail e-commerce channel in the
> United States.

208.    In the alternative, if the Big Five Defendants are determined to be the intended

third-party beneficiaries of Barnes & Noble's mandatory arbitration clause for any purchases

through the Barnes & Noble platform,[281] Plaintiffs propose the following Subclasses:

209.    Plaintiffs Fremgen, Christopherson-Juve, DeLeon, Bonilla, Lerner, Agostino, and

Etten would seek to represent a Subclass of consumers who purchase Big Five's eBooks through

Barnes & Noble and would assert claims on behalf of themselves and the following proposed

subclass against Amazon only:

---

[281] *See* Barnes & Noble, Digital Content Terms of Sale,
https://www.barnesandnoble.com/h/digital-content-terms-of-sale#7.

> All persons who, on or after January 14, 2017, purchased in the
> United States one or more eBooks sold by the Big Five Publishers
> via an agency model through the Barnes & Noble platform.

210.     Plaintiffs Wilde, Wilder, Sacks, Silverman, Tomasulo, Twill, Ackerman, and

Jeffrey and Susan Cook would seek to represent the following Subclass and assert claims against

all Defendants:

> All persons who, on or after January 14, 2017, purchased in the
> United States one or more eBooks sold by the Big Five Publishers
> via an agency model through any retail e-commerce channel in the
> United States other than the Barnes & Noble platform.

211.     Excluded from the proposed Class(es) are the Defendants and their officers,

directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge

or magistrate judge to whom this case is assigned, as well as those judges' immediate family

members, judicial officers and their personnel, and all governmental entities.

212.     **Numerosity:** Members of the proposed Class(es) are so numerous that joinder is

impracticable. Plaintiffs believe that there are millions of members of the proposed Class(es)

geographically dispersed throughout the United States, such that joinder of all Class members is

impracticable.

213.     **Typicality:** Plaintiffs' claims are typical of the claims of other members of the

proposed Class(es). The factual and legal bases of Defendants' liability are the same and resulted

in injury to Plaintiffs and all other members of the proposed Class(es).

214.     **Adequate representation:** Plaintiffs will represent and protect the interests of the

proposed Class(es) both fairly and adequately. They have retained counsel competent and

experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to

those of the proposed Class(es), and their interests do not conflict with the interests of the

members of the proposed Class(es) they seek to represent.

215.   **Commonality:** Questions of law and fact common to the members of the proposed Class(es) predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class(es), and members of the proposed Class(es) share a common injury. Thus, determining damages with respect to the Class(es) as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class(es) are inherent in Defendants' wrongful conduct because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class(es) arose from the same anticompetitive conduct alleged herein.

216.   There are common questions of law and fact specific to the Class(es) that predominate over any questions affecting individual members, including:

i.   Whether Amazon and the Big Five unlawfully contracted, combined, or conspired to unreasonably restrain trade in violation of section 1 of the Sherman Act by agreeing that the Big Five would not sell their eBooks to consumers or allow other retailers to sell them at a price lower than what they offered at the Amazon platform;

ii.   Whether Amazon has unlawfully monopolized the U.S. retail trade eBook market, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

iii.   Whether the Publisher Defendants conspired with Amazon to help Amazon, through the contractual terms, policies, practices, mandates, and restraints described herein, unlawfully monopolize the U.S. retail market for trade eBooks;

iv.   Whether competition in the U.S. retail trade eBook market has been restrained and harmed by Defendants' conduct in this market;

v.   Whether Plaintiffs and Class members have been damaged by Defendants' conduct;

vi.   The amount of any damages; and

vii.   The nature and scope of injunctive relief necessary to restore a competitive market.

217.   **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there likely would be

inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Plaintiffs' proposed Class(es) would prevent these undesirable outcomes.

218.   **Injunctive relief:** By way of its conduct described in this complaint, Defendants have acted on grounds that apply generally to the proposed Class(es). Accordingly, final injunctive relief is appropriate respecting the Class(es) as a whole.

219.   **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed Class(es) could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, it ensures the uniformity of decisions on the subject of this complaint.

## IX.   ANTITRUST INJURY

220.   Plaintiffs and Class members are trade eBook consumers. They purchase the Big Five's trade eBooks on the retail platforms of Amazon and its competitors at prices inflated by Defendants' anticompetitive conduct. They are direct purchasers both from the retail platforms (to which they directly make their payment, including the supracompetitive fee charged to

complete the transaction on the retail platform) and from the eBook publishers (from which they directly purchase the eBooks through the retail platforms at supracompetitive prices).[282]

221.    Defendants, through their unlawful conduct alleged herein, increase the retail prices of trade eBooks throughout the U.S. market, reduce consumer choices, and cause antitrust injury to trade eBook direct purchasers in the form of overcharges. Plaintiffs and members of the proposed Class(es) have sustained, and continue to sustain, significant losses from overcharges directly caused by Defendants' anticompetitive activity. Plaintiffs will calculate the full amount of such overcharge damages after discovery and upon proof at trial. Unless Defendants' anticompetitive conduct is stopped, Plaintiffs and members of the proposed Class(es) will incur future overcharges in their direct purchases of trade eBooks.

