**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AMAZON.COM, INC. EBOOK
ANTITRUST LITIGATION

Case Number 1:21-cv-00351-GHW-VF

**AMAZON.COM, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS'
<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................2

      A.    Plaintiffs' Amended Allegations .........................................................2

      B.    Procedural History ...............................................................................6

LEGAL STANDARD .................................................................................................7

ARGUMENT ..............................................................................................................8

I.     PLAINTIFFS' NEW MONOPOLIZATION THEORIES FAIL TO STATE A
CLAIM......................................................................................................................8

      A.    Plaintiffs Have Not Alleged Antitrust Injury, and Therefore Lack
Standing.................................................................................................8

      B.    Plaintiffs' "Two-Sided" Market Allegation is Incorrect and Meaningless. ..........12

      C.    Plaintiffs Are Not "Efficient Enforcers" of their Alleged Monopolization
Claims..................................................................................................14

      D.    Plaintiffs Have Not Validly Alleged Anticompetitive Conduct. ..........................16

      E.    Regardless of the Above Arguments, Thirteen of the Fifteen Named
Plaintiffs Lack Antitrust Standing and Their Claims Must be Dismissed. ..........19

II.    PLAINTIFFS' CONSPIRACY ALLEGATIONS ARE EFFECTIVELY
UNCHANGED, AND MUST BE DISMISSED...............................................20

CONCLUSION.........................................................................................................21

# TABLE OF AUTHORITIES

## CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) ............................................................................8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................7

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) .....................................................................................14-15

*B.C.B.S. Utd. of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ............................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................7, 18-19

*Delta Airlines, Inc. v. Bombardier, Inc.*,
  No. 1:20-cv-3025-GHW, 2021 WL 1163702 (S.D.N.Y. Mar. 25, 2021) .............................18

*Harry v. Total Gas & Power N. Am., Inc.*,
  889 F.3d 104 (2d Cir. 2018) ....................................................................*passim*

*Hughes v. Tobacco Inst., Inc.*,
  278 F.3d 417 (5th Cir. 2001) .............................................................................8

*In re Aluminum Warehousing Antitrust Litigation*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015) (*Aluminum Warehousing I*)............................ 10, 11, 16

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) (*Aluminum Warehousing II*) .........................................8, 10, 12

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  433 F. Supp. 3d 395 (E.D.N.Y. 2020)..................................................................14

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ..........................................................................9, 14

*In re Zinc Antitrust Litigation*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) .............................................................11, 12, 15

*Ocean State Phys. Health Plan, Inc. v. BCBS of R.I.*,
  883 F.2d 1101 (1st Cir. 1989) ...........................................................................16

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ...................................................................................... 1, 12, 13, 14

*Oliver v. Am. Express Co.*,
    2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ...................................................... 14

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ......................................................................... 14, 15

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
    507 F.3d 117 (2d Cir. 2007) ........................................................................... 8, 14

*Salveson v. JPMorgan Chase & Co.*,
    860 Fed. App'x 207 (2d Cir. June 29, 2021) ........................................................ 14

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) .................................................................................. 16

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) .................................................................... 16, 20, 21

*United States v. Bertelsmann SE & Co. KGaA*,
    No. 1:21-cv-02886 (D.D.C.) .............................................................................. 21

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) ................................................................................. 15

*Weslowski v. Zugibe*,
    96 F. Supp. 3d 308 (S.D.N.Y. 2016). ................................................................. 20

## INTRODUCTION

Plaintiffs concede that their amended allegations cannot revive their dismissed conspiracy-based antitrust claims (Third and Fourth Causes of Action).  Nevertheless, they attempt to salvage their monopolization claims (First and Second Causes of Action) against Amazon.com, Inc. ("Amazon") by concocting an alleged relevant product market that they describe as a "two-sided retail transaction platform market for trade eBooks."  *See* Second Consolidated Amended Complaint ("SCAC"), ECF 175, ¶ 197; *id.* ¶¶ 186, 226, 246 (similar).  That alleged market is little more than a collection of antitrust jargon and buzz words that does nothing to change the controlling facts or to overcome the Court's previous bases for dismissal.  Plaintiffs are still consumers whose only alleged injury is "overpay[ing] for trade eBooks," *id.* ¶ 16, sold directly by the Publisher Defendants at prices they alone determine.  As a result, the only market Plaintiffs could have standing to allege has been monopolized is a market for the sale of trade eBooks. Plaintiffs' monopolization claims therefore fail for all of the same reasons previously identified by the Court: Amazon cannot have monopolized a market in which other sellers are alleged to price and to sell more than 80% of the products.  And Plaintiffs lack antitrust standing to allege that Amazon has monopolized some other type of market in which Plaintiffs do not themselves participate either as buyers or as sellers.

Plaintiffs' attempt to plead around the Court's prior dismissal by alleging that the market is "two-sided" is unavailing.  For one, the case they are attempting to draw a parallel to, *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*AmEx*"), has nothing to do with monopolization claims nor with antitrust standing.  Rather, it is a case that addresses how the rule of reason should apply in certain types of markets that are very different from the one alleged here.  Moreover, even if there were some significance to an alleged market being "two-sided," it does not save Plaintiffs' monopolization claims here because they do not allege to have suffered any injury attributable to

Amazon's conduct in that market—they do not and cannot claim to have paid for any "services" from Amazon in connection with their purchases of eBooks directly from the Publisher Defendants.

