**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMAZON.COM, INC. EBOOK ANTITRUST LITIGATION | Case Number 1:21-cv-351-GHW-VF |

**EBOOK PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT .............................................................................................................2

      A.    Section 2 Monopolization Claims..............................................................2

            1.    Plaintiffs Plead a Plausible Market Definition under *Amex*.........................4

            2.    Plaintiffs Plead Anticompetitive Effects.............................7

            3.    Plaintiffs Have Antitrust Standing to Bring Suit. ......................17

      B.    Conspiracy Claims........................................................................25

            1.    Plaintiffs Have Adequately Pleaded a Horizontal Per Se
                  Conspiracy Claim......................................................................27

                  a.    Plaintiffs adequately plead direct evidence of a hub-
                        and-spoke conspiracy...............................................28

                  b.    Plaintiffs adequately plead circumstantial evidence
                        of a horizontal conspiracy.........................................30

                        (1)   The Defendants would have been acting
                              against their individual self-interests if they
                              had acted unilaterally. .....................................31

                        (2)   Publisher Defendants had a common motive
                              to collude................................................32

                        (3)   The Publisher Defendants' prior and
                              ongoing collusive conduct. ...............................33

                        (4)   The Defendants' collusive conduct was
                              facilitated by market concentration......................35

                        (5)   Defendants raise prices despite no rise in
                              costs.....................................................36

                        (6)   Defendants deliberately mislabeled the MFN
                              provisions.............................................37

    (7) All Publisher Defendants executed their
      pricing agreements within months. ...................................37

    (8) Defendants had the opportunity to (and did)
      collude. ................................................................................38

  2. Alternatively, the agreements between Amazon and the
    Publisher Defendants violate the rule of reason. ......................................38

  3. Conspiracy to Monopolize ........................................................................44

III. CONCLUSION ........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016)....................................................................23

*In re Aluminum Warehousing Antitrust Litig.*,
  520 F. Supp. 3d 455 (S.D.N.Y. 2021)..................................................................22

*In re Aluminum Warehousing Antitrust Litig.*,
  95 F. Supp. 3d 419 (S.D.N.Y. 2015)....................................................................21

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  433 F. Supp. 3d 395 (E.D.N.Y. 2020) .................................................................22

*Am. Tobacco Co. v. U.S.*,
  328 U.S. 781 (1946).............................................................................................8

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)..........................................................................27, 28

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)...........................................................................18, 19, 20, 23

*Applied Med. Res. Corp. v. Jonson & Johnson*,
  2004 U.S. Dist. LEXIS 29409 (C.D. Cal. Feb. 23, 2004)......................................43

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983).......................................................................................23, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................27

*In re Blood Reagents Antitrust Litig.*,
  266 F. Supp. 3d 750 (E.D. Pa. 2017) ..................................................................37

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982).............................................................................................24

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)..................................................................43

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017)...................................................................................27

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)........................................................................................28

*De Coster v. Amazon.com, Inc.*,
2023 WL 372377 (W.D. Wash. Jan. 24, 2023)......................................9, 15, 16, 18

*DNAML Pty, Ltd. v. Apple Inc.*,
25 F. Supp. 3d 422 (S.D.N.Y. 2014)................................................................22, 23

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992)..........................................................................................8

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012)...............................................................33, 39

*In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009).....................................................................37

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2022 WL 294118 (S.D.N.Y. Feb. 1, 2022).............................................................44

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969).........................................................................................41

*Frame-Wilson v. Amazon.com, Inc.*,
591 F. Supp. 3d 975 (W.D. Wash. 2022).......................................................... *passim*

*Frame-Wilson v. Amazon.com, Inc.*,
2022 WL 6149871 (W.D. Wash. May 16, 2022)......................................................17

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016).............................................................................27

*Genico, Inc. v. Ethicon, Inc.*,
2006 U.S. Dist. LEXIS 96909 (E.D. Tex. Mar. 23, 2006)......................................43

*In re Google Play Store Antitrust Litig.*,
2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) ...................................................21

*Harry v. Total Gas & Power N. Am., Inc.*,
889 F.3d 104 (2d Cir. 2018).............................................................................22

*Hawaii v. Standard Oil*,
405 U.S. 251 (1972).........................................................................................24

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977).........................................................................................24

*Interstate Circuit, Inc. v. U.S.*,
  306 U.S. 208 (1939)......................................................................................37

*In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019).........................................................42

*Laumann v. NHL*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012)..........................................................30

*MacDermid Printing Sols., LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016).........................................................................40

*In re NASDAQ Market-Makers Antitrust Litig.*,
  894 F. Supp. 703 (S.D.N.Y. 1995)...............................................................36

*New York v. Actavis, PLC*,
  2014 U.S. Dist. LEXIS 172918 (S.D.N.Y. 2014).........................................40

*Oberdorf v. Amazon.com, Inc.*,
  2018 WL 2973856 (3d Cir. June 4, 2018) ......................................................5

*Ohio v. Am. Express Co.*,
  2017 WL 6492474 (Dec. 14, 2017) .................................................................6

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018).........................................................................*passim*

*Oliver v. Am. Express Co.*,
  2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ..............................................22

*Orchard Supply Hardware, LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ..................................................42, 43

*Paper Sys., Inc. v. Nippon Paper Indus. Co.*,
  281 F.3d 629 (7th Cir. 2002) .......................................................................44

*PepsiCo., Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)..........................................................................41

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968)......................................................................................24

*In re Platinum & Palladium Antitrust Litig.*,
  2023 WL 2229364 (2d Cir. Feb. 27, 2023)...................................................22

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  940 F. Supp. 2d 367 (E.D. La. 2013) ...........................................................39

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................................................................24

*Salveson v. JPMorgan Chase & Co.*,
860 F. App'x 207 (2d Cir. 2021) .......................................................................21

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .............................................................................37

*Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*,
2012 U.S. Dist. LEXIS 170201 (E.D. Mich. Nov. 30, 2012) ............................39

*Sitts v. Dairy Farmers of Am., Inc.*,
417 F. Supp. 3d 433 (D. Vt. 2019)................................................................42, 43

*Standard Oil Co. v. U.S.*,
337 U.S. 293 (1948)............................................................................................41

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010)....................................................................... *passim*

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)...............................................................................40

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998).................................................................................40

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982)............................................................................42

*U.S. Airways v. Sabre Holdings Corp.*,
2017 WL 3328267 (2d Cir. July 26, 2017)...........................................................6

*U.S. v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015)...............................................................................17

*U.S. v. Apple, Inc.*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013)........................................................ *passim*

*U.S. v. Delta Dental*,
943 F. Supp. 172 (D.R.I. 1996)..........................................................................39

*U.S. v. Esposito*,
2021 WL 5492935 (2d Cir. Nov. 23, 2021).......................................................29

*U.S. v. Greenfield*,
44 F.3d 1141 (2d Cir. 1995)...............................................................................29

*U.S. v. Masoni te Corp.*,
　　316 U.S. 265 (1942)........................................................................................44

*U.S. v. Microsoft Corp.*,
　　253 F.3d 34 (D.C. Cir. 2001) .........................................................................42

*U.S. v. Visa U.S.A., Inc.*,
　　344 F.3d 229 (2d Cir. 2003)...........................................................................40

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*,
　　516 F. Supp. 2d 270 (S.D.N.Y. 2007).............................................................43

*Zenith Radio Corp. v. Hazeltine Research*,
　　395 U.S. 100 (1969)........................................................................................24

*In re Zinc Antitrust Litig.*,
　　155 F. Supp. 3d 337 (S.D.N.Y. 2016).......................................................21, 30

### STATUTES

15 U.S.C. § 15...........................................................................................................24

### OTHER AUTHORITIES

Areeda & Hovenkamp, ¶ 310(c)(1) (4th ed. 2014) ..................................................42

Areeda & Hovenkamp ¶ 1421b2 (4th ed. 2017) ......................................................33

David S. Evans & Michael Noel, *Defining Antitrust Markets When Firms Operate Two-Sided Platforms*, 2005 COLUM. BUS. L. REV. 667 (2005).................................6

Iakovos Sarmas, *Market Definition for Two-Sided Platforms: Why Ohio v. American Express Co. Matters for the Big Tech*,
　　19 FLA. ST. U. BUS. REV. 199 (2020).............................................................6

Lina M. Khan, *Amazon's Antitrust Paradox*,
　　126 Yale L.J. 710 (2017) .................................................................................7

Rob Frieden, *Two-Sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, 68 AM. U. L. REV. 713 (2019) ......................................6

Richard A. Posner, ANTITRUST LAW (2d ed. 2001) ..................................................36

## I.    INTRODUCTION

Amazon dominates the eBook market as the primary retail distribution platform for consumers' eBook purchases, and it maintains its dominance in this market through its agreements with the Defendant Big Five Publishers that block other eBook platforms from competing with Amazon's platform (Amazon Marketplace). Prices for eBooks have risen. Output has declined. Transaction fees on eBook platforms grossly exceed costs and competitive rates. Consumer choice has been limited. Product innovation has been stunted. This is not how competitive markets operate.

There can be no reasonable dispute that Plaintiffs allege all this. And as set forth and pleaded in the Second Consolidated Amended Complaint ("SCAC"), government investigations and antitrust commentators agree not only that consumers are harmed, competition is suppressed, and output is limited, but also that the root cause is Amazon's abuse of its monopoly power.

Moreover, the question at this stage is not whether Defendants have in fact violated the antitrust laws but, rather, whether Plaintiffs have met pleading requirements so that their claims—accepting all allegations as true and drawing all reasonable inferences in their favor—should get past a motion to dismiss. Plaintiffs plainly have met those pleading requirements with respect to their Section 2 monopolization claim against Amazon, because the SCAC addresses every deficiency identified in this Court's Report and Recommendation ("RR") (ECF 161). Indeed, other than a revised standing, Amazon has dropped its prior challenges to these claims and now focuses on two new arguments—neither of which, as described below, support dismissing the SCAC's monopolization claim or attempt-to-monopolize claim.

With respect to the Section 1 and the conspiracy-to-monopolize claims, Plaintiffs acknowledge that the SCAC does not address every ground identified by the Court when it recommended dismissal. However, Plaintiffs have addressed several of those grounds and

respectfully ask the Court to either reconsider its prior decision or narrow its prior holdings so that they may be more efficiently addressed in any future proceeding.

## II.   ARGUMENT

### A.   Section 2 Monopolization Claims

The Second Consolidated Amended Complaint adds more than 30 pages and 100 paragraphs of allegations to address the deficiencies found in the Report and Recommendation. Specifically, with respect to the monopolization claims against Amazon, the SCAC:

➢ Embraces the Supreme Court's decision in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"), and its guidance for establishing anticompetitive harm in a two-sided transaction platform market, ¶¶ 194-97[1];

➢ Defines a two-sided eBook transaction platform market in which Amazon possesses monopoly power, ¶¶ 186, 194-97;

➢ Focuses on the prices set by Amazon itself, *i.e.*, the price of the transaction, instead of those prices set by the Publishers, *i.e.*, the retail eBook price, ¶¶ 3-5, 7, 9, 11-12, 52-55, 97-102;

➢ Explains how Amazon has the power to control those transaction prices (typically expressed as a percentage of retail price) for eBook sales and has raised those transaction prices paid by Plaintiffs above a competitive level, *id.*;

➢ Details how Amazon unlawfully employs a variety of parity provisions—including those related to business model, price, selection, and notification—to exclude competition in the eBook retail transaction market, along with official findings concerning their ubiquitous nature and anticompetitive effects, ¶¶ 60-96;

➢ Focuses market share allegations on Amazon's share in the retail eBook transaction market, ¶¶ 51, 226;

➢ Demonstrates how Amazon's conduct has reduced output in the two-sided eBook retail transaction market, including by comparison to Europe—where Amazon's conduct was enjoined, and output has increased, innovation has flourished, and prices have fallen, ¶¶ 61-68; 70-81; 95-96, 159-63;

---

[1] Unless otherwise indicated, references to "¶ __" are to paragraphs of the Second Consolidated Amended Complaint.

