UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

IN RE AMAZON.COM, INC. EBOOK
ANTITRUST LITIGATION,

21-cv-00351 (GHW) (VF)

**REPORT AND RECOMMENDATION**

------------------------------------------------------X

**VALERIE FIGUEREDO, United States Magistrate Judge:**

**TO THE HONORABLE GREGORY H. WOODS, United States District Judge**

Plaintiffs, 15 individuals who purchased electronic books ("eBooks") between 2017 and 2021, commenced this suit on January 14, 2021, with allegations that Defendants Amazon.com, Inc. ("Amazon"), and the five largest book publishers in the United States—Hachette Book Group, Inc., HarperCollins Publishers L.L.C, Macmillan Publishing Group, LLC, Penguin Random House LLC, and Simon & Schuster, Inc. (collectively, the "Publishers")—had conspired to artificially inflate the price paid by consumers for eBooks sold on Amazon and other retail platforms. See, e.g., ECF No. 1 at ¶¶ 4, 15, 28. For the reasons stated in a Report and Recommendation dated August 3, 2022, and subsequently adopted by the Honorable Gregory H. Woods, the Court dismissed without prejudice all of Plaintiffs' antitrust claims against Defendants. See ECF Nos. 161 (the "R&R"), 170 (order adopting R&R).

Having obtained leave to replead, Plaintiffs did so, filing an amended complaint on November 21, 2022. See ECF No. 175 (the Second Consolidated Amended Class Action Complaint ("SACAC")). Plaintiffs assert claims against Amazon for monopolization and attempted monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; a claim

against all Defendants for conspiracy to monopolize in violation of Section 2 of the Sherman Act; and a claim against all Defendants for unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. As they did before, Amazon and the Publishers separately moved to dismiss the Second Consolidated Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6). See ECF Nos. 188, 190. For the reasons that follow, I respectfully recommend that Amazon's motion be **DENIED in part and GRANTED in part** and that the Publishers' motion be **GRANTED.**

**BACKGROUND**[1]

### A. <u>Factual Background</u>[2]

Plaintiffs are "consumers who directly purchase" eBooks published and sold by the five largest publishers in the United States: Hachette Book Group, Inc.; HarperCollins Publishers L.L.C.; Macmillan Publishing Group, LLC; Penguin Random House LLC; and Simon & Schuster, Inc. See SACAC ¶¶ 1 n.2, 21, 29-49, 220. Together, the Publishers "publish 80% of all trade eBooks" and their sales account for "80% of the trade publications in the United States." Id. ¶¶ 1, 56, 199, 280, 290. The Publishers distribute their eBooks to consumers through competing retail platforms, such as the platform operated by Amazon or its retail rivals, including Google, Apple, Barnes & Noble, and Kobo.[3] Id. ¶ 55. Collectively, the Publishers are

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents.

[2] The following facts are taken from the Second Consolidated Amended Class Action Complaint and are accepted as true for purposes of this motion. <u>LaFaro v. New York Cardiothoracic Group, PLLC</u>, 570 F.3d 471, 475 (2d Cir. 2009).

[3] HarperCollins also distributes eBooks directly to consumers through its own website. SACAC ¶ 115.

2

responsible for many of the biggest titles in fiction and nonfiction, including the vast majority of New York Times Bestsellers. Id. ¶ 56.

Amazon, the largest retailer in the United States, "dominates the retail market for the sale of trade eBooks." Id. ¶¶ 1, 55. Amazon is vertically integrated: it is active "upstream" as a publisher (with its own publishing labels that generate over $100 million annually) and "downstream" as an eBook retailer. Id. ¶ 44. Amazon "enjoys nearly 90% of the [eBook] market and its closest competitor, Apple, has a distant 6% share." Id. ¶ 201.

Plaintiffs are fifteen individuals who have "directly purchase[d]" the Publishers' eBooks through the "retail platforms of Amazon and its competitors." Id. ¶ 21. Seven Plaintiffs purchased eBooks through Barnes & Noble's retail platform, id. ¶¶ 29-31, 35, 39, 41-42, and six Plaintiffs purchased eBooks through Apple's retail platform, id. ¶¶ 34, 36-38, 40, 43. Two Plaintiffs purchased eBooks through Amazon's and Apple's retail platforms. Id. ¶¶ 32-33.

For trade eBooks, Amazon "employs an agency model and provides a retail-transaction platform (i.e., the Kindle platform)."[4] Id. ¶ 2. On the publisher-side of the platform, "Amazon makes the publishers' eBooks available for sale at prices set by the Publishers." Id. When consumers (like some Plaintiffs here) purchase an eBook on Amazon's platform, Amazon distributes the eBook to the consumer in exchange for the consumers' payment to Amazon of the "transaction price." Id. That transaction price is comprised of the "publisher-set sales price and Amazon's own transaction fee." Id. Amazon completes the transaction by deducting its transaction fee from the consumers' payment and remitting the remainder to the publisher. Id.

---

[4] Under the agency model used by the Publishers to sell their eBooks, "Amazon is not a buyer and the [Publishers] are not its suppliers." SACAC ¶ 58; see also id. ¶ 2.

Amazon's transaction fee (also characterized as a "commission") for each sale of a trade eBook on its platform is at least 30%, and routinely exceeds 40% for trade eBooks published by the Publishers that sell for more than $9.99. Id. ¶¶ 3, 53. Such a transaction fee "vastly exceeds the cost to Amazon of executing the transaction." Id. ¶¶ 14, 54, 99, 203. It costs Amazon on average $0.06 to deliver each eBook, in addition to "Amazon's low transaction processing costs." Id. ¶ 54. Amazon thus earns "a return north of 300%" when, for example, it sells a $10 eBook and earns a 30% transaction fee. Id.; see also id. ¶ 203 ("Amazon's transaction fee is at least 50 times greater than its delivery cost."). By contrast, competing eBook platforms charge lower commission fees for eBooks sold on their platforms. Id. ¶ 100. For example, the eBook platform Smashwords charges a 15% transaction fee; Aerobook Retail, an eBook transaction platform, charged a 15% transaction fee before it was acquired by a major book distributor. Id. In a competitive market, Amazon could not earn such a supracompetitive profit without losing sales to competitors and experiencing reduced profits. Id. ¶¶ 4, 101. In other words, in a competitive market, Amazon would be expected to earn a lower commission of around 15% or lower. Id. ¶ 101.

1.   The Publishers' agreements with Amazon

The Publishers entered into "agency agreements" with Amazon to sell their eBooks on Amazon's Kindle platform. Id. ¶ 1 n.2. Under these agreements, consumers make their payments on the Kindle platform, Amazon accepts payment as an "agent" of the Publishers, and Amazon remits the consumers' payment to the Publishers after it has deducted its transaction fee. Id.; see also id. ¶¶ 2, 52. These agreements underlie Plaintiffs' Sherman Act, Section 1 claims. According to Plaintiffs, the Publishers "did not act unilaterally or independently" when entering into these "anticompetitive agreements" with Amazon, but rather engaged in a horizontal price-

4

fixing conspiracy or a "hub-and-spoke conspiracy" facilitated by Amazon. Id. ¶¶ 15, 62, 121, 262-63, 270, 285, 287. Alternatively, Plaintiffs allege that the agency agreements with Amazon constitute an unlawful vertical price restraint. Id. ¶¶ 15, 289.

Amazon's agency agreements with the Publishers contain a provision, known as a "Most Favored Nations Clause" or "MFN," that "operate[s] to prevent publishers from offering their trade eBooks for sale on other electronic platforms, including their own platform, at a price below the price charged" on Amazon's platform. Id. ¶ 8; see also id. ¶ 58. Those agreements also contain other provisions that "shield Amazon's retail-transaction platform from competition," such as a "Business Model Parity Clause"; "Selection Parity Clause"; "Retail Price Parity Clauses"; and "Notification Provisions." Id. ¶ 9; see also id. ¶¶ 60-96.

The Business Model Parity Clause obligates publishers to notify Amazon of its agreements with other retail distribution platforms and offer Amazon the same business model and terms utilized by that would-be competitive platform. Id. ¶ 9; see also id. ¶¶ 61-69. The European Commission found evidence that Amazon's use of such a clause prevented the development of alternative business models including: (i) print and e-book bundles; (ii) pay-as-you-read and book-club models; (iii) subscription models; and (iv) applications for smartphones that give access to the electronic versions of classic books. Id. ¶ 64. With the insertion of the Business Model Parity Clause, eBook retailers "anticipate that Amazon will also have access to an E-book Supplier's inputs for alternative business models and would also know that Amazon could free-ride on its proposed business model given the E-book Supplier's obligation to inform Amazon about the material terms of such models." Id. ¶ 67 (citation and internal quotation marks omitted). Thus, such a clause reduces the ability and incentive of Amazon's competitors to

compete on price or develop alternative business models to differentiate their eBooks offerings, and discourages and prevents competitors from entering the market. Id. ¶¶ 61, 63, 69.

A Selection Parity Clause contractually obligates the Publishers to make available to Amazon any eBooks or related features and functionality available on any other eBook platform. Id. ¶ 9; see also id. ¶¶ 70-81. In other words, this clause prohibits the Publishers from offering unique titles through Amazon's competitors, and from selling titles on competing platforms, unless they are also offered on Amazon's platform. Id. ¶ 70. Amazon employs the Selection Parity Clause to weaken competition from other eBook retailers, because it prevents competing platforms from increasing sales by means of exclusive non-price promotions, exclusive content, or differentiated product offerings such as titles or release dates. Id. ¶¶ 71-81.

A Retail Price Parity Provision precludes the Publishers from offering their trade eBooks on any competing platform at a lower price than the price offered on Amazon, thereby foreclosing retail price competition on competing distribution platforms. Id. ¶¶ 9, 82, 83. Amazon uses this provision to deter entry and expansion of competing distribution platforms, which allows Amazon to obtain higher prices from consumers and increased commissions from publishers. Id. ¶¶ 84-88.

The Price Notification Provision contractually obligates the Publishers to notify Amazon of the price-related and non-price-related terms offered by or to other retail platforms. Id. ¶ 9; see also id. ¶¶ 89-90. Publishers are obligated to notify Amazon if the agency price on Amazon is higher than the retail price charged on any competing eBook platform, including the publisher's own retail platform. Id. ¶ 90(a) (defining the Retail Price Notification Provision). The price notification provision is used by Amazon in its eBook distribution agreements to prevent competing retail platforms from gaining volume and sales through lower prices. Id. The non-

price related notification provision obligates a publisher to notify Amazon of such things as whether the publisher has made available a particular feature or functionality on a retail platform that the publisher has not made available to Amazon. Id. ¶ 95. When the Publishers renegotiated their contracts with Amazon, in approximately 2015, there were consent decrees in place that prevented them from having explicit MFN clauses in their eBook contracts.[5] Id. ¶¶ 146-47. Until around 2017, Amazon and the Publishers agreed to notification clauses, such as a price notification provision, that served the same function as the prohibited MFN provision. Id. ¶ 89.

To preserve its market dominance, Amazon has coerced the Publishers into accepting these contractual provisions that foreclose competition on price or product availability. Id. ¶ 7. Because Amazon is the largest retailer in the United States, the Publishers feel market pressure to distribute through Amazon and accede to Amazon's request to insulate it from platform competition and maintain its monopoly power in the market. Id. ¶¶ 7, 55

    2.   Defendants' eBook pricing practices and antitrust investigations in the United States and Europe

As they did in their prior complaint, Plaintiffs include numerous allegations concerning conduct by the Publishers that was the subject of two antitrust lawsuits—one commenced by the United States and 33 States, United States v. Apple, Inc., 791 F.3d 290 (2d Cir. 2015) and 952 F. Supp. 2d 638 (S.D.N.Y. 2013), and a related class action for damages brought by individual consumers, In re Elec. Books Antitrust Litig., 639 F. App'x 724 (2d Cir. 2016). See SACAC ¶¶ 17, 124-38, 142. The Apple litigation stems from conduct taken by the Publishers to counter Amazon's "growing power in the trade book industry." Id. ¶¶ 125-26. Apple and the

---

[5] MFNs are common devices that guarantee buyers will get the lowest prices or best terms from their suppliers, by getting the supplier to agree to treat them as favorably as any other customer. SACAC ¶¶ 58,131.

Publishers agreed to raise the price of eBooks above the $9.99 price point using a new sales model—the "agency model." Id. ¶ 129. Under the agreement, Apple received a 30% commission for hosting the sale and the Publishers accomplished their overarching long-term goal of retaking control of pricing from eBook retailers. Id. ¶ 130. Initially, some of the Publishers objected to the agency model. Id. ¶ 131. To force their hand, Apple introduced a MFN clause in the proposed agreements that ensured that the Publishers' trade eBooks would be sold on Apple's store for the lowest retail price available in the marketplace. Id. The MFN clause ensured that no eBook retailer could underprice Apple and enabled the Publishers' collective action. Id. ¶ 132.