222.    The injury imposed on Plaintiffs and members of the proposed Class(es) is an integral part and necessary step of Defendants' anticompetitive scheme. It is directly related to and caused by Defendants' anticompetitive conduct and is the mechanism by which Defendants obtain an anticompetitive reward for its unlawful conduct.

223.    Because Defendants continue to adhere to their anticompetitive agreements, Plaintiffs and Class members are reasonably likely to incur future overcharges for the Big Five's eBooks. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendants' violations of antitrust laws, including their unreasonable restraints against trade and Amazon's monopolization of trade eBooks retail distribution, as alleged herein.

---

[282] To use Amazon's platform, consumers must agree to Amazon's "Kindle Store Terms of Use," which specify that the parties offering the content (in this case, the Big Five) are the "Content Providers" and that Amazon's "Service" is to provide the "Kindle Store" (i.e., the transaction platform). *See* Kindle Terms of Use, available at https://smile.amazon.com/gp/help/customer/display.html?nodeId=201014950 (attached as Exhibit A).

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION
### (15 U.S.C. § 2) (AMAZON)

224.    Plaintiffs incorporate by reference the relevant and applicable allegations in the preceding paragraphs.

225.    Plaintiffs bring this claim, on their own behalf and on behalf of the proposed Class(es) described above, against Amazon. Plaintiffs seek damages and injunctive relief.

226.    Amazon possesses monopoly power in the two-sided retail market for trade-eBook platform transactions. Amazon's monopoly power is illustrated by its ability to charge and maintain supracompetitive prices for transactions on its two-sided platform, resulting in higher eBook transaction prices paid by consumers. Amazon's monopoly power is also demonstrated by its ability exclude competition from the market for platform transactions, curtailing both entry into the market and expansion by existing rival platforms. Likewise, Amazon's monopoly is exemplified by its ability to impose unreasonable and coercive terms on participants in the market—terms to which the participants would not agree but for Amazon's monopoly power. Finally, Amazon's monopoly power in the relevant market(s) may be inferred from its market share: nearly 90% of all trade-eBook sales occur on Amazon's transaction platform.

227.    Alternatively, to the extent the relevant market is defined as one-sided, such that Amazon provides non-simultaneous retail distribution services to publishers and consumers, Amazon likewise possesses monopoly power in the relevant market for the retail distribution of eBooks to consumers as shown by its ability to profitably charge the eBook buyers supracompetitive prices while also excluding price competition and rivals from that market who could alternatively provide those retail services at lower prices if they were not excluded from

the market by Amazon. And again, Amazon's monopoly power in those markets may also be inferred from its approximately 90% market share.

228.    Through its Parity Clauses, Amazon has willfully acquired or maintained its monopoly power in the relevant market(s) (whether defined as the two-sided platform market or the single "retail sides" of that platform) and substantially foreclosed competition in the market by unlawful and improper means, including preventing competing eBook retailers from gaining market share and erecting barriers to entry for potential competitors. Defendants entered into anticompetitive agreements and imposed coercive contractual terms with the intent and effect of (a) ensuring that eBooks sold by or through Amazon's eBook retailer rivals were sold at prices no lower than the prices on the Amazon platform; (b) diminishing the incentives of Amazon's eBook retailer rivals from lowering their prices for transactions on their platforms; (c) eliminating Amazon's current and potential eBook retailer competitors' ability and incentive to offer price promotions or early releases; (d) eliminating Amazon's current and potential eBook retailer competitors' ability and incentive to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and (e) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

229.    Amazon's current monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident and the anticompetitive conduct alleged herein has no procompetitive effects or justification and does not advance competition on the merits.

230.    Amazon's monopolization has injured and will continue to injure competition in the relevant market(s).

231.    Amazon has acted with the specific intent of monopolizing the relevant market(s) in the United States.

232.    Amazon's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

233.    Plaintiffs and members of the proposed Class(es) execute purchase transactions with Amazon and directly pay for those transactions. They have been injured and will continue to be injured in their businesses and property by paying more for eBooks and eBook transactions than they would have paid or will pay in the future in the absence of Amazon's unlawful acts.

234.    Plaintiffs and members of the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – ATTEMPT TO MONOPOLIZE**
**(15 U.S.C. § 2) (AMAZON)**

235.    Plaintiffs incorporate by reference the relevant and applicable allegations in the preceding paragraphs and bring this cause of action in the alternative to the first cause of action.

236.    Plaintiffs bring this claim, on their own behalf and on behalf of the proposed Class(es) described above, against Amazon. Plaintiffs seek damages and injunctive relief.