In addition to their attempted reinvention of the alleged relevant market, Plaintiffs assert that the SCAC contains various other amendments that strengthen their conspiracy claims. *See* ECF No. 180 (Plaintiffs' pre-motion letter), at 3-4. Those allegations also leave Plaintiffs far short of stating a claim in light of the Court's prior ruling. The various amendments they identify overwhelmingly consist of more verbose repetitions of the same facts previously alleged in the Consolidated Amended Complaint ("CAC"), ECF No. 67, or of rhetorical allegations that merely incorporate in pleading format the arguments Plaintiffs previously made in their briefs opposing the dismissal of the CAC. Although it is unnecessary for the Court to address those allegations given their conceded insufficiency, Amazon briefly addresses those arguments to explain why they fail to render an inference of conspiracy any more plausible than was the case in the CAC.

For all of these reasons, as explained herein, the SCAC should be dismissed with prejudice.

## BACKGROUND[1]

### A.    Plaintiffs' Amended Allegations

Plaintiffs are consumers of trade eBooks. *See* SCAC ¶¶ 29-43. All fifteen of the named Plaintiffs have purchased eBooks through one of Amazon's "numerous competitors," *id.* ¶ 5, principally Barnes & Noble or Apple Books. *Id.* ¶¶ 29-43. Just two of the Plaintiffs also purchased

---

[1]     The Report & Recommendation ("R&R") already contains a fulsome discussion of the core alleged facts, most of which remain unchanged from the CAC to the SCAC. *See* R&R, ECF 161, at 2-13. As a result, this background section focuses primarily on the most important differences and similarities between the CAC and SCAC.

eBooks through Amazon's online store. *Id.* ¶¶ 32-33.[2]  Plaintiffs continue to allege that they were injured as a result of being made "to overpay for trade eBooks." *Id.* ¶ 16; *see also id.* at ¶¶ 29-43 (each alleging that a plaintiff "has been injured and will continue to be injured by paying more for the Big Five's trade eBooks than [he or she] would have paid or would pay in the future").

While the CAC contained the straight-forward allegation that Plaintiffs purchased their eBooks "directly" from the Publisher Defendants, *see, e.g.*, CAC ¶¶ 2, 47, 149, the SCAC now attempts to allege that each eBook sale also involved some additional purchase from Amazon. SCAC ¶¶ 21, 220 ("Plaintiffs . . . are direct purchasers both from the retail platforms (to which they directly make their payment, including the supracompetitive fee charged to complete the transaction on the retail platform) and from the eBook publishers (from which they directly purchase the eBooks through the retail platforms at supracompetitive prices)."). Notwithstanding that allegation, the SCAC continues to acknowledge that Amazon's role in the transaction remains that of an agent to the Publisher Defendants, and that the Publishers (rather than Amazon) control the terms of sale:

> Under the agency agreements between the Big Five and Amazon, the eBooks are sold on Amazon's Kindle platform, and consumers make their payments on the Kindle platform. But Amazon accepts those payments as an agent of the Big Five, which are responsible for providing the eBook content and setting the price of the transaction. And after deducting its transaction fees in accordance with the agency agreements, Amazon remits the consumers' payments to the Big Five.

*Id.* ¶ 1 n.2; *see also id.* ¶ 52 ("Amazon makes the eBooks of the Big Five available for sale at publisher-set prices"); *id.* ¶ 58 (under the agency model, "Amazon is not a buyer and the Big Five are not its suppliers."). Reinforcing these allegations, the SCAC newly adds an allegation about a

---

[2]     The Court previously determined that the thirteen named Plaintiffs who do not purchase eBooks through Amazon's store do not have "standing to assert a claim against Amazon." R&R, at 17-18.

statement purportedly made by the CEO of one of the Publisher Defendants, characterizing their "control of [the] price" of eBooks as "the very heart of the agency model." *Id.* ¶ 116. The SCAC also continues to estimate that 80% of trade eBooks are sold by the Big Five publishers under that agency model. *Id.* ¶¶ 1 n.3, 56, 280, 290.

The SCAC also contains new allegations concerning the commissions that Amazon and other eBook retailers charge to publishers with whom they have agency contracts. For unknown reasons, Plaintiffs define the term "transaction fee" as a substitute for "commission," *see* SCAC ¶¶ 3, 53, and then principally use that euphemistic phrase in their allegations about commissions, *id.* ¶¶ 4-5, 11-12, 14-15, 52-55, 99-102, 203-04. In some places, Plaintiffs appear to use that naming device to suggest that this "transaction fee" is a formally disclosed separate fee paid by consumers on top of the eBook prices set by the publisher.[3] But contrary to any such suggestion, the SCAC directly alleges that this "transaction fee (i.e. commission)" is paid by the publishers to their agents in amounts agreed to in their respective contracts, *id.* ¶¶ 1 n.2, 3, 52-53, 100. There is no well-pleaded allegation that consumers pay these commissions directly or that they are even visible to eBook consumers. Indeed, that is why certain of Plaintiffs' allegations about Amazon's commission on higher priced eBooks are described in the SCAC as being merely an "estimate" that Plaintiffs have "inferred from available information." *Id.* ¶ 53 & n.29. The SCAC alleges that Amazon charges publishers "at least" a 30% commission on most eBooks, *id.*, and that competitors Google and Apple Books likewise charge a "flat 30%" commission, *id.* ¶ 100.