➢ Details how Amazon's conduct has increased the price for eBook transactions in the market as whole while curtailing innovation in eBook formats, features, and business models, ¶¶ 58-68, 70-96, 159-63;

➢ Calculates the monopoly profits extracted by Amazon—by contrasting its prices and costs for eBook transactions—and compares those profits to the economic profit rate of 13,342 U.S. and non-U.S. firms, ¶ 99;

➢ Cites extensive primary and secondary sources to document market conditions and Amazon's anticompetitive conduct, ¶¶ 97-115;

➢ Further details publishers' own concerns and claims regarding Amazon and the market power Amazon possesses over them because of its control of the eBook transaction market, ¶¶ 7-10, 116-122, 201-06; and

➢ Sets forth a new cause of action for attempted monopolization in the event Amazon is not adjudicated to already possess monopoly power, ¶¶ 235-43.

These extensive additions and revisions are neither cosmetic nor cursory. Instead, they are curative and address every basis identified in the Court's Report and Recommendation for dismissing the monopolization claim against Amazon. As the attached redline comparison of the complaint illustrates, these revisions address the Court's decision regarding: (i) the existence of monopoly power in the relevant market (RR at 50–53), (ii) Amazon's ability to control transaction prices in the eBook retail transaction market (RR at 51–52), (iii) Amazon's ability to exclude other retail transaction platforms in the relevant market (RR at 52–53), (iv) Amazon's market share in the two-sided eBook retail transaction market (RR at 51–52), (v) the anticompetitive and unlawful manner in which Amazon has obtained and maintained its monopoly power (RR at 52–53), (vi) the extensive anticompetitive harm stemming from Amazon's conduct, including higher transaction prices, reduced consumer choice, stifled innovation, and decreased output (RR at 46–48), and (vii) antitrust standing (RR at 15–18).

In moving to dismiss the monopolization claims, Amazon does not attack the plausibility of the underlying economic analysis or factual underpinnings of the SCAC. Amazon does not dispute the plausible existence (or its use) of parity provisions nor the resulting increased prices,

lower output, and reduced consumer choice. Amazon does not dispute that Plaintiffs have plausibly alleged that the dominant share of eBook transactions flow through its online marketplace, nor the lack of alternative retail distribution platforms. And Amazon does not dispute that Plaintiffs have accurately depicted the holdings of the European Commission, the findings of the House Judiciary Committee, and the analysis of Professor Herbert Hovenkamp, all concluding that Amazon is abusing and unlawfully maintaining its monopoly power as the dominant retail platform for consumer eBook purchases.

Instead, Amazon (1) contests Plaintiffs' characterization of Amazon Marketplace as a two-sided retail platform, (2) attempts to justify its anticompetitive conduct, and (3) revises its attack on Plaintiffs' right to bring suit. None of these arguments support dismissing Plaintiffs' monopoly claims.

### 1.      Plaintiffs Plead a Plausible Market Definition under *Amex*.

Amazon does not dispute that trade eBooks are a relevant antitrust market. Nor does Amazon take issue with a retail market for the distribution of trade eBooks. Amazon's only quarrel is whether it operates as a "one-sided" or "two-sided" retail platform. (Amazon Br. at 1–2, 12–14.) In *Amex*, the Supreme Court defined "a two-sided platform" as one that "offers different products or services to two different groups who both depend on the platform to intermediate between them."[2] "There is no material controversy over the basic economics of two-sided platforms in the industrial organization literature, which now consists of hundreds of papers, many published in top journals, and several books."[3] While Amazon now fights its

---

[2] *Amex*, 138 S. Ct. at 2280.

[3] David S. Evans & Richard Schmalensee, *Ignoring Two-Sided Business Reality Can Also Hurt Plaintiffs*, CPI ANTITRUST CHRON., Apr. 2018. https://www.competitionpolicyinternational.com/wp-content/uploads/2018/04/CPI-Evans-Schmalensee.pdf (last visited Mar. 1, 2023).

characterization as a two-sided platform, it has spent the past decade waging legal battles throughout the United States to establish just that.[4] It has convinced courts around the country that "Amazon is a marketplace provider" based on its self-professed "role as the 'platform' for the third-party sales."[5]

In *Amex*, the Supreme Court held that "[t]he key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other."[6] That is exactly how Amazon describes itself. For example, Amazon asserted in a recent case that "Amazon's only role in third-party transactions is to offer sellers an online storefront through the marketplace."[7] Amazon said that its "services make it easier to for the parties to the sale to complete their transaction":

> [A]s the operator of a marketplace, Amazon provides various services to facilitate transactions between third-party sellers and their customers. For example, Amazon processes payments, provides a streamlined website interface, and offers a way for customers and sellers to communicate through secure channels. These services make it easier for the parties to the sale to complete their transaction, but they do not turn Amazon into a seller ....[8]

Compare that description from Amazon with how economists describe the two-sided platform—as an "exchange" that "helps buyers and sellers search for feasible contracts":

---

[4] *See, e.g.*, Amazon Appellee Brief, *Oberdorf v. Amazon.com, Inc.*, 2018 WL 2973856, at *10 (3d Cir. June 4, 2018) [hereinafter Amazon *Oberdorf* Appellee Br.].

[5] *Id.* at *16-17.

[6] *Amex*, 138 S. Ct. at 2280, 2286 (explaining that "two-sided transaction platforms … facilitate a single, simultaneous transaction between participants").

[7] Amazon *Oberdorf* Appellee Br., *supra* n.3, at *2.

[8] Amazon *Oberdorf* Appellee Br., *supra* n.3, at *14. In a brief filed by Amazon on February 6, 2023, in *Floyd v. Amazon.com, Inc.*, Amazon explained that although it "began in 1994 as a pure first-party retailer," it has since "opened its website to third-party sellers." Amazon's Motion to Dismiss at 6 n.7, ECF 32, No. C22-01599-JCC (W.D. Wash. Feb 6, 2023).

Exchanges have two groups of customers that generally can be considered "buyers" and "sellersdou." The exchange helps buyers and sellers search for feasible contracts--that is, where the buyer and seller could enter into a mutually advantageous trade and for the best prices. In these situations, the buyer pays as little as possible, and the seller receives as much as possible. It covers … traditional exchanges: auction houses; Internet sites for business-to-business, person-to-business, and person-to-person transactions ….[9]

It is thus no wonder that Amazon is frequently described in economic and legal literature as the "original" two-sided platform[10] and "a prime candidate for an *Amex* approach in market definition."[11] Indeed, while the economic community was divided in *Amex* over how two-sided markets should be analyzed for antitrust purposes, it was in agreement on one thing: Amazon is a two-sided platform.[12] And not surprisingly—given the prior legal positions of Amazon itself, the

---

[9] David S. Evans & Michael Noel, *Defining Antitrust Markets When Firms Operate Two-Sided Platforms*, 2005 COLUM. BUS. L. REV. 667, 674 (2005).

[10] Jon Malankar, *Same network effects responsible for Amazon's rise might lead to its undoing*, https://d3.harvard.edu/platform-digit/submission/same-network-effects-responsible-for-amazons-rise-might-lead-to-its-undoing/ ("Amazon is the original two-sided marketplace.") (last visited Mar. 1, 2023).

[11] Iakovos Sarmas, *Market Definition for Two-Sided Platforms: Why Ohio v. American Express Co. Matters for the Big Tech*, 19 FLA. ST. U. BUS. REV. 199, 206 (2020); *id.* at 200 ("Amazon, Apple, Google, and Facebook all operate two-sided platforms that allow two different groups of customers to interact."); Rob Frieden, *Two-Sided Internet Markets and the Need to Assess Both Upstream and Downstream Impacts*, 68 AM. U. L. REV. 713, 721 (2019) (identifying Amazon as a two-sided platform); Vaclav Vincalek, *Launch A Two-Sided Market, Rinse, Repeat*, FORBES (Nov. 18, 2019), https://www.forbes.com/sites/forbestechcouncil/2019/11/18/launch-a-two-sided-market-rinse-repeat/?sh=5045bb3eb8da ("The worlds biggest company, Amazon, is a two-sided market between sellers and consumers.") (last visited Mar. 1, 2023); Sequoia, *Two-Sided Marketplaces and Engagement*, Medium (Dec. 14, 2018), https://medium.com/sequoia-capital/two-sided-marketplaces-and-engagement-ded7d5dcfe71 ("American Express, … Amazon, and YouTube can all be considered as two-sided marketplaces.") (last visited Mar. 1, 2023).

[12] *Compare* Brief for Amici Curiae John M. Connor, *et al.*, in Support of Petitioners, *Ohio v. Am. Express Co.*, 2017 WL 6492474, at *9 (Dec. 14, 2017) (economists' brief in support of the government's case against Amex describing Amazon as a two-sided platform) with Brief of Dr. David S. Evans and Prof. Richard Schmalensee as Amici Curiae, *U.S. Airways v. Sabre Holdings Corp.*, 2017 WL 3328267, at *29 (2d Cir. July 26, 2017) (economists who supported Amex and

consensus of economists, and the plain language of the *Amex* decision—lower courts have taken the same view, finding that "Amazon operates as ... a 'two-sided platform'" providing services to facilitate transactions between sellers (*e.g.*, publishers) and consumers (*e.g.*, eBook readers).[13] Amazon's assertions to the contrary solely for purposes of avoiding liability in this case should be rejected.

## 2.   Plaintiffs Plead Anticompetitive Effects.

It is easy to see why Amazon *wants* to distance itself from two-sided antitrust jurisprudence: Amazon prefers the pre-*Amex* antitrust framework. As Lina Khan (current chair of the FTC) observed before the *Amex* decision in 2018: "Amazon's conduct and structure may threaten competition yet fail to trigger scrutiny under the analytical framework [then] used in antitrust."[14]

Amazon contends that its alleged conduct has no anticompetitive effects (Amazon's Br. 16–19), but that contention is baseless if the Court "[e]valuat[es] both sides of a two-sided transaction platform" as *Amex* requires "to accurately assess competition."[15] That analysis examines whether Amazon's "conduct on one side [of the platform] inflicts harm through its impact on the other side."[16] So while Amazon asserts that its transaction fee (or "commission" in Amazon's preferred parlance) on eBook sales are charged to publishers, Amazon is accountable

---

on whom the Supreme Court heavily relied, concurring in their amicus brief in the *Sabre* post-*Amex* case that Amazon operates a "two-sided platform").

[13] *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 986 (W.D. Wash. 2022).

[14] Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 784 (2017).

[15] *Amex*, 138 S. Ct. at 2287.