Following a bench trial in this District, the court held that Apple and the Publishers had engaged in a *per se* illegal horizontal price-fixing agreement, which had the intent and effect of eliminating price competition in the trade eBook market and increasing the retail price of trade eBooks. Id. ¶ 142. The court found that Apple had "made a conscious commitment to join a scheme with the Publisher Defendants to raise the prices of e-books," and that it was only through "the coordinated effort and conscious commitment of the Publisher Defendants and Apple," that they were able to "effect a significant increase in the retail price of e-books." Id. (citing Apple, 952 F. Supp. 2d at 697). The court entered a $450 million judgment against Apple and enjoined Apple from entering into any agreements with the Publishers that would prevent it from lowering eBook prices "beyond the 2-year deadline" imposed by the consent decrees.[6] Id. ¶¶ 17, 142.

---

[6] In 2012, the Department of Justice and Attorneys General from 33 states brought their own enforcement actions in this District. SACAC ¶ 139. Consent decrees imposed by the Justice Department prohibited the Publishers from entering into any agreement with an eBook retailer that contained an MFN clause for a period of five years. Id. ¶¶ 17, 140.

In December 2011, the European Commission's Directorate General for Competition opened proceedings against the Publishers and Apple, ultimately concluding that the Publishers had colluded with Apple to raise the retail price of trade eBooks. Id. ¶¶ 17, 139, 143. In 2019, the House Antitrust Committee investigated Amazon and other large technology companies. Id. ¶¶ 7, 164-66. The Committee concluded that Amazon's use of MFNs was harmful to competition. Id. ¶ 18. The Federal Trade Commission is also investigating Amazon, and there is a pending investigation by the Connecticut Attorney General, which is focused on Amazon's agreements with publishers. Id. ¶¶ 18, 167.

   3.   Defendants' market power in the relevant market

With the Second Consolidated Amended Class Action Complaint, Plaintiffs have changed their allegations concerning the "relevant market." Cf. ECF No. 67 at ¶ 113 (the Consolidated Amended Class Action Complaint ("CAC")). Now, the relevant product market is "the two-sided market for the retail distribution of trade eBooks." See SACAC ¶ 186. This market is "a platform-transaction market in which electronic platforms (such as Amazon's Kindle platform) compete against each other to execute transactions between trade eBook publishers and retail consumers." Id. Approximately 90% of eBook sales in the United States occur on Amazon's retail platform—a market share that creates "an inference of market and monopoly power." Id. ¶¶ 1,51, 201-02, 226-27, 290. The Publishers account for "about 80%" of the trade eBooks in the United States." Id. ¶¶ 1 n.3, 56, 280, 290.

Retail transaction platforms, like Amazon's, operate what economists call a "two-sided platform," which offers different products or services to two different groups who both depend on the platform to intermediate between them. Id. ¶ 194; see also id. ¶ 186. These platforms facilitate a single, simultaneous transaction and cannot transact a sale with a participant on one

side of the platform without simultaneously transacting the sale with a participant on the other side. Id. ¶ 195. Apart from Amazon's Kindle platform, other examples of two-sided, retail-transaction platforms for eBooks are the platforms operated by Barnes & Noble, Apple, Google, and Kobo. Id. ¶ 197.

As an alternative, Plaintiffs allege that the relevant product market "is the one-sided market in which electronic platforms (such as Amazon's Kindle platform) compete against other electronic platforms to provide retail distribution services to trade eBook consumers." Id. ¶ 186. But, whether the market is viewed as a "one-sided retail market in which Amazon provides retail distribution services to consumers" or a "two-sided market for trade eBook transaction platforms," Amazon's anticompetitive conduct has led to higher consumer prices, lower market output, and fewer consumer choices. Id. ¶ 206.

The relevant geographic market is the United States. Id. ¶ 198. "Trade books" represent a distinct product market from non-trade books and self-published books, and within the "trade book market," there is a distinct product market for "the retail sale of trade eBooks." Id. ¶¶ 187-88.

In a competitive market, the Publishers could sell eBooks at a lower price on their own websites or through Amazon's retail competitors that offer lower commissions and fees. Id. ¶ 180. But the Publishers have agreed to "immunize" Amazon from competition because "it suits their goal of maintaining supracompetitive trade eBook prices throughout the U.S. market." Id. As a result, prices for trade eBooks have remained "elevated above what they would have been in a competitive market." Id. ¶¶ 13-14. For its part, Amazon, "as the largest retailer of both print books and eBooks," could have retained the ability to discount the Publishers' eBooks, but it chose to forgo that option because "it faces no competition from other eBook retailers on price

10

or product availability." Id. ¶ 181. Defendants' conduct has thus led to decreased output, reduced competition, and higher prices for consumers for trade eBooks. Id. ¶¶ 7, 13, 16, 68, 102, 109, 114, 123, 205-206, 221, 291.

### B. Procedural Background

On January 14, 2021, Plaintiffs filed a Class Action Complaint against Amazon and the Publishers (ECF No. 1) and subsequently filed an Amended Class Action Complaint on February 4, 2021 (ECF No. 7). On May 24, 2021, the Court entered the parties' proposed joint stipulation and order consolidating seven related actions in this District. See ECF No. 66.

On June 2, 2021, Plaintiffs filed the Consolidated Amended Class Action Complaint. See ECF No. 67 (the CAC). That complaint asserted three causes of action: a claim against all Defendants under Section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that the Publishers colluded with Amazon to raise the retail price of trade eBooks and eliminate retailer discounting of eBooks (CAC ¶¶ 4, 8, 151-72); a claim against Amazon under Section 2 of the Sherman Act, 15 U.S.C. § 2, alleging that Amazon, through its agreements with the Publishers, willfully acquired and maintained its monopoly power in the U.S. retail market for trade eBooks (CAC ¶¶ 9, 173-83); and a claim against all Defendants for conspiracy to monopolize, 15 U.S.C. § 2, alleging that the Publishers demonstrated a specific intent to confer monopoly power on Amazon by agreeing to immunize it from competition from other eBook retailers (CAC ¶¶ 184-93).

On September 17, 2021, the Publishers and Amazon separately moved to dismiss the complaint. ECF Nos. 96, 98. On November 1, 2021, Plaintiffs filed their opposition to the motions to dismiss. ECF No. 123. The Publishers and Amazon filed their separate reply briefs on December 1, 2021. ECF Nos. 136, 137. I held oral argument on the motions on July 27, 2022,

and issued a Report and Recommendation on August 3, 2022, recommending dismissal of all claims against Amazon and the Publishers. See ECF No. 161 (the R&R).

First, as to the thirteen named Plaintiffs who did not purchase their eBooks from Amazon, I concluded that they lacked standing to sue Amazon, because they were not direct purchasers, as required by the Supreme Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). See R&R at 15-18. Next, as to the Section 1 claim against all Defendants, I concluded that the complaint did not plausibly allege the existence of a conspiracy between the Publishers and Amazon to raise eBook prices and limit retail competition. See id. at 18-43. Although the failure to plausibly plead a collusive agreement was a sufficient basis to dismiss the Section 1 claim, I nevertheless addressed whether Plaintiffs had plausibly alleged an unreasonable restraint of trade. Id. at 43-49. In that regard, I concluded that if each Publisher's vertical distribution agreement with Amazon were subjected to a rule-of-reason analysis, the allegations in the complaint would be insufficient to plausibly allege that any single Publisher's agreement with Amazon harmed competition in the entire relevant market. See id. at 46-48. I thus recommended that the Section 1 claim in Count I of the Consolidated Amended Class Action Complaint be dismissed. Id. at 48.

As to the Section 2 claim, in which Plaintiffs alleged that Amazon monopolized the U.S. retail market for trade eBooks, I concluded that Plaintiffs' allegations did not plausibly plead that Amazon possessed monopoly power in the relevant market. Id. at 50-53. For evidence of monopoly power, the complaint relied on Amazon's share of the U.S. retail market for eBooks and also on Amazon's "power to raise trade eBook prices." Id. at 51. I reasoned that the allegations that Amazon had market power because of its ability to raise trade eBook prices were contradicted by the allegations that the Publishers (and not Amazon) determined the retail price

of eBooks sold through Amazon. Id. at 51-52. The Plaintiffs were thus attempting to plead Amazon's market power in the relevant market by relying on eBook sales for which Amazon did not set the price and acted merely as an agent to the seller, and Plaintiffs had not offered any support for the proposition that a monopoly claim could proceed against Amazon based on sales for which Amazon acted only as an agent to the seller. Id. at 52. I thus recommended dismissal of the Section 2 claim in Count II of the Consolidated Amended Class Action Complaint. Id. at 49-53.

Finally, because Plaintiffs had not plausibly alleged the existence of a conspiracy for purposes of their Section 1 claim, I also concluded that dismissal of the Conspiracy to Monopolize claim in Count III was appropriate. Id. at 48-49.

On August 31, 2022, Plaintiffs filed objections to the R&R. See ECF No. 166. The Publishers and Amazon filed their respective responses on September 14, 2022. See ECF Nos. 167, 168. On September 29, 2022, Judge Woods adopted the R&R in full and afforded Plaintiffs an opportunity to amend the complaint. See ECF No. 170.

On November 21, 2022, Plaintiffs filed their Second Consolidated Amended Class Action Complaint asserting four claims: a claim in Count I against Amazon for monopolization in violation of Section 2 of the Sherman Act; a claim in Count II against Amazon for attempted monopolization in violation of Section 2 of the Sherman Act; a claim in Count III against all Defendants for conspiracy to monopolize in violation of Section 2 of the Sherman Act; and a claim in Count IV against all Defendants for unlawful restraint of trade in violation of Section 1 of the Sherman Act. See ECF No. 175. On January 23, 2023, the Publishers and Amazon again moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). See ECF Nos. 188-91. Plaintiffs submitted their opposition to the motions to dismiss on February 2, 2023, see ECF No.

194, and the Publishers and Amazon submitted their reply briefs on April 4, 2023, <u>see</u> ECF Nos. 203-04. The Court held oral argument on the motions on June 22, 2023, and July 21, 2023. <u>See</u> ECF Nos. 210 ("6/22/23 Tr."); 208 ("7/21/23 Tr.").

<b>DISCUSSION</b>

**I. Motion to Dismiss**

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This Rule does not countenance pleadings that are conclusory; it requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 182 (2d Cir. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). Where the well-pleaded facts in a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that 'the pleader is entitled to relief.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." <u>Twombly</u>, 550 U.S. at 556.

14

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 403 (2d Cir. 2014) (quoting Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 555, 570) (internal quotation marks, alteration, and citation omitted).

## II.  Plaintiffs' Sherman Act, Section 2 Claims

In Counts I and II of the Second Amended Consolidated Class Action Complaint, Plaintiffs allege that Amazon monopolized, or alternatively, attempted to monopolize, the retail market for trade eBooks in the United States. SACAC ¶¶ 224-43. Plaintiffs have redefined the relevant market in this complaint. Now, Plaintiffs allege that the market that Amazon has monopolized is the "two-sided market for the retail distribution of trade eBooks," or, alternatively, "the one-sided market in which electronic platforms (such as Amazon's Kindle platform) compete against other electronic platforms to provide retail distribution services to trade eBook consumers." SACAC ¶ 186; see also id. ¶¶ 226-27. In this newly defined market, Plaintiffs allege that Amazon's monopoly power may be inferred from (1) Amazon's ability to charge supracompetitive prices for transactions on the platform and for eBooks sold to consumers; (2) its ability to exclude from the market competitors who could provide the retail

services at a lower price; and (3) its market share, because nearly 90% of all trade eBook sales occur on Amazon's platform. Id. ¶¶ 226-27. And, Plaintiffs further aver that Amazon's monopoly power has substantially foreclosed competition in the market and has caused Plaintiffs to pay more for eBooks than they would have paid in the absence of Amazon's unlawful acts. Id. ¶¶ 98, 228-30, 233.

Amazon first attacks Plaintiffs' monopolization claim by arguing that Plaintiffs have not suffered an antitrust injury and thus do not possess antitrust standing to sue under the Sherman Act.[7] See ECF No. 189 ("Amazon's Br.") at 8-12. More particularly, Amazon argues that Plaintiffs are not direct participants in the market that they allege was monopolized because the "transaction fee" relied on by Plaintiffs is the "commission" the Publishers pay their agent (Amazon) to facilitate the sale of eBooks, and Plaintiffs are "neither buyers nor sellers" of "agency services" and do not "themselves pay any commissions" to Amazon for those services. Id. at 9, 11-12.

As to the two Plaintiffs who directly purchased eBooks from Amazon (see SACAC ¶¶ 32-33), the complaint adequately alleges antitrust standing and anticompetitive conduct by Amazon. However, as to the thirteen Plaintiffs who did not purchase their eBooks from Amazon (see id. ¶¶ 29-31, 34-43), those Plaintiffs lack standing to sue Amazon, because they are indirect purchasers under Illinois Brick.

A. Plaintiffs who bought eBooks from Amazon have antitrust standing.

"Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws and entitles '[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust trust laws' to treble damages for those injuries."

_____

[7] The Publishers do not raise a challenge to Plaintiffs' antitrust standing.