237.    There is a dangerous probability that Amazon will obtain monopoly power in the two-sided platform transaction market for the retail sale of trade eBooks. Alternatively, to the extent the relevant market is defined as one-sided, there is a dangerous probability that Amazon will obtain monopoly power in the one-sided market.

238.    Through its Parity Clauses, Amazon has willfully acquired or maintained its monopoly power in the relevant market(s) (whether defined as the two-sided platform transaction

- 99 -

market or the "single side" market for the retail distribution of eBooks to consumers) and substantially foreclosed competition in the relevant market(s) by unlawful and improper means, including preventing competing eBook retailers from gaining market share and erecting barriers to entry for potential competitors. Amazon entered into anticompetitive agreements with, and imposed coercive contractual terms on, eBook publishers with the intent and effect of (a) ensuring that eBooks sold by or through Amazon's eBook retailer rivals were not sold at prices that were lower than the prices on the Amazon platform; (b) diminishing the incentives of Amazon's eBook retailer rivals from lowering their prices for transactions on their platforms; (c) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; (d) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and (e) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

239.    Amazon's attempted monopolization has injured and will continue to injure competition in the relevant market(s).

240.    Amazon has acted with the specific anticompetitive intent of obtaining or maintaining monopoly power in the alleged relevant market(s) in the United States. Amazon's anticompetitive conduct has no procompetitive effects or justification and does not advance competition on the merits.

241.    Amazon's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

242.     Plaintiffs and members of the proposed Class(es) execute trade-eBook purchase transactions with Amazon and directly pay for those transactions. They have been injured and will continue to be injured in their businesses and property by paying more for eBooks and eBook transactions than they would have paid or will pay in the future in the absence of Amazon's unlawful acts.

243.     Plaintiffs and members of the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE SHERMAN ACT – CONSPIRACY TO MONOPOLIZE**
**(15 U.S.C. § 2) (ALL DEFENDANTS)**

244.     Plaintiffs incorporate by reference the relevant and applicable allegations in the preceding paragraphs.

245.     Plaintiffs bring this claim, on their own behalf and on behalf of the proposed Class(es) described above, against Amazon and the eBook Publisher Defendants. Plaintiffs seek damages and injunctive relief.

246.     Amazon possesses monopoly power in the two-sided retail market for trade-eBook platform transactions. Amazon's monopoly power is illustrated by its ability to charge and maintain supracompetitive prices for transactions on its two-sided platform, which results in higher eBook platform-transaction prices paid by consumers. Amazon's monopoly power is also demonstrated by its ability exclude competition from the platform-transaction market, curtailing both entry into the market and expansion by existing competing platforms. Amazon's monopoly power in the two-sided relevant market may be inferred from its approximately 90% market share.

247.     Alternatively, to the extent the relevant market is defined as one-sided, such that Amazon provides non-simultaneous retail distribution services to publishers and consumers,

- 101 -

Amazon likewise possesses monopoly power in the one-sided relevant market for the retail distribution of trade eBooks to consumers as evidenced by its ability to profitably charge eBook consumers supracompetitive prices while excluding price competition from other competitors who could and would, but for the unlawful conduct alleged herein, provide those services to eBook consumers at a lower price. Amazon's monopoly power in the one-sided retail eBooks market may be inferred from its approximately 90% market share.

248.     That Defendants have market power is also evident from their power to raise trade eBook prices above that which would be charged in a competitive market. Notably, in the *Apple* case, the court found that the Big Five and Apple had the power to raise trade eBook prices above a competitive level even though Apple was a new entrant to the eBook market and never achieved Amazon's market dominance.

249.     The Publisher Defendants demonstrated a specific intent to confer monopoly power upon Amazon when they acted in concert with Amazon to immunize Amazon from competition from any other eBook retailer rivals and took steps in furtherance of their conspiracy by executing and adhering to agency contracts containing Amazon's Parity Clauses. The natural effect of those agreements is to ensure that Amazon controls trade eBook prices throughout the U.S. market and that Amazon faces no competition from competing eBook retailers in terms of price and product availability.

250.     Amazon's specific intent can be inferred from its sustained monopoly power and its execution of agreements with each of the five largest trade eBook publishers designed to secure and/or maintain its monopoly.

251.     Through a series of agreements between the Publisher Defendants and Amazon, Amazon has willfully acquired or maintained its monopoly power in the relevant market

(whether defined as the two-sided platform market or the single retail "side" of that platform) and substantially foreclosed competition in the market by unlawful and improper means, including preventing competing eBook retailers from gaining market share and dissuading potential competitors from entering the market. Defendants entered into anticompetitive agreements and imposed coercive contractual terms with the intent and effect of (a) ensuring that eBooks sold by or through Amazon's eBook retailer rivals were sold at prices at least as high as the prices on the Amazon platform; (b) diminishing the incentives of Amazon's eBook retailer rivals from lowering their prices for transactions on their platforms; (c) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to offer price promotions or early releases; (d) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and (e) eliminating Amazon's current and potential eBook retailer competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

252.    Defendant HarperCollins operates its own retail eBook site but has agreed with Amazon not to price eBooks sold on that platform at prices below the prices charged by Amazon for those same eBooks, thereby eliminating horizontal price competition and the natural market force of price to drive retail traffic away from Amazon's monopoly price and to HarperCollins. This has hindered the adoption of HarperCollins's eBooks platform as a substitute to Amazon's Kindle, thereby preserving the high switching costs from Amazon's platform to competing eBook retail platforms and ensuring Amazon's continued monopoly power.