Plaintiffs also allege that an entity named Smashwords charges a 15% commission, citing to a Frequently Asked Questions ("FAQ") page on its website. SCAC ¶ 100 & n.121. However,

---

[3]     *See, e.g.*, SCAC ¶ 2 (discussing a "transaction price, comprising the publisher-set sales price and Amazon's own transaction fee."); *id.* ¶ 21 (describing Plaintiffs' payment for eBooks as "including the supracompetitive fee charged to complete the transaction on the retail platform").

as that same FAQ makes clear, Smashwords is principally a *distributor* of eBooks that facilitates sales through "Apple Books . . . , Barnes & Noble, Kobo" and other retailers.[4]  For those sales, the FAQ explains that Smashwords' commission is an additional amount charged *on top of* those retailers' own 30% commissions, resulting in an aggregate 40% commission split between Smashwords and its retail partners.[5]  Thus, while Plaintiffs cite Smashwords' commission as "a yardstick for a competitive but-for transaction fee" of 15%, *see* SCAC ¶ 100, the source cited in support of those allegations contradicts that very claim.[6]

The SCAC also seeks to frame Amazon's commission as unreasonably large based on a comparison with Amazon's alleged low cost "*to deliver* each eBook plus Amazon's low transaction processing costs."  SCAC ¶ 4 (emphasis added); *id.* ¶¶ 54, 99 (same).  However, nothing in the SCAC purports to describe any other costs of operating Amazon's eBooks store, such as the costs associated with designing and maintaining services that make eBook reading attractive to customers, with accessibility features, and available to them on a variety of surfaces, including web browsers, phones, tablets, and e-readers; or the costs of implementing and enforcing anti-piracy measures.  Similarly, Plaintiffs cite no external source to support the proposition that Amazon's operating costs can be approximated as the sum of its cost "to deliver each eBook" and its "transaction processing costs" without more.  *Id.* ¶¶ 4, 54.

---

[4]     *See* https://www.smashwords.com/about/supportfaq at "What is Smashwords?"

[5]     *Id.* at "Why can't I find any information about what Smashwords costs?" (giving the example that "a $10.00 ebook sold at one of our retail partners earns you $6.00, the retailer earns $3.00 and Smashwords earns $1.00").

[6]     The FAQ also states that Smashwords directly sells some eBooks at a stand-alone commission of between 15% to 18.5%.  However, that commission rate is applicable to less than 10% of Smashwords' sales; the vast majority of their eBook sales incur the 40% commission cited above.  *Id.* at "What happens after I click 'Publish' and upload my book to Smashwords?" (stating that "over 90%" of authors' sales will be made at "the major retailers" to whom it distributes).

Finally, as they did in the CAC, Plaintiffs maintain that certain alleged parity provisions in Amazon's agency agreements with the Publisher Defendants have caused the publishers to set higher eBook prices than would have been the case but-for the existence of those provisions.  *See* SCAC ¶¶ 55-101 (alleging that Amazon and the Publisher Defendants agreed to a "Business Model Parity Clause," "Selection Parity Clauses," "Agency Price Parity Clause," "Promotion Price Parity Clause," "Discount Pool Provision," "Price Notification Provisions," and other "Notification Provisions").  All of these alleged provisions were previously described in the CAC, and discussed in the R&R.  *Compare* CAC at ¶¶ 74-87, *with* SCAC ¶¶ 55-96; *see also* R&R at pp. 10-11, 25-26, 30-31.  Plaintiffs once again acknowledge that at the time the contracts at-issue were adopted, judicial consent decrees prevented the Publisher Defendants "from having explicit [Most Favored Nations ("MFN") clauses] in their eBook contracts."  SCAC ¶ 89.  Nevertheless, they group together certain other provisions under the name "Retail Price Parity Provisions," and repeatedly utilize that umbrella term to suggest that the agreements contain price MFNs notwithstanding their prohibition by consent decree.  *Id.* ¶¶ 83-88.  Plaintiffs allege that these asserted "MFN and other Parity Clauses in Amazon's contracts with the Publisher Defendants have resulted in supracompetitive transaction fees and higher retail prices paid by consumers."  *Id.* ¶ 98.

## B.    Procedural History

Magistrate Judge Figueredo recommended the dismissal of Plaintiffs' claims in a thorough 54-page R&R issued on August 3, 2022.  ECF No. 161.  After considering Plaintiffs' Objections and Defendants' responses thereto, Judge Woods adopted "in full" the "thoughtful and well-reasoned Report and Recommendation" and dismissed the CAC.  ECF No. 170, at 1.  Judge Woods further granted Plaintiffs' request to amend the CAC.  *Id.* at 3-4.  After receiving an extension of time, Plaintiffs filed the SCAC on November 21, 2022.  ECF No. 175.

After Defendants filed pre-motion letters reflecting their intention to file motions to dismiss, Plaintiffs responded with a letter that "acknowledge[d] that [the amended allegations] do not address all of the Court's bases concerning the plausibility of a conspiracy, direct evidence of an agreement among Publishers, and adequacy of the plus factors." *See* ECF No. 180, at 4.  During a subsequent teleconference and exchange of correspondence, Plaintiffs confirmed that it is their position that certain amended allegations in the SCAC strengthen the Sherman Act conspiracy claims stated in the Third and Fourth Causes of Action but, under the terms of the Court's prior rulings, those causes of action should again be dismissed for failure to state a claim.  *See* Ex. A (12.22.22 Ltr. from C. Metz to Plaintiffs' Counsel, and Plaintiffs' emailed response).  Plaintiffs argue, however, that their amendments cure deficiencies in their previously-dismissed claim against Amazon for monopolization, and they have added a new claim for attempted monopolization.  ECF No. 180, at 4 (Plaintiffs' Pre-Motion Letter).  Amazon now brings this motion to dismiss.

## LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do[.]"  *Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level[.]"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678.

## ARGUMENT

## I.   PLAINTIFFS' NEW MONOPOLIZATION THEORIES FAIL TO STATE A CLAIM.

### A.   Plaintiffs Have Not Alleged Antitrust Injury, and Therefore Lack Standing.

Plaintiffs changed their legal theory in an attempt to plead around this Court's conclusion that it "cannot be that Amazon and the Publishers both simultaneously account for the *same* percentage of eBooks sales in the *same* relevant market." R&R, at 52. However, their attempted solution to that obstacle – alleging that Amazon has monopolized an amorphous market for "platform transactions" rather than a market for the sale of trade eBooks – simply creates new grounds for dismissal.

"Antitrust standing is distinct from constitutional standing, in which a mere showing of harm in fact will establish the necessary injury." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). "[A]ntitrust standing for a private plaintiff requires a showing of a special kind of 'antitrust injury,' as well as a showing that the plaintiff is an 'efficient enforcer' to assert a private antitrust claim." *Id.* (citations omitted). "The necessary 'antitrust injury' is an injury attributable to the anticompetitive aspect of the practice under scrutiny." *Id.* at 122. "Generally, only those that are *participants in the defendants' market* can be said to have suffered antitrust injury." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (*Aluminum Warehousing II*) (emphasis added)).[7] "The overall inquiry is akin to proximate cause

---

[7]   *See also Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries . . . are experienced in another market do not suffer antitrust injury."); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.").

in tort law—plaintiffs may not be too remote so as to avoid duplicative recovery and limitlessly increase the universe of potential plaintiffs." *Id.* at 116 (quotations omitted).[8]

These principles compel the dismissal of Plaintiffs' monopolization claims on the basis that they have not alleged antitrust injury, and therefore do not possess antitrust standing.  Plaintiffs allege that they are consumers who were injured by overpaying for trade eBooks.  SCAC ¶¶ 16, 29-43, 220-21.  But they no longer allege that Amazon has monopolized any market for the sale of trade eBooks, since that conflicts with their consistent allegation that the Big Five Publisher Defendants are the "direct" sellers of the vast majority (80%) of trade eBooks.  *Id.* ¶¶ 21, 220, 280, 290; R&R, at 52.  While Plaintiffs employ euphemistic phrases and labels in an attempt to insert themselves into their newly-defined "two-sided" market for "platform transactions," their substantive allegations contradict any suggestion that they participate directly in the market they allege has been monopolized.  The "transaction fee" that Plaintiffs refer to throughout the SCAC, is just the "commission" that the Publisher Defendants have agreed to pay their agents for facilitating their sale of eBooks.  *Id.* ¶¶ 3, 53.  That commission is paid in a transaction that occurs between the Publisher Defendant and the agent without further involvement of the consumers who, by that point, have already purchased their eBooks at the "publisher-set" price and are no longer part of the transaction.  *Id.* ¶¶ 1 n.2, 2, 52.  Plaintiffs' suggestion that they are injured by the size of the commission that publishers agree to pay their agents, is indistinguishable from the claim that any consumer could make about any other upstream cost in any chain of distribution, and if countenanced would impermissibly lead to "limitless" antitrust liability.  *Harry*, 889 F.3d at 116;

---

[8]       "In the context of antitrust standing, proximate cause generally follows the first-step rule."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2d Cir. 2021).  "Under the rule, injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior."  *Id.* at 140.

*Aluminum Warehousing II*, 833 F.3d at 162.  The doctrine of antitrust standing prevents that result.  *Id.*[9]

Two analogous decisions by Judge Forrest help illustrate the point.  First, in *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015) (*Aluminum Warehousing I*), plaintiffs were purchasers of "primary aluminum" who alleged an injury resulting from a conspiracy among "financial institutions with commodities trading arms that trade financial instruments (such as warrants) tied to physical metals, and operators of warehouses that store metals." *Id.* at 429.[10]  Plaintiffs alleged that the conduct about which they complained affected both the cost of primary aluminum, and the upstream cost of warehousing that aluminum at facilities approved by the London Metal Exchange ("LME-certified warehouse services").  *Id.* at 448.  For their monopolization claim, plaintiffs alleged that one provider of LME-certified warehousing, Metro, "had or was on the cusp of achieving . . . market power" in an alleged "market for LME-certified warehouse services for aluminum[.]" *Id.* at 456.  Based on that allegation, Metro allegedly could increase "the cost of storage," but that was "not the injury that plaintiffs claim to have suffered; [their] injury is having paid more for *aluminum* . . . ."  *Id.* (emphasis added).

---

[9]    For instance, as applicable here, eBook consumers might think that authors are paid too large of an advance or that their royalty rates are too high, and that this increases the prices consumers ultimately pay for eBooks.  Print book consumers might additionally believe that printing and binding costs are excessive, or that shipping and warehousing rates are too high.  All of those consumers might further believe that publishers' costs of advertising are excessive, or that prices for books are inflated by any of the other myriad costs incurred in the ordinary course of the publishing business.  Even if such costs ultimately factor into the prices publishers charge for eBooks, and even if those costs resulted from antitrust violations in upstream markets, the law does not recognize the right of end-consumers who only indirectly incur those costs to bring antitrust claims about them for the reasons stated in *Harry* and *Aluminum Warehousing II*.