[16] David S. Evans & Richard Schmalensee, *Ignoring Two-Sided Business Reality Can Also Hurt Plaintiffs*, CPI ANTITRUST CHRON., Apr. 2018. https://www.competitionpolicyinternational.com/wp-content/uploads/2018/04/CPI-Evans-Schmalensee.pdf (last visited Mar. 1, 2023).

under *Amex* for "the overall cost of the platform's services," including higher eBook prices charged to consumers.[17] To apply the Supreme Court's words to this case:

> [Amazon's] argument about [publisher] fees wrongly focuses on only one side of the two-sided [eBook] market. As explained, the [eBook] market must be defined to include both [publishers] and [consumers]. Focusing on [consumer or publisher] fees alone misses the mark because the product that [Amazon] sell[s] is transactions, not services to [to one group or another], and the competitive effects of a restraint on transactions cannot be judged by looking at [publishers] alone.[18]

Amazon attempts to write off the anticompetitive effects of its conduct by asserting that Plaintiffs only "nominally allege that Amazon's contracts have had the effect of raising its agency commissions to anticompetitive levels." (Amazon's Br. at 17.) But Plaintiffs' allegations of supracompetitive agency transaction-fee/commissions are far from nominal. As Plaintiffs allege in the SCAC, on average, it costs Amazon only $0.06 to deliver each eBook, plus Amazon's low transaction-processing costs. (¶ 4.) Yet Amazon charges an agency commission (*i.e.*, transaction fee) that routinely exceeds 40% of the price paid by consumers for trade eBooks (*e.g.*, an $8 commission on a $20 eBook), a sum that vastly exceeds Amazon's transaction costs. (¶¶ 3-4.) In a but-for competitive market, Amazon could not earn such a supracompetitive profit without losing sales to a competitor and experiencing reduced profits. (*Id.*) Yet despite its excessive commissions, Amazon continues to dominate the retail market for the distribution of trade eBooks, with nearly 90% of those transactions occurring on its platform.[19] (¶ 1.)

---

[17] *Amex*, 138 S. Ct. at 2286.

[18] *Id.* at 2287.

[19] *See Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 797 (1946) (characterizing as a "substantial monopoly" a market share of "over 80%"); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992) (monopoly power can be inferred from market share above 80%).

Amazon sustains its supracompetitive profits and maintains its market dominance through parity provisions that operate to restrain competition from other eBook retail distribution platforms. (¶ 8.) As publishers testified to the United States House Committee investigating competition among technology platforms, "Amazon always has and still does require MFNs." (¶ 8 (quoting House Report).)  This restraint "reinforces Amazon's 'stranglehold' and 'control' over book distribution." (*Id.*)

The nation's leading antitrust authority, Professor Herbert Hovenkamp, flatly stated that Amazon's "very large proportion of the eBook market" renders Amazon a monopolist and that Amazon's market power "is very likely sufficient for [antitrust] offenses such as … most-favored-nations agreements." (¶ 6). Professor Hovenkamp is not alone. As the district court explained in *De Coster v. Amazon.com, Inc.*, "[a]n investigation by the House of Representatives Judiciary Committee's Subcommittee on Antitrust, Commercial, and Administrative Law … found that 'Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers.'"[20]

Likewise, the European Commission (through its Directorate General for Competition) found that the very facts alleged by Plaintiffs here constituted an abuse of monopoly power that caused a host of anticompetitive effects in the eBook market. (¶ 6.) The European Commission concluded that Amazon uses its monopoly power to extract supracompetitive profits from the market as a whole by suppressing platform competition through the use of its parity provisions. (¶ 69.)  And the European Commission found that Amazon systematically employs parity provisions in its eBook distribution agreements with publishers to (i) extinguish the normal and

---

[20] 2023 WL 372377, at *1 (W.D. Wash. Jan. 24, 2023).

highly procompetitive incentive and ability of eBook publishers to compete against each other on price, quality, and features; and (ii) extinguish the normal and highly procompetitive incentive of electronic platforms to compete against each other, including on the commission rate [*i.e.*, the transaction fee] charged for the retail delivery and distribution of trade eBooks. (¶ 10.)

Amazon's parity provisions fall into four categories: (i) a Business Model Parity Clause that obligates publishers to notify Amazon of its agreements with other retail distribution platforms and then offer Amazon the same business model and terms utilized by that would-be competitive platform; (ii) Selection Parity Clauses that contractually obligate the eBook publisher to give Amazon any eBooks or related features and functionality available on any other eBook platform; (iii) express Retail Price Parity Clauses that preclude the eBook publisher from offering its trade eBooks on any competing platform at a lower price than the price offered on Amazon, thereby foreclosing price competition on eBook platforms; and (iv) Notification Provisions that contractually obligate a publisher to notify Amazon of the price-related and non-price-related terms offered by or to other platforms for selling eBooks at retail. (¶ 9.)

**Business Model Parity Clause:** Amazon uses the Business Model Parity Clause to reduce publisher "incentives to support and invest in alternative new and innovative business models." (¶ 61 (quoting EC Decision).) Through this parity clause, Amazon reduces its "competitors' ability and incentives to compete on price or to develop and differentiate their eBook offerings through such business models." (*Id.*) As a result, Amazon weakens competition at the eBook distribution level and maintains its monopoly power in the relevant retail-distribution market(s). (*Id.*) It also hinders the emergence of alternative business models for the distribution of eBooks. (*Id.*)

**Selection Parity Clauses:** Amazon uses Selection Parity Clauses with a host of restraints that require publishers to afford Amazon priority with respect to title, date, and feature availability. (¶ 70.) Publishers are restrained from offering unique titles through competing eBook retail platforms, and from selling titles on competing platforms, unless they are offered on Amazon. (*Id.*) Likewise, publishers are prohibited from offering distinct eBook features on competing platforms and must affirmatively assist Amazon in creating eBook formats to match those that may be offered on competing platforms. (*Id.*) Amazon knows, and the European Commission found, that "even a short window of exclusivity granted by an E-book Supplier to an E-book Retailer may have a significant impact on sales volumes for that E-book Retailer." (¶ 71.) Accordingly, Amazon employs the Selection Parity Clauses to eliminate such competition. (*Id.*) The European Commission found that Amazon's Selection Parity Clauses "reduce innovation, quality and choice to the detriment of consumers" and "result in higher prices." (¶ 72.) This is because Selection Parity Clauses reduce the incentives of market participants—including publishers and competing platforms—to develop eBooks that are not primarily text and prevent the differentiation of eBooks through innovative features or functions. (*Id.*).

**Retail Price Parity Clauses:** Amazon also employs several types of parity provisions to foreclose retail price competition among competing distribution platforms, including an Agency Price Parity Clause, a Promotion Price Parity Clause, and a Discount Pool Provision. (¶ 82.) Together, the European Commission refers to these pricing parity provisions as the "Retail Price Parity Provisions." (¶ 83.) The European Commission found that "any of them is directly or indirectly capable of ensuring price parity of retail prices among competing E-book Retailers." (*Id.*) The Retail Price Parity Provisions limit the ability of a competing platform to attract buyers

by offering lower retail prices than those on Amazon, thereby deterring entry and expansion while maintaining and increasing Amazon's monopoly power. (¶ 85.) "[W]ith Retail Price Parity Provisions in place, Amazon has the incentive to charge higher rates of commission, as E-book Suppliers cannot steer customers away from Amazon by setting a lower retail price on competing E-book Retailers' platforms that charge a lower rate of commission." (¶ 88.) To the contrary, "[i]nstead of raising the retail price exclusively on Amazon as a consequence of higher rates of commission, E-book Suppliers will have to raise the retail price of their e-books uniformly on all E-book Retailers' platforms." (*Id*.) In other words, Amazon would "benefit from a higher commission and at the same time would not have to fear a substantial loss of consumers, as the latter would also face higher retail prices at competing Ebook Retailers." (*Id*.)

**Notification Provisions:** When the Big Five publishers renegotiated their contracts with Amazon in approximately 2015, the consent decrees prevented them from having explicit price-parity provisions in their eBook contracts. Until about 2017, while they were still subject to this prohibition, Amazon and the Big Five agreed to notification provisions that served the same function as the prohibited MFN provisions. (¶ 89.) The European Commission found that the notification provisions function as full-fledged price parity (or MFN) provisions because Amazon explicitly threatens to punish publishers if they do not accede to Amazon's demands that they be treated as such. (¶ 91.) The European Commission found that "the Retail Price Notification Provision and the Promotion Notification Provision and Amazon's policy to request parity result in anticompetitive effects which are very similar to those of the Retail Price Parity Provisions. (¶ 93.) Several eBook publishers admitted that they were hindered from offering lower prices or promotions on competing eBook retail platforms. (*Id*.) Similarly, publishers

"turned down" proposed promotions from eBook retail platforms "because of the concern that such promotions would have to be notified to Amazon." (*Id*.)

For purposes of this motion, Amazon does not dispute its alleged use of the above parity clauses. And it must concede at this stage, based on the well-pleaded allegations, that the parity clauses have increased transaction prices throughout the market by setting supracompetitive agency commissions (*i.e.*, transaction fees) across other eBook platforms.[21] Amazon's economic-profit rate on the eBook transactions far exceeds the rate of economics profits obtained by comparable firms and platforms in competitive markets or even, for that matter, by Amazon itself in other markets. which on average is. (¶ 99.) Its ability to charge a 40% transaction fee, despite its exceedingly low marginal cost for distributing eBooks on its platform ($0.06 to deliver each eBook plus Amazon's low transaction processing costs) generates an economic-profit rate that far exceeds those earned at the 95th percentile of all firms. The incentives eBook publishers would have in a competitive market to lower their eBook prices on other platforms based on lower transaction fees charged to consumers demonstrates Amazon's market and monopoly power and its ability to keep prices elevated above the competitive level. (¶ 204.)

---

[21] Plaintiffs allege that "eBook platform Smashwords charges a 15% transaction fee for eBook transactions on its platform." (100.) Amazon suggests that the 15% fee happens only on a small percentage of transactions and that, for the remaining transactions, the fee is 40%. (Amazon's Br. at 4–5, 17–19.) That suggestion is false; Smashwords charges a 15% transaction fee, and the only exception is when the sale is originated by an affiliate marketer and Smashwords then charges "18.5% (vs. the ordinary 15%)." (Smashwords, *FAQ*, https://www.smashwords.com/about/supportfaq#pricing.) It is of course true that, when a Smashwords author sells books on the platform of another retailer like Amazon or Barnes & Noble, the artificially inflated transaction fee charged by that other retailer platform is charged on top of the Smashwords fee. (*Id*.) ("[T]he retailer will take 30% of the price as their commission."). But nothing about that artificially inflated fee—which result from Amazon's conduct and is at the very center of Plaintiffs' claims—undermines Plaintiffs' allegation that the lower Smashwords fee provides a yardstick for a competitive but-for transaction fee. Instead, it seeks to validate Plaintiffs' allegations and demonstrate the market-wide effects of Amazon's anticompetitive conduct.