16

Gatt Comm'ns, Inc. v. PMC Assocs., LLC, 711 F.3d 68, 75 (2d Cir. 2013) (quoting 15 U.S.C. § 15) (alterations in original). In enacting this law, "Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices." Associated Gen. Contractors of Ca., Inc. v. California State Council of Carpenters, 459 U.S. 519, 530 (1983). But Congress "did not intend the antitrust laws to provide a remedy in damages for *all* injuries that might conceivably be traced to an antitrust violation." Id. at 534 (citation and internal quotation marks omitted, emphasis added). "Accordingly, courts have imposed 'boundaries' on the invocation of this private enforcement tool to ensure that an action for treble damages is invoked in service of 'the purpose of the antitrust laws: to protect competition.'" DNAML Pty., Ltd. v. Apple Inc., 25 F. Supp. 3d 422, 427 (S.D.N.Y. 2014) (quoting Gatt, 711 F.3d at 75).

Those boundaries are "'embodied in the concept of antitrust standing.'" Id. (quoting Gatt, 711 F.3d at 75). To plead antitrust standing, a plaintiff must plausibly allege both that it "suffered 'antitrust injury'" and that it is an efficient enforcer of the antitrust laws, otherwise known as "a 'proper party' to bring suit." Laumann v. Nat'l Hockey League, 907 F. Supp. 2d 465, 477-78 (S.D.N.Y. 2012) (quoting Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110-11 (1986)); see also In re London Silver Fixing, Ltd., Antitrust Litig., 213 F. Supp. 3d 530, 549 (S.D.N.Y. 2016) (At the pleading stage, "a private antitrust plaintiff must plausibly allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.") (quoting Gatt, 711 F.3d at 76) (alterations adopted, quotation marks omitted). Requiring a plaintiff to demonstrate antitrust injury "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." Gatt, 711 F.3d at 76 (citing Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990) (ARCO)).

17

*1.   Plaintiffs who bought eBooks from Amazon have alleged an antitrust injury.*

The first question in determining whether antitrust standing exists is whether Plaintiffs

have suffered antitrust injury. See Gelboim v. Bank of Am. Corp., 823 F.3d 759, 770 (2d Cir.

2016); see also Gatt, 711 F.3d at 76. An antitrust injury is an "injury of the type the antitrust laws

were intended to prevent and that flows from that which makes defendants' acts unlawful." See

Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 489 (1977). Courts use a three-step

inquiry to determine whether antitrust injury has been adequately pled:

> First, the party asserting that it has been injured by an illegal anticompetitive
> practice must identify the practice complained of and the reasons that such a
> practice is or might be anticompetitive. Next, we identify the actual injury the
> plaintiff alleges . . . . Finally, we compare the anticompetitive effect of the
> specific practice at issue to the actual injury the plaintiff alleges.

Gatt, 711 F.3d at 76 (citation omitted).

Before examining the antitrust injury Plaintiffs claim they suffered, it is necessary to

address Plaintiffs' allegations about the relevant product market. Plaintiffs have alleged

anticompetitive conduct in a "two-sided market," defined as "a platform-transaction market in

which electronic platforms (such as Amazon's Kindle platform) compete against each other to

execute transactions between trade eBook publishers and retail consumers." SACAC ¶ 186.

Alternatively, Plaintiffs allege that the relevant product market "is the one-sided market in which

electronic platforms (such as Amazon's Kindle platform) compete against other electronic

platforms to provide retail distribution services to trade eBook consumers." Id. In alleging the

existence of a two-sided, platform-transaction market, Plaintiffs embrace the United States

Supreme Court's decision in Ohio v. American Express Co., 138 S. Ct. 2274 (2018) ("Amex").[8]

---

[8] In Amex, the Supreme Court explained that "credit-card companies," like American
Express, "operate what economists call a 'two-sided' platform," which "offers different products
or services to two different groups who both depend on the platform to intermediate between

See ECF No. 194 ("Pls.' Br.") at 4-7. Attacking Plaintiffs' attempt to embrace the Amex

decision, Amazon contends that Plaintiffs' description of the relevant market as two-sided is

wrong.[9] Amazon's Br. at 12-13.

I need not decide whether the allegations that the market is two-sided are plausible,

because Plaintiffs have adequately alleged the existence of a one-sided market involving retail

electronic platforms, like Amazon, Apple, and Google, that all compete to sell trade eBooks to

consumers. SACAC ¶¶ 5, 186. Amazon does not contest the adequacy of the allegations

pertaining to a one-sided, retail-platform market. And, courts have allowed Section 2

monopolization claims to proceed based on allegations that the monopolist operated in a one-

sided, electronic-retail-platform market of the kind alleged by Plaintiffs here. See, e.g., Apple,

Inc. v. Pepper, 139 S. Ct. 1515, 1518 (2019) (relevant product market for Sherman Act

monopolization claim was the retail market for the sale of iPhone apps, which was a one-sided

retail platform). Accordingly, I will analyze whether Plaintiffs have antitrust standing by

reference to the one-sided, electronic-platform market alleged in the complaint.

Turning to the issue of antitrust injury, Plaintiffs contend that Amazon's anticompetitive

conduct "increase[s] the retail price of trade eBooks . . ., reduce[s] consumer choices, and

---

them." 138 S. Ct. at 2280. "The key feature of transaction platforms," the Court further detailed,
"is that they cannot make a sale to one side of the platform without simultaneously making a sale
to the other." Id. at 2280; see also id. at 2286 (explaining that "two-sided transaction platforms . .
. facilitate a single, simultaneous transaction between participants").

[9] Amazon also argues that even if the relevant market were two-sided, the conduct
Plaintiffs complain of is directed at a side of the two-sided market in which Plaintiffs do not
participate, because Plaintiffs are complaining about the Publishers' payment of agency fees.
Amazon's Br. at 14-15. I address this argument below, in connection with Amazon's contention
that Plaintiffs have not suffered an antitrust injury. As explained, see infra 22-28, the argument is
meritless, because the complaint adequately alleges that Amazon's commission was included in
the retail price paid by consumers directly to Amazon for the purchase of eBooks.

cause[s] antitrust injury to trade eBook direct purchasers in the form of overcharges." SACAC ¶ 221; see also id. ¶ 84 (Amazon's pricing provisions "allow[] Amazon to obtain higher prices from consumers."), id. ¶ 123 (The Publishers' agreements with Amazon result in "reduced choice, stifled innovation, decreased output, and increased price in the transaction market for the sale of eBooks."). According to Plaintiffs, Amazon's "supracompetitive transaction fees and higher retail prices paid by consumers" are the result of "Amazon's MFN and other Parity Clauses" in the agency agreements with the Publishers, which operate to restrain competition from other eBook retail-distribution platforms. See id. ¶ 205 (The Publishers' agreements with Amazon "eliminat[e] Amazon's current and potential eBook retailer competitors' ability and incentives to develop and differentiate their eBook offerings through new and innovative business models."); see also id. ¶¶ 7-9, 11, 15, 17, 54, 84, 98, 114-15, 228. As explained in the complaint, the MFNs and other Parity Clauses "suppress horizontal price competition for the sale of trade eBooks to consumers." Id. ¶¶ 58-96; see also id. ¶¶ 32-33 ("Defendants' anticompetitive agreement prevented the price competition with the Amazon platform that would have resulted in a lower market price for these eBooks."). Plaintiffs allege that for each transaction on its platform, Amazon charges a fee that "vastly exceeds the cost to Amazon" of distributing eBooks. Id. ¶¶ 4, 54, 203-04. In a competitive market, Plaintiffs allege, "Amazon would charge a reduced transaction fee in response to competition, and consumers would have paid lower prices" for trade eBooks, because of the low cost to Amazon "to process each transaction and deliver an eBook on its Kindle platform." Id. ¶¶ 4, 14, 54.

Collectively, Plaintiffs' allegations point to an anticompetitive practice: the use of contractual provisions by Amazon that "foreclose competition on price or product availability," permitting Amazon to maintain a supracompetitive transaction fee which results in higher

consumer prices for eBooks. SACAC ¶¶ 4, 7-11, 98, 204. And Plaintiffs have also explained "the reasons such a practice is or might be anticompetitive," Gatt, 711 F.3d at 76, because the contractual provisions have forced consumers to pay higher retail prices for trade eBooks, reduced consumer choices, and prevented competitors' abilities to develop and differentiate their eBook offerings through new business models, SACAC ¶¶ 7, 12, 15, 16, 21, 61, 63, 68, 69, 72-73, 77, 81-82, 84, 86-87, 94, 98, 102, 206. A practice that eliminates price competition and results in consumers paying higher prices, as Plaintiffs have alleged occurred here, is anticompetitive. See US Airways, Inc. v. Sabre Holdings Corp., 105 F. Supp. 3d 265, 285 (S.D.N.Y. 2015) (explaining that alleged practice was "anticompetitive because it allegedly restrict[ed] price competition in the [relevant] market" and "possibly" increased prices across the board).

Next, Plaintiffs have also identified an "actual injury." Gatt, 711 F.3d at 76 (citation omitted). "This requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." Id. (citation omitted). Plaintiffs, who are consumers who purchased eBooks from Amazon, contend that they are worse off because they were "overcharge[d]" for eBooks they bought on Amazon's platform. SACAC ¶¶ 21, 221. Stated differently, Plaintiff allege that the retail price of eBooks—paid to Amazon and which is comprised of "the publisher-set sales price and Amazon's own transaction fee"—was higher than it would have been absent Amazon's unlawful conduct. SACAC ¶¶ 2, 21, 84, 87, 98, 119, 121-22, 220. Amazon's conduct, Plaintiffs allege, "results in higher prices and reduced choice in the market as a whole." Id. ¶ 81. According to Plaintiffs, "[i]n a but-for competitive market, Amazon would charge a reduced transaction fee in response to competition, and consumers would have paid lower prices" for eBooks. Id. ¶¶ 7, 14, 54, 94, 121. Further, Plaintiffs also allege that

Amazon's conduct has precluded competition from other eBook retail platforms, allowing Amazon to charge supracompetitive fees. Id. ¶¶ 8, 11-12.

"The third step for evaluating antitrust injury is the comparison of the anticompetitive effect of the practice to the injury alleged by the plaintiff. This comparison requires more than a demonstration that the practice and injury are causally linked." DNAML, 25 F. Supp. 3d at 428 (citing Gatt, 711 F.3d at 76). A plaintiff must show that its loss "stems from a competition-*reducing* aspect or effect of the plaintiff's behavior." ARCO, 495 U.S. at 344 (emphasis in the original).

Plaintiffs' alleged injury—the payment of higher retail prices for trade eBooks—is "precisely the type of loss that [Amazon's conduct] would be likely to cause," because without the parity clauses in the agency agreements, Amazon would "have been forced to lower its excessive commission" to induce the Publishers to lower their prices to a competitive level (see, e.g., SACAC ¶ 11). DNAML, 25 F. Supp. 3d at 429 (quoting Blue Shield of Va. V. McCready, 457 U.S. 465, 479 (1982) (internal quotation marks omitted)). Further, the elimination of retail price competition resulting in higher prices borne by consumers is "plainly" the type of injury "the antitrust laws were intended to prevent. In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009) (concluding that antitrust injury was present where plaintiffs, who were direct purchasers of defendants' prescription medication, were "forced to pay supracompetitive price as a result of defendants' anticompetitive conduct"); see also McCagg v. Marquis Jet Partners, Inc., No. 05-CV-10607 (PAC), 2007 WL 2454192, at *3 (S.D.N.Y. Mar. 29, 2007) (allegations that defendants' anticompetitive conduct had effect of limiting competition and artificially inflating prices were sufficient to establish antitrust injury on a motion to dismiss). Indeed, "the prototypical example of antitrust injury is an allegation by

consumers that they have had to pay higher prices . . . as the result of a defendant's anticompetitive conduct." Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 478 (S.D.N.Y. 2001) (citing Associated Gen. Contractors, 459 U.S. at 538); see also Merced Irrigation Dist. v. Barclays Bank PLC, 165 F. Supp. 3d 122, 133 (S.D.N.Y. 2016) (holding that plaintiff who purchased electricity at artificially inflated prices due to defendants' price manipulation, "instead of [at prices derived from] the forces of supply and demand," alleged antitrust injury); Kasada, Inc. v. Access Cap., Inc., No. 01-CV-8893 (GBD), 2004 WL 2903776, at *11 (S.D.N.Y. Dec. 14, 2004) (complaint adequately pled antitrust injury where plaintiffs alleged that defendants' actions harmed consumers as a result of higher prices and reduction in ability to choose among differing levels of quality); N.Y. Jets LLC v. Cablevision Sys. Corp., No. 05-CV-2875 (HB), 2005 WL 2649330, at *10 (S.D.N.Y. Oct. 17, 2005) (allegations that anticompetitive conduct "limited, reduced, restrained, suppressed, and effectively foreclosed competition" and "forced consumers . . . to pay . . . artificially inflated prices" pled antitrust injury) (citation, internal quotation marks, and alterations omitted); In re Tether & Bitfinex Crypto Asset Litig., 576 F. Supp. 3d 55, 93-94 (S.D.N.Y. 2021) (allegations of conduct that purchasers paid "artificially inflating prices of cryptocommodities" adequately pled antitrust injury).