253.     Amazon's current monopoly power is not due to growth or development because of a superior product, business acumen, or historic accident. Amazon's anticompetitive conduct has no procompetitive effects or justification and does not advance competition on the merits.

254.     Defendants' monopolization conspiracy has injured and will continue to injure competition in the relevant market(s).

255.     Defendants' exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

256.     Plaintiffs and members of the proposed Class(es) execute eBook purchase transactions with Amazon and directly pay Amazon for those transactions. They have been injured and will continue to be injured in their businesses and property by paying more for eBooks and eBook transactions than they would have paid or will pay in the future in the absence of Amazon's unlawful acts.

257.     Plaintiffs and members of the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE
## (15 U.S.C. § 1) (ALL DEFENDANTS)

258.     Plaintiffs incorporate by reference the relevant and applicable allegations in the preceding paragraphs.

259.     Plaintiffs bring this claim on their own behalf and on behalf of the proposed Class(es) described above. Plaintiffs seek damages and injunctive relief.

260.     Defendants, by and through their officers, directors, employees, agents and other representatives, have entered into unlawful agreements, combinations, and conspiracies in restraint of trade. Specifically, Defendants have mutually and unlawfully agreed to prevent competitive pricing of trade eBooks by switching to an agency model and agreeing to

anticompetitive MFNs and other Parity Clauses. These unlawful agreements have unreasonably restrained price competition for trade eBook sales to consumers (regardless of whether the market is defined as the Publisher's sale of eBooks or the joint sale of eBooks by the Publisher and Amazon) by ensuring that the Big Five's eBooks sold at the same prices through Amazon's retail platform as through all other eBook retailers.

261.     Defendants are liable for the creation, maintenance, and enforcement of the anticompetitive restraints whether a *per se*, "quick look," or rule of reason standard applies.

262.     **Per se**: All Defendants are trade publishers and horizontal competitors in the publication and sale of trade eBooks.

263.     Defendants engaged in parallel conduct by entering into the same anticompetitive agency agreements with Parity Clauses and a supracompetitive commission that the court in this District had previously found to be a *per se* violation of Section 1 of the Sherman Act.

264.     The Court found "overwhelming evidence that the Publisher Defendants joined with each other in a horizontal price-fixing conspiracy."[283] The objective of this "*per se* violation of the Sherman Act" was to "eliminate retail price competition and to raise e-book prices."[284] To do so, "the conspiracy required the full participation of the Publisher Defendants…to change Amazon's pricing policies and to raise e-book prices."[285] These findings were affirmed by the Second Circuit.[286]

265.     The Publisher Defendants managed to extricate themselves from the court's prior proceedings by agreeing to final judgments with the United States. These final judgments

---

[283] *Apple*, 952 F. Supp. 2d at 691.

[284] *Id*. at 691, 694.

[285] *Id.* at 706.

[286] *Apple*, 791 F.3d at 298.

required that the Publisher Defendants refrain from enjoying the fruits of their conspiracy for a period of two years and to refrain from certain other conduct for an additional three years. Notwithstanding these temporary restrictions, the Publisher Defendants refused to make a clean breast to the authorities or to publicly acknowledge and repudiate their horizontal price-fixing conspiracy.[287]

266.    Before the final judgments even expired, the Publisher Defendants picked up where they left off. They went back to Amazon and tried again, but this time they upped the offer – a share of supracompetitive pricing on eBook sales and the elimination of all retail price competition so as to ensure Amazon's continued retail platform monopoly. Amazon agreed. To borrow the court's prior explanation of the parties' rationales:  Amazon "did not want to compete with [other retailers] on price and proposed to the Publishers a method through which both [Amazon] and the Publishers could each achieve their goals."[288]

267.    The conduct of the Publisher Defendants and Amazon is rooted in standard economic, albeit anticompetitive, theory. The Publisher Defendants obtained what they had wanted all along – higher consumer prices across the entire eBook market. And Amazon got what it wanted – protection from competition and the perpetuation of its retail market dominance. And together, they agreed to share in the bounty.

268.    Defendants' agreements are *per se* violations because they were formed for the purpose and with the effect of raising the price of trade eBooks even if they had not explicitly

---

[287] *See* Final Judgments of Hachette, HarperCollins, and Simon & Schuster (9/6/12) ("Final Judgment does not constitute any admission by Settling Defendants that the law has been violated or of any issue of fact or law"); Final Judgment of Penguin (5/17/13) (same); Final Judgment of MacMillan (8/12/13) (same).