[10]    The *Aluminum Warehousing* litigation was a multi-district litigation ("MDL") involving a large number of plaintiffs and theories.  For the avoidance of doubt, the decision identified in this memorandum as *Aluminum Warehousing II* arises from the same MDL as *Aluminum Warehousing I*, but is not a direct appeal from that decision.  This memorandum identifies the opinions sequentially by the date upon which they were issued.

Plaintiffs' antitrust standing could only be based "on injuries they have sustained in connection with Metro's monopoly (or near-monopoly) position in that market," *id.*, but there were none. Accordingly, the Court held that they lacked antitrust standing to allege monopolization of that market because they "themselves have not paid higher warehouse storage fees." *Id.*

Similarly, in *In re Zinc Antitrust Litigation*, 155 F. Supp. 3d 337 (S.D.N.Y. 2016), plaintiffs filed monopolization claims relating to alleged antitrust violations affecting the price of zinc. *Id.* at 362. As in *Aluminum Warehousing I*, there was a disconnect between the market plaintiffs alleged had been monopolized (an alleged "LME Zinc Warehouse Services" market), and the one in which they directly participated (an alleged "market for Special High Grade Zinc or the market for selling such zinc"). *Id.* As a result, plaintiffs lacked antitrust standing:

> The injury resulting from monopolization (or attempted monopolization) is higher prices for output or reduced output; the "output" here is "LME Zinc Warehouse Services." "Higher prices" would reference prices for such services; restrictions in output would relate to restrictions in availability of such *services*. Plaintiffs' claim is quite different: that they purchase the good that is stored and pay higher prices for that good—the physical zinc—itself. It is easy to see that the injury arising from monopolization of a service would be to buyers and sellers of that service. And plaintiffs were neither.

*Id.* at 363 (emphasis in original).

By the same token, Plaintiffs lack antitrust standing to allege monopolization or attempted monopolization of a market in which retailers allegedly provide agency services to publishers in exchange for commissions. It makes no difference whether that market is described as one in which "electronic platforms . . . compete against each other to execute transactions between trade eBook publishers and retail consumers;" or, in Plaintiffs' alternative formulation, one in which they "compete against other electronic platforms to provide retail distribution services to trade eBook consumers." SCAC ¶ 186. Either way, the substantive allegation is the same: publishers

of trade eBooks engage retailers to serve as their agents, and they compensate those agents by paying a share of the proceeds from an eBook sale as a commission.  *Id.* ¶¶ 1 n.2, 2, 52.  To the extent that Plaintiffs have otherwise alleged that Amazon has monopolized or attempted to monopolize such a market resulting in "grossly inflated" commissions, *id.* ¶100, they nevertheless lack antitrust standing because they are neither buyers nor sellers of those services, and do not themselves pay any commissions (inflated or otherwise).  Their monopolization claims must therefore be dismissed.  *Harry*, 889 F.3d at 115; *Aluminum Warehousing II*, 833 F.3d at 158; *Zinc Antitrust Litig.*, 155 F. Supp. 3d at 363.

**B.    Plaintiffs' "Two-Sided" Market Allegation is Incorrect and Meaningless.**

Plaintiffs appear to anticipate the foregoing ground for dismissal, and are attempting to set up a response based on the allegation that the relevant market is "two-sided."  *See* SCAC ¶¶ 186, 194-95, 206, 226, 237.  The apparent suggestion is that although Plaintiffs are solely purchasers of eBooks, they nevertheless participate in a non-traditional market in which other parties purchase agency services, and they should therefore have standing to complain about the monopolization of that "side" of a "two-sided" market.  Any such argument would be incorrect, and ultimately meaningless to Plaintiffs' antitrust standing.

In their pre-motion letter, Plaintiffs argue that their "two-sided" market allegation "[e]mbraces the Supreme Court's decision in [*AmEx*] and its guidance for establishing anticompetitive harm in a two-sided transaction platform market."  ECF No. 180, at 1.  But *AmEx* is not a case about monopolization (it involved alleged agreements in restraint of trade, allegedly in violation of Section 1 of the Sherman Act), and it did not involve questions of antitrust standing (because Plaintiffs were the United States and several individual states, all of whom had statutory standing).  *See AmEx*, 138 S. Ct. at 2283.  The Court described the market in that case as "two-sided" because American Express sold two distinct products to two distinct classes of buyers, and

it could not make either sale unless both purchasers agreed to the transaction. *Id.* at 2286. The Court's core holding was that in evaluating the legality of the challenged agreements' effect on competition for one of those sales, courts must also consider the impact on competition for the second type of sale. *Id.* at 2287.