Additionally, the anticompetitive effects of the parity clauses extend beyond price. Amazon's use of parity clauses has reduced output, stunted innovation, and curtailed consumer choice.  (¶ 108.) These allegations are not conclusory. To the contrary, in response to the European Commission's findings that the Parity Clauses impede competition, Amazon agreed to "not enforce or otherwise rely upon any Business Model Parity Clause, Agency Commission Parity Clause, Agency Price Parity Clause, Features Parity Clause, Promotion Parity Clause, Selection Parity Clause, Wholesale Price Parity Clause or Notification Provision contained in agreements between Amazon and E-book Suppliers for the sale of e-books to consumers in the EEA." The result? Increased output, lower prices, and more innovation in Europe while the United States has trended in the opposite direction.  (¶¶ 160-163.)

In sum, Amazon used its market and monopoly power to substantially foreclose competition in the market by unlawful and improper means, including preventing competing eBook retail platforms from gaining market share through lower transaction fees (*i.e.*, agency commissions in Amazon's parlance) and dissuading and preventing potential competitors from entering the market. Amazon's unlawful conduct has had the purpose and effect of (a) ensuring that eBooks sold by or through Amazon's eBook retailer rivals were sold at prices that were no lower than the prices on the Amazon platform; (b) diminishing the incentives of Amazon's eBook retailer rivals from lowering their prices for transactions on their platforms; (c) eliminating Amazon's current and potential eBook distribution platform competitors' ability and incentives to offer price promotions or early releases; (d) eliminating Amazon's current and potential eBook distribution platform competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models, *e.g.*, eBook rentals and partial downloads; and (e) eliminating Amazon's current and potential eBook

distribution platform competitors' ability and incentives to develop innovative eBook products with greater functionality, *e.g.*, adding illustrations and animation.

All these well-pleaded anticompetitive effects are supported by specific findings of the European Commission, Professor Hovenkamp, and the House Judiciary Committee. And consistent with those findings, in *Frame-Wilson v. Amazon.com, Inc.,* the court considered and rejected Amazon's motion to dismiss a challenge to similar pricing policies that Amazon imposes on other third-party sellers in its marketplace.[22] As here, Amazon had argued that its pricing policies "encourage low prices from third party sellers" and have "no anticompetitive tendency 'as a matter of law.'"[23] But the plaintiffs had alleged that Amazon's parity provisions "raise the cost of products on external platforms," "suppress[] competition from its sellers on external platforms," and cause consumers to pay "higher prices."[24] And the court ruled that the plaintiffs' allegations, "if taken as true, [w]ere sufficient to demonstrate that the conduct at issue has resulted in and continues to result in the suppression of competition and increase of prices on external platforms."[25] Nor did it matter that Amazon argued pro-competitive justifications for its conduct because, as the court explained, such arguments are improper at the pleading stage.[26]

Likewise, in *De Coster v. Amazon.com, Inc.*, the court held that allegations regarding Amazon's pricing provisions "plausibly allege antitrust injury."[27] The plaintiffs in *De Coster* had asserted that "Amazon's MFN policies restrain competition in ways that cause consumers to pay

---

[22] 591 F. Supp. 3d 975 (W.D. Wash. 2022).

[23] *Id*. at 991.

[24] *Id*. at 991–92.

[25] *Id*. at 992 ("The Court therefore determines that they sufficiently allege the requisite anticompetitive conduct for Section 2 claims under the Sherman Act.").

[26] *Id.* ("the Court need not consider such rebuttals on a motion to dismiss").

[27] 2023 WL 372377, at *5.

supra-competitive prices directly to Amazon."[28] And while Amazon argued that "third-party merchants make 'independent pricing decisions,'" the court rejected that argument on a motion to dismiss and found "plausible" that "Amazon uses its MFN policies to block third-party merchants from making truly independent pricing decisions."[29] The court likewise rejected Amazon's argument that "no court ha[d] ever condemned competitive price policies like these" because that factual assertion "does not, in itself render these claims implausible."[30] As the court explained: "Amazon's arguments [were] fact-based and premature, essentially asking the Court to hear expert testimony at the motion-to-dismiss stage of litigation. That is not how civil litigation is supposed to proceed and will not serve as a basis for dismissal under Rule 12(b)(6)."[31] In short, taking the plaintiffs' allegations as true, "Amazon's MFN policies cause Amazon customers to pay more for goods purchased on its marketplace than they would pay in a competitive market."[32]

Despite this authority directly involving Amazon itself, Amazon persists in arguing that its parity clauses/MFNs are somehow shielded from antitrust scrutiny as a matter of law.

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at *3 (internal alterations omitted).

[31] *Id. See also Frame-Wilson*, 591 F. Supp. 3d at 991–92 (Amazon's MFNs "could—and as Plaintiffs allege, do[] in fact—raise the cost of products on external platforms that charge lower fees than Amazon. Amazon thus suppresses competition from its sellers on external platforms, 'where they would otherwise competitively price their goods at a lower price.' Consumers of such products are therefore subject to higher prices of products on external platforms as a result of Amazon's pricing policy. Here, Plaintiffs state facts, which, if taken as true, are sufficient to demonstrate that the conduct at issue has resulted in and continues to result in the suppression of competition and increase of prices on external platforms. The Court therefore determines that they sufficiently allege the requisite anticompetitive conduct for Section 2 claims under the Sherman Act.") (internal citation omitted).

[32] *De Coster*, 2023 WL 372377, at *3.

(Amazon's Br. at 16–17.) But when rejecting the same arguments from Apple, the Second Circuit held that it was "breaking no new ground in concluding that MFNs, though surely proper in many contexts, can be misused to anticompetitive ends in some cases."[33] And as in *Frame-Wilson* and *De Coster*, Plaintiffs sufficiently allege such misuse to anticompetitive ends here. Plaintiffs respectfully ask this Court to hold the same.

### 3.   Plaintiffs Have Antitrust Standing to Bring Suit.

Amazon seeks to insulate its anticompetitive conduct by asserting that Plaintiffs cannot bring suit. (Amazon's Br. at 8–12.) Whereas Amazon previously limited its standing challenge to those Plaintiffs who purchased Big Five eBooks through platforms other than Amazon Marketplace, Amazon now has expanded its argument to encompass *all* Plaintiffs. Again, Amazon tried this same strategy in other courts and lost. For example, in *Frame-Wilson*, where the plaintiffs sued Amazon for overcharges it caused to occur on online retail sites outside of Amazon Marketplace (like eBay), Amazon asserted in its motion to dismiss that the plaintiffs lacked antitrust standing:

> Plaintiffs' claims, like the claims in *ATM*, run "squarely into the *Illinois Brick* wall," *ATM*, 686 F.3d at 749, because Plaintiffs do not pay Amazon seller fees directly. Plaintiffs' claims depend on those fees being incorporated into the ultimate prices that they pay. This is a pass-on theory of damages and therefore cannot provide antitrust standing even based on a co-conspirator theory.[34]

But the court rejected Amazon's argument, explaining that "[t]he antitrust laws are intended to preserve competition for the benefit of consumers" and that the plaintiffs had sufficiently

---

[33] *U.S. v. Apple, Inc.*, 791 F.3d 290, 320 (2d Cir. 2015) (internal quotation and citation omitted).

[34] Amazon.com, Inc.'s Motion to Dismiss Second Amended Complaint, *Frame-Wilson v. Amazon.com, Inc.*, ECF 59, 2022 WL 6149871 (No. 2:20-cv-00424, W.D. Wash. May 16, 2022).

pleaded consumer injury in the form of "reduced price competition" and "sellers' inability to charge competitive prices."[35]

Similarly, in *De Coster*, Amazon argued that the consumer plaintiffs lacked standing because they complained about injury not to themselves but, instead, to sellers such as the publishers here.[36] Rejecting Amazon's argument, the court credited the plaintiffs' position that *Apple v. Pepper* is "factually analogous," holding "that Plaintiffs allege a valid injury here, even if third-party merchants also have their own cause of action for lost profits."[37]

*Apple v. Pepper* is indeed analogous here as well. In *Pepper*, independent app developers made their apps available to iPhone users through Apple's retail distribution App Store.[38] Apple sold the apps to iPhone users. Apple deducted a 30% commission from the iPhone user's payment to the app developer. The iPhone users alleged they were "paying Apple's 30% fee."[39] The Court agreed, holding "[t]he iPhone owners pay the alleged overcharge directly to Apple."[40] That was so, even though the app developer's revenues were *reduced* by the 30% commission and Apple argued that only the app developers could sue.[41]

The same thing is true here, and Amazon makes the same argument, rejected by the Supreme Court, that Apple made: that this is a "commission case," and consumers have no standing to sue.[42] *Pepper* holds that the commission structure is irrelevant to whether the

---

[35] *Frame-Wilson*, 591 F. Supp. 3d at 992 (internal quotation and citation omitted).

[36] *De Coster*, 2023 WL 372377, at *6.

[37] *Id*. at *5–6.

[38] *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519 (2019).

[39] *Id.*

[40] *Id.* at 1521.

[41] *Id.* at 1524.

[42] *Id.*

consumer paid the supracompetitive transaction fee and is the direct purchaser.[43] Consumers directly pay the overcharge to the defendant even where the retail platform, like Amazon or Apple, "collect[s] the price of the product from consumers and remit[s] only a fraction of that price to the supplier."[44] To hold otherwise would "allow a monopolistic retailer to insulate itself from antitrust suits by consumers," and the Supreme Court "refuse[d] to rubber-stamp such a blatant evasion of statutory text and judicial precedent."[45]

Remarkably, despite going to great lengths to recharacterize plaintiffs' allegations as Amazon's imposition of a commission (Amazon Br. at 4), Amazon does not even cite the seminal *Pepper* case that is dispositive precedent on antitrust standing in commission cases. *Pepper* holds: "A claim that a monopolistic retailer (here, Apple) has used its monopoly to overcharge consumers is a classic antitrust claim," and "under *Illinois Brick*, the iPhone owners were direct purchasers who may sue Apple for alleged monopolization."[46] That "straightforward conclusion follows from the text of the antitrust laws," including "Section 2 of the Sherman Act [which] makes it unlawful for any person to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations.'"[47] As the Supreme Court explained, "Section 4 of the Clayton Act in turn provides that '*any person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... the defendant ... and

---

[43] *Id*. at 1522–23.

[44] *Id.* at 1523.

[45] *Id.* at 1523–24.

[46] *Pepper*, 139 S. Ct. at 1519–20. The Supreme Court further held that the app developers directly sold to Apple and also had standing to sue Apple.

[47] *Id.* at 1520 (quoting 26 Stat. 209, 15 U.S.C. § 2).

shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.'"[48]

Despite the Supreme Court's unequivocal holding, Amazon doubles down on Apple's rejected approach, arguing that consumers pay "the publisher-set price" and never pay the commission Amazon extracts from every transaction on its retail platform. (Amazon's Br. at 9.) But the Supreme Court rejected that very argument,[49] holding that such a defense "would disregard statutory text and precedent, create an unprincipled and economically senseless distinction among monopolistic retailers, and furnish monopolistic retailers with a how-to guide for evasion of the antitrust laws."[50] Additionally, the Court explained that "[l]eaving consumers at the mercy of monopolistic retailers simply because upstream suppliers could *also* sue the retailers makes little sense and would directly contradict the longstanding goal of effective private enforcement and consumer protection in antitrust cases."[51]

Amazon is not the only company that has tried to reuse Apple's rejected argument. For example, Google recently tried the same argument in litigation involving its Play store, and the court rejected it, explaining that "[t]he problem for Google is that this theory has been definitively held not to apply to online app markets that do not operate as traditional, vertical

---

[48] *Id*. (quoting 38 Stat. 731, 15 U.S.C. § 15(a)) (emphasis original).