And as the Second Circuit has recognized, when consumers "must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Gelboim, 823 F.3d at 772-73 (quoting Brunswick, 429 U.S. at 489); see also In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 187 (S.D.N.Y. 2000) ("The Supreme Court has stated that consumers may suffer a particular kind of antitrust injury" when the price of goods or services "is artificially inflated" by anticompetitive conduct.); State of New York v. Hendrickson Bros.,

Inc., 840 F.2d 1065, 1079 (2d Cir. 1988) ("In general, the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws is deemed to have suffered the antitrust injury within the meaning of § 4 of the Clayton Act."). Not surprisingly, then, at least one court has concluded that allegations that Amazon's contractual provisions "restrain competition in ways that cause consumers to pay supracompetitive prices directly to Amazon" for purchases of goods made on Amazon's retail marketplace were sufficient to plead antitrust injury at the motion-to-dismiss stage. De Coster v. Amazon.com, Inc., No. 21-CV-693 (RSM), 2023 WL 372377, at *5-6 (W.D. Wash. Jan. 24, 2023) (internal quotation marks omitted).[10] Simply put, Plaintiffs have adequately alleged that they suffered an antitrust injury.

In an attempt to attenuate the casual connection between the alleged overcharge injury and Amazon's alleged monopolistic conduct, Amazon recasts Plaintiffs' allegations as a complaint over the payment of commissions for agency services. According to Amazon, Plaintiffs' monopolization theory is that Amazon foreclosed competition over agency commissions paid by the Publishers to retailers, like Amazon, and the alleged harm there stems

---

[10] Amazon argues that the retail platform at issue in De Coster was its retail marketplace, which is "a different forum" than the eBook transaction platform at issue here. ECF No. 204 ("Amazon's Reply Br.") at 2. De Coster is significant because the court there concluded that the plaintiffs had antitrust standing based on allegations of injury that are similar to the allegations here. See 2023 WL 372377, at *5-6. As here, the plaintiffs in De Coster alleged that they paid higher prices for goods sold by third-party merchants on Amazon, and the higher prices were the result of Amazon's inflated fees which were passed on to the consumer as part of the retail price paid by the consumer directly to Amazon. See id. at *1; see also De Coster v. Amazon.com, Inc., Dkt. No. 21-cv-693 at ECF No. 20, ¶ 8 (Consolidated Amended Complaint) ("[W]hen an Amazon customer buys an item listed by a third-party merchant, Amazon retains a significant percentage of the customer's payment as a 'referral fee' for the use of Amazon's marketplace. After deducting that and other fees, Amazon remits the remainder to the third-party merchant.). Amazon's argument that its marketplace is a different forum than its eBook transaction platform ignores that in both forums the transaction fee is built into the retail price paid by consumers directly to Amazon.

from conduct that occurred in a separate market for agency services, in which Plaintiffs are neither the "buyers nor sellers" of those services. See Amazon's Reply Br. at 1-2, 5; Amazon's Br. at 9, 11-12. But Amazon ignores that it is responsible for the commission it charges the Publishers, and that commission forms part of the retail price of eBooks. SACAC ¶¶ 2-3, 13-14, 16, 52-53, 82, 84, 87, 98, 119, 121, 203-04, 220-21. Regardless of the reason for the commission's existence, the complaint alleges that the supracompetitive commission artificially inflated the retail price paid by consumers directly to Amazon. Id. ¶¶ 2, 220.

In responding to Amazon's argument that Plaintiffs are complaining about inflated commissions for agency services charged to the Publishers, Plaintiffs rely heavily on Apple Inc. v. Pepper, 139 S. Ct. 1514 (2019) (see Pls.' Br. at 18-21), and for good reason, because the facts in Pepper are nearly indistinguishable from the factual allegations here.[11] Compare SACAC ¶¶ 2, 52 with Pepper, 139 S. Ct. at 1519. Pepper involved a retailer (Apple) that exercised its monopoly power to cause consumers to pay supracompetitive prices for iPhone "apps," through the imposition of a fixed fee that Apple charged the third-party app developer (who set the sales price of the app), but which consumers paid directly to Apple when they purchased apps from Apple's electronic platform. 139 S. Ct. at 1519-20. The Supreme Court in Pepper rejected an argument by Apple, similar to the one raised by Amazon here, that focused on the financial arrangement between Apple (as the retailer) and the app developer (as the entity who set the retail price for the app on Apple's platform). In Pepper, the Court explained that "a 'who sets the price' rule would draw an arbitrary and unprincipled line among retailers based on retailers'

---

[11] Perhaps the only meaningful difference between the facts in Pepper and those alleged here is that in Pepper, Apple ran the *only* marketplace for iPhone apps. See Pepper, 139 S. Ct. at 1519 ("By contract and through technological limitations, the App Store is the only place where iPhone owners may lawfully buy apps."). By contrast, Amazon is not the only eBook retail platform where consumers can purchase trade eBooks. See, e.g., SACAC ¶ 5.

financial arrangements with their manufacturers or suppliers." 139 S. Ct. at 1522. The Court
added that "[i]f a retailer has engaged in unlawful monopolistic conduct that has caused
consumers to pay higher-than-competitive prices, it does not matter how the retailer structured its
relationship with an upstream manufacturer or supplier—whether, for example, the retailer
employed a markup or kept a commission." Id. at 1523.

To be sure, the lone issue in Pepper was whether the plaintiffs—iPhone owners who had
bought apps directly from Apple through the Apple store—where "direct purchasers" from
Apple under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). See Pepper, 139 S. Ct. at 1520.
But ignoring Pepper simply because the case focused on a narrower component of the antitrust
standing analysis would be misguided. The Second Consolidated Amended Class Action
Complaint alleges that it was Amazon's imposition of contractual provisions in its agreements
with the Publishers that allowed it to charge supracompetitive commissions and those
commissions, which were part of the retail price charged to consumers, caused consumers to pay
higher-than-competitive prices for eBooks purchased on Amazon's platform. SACAC ¶¶ 7, 9,
16, 61, 87, 94, 98, 121. Accepting those allegations as true, as I must on a motion to dismiss, it
was Amazon's conduct that resulted in the overpayment by consumers for eBooks purchased on
Amazon's platform. Pepper makes clear that "[i]f the retailer's unlawful monopolistic conduct
caused a consumer to pay the retailer a higher-than-competitive price, the consumer is entitled to
sue the retailer under the antitrust laws." Pepper, 139 S Ct. at 1523.

To support its arguments that Plaintiffs lack standing because they are complaining about
monopolization of a market in which they do not participate—a market for agency services—
Amazon relies primarily on two decisions: In re Aluminum Warehousing Antitrust Litigation, 95
F. Supp. 3d 419 (S.D.N.Y. 2015) ("In re Aluminum"), and In re Zinc Antitrust Litigation, 155 F.

Supp. 3d 337 (S.D.N.Y. 2016) ("In re Zinc"). See Amazon's Br. at 10-12. Neither decision

supports Amazon's arguments here.

In In re Aluminum, the complaint alleged a Section 2 claim against Metro International

Trade Services LLC, a provider of warehousing facilities who was alleged to "have, or be about

to achieve, a monopoly position in the market for LME-certified warehouse services for

aluminum." 95 F. Supp. 3d at 455. But the plaintiffs' alleged injury in In re Aluminum was not

the payment of higher warehouse storage costs; it was the payment of artificially inflated prices

for aluminum. Id. at 440, 442, 456. In concluding that the plaintiffs lacked antitrust standing, the

court reasoned that plaintiffs were "neither competitors nor consumers in any relevant market,"

and plaintiffs also did not "directly consume" any "aluminum warehouse-related products or

services." Id. at 442, 448-449. As the court explained, if focused solely on actions by Metro in

"the market for LME-certified warehouse services for aluminum," the plaintiffs had not alleged

that their injuries were sustained from actions in that market alone because the plaintiffs

"themselves have not paid higher warehouse storage fees." Id. at 456.

In In re Zinc, the plaintiffs, who were "purchasers of primary zinc," brought a Section 2

claim against defendants who were "operators of LME-certified warehouses that stored zinc" and

corporate affiliates of financial entities with commodities trading units that traded financial

instruments whose price was predicated on the underlying cost of physical zinc and its storage.

155 F. Supp. 3d at 343, 350. In concluding that the plaintiffs lacked antitrust standing, the court

reasoned that the plaintiffs were neither "buyers" or "sellers" of the service alleged to have been

monopolized—the LME warehousing services. Id. at 362-63. Stated differently, the court

concluded that the plaintiffs, who were zinc purchasers, failed to allege antitrust injury in

connection with their monopolization claim against operators of zinc warehouses, because they

27

were purchasers in the market for physical zinc, while the operators were alleged to have monopolized the market for zinc-storing services. Id. at 362-63.

Amazon's reliance on In re Aluminum and In re Zinc wholly ignores that Plaintiffs have defined the relevant market differently now than they did in their prior complaint. Plaintiffs now allege monopolization of the eBook electronic-platforms market—a market in which they are participants because they pay the retail price of eBooks (which includes Amazon's supracompetitive commission) directly to Amazon. See SACAC ¶ 226 ("Amazon possesses monopoly power in the two-sided retail market for trade eBook platform transactions"); id. ¶ 227 ("Amazon likewise possesses monopoly power in the relevant market for the retail distribution of eBooks"); id. ¶¶ 2, 220 (the artificially retail price is paid by consumers directly to Amazon and is inflated as a result of Amazon's supracompetitive commission fee); id. ¶ 186 (defining the relevant product market). Thus, unlike the plaintiffs in In re Aluminum and In re Zinc, Plaintiffs have alleged an injury (the payment of higher retail prices for eBooks) as a result of their participation in the same market that Amazon is alleged to have monopolized (the electronic-platforms market for the retail distribution of eBooks). Id. ¶¶ 186, 220.

In short, Plaintiffs who bought eBooks from Amazon have now plausibly pled that they suffered a classic antitrust injury as a result of Amazon's alleged anticompetitive conduct in the retail-electronic-platforms market for eBooks.

###### 2. *Plaintiffs who bought eBooks from Amazon are efficient enforcers.*

In addition to pleading that they suffered antitrust injury, Plaintiffs must adequately allege that they would be efficient enforcers of the antitrust laws. "To determine whether a plaintiff is an efficient enforcer of the antitrust laws, the Second Circuit directs courts to the following factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an

identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." <u>DNAML</u>, 25 F. Supp 3d at 430 (citing <u>Gatt</u>, 711 F.3d at 78). "[These] factors reflect a concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." <u>Gelboim</u>, 823 F.3d at 780 (citation and internal quotation marks omitted). Moreover, "[t]hese four factors need not be given equal weight," and "the relevant significance of each factor will depend on the circumstances of the particular case." <u>IQ Dental Supply, Inc. v. Henry Schein, Inc.</u>, 924 F.3d 57, 65 (2d Cir. 2019) (citation omitted). Amazon contends that Plaintiffs are not efficient enforcers, briefly arguing that Plaintiffs' claims are "more indirect, speculative, and duplicative than they were" in the prior complaint. Amazon. Br. at 14-15. As explained below, collectively the factors weigh in favor of concluding that Plaintiffs who bought eBooks from Amazon are efficient enforcers.

i.   *Directness of the Injury*

The first factor—whether the violation was a direct or remote cause of the injury—"turns on familiar principles of proximate causation." <u>In re Am. Express Anti-Steering Rules Antitrust Litig.</u>, 19 F.4th 127, 139 (2d Cir. 2021) (citation omitted). "In the context of antitrust standing, proximate cause generally follows the first-step rule." <u>Id.</u> That rule "requires some direct relation between the injury asserted and the injurious conduct alleged." <u>Id.</u> at 140 (citation and internal quotation marks omitted); <u>see also</u> <u>Gatt</u>, 711 F.3d at 78 ("'Directness in the antitrust context means close in the chain of causation.'") (quoting <u>IBM Corp. v. Platform Sols., Inc.</u>, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)).

Plaintiffs have adequately pled a direct relationship between their alleged injury and Amazon's conduct. Plaintiffs' alleged injury is the payment of higher retail prices for eBooks. See SACAC ¶¶ 7, 21, 81, 84, 87, 94, 98, 121-22, 220-21. And as alleged in the complaint, that overcharge injury was caused by contractual provisions imposed by Amazon that prevented competition on price and permitted Amazon to charge a supracompetitive commission that formed part of the retail price of eBooks. See id. ¶¶ 8-9, 11, 15, 102, 106-07, 113, 120, 122, 247, 249. The direct relationship between Plaintiffs' injury and Amazon's conduct is further supported by the finding that Plaintiffs are direct purchasers from Amazon, and thus paid the alleged overcharge directly to Amazon. See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 383 F. Supp. 3d 187, 222 (S.D.N.Y. 2019)  (directness of injury to direct purchaser plaintiffs who paid supracompetitive prices as a result of defendants' anticompetitive conduct supported their standing); see also In re Google Play Store Antitrust Litig., No. 20-CV-05761 (JD), 2022 WL 17252587, at *9-10 (N.D. Cal. Nov. 28, 2022) (discussing the directness of the alleged injury in terms of the plaintiffs being "direct purchasers" because they purchased from the defendant's app store and directly overpaid the overcharge to the retailer-defendant) (citing Pepper, 139 S. Ct. at 1521). There thus was no "intermediary in the distribution chain" between the consumer, who paid the overcharge, and Amazon, who is alleged to have caused the overcharge. Pepper, 139 S. Ct. at 1521. For this reason, the case relied on by Amazon (Br. at 14), In re Am. Express Anti-Steering Antitrust Litig., 19 F.4th 127 (2d Cir. 2021), is distinguishable, because plaintiffs there were merchants who did not accept American Express and thus had not directly transacted with the alleged antitrust violator, American Express. In other words, the court there found no direct injury where plaintiffs sued American Express alleging injuries caused by merchant fees charged to them by *other* credit-card companies, like Mastercard and

Via, which plaintiffs claimed were inflated by American Express' anti-steering rules. In re Am. Express Anti-Steering Antitrust Litig., 19 F.4th at 134, 140-41; see also In re Aluminum Warehousing Antitrust Litig., 520 F. Supp. 3d 455, 474-76, 485-87 (S.D.N.Y. 2021) (no directness of injury, in part, because plaintiffs had not directly transacted with the defendants). Plaintiffs who purchased from Amazon have thus sufficiently alleged a direct injury proximately caused by Amazon's conduct and this factor therefore weighs in their favor.

ii.   *Existence of More Direct Victims*

The second factor asks "whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation." Gelboim, 823 F.3d at 772. Stated otherwise, the factor "simply looks for a class of persons naturally motivated to enforce the antitrust laws." In re DDAVP, 585 F.3d at 689.