[288] *Apple,* 952 F.Supp.2d at 706.

agreed on the prices to be charged. Further, the Big Five Defendants set their prices along the same ranges they previously agreed to under the *Apple* conspiracy.

269.     Defendants share a common motive to collude. Defendant Amazon has a motive to dominate rival platforms, which it achieves through its Parity Clauses to ensure that no rival retail platform can differentiate itself from, or otherwise compete with, Amazon. Each of the Big Five Defendants has a motive to increase the price of eBooks. And each has previously colluded with a retail platform operator to control trade eBook prices throughout the U.S. market by entering into agency agreements with MFNs.

270.     Defendants did not act unilaterally or independently, or in their own economic interests, when entering into these anticompetitive agreements, which substantially, unreasonably, and unduly restrain trade in the relevant market, and thereby harmed and continue to harm Plaintiffs and the proposed Class(es). The Big Five Defendants acted against their own self-interest by agreeing to agency agreements with Amazon that contained supracompetitive commissions along with the MFNs and Parity Clauses, since those agreements and provisions caused them to lose revenue and entrench Amazon's market position. For example, if Publisher 1 by itself agrees to restrict every eBook retail platform, *including its own*, from offering consumers better prices, availability, features, and business models then it puts itself at a competitive disadvantage vis-à-vis every other Publisher, whose products consumers may find at lower prices or in more desirable formats on non-Amazon retail platforms.  Publisher 1 would be expected to lose market share to those other Publishers while ensuring that sales of its own products would continue to be dominated by Amazon. However, if all Publisher Defendants acted collectively to restrict price competition among retail platforms, no Publisher Defendant would be disadvantaged.

271.     Moreover, and perhaps more importantly, by acting collectively they could then parlay the lack of retailer price competition into sharing the spoils of Amazon's market dominance. The retail price competition restrictions in the Publisher-Amazon agreements allowed Amazon to maintain its own monopoly power in the eBook retail market. Such price competition restrictions facilitate anticompetitive horizontal coordination by reducing their incentive to deviate from a coordinated horizontal arrangement.  Accordingly, the Publisher Defendants turned their individual aversion to Amazon's retail market dominance into their collective benefit.

272.     In the pre-conduct world, "Amazon was staunchly committed to its $9.99 price point and believed it would have long-term benefits for its consumers."[289] Consumers benefited with low prices, increased output, and competition among publishers on the quality of their offerings. Amazon was able to grow the overall market while underpricing its retail competitors. And publishers sold more eBooks and received higher per unit revenue on each eBook sold.

273.     However, the Publisher Defendants wanted more than what the market provided. They wanted consumers to pay higher prices, even if it meant the Publisher Defendants receiving less on eBook sales. The Publisher Defendants could not do this unilaterally. They could not individually convince eBook retailers to raise prices. And even if an individual publisher could, it would not be in that publisher's individual interest for eBook retailers to raise just the prices of its eBooks, as consumers would just switch to other publishers' books. As the Court in *Apple* explained:

> The Publisher Defendants already expected to lose revenue from their substitution of an agency model for the wholesale model of e-book distribution. Unless a Publisher Defendant followed through and transformed its relationships with Amazon and other resellers into an agency relationship, it would be in

---

[289] *Apple*, 952 F. Supp. 2d at 649.

significantly worse terms financially as a result of its agency contract with Apple. As significantly, unless the Publisher Defendants joined forces and together forced Amazon onto the agency model, their expected loss of revenue would not be offset by the achievement of their ultimate goal: the protection of book value.[290]

274.     To achieve their collective goal, the Publisher Defendants had to act collectively. They agreed to pay high commissions to eBook retailers. They agreed to accept less revenue on eBooks they sold. And they agreed to raise consumer prices.

275.     But doing so after being caught in *Apple* required a Faustian bargain. They had to agree to insulate and perpetuate Amazon's dominance as an eBook retail platform, which became the linchpin of the Defendant Publishers' scheme. Amazon also wanted something that it could not obtain in the free market. Amazon had achieved its retail dominance in eBooks through low retail prices (albeit in conjunction with some less consumer and competition friendly tactics). Now Amazon wants to reap the economic rewards of its dominance. But raising prices could put its dominance at risk of being undercut by competing eBook retail platforms, so Amazon and the Publisher Defendants agreed to eliminate any price competition by competing platforms and to share the spoils of collectively charging consumers higher prices for eBooks.

276.     Thus, even though all Defendants have an interest in generating sales in the trade eBook market, Defendants' supracompetitive prices have depressed sales in this market.

277.     Defendants had opportunities to collude. In *Apple,* the Publisher Defendants not only had the opportunity to collude, but they did in fact do so. Defendants needed minimal opportunity to effectuate their conspiracy. That opportunity presented itself with their negotiations with Amazon and statements to the press about these negotiations, which afforded

---

[290] *Apple*, 952 F. Supp. 2d at 692.

the Publisher Defendants the means to again facilitate their conspiratorial goal to raise consumer prices across the entire eBook market.