*AmEx* is irrelevant to the vitality of Plaintiffs' allegations in this case for multiple reasons. First, it is irrelevant because the alleged market is not "two-sided" at all. For all of their attempts to clothe their allegations in the terminology of *AmEx* – including their repetitive use of the term "platform," and their focus on "transactions" rather than sales – Plaintiffs allege only an ordinary chain of distribution found in countless traditional markets. In order to publish and sell eBooks, the Publisher Defendants allegedly purchase inputs from multiple sources, including content and literary rights from authors to whom they pay advances and a "standard royalty [of] 25% of the publisher's proceeds" when it eventually sells their works, *see* SCAC ¶¶ 156, 174; as well as services from sales agents to whom they pay a commission that allegedly varies by agent but is at least 30% of the publisher's proceeds, *id.* ¶¶ 1 n.2, 3, 53, 99-100. With those inputs, the Publisher Defendants, in turn, are able to publish and sell eBooks "directly" to consumers like the Plaintiffs. *Id.* ¶¶ 21, 220. The allegation that sales agents work on commission and only are paid when a publisher successfully completes a sale, no more makes the market in this case "two-sided" than does the alleged fact that authors are compensated with royalties make it "three-sided." Authors and sales agents are both input sellers to the Publisher Defendants, and the Publisher Defendants make use of their respective literary rights and agency services to sell something different to consumers. Such allegations describe only a commonplace chain of distribution, not a "two-sided" market of the kind addressed in *AmEx*.

13

In any event, even if Plaintiffs were able to draw a more apt comparison to *AmEx*, it would have no bearing on their standing to bring monopolization claims based on conduct directed to the other side of the alleged market. *AmEx* says nothing at all about the ability of consumers in a "two-sided" market to allege that a product or service they neither purchase nor sell has been monopolized, resulting in excessive prices that they do not themselves pay. *See Salveson v. JPMorgan Chase & Co.*, 860 Fed. App'x 207, 209 (2d Cir. June 29, 2021) ("Importantly, *American Express* did not directly address antitrust standing at all."). Thus, even in follow-on litigation involving the *exact same* two-sided market, courts have continued to apply traditional antitrust standing principles and dismissed the claims of indirectly injured plaintiffs. *See, e.g., Am. Express Anti-Steering Rules Antitrust Litig.*, *supra*, 19 F.4th at 141 (affirming dismissal on antitrust standing grounds because "the appellants' injuries did not occur at the first step following Amex's conduct. The injuries, therefore, were not proximately caused by Amex.").[11]

In short, Plaintiffs' monopolization claims must be dismissed for failure to plead antitrust injury, and that conclusion is not altered by the incorrect (and superfluous) characterization of the market as being "two-sided."

## C.   Plaintiffs Are Not "Efficient Enforcers" of their Alleged Monopolization Claims.

As discussed above, separate and apart from the obligation to allege antitrust injury, a plaintiff does not possess antitrust standing unless it is also an "efficient enforcer" of the purported claim. *Port Dock & Stone Corp.*, 507 F.3d at 121; *see also Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290, 293-94 (2d Cir. 2006) (citing *Assoc. Gen. Contractors*

---

[11]      *See also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 409-10 (E.D.N.Y. 2020) (consumer plaintiffs were "indisputably participants in the two-sided credit card market— the very market allegedly distorted by Amex's actions," but they lacked antitrust standing because their asserted injuries were "indirect" and "incidental to Amex's alleged anticompetitive behavior."); *Oliver v. Am. Express Co.*, 2020 WL 2079510, *9-*10 (E.D.N.Y. Apr. 30, 2020) (same).

*of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983) ("*AGC*")).  Under *AGC*,

courts are required to consider several non-exclusive factors including:

> (1) "the directness or indirectness of the asserted injury"; (2) "the
> existence of an identifiable class of persons whose self-interest
> would normally motivate them to vindicate the public interest in
> antitrust enforcement"; (3) the speculativeness of the alleged injury;
> and (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative
> recoveries.

*Paycom*, 467 F.3d at 290-91 (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,

857 F.2d 55, 66 (2d Cir. 1988)).  "The weight to be given the various factors will necessarily vary

with the circumstances of particular cases."  *Id.* (quotation and alteration omitted).

Amazon previously addressed this failure in Plaintiffs' claims with respect to their

purchases of eBooks in stores other than Amazon.  *See* ECF No. 99, at 23-25.  If anything, the

amended allegations of the SCAC leave *all* of the Plaintiffs even further removed from possessing

antitrust standing under this test.  Whereas Plaintiffs previously sought to allege that Amazon's

conduct in connection with the sale of trade eBooks had the indirect effect of causing higher prices

for eBooks in other stores, *id.*, now Plaintiffs are in the position of alleging that Amazon's conduct

in the provision of agency services indirectly affects the prices of agency services charged by other

retailers, *see* SCAC ¶ 100, which in turn is alleged to have indirectly affected the prices of eBooks

both in Amazon's store and in other retailers' stores, *id.* ¶¶ 220-21.  By any measure, that makes

their claims more indirect, speculative, and duplicative than they were before, and highlights the

existence of other parties who would be better positioned to bring such claims if they had any merit

at all.  As the Second Circuit held in like circumstances, under those alleged facts "there is no

reason to examine whether Plaintiffs are efficient enforcers; they cannot be."  *Harry*, 889 F.3d at

116; *see also Zinc Antitrust Litig.*, 155 F. Supp. 3d at 363 ("For the same reason, plaintiffs would

not be efficient enforcers—the efficient enforcers would be participants in that market.");
*Aluminum Warehousing I*, 95 F. Supp. 3d at 456 (same).

### D.      Plaintiffs Have Not Validly Alleged Anticompetitive Conduct.

Even if Plaintiffs possessed antitrust standing, their monopolization and attempted monopolization claims would fail for an additional reason:  they have not validly alleged that Amazon is engaged in any anticompetitive conduct.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) ("A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics" including "the nature of [any] anticompetitive conduct"); *id.* at 99-100 ("To establish a claim for attempted monopolization, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.").