[49] *Id.* at 1521 ("Apple's theory is that *Illinois Brick* allows consumers to sue only the party who sets the retail price …").

[50] *Id.* at 1524.

[51] *Id.*

supply chains."[52] As the court further explained: "the Supreme Court had no trouble concluding that the traditional pass-through concept was inapposite."[53]

Instead of addressing *Apple v. Pepper* and cases directly applying that decision, Amazon attempts to cobble together a hodgepodge of lower court decisions that neither address Amazon's "commission" argument nor bear any resemblance to the facts presented here. Indeed, several of the decisions Amazon relies on contradict its position. For example, on page 14 of its brief, Amazon seeks solace in *Salveson v. JPMorgan Chase & Co.*, but in that case, the court observed that, when consumers purchase products directly from a retail platform "they [are] injured by the[] commission" and "*Illinois Brick* d[oes] not preclude the suit."[54] The metal commodity cases relied upon by Amazon fare no better. In both the *Aluminum* and *Zinc* cases (Amazon Br. at 11), the plaintiffs were "neither competitors nor consumers."[55] Indeed, the court in *Zinc* all but endorsed the antitrust standing of parties that are situated as Plaintiffs are here, explaining that "the injury arising from monopolization of a service would be to buyers and sellers of that service."[56] Recently, in another metal commodity case, *In re Platinum & Palladium Antitrust Litigation*, the Second Circuit confirmed that the plaintiffs, who traded in the same metals commodities market as the defendants, but did not transact directly with any of them satisfied the

---

[52] *In re Google Play Store Antitrust Litig.*, 2022 WL 17252587, at *10 (N.D. Cal. Nov. 28, 2022).

[53] *Id.* (holding that consumers such as Plaintiffs are "the direct consumer payment of an overcharge").

[54] 860 F. App'x 207, 210 (2d Cir. 2021).

[55] *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 443 (S.D.N.Y. 2015), *aff'd*, 833 F.3d 151 (2d Cir. 2016); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 360 (S.D.N.Y. 2016) ("As in *Aluminum*, plaintiffs are not … consumers of their products or services.").

[56] *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 363 (explaining that the plaintiffs there "were neither").

efficient-enforcer factors necessary to establish standing.[57] Notably, under the Second Circuit's first-step rule, which Amazon principally relies on to contest Plaintiffs' standing here (Amazon Br. at 9 n.8 and 14), the court held that the *Platinum & Palladium* plaintiffs had suffered a direct overcharge injury as a result of the defendants' alleged price fixing and rejected the defendants' argument "that interposing a clearinghouse immunize[d their] misconduct on an exchange market[.]"[58]

Amazon nonetheless argues that consumer plaintiffs are not efficient enforcers of antitrust law. (Amazon's Br. at 14–15.) But again, Amazon cobbles together inapposite cases[59] without ever acknowledging on-point precedent. For example, in *DNAML Pty, Ltd. v. Apple Inc.*, this Court ruled that consumers were directly injured "in a scheme that took direct aim at

---

[57] *In re Platinum & Palladium Antitrust Litig.*, 2023 WL 2229364, at *9–12 (2d Cir. Feb. 27, 2023).

[58] *Id.* at *10.

[59] Amazon relies on *Aluminum* (Amazon's Br. at 15–16), yet the court explained there that "plaintiffs are not efficient enforcers to the extent that they sued entities with whom they had not directly transacted." *In re Aluminum Warehousing Antitrust Litig.*, 520 F. Supp. 3d 455, 472 (S.D.N.Y. 2021). Similarly, Amazon relies on *In re Am. Express Anti-Steering Rules Antitrust Litig.* (Amazon's Br. at 14 n.11), in which the court ruled that the plaintiffs "did not suffer a direct injury from the alleged antitrust violation" because their allegation was that the antitrust violation "enabled" competitors outside the conspiracy to independently raise prices. 19 F.4th 127, 140–41 (2d Cir. 2021); *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 409–10 (E.D.N.Y. 2020) (explaining plaintiffs' reliance on so-call "umbrella" purchases); *Oliver v. Am. Express Co.*, 2020 WL 2079510, at *9–10 (E.D.N.Y. Apr. 30, 2020) (same). But in this case, Plaintiffs do not rely on any umbrella theory. They purchased the Publisher Defendants' eBooks through Amazon's platform or, as discussed below, through other platforms at prices dictated by Amazon's anticompetitive conduct. They thus allege direct injuries. For the same reason, Amazon's reliance on *Harry*, in which there was no alleged injury at all, is also misplaced. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) ("There is no actual injury the Plaintiffs allege, let alone a connection between Defendants' unlawful conduct and that non-injury. … [T]here is no reason to examine whether Plaintiffs are efficient enforcers; they cannot be.").

retailers' pricing authority."[60] As *Pepper* held, the argument now advanced by Amazon "makes little sense" and "would directly contradict the longstanding goal of effective private enforcement and consumer protection in antitrust cases."[61] And this Court's prior decisions also establish that Plaintiffs are efficient enforcers.[62]

In addition, contrary to Amazon's argument (Amazon's Br. at 19), antitrust standing is not limited to those Plaintiffs who purchased eBooks directly on Amazon's eBook retail platform. "[T]he Sherman Act was enacted to assure customers the benefits of price competition." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983). And in this case, Amazon's anticompetitive conduct has increased prices and thereby caused injury on all transactions across all retail eBook platforms. That was precisely the question in *Frame-Wilson*, which addressed consumers' standing to sue Amazon for overcharges they paid on online retail sites outside of Amazon Marketplace, which were allegedly inflated by Amazon's MFNs with its third-party sellers. As that court observed, "Consumers of such products are therefore subject to higher prices of products on external platforms as a result of Amazon's pricing policy."[63] Accordingly, all named class representative plaintiffs have antitrust

---

[60] *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (ruling that the retailer had standing to sue Apple and the publishers because the retailer, like the consumers, was directly injured by defendants' agreed "elimination of retail price competition").

[61] *Pepper*, 139 S. Ct. at 1524; *see also id.* at 1525 ("The consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit.").

[62] *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 60–61 (S.D.N.Y. 2016) (holding that regardless of possible injury to nondefendant banks, the plaintiffs who purchased financial instruments tied to a currency benchmark that defendants allegedly used to manipulate currency values were efficient enforcers because they paid higher prices or earned lower profits as a direct result of defendants' anticompetitive conduct).

[63] 591 F. Supp. 3d at 992.

standing—*i.e.*, both those who purchased from Amazon's eBook platform itself and those who purchased on other retail eBook platforms whose transaction prices and offerings were dictated (and undoubtedly raised) by Amazon's abuse of monopoly power.

This conclusion is confirmed by Section 4 of the Clayton Act, which entitles "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages.[64] In passing the Clayton Act, "Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices."[65] And for over 50 years, the Supreme Court has emphasized that "the [Congressional] purpose" of Section 4 "was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws."[66] After all, "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws."[67]

Finally, in a last-ditch effort to avoid Plaintiffs' well-pleaded allegations, Amazon purports to defend its supracompetitive transaction fee (which, as explained above, routinely exceeds 40% for sales of trade eBooks) by invoking the precedent set by Apple in 2010—when

---

[64] 15 U.S.C. § 15.

[65] *Associated Gen.*, 459 U.S. at 530.

[66] *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 130–31 (1969); *Hawaii v. Standard Oil,* 405 U.S. 251, 262 (1972) ("Congress encouraged these persons to serve as 'private attorneys general'"); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 344 (1979) ("Congress created the treble-damages remedy of § 4" to "provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations"); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977) ("legislative purpose in creating a group of 'private attorneys general'" was "to enforce the antitrust laws under § 4"); *Blue Shield of Va. v. McCready,* 457 U.S. 465, 472 (1982) (through "'expansive remedial purpose' in enacting § 4[,] Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions").

[67] *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968), *overruled on other grounds Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

Apple entered its own anticompetitive agreements with the Publisher Defendants and charged a supracompetitive transaction fee of 30%. (Amazon's Br. at 17.) Respectfully, it appears that Amazon has gotten its wires crossed. While there is undeniable similarity between Amazon's conduct here and the Apple's conduct in 2010—including with respect to the supracompetitive transaction fees imposed—that similarity is an *indictment* of Amazon's conduct, not a basis for vindication. The precedent set by Apple only drives Plaintiffs' well-pleaded allegations home.[68]

Plaintiffs seek enforcement of Section 2 of the Sherman Act to stop Amazon's abuse and unlawful maintenance of its monopoly power. They respectfully ask the Court to deny Amazon's motion.

**B.    Conspiracy Claims**

With respect to Plaintiffs' claims that involve both the Publisher Defendants and Amazon (*i.e.*, conspiracy to monopolize under Section 2 and agreement or conspiracy in unreasonable restraint of trade under Section 1), Plaintiffs made substantial revisions and additions to the complaint. Specifically, the Second Consolidated Amended Complaint:

➢  Chronicles how the Publisher Defendants never admitted guilt or otherwise repudiated their horizontal price-fixing conspiracy uncovered in *Apple*; instead, the Big Five continue to deny "that they discussed the Apple Agreement with one another or that those conversations occurred at all, in the face of overwhelming evidence to the contrary," ¶ 141;

➢  Compares the time it took the Publisher Defendants to implement their collusive conduct in *Apple* (18 months) to the time it took them to achieve the same result with Amazon (8 months), ¶¶ 283-84;

➢  Incorporates the recent findings of the D.C. District Court arising out of its decision to block Penguin Random House's proposed $2.2 billion acquisition of Simon & Schuster,

---

[68] Likewise, Amazon gets no cover for its anticompetitive conduct by observing that, currently, Apple and Barnes & Noble also charge a 30% transaction fee. Of course they do— because Amazon, through its anticompetitive agreements with the Publisher Defendants, has ensured that its competitors cannot gain any advantage by undercutting Amazon's transaction fees.

in which the Court found based on a full trial record that the Big Five have a "history of successful cooperation [that] establishes a precondition to effective collusion" and that the Publisher Defendants are "prone to collusion," ¶¶ 168-78;

➢ References the D.C. District Court's finding that the Big Five colluded with respect to eBooks beyond just the conduct identified by the Court in *Apple*, ¶ 174;

➢ References the D.C. District Court's finding that "coordinated conduct already appears to be rampant" among the Publisher Defendants, ¶ 178;

➢ Further clarifies why it would be against the individual self-interests of the Publisher Defendants to agree to Amazon's parity provisions without assurance that the other publishers would likewise agree, ¶¶ 15, 179;

➢ More fully quantifies Amazon's own role as an eBook publisher such that agreements among Amazon and the Big Five constitute a horizontal restraint, ¶¶ 182-84;

➢ Elaborates on white-labeled eBook platforms that could have been utilized by the Big Five to offer eBook sites (like HarperCollins') to compete with Amazon (and one another) in providing retail eBook transactions for their own eBooks, ¶ 115;

➢ Compares the Big Five's behavior in Europe where Amazon was barred from serving as the hub of their conspiracy (and resulting eBook innovation, pricing, and output) to their conduct in the United States, where Amazon continues to serve that function resulting in increased prices and reduced output, ¶¶ 159-63; and

➢ Better explains the Publisher Defendants' motives to conspire and why they would collectively agree to entrench Amazon's monopoly power at the retail platform level in exchange for higher prices and the sharing of monopoly rents, ¶¶ 15, 123- 158; 168-81.