Plaintiffs are consumers who directly purchased eBooks from Amazon and seek to recover for their overpayment in the retail price of those eBooks. See, e.g., SACAC ¶ 220. "Direct purchasers," like Plaintiffs, are in "a superior position to pursue antitrust claims." In re Aluminum Warehousing Antitrust Litig., 520 F. Supp. 3d at 492. Further, Plaintiffs' interest in seeking retail price competition among competing eBook platforms aligns with the public's interest in promoting price competition. Cf. DNAML, 25 F. Supp. 3d at 431 (retailer who was injured by a conspiracy to eliminate retail price competition had "interest [that] align[ed] with the public's interest in promoting price competition").

Amazon suggests that there may exist other parties better positioned to sue for an antitrust violation here. See Amazon's Br. at 15. Even if Amazon's retail competitors were such a class of plaintiffs, this second factor does not ask whether Plaintiffs are "*the* entity most motivated by self-interest." In re DDAVP, 585 F.3d at 688-89 (citation omitted; emphasis in the

original); Keurig, 383 F. Supp. 3d at 222 (noting that this factor does not look for "what plaintiff is the most motivated"). "Even if the competitors might be the most motivated, the plaintiffs are also significantly motivated due to their natural economic self-interest in paying the lowest price possible." In re DDAVP, 585 F.3d at 689 (citation and internal quotation marks omitted). Further, even if Amazon's retail competitors have a claim for lost profits, Plaintiffs here seek overcharge damages, which is a "wholly distinct" category of damages. DNAML, 25 F. Supp. 3d at 431 (citing In re DDAVP, 585 F.3d at 689). Denying Plaintiffs a remedy would thereby be "'likely to leave a significant antitrust violation undetected or unremedied.'" In re DDAVP, 585 F.3d at 689 (quoting Associated Gen. Contractors, 459 U.S. at 542). Consequently, this factor also supports Plaintiffs' antitrust standing.

iii.     *Speculative Damages*

The third factor assesses whether a plaintiff's damages are "highly speculative," because that is "a sign that a given plaintiff is an inefficient engine of enforcement." Gelboim, 823 F.3d at 779. Courts in this Circuit typically assess four considerations in deciding whether damages are unduly speculative in price-fixing cases:

> (1) the extent to which the damages claim is conclusory in nature; (2) whether the injury is "so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions," which relates to the causation factor; (3) whether external market factors affected the "relationship between the fixed price and the price that the plaintiffs ultimately paid"; and (4) whether "the non-fixed components of a transaction were heavily negotiated between the parties in relation to the fixed component."

Sonterra v. Barclays, 366 F. Supp. 3d 516, 546 (S.D.N.Y. 2018) (quoting In re LIBOR-Based Fin. Instruments Antitrust Litig., 11-MDL-2262 (NRB), 2016 WL 7378980, at *17–18 (S.D.N.Y. Dec. 20, 2016)).

Plaintiffs, who are alleging an overcharge injury, have adequately pled that they suffered non-speculative damages. Plaintiffs allege that "[i]n a but for competitive market, Amazon would charge a reduced transaction fee in response to competition." SACAC ¶ 54. "Because of the low cost to Amazon to process each transaction and deliver an eBook on its Kindle platform," Plaintiffs allege that "the competitive commission rate that would have prevailed in the absence of Amazon's anticompetitive conduct is substantially less than the 30%-plus transaction fee it actually charges." Id. ¶ 14; see also id. ¶ 54 (describing how "Amazon's transaction fees vastly exceed Amazon's transaction costs"). Further, Plaintiffs allege that "[c]ompeting platforms [that] have tried to offer lower transaction prices" have been unable to "gain any competitive advantage by attracting consumers with lower rates" because of Amazon's parity clauses. Id. ¶ 14; see also id. ¶¶ 100-01. Because the transaction fee, or commission, is included in the retail price for an eBook, see id. ¶ 2, Plaintiffs allege that a lower commission would result in "lower prices" for consumers, id. ¶ 54. Finally, because Plaintiffs purchased directly from Amazon, their injury is not far down the causal chain. For these reasons, this factor further supports a finding of standing. See Keurig, 383 F. Supp. 3d at 222 (concluding that "alleged injury" of "overpayment for K-Cups purchased directly from Keurig or its agents [] is not speculative").

    *iv.*    *Duplicative Recovery or Complex Apportionment*

The final factor assesses whether Plaintiffs' claims present a risk of duplicative recovery or complex apportionment. "Under this factor courts are traditionally concerned with the prospect of different groups of plaintiffs attempting to recover for the same exact injury[.]" In re LIBOR, 2016 WL 7378980, at *23 (citation omitted). Here, while there may be other parties properly positioned to bring monopolization claims against Amazon, their damages would be

"wholly distinct" from those allegedly suffered by consumers who purchased eBooks from Amazon. DNAML, 25 F. Supp. 3d at 431. Further, consumers, like some of the Plaintiffs in this case, are the only class that can recover for the claimed injury here, based on artificially inflated retail prices. Therefore, there is no risk that different groups of plaintiffs would be attempting to recover for the *same exact* injury.[12]

In sum, Plaintiffs who bought eBooks from Amazon have adequately alleged that they suffered an antitrust injury and are efficient enforcers, as required to plead antitrust standing.

B. Plaintiffs who did not buy eBooks from Amazon lack antitrust standing to sue Amazon.

Thirteen of the fifteen named Plaintiffs did not purchase eBooks from Amazon. Those Plaintiffs bought eBooks from competing electronic-retail platforms, like Apple, Google, or Barnes & Noble. See SACAC ¶¶ 29-31, 34-43. These Plaintiffs allege that Amazon's anticompetitive conduct "increase[d] the retail prices of trade eBooks throughout the U.S. market, reduce[d] consumer choice, and caused [them] antitrust injury . . . in the form of overcharges." Id. ¶¶ 220-21. In other words, these Plaintiffs allege that in the absence of Amazon's anticompetitive agreements, retail prices for eBooks across all electronic-retail platforms would be "substantially lower." Id. ¶¶ 7, 11-12, 14-16, 21, 87, 94, 98, 220-21, 228.

---

[12] The Second Consolidated Amended Class Action Complaint describes certain government investigations into Amazon's conduct. See SACAC ¶¶ 164-67. Although ongoing government oversight may pose a minimal risk of duplicative recoveries, see Gelboim, 823 F.3d at 780, on the whole this factor still favors Plaintiffs, because there is no indication that Plaintiffs "have been made whole" through recoveries obtained as a result of those investigations. See In re LIBOR, 2016 WL 7378980, at *23 (concluding that the presence of ongoing, parallel government actions did not heighten risk of duplicative recovery where no showing had been made that plaintiffs "have been made whole through the receipt of restitution payments made to governments"); see also Sullivan v. Barclays PLC, No. 13-CV-2811 (PKC), 2017 WL 685570, at *20 (S.D.N.Y. Feb. 21, 2017) (affording existence of governmental enforcement actions some weight, but concluding that those enforcement actions were not shown to pose risk of duplicative recovery).

"[C]ourts have imposed boundaries on the invocation of the private enforcement tool" that is Section 4 of the Clayton Act. DNAML, 25 F. Supp. 3d at 427 (citation and internal quotation marks omitted). One such boundary is the "bright-line rule" established by the Supreme Court in Illinois Brick, which "authorizes suit by direct purchasers but bars suits by indirect purchasers." Pepper, 139 S. Ct. at 1520 (citing Illinois Brick, 431 U.S. at 776). For eBooks purchased on a retail platform other than Amazon, Plaintiffs are not direct purchasers from the alleged antitrust violator (Amazon) and thus "must show why Illinois Brick does not bar their claims for damages" against Amazon based on those purchases. Laumann, 907 F. Supp. 2d at 480-81 (applying Illinois Brick to reason that plaintiffs, who based their claims on purchases of television programming, had to demonstrate standing to assert claims against defendants from whom they had not purchased such programming).

Relying on Frame-Wilson v. Amazon.com, Inc., 591 F. Supp. 3d 975 (W.D. Wash. 2022), Plaintiffs argue that even consumers who bought eBooks from competing retail platforms have standing to sue Amazon. Pls.' Br. at 17. In Frame-Wilson, the plaintiffs sued Amazon for overcharges paid by consumers for goods purchased on Amazon from third-party merchants and for goods purchased on other retail websites, like eBay or Walmart.com. 591 F. Supp. 3d at 981. Although Amazon there raised an Illinois Brick argument,[13] the court rejected Amazon's argument, concluding instead that the plaintiffs had standing because they were "direct purchasers of alleged antitrust co-conspirators"—namely, the third-party merchants. Frame-Wilson, 591 F. Supp. 3d at 984. But Frame-Wilson is a case from the Ninth Circuit, where courts apply the co-conspirator exception to Illinois Brick, which allows "an indirect purchaser [to]

---

[13] See Amazon's Brief in Support of its Motion to Dismiss the First Amended Complaint in Frame-Wilson, available at 2020 WL 7646430 (W.D. Wash. Sep. 2, 2020).

35

bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." Delaware Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1123 n.1 (9th Cir. 2008) (citation omitted); see also In re Nat'l Football League's Sunday Ticket Antitrust Litig., 933 F.3d 1136, 1157 (9th Cir. 2019) (In the Ninth Circuit, "when co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation.") (citation omitted). The court in Frame-Wilson seemingly relied on that exception in concluding that all plaintiffs, even those who bought from Amazon's retail competitors, had antitrust standing, because the plaintiffs were "direct purchasers of alleged antitrust co-conspirators"—specifically, the third-party sellers who were alleged to have conspired with Amazon. See 591 F. Supp. 3d at 984.[14]

Here, Plaintiffs who bought eBooks on competing retail platforms were direct purchasers of the Publishers, but as discussed below, see infra at 46-53, Plaintiffs have not adequately pled the existence of a conspiracy between Amazon and the Publishers. The Publishers thus are not akin to the uncharged co-conspirators in Frame-Wilson, from whom the plaintiffs in that case were direct purchasers. Regardless, even if Plaintiffs had adequately pled the existence of a conspiracy between Amazon the Publishers, the Second Circuit has not endorsed or adopted the co-conspirator exception. See Laumann, 907 F. Supp. 2d at 481 (recognizing that the Second Circuit has not addressed the co-conspirator exception and that "those circuits that have addressed it have not taken a uniform view" of the exception's scope). Plaintiffs thus cannot avail themselves of that exception to the Illinois Brick direct-purchaser rule. Accordingly,

---

[14] See also Frame-Wilson v. Amazon, First Amended Class Action Complaint, 2020 WL 5542257, at ¶¶ 224-35 (W.D. Wash. Aug. 3, 2020) (allegations detailing that Amazon entered into a horizontal price-fixing agreements with its third-party sellers).

Plaintiffs who purchased eBooks from a retail platform other than Amazon are indirect purchasers and thus lack antitrust standing to sue Amazon.

    C.   <u>Plaintiffs who bought eBooks from Amazon have validly alleged anticompetitive conduct by Amazon.</u>

Aside from the threshold issue of antitrust standing, Amazon also attacks the sufficiency of the allegations supporting the monopolization and attempted monopolization claims. Amazon's Br. at 16-19. To state a claim for monopolization under Section 2, a plaintiff must plead "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002); <u>Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.</u>, 386 F.3d 485, 495 (2d Cir. 2004). "Inherent to the second element, there must be a showing of anticompetitive conduct." <u>In re Term Commodities Cotton Futures Litig.</u>, No. 12-CV-5126 (ALC) (KNF), 2013 WL 9815198, at *23 (S.D.N.Y. Dec. 20, 2013), <u>on reconsideration in part</u>, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014). For a Section 2 claim, "'the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.'" <u>trueEX, LLC v. MarkitSERV Ltd.</u>, 266 F. Supp. 3d 705, 718 (S.D.N.Y. 2017) (quoting <u>Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004)). Conduct is deemed anticompetitive under the Sherman Act where it lacks "a legitimate business purpose" and "makes sense only because it eliminates competition.'" <u>Id.</u> (quoting <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 124 (2d Cir. 2007)).