278.    For example, as each of the Big Five Defendants entered into the same agreement with Amazon, they publicly signaled to the others that the agreement provided agency pricing. Defendant Amazon also publicly stated that it had offered the same terms to each of the Big Five. Because of the findings of the European Commission, the Big Five could effectively signal to each other the presence of the Parity Clauses and their adherence to them.

279.    Authorities in the United States and Europe have launched multiple investigations into Defendants' conduct in the eBook market and have found their agency agreements with MFNs to be anticompetitive. The House Antitrust Committee and the European Commission also found at the conclusion of their respective investigations into Amazon's MFNs and similar anticompetitive provisions in its agreements with eBook publishers, including the Big Five, that Amazon's agreements harm consumers and competition in the U.S. and European eBook markets.

280.    Defendants' collusion was facilitated by market concentration. Not only do the Publisher Defendants account for 80% of the supply for trade eBooks, but they also have a pattern and practice of collusion that extends well beyond the *Apple* litigation. The District Court for the D.C. Circuit recently held that "the Big Five are already engaging in tacit collusion or parallel accommodating conduct when acquiring books" and "coordinated conduct already appears to be rampant."[291]

281.    And trade-eBook prices increased despite no rise in costs. As Amazon itself acknowledges: "With an e-book there's no printing, no overprinting, no need to forecast, no

---

[291] *Bertelsmann*, 2022 WL 16949715, at *28.

returns, no lost sales due to out-of-stock, no warehousing costs, no transportation costs, and there is no secondary market – e-books cannot be resold as used books," so "E-books can be and should be less expensive."[292]

282.    Defendants deliberately disguised their MFNs as notification provisions to avoid detection by the DOJ and state attorneys general overseeing compliance with the consent decrees.

283.    In the *Apple* case, it took 18 months for the Publisher Defendants to implement their conspiracy. They began colluding with each other in January 2009 and included Apple in their price-fixing conspiracy by December 2009.[293] They agreed on Apple's proposal and finalized their contracts with Apple in January 2010, but the conspiracy was not complete until they reached agreements with Amazon to switch to an agency model, which took them until June 2010.[294] The Publisher Defendants immediately increased their eBook prices.

284.    By comparison, it took the Publisher Defendants just eight months to execute their price-fixing agreements with Amazon and start raising eBook prices. Amazon signed its first contract with Simon & Schuster on October 20, 2014.[295] It immediately followed with its agreement with Hachette on November 13, 2014,[296] and with Macmillan on December 18,

---

[292] Kozlowski, *supra* note 130.

[293] *Apple*, 952 F. Supp. 2d at 650–56.

[294] *Apple*, 791 F.3d at 309.

[295] Author's Guild *supra* note 225.

[296] Taylor Soper, *Amazon and Hachette settle dispute with multi-year e-book agreement*, GeekWire (Nov. 13, 2014), https://www.geekwire.com/2014/hachette-amazon-reach-multi-year-e-book-agreement/#:~:text=November%2013%2C%202014%20%E2%80%93%20Hachette%20Book%20Group%20and,will%20benefit%20Hachette%20authors%20for%20years%20to%20come.

2014.[297] These contracts took effect in January 2015, and those publishers immediately increased their eBook prices by 8.3% to 15.8%. Negotiations with HarperCollins and Penguin took a little longer. HarperCollins signed on April 14, 2015,[298] and Amazon and Penguin reached agreement on June 17, 2015.[299] Penguin immediately increased its eBook prices by 30.4% and HarperCollins by 29.3%.

285.    Plaintiffs also allege a hub-and-spoke conspiracy supporting a horizontal price fixing agreement. Amazon has the dominant retail platform, through which the Big Five sell their trade eBooks. Like Apple before it, Amazon serves as the central, common contractual party (*i.e.*, the hub) through which the Defendants carried out their common scheme to control trade eBook prices throughout the U.S. market and ensure that Amazon's competitors could not differentiate themselves in terms of price or offerings by entering into agency agreements with MFNs and other Parity Clauses.

286.    Defendants publicly signaled the terms of their agreement. Each Big Five Defendant participated in the unlawful scheme because it knew that the other Big Five Defendants had entered into the same anticompetitive agreement with Amazon and because its participation was contingent upon the participation of the others. The Big Five Defendants knew that consumers had grown accustomed to the low prices afforded by competitive pricing under the wholesale model and that they could not achieve their goal of controlling trade eBook prices

---

[297] *Macmillan Strikes Deal with Amazon, but "Irony Prospers in the Digital Age*," The Authors Guild (Dec. 19, 2014), https://authorsguild.org/news/macmillan-strikes-deal-with-amazon-but-irony-prospers-in-the-digital-age/.

[298] Brian Stelter, *Amazon, HarperCollins avert public fight*, CNN (Apr. 14, 2015), https://money.cnn.com/2015/04/14/media/amazon-harpercollins-deal/index.html.