The crux of Plaintiffs' allegation that Amazon has engaged in anticompetitive conduct is that various asserted *non-price* parity (or MFN) provisions have allegedly allowed Amazon to charge supracompetitive commissions to the Publisher Defendants.  SCAC ¶¶ 53, 58-96.  Standing alone, *price* MFNs are not inherently anticompetitive and indeed are frequently characterized as procompetitive.[12]   By extension, Plaintiffs' allegations about various other provisions that

---

[12]      *See, e.g., United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (observing that the "agency model and MFNs" are generally "lawful contract terms"); *Ocean State Phys. Health Plan, Inc. v. BCBS of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("a policy of insisting on a supplier's lowest price . . . tends to further competition on the merits and, as a matter of law, is not exclusionary."); *B.C.B.S. Utd. of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (""Most favored nations' clauses are standard devices by which buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers.")

admittedly were not "explicit MFNs," SCAC ¶ 89, also do not independently state a claim for anticompetitive behavior.[13]

While Plaintiffs nominally allege that Amazon's contracts have had the effect of raising its agency commissions to anticompetitive levels, SCAC ¶¶ 53, 100, those allegations do not withstand scrutiny.  According to Plaintiffs, Amazon's "commission" on agency sales is "at least 30% and routinely exceeds 40% for the trade eBooks published by the Big Five that sell for more than $9.99."  SCAC ¶ 53; *see also id.* ¶ 54 (alleging a "30% 'transaction fee'"); *id.* ¶ 99 (same). But a 30% commission is not remotely excessive or unusual according to the SCAC.  That is the exact same commission that Apple received when it first adopted agency agreements in 2010, *id.* ¶ 130, and it is likewise the commission that Amazon's competitors Apple and Google allegedly receive today, *id.* ¶ 100.  Plaintiffs' repeated allegation that Amazon also receives a 30% commission on standard eBook sales, *id.* ¶¶ 53-54, 99, is nothing more than an allegation that it receives the same compensation for agency services as other sales agents, both historically and today.  That does not state a claim for monopolization based upon demonstrated anticompetitive conduct.

Notably, the only "yardstick" that Plaintiffs cite in support of their allegation that a competitive commission would be "much lower . . . , on the order of 15%," SCAC ¶¶ 100-01, comes from their own misreading of the webpage of a single company, Smashwords, *id.* at ¶ 100

---

[13]    As the Court noted previously, at the time the relevant "agreements with Amazon were being negotiated," judicial consent decrees required the Publisher Defendants to submit all of their "nonprivileged communication related to eBook strategy" including any "new or modified eBook agreements with Apple, Amazon, or other eBook retailer" to the Department of Justice.  R&R, at 40-41.  That "backdrop of government oversight," *id.* at 41, not only renders it implausible that the Publisher Defendants could have colluded in that period, it renders implausible Plaintiffs' further allegation that the contracts each unilaterally contained prohibited "Retail Price Parity Provisions."  *Compare* SCAC ¶ 83, *with id.* ¶ 89. Plaintiffs' use of that terminology to describe entirely different contractual provisions is a mere label and conclusory statement entitled to no weight.

n.121.  While the webpage cited by Plaintiffs does state that under certain conditions Smashwords'

"commission is only 15% or less of the net," it goes on to explain that more than 90% of the time,

that is a commission charged *after* other retailers have already received their own 30% commission

on the same sale:  "For example, a $10.00 ebook sold at one of our retail partners earns you $6.00,

the retailer earns $3.00 and Smashwords earns $1.00."[14]  Accordingly, that "yardstick" shows that

Smashwords and its retail partners charge a 40% aggregate commission on the vast majority of

their joint sales; the 15% commission alleged in the SCAC, should not be credited as a competitive

benchmark.  *See Delta Airlines, Inc. v. Bombardier, Inc*., No. 1:20-cv-3025-GHW, 2021 WL

1163702, *10 (S.D.N.Y. Mar. 25, 2021) ("[W]hen allegations contained within the complaint are

contradicted by documents attached to the complaint, the documents control, and the Court need

not accept the allegations contained within the complaint as true.") (citation omitted).

     Plaintiffs' further allegation that Amazon receives a higher commission of up to 40% on

eBooks priced above $9.99 is both speculative and not supportive of an inference that consumers

like Plaintiffs were harmed by Amazon's alleged conduct.  It is speculative by Plaintiffs' own

admission:  that allegation is an "estimate, based on additional investigation and inferred from

available information."  SCAC ¶ 53 n.29.  Specifically, Plaintiffs "infer" a commission rate that

Amazon charges large sophisticated publishers based on the royalty rates it pays to "self-published

authors" on eBooks priced above $9.99.  *Id.*  But the "Big Five" Publisher Defendants – who

allegedly publish more than 80% of trade eBooks, SCAC ¶¶ 1 n.3, 56, 280, 290 – are not similarly

situated to self-published authors, and Plaintiffs are not entitled to an inference that Amazon's

commission on those established publishers' eBook sales mirror the economic terms that self-

---

[14]    *See* https://www.smashwords.com/about/supportfaq#works at "Why can't I find any information about what Smashwords costs?"

published authors receive for an entirely different range of services. *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level").