These additional and refined allegations address many of the Court's reasons for recommending dismissal of Plaintiffs' conspiracy-based claims; however, Plaintiffs acknowledge that they do not address all the Court's bases concerning the plausibility of a conspiracy, direct evidence of an agreement among Publishers, and adequacy of some plus factors. (RR at 22–23, 28–29, 33–37.) Nor do the amendments address the Court's rulings with respect to the conspiracy to monopolize claims against the Publisher Defendants. (RR at 48–49.)

If the Court is unwilling to revisit these rulings, then Plaintiffs acknowledge that the Court will again recommend dismissal of the Section 1 claims and the conspiracy-to-monopolize claim. They have nonetheless repleaded those claims to preserve their appellate rights. *See*

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 94–95 (2d Cir. 2017). Toward that end, Plaintiffs reassert arguments raised in their prior Objection (ECF 166) and Reply (ECF 169, Attachment 1) in response to the motions to dismiss, as set forth below.

### 1.    Plaintiffs Have Adequately Pleaded a Horizontal Per Se Conspiracy Claim.

Plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face."[69] Because "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage," the Supreme Court explained in *Twombly* that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[70] The "choice between two plausible inferences that may be drawn from factual allegations is ***not*** a choice to be made by the court on a Rule 12(b)(6) motion."[71] To the contrary, a court must "accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff."[72]

Thus, for allegations of conspiracy, "although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible" and should not be credited at the pleading stage.[73]

---

[69] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[70] *Id*. at 556; *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) ("Skepticism of a conspiracy's existence is insufficient to warrant dismissal.").

[71] *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).

[72] *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

[73] *Id*. at 190; *see also id*. at 184 (explaining that plaintiff's allegations need not "rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment"); *Gelboim*, 823 F.3d at 781 (same).

A plaintiff's allegations need not "rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment."[74] And "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[75] The "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[76]

### a.   Plaintiffs adequately plead direct evidence of a hub-and-spoke conspiracy.

"Through a coordinated effort, the Publishers forced Amazon to accept the agency model." (RR at 6.) That conduct constitutes a horizontal agreement as a matter of law (RR at 8 ("*per se* illegal horizontal price-fixing agreement")), and it set the stage for their collusion with Amazon. The court's findings in *United States v. Apple* not only provide the "course of dealings or other circumstances" necessary to *allege* a horizontal agreement (RR at 20), but they also provide direct evidence that "the Publisher Defendants agreed to raise the prices of e-books by

---

Amazon suggests otherwise with a quote from a pre-*Twombly* decision. *See* Amazon Mot. at 7 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987)). But *Apex Oil* was decided on summary judgment, and, in any event, *Twombly* from 2007, *Anderson* from 2012, and *Gelboim* from 2016 debunk this approach on a motion to dismiss.

[74] *Anderson News*, 680 F.3d at 184; *Gelboim*, 823 F.3d at 781. Amazon suggests otherwise with a quote from a pre-*Twombly* decision. *See* Amazon Mot. at 7 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987)). But *Apex Oil* was decided on summary judgment, and, in any event, *Twombly* from 2007, *Anderson* from 2012, and *Gelboim* from 2016 debunk this approach on a motion to dismiss.

[75] *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).

[76] *Id*.; *see also Anderson News*, 680 F.3d at 190 (complaint must be "read 'as a whole,' rather than piecemeal"); *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 697–98 (S.D.N.Y. 2013) (ruling that "the evidence [taken] as a whole" painted a "a clear portrait of a conscious commitment" to "eliminate retail price competition [in order] to raise the retail prices").

taking control of retail pricing"[77]—an agreement the Publisher Defendants never disavowed or abandoned.[78]

Indeed, while the judgments entered against the Publisher Defendants in *Apple* imposed temporary restrictions that prevented them from enjoying the fruits of their conspiracy for several years after the consent judgments, they did not require the Publisher Defendants to admit guilt or repudiate their horizontal price-fixing conspiracy. Just the opposite is true; the Publisher Defendants' final judgments were explicit that they "d[id] not constitute any admission by Settling Defendants that the law has been violated." (¶ 141 n.192.) As the court in Apple observed, while "at trial" and under oath, the Publisher Defendants continued to deny "that they discussed the Apple Agreement with one another . . . or that those conversations occurred at all, in the face of overwhelming evidence to the contrary[.]" (¶ 141 (quoting *Apple*, 952 F. Supp. 2d at 693 n.59).) And before the final judgments even expired, the Publisher Defendants picked up where they had left off, entering into agreements (now with Amazon) to fulfill the goals of their horizontal conspiracy—*i.e.*, eliminating retail price competition for eBooks and raising eBook prices throughout the market. (RR at 9–13.)

Plaintiffs thus allege that the Publisher Defendants and Amazon "have employed and continue to employ the same devices to again fix the retail price of trade eBooks" that "'removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved [Amazon] of the need to compete on price, and allowed the [Big Five] to raise the prices

---

[77] *U.S. v. Apple Inc.*, 952 F. Supp. 2d 638, 691 (S.D.N.Y. 2013).

[78] *U.S. v. Greenfield*, 44 F.3d 1141, 1149–50 (2d Cir. 1995) ("[C]essation of conspiratorial activity is generally considered insufficient to demonstrate a withdrawal from a conspiracy . . . since it is all too easy after the fact for a defendant to claim that he or she withdrew from a plot, the law generally requires the taking of some affirmative action[.]") (quotation omitted); *see also U.S. v. Esposito*, 2021 WL 5492935, at *2 (2d Cir. Nov. 23, 2021) (prior conviction was properly "admissible as direct evidence of the conspiracy itself").

for their e-books, which they promptly did[.]'" (¶ 142 (quoting *Apple*, 952 F. Supp. 2d at 694).) This conduct was sufficient to prove a *per se* violation of the Sherman Act in *Apple*, and Plaintiffs' allegations of the same conduct are likewise sufficient to allege a conspiracy that resulted in sudden and substantial increases in eBook prices here. For a hub-and-spoke conspiracy, the only "agreement" Plaintiffs are required to allege "among the spokes" is that they "'adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'"[79] And Plaintiffs plausibly allege that each Publisher Defendant agreed to the same contract to raise eBook prices and knew that the others were negotiating or had negotiated those same terms with Amazon. (RR at 38.) If these allegations were not plausible, then the *Apple* case could not possibly have been decided the way it was.

                **b.**    **Plaintiffs adequately plead circumstantial evidence of a horizontal conspiracy.**

       Plaintiffs also adequately allege circumstantial evidence of a horizontal conspiracy. "Circumstantial evidence is no less persuasive than direct evidence; indeed, '[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Apple*, 952 F. Supp. 2d at 689 (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). Under the decision in *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010), Plaintiffs may allege "plus factors" as circumstantial evidence of a horizontal agreement, and as a matter of law, adequately pleaded plus factors constitute circumstantial evidence of a

---

    [79] *Zinc*, 155 F. Supp. 3d at 376 (quoting Areeda & Hovenkamp, ¶ 1402c (3d ed. 2010)); *see also Laumann v. NHL*, 907 F. Supp. 2d 465, 486–87 (S.D.N.Y. 2012) ("[W]here parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade.").

horizontal conspiracy—regardless of whether a court might harbor doubt or even skepticism about the existence of a conspiracy.[80]

In the SCAC, Plaintiffs adequately allege the following plus factors:

> **(1)   The Defendants would have been acting against their individual self-interests if they had acted unilaterally.**

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."[81] So the question is whether the SCAC alleges behavior would "plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'"[82]

Amazon's monopoly power in the retail eBook platform transaction market does not mean that the Publisher Defendants acted in their *unilateral* self-interests in entering their agency agreements with Amazon. As the SCAC alleges, and the Report and Recommendation acknowledges, "the Publishers lost eBook revenue under the agency model" with Amazon.[83] Absent collective action, it was not in each Publisher Defendant's interest to enter those agency agreements because, acting alone, each Publisher Defendant would have been better off returning to the traditional distribution agreement with Amazon after getting caught in their conspiracy with Apple. The economics to this are straightforward: the Publisher Defendants are unilaterally motivated to increase sales, not suppress them, and the higher transaction prices charged by Amazon have led to a *decline in market sales*. (¶¶ 105–113.) As the court explained in *Apple*,

---

[80] *Starr*, 592 F.3d at 327 (explaining that plus factors defeat arguments that "conduct alleged in the complaint would be entirely consistent with independent, though parallel, action").

[81] *Starr*, 592 F.3d at 324 (quotation omitted).

[82] *Id.* at 327 (quoting Areeda & Hovenkamp ¶ 1415a (2d ed. 2003)).

[83] RR at 7; *see also* RR at 5 (explaining that "the Publishers stood to make less money on each sale under the agency model than they would under the wholesale model"); *Apple*, 952 F. Supp. 2d at 665, 699.

any Publisher Defendant that unilaterally raises eBook retail prices can "expect to lose substantial sales" unless "their competitors follow[] suit."[84]

Thus, as Plaintiffs allege, the Publisher Defendants avoid that competitive disadvantage by acting collectively and, in fact, sharing the spoils of Amazon's market dominance. As the Report and Recommendation acknowledges, the restrictions on retail-price competition allowed Amazon to maintain its monopoly power in the eBook retail platform market (RR at 30), which "can facilitate anticompetitive horizontal coordination by reduc[ing] [a company's] incentive to deviate from a coordinated horizontal arrangement." (RR at 22.) In short, while the competitive self-interests of the Publisher Defendants, acting alone, were at odds with Amazon's retail platform dominance, it benefitted each of them as long as they acted collectively. This is more than a "plausible explanation for why the Publishers would have been motivated to participate in a conspiracy that further entrenched Amazon's dominance as an eBook retailer." (RR at 32.)

### (2) Publisher Defendants had a common motive to collude.

A common motive to collude is a plus factor separately considered from actions against self-interest.[85] This Court acknowledged that the Publisher Defendants had a common motive to "control[] trade eBook prices." (RR at 29.) They initially approached Amazon—not Apple—to effectuate their horizontal conspiracy, and only after Amazon refused to participate did they turn to Apple, which offered an alternative mechanism for their anticompetitive goals. (RR at 4-5.)

Although the final judgments entered by the court in *Apple* required the Publisher Defendants to relinquish the fruits of their conspiracy for a time, the Publisher Defendants never withdrew from their conspiracy. Instead, the Publisher Defendants went back to Amazon to

---

[84] *Apple*, 952 F. Supp. 2d at 692.

[85] *Apple*, 952 F. Supp. 2d at 690.

continue where they left off. To again borrow this Court's explanation in *Apple*: Amazon "did not want to compete with [other retailers] on price and proposed to the Publishers a method through which both [Amazon] and the Publishers could each achieve their goals."[86] Ending retail price competition gave all parties what they wanted: the Publisher Defendants obtained higher consumer prices across the entire eBooks market; Amazon excluded competition from other eBook retail platforms and perpetuated the dominance of its retail distribution platform, while using its monopoly power over the retail platform distribution market to generate supracompetitive transactions fees on each eBook sale.