An attempted monopolization claim requires a plaintiff to plead: "'(i) that the defendant has engaged in predatory or anticompetitive conduct with (ii) a specific intent to monopolize and (iii) a dangerous probability of achieving monopoly power.'" <u>A.V.E.L.A., Inc. v. Est. of Marilyn</u>

37

Monroe, LLC, 241 F. Supp. 3d 461, 481 (S.D.N.Y. 2017) (quoting Bayer Schering Pharma AG

v. Sandoz, Inc., 813 F. Supp. 2d 569, 578 (S.D.N.Y. 2011). "[C]ourts may infer a specific intent

to monopolize from allegations of anticompetitive conduct." IHS Dialysis Inc. v. Davita, Inc.,

No. 12-CV-2468 (ER), 2013 WL 1309737, at *6 n.8 (S.D.N.Y. Mar. 31, 2013) (citing Volvo N.

Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988)).

Amazon argues that Plaintiffs have not validly alleged any anticompetitive conduct.

Amazon's Br. at 16-19. Amazon levies two attacks on this front: that its price MFNs are "not

inherently anticompetitive," and that Plaintiffs have not plausibly alleged that Amazon's conduct

had the effect of raising agency commissions to anticompetitive levels. Id. at 16-18.

Beginning with Amazon's argument concerning the anticompetitiveness of its price MFN

and non-price MFNs provisions, Amazon's contention that such provisions are not inherently

anticompetitive misconstrues Plaintiffs' allegations. MFNs and other parity provisions may not

be inherently anticompetitive, but they may be "misused to anticompetitive ends in some cases."

Apple, 791 F.3d at 320 (quoting Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,

65 F.3d 1406, 1415 (7th Cir. 1995)). And, here, Plaintiffs claim that Amazon *has* used such

provisions to anticompetitive ends and substantially foreclosed competition in the market for

eBook retail-electronic-transaction platforms. See SACAC ¶¶ 11-12, 61, 64, 71, 73, 82, 84, 90,

205, 228. Whether the MFN provisions actually had procompetitive effects, as Amazon contends

(Amazon's Br. at 16), is not an inquiry for resolution at the pleading stage. See PLS.Com, LLC

v. Nat'l Ass'n of Realtors, 32 F.4th 824, 839-40 (9th Cir. 2022) (explaining that "whether the

alleged procompetitive benefits of [the challenged restraint] outweigh its alleged anticompetitive

effects is a factual question that the district court cannot resolve on the pleadings").

Next, Amazon avers that Plaintiffs' allegations only "nominally allege" that Amazon's contracts have had the effect of raising agency commissions to anticompetitive levels. Amazon's Br. at 17-19. If accepted as true, however, Plaintiffs' allegations are sufficient, at this pleading stage, to plausibly allege that Amazon's conduct has allowed it to charge supracompetitive commission fees, leading to reduced competition in the eBooks platforms-transaction market and higher eBooks prices for consumers. As Plaintiffs allege, Amazon charges a commission that is "at least 30%," and "routinely exceeds 40%," of the price paid by consumers for eBooks that sell for more than $9.99.[15] SACAC ¶¶ 3-4, 53. Such a fee "vastly exceeds Amazon's transaction costs," because on average it costs Amazon only "$0.06" to deliver each eBook," in addition to its low cost to process the transaction. Id. ¶¶ 4, 54, 99. As an example of what a more competitive commission would be, Plaintiffs point to the 15% transaction fee charged by Smashwords, another eBook platform. Id. ¶ 100. "In a but-for competitive market," Plaintiffs allege, "Amazon could not earn such a supracompetitive profit without losing sales to a competitor and experiencing reduced profits." Id. ¶¶ 4, 100. But Amazon has sustained its market dominance through the imposition of its parity provisions, id. ¶ 204, resulting in "reduced choice, stifled innovation, decreased output, and increased price in the transaction market for the sale of trade eBooks to consumers," id. ¶ 7; see also id. ¶¶ 12, 17, 68, 205, 228, 238.

---

[15] Amazon argues that a 30% commission is not excessive or unusual and points to the fact that Apple also took a 30% commission in 2010 for the sale of eBooks on its platform. See Amazon's Br. at 17. But that comparison is flawed because it looks at a commission that Apple received during its participation in a hub-and-spoke conspiracy with the Publishers, the aim of which was to eliminate retail-price competition and raise prices for print trade eBooks. See Apple, 952 F. Supp. 2d at 659-60, 682-83, 686-87. And a comparison to the commission presently charged by Amazon's competitors, like Google, is also flawed because it ignores the allegations in the complaint that the commission is artificially inflated by Amazon's parity provisions, which disincentivize competitors from charging a lower commission. See, e.g., SACAC ¶¶ 84, 86-88, 100.

Additionally, Plaintiffs buttress their allegations with findings of regulators from the United

States and Europe, who have investigated the anticompetitive effect of MFNs and other

contractual provisions in Amazon's agreements with third-party retailers who sell on its platform

and have concluded that such provisions "impede competition" and have "probable

anticompetitive effects." Id. ¶¶ 6, 120, 143-44, 158-62.

Amazon contends that the allegations in the complaint that a more competitive

commission would be 15% should not be credited. Specifically, Amazon argues that Plaintiffs'

use of the Smashwords' commission as a competitive benchmark is misplaced, because Plaintiffs

have misread Smashwords' website and the commission charged is about 40%. Amazon's Br. at

4-5, 17-18. Plaintiffs counter that "Smashwords charges a 15% transaction fee, and the only

exception is when the sale is originated by an affiliated marketer and Smashwords then charges

18.5%." Pls.' Br. at 13 n.21. That is borne out by statements on Smashwords' website, which

explain that when an author sells her book on Smashwords, "85% of the net proceeds go to the

author and 15% go to Smashwords."[16] Smashwords FAQ for Authors and Publishers,

Smashwords, https://www.smashwords.com/about/supportfaq#pricing [perma.cc/CG3L-VZRX];

see also id. (stating that "our commission is only 15% or less of the net," and explaining that if

the eBook sold for $10.00 on Smashwords, it earns the author "about $8.00"). But when an

author uses Smashwords to publish her book and then sells that book through another retailer's

platform, like Amazon or Barnes & Noble, the commission structure changes. Id. Under those

---

[16] The "Frequently Asked Questions" portion of Smashwords' website is referenced in the complaint and statements made on that site concerning Smashwords' commission were relied on by Plaintiffs in drafting the allegations in the complaint. See SACAC ¶ 100. The Court may therefore consider that portion of Smashwords' website on this motion to dismiss. See Cortec Indus., Inc. v. Sum Holdings, 949 F.2d 42, 47 (2d Cir. 1991) (explaining that as part of a Rule 12(b)(6) motion a court may consider any document incorporated by reference into the complaint).

circumstances, if the book sold for $10.00 through one of Smashwords "retail partners" than the author earns $6.00, the retail partner earns $3.00, and Smashwords earns $1.00. Id. (Answer in response to question: "Why can't I find any information about what Smashwords costs?"). Even under that scenario, however, Smashwords is only taking between a 10% and 15% commission and it is the retail partner claiming a 30% commission. Thus, and contrary to Amazon's argument, Smashwords itself does not take a 40% commission. In short, Plaintiffs have adequately pled anticompetitive conduct to support their monopolization and attempted monopolization claims.

For the foregoing reasons, I recommend that Amazon's motion to dismiss Counts I and II be denied as to Plaintiffs who purchased eBooks from Amazon. Those Plaintiffs have antitrust standing and have adequately pled a monopolization and attempted monopolization claim. However, I recommend that Amazon's motion to dismiss Counts I and II be granted as to Plaintiffs who did not purchase eBooks from Amazon, because those Plaintiffs lack antitrust standing to sue Amazon.

### III.  Plaintiffs' Sherman Act, Section 1 Claim

In Count IV of the Second Consolidated Amended Class Action Complaint, Plaintiffs assert a Section 1 claim against the Publishers and Amazon, alleging that they entered into agreements that "unreasonably restrained price competition for trade eBook sales to consumers." SACAC ¶¶ 258-96. Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. "Since all contracts necessarily restrain trade to some extent, this provision cannot be read literally: [O]nly 'unreasonable' restraints of trade are unlawful." In re Aluminum, 95 F. Supp. 3d at 438 (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723, (1988)). And "[t]o run afoul

of § 1, the unreasonable restraint must result from an agreement between two or more entities."
Accordingly, to state a Section 1 claim, a plaintiff must make two showings: "(i) a combination
or some form of concerted action between at least two legally distinct economic entities that (ii)
unreasonably restrains trade." United States v. Am. Express Co., 838 F.3d 179, 193 (2d Cir.
2016) (internal quotation mark and citation omitted).

"Agreements that fall within the scope of Section 1 are characterized as either
'horizontal' or 'vertical.'" In re Zinc, 155 F. Supp. 3d at 376. "A horizontal agreement is an
'agreement between competitors at the same level of the market structure,' while a vertical
agreement is a 'combination[ ] of persons at different levels of the market structure.'" Id.
(quoting United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972)). Further, "courts have
long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of
the market structure, the 'hub,' coordinates an agreement among competitors at a different level,
the 'spokes.'" Apple, 791 F.3d at 314 (citation omitted). "These arrangements consist of both
vertical agreements between the hub and each spoke and a horizontal agreement among the
spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with
[the vertical agreements] except on the understanding that the other [spokes] were agreeing to the
same thing." Id. (internal quotation marks and citation omitted). To support a Section 1 claim,
the hub-and-spoke conspiracy requires "both vertical agreements between the hub and each
spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc,
155 F. Supp. 3d at 376 (citing Apple, 791 F.3d at 314).

"The crucial question in a Section 1 case is . . . whether the challenged conduct stems
from independent decision or from an agreement, tacit or express." Mayor & City Council of
Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 135 (2d Cir. 2013) (quoting Starr v. Sony BMG

Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010)) (internal quotation marks omitted). To establish
a conspiracy in violation of Section 1, the circumstances of the alleged conspiracy "must reveal a
unity of purpose or a common design and understanding, or a meeting of minds in an unlawful
arrangement." Monsanto Co. v. Spray–Rite Service Corp., 465 U.S. 752, 764 (1984) (internal
citation and quotation marks omitted). "No formal agreement is required to constitute an antitrust
conspiracy." Ross v. Am. Express Co., 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014), aff'd sub nom.
Ross v. Citigroup, Inc., 630 F. App'x 79 (2d Cir. 2015), as corrected (Nov. 24, 2015). Rather, the
"essential combination or conspiracy in violation of the Sherman Act may be found in a course
of dealings or other circumstances as well as in any exchange of words." Am. Tobacco Co. v.
United States, 328 U.S. 781, 809-10 (1946). Courts examine the existence of a conspiracy "as a
whole" taking into consideration the totality of the evidence, as opposed to "dismembering it and
viewing its separate parts." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699
(1962) (citation omitted); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 65 (2d Cir.
2012).

An unlawful agreement to conspire may be proven through direct or circumstantial
evidence. Monsanto, 465 U.S. at 764. Circumstantial evidence of a conspiracy is evidence "that
reasonably tends to prove that the [defendant] and others had a conscious commitment to a
common scheme designed to achieve an unlawful objective" Id. (internal quotation marks and
citation omitted). Because conspiracies, by their nature, tend to form in secret, such unlawful
agreements "nearly always must be proven through inferences that may fairly be drawn from the
behavior of the alleged conspirators." Anderson News, 680 F.3d at 183 (citation omitted).

"Under Twombly, parallel conduct, such as competitors adopting similar policies around
the same time in response to similar market conditions, may constitute circumstantial evidence of

43

anticompetitive behavior." In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186,

1193 (9th Cir. 2015) (citation omitted). But a complaint that merely alleges parallel conduct

among defendants—even consciously parallel conduct—does not state a claim under Section 1.

See Twombly, 550 U.S. at 553-54. That is because "parallel conduct or interdependence, without

more," is behavior that is "consistent with conspiracy, but just as much in line with a wide swath

of rational and competitive business strategy unilaterally prompted by common perceptions of

the market." Id. at 554; Mayor & City Council, 709 F.3d at 136 (explaining that "alleging

parallel conduct alone is insufficient, even at the pleading stage" to state a Section 1 claim); In re

Musical Instruments, 798 F.3d at 1193-94 ("Allegations of facts that could just as easily suggest

rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are

insufficient to plead a § 1 violation.") (citation and internal quotation marks omitted); Bookhouse

of Stuyvesant Plaza, Inc. v. Amazon.com, 985 F. Supp. 2d 612, 619 (S.D.N.Y. 2013). Instead,

allegations of parallel conduct "gets the complaint close to stating a claim, but without some

further factual enhancement it stops short of the line between possibility and plausibility of

entitlement to relief." Twombly, 550 U.S. at 557 (international quotation marks, alteration, and

citation omitted); see also Iqbal, 556 U.S. at 678.

At the pleading stage, "when allegations of parallel conduct are set out in order to make a

§ 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement."

Twombly, 550 U.S. at 557; Starr, 592 F.3d at 323; In re Elevator Antitrust Litig., 502 F.3d 47, 50

(2d Cir. 2007). This standard does not require a plaintiff to show that the allegations suggesting

agreement "are more likely than not true or that they rule out the possibility of independent

action." Anderson News, 680 F.3d at 184. A court ruling on a motion to dismiss need not choose

among plausible interpretations of the evidence. Id. at 189-90. But a statement of facts that is

"merely consistent" with an agreement will not suffice. Twombly, 550 U.S. at 557. A complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556.