[299] Amazon, PRH Reach Sales Deal, Publishersweekly.com (Jun. 17, 2015), https://www.publishersweekly.com/pw/by-topic/industry-news/industry-deals/article/67166-amazon-prh-reach-sales-deal.html.

by acting alone. For example, it would not be sustainable for Defendant HarperCollins to raise its new releases to $15.99, if retailers were free to sell new releases of the other Big Five Defendants for $9.99.

287.    Defendant Amazon participated in and facilitated the horizontal agreement among the Big Five Defendants by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the Big Five Defendants that it was offering each of them a similar deal.

288.    For purposes of Plaintiffs' allegations of a *per se* violation, it is not necessary to prove a relevant market or adverse effects in such market.

289.    **Quick look/rule of reason**: To the extent Defendants' conduct is determined to be a vertical price restraint and the conduct at issue is not a *per se* violation, the relevant product market is the retail market for trade eBooks, regardless of whether the market is defined as the Publisher's sale of eBooks or the joint sale of eBooks by the Publisher and Amazon. The relevant geographic market is the entire United States.

290.    Defendants possess market power within the relevant market. Approximately 90% of eBook sales in the United States occur on the Amazon retail platform. The Big Five Defendants' sales account for about 80% of the trade publications in the United States. That Defendants have market power in the U.S. retail market for trade eBooks is also evident from their power to raise prices above those that would be charged in a competitive market.

291.    Defendants' agreements have an open and obvious adverse effect on competition. They ensure that the Amazon platform faces no competition in the price or availability of trade eBooks, no competition from other competing business models (like rental, bundling with physical books, book clubs, streaming, or reduced prices for partial downloads), and no

competition from retailers that support enhanced eBooks with features not supported by Amazon's Kindle e-readers. By preventing Amazon's eBook retailer competitors from offering superior products or superior prices, Defendants increase the market price of the Big Five's eBooks and limit the number of meaningful choices consumers have in their consumption of trade eBooks.

292.    Defendants' anticompetitive agreements have actual detrimental effects in the relevant market, *i.e.*, less competitive pricing and greater product conformity.

293.    An observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.

294.    Defendants' agreement to 1) eliminate all forms of competition across all retail platforms, 2) relieve Amazon of the need to compete on price or non-price bases, and 3) allow the Big Five to raise their eBook prices (which the Big Five acted upon), also violates Section 1 under the rule of reason.[300]

295.    There is no legitimate, pro-competitive business justification for Defendants' anticompetitive agreements. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose. The anticompetitive effects outweigh any such procompetitive justifications.

296.    **Injury:** Defendants' combinations and conspiracy have raised trade eBook prices and deprived Plaintiffs and the members of the proposed Class(es) of free and fair competition in the retail market for trade eBooks. Defendants have directly injured Plaintiffs and Class members by causing them to pay more for the Big Five's eBooks than they would have paid or would pay

---

[300] *Apple*, 952 F. Supp. 2d at 694.

in the future in the absence of Defendants' unlawful acts. Plaintiffs and the proposed Class(es) are entitled to an injunction that terminates the ongoing violations alleged in this Complaint and to recover three times the amount of their overcharge damages directly caused by Defendants' unreasonable restraint of trade.

## JURY TRIAL DEMANDED

297.   Plaintiffs hereby demand a trial by jury of all the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class(es), once certified;

B.   Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.   Adjudication that the acts alleged herein constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.   Judgment against Defendants for the damages sustained by Plaintiffs and the proposed Class(es), and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

E.   Pre-judgment and post-judgment interest on such monetary relief;

F.   Equitable relief requiring that Defendants cease their abusive, unlawful, and anti-competitive practices described and requested herein;

G.      The costs of bringing this suit, including reasonable attorneys' fees; and

H.      All other relief to which Plaintiffs and members of the proposed Class(es) may be

entitled at law or in equity.

DATED this 21st day of November, 2022      Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
         Steve W. Berman (*pro hac vice*)
    Barbara A. Mahoney (*pro hac vice*)
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile:  (206) 623-0594
    steve@hbsslaw.com
    barbaram@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the*
*Proposed Class*

Joseph M. Vanek (*pro hac vice*)
Paul E. Slater(*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
Blake Sercye (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
pes@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com
bsercye@sperling-law.com

*Counsel for Plaintiffs and the Proposed Class*

Linda P. Nussbaum
Bart D. Cohen
Marc E. Foto
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
mfoto@nussbaumpc.com

Michael E. Criden
Kevin B. Love
Lindsey C. Grossman
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
mcriden@cridenlove.com
klove@cridenlove.com
lgrossman@cridenlove.com

*Counsel for Jordan Sacks*

Neil L. Glazer
William E. Hoese
Douglas A. Abrahams
Zahra R. Dean
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 238-1700
Facsimile:  (215) 238-1968
nglazer@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com
zdean@kohnswift.com