Even if such an inference were valid, the allegation that Amazon charges a higher commission on eBooks that the Publisher Defendants choose to price above $9.99, and a lower commission on eBooks that they price at or below that threshold, *see* SCAC ¶ 53, is on its face an allegation that Amazon is incentivizing *lower* eBook prices to consumers. If true, that allegation would mean that the Publisher Defendants would find it less profitable to increase eBook prices above $9.99 (both because they would sell fewer copies at higher prices, and because they would receive a smaller share of each such sale), than if Amazon charged the same or lower commissions on higher priced eBook sales. Such allegations are therefore more consistent with the conclusion that Amazon is incentivizing lower eBook prices to consumers like the Plaintiffs, than that it is incentivizing higher prices. Either way, the unambiguous allegation in the SCAC is that the Publisher Defendants are responsible for setting the prices of eBooks, *id.* ¶¶ 1 n.2, 52, 58, and there is no logical inference to be drawn that Amazon encourages *higher* eBook prices by charging the Publisher Defendants a higher commission when they make eBooks more expensive, *id.* ¶ 53.

> ### E. Regardless of the Above Arguments, Thirteen of the Fifteen Named Plaintiffs Lack Antitrust Standing and Their Claims Must be Dismissed.

As a final matter, nothing in the SCAC attempts to cure the Court's earlier conclusion that Plaintiffs whose eBook purchases were made in other stores lack standing to sue Amazon. *See* R&R, at 15-18. Accordingly, while all Plaintiffs' claims should be dismissed for the reasons discussed above, at a minimum, the claims of thirteen out of the fifteen named Plaintiffs (and any similarly situated class members) must again be dismissed. *Id.*

## II.   PLAINTIFFS' CONSPIRACY ALLEGATIONS ARE EFFECTIVELY UNCHANGED, AND MUST BE DISMISSED.

Plaintiffs concede that their SCAC does not allege facts capable of resuscitating their conspiracy allegations (Third and Fourth Causes of Action), and that consequently those claims must again be dismissed.  *See* ECF No. 180, at 3-4; Ex. A at 1, 3.  Nevertheless, they argue that they have strengthened those claims in various ways that they propose not to subject to scrutiny by this Court.  While Plaintiffs' arguments are unnecessary for the Court to address before dismissing the SCAC, they are also meritless.

Most of Plaintiffs' new allegations are little more than a regurgitation in pleading form of allegations that Plaintiffs previously made in legal briefs.[15]  For instance, the allegation that the Publisher Defendants "never admitted guilt or otherwise repudiated their horizontal price-fixing conspiracy uncovered in *Apple*," ECF No. 180, at 3 (citing SCAC ¶ 141), is a repetition of an argument that Plaintiffs made without success in their Objection to the R&R and at oral argument. *See* ECF No. 166, at 2, 7.  Likewise, the argument that Plaintiffs have "[f]urther clarifie[d] why it would be against the individual self-interests of the Publisher Defendants to agree to Amazon's parity provisions without assurance that the other publishers would likewise agree," ECF No. 180, at 3 (citing SCAC ¶¶ 15, 179), simply repeats arguments that Plaintiffs made (and that were rejected) previously.  *See* ECF No. 166, at 9-11.  None of those arguments provide grounds to reconsider the Court's earlier conclusion that Plaintiffs fail to state a claim upon which relief can be granted.

---

[15]    "Because the [Second Consolidated] Amended Complaint . . . is in large part identical to Plaintiffs' [previous] Complaint, the law of the case doctrine counsels against reconsideration of the Court's . . . dismissal of the [previous] Complaint."  *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2016).

Similarly, Plaintiffs make multiple arguments based upon conclusions reached by Judge Pan in *United States v. Bertelsmann SE & Co. KGaA*, No. 1:21-cv-02886 (D.D.C.). *See* ECF No. 180, at 3 (citing SCAC ¶¶ 168-78). But *Bertelsmann* concerned an entirely different alleged market than the one at issue here – a market for advances paid to authors of anticipated best-selling books – and the statements from that case that Plaintiffs include in the SCAC primarily relate to the Court's interpretation of the relevance of the *Apple* litigation to that case. *See* SCAC ¶¶ 173, 176-78. This Court has also thoroughly addressed the relevance of the *Apple* litigation to the distinct allegations in this case. *See* R&R at 3-7, 22-23, 32-34, 42. The SCAC's inclusion of yet more allegations about *Apple* does not "refin[e]," ECF No. 180, at 4, Plaintiffs' facially inadequate conspiracy claims.

## CONCLUSION

For all of the foregoing reasons, the SCAC should be dismissed with prejudice against Amazon. Plaintiff also concedes that the SCAC should (based upon the Court's earlier rulings) be dismissed against the Publisher Defendants. The Court should therefore enter final judgment and close this case.

Dated: January 23, 2023                    Respectfully submitted,

                                           /s/ John E. Schmidtlein
                                           John E. Schmidtlein (*Pro Hac Vice*)
                                           Jonathan B. Pitt (S.D.N.Y. Bar No. jp0621)
                                           Carl R. Metz (*Pro Hac Vice*)
                                           WILLIAMS & CONNOLLY LLP
                                           680 Maine Avenue, S.W.
                                           Washington, DC 20024
                                           Tel.: (202) 434-5000
                                           Fax: (202) 434-5029
                                           JSchmidtlein@wc.com
                                           JPitt@wc.com
                                           CMetz@wc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Amazon.com, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint has been filed and served upon counsel of record via ECF electronic notification.

Dated:  January 23, 2023

Respectfully Submitted,

/s/ John E. Schmidtlein
John E. Schmidtlein (*Pro Hac Vice*)