### (3)   The Publisher Defendants' prior and ongoing collusive conduct.

Courts have long recognized defendants' prior collusive conduct as circumstantial evidence of a horizontal conspiracy.[87] "[P]articipation in an illegal conspiracy elsewhere can affect a fact finder's view of a defendant's character and thus of the sincerity of an independent explanation of the conduct now challenged."[88] And as already addressed, the very type of agreements alleged by Plaintiffs here was evidence in the *Apple* case "showing that Apple and the Publishers had engaged in a 'conscious commitment' to use those 'business practices' to 'eliminate retail price competition in order to raise retail prices' that rendered the agreements

---

[86] *Apple*, 952 F. Supp. 2d at 706.

[87] *See, e.g., In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012).

[88] Areeda & Hovenkamp ¶ 1421b2 (4th ed. 2017); *id*. ("Where a reasonable inference of conspiracy contends with the defendants' innocent explanation, evidence reflecting upon their character can undermine their credibility and tip the balance against them.") (citing *De Jong Packing Co. v. U.S. Dep't of Agriculture*, 618 F.2d 1329 (9th Cir. 1980) (affirming conspiracy ruling and rejecting argument that conduct was independent because defendants similarly conspired two years earlier)).

unlawful." (RR at 23.) All the Court need to do is swap out "Apple" for "Amazon" in its recitation of the *Apple* case to draw the connection.[89]

Moreover, the conspiracy uncovered in *Apple* is not the only example of the Publisher Defendants' prior collusion. On October 31, 2022, the District Court for the District of Columbia ruled in favor of the United States to block Penguin Random House's proposed $2.2 billion acquisition of Simon & Schuster. (¶ 168.)  With the benefit of a thirteen-day trial, the court found that "the Big Five publishers have engaged in tacit coordination that is profitable for those involved" and that "coordinated conduct already appears to be rampant." (¶ 178.) The court further found that the Big Five had colluded with respect to eBooks beyond just the conspiracy uncovered in *Apple*, noting that "during the early years of e-books, publishers uniformly shifted e-book royalty rates from 50 percent to 25 percent, thereby reducing authors' compensation." (¶ 174.) As the court explained, the Publisher Defendants' "history of successful cooperation establishes a precondition to effective collusion — mutual trust and forbearance."  (¶¶ 169, 173.) The court also validated that "[t]he [Apple] case portrays an industry already 'prone to collusion'" and that the Publisher Defendants consistently choose collusion over acting in their unilateral self-interests: "[I]n an industry where the competition to acquire anticipated top sellers is intense, the competing publishers nevertheless choose, almost always, not to gain advantage by offering more favorable contract terms. This phenomenon bespeaks a tacit agreement among

---

[89] *E.g.*, RR at 6 ("the very act of signing a Contract with ~~Apple~~ Amazon containing an MFN Clause, then each of the Publisher Defendants signaled a clear commitment against … the industry practice of retail discounting, thereby facilitating their collective action"); RR at 6 ("the MFN not only ensured that no eBook retailer could underprice ~~Apple~~ Amazon, but also enabled the Publishers' collective action"); RR at 23 ("use of otherwise lawful contract terms to incentivize and ensure collective action by the Publishers rendered the agency agreements between ~~Apple~~ Amazon and the Publishers in that case an unlawful restraint of trade").

the publishers to compete only on the basis of advance level because it collectively benefits them not to yield on other contract terms." (¶¶ 173, 175.)

### (4)    The Defendants' collusive conduct was facilitated by market concentration.

The Report and Recommendation acknowledges that Amazon controls about 90% of the eBook retail platform market and that the Publisher Defendants account for about 80% of the trade books sold in the United States. (RR at 34.) As the D.C. District Court observed in blocking the Penguin Random House/Simon & Schuster merger, "[t]he Big Five have achieved their market dominance in part by acquiring other publishers, contributing to a trend toward consolidation in the industry." (¶ 170.) Observing "an undeniable trend in consolidation in the publishing industry," the D.C. District Court explained that "[c]oordinated effects are likelier in concentrated markets" and that the market concentration is unlikely to change because "barriers to entry are high in the publishing business." (¶¶ 171, 172.) In the court's words, "The best proof that would-be new competitors face formidable barriers to entry is the stability of market shares in the industry: No publisher has entered the market and become a strong competitor against the Big Five in the past thirty years." (¶ 172.)

The D.C. District Court's trial findings are consistent with empirical studies showing that "'noncompetitive pricing … may be the result of price coordination … when the four leading firms account for some 50 to 80 percent of the market.'"[90] Plaintiffs have alleged market concentration in two different, albeit related, markets: the retail platform market in which eBooks are distributed (and in which Amazon has a 90% share) and the production of trade eBooks (in which the Publisher Defendants have an 80% share). Concentration in either market

---

[90] *Starr*, 592 F.3d at 324 (brackets omitted) (quoting Areeda & Hovenkamp treatise).

facilitates collusion. That is, by executing nine out of every ten eBook transactions, Amazon can serve as an effective hub in a hub-and-spoke conspiracy for the trade eBook industry. Conversely, by producing eight out of every ten trade eBooks, the Publisher Defendants can continue their "rampant" collusion with or without Amazon.

### (5)   Defendants raise prices despite no rise in costs.

Pricing behavior untethered from the cost of doing business is a well-recognized plus factor that, together with parallel pricing behavior, raises an inference of conspiracy. As Judge Posner states in his antitrust treatise, "[s]imultaneous price increases and output reductions unexplained by an increase in cost may [] be good evidence of the initiation of a price-fixing scheme."[91] The courts, including the Second Circuit in *Starr*, confirm that pricing practices with little or no relationship to costs are probative of a conspiracy.[92]

---

[91] Richard A. Posner, ANTITRUST LAW, p. 88 (2d ed. 2001).

[92] *See Starr*, 592 F.3d at 324 (noting as a "plus factor" that defendants raised the price of songs even though earlier in the year the costs of providing digital music had decreased); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 714 (S.D.N.Y. 1995) ("allegations that defendants' pricing bore no reasonable relation to either the operation of defendants' business, or market or economic conditions, was sufficient to create a reasonable inference of conspiracy").

Not surprisingly, Publishing executives acknowledge that the "higher e-book prices, resulting from the Amazon deals, are discouraging purchases." (¶ 108.) Book sales data analyzed by Nielsen Book (now known as NPD BookScan) confirms this: the "return of agency pricing by the Big Five trade houses in 2015 raised e-book prices by an average of $3, leveling off at about $8 per book. *That jump in prices coincided with the downturn in e-book sales for traditional publishers*. And while *e-book prices for the Big Five were rising*, prices for self-published books were settling in at about $3." (*Id.*) One market observer, writing in 2018, estimated an average price increase of $5 per title over the preceding few years and concluded that eBook sales were low because "many people find that paying $15.00 to $22 for a Kindle book, is too expensive." (¶ 113.) In that same period, eBook sales declined by 24%. (*Id.*)

### (6)    Defendants deliberately mislabeled the MFN provisions.

The Report and Recommendation acknowledges that Defendants faced heightened scrutiny from the government because they were barred from including MFNs in their agreements in 2014 and 2015. (RR at 36.) A government investigation of Amazon by European regulators found that because the Publisher Defendants were prohibited by their judgments in *Apple* from entering into MFNs with an eBook retail platform, the Publisher Defendants and Amazon relied on a notice provision that functioned as an MFN and had the same effect of eliminating retail competition. (¶ 89.) The notice provisions prevented "any competitor retail platform from gaining volume and sales through lower prices." (*Id.*) Disguising provisions and calling them something different is exactly the type of conduct that *Starr* said is a plus factor: It goes to Defendants' knowledge that "they would attract antitrust scrutiny."[93] If Defendants had no worry that eliminating retail price competition would attract antitrust scrutiny, they would have called the MFN provisions by name and avoided the effort of disguise.[94]

### (7)    All Publisher Defendants executed their pricing agreements within months.

An "unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."[95] Here, three of the five Publisher Defendants

---

[93] *Starr*, 592 F.3d at 324.

[94] *See, e.g., SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("attempts by the manufacturers to hide their actions could suggest that the defendants knew their actions 'would attract antitrust scrutiny'") (internal citations omitted); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 777 (E.D. Pa. 2017) (recognizing concealment where defendant's document was deliberately written to obfuscate facts); *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (attempted concealment "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

[95] *Interstate Circuit, Inc. v. U.S.*, 306 U.S. 208, 227 (1939).

executed their agreements between October and December of 2014, and those three agreements each *took effect* simultaneously at the start of the new year. (¶¶ 146-153.) That is on par with the facts in *Apple*, where it took two months for five out of the six publishers Apple negotiated with to execute agreements, which also took effect at the same time.[96]

**(8)    Defendants had the opportunity to (and did) collude.**

The Report and Recommendation acknowledges that, in *Apple*, the Publisher Defendants not only had the opportunity to collude, but also that they in fact did so. (RR at 41.) Government oversight does not negate this plus factor. Indeed, the Court in *Starr* applied the factor even though a government investigation resulted in no action against the defendants.[97] This plus factor is further warranted because, in this case, the Publisher Defendants had colluded before and agreed to the blueprint. They needed minimal opportunity to effectuate their conspiracy, and that opportunity presented itself with their dealings with Amazon and statements to the press about these agreements, which afforded the Publisher Defendants the means to again facilitate their conspiratorial goal to raise consumer prices across the entire eBook market.

*        *        *

Plaintiffs have adequately alleged a horizontal price-fixing conspiracy.

**2.    Alternatively, the agreements between Amazon and the Publisher
        Defendants violate the rule of reason.**

In *Apple*, the Court held that while an agency agreement and an MFN may not be "*per se*" illegal, it was "breaking no new ground" by examining their potentially anticompetitive

---

[96] *Apple*, 952 F. Supp. 2d at 677; *see also id.* at 650–54 (recounting that for nearly a year *before* Apple's involvement, the Publisher Defendants colluded among themselves to control retail pricing).

[97] *Starr*, 592 F.3d at 325 ("defendants cite no case to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy").

effect and ruling that they were unlawful when used to "eliminate retail price competition in order to raise retail prices."[98] Such an agreement "is illegal per se" if agreed to by horizontal competitors, as addressed above, and is also subject to scrutiny under the rule of reason, if carried out only by a series of non-conspiratorial agreements.[99]

Under the rule of reason, Plaintiffs may show that the challenged conduct adversely affected competition in the relevant market. (RR at 45.) An adverse effect on competition can be proved directly by evidence of "higher prices, reduced output, or lower quality" in the relevant market, or indirectly by proof of market power plus some evidence that the challenged conduct harms competition. (RR at 45.) Only one method of proof must be satisfied, but for purposes of their claims against Amazon, Plaintiffs adequately alleged a violation under both methods.

*First*, Plaintiffs allege that Amazon, through its agreements with the Publisher Defendants, caused eBook prices to rise to anticompetitive levels. (¶¶ 105–113, 116–122). This

---

[98] 952 F. Supp. 2d at 698.