For their Section 1 claim, Plaintiffs again rely on the existence of both a horizontal conspiracy among the Publishers and a hub-and-spoke conspiracy involving Amazon. As alleged, the Publishers entered into a "horizontal agreement . . . to execute agency agreements with MFNs and other Parity Clauses and thereby suppress horizontal price competition for the sale of trade eBooks to consumers." SACAC ¶¶ 15, 271. For their hub-and-spoke conspiracy, Plaintiffs allege that Amazon, as the "common contractual party," facilitated the Publishers' "common scheme to control trade eBook prices" in the United States. Id. ¶¶ 15, 285, 287. Additionally, Plaintiffs allege the existence of a vertical restraint, in violation of Section 1, based on the agency agreements between each Publisher and Amazon. Id. ¶¶ 8, 289.

I previously concluded that dismissal of the Section 1 claim as against all Defendants was necessary because Plaintiffs had not plausibly alleged the existence of a horizontal, price-fixing conspiracy among the Publishers. See R&R at 22-43. Plaintiffs acknowledge that their revisions in the Second Consolidated Amended Class Action Complaint do not address all the grounds for dismissal identified in the prior R&R. See Pls.' Br. at 26; Amazon's Br., Ex. A. As explained below, Plaintiffs' "additional and refined allegations," Pls. Br. at 25-26, are still insufficient to plausibly plead the existence of a horizontal conspiracy between the Publishers, or a hub-and-spoke conspiracy amongst the Publishers and Amazon.

Plaintiffs also rely on the existence of a vertical restraint, based on the agency agreements between Amazon and the Publishers, to support their Section 1 claim. As explained below, under the rule of reason, which examines whether an agreement operates as an unreasonable restraint

45

of trade, Plaintiffs have not plausibly alleged that the agreements harmed competition as a whole in the relevant market. I thus recommend dismissal of Plaintiffs' Section 1 claim as against all Defendants.

A.  Plaintiffs' allegations about concerted action among the Publishers and Amazon.

Beginning with Plaintiffs' allegations of a horizontal conspiracy facilitated by Amazon, Plaintiffs allege that the Publishers agreed "to prevent competitive pricing of trade eBooks by switching to an agency model and agreeing to anticompetitive MFNs and other Parity Clauses." SACAC ¶ 260; see also id. ¶¶ 15, 62, 271. The "conspiracy" entered into, Plaintiffs allege, was "formed for the purpose and with the effect of raising the price of trade eBooks even if [the Defendants] had not explicitly agreed on the prices to be charged." Id. ¶ 268. Plaintiffs allege that the "horizontal agreement among the [Publishers] . . . to execute agency agreements with MFNs and other Parity Clauses" with Amazon "suppress[es] horizontal price competition for the sale of trade eBooks to consumers." Id. ¶ 15. Plaintiffs contend that, without assurance that all Publishers would have entered into such agreements with Amazon, adopting Amazon's MFN and other parity provisions would not have been in any individual publisher's best interest, because such provisions "caused them to lose revenue and entrench[ed] Amazon's market position." Id. ¶ 270. Amazon facilitated and supported the "horizontal agreement among the [Publishers] by coordinating a series of substantially identical agreements with the same anticompetitive terms and making clear to each of the [Publishers] that it was offering each of them a similar deal." Id. ¶¶ 15, 285-87.

1.  *Direct evidence of concerted action*

In the prior complaint, Plaintiffs relied on the fact that each Publisher entered into an agency agreement to distribute eBooks through Amazon, as direct evidence of concerted action

among Defendants. See R&R at 22; ECF No. 123 (Pls.' Br. in Opp'n) at 5-6. Plaintiffs argued that because Defendants entered into the same type of agreement that constituted an illegal price-fixing scheme in Apple, the agreements themselves were direct evidence of Defendants' conspiracy to restrain trade. R&R at 22. I concluded that those agreements were not direct evidence of a conspiracy to fix eBook prices and eliminate retail price competition, because they were themselves lawful agreements. See id. at 22-23. Consequently, the mere fact that the Publishers entered into agency agreements with Amazon was not direct evidence of a conspiracy but merely parallel conduct. Id. at 23; see also Mayor & City Council, 709 F.3d at 136 (providing example of direct evidence of a conspiracy such as "a recorded phone call in which two competitors agreed to fix prices at a certain level").

Again, Plaintiffs rely solely on the agency agreements between the Publishers and Amazon as direct evidence of a conspiracy, along with allegations concerning the prior conspiracy between the Publishers and Apple. SACAC ¶¶ 260-87. The only new allegation to support Plaintiffs' theory of concerted action is the assertion that the Publishers "refused to make a clean breast to the authorities or to publicly acknowledge and repudiate their [previously uncovered] horizontal price-fixing conspiracy" with Apple. Id. ¶ 265; see also Pls.' Br. at 29. As previously discussed, the prior price-fixing conspiracy between Apple and the Publishers does not plausibly suggest the existence of a conspiracy here between Amazon and the Publishers. R&R at 25-28. Further, a party can effectively withdraw from a conspiracy without publicly repudiating its prior behavior. See Drug Mart Pharm. Corp. v. Am. Home Prods. Corp., 288 F. Supp. 2d 325, 330 (E.D.N.Y. 2003) ("The legally effective withdrawal from a conspiracy does not require an accompanying pronouncement of mea culpa."). And although Plaintiff suggests that cessation of the conspiratorial activity alone is insufficient to demonstrate withdrawal from a

conspiracy (Pls.' Br. at 29 n.78), this ignores the allegations in the complaint that the Publishers agreed to final judgments with the United States, following the conspiracy in <u>Apple</u>, temporary restrictions imposed by those judgments, and government oversight pursuant to consent decrees. SACAC ¶¶ 103, 140-42, 265, 282. The fact that the Publishers may not have been required to admit their guilt as part of those consent decrees is not direct evidence that the conspiracy continued with an entirely new party (Amazon).

Plaintiffs nevertheless contend that the Publishers entering into similar agency agreements with Amazon was sufficient evidence to prove a horizontal conspiracy in <u>Apple</u> and should likewise be sufficient evidence of a conspiracy here. Pls.' Br. at 29-30. But as explained (<u>see</u> R&R at 22-23), it was not solely the fact that the Publishers entered into lawful distribution agreements with Apple that supported a finding of a horizontal price-fixing conspiracy in that case. Instead, it was the particular circumstances that surrounded the execution of those agreements that supported a finding of concerted action between the Publishers and Apple and rendered the agreements unlawful. <u>See</u> R&R at 22-23. The agreements there were considered with other evidence that viewed collectively established the existence of a conspiracy—such as the fact that it would have been against each Publisher's individual interest to enter into an agreement with Apple, the Publishers' near simultaneous signing of the agreements with Apple, and their constant communication regarding the negotiations with Apple. <u>Apple</u>, 791 F.3d at 318-19. All of that evidence showed that the Publishers and Apple were trying to use otherwise lawful distribution agreements for an unlawful means—to eliminate retail price competition. <u>Id.</u> And, here, as explained below, <u>see</u> <u>infra</u> 49-53, there are no similar allegations of other plus factors as existed in <u>Apple</u>.

Plaintiffs have therefore again failed to offer direct evidence of a conspiracy amongst the Publishers or the Publishers and Amazon.

### 2. Circumstantial evidence of concerted action

Where there is no direct evidence of an agreement to conspire, parallel conduct—"such as competitors adopting similar policies around the same time in response to similar market conditions," In re Musical Instruments, 798 F.3d at 1193—can be probative evidence of a conspiracy. Apex Oil v. DiMauro, 822 F.2d 246, 253 (2d Cir. 1987). And here, as was true in the prior complaint (see CAC ¶¶ 156-60), the Second Amended Consolidated Class Action Complaint alleges certain parallel conduct by the Publishers—namely, their decisions to enter "into the same anticompetitive agency agreements" with Amazon. SACAC ¶ 263; see also id. ¶¶ 151-55, 284 (detailing how the Publishers executed their individual agreements with Amazon over the course of "just eight months"). However, "alleging parallel conduct alone is insufficient even at the pleading stage" to allow a plausible inference of conspiracy. Mayor & City Council, 709 F.3d at 136. Instead, a conspiracy "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001); see also Apex Oil, 822 F.2d at 253 ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor & City Council, 709 F.3d at 136 (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544)). Such plus factors are "neither

exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might [lead a court to] infer the existence of an agreement." Id. at 136, n. 6.

Plaintiffs previously relied on the following "plus factors" as circumstantial evidence of a conspiracy amongst the Publishers. First, Plaintiffs alleged that each of the Publishers acted against their independent business interests in entering into distribution agreements with Amazon. CAC ¶ 158. Plaintiffs also alleged that the Publishers shared a common motive to collude, pointing to the Publishers' history of collusive price-fixing. Id. ¶ 157. For further support, Plaintiffs relied on the concentrated nature of the eBooks market, and argued that Defendants attempted to hide the existence of the MFN clauses in the agency agreements with Amazon. Id. ¶¶ 1, 73, 78-79, 131. Plaintiffs also pointed to the timing of the agreements, alleging that the Publishers adopted identical agreements with Amazon within the span of a few months. Id. ¶¶ 65, 67-71. Finally, Plaintiffs noted that the Publishers had opportunities to collude. Id. ¶ 159. After examining these plus factors (see R&R at 25-42), I concluded that they were "no more consistent with a conspiracy than with rational behavior independently adopted by the Publishers acting within a concentrated market." R&R at 42. I thus held that the allegations in the complaint did not plausibly suggest collusive conduct amongst the Publishers. Id. at 42-43.

The same plus factors are again relied on by Plaintiffs in the Second Amended Consolidated Class Action Complaint. The allegations, although slightly reworded, are substantively unchanged from those in the prior complaint.[17] Plaintiff have also included additional allegations to address some of the reasoning in the prior R&R. See Pls.' Br. at 26.

---

[17] Compare CAC ¶¶ 158 (action against self-interest); id. ¶ 157 (twin motives, prior history of collusive behavior); id. ¶¶ 1, 131 (market concentration); id. ¶¶ 73, 78-79 (attempt to hide the existence of MFN clauses in the agency agreements); id. ¶¶ 65, 67-71 (timing of

For example, the Second Amended Consolidated Class Action Compliant compares the eighth-month time frame in which the Publishers entered into the agency agreements with Amazon with the 18-month time frame in <u>Apple</u>. <u>See</u> SACAC ¶¶ 283-84. However, without more, such an allegation is also consistent with lawful parallel conduct. <u>Mayor & City Council</u>, 709 F.3d at 136.

Plaintiffs now also point to an additional case, <u>United States v. Bertelsmann SE & Co.</u>, No. 21-CV-2886 (FYP), 2022 WL 16949715 (D.D.C. Nov. 7, 2022), to bolster the plus factor pertaining to prior collusive conduct. SACAC ¶¶ 168-78, 280. But the outcome in that case does not make Plaintiffs' allegations that the Publishers had to act collectively here any more plausible. The observations by the court in <u>Bertelsmann</u> did not arise in the context of a Section 1, Sherman Act claim. Instead, the court was analyzing whether a proposed merger of two of the Publishers could lead to a "substantial lessening of competition" under Section 7 of the Clayton Act be. <u>See</u> 2022 WL 16748157 at *23, 27-28. And under the Clayton Act, the court was required to assess whether the merge increased the likelihood of "coordinated effects" resulting from "parallel accommodating conduct among competitors without a prior agreement." <u>Id.</u> at *27 (citation and internal quotation marks omitted). Further, the court in <u>Bertelsmann</u> was analyzing a different relevant market—the market for acquiring rights to anticipated top-selling books. <u>Id.</u> at *12.

Finally, Plaintiffs assert that their new allegations better explain why the Publishers had a common motive to collude, because it was not in each Publishers self-interest to enter into an

---

execution of agreement); <u>id.</u> ¶ 159 (opportunity to collude) <u>with</u> SACAC ¶¶ 270 (action against self-interest); <u>id.</u> ¶ 269 (twin motives, prior history of collusive behavior); <u>id.</u> ¶ 280 (market concentration); <u>id.</u> ¶ 282 (deliberate mislabeling of MFN provisions); <u>id.</u> ¶ 284 (timing of agreements); <u>id.</u> ¶ 277 (opportunity to collude).

agency agreement with Amazon, absent collective action. Pls.' Br. at 25-26, 31-32. The Second Consolidated Amended Class Action Complaint alleges that it would have been contrary to the self-interest of each Publisher to enter into an agreement with Amazon (absent collective action), because the other Publishers could forgo distribution through Amazon and offer their eBooks to consumers at better prices on other retail platforms. See SACAC ¶¶ 15, 270. However, as I previously explained (see R&R at 28-31), the allegations in the complaint provide ample reasons why each Publisher could have independently sought a distribution agreement with Amazon, even with the restrictions the agreement imposed on it. See, e.g., SACAC ¶ 55 (explaining that because Amazon is the largest retailer in the United States, the Publishers feel "market pressure to distribute through Amazon"). Indeed, as I previously found (see R&R at 29-30), the Publishers were dealing with a dominant eBook retailer who "account[s] for nearly 90%" of eBook sales. SACAC ¶ 1. That allegation alone explains why each Publisher could have individually wanted a distribution agreement with Amazon and would not have risked forgoing such an agreement for the ability to sell its eBooks at a higher price through one of Amazon's competitors, which, as alleged in the complaint, account for at most approximately 6.3% of eBook sales. See SACAC ¶ 51 n.28 (citing article from 2018 which explains that Amazon has 89% of eBook sales, Apple accounts for 6.3% of eBooks sales and all other platforms account for 4.8% of eBook sales).