Michael L. Roberts
Morgan Hunt
ROBERTS LAW FIRM US, PC
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 821-5575
Facsimile:  (501) 821-4474
mikeroberts@robertslawfirm.us
morganhunt@robertslawfirm.us

Gary M. Klinger
MASON LIETZ & KLINGER, LLP
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Telephone: (202) 429-2290
Facsimile:  (202) 429-2294
gklinger@masonllp.com

*Counsel for Mariacristina Bonilla*

Kellie Lerner, Bar No. (4446472)
Meegan Hollywood
David Rochelson
ROBINS KAPLAN LLP
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
mhollywood@robinskaplan.com
drochelson@robinskaplan.com

Adam Frankel
GREENWICH LEGAL ASSOCIATES LLC
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
afrankel@grwlegal.com

*Counsel for Ethan Silverman and Jeffrey Tamasulo*

Gregory B. Linkh (GL 0477)
Brian P. Murray (BM-9954)
Lee Albert (*pro hac vice* application forthcoming)
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite. 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile:  (212) 884-0988
bmurray@glancylaw.com
glinkh@glancylaw.com
lalbert@glancylaw.com

Eugene A. Spector
Jeffrey J. Corrigan (NY No. 2372654)
William G. Caldes
Jeffrey L. Spector
Diana J. Zinser
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
Telephone: (215) 496-0300
Facsimile:  (215) 496-6611
espector@srkattorneys.com
jcorrigan@srkattorneys.com
bcaldes@srkattorneys.com
jspector@srkattorneys.com
dzinser@srkattorneys.com

Steven A. Kanner (*pro hac vice* application
forthcoming)
Douglas A. Millen (*pro hac vice* application
forthcoming)
Brian M. Hogan (*pro hac vice* application
forthcoming)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile:  (224) 632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com
bhogan@fklmlaw.com

010888-12/2075606 V1

W. Joseph Bruckner (*pro hac vice* application forthcoming)
Heidi S. Silton (*pro hac vice* application forthcoming)
Brian D. Clark (*pro hac vice* application forthcoming)
Jessica N. Servais (*pro hac vice* application forthcoming)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile:  (612) 339-0981
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com
jnservais@locklaw.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, L.P.A.
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Telephone: (513) 345-8291
Facsimile:  (513) 345-8294
jgoldenberg@gs-legal.com

Michael J. Boni (*pro hac vice* application forthcoming)
Joshua D. Snyder (*pro hac vice* application forthcoming)
John E. Sindoni (*pro hac vice* application forthcoming)
BONI, ZACK & SNYDER LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

010888-12/2075606 V1

David P. McLafferty (*pro hac vice* application forthcoming)
McLAFFERTY LAW FIRM, P.C.
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

*Counsel for Jeffrey Cook, Susan Cook, and Cecily Lerner*

Jeffrey S. Abraham
ABRAHAM, FRUCHTER & TWERSKY, LLP
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile:  (212) 279-3655
jabraham@aftlaw.com

Richard B. Brualdi
THE BRUALDI LAW FIRM P.C.
29 Broadway, Suite 2400
New York, NY 10006
Telephone: (212) 952-0602
Facsimile:  (212) 952-0608
rbrualdi@brualdilawfirm.com

Adam Frankel
GREENWICH LEGAL ASSOCIATES LLC
881 Lake Avenue
Greenwich, CT 06831
Telephone: (203) 622-6001
afrankel@grwlegal.com

*Counsel for Lawrence Twill and Thomas Agostino*

Gregory B. Linkh
GLANCY PRONGAY & MURRAY LLP
230 Park Avenue, Suite. 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile:  (212) 884-0988
glinkh@glancylaw.com

Garrett D. Blanchfield
Brant D. Penney
REINHARDT WENDORF & BLANCHFIELD
332 Minnesota Street, Suite W1050
St. Paul, MN 55101
Telephone: (651) 287-2100
Facsimile:  (651) 287-2103
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Counsel for Robert Etten*

Kevin Landau
Brett Cebulash
TAUS, CEBULASH & LANDAU, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Telephone: (646) 873-7654
Facsimile:  (212) 931-0703
klandau@tcllaw.com
bcebulash@tcllaw.com

Daniel E. Gustafson
Daniel C. Hedlund
Daniel J. Nordin
Ling S. Wang
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile:  (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
lwang@gustafsongluek.com

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Facsimile:  (215) 923-9302
dnast@nastlaw.com

Simon Bahne Paris, Esquire
Patrick Howard, Esquire
SALTZ, MONGELUZZI & BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile:  (215) 496-0999
sparis@smbb.com
phoward@smbb.com

*Counsel for Janet Ackerman*

010888-12/2075606 V1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2022, I electronically transmitted the foregoing

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will

transmit a Notice of Electronic Filing to all ECF registrants.

*/s/ Steve W. Berman*
STEVE W. BERMAN