[99] *See*, *e.g.*, *U.S. v. Delta Dental*, 943 F. Supp. 172, 175 (D.R.I. 1996) (upholding the rule of reason claim as applied to dental insurer's anticompetitive use of MFNs in its individual agreements with dentists). *See also In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 375 (E.D. La. 2013) (declining to dismiss Section 1 illegal boycott claim, where the defendant pool products distributor allegedly used MFNs in its contracts with pool product manufacturers to suppress its competitors' ability to compete on price); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 691 (explaining that the "fundamental claim in the CAC … alleges that the defendants conspired to eliminate retail price competition and to raise the price of eBooks above [the price set through retail competition]," and ruling that "[t]his states a claim for violation of the law") (italics omitted).

is the same adverse effect on competition found by the Court in *Apple*.[100] Plaintiffs' allegations are likewise adequate here.[101]

*Second*, monopoly power may be inferred from a market share "between 50% and 70%," and a market share "above 70% is usually strong evidence of monopoly power."[102] In this case, as Plaintiffs allege, more than 90% of all eBook sales occur on the Amazon platform, and the Publisher Defendants account for 80% of all trade books in the United States. (¶¶ 1 & n.3, 51, 56, 201, 290.) Those allegations, combined with the allegations that consumers prices increased to anticompetitive levels, are adequate under the indirect method of proof.103

In the prior RR (ECF 161 at 46), this Court held that each vertical agreement between Amazon and a Publisher Defendant had to be separately analyzed to determine whether it violated the rule of reason and that the anticompetitive effect of all five of Amazon's vertical agreements with the Publisher Defendants could not be aggregated. (RR at 46–47.) Plaintiffs respectfully submit that is incorrect. Controlling authority from both the Supreme Court and the Second Circuit hold that the market effects of all of Amazon's vertical agreements with the Publisher Defendants should be aggregated to determine whether Defendants restrained trade under the rule of reason.

---

[100] 952 F. Supp. 2d at 694 (ruling that, even without a *per se* violation, the elimination of competitive pricing and increase in eBook prices violated the rule of reason).

[101] *See Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (allegation that prices have been artificially increased or decreased is sufficient to allege adverse effect on competition).

[102] *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998). Market power may be inferred from "shares less than 50%." *New York v. Actavis, PLC*, 2014 U.S. Dist. LEXIS 172918, at *102 (S.D.N.Y. 2014); *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (market power inferred from market shares of 47% or as low as 26%).

[103] *See, e.g., Amex*, 138 S. Ct. at 2298; *MacDermid Printing Sols., LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (increased consumer prices are an "adverse effect on competition under the rule of reason").

In *Standard Oil Co. v. U.S.*, 337 U.S. 293 (1948), the Supreme Court addressed a series of vertical exclusive-dealing agreements between Standard Oil and 5,937 independent gas stations. There was no allegation of a horizontal agreement among the gas stations, but the Supreme Court aggregated the effect of the separate agreements, holding that the agreements collectively foreclosed competition in a substantial share of the market.[104] Two decades later, the Supreme Court decided *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969), another case involving a series of vertical agreements. The defendants argued, as do the Defendants herein, that the effect of each agreement had to be evaluated independently, but the Supreme Court disagreed and held that "a narrow focus on the volume of commerce foreclosed by [a] particular contract or contracts … would not be appropriate" and that "the relevant figure is the *total volume of sales* tied by the sales policy under challenge."[105]

The Second Circuit followed the same approach in *PepsiCo., Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002). There, Pepsi asserted a rule of reason violation against Coke, which had entered into 377 vertical agreements with independent food distributors. Each vertical agreement prohibited the food distributor from distributing Pepsi, but no horizonal agreement among the distributors was alleged. In order to determine whether Coke violated the rule of reason, the Second Circuit aggregated the effect of all the vertical agreements, but it held that Coke had foreclosed only 377 out of more than 2000 distributors—*i.e.*, 19%. *Id*. at 111. The leading antitrust treatise agrees that, where a defendant enters into a series of vertical agreements, the

---

[104] *Id*. at 313.

[105] *Id*. at 502 (emphasis added). *See also Amex*, 138 S. Ct. at 2287 (holding that Amex's 3.4 million separate vertical agreements with merchants would violated the rule of reason if their aggregated effect was to increase price or reduce output or otherwise injure competition).

rule of reason analysis requires that one look to the aggregated effect of all of those agreements.[106]

Numerous courts agree with the Supreme Court and Prof. Hovenkamp. For example, in *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, the antitrust defendant entered into a series of vertical concession agreements with sports stadiums.[107] The defendant argued "it was improper" to aggregate the effects of all its vertical stadium agreements.[108] The Ninth Circuit Court stated that the issue was whether in assessing antitrust liability one "may look to the overall effects of a defendant's conduct … or is limited to looking at the market implications of the one contract."[109] Relying on the Supreme Court's decision in *Standard Oil Co.* and *Fortner Enters.*, the court held that "the district court correctly assessed [defendant's] aggregate pattern of conduct in the relevant market."[110] Because Plaintiffs herein allege a series of agreements

---

[106] Areeda & Hovenkamp, ¶ 310(c)(1) (4th ed. 2014) (where a defendant enters into a series of separate vertical agreements, "it would clearly be improper for the court to examine each agreement with the same defendant separately, conclude that the agreement standing alone is insufficient to establish illegality, and dismiss the complaint without considering the impact of the aggregation").

[107] 676 F.2d 1291 (9th Cir. 1982).

[108] *Id*. at 1302.

[109] *Id*.

[110] *Id*.; *see also Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 469–70 (D. Vt. 2019) (where plaintiff alleged that defendant's vertical agreements had an anticompetitive effect in the aggregate, Court rejected defendant's assertion that plaintiff had to prove "each separate agreement had an actual adverse effect on competition" because "the Supreme Court has rejected that approach"); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (aggregated effect of Microsoft's vertical agreements with "fourteen of the top fifteen [internet] access providers" found to have significant anticompetitive effect); *Orchard Supply Hardware, LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1360–62 (N.D. Cal. 2013); *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019) (holding that series of vertical agreements with distributors could violate the rule of reason even though no one distributor had market power or a high market share).

between Amazon and the Publisher Defendants, the effects of those agreements should be considered in the aggregate.[111]

Defendants' reliance on *Bookhouse of Stuyvesant Plaza v. Amazon, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013), is misplaced. The court in *Bookhouse* ruled that the plaintiffs' allegations were deficient in numerous respects: The plaintiffs did not plausibly allege any anticompetitive agreement; did not properly allege the relevant market; and did not plausibly allege market power because the aggregated vertical agreements would account for only 36% of the relevant eBook sales.[112] And while the court stated as an aside that aggregation was inappropriate,[113] that statement was unnecessary to the decision and contrary to the Supreme Court precedent discussed above. And it was further directly contradicted by the very cite the *Bookhouse* court relied on for support for that proposition: *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007)—a case in which the court did in fact assess the aggregated effects of the alleged vertical agreements.[114]

---

[111] *See Sitts*, 417 F. Supp. 3d at 468 (holding that aggregation was permissible even without alleging a hub-and-spoke conspiracy); *Genico, Inc. v. Ethicon, Inc.*, 2006 U.S. Dist. LEXIS 96909, at *14 (E.D. Tex. Mar. 23, 2006) (holding that market share against alleged spokes to be adequately pleaded through aggregation of adverse effects); *Applied Med. Res. Corp. v. Jonson & Johnson*, 2004 U.S. Dist. LEXIS 29409, at *12–13 (C.D. Cal. Feb. 23, 2004) (same). *Cf. Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013); *Orchard Supply Hardware*, 967 F. Supp. 2d at 1362–63. While the court in *Dickson v. Microsoft Corp.* did not allow aggregation against all conspirator with Microsoft, that decision was based on the plaintiff's express allegation that there were "two separate vertical conspiracies." 309 F.3d 183, 203, 210 (4th Cir. 2002).

[112] *Id*. at 620, 622.

[113] *Id*. at 622.

[114] In *Wellnx*, the Court determined that the effects were insufficient because the "agreements only freeze out one competitor from 70% of the market" while "[a]ll other competitors compete unobstructed." 516 F. Supp. 2d at 293.

### 3.   Conspiracy to Monopolize

Although Plaintiffs continue to take the position that they have pleaded a horizontal agreement between the Publisher Defendants, there is no requirement to allege such an agreement for purposes of pleading a conspiracy-to-monopolize claim. A participant need only agree to the "conspiracy's 'general nature and extent;'" it "need not have full knowledge of all the details of a conspiracy or its scope to be a member."[115]

Plaintiffs satisfied this requirement. As this Court previously acknowledged, Plaintiffs plausibly alleged that each Publisher Defendant "knew that the other Publishers were negotiating agreements with Amazon that used agency pricing and contained MFN clauses (or their equivalent)," and that the object of this conspiracy was to "entrench[] Amazon's dominance as an eBook retailer." (RR at 32, 38.) And the Sherman Act generally makes "each member of [the] conspiracy . . . liable for all of the damages [directly] caused by the conspiracy[.]"[116]

It is no answer that it was in each Publisher Defendant's individual interest to distribute through Amazon. There is, of course, nothing inherently unlawful with any Publisher Defendants distributing eBooks through Amazon, but that is not the problem that Plaintiffs allege. What Plaintiffs allege is that the Publisher Defendants required Amazon to cede pricing authority and to operate as a retail transaction platform instead of a traditional retailer. In so doing, the Publisher Defendants wrestled away the retail pricing function so they could raise eBook prices while allowing Amazon to exercise monopoly power over the eBook retail platform market to

---

[115] *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 294118, at *12 (S.D.N.Y. Feb. 1, 2022) (quotation omitted). *See also U.S. v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (Even if it were "not clear at what precise point of time each [defendant] became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement . . . it is clear that as the arrangement continued each became familiar with its purpose and scope.").

[116] *Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632, 634 (7th Cir. 2002).

charge excessive transaction fees.  (¶¶ 179-84.)  They did so collectively—knowing that it was not in their economic self-interest if acting alone—because they wanted to gain control over retail pricing and cause supracompetitive trade eBook prices.

The conspiracy-to-monopolize claim should not be dismissed.

### III.    CONCLUSION

The motions before the Court are not about whether Plaintiffs have alleged the classic ingredients of an antitrust violation; the question is whether Plaintiffs have met all of the technical pleading requirements for their claims to survive Rule 12 scrutiny. With respect to the Section 2 monopolization claims against Amazon, the SCAC addresses every deficiency identified in this Court's Report and Recommendation. The Court should deny Amazon's motion to dismiss. With respect to the Section 1 and the conspiracy-to-monopolize claims, Plaintiffs acknowledge that the SCAC does not address every ground identified by the Court when it recommended dismissal. However, Plaintiffs have addressed several of those grounds and respectfully ask the Court to either reconsider its prior decision or narrow its prior holdings so that they may be more efficiently addressed in any future proceeding.

DATED this 6th day of March 2023          Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
      Steve W. Berman (*pro hac vice*)
Barbara A. Mahoney (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile:  206-623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

*Interim Lead Counsel for Plaintiffs and the Proposed Class*

- 45 -

Joseph M. Vanek (*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Paul E. Slater (*pro hac vice*)
Matthew T. Slater (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: 312-641-3200
jvanek@sperling-law.com
pes@sperling-law.com
mslater@sperling-law.com

*Counsel for Plaintiffs Shannon Fremgen, Mary Christopherson-Juve, Denise Deleon, Sandra Wilde, Michael Wilder, and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 6, 2023, I electronically transmitted the foregoing

document to the Court Clerk using the ECF System for filing. The Clerk of the Court will

transmit a Notice of Electronic Filing to all ECF registrants.

*/s/ Steve W. Berman*
_____

STEVE W. BERMAN