Additionally, although Plaintiffs contend that each Publisher would have been better off returning to the traditional wholesale pricing model that existed prior to the conspiracy in Apple (see Pls.' Br. at 31), Plaintiffs ignore that Amazon was already using the agency model at the time the operative agreements were executed (SACAC ¶ 2). Given that in Apple, a "coordinated effort" by the Publishers was required to force Amazon to switch its pricing model (SACAC ¶¶

124-28, 134), the complaint provides no factual allegations from which to plausibly infer that a single Publisher could have forced Amazon to switch its pricing back to the wholesale model.

In sum, Plaintiffs' allegations—however restyled or "refined"—are not substantially different from the allegations in the prior complaint and are therefore insufficient to support a finding of a conspiracy. Consequently, for the same reasons indicated in the prior R&R (see R&R at 24-43), Plaintiffs have not plausibly alleged circumstantial evidence of a conspiracy. Further, in the absence of new allegations, my prior conclusion about the inadequacy of these allegations remains the law of the case. See, e.g., Arizona v. California, 460 U.S. 605, 618 (1983) ("When a court decided upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); see also Weslowski v. Zugibe, 96 F. Supp. 3d 308, 315–18 (S.D.N.Y.), aff'd, 626 F. App'x 20 (2d Cir. 2015) (explaining that where amended complaint "is in large part identical to Plaintiffs' first Complaint, the law of the case doctrine counsels against reconsideration of the [] dismissal of the first Complaint") (citing State Farm Mut. Auto. Ins. Co. v. Mallela, No. 00–CV–4923, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002)).

In short, Plaintiffs have not added any new allegations to support a plausible inference of a conspiracy amongst the Publishers or between Amazon and the Publishers. As such, Plaintiffs have still not adequately alleged the existence of a horizontal price-fixing conspiracy or a hub-and-spoke conspiracy involving Defendants.[18]

---

[18] "[A] hub-and-soke theory is cognizable under Section 1 only if there are *both* vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." In re Zinc, 155 F. Supp. at 376 (citing Apple, 791 F.3d at 314) (emphasis added).

B.  <u>Plaintiffs' allegations concerning a vertical agreement.</u>

Plaintiffs also allege a "vertical" restraint in violation of Section 1, based on the

individual agency agreements between each Publisher and Amazon. <u>See</u> SACAC ¶ 289. The

agency agreements are sufficient to satisfy the first prong of a Section 1 claim, which requires

"(1) a combination or some form of concerted action between at least two legally distinct

economic entities." <u>Tops Mkts., Inc. v. Quality Mkts., Inc.,</u> 142 F.3d 90, 95-96 (2d Cir. 1988); <u>see</u>

<u>also</u> <u>Frame-Wilson</u>, 591 F. Supp. 3d at 988 (plaintiffs must establish that "an agreement exists"

as the first element of a Section 1 claim); <u>Wellnx Life Sciences Inc. v. Iovate Health Sciences</u>

<u>Research Inc.</u>, 516 F. Supp. 2d 270, 288-89 (S.D.N.Y. 2007).

C.  <u>Plaintiffs have not plausibly alleged that the agency agreements between Amazon and</u>
<u>the Publishers pose an unreasonable restraint of trade under the rule of reason.</u>

A vertical restraint, like the agency agreements at issue here, is typically analyzed under

the rule of reason. <u>See</u> <u>In re Elec. Books Antitrust Litig.</u>, 859 F. Supp. 2d 671, 682 (S.D.N.Y.

2012); <u>see also</u> <u>Pepsico</u>, 315 F.3d at 110-11 (holding that absent evidence of an agreement

between distributors, the conspiracy was vertical and applying the rule of reason). Under the rule

of reason, a plaintiff seeking to allege an antitrust violation must initially show that the

challenged action adversely effected competition as a whole in the relevant market. <u>Tops Mkts.</u>,

142 F.3d at 96; <u>see also</u> <u>Wellnx</u>, 516 F. Supp. 2d at 293 ("Under the rule of reason, the plaintiff

must show that defendants' challenged behavior had an *actual* adverse effect on competition as a

whole in the relevant market.") (internal quotation marks omitted) (quoting <u>Geneva Pharm.</u>

<u>Tech.</u>, 386 F.3d at 506-07). To show an adverse effect on competition, a plaintiff "may offer

direct evidence of harm to competition by proving higher prices, reduced output, or lower quality

in the market as a whole." <u>MacDermid Printing Sols. LLC v. Cortron Corp.</u>, 833 F.3d 172, 182

(2d Cir. 2016) (citation omitted). Alternatively, a plaintiff "may demonstrate an adverse effect

indirectly by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition." Id. (quoting Tops Mkts., 142 F.3d at 97); see also Amex, 138 S. Ct. at 2284; In re Google Digital Advertising Antitrust Litig., 627 F. Supp. 3d 346, 376 (S.D.N.Y. 2022) (citations and internal quotation marks omitted). Market power "is the ability to raise price significantly above the competitive level without losing all of one's business and may be established by a showing of sufficient market share." Bookhouse, 985 F. Supp. 2d at 620 (internal citations and quotation marks omitted); see also Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 265 (2d Cir. 2001) ("Market power" is the "ability of a single seller to raise price[s] and restrict output.") (alteration in original and citation omitted).

The Publishers argue that Plaintiffs have failed to allege market-wide harm to competition because the compliant does not plausibly allege that any individual agreement between a Publisher and Amazon harmed competition in the entire market. See ECF No. 191 ("Publishers' Br.") at 15; ECF No. 203 ("Publishers' Reply Br.") at 8. As was the case before, the Second Consolidated Amended Class Action Complaint again pleads market-wide anticompetitive effect by pointing to the rise in prices for eBooks after each Publisher entered into its agency agreement with Amazon. Compare CAC ¶¶ 97-101 with SACAC ¶¶ 102, 106-13. Citing to the lower court decision in Apple, Plaintiffs argue that allegations that the agency agreements caused eBook prices to rise to anticompetitive levels—as is alleged here—was sufficient to plead an adverse effect on competition. Pls.' Br. at 39-40. But in Apple, the court found evidence of a horizontal conspiracy among the Publishers and between the Publishers and

Apple.[19] In re Elec. Books, 859 F. Supp. 2d at 685-686. And as I explained previously, absent evidence of a conspiracy, the complaint does not plausibly allege that a single Publisher's agreement with Amazon could have had a market-wide effect on the price of trade eBooks. See R&R at 46. Each Publisher controls the price of only its books (SACAC ¶¶ 2, 5), and no Publisher has a market share greater than, at most, 35%. Id. ¶¶ 56.

Plaintiffs also contend that they have plausibly alleged an adverse effect on competition through indirect evidence—specifically, proof of market power plus allegations that consumer prices have increased to anticompetitive levels. Pls.' Br. at 40-43. To support that argument, Plaintiffs rely on the allegations that the Publishers account for 80% of all trade books in the United States and Amazon accounts for 90% of all eBooks sales. SACAC ¶¶ 1, 1 n.3, 56, 226, 290. But Plaintiffs are again aggregating the market share of each Publisher and of Amazon's sales for each Publisher to show market power. Relying on Bookhouse, 985 F. Supp. 2d at 622, I previously concluded that aggregation was inappropriate absent evidence of a conspiracy. See R&R at 46-47.

Plaintiffs assert that I was mistaken, but the cases they rely on are all distinguishable, because those cases all concerned some type of exclusive dealing agreement.[20] See Standard Oil Co. v. U.S., 337 U.S. 293, 313 (1948) (aggregating the effect of separate vertical exclusive

---

[19] Plaintiffs also rely on Todd v. Exxon Corporation (Pls.' Br. at 40 n.101), but a horizontal conspiracy also existed in that case. See Todd, 275 F.3d at 214.

[20] Plaintiffs also cite to the leading antitrust treatise to argue that the authors agree that under the rule of reason, a defendant's vertical agreements are aggregated to examine their anticompetitive effects. Pls.' Br. at 42 n.106. But, here, too, the agreements discussed in the section of the treatise cited by Plaintiffs were tying or exclusive dealing agreements. See Phillip E. Areeda & Herbert Hovencamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 310(c)(1) (4th ed. 2014) (discussing how aggregation is to be applied in the context of distinct tying or exclusive dealing contracts).

56

dealing agreements); <u>Fortner Enters., Inc. v. U.S. Steel Corp.</u>, 394 U.S. 495, 502 (1969)

(evaluating the aggregate effect of a series of tying arrangements); <u>PepsiCo., Inc.</u>, 315 F.3d at

111 (aggregating the effect of vertical agreements that contained loyalty and exclusivity

provisions).[21]

  Here, by contrast, there are no allegations that the vertical agreements between Amazon

and the Publishers limit any Publishers' ability to sell its eBooks through retailers other than

Amazon (<u>see, e.g.</u>, SACAC ¶ 5). Further, at oral argument, Plaintiffs acknowledged that "there is

an open question in the case law" as to whether aggregation of each Publisher's market share is

appropriate in assessing the effects of the Publishers' agreements with Amazon.[22] <u>See</u> 7/21/23

Tr. at 6. In short, Plaintiffs have pointed to no case that would indicate that aggregation of each

---

[21] <u>See also</u> <u>Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.</u>, 676 F.2d 1291, 1302 (9th Cir. 1982) (aggregating effect of exclusive dealing arrangements); <u>U.S. v. Microsoft Corp.</u>, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (aggregating the effect of tying arrangements); <u>Orchard Supply Hardware, LLC v. Home Depot USA, Inc.</u>, 967 F. Supp. 2d 1347, 1360-62 (N.D. Cal. 2013) (aggregating effects of exclusive dealing agreements); <u>Keurig</u>, 383 F. Supp. 3d at 245 (aggregation in the context of exclusive dealing agreements); <u>Wellnx</u>, 516 F. Supp. 2d at 293 (aggregating the effects of exclusive distribution agreements); <u>Applied Med. Res. Corp. v. Johnson & Johnson</u>, No. 03-CV-1329 (JVS), 2004 U.S. Dist. LEXIS 29409, at *12-13 (C.D. Cal. Feb. 23, 2004) (aggregating the effects of exclusive dealing contracts); <u>Genico, Inc. v. Ethicon, Inc.</u>, No. 04-CV-229 (DF), 2006 WL 7134667, at *3 (E.D. Tex. Mar. 23, 2006) (aggregating the effects of exclusive contracts). And <u>Sitts v. Dairy Farmers of Am., Inc.</u>, 417 F. Supp. 3d 433, 469-70 (D. Vt. 2019), relied on by Plaintiffs is distinguishable for another reason: the allegations established the existence of a conspiracy.

[22] For the first time at oral argument, Plaintiffs pointed to Penguin Random House and its market share of 30 to 35% to argue that aggregation would not be required to allow a Section 1 claim to proceed as against Penguin Random House under a rule of reason analysis. <u>See</u> 7/21/23 Tr. at 9. Because that contention was raised for the first time at oral argument, I do not address it fully here. <u>See id.</u> 10-16. I note, however, that even if the allegation as to Penguin Random House's market share were credited, a market share of between 30 and 40% does not lead to an inference of market power, as is necessary to adequately plead a market-wide effect. <u>See</u> <u>Bookhouse</u>, 985 F. Supp. 2d at 622.

Publishers' market share is appropriate to assess market power or the market-wide effect of conduct where, as here, the vertical restraint is not alleged to be an exclusive dealing agreement.

Thus, whether viewed as a horizontal conspiracy or a vertical restraint, Plaintiffs have not plausibly alleged a violation of Section 1 of the Sherman Act. I thus recommend that Count IV of the Second Consolidated Amended Class Action Complaint be dismissed.

### IV.  Plaintiffs' Sherman Action, Section 2 Conspiracy to Monopolize Claim

In Count III, Plaintiffs allege a Conspiracy to Monopolize under Section 2 of the Sherman Act against Amazon and the Publishers. See SACAC ¶¶ 244-57. A Section 2 conspiracy to monopolize claim requires allegations from which to plausibly infer "concerted action." See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 246 (2d Cir. 1997). As discussed, Plaintiffs have failed to allege facts from which to infer that a conspiracy existed. Therefore, I recommend that Count III also be dismissed.

**CONCLUSION**

For the foregoing reasons, I respectfully recommend that Amazon's Motion to Dismiss be **DENIED** as to the Sherman Act, Section 2 Monopolization and Attempted Monopolization claims in Counts I and II. I further recommend that Amazon's and the Publishers' Motions to Dismiss be **GRANTED** as to the Sherman Act, Section 1 claim in Count IV and the Sherman Act 2 Conspiracy to Monopolize claim in Count III.

Date: July 31, 2023
New York, New York

Respectfully submitted,

_____
VALERIE FIGUEREDO
United States Magistrate Judge

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Analisa Torres. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**