**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMAZON.COM, INC. EBOOK ANTITRUST LITIGATION | No. 1:21-cv-351-GHW-VF<br><br>**PLAINTIFFS' OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.   THE COURT SHOULD AGGREGATE THE MARKET EFFECT OF
     ALL AMAZON'S VERTICAL PARITY AGREEMENTS WITH THE
     PUBLISHER DEFENDANTS .................................................................................2

II.  PLAINTIFFS WHO PURCHASED EBOOKS ON COMPETING
     PLATFORMS ARE DIRECT PURCHASERS WITH ANTITRUST
     STANDING ..............................................................................................................8

III. PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR CLAIMS
     AGAINST THE PUBLISHER DEFENDANTS ....................................................11

     A.   Plaintiffs Adequately Plead Direct Evidence of a Hub-And-Spoke
          Conspiracy ......................................................................................................12

     B.   Plaintiffs Adequately Plead Circumstantial Evidence of a Horizontal
          Conspiracy ......................................................................................................15

          1.   The Publisher Defendants had a common motive to collude. .......................17

          2.   The Publisher Defendants engaged in prior (and ongoing)
               collusive conduct. ...........................................................................................18

          3.   The collusive conduct was facilitated by market
               concentration. ..................................................................................................19

          4.   The Defendants raise prices despite no rise in costs. ....................................21

          5.   The Defendants deliberately mislabeled the parity provisions. .....................21

          6.   All Publisher Defendants executed their pricing agreements
               within months. .................................................................................................22

          7.   The Defendants had the opportunity to collude. ............................................22

     C.   Plaintiffs Adequately Plead Rule-of-Reason Claims Against The
          Publisher Defendants ......................................................................................23

CONCLUSION .................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson News L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) ........................................................................................................ 12

*Apple, Inc. v. Pepper,*
139 S. Ct. 1514 (2019) ........................................................................................................... 8, 10

*Med. Res. Corp. v. Johnson & Johnson*
2004 U.S. Dist. LEXIS 29409 (C.D. Cal. Feb. 23, 2004) ......................................................... 23

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ................................................................................................................... 11

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................................... 11

*In re Blood Reagents Antitrust Litig.,*
266 F. Supp. 3d 750 (E.D. Pa. 2017) ......................................................................................... 22

*Bookhouse of Stuyvesant Plaza v. Amazon.com, Inc.,*
985 F. Supp. 2d 612 (S.D.N.Y. 2013) .......................................................................................... 6

*Catania v. United Fed'n of Teachers,*
2022 U.S. Dist. LEXIS 45016 (S.D.N.Y. Mar. 12, 2022) ........................................................... 2

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962) .............................................................................................................. 12, 14

*De Coster v. Amazon.com, Inc.,*
2023 U.S. Dist. LEXIS 12365 (W.D. Wash. Jan. 24, 2023) ....................................................... 6

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002) ....................................................................................................... 5

*In re Elec. Books Antitrust Litig.,*
859 F. Supp. 2d 671 (S.D.N.Y. 2012) ........................................................................................ 18

*In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.,*
681 F. Supp. 2d 141 (D. Conn. 2009) ........................................................................................ 22

*Fortner Enters., Inc. v. United States Steel Corp.,*
394 U.S. 495 (1969) ..................................................................................................................... 4

*Frame-Wilson v. Amazon.com, Inc.,*
591 F. Supp. 3d 975 (W.D. Wash. 2022) .................................................................................... 9

*Frame-Wilson v. Amazon.com, Inc.*,
--- F. Supp. 3d ---, 2023 WL 2632513 (W.D. Wash. Mar. 23, 2023) ................................... 6

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) .......................................................................................... 11, 12

*Genico, Inc. v. Ethicon, Inc.*,
2006 U.S. Dist. LEXIS 96909 (E.D. Tex. Mar. 23, 2006) ............................................... 23

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ............................................................................................................ 8

*Interstate Circuit, Inc. v. U.S.*,
306 U.S. 208 (1939) .......................................................................................................... 22

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) ............................................................................... 5

*Laumann v. NHL*,
907 F. Supp. 2d 465 (S.D.N.Y. 2012) .................................................................. 10, 11, 15

*Loeb Indus. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) .......................................................................................... 8, 9

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ............................................................................................ 11

*In re NASDAQ Market-Makers Antitrust Litig.*,
894 F. Supp. 703 (S.D.N.Y. 1995) ................................................................................... 21

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) .................................................................................................... 4, 5

*Orchard Supply Hardware, LLC v. Home Depot USA, Inc.*,
967 F. Supp. 2d 1347 (N.D. Cal. 2013) ............................................................................ 5

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002) .............................................................................................. 5

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ........................................................................................... 22

*Sitts v. Dairy Farmers of Am., Inc.*,
417 F. Supp. 3d 433 (D. Vt. 2019) .................................................................................... 5

*Standard Oil Co. v. United States*,
337 U.S. 293 (1949) ............................................................................................................ 4

*Starr v. Sony BMG Music Entm't,*
   592 F.3d 314 (2d Cir. 2010) ...................................................................................*passim*

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*
   676 F.2d 1291 (9th Cir. 1982) .............................................................................. 6

*U.S. v. Apple Inc.,*
   952 F. Supp. 2d 638 (S.D.N.Y. 2013).....................................................................*passim*

*U.S. v. Esposito,*
   2021 WL 5492935 (2d Cir. Nov. 23, 2021) ............................................................ 13

*U.S. v. Greenfield,*
   44 F.3d 1141 (2d Cir. 1995) ................................................................................ 13

*Wellnx Life Sci. Inc. v. Iovate Health Sci. Research Inc.,*
   516 F. Supp. 2d 270 (S.D.N.Y. 2007)..................................................................... 6

*In re Zinc Antitrust Litig.,*
   155 F. Supp. 3d 337 (S.D.N.Y. 2016)..................................................................... 15

## STATUTES

28 U.S.C. § 636(b)(1)(C) ............................................................................................. 2

## OTHER AUTHORITIES

Fed. R. Civ. P. 72(b)(3) ............................................................................................. 2

Areeda & Hovenkamp, Antitrust Law ¶ 1421b2 (4th ed. 2017) ................................. 18

Hovenkamp, *Antitrust Law Vol. II*, ¶310(c) (5th Ed. 2021) ....................................... 4

Richard A. Posner, ANTITRUST LAW (2d ed. 2001) ................................................... 21

## INTRODUCTION

Amazon is the dominant retail distribution platform for consumer eBook purchases, and it maintains its dominance through parity agreements with publishers that block other eBook platforms from competing with Amazon's platform. The resulting harms to competition are manifold: Prices for eBooks have risen. Output has declined. Transaction fees on eBook platforms grossly exceed costs and competitive rates. Consumer choice has been limited. Product innovation has been stunted.

As set forth in Plaintiffs' Second Consolidated Amended Complaint (SCAC), government investigators and antitrust commentators agree that the root cause of these harms are Amazon's anticompetitive agreements that allow Amazon (among other things) to charge supracompetitive transaction fees for purchases on its eBook platform. The Court should adopt the Magistrate Judge's recommendation that Section 2 claims against Amazon, brought by Plaintiffs who purchased eBooks on Amazon's platform, should not be dismissed. (ECF 212 at 15–34, 37–41.) Plaintiffs respectfully object, however, to certain other conclusions in the R&R. **First**, in Section I *infra*, Plaintiffs object to the Magistrate Judge's conclusion that Amazon is not also liable under Section 1 of the Sherman Act, when the aggregate effect of its parity agreements is no different from Amazon's abuse of monopoly power in the same market. (R&R at 56–58.) **Second**, in Section II *infra*, Plaintiffs object to the conclusion that Plaintiffs who bought eBooks on platforms that compete with Amazon (like Barnes & Noble) lack antitrust standing. (R&R at 34–37.) **Third**, in Section III *infra*, Plaintiffs object to the conclusion that Plaintiffs have not adequately pleaded a *per se* horizontal conspiracy or rule-of-reason claim under which the Publisher Defendants agreed to the anticompetitive distribution agreements with Amazon. (R&R at 41–53.)

**ARGUMENT**

"The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."[1]

**I.     THE COURT SHOULD AGGREGATE THE MARKET EFFECT OF ALL AMAZON'S VERTICAL PARITY AGREEMENTS WITH THE PUBLISHER DEFENDANTS**

Plaintiffs allege that Amazon's eBook distribution agreements, including with each of the "Big Five" Publisher Defendants, contain anticompetitive parity clauses. Because Plaintiffs adequately allege the market-wide anticompetitive effects of these clauses, Plaintiffs respectfully object to the Magistrate Judge's conclusion that it is inappropriate to consider their aggregate impact for purposes of evaluating Plaintiffs' Section 1 rule-of-reason claim against Amazon. (SCAC ¶¶ 7–16, 56–115.)

By agreement, Amazon distributes the publishers' eBooks under an "agency model." (R&R at 3.) Under that model, Amazon provides platform distribution services to connect the sellers (publishers) and the buyers (Plaintiffs), from whom Amazon extracts supracompetitive transaction fees. (R&R at 3–4.) Amazon's parity agreements enable it to charge supracompetitive fees because the agreements prevent any competing platform from offering prices for the Publisher Defendant's eBooks that are lower than the price on Amazon. (R&R at 4–7.)[2] As the SCAC alleges, it costs Amazon on average only $0.06 to deliver each eBook, plus Amazon's low transaction-processing costs. (¶ 4; *see*

---

[1] Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *Catania v. United Fed'n of Teachers*, 2022 U.S. Dist. LEXIS 45016, at *4 (S.D.N.Y. Mar. 12, 2022) (conducting de novo review and rejecting report and recommendation).

[2] While the consent decrees prohibited the Publisher Defendants from agreeing to explicit price-parity clauses, the European Commission found that their contracts with Amazon included notification provisions that function as full-fledged price-parity provisions because once notified of lower prices on competing platforms Amazon explicitly threatens to punish publishers if they do not offer the same lower price on Amazon's platform. (SCAC ¶¶ 89, 91, 93; *see also* R&R at 6–7.)

*also* R&R at 4.) Yet Amazon charges a 40% or more fee on each consumer's purchase (e.g., $8 on a $20 eBook), a sum that vastly exceeds its transaction costs and drastically increases the purchase price (SCAC ¶¶ 3–4; *see also* R&R at 4.) Amazon could not charge such high fees in a competitive market, where other platforms would be expected to lower their fees to encourage publishers to sell eBooks at reduced prices on the competitor's platform. (SCAC ¶¶ 3–4.) But because Amazon does not allow lower eBook prices on competing platforms, Amazon continues to dominate the retail market for distribution of trade eBooks, with nearly 90% of those transactions occurring on its platform. (SCAC ¶ 1; *see also* R&R at 3.)

In addition to price parity provisions that raise trade eBooks prices across all platforms, Amazon's agreements also contain other parity provisions, which have stunted innovation from all publishers, decreased overall market output, and reduced choices available throughout the market. (SCAC ¶¶ 57–115.) Amazon's "Business Model" parity clause reduces publishers' "incentives to support and invest in alternative new and innovative business models." (SCAC ¶ 61 (quoting EC Decision[3] ¶ 22); *see also* R&R at 5–6.) This reduces the "ability and incentives" of Amazon's competitors "to develop and differentiate their eBook offerings through" alternative business models (like rentals, bundling with physical books, book clubs, streaming, or reduced prices for partial downloads), which hinders the emergence of alternative distribution models and fortifies Amazon's dominance. (SCAC ¶ 61; *see also* R&R at 5–6.) Amazon also uses its "Selection" parity clauses to prohibit publishers from offering early releases or enhanced eBooks features not supported by Amazon's Kindle e-readers on competing platforms. By eliminating even short windows of exclusivity

---

[3] European Commission, Directorate General for Competition, Case AT.40153 EBook MFNs and related matters (Amazon), https://ec.europa.eu/competition/antitrust/cases/dec_docs/40153/40153_4392_3.pdf.

that a publisher might grant to a competing eBook retailer, Amazon reduces the incentives of market participants to develop innovative eBook features and functions. (SCAC ¶¶ 70–72; *see also* R&R at 6.)

As the Magistrate Judge explained, to prove a rule-of-reason violation under Section 1, Plaintiffs must show a "market-wide anticompetitive effect." (R&R at 55.) Plaintiffs' multifaceted allegations of market-wide impact are sufficient to hold Amazon liable for the aggregate impact of its agreements, as a matter of law. As the leading treatise explains, when multiple contracts in the aggregate would foreclose a significant portion of the market, "it clearly would be improper for the court to examine each agreement with the same defendant separately, conclude that each agreement standing alone is insufficient to establish liability, and dismiss the complaint without considering the impact of aggregation."[4] Yet that is precisely the approach the Magistrate Judge recommends on the mistaken premise that, absent a horizontal conspiracy among the Publisher Defendants, it was "inappropriate" to aggregate the effects of all publisher agreements. (R&R at 56–58.)

In *Fortner Enterprises, Inc. v. United States Steel Corp.*, which raised no allegations of horizontal conspiracy, the Supreme Court expressly rejected the Magistrate Judge's approach, holding that "a narrow focus on the volume of commerce foreclosed by the particular contract or contracts in suit *would not* be appropriate" in determining whether that defendant violated the antitrust laws.[5] The Magistrate Judge's approach is also contrary to *Standard Oil Co. v. United States*, where despite no allegation of a horizontal agreement, the Supreme Court also considered the aggregate effect of 5,937 independent vertical dealing agreements between Standard Oil and 5,937 independent gas stations.[6] More recently, in *Ohio v. American Express Co.*, the Supreme Court held that plaintiffs, alleging only vertical restraints, could have prevailed against Amex by showing that the aggregated effect of its 3.4

---

[4] Hovenkamp, *Antitrust Law Vol. II*, ¶310(c), at 241–42 (5th Ed. 2021).

[5] 394 U.S. 495, 502 (1969) (emphasis added).

[6] 337 U.S. 293, 313 (1949).

million independent vertical agreements with merchants was to "increase the cost of credit card transactions above a competitive level, reduced the number of credit card transactions or otherwise stifled competition."[7] And in *PepsiCo, Inc. v. Coca-Cola Co.*, the Second Circuit aggregated the effects of 377 vertical agreements and found that, because they collectively constituted less than 19% of the market, the rule of reason was not violated.[8] Other courts have followed suit.[9] For example, in *Orchard Supply Hardware, LLC v. Home Depot USA, Inc.*,[10] the court applied this well-settled precedent to hold that "aggregating the effects of [the vertical agreements] is appropriate for the purpose of showing the Defendant Home Depot's conduct was anticompetitive."[11]

While acknowledging this well-settled authority, the Magistrate Judge concluded, without citing any authority, that the decisions supporting aggregated effects "are all distinguishable because those cases all concerned some type of exclusive dealing agreement." (R&R at 56.) This is incorrect. In *Fortner*, the Supreme Court aggregated the effects of tying (i.e., not exclusive dealing) agreements and in *American Express*, the Supreme Court considered the aggregate effect of millions of anti-steering vertical agreements under rule of reason. More recently in *Frame-Wilson v. Amazon*, which like the SCAC alleges the anticompetitive impact of a series of vertical parity agreements, a federal court

---

[7] 138 S. Ct. 2274, 2281, 2287 (2018).

[8] 315 F.3d 101, 111 (2d Cir. 2002).

[9] *See Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 470 (D. Vt. 2019) (rejecting the argument that the court had to "examine each agreement with each alleged co-conspirator independently" because "the Supreme Court has rejected that approach"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 245 (S.D.N.Y. 2019) (holding that a series of vertical agreement with distributors could violate the rule of reason even though no individual distribution was alleged to have market power or a high market share).

[10] 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013).

[11] In *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207, 210 (4th Cir. 2002), the court did not allow aggregation, but *Dickson* has been repeatedly distinguished as a case that alleged "discrete" and separate conspiracies and did not allege "that each Defendants agreements considered in the aggregate have anticompetitive effects." *Orchard Supply*, 967 F. Supp. 2d at 1361; *see also Sitts*, 417 F. Supp. 3d at 467–68 (same).

aggregated the impact of millions of parity agreements against Amazon itself.[12] In that case, consumers who purchased goods from online sites that compete with Amazon sued Amazon for overcharges caused by its anticompetitive agreements with the third-party sellers that sold their goods on Amazon's platform. Amazon argued there—as it does here—that the market effects of its vertical agreements could not be aggregated and that plaintiffs had to allege that "each agreement with a third party seller is likely to result in an anticompetitive effect."[13] The court rejected that argument, holding that it is proper to "consider the overall effects of a defendant's conduct in the relevant market" and that the court "was not limited to looking at the market implications of the one contract."[14]

Against the weight of this authority, the Magistrate Judge relied on *Bookhouse of Stuyvesant Plaza v. Amazon.com, Inc.* for the proposition that the effects of vertical agreements cannot be aggregated.[15] (R&R at 56–58.) But not only does *Bookhouse* fail to address the controlling Supreme Court and Second Circuit authority on aggregation, it is far from clear that the decision it relies on, *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, supports its ruling against aggregation, given that the *Wellnx* court in fact aggregated the effects of vertical agreements when it held that they excluded the plaintiff from only 70% of the market.[16] To the extent that the *Wellnx* court also held that the plaintiff had not established that either defendant in that case independently had sufficient market power,[17] that does

---

[12] --- F. Supp. 3d ---, 2023 WL 2632513, at *7 (W.D. Wash. March 23, 2023) (citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982)). *Twin City* relied on *Fortner* and *Standard Oil* in holding that "it was proper for the district court to have aggregated [defendant's] contracts … in order to assess the Sherman Act violations resulting from those contracts." 676 F.2d at 1303.

[13] *Frame-Wilson,* 2023 WL 2632513, at *6.

[14] *Id.,* at *7 (citation omitted). *See also De Coster v. Amazon.com, Inc.*, 2023 U.S. Dist. LEXIS 12365, at *12–15 (W.D. Wash. Jan. 24, 2023) (holding that Amazon could violate rule of reason by entering into millions of price parity agreements third-party sellers).

[15] 985 F. Supp. 2d 612 (S.D.N.Y. 2013).

[16] 516 F. Supp. 2d 270, 293–94 (S.D.N.Y. 2007).

[17] *Id.*

not square with the Magistrate Judge's recommendation that aggregate effects should be considered in the case of exclusive dealing arrangements, which was precisely the subject of the *Wellnx* case.

In short, there is no authority for the Magistrate Judge's conclusion that aggregation is proper only in cases that involve exclusive dealing. The Magistrate Judge's alternative recommendation: that aggregation was improper because Amazon's vertical agreements did not prevent the publishers from selling eBooks on other platforms, (R&R at 57), focuses on the wrong harm. Plaintiffs allege that Amazon's vertical agreements prevented *other retail platforms* from competing with Amazon. Indeed, the destruction of horizontal price competition in this case—along with the destruction of competition with respect to business models or innovative eBooks features—is every bit as anticompetitive as exclusive dealing: increasing the market price of the Publisher Defendants' eBooks, reducing market-wide output, and limiting the number of meaningful choices consumers have in their consumption of trade eBooks. (SCAC ¶ 291.)

Finally, the R&R incorrectly states that Plaintiffs conceded at oral argument "that 'there is an open question in the cases' as to whether aggregation of each Publisher's market share is appropriate in assessing the effects of the Publishers' agreements with Amazon." (R&R at 57 (quoting 7/23/2023 Transcr. at 6:10–14).) On the contrary, when asked the following question: "if we assume" that aggregation is proper, "does the claim survive only as against Amazon, or does it survive against every defendant?" (7/23/2023 Transcr. at 5:10–14), Counsel's response to the Magistrate Judge's question about Amazon was unequivocal: "To start, yes, it would certainly survive against Amazon… . [T]he case law squarely holds that the aggregation theory holds against Amazon." (*Id.* at 5:18–19, 6:11–13.) The only "open question" acknowledged by Plaintiffs' counsel was whether aggregation was properly applied to the individual partners to Amazon's serial agreements (the Publisher Defendants), an issue that the *Standard Oil* and *Fortner* cases did not address. (*Id.* at 6:12–14 ("As for the *publishers*, we concede that there is an open question in the case law.") (emphasis added).)

Plaintiffs respectfully submit that aggregation should have been applied against Amazon and that their claims under Section 1 of the Sherman Act should not be dismissed.

## II.   PLAINTIFFS WHO PURCHASED EBOOKS ON COMPETING PLATFORMS ARE DIRECT PURCHASERS WITH ANTITRUST STANDING

The Magistrate Judge correctly concluded that Plaintiffs alleged a "prototypical example of antitrust injury" and that higher consumer prices caused by the elimination of retail competition is "'plainly' the type of injury the antitrust laws were intended to prevent." (R&R at 22.) The Magistrate Judge also properly credited Plaintiffs' allegations that the challenged agreements caused higher eBook prices for consumers "across all the electronic-retail platforms." (R&R at 34.) But the Magistrate Judge nevertheless concluded that any Plaintiffs who purchased from the Publisher Defendants on a platform other than Amazon's are indirect purchasers that lack standing to sue under *Illinois Brick Co. v. Illinois*.[18] That conclusion is incorrect. Privity is not a necessary element of standing, and the Magistrate Judge was incorrect to require it.[19]

In *Illinois Brick*, the Supreme Court held that only "the overcharged direct purchaser and not others in the chain of manufacture or distribution" can sue for damages.[20] *Apple, Inc. v. Pepper* further clarifies that *Illinois Brick* "drew a bright line that allowed direct purchasers to sue but barred indirect purchasers from suing. When there is no intermediary between the purchaser and the antitrust violator, the purchaser may sue."[21] Notably, the *Pepper* Court cited with approval the Seventh Circuit's interpretation of *Illinois Brick* in *Loeb Industries v. Sumitomo Corp.*, in which the court observed that *Illinois Brick* does not require privity and that the "reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did not sell to them," but "because the defendants did sell to a third party [*i.e.*,

---

[18] 431 U.S. 720 (1977).

[19] *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002) (collecting cases).

[20] 431 U.S. at 729.

[21] 139 S. Ct. 1514, 1522 (2019).

an intermediary] who (after *Hanover Shoe*) could recover for any injury they claimed."[22] Here there are no intermediaries between any Plaintiff and their purchases of the Publisher Defendants' eBooks. Under that precedent, a direct purchaser from any party to an alleged anticompetitive agreement that causes the purchaser to be overcharged has antitrust standing to sue for overcharge damages from the antitrust violator. Simply stated, regardless of the platform used, because all Plaintiffs allegedly overpaid for the eBooks they purchased directly from the Publisher Defendants, they have standing to sue Amazon because it is party to the illegal agreements that directly caused all Plaintiffs' overcharges.

This same issue was addressed in *Frame-Wilson*. In that case, like this one, Amazon had acted as a sales platform and was accused of entering into agreements with third-party sellers that prevented them from selling on competing platforms at prices below those on Amazon's platform.[23] And relying on *Illinois Brick*, Amazon moved—like it moved here—to dismiss the claims of the consumers who purchased on other platforms. But the court rejected Amazon's argument and held that, under *Illinois Brick* and *Pepper*, the consumers who bought from co-conspirator sellers (none of which were named defendants) on competing platforms were direct purchasers.[24] The court also pointed to case law holding that where "a plaintiff who is an immediate purchaser from any of the conspirators is directly injured by the violation" and may sue.[25] This so-called "co-conspirator rule" has been uniformly adopted by the courts that have considered it.

The Magistrate Judge did not disagree with any of this. Indeed, the Magistrate Judge concluded that Plaintiffs who purchased on competing electronic platforms "were direct purchasers of the

---

[22] 306 F.3d at 482.

[23] *Frame-Wilson v. Amazon.com, Inc.,* 591 F. Supp. 3d 975, 980–91 (W.D. Wash. 2022).

[24] *Id.* at 984.

[25] *Id.* (citing *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157 (9th Cir. 2019).

publishers." (R&R at 36.) But observing that "[t]he Second Circuit has not addressed the 'co-conspirator exception' and those circuits that have addressed it have not taken a uniform view of its scope," *id.* (quoting *Laumann v. NHL*, 907 F. Supp. 2d 465, 481 (S.D.N.Y. 2012)), the Magistrate Judge concluded that Plaintiffs who purchased eBooks on a platform that competes with Amazon lack standing under *Illinois Brick*. And according to the Magistrate Judge, that conclusion would hold even if Plaintiffs "adequately pled the existence of a conspiracy between Amazon [and] the Publishers." (R&R at 36.)

Respectfully, the Magistrate Judge's conclusion is incorrect. In *Laumann*, the Court treated the Second Circuit's silence not as permission to avoid the question but as an obligation to grapple with it head-on. Indeed, after evaluating the relevant case law, the Court in *Laumann* held that the direct purchaser from any member of a conspiracy is entitled to collect damages from each conspirator because in such cases "the problems of apportioning recovery among all potential plaintiffs and duplicative recovery simply do not arise, and the principle of permitting the purchasers who have been most directly injured is honored."[26]

It makes no difference that the Second Circuit has not itself addressed the co-conspirator issue. The Magistrate Judge's mistake was in failing to apply *Pepper*. Because the *Laumann* decision complies with *Pepper's* holding that regardless of privity, anyone who is "the immediate buyers from the alleged antitrust violators" is a direct purchaser and may sue, it was error not to find standing.[27] This error is particularly problematic here—when every circuit identified in the Court's *Laumann* decision adopted some version of the co-conspirator rule, and no version of the rule identified in *Laumann* would result in a lack of standing for Plaintiffs who purchased eBooks on platforms that

---

[26] *Laumann,* 907 F. Supp. 2d at 483.

[27] 139 S. Ct. at 1521.

compete with Amazon.[28] Indeed, even the narrow approach to standing, requiring the party from whom the plaintiff purchased to fill some role in setting the price of the product—which the Court rejected in *Laumann* as too restrictive—is satisfied here, where the Publisher Defendants set the retail price of the eBooks that are sold on platforms other than Amazon. (SCAC ¶ 52.) Thus, *Laumann* is on all fours with the SCAC, and the Magistrate Judge should have concluded that all Plaintiffs have antitrust standing.[29]

### III.   PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR CLAIMS AGAINST THE PUBLISHER DEFENDANTS

This Court has previously affirmed the Magistrate Judge's recommendation to dismiss Plaintiffs' claims against the Publisher Defendants, and Plaintiffs acknowledge the likelihood of this Court doing so again. Plaintiffs lodge this objection primarily to preserve their appellate rights.

Plaintiffs must plead "only enough facts to state a claim to relief that is plausible on its face."[30] A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[31] The "choice between two plausible inferences that may be drawn from factual allegations is ***not*** a choice to be made by the court on a

---

[28] *Laumann*, 907 F. Supp. 2d at 481–82.

[29] If consumers on competing platforms are not permitted to sue for redress, the harm caused by Amazon will go unaddressed and uncompensated even though the Sherman Act "was enacted to assure customers the benefits of price competition." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983). Plaintiffs are the only injured parties for the overcharges they incurred on competing eBook platforms. Accordingly, Amazon will have caused them harm but able to escape any liability for doing so. This undermines the very premise of *Illinois Brick*, which sought to avoid *double* recovery, not prevent *any* recovery. In *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, the Second Circuit explained that *Illinois Brick* does not foreclose equitable relief and does not apply when there is no risk of double recovery or need to calculate elasticities in order to apportion damages among multiple tiers. 753 F.3d 395, 413 n.7 (2d Cir. 2014) (citing *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003)).

[30] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[31] *Id.* at 556; *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) ("Skepticism of a conspiracy's existence is insufficient to warrant dismissal.").

Rule 12(b)(6) motion."[32] A plaintiff's allegations need not "rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment."[33] Thus, for allegations of conspiracy, "although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible" and should not be credited at the pleading stage.[34] And "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[35] The "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."[36]

In this case, the Magistrate Judge concluded that Plaintiffs allegations are "insufficient to plausibly plead the existence of a horizontal conspiracy between the Publishers, or a hub-and-spoke conspiracy amongst the Publishers and Amazon." (R&R at 45.) The Magistrate Judge also rejected a rule-of-reason claim against the Publisher Defendants. Plaintiffs respectfully object to those conclusions.

## A.      Plaintiffs Adequately Plead Direct Evidence of a Hub-And-Spoke Conspiracy

As the Magistrate Judge explained in her first Report and Recommendation issued August 3, 2022 (2022 R&R), "[t]hrough a coordinated effort, the Publishers forced Amazon to accept the agency

---

[32] *Gelboim v. Bank of Am. Corp.*, 823 F.3d at 781.

[33] *Anderson News L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012); *Gelboim*, 823 F.3d at 781. Amazon's motion to dismiss suggested otherwise with a quote from a pre-*Twombly* decision. *See* Amazon Mot. at 7 (quoting *Apex Oil Co. v. Di Mauro*, 822 F.2d 246 (2d Cir. 1987)). But *Apex Oil* was decided on summary judgment, and, in any event, *Twombly* from 2007, *Anderson* from 2012, and *Gelboim* from 2016 debunk this approach on a motion to dismiss.

[34] *Anderson News*, 680 F.3d at 190; *see also id.* at 184 (explaining that plaintiff's allegations need not "rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment"); *Gelboim*, 823 F.3d at 781 (same).

[35] *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

[36] *Id.*

model." (2022 R&R at 6.) That conduct constitutes a horizontal agreement as a matter of law (*id.* at 8 ("*per se* illegal horizontal price-fixing agreement")), and it set the stage for their later collusion with Amazon. The court's findings in *United States v. Apple* not only provide the "course of dealings or other circumstances" necessary to *allege* a horizontal agreement (2022 R&R at 20), but they also provide direct evidence that "the Publisher Defendants agreed to raise the prices of e-books by taking control of retail pricing"[37]—an agreement the Publisher Defendants never disavowed or abandoned.[38]

Indeed, while the judgments entered against the Publisher Defendants in *Apple* imposed temporary restrictions that prevented them from enjoying the fruits of their conspiracy for several years after the consent judgments, they did not require the Publisher Defendants to admit guilt or repudiate their horizontal price-fixing conspiracy. Just the opposite is true; the Publisher Defendants' final judgments were explicit that they "d[id] not constitute any admission by Settling Defendants that the law has been violated." (SCAC ¶ 141 n.192.) As the court in *Apple* observed, while "at trial" and under oath, the Publisher Defendants continued to deny "that they discussed the Apple Agreement with one another … or that those conversations occurred at all, in the face of overwhelming evidence to the contrary[.]" (SCAC ¶ 141 (quoting *Apple*, 952 F. Supp. 2d at 693 n.59).) And before the final judgments even expired, the Publisher Defendants picked up where they had left off, entering into agreements (now with Amazon) to fulfill the goals of their horizontal conspiracy—*i.e.*, eliminating retail price competition for eBooks and raising eBook prices throughout the market. (2022 R&R at 9–13.)

---

[37] *U.S. v. Apple Inc.*, 952 F. Supp. 2d 638, 691 (S.D.N.Y. 2013).

[38] *U.S. v. Greenfield*, 44 F.3d 1141, 1149–50 (2d Cir. 1995) ("[C]essation of conspiratorial activity is generally considered insufficient to demonstrate a withdrawal from a conspiracy … since it is all too easy after the fact for a defendant to claim that he or she withdrew from a plot, the law generally requires the taking of some affirmative action[.]") (quotation omitted); *see also U.S. v. Esposito*, 2021 WL 5492935, at *2 (2d Cir. Nov. 23, 2021) (prior conviction was properly "admissible as direct evidence of the conspiracy itself").

But the Magistrate Judge concluded that this direct evidence does not support Plaintiffs' conspiracy claims. According to the Magistrate Judge, the Publisher Defendants prior conspiracy does not support the finding of a conspiracy here because "a party can effectively withdraw from a conspiracy without publicly repudiating its behavior" and because "the Publishers agreed to final judgments with the United States, following the conspiracy in <u>Apple</u>, temporary restrictions imposed by those judgments, and government oversight pursuant to those decrees." (R&R at 47–48.) And even though the agency agreements were sufficient evidence of a conspiracy in *Apple*, the Magistrate Judge concluded that the same is not true here because, in *Apple*, "it was the particular circumstances that surrounded the execution of those agreements that supported a finding of concerted action." (R&R at 48.)

Respectfully, Plaintiffs object that the Magistrate Judge's analysis "tightly compartmentaliz[es] the various factual components and wip[es] the slate clean after scrutiny of each."[39] It may be true that conspirators need not publicly repudiate a conspiracy to withdraw, and there is no dispute that the Publisher Defendants entered final judgments with the United States that included temporary restrictions. But the particular circumstances alleged must be considered as a whole: not only did the Publisher Defendants fail to publicly repudiate the conspiracy, but they resumed the same collusive conduct as soon as the temporary restrictions were lifted—including by entering agency agreements similar to what they had entered before. As Plaintiffs allege, the Publisher Defendants and Amazon "have employed and continue to employ the same devices to again fix the retail price of trade eBooks" that "'removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved [Amazon] of the need to compete on price, and allowed the [Big Five] to raise the prices for their e-books, which they promptly did[.]'" (SCAC ¶ 142 (quoting *Apple*, 952 F. Supp. 2d at

---

[39] *Cont'l Ore Co.*, 370 U.S. at 699.

694).) This is direct evidence of conspiracy that does not "rely solely on the agency agreements." (R&R at 47.) Rather, in the Magistrate Judge's words, they rely "on the particular circumstances that surrounded the execution of those agreements."

This conduct was sufficient to prove a *per se* violation of the Sherman Act in *Apple*, and Plaintiffs' allegations of the same conduct are likewise sufficient to allege a conspiracy that resulted in sudden and substantial increases in eBook prices here. For a hub-and-spoke conspiracy, the only "agreement" Plaintiffs are required to allege "among the spokes" is that they "'adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.'"[40] And Plaintiffs plausibly allege that each Publisher Defendant agreed to the same contract to raise eBook prices and knew that the others were negotiating or had negotiated those same terms with Amazon. (2022 R&R at 38.) If these allegations were not plausible, then the *Apple* case could not possibly have been decided the way it was.

**B.    Plaintiffs Adequately Plead Circumstantial Evidence of a Horizontal Conspiracy**

Plaintiffs also adequately allege circumstantial evidence of a horizontal conspiracy. "Circumstantial evidence is no less persuasive than direct evidence; indeed, '[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"[41] Under the decision in *Starr v. Sony BMG Music Entm't*, Plaintiffs may allege "plus factors" as circumstantial evidence of a horizontal agreement, and as a matter of law, adequately pleaded plus

---

[40] *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) (quoting Areeda & Hovenkamp, ¶ 1402c (3d ed. 2010)); *see also Laumann v. NHL*, 907 F. Supp. 2d at 486–87 ("[W]here parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade.").

[41] *Apple*, 952 F. Supp. 2d at 689 (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)).

factors constitute circumstantial evidence of a horizontal conspiracy—regardless of whether a court might harbor doubt or even skepticism about the existence of a conspiracy.[42]

In the SCAC, Plaintiffs allege several plus factors, including that the Publisher Defendants would have been acting against their individual self-interests if they had acted unilaterally. (¶¶ 180, 270–76.) The Magistrate Judge considered Plaintiffs' well-pleaded plus factors as nothing more than allegations of lawful parallel conduct and insufficient to "plausibly suggest collusive conduct amongst the Publishers." (R&R at 50–51.) The Magistrate Judge's conclusion is premised on her assessment that "the traditional wholesale pricing model that existed prior to the conspiracy in <u>Apple</u>" had irretrievably ended and, thus, that the Publisher Defendants either had to enter the agency agreements with Amazon or, else, have no distribution agreement with Amazon at all. (R&R at 52–53.) And with that premise in play, the Magistrate Judge concluded that no publisher would "risk forgoing such an agreement" with Amazon. (R&R at 52.)

But the premise—that the traditional wholesale pricing model had irretrievably ended—has no basis in Plaintiffs' allegations. To the contrary, Plaintiffs allege that the Publisher Defendants were required under their consent decrees to permit retailer discounting of trade eBooks until 2015, and that they then "promptly *reintroduced* the agency model by *renegotiating* their agreements with Amazon, thus *reclaiming* the right to set prices in furtherance of their ongoing conspiracy." (SCAC ¶ 146 (emphasis added).)[43] No allegations in the SCAC support the Magistrate Judge's premise that the Publisher Defendants had to accept an agency agreement unless they were willing to risk having no distribution agreement at all.

---

[42] 592 F.3d 314, 327 (2d Cir. 2010) (explaining that plus factors defeat arguments that "conduct alleged in the complaint would be entirely consistent with independent, though parallel, action").

[43] Even if the Publisher Defendants had persisted in agency agreements without parity provisions while supervised by the DOJ, Amazon had the market power to require the Publisher Defendants to revert to wholesale agreements. As the contemporaneous press statements suggest, that Amazon would agree to an agency model was far from certain. (SCAC ¶¶ 149–55.)

Without the incorrect premise, the Publishers' excuse cannot stand. Amazon's monopoly power in the retail eBook platform transaction market does not mean that the Publisher Defendants acted in their *unilateral* self-interests in entering their agency agreements with Amazon. As the Magistrate Judge acknowledged in the 2022 R&R, "the Publishers lost eBook revenue under the agency model" with Amazon.[44] Absent collective action, it was not in each Publisher Defendant's interest to enter the agency agreements because, acting alone, each Publisher Defendant would have been better off if it stayed with the traditional distribution agreement after getting caught in the conspiracy with *Apple*. The economics are straightforward: the Publisher Defendants are unilaterally motivated to increase sales, not suppress them, and the higher transaction prices charged by Amazon have led to a *decline in market sales*. (SCAC ¶¶ 105–113.) As the court explained in *Apple*, any Publisher Defendant that unilaterally raises eBooks retail prices can "expect to lose substantial sales" unless "their competitors follow[] suit."[45]

In short, while the competitive self-interests of the Publisher Defendants, acting alone, were at odds with Amazon's retail platform dominance, it benefitted each of them as long as they acted collectively. Moreover, as noted above, Plaintiffs plead multiple additional plus factors, including that:

### 1.      The Publisher Defendants had a common motive to collude.

A common motive to collude is a plus factor separately considered from actions against self-interest.[46] As the Magistrate Judge acknowledged in her 2022 R&R, the Publisher Defendants had a common motive to "control[] trade eBook prices." (2022 R&R at 29.) They initially approached Amazon—not Apple—to effectuate their horizontal conspiracy, and only after Amazon refused to

---

[44] R&R at 7; *see also* R&R at 5 (explaining that "the Publishers stood to make less money on each sale under the agency model than they would under the wholesale model"); *Apple*, 952 F. Supp. 2d at 665, 699.

[45] *Apple*, 952 F. Supp. 2d at 692.

[46] *Id.*

participate, did they turn to Apple, which offered an alternative mechanism for their anticompetitive goals. (2022 R&R at 4–5.)

Although the final judgments entered by the court in *Apple* required the Publisher Defendants to relinquish the fruits of their conspiracy for a time, the Publisher Defendants never withdrew from their conspiracy. Instead, the Publisher Defendants went back to Amazon to continue where they left off. To again borrow this Court's explanation in *Apple*: Amazon "did not want to compete with [other retailers] on price and proposed to the Publishers a method through which both [Amazon] and the Publishers could each achieve their goals."[47] Ending retail price competition gave all parties what they wanted: the Publisher Defendants obtained higher consumer prices across the entire eBooks market; Amazon excluded competition from other eBook retail platforms and perpetuated the dominance of its retail distribution platform, while using its monopoly power over the retail platform distribution market to generate supracompetitive transactions fees on each eBook sale.

### 2. The Publisher Defendants engaged in prior (and ongoing) collusive conduct.

Courts have long recognized defendants' prior collusive conduct as circumstantial evidence of a horizontal conspiracy.[48] "[P]articipation in an illegal conspiracy elsewhere can affect a fact finder's view of a defendant's character and thus of the sincerity of an independent explanation of the conduct now challenged."[49] And as already addressed, the very type of agreements alleged by Plaintiffs here was evidence of conspiracy in the *Apple* case.

---

[47] *Apple*, 952 F. Supp. 2d at 706.

[48] *See, e.g., In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012).

[49] Areeda & Hovenkamp, Antitrust Law ¶ 1421b2 (4th ed. 2017); *id.* ("Where a reasonable inference of conspiracy contends with the defendants' innocent explanation, evidence reflecting upon their character can undermine their credibility and tip the balance against them.") (citing *De Jong Packing Co. v. U.S. Dep't of Agriculture*, 618 F.2d 1329 (9th Cir. 1980) (affirming conspiracy ruling and rejecting argument that conduct was independent because defendants similarly conspired two years earlier)).

Moreover, the conspiracy uncovered in *Apple* is not the only example of the Publisher Defendants' prior collusion. On October 31, 2022, the District Court for the District of Columbia ruled in favor of the United States to block Penguin Random House's proposed $2.2 billion acquisition of Simon & Schuster. (SCAC ¶ 168.) With the benefit of a thirteen-day trial, the court found that "the Big Five publishers have engaged in tacit coordination that is profitable for those involved" and that "coordinated conduct already appears to be rampant." (*Id.* at ¶178.) The court further found that the Big Five had colluded with respect to eBooks beyond just the conspiracy uncovered in *Apple*, noting that "during the early years of e-books, publishers uniformly shifted e-book royalty rates from 50 percent to 25 percent, thereby reducing authors' compensation." (*Id.* at ¶ 174.) As the court explained, the Publisher Defendants' "history of successful cooperation establishes a precondition to effective collusion — mutual trust and forbearance." (*Id.* at ¶¶ 169, 173.) The court also validated that "[t]he [Apple] case portrays an industry already 'prone to collusion'" and that the Publisher Defendants consistently choose collusion over acting in their unilateral self-interests: "[I]n an industry where the competition to acquire anticipated top sellers is intense, the competing publishers nevertheless choose, almost always, not to gain advantage by offering more favorable contract terms. This phenomenon bespeaks a tacit agreement among the publishers to compete only on the basis of advance level because it collectively benefits them not to yield on other contract terms." (*Id.* at ¶¶ 173, 175.)

### 3. The collusive conduct was facilitated by market concentration.

The R&R acknowledges that Amazon controls about 90% of the eBook retail platform market and that the Publisher Defendants account for about 80% of the trade books sold in the United States. (R&R at 2–3.) As the D.C. District Court observed in blocking the Penguin Random House/Simon & Schuster merger, "[t]he Big Five have achieved their market dominance in part by acquiring other publishers, contributing to a trend toward consolidation in the industry." (SCAC ¶ 170.) Observing "an undeniable trend in consolidation in the publishing industry," the D.C. District Court explained

that "[c]oordinated effects are likelier in concentrated markets" and that the market concentration is unlikely to change because "barriers to entry are high in the publishing business." (*Id.* at ¶¶ 171, 172.) In the court's words, "The best proof that would-be new competitors face formidable barriers to entry is the stability of market shares in the industry: No publisher has entered the market and become a strong competitor against the Big Five in the past thirty years." (*Id.* at ¶ 172.)

The D.C. District Court's trial findings are consistent with empirical studies showing that "'noncompetitive pricing … may be the result of price coordination … when the four leading firms account for some 50 to 80 percent of the market.'"[50] Plaintiffs have alleged market concentration in two different, albeit related, markets: the retail platform market in which eBooks are distributed (and in which Amazon has a 90% share) and the production of trade eBooks (in which the Publisher Defendants have an 80% share). Concentration in either market facilitates collusion. That is, by executing nine out of every ten eBook transactions, Amazon can serve as an effective hub in a hub-and-spoke conspiracy for the trade eBook industry. Conversely, by producing eight out of every ten trade eBooks, the Publisher Defendants can continue their "rampant" collusion.

The Magistrate Judge gave no weight to the district court's findings in *Bertelsmann*, noting that the court in that case was not addressing a claim under Section 1 of the Sherman Act and was "analyzing a different relevant market." (R&R at 51.) Respectfully, however, those distinctions miss the point that collusion is how the publishing industry typically works. With the benefit of a full record, the court in *Bertelsmann* found that this industry was "prone to collusion" and that the "history of successful cooperation" in *Apple* "establishes a precondition to effective collusion — mutual trust and forbearance." (SCAC ¶ 173 (quoting *U.S. v. Bertelsmann SE & Co.*, 2022 WL 16949715, at *27 (D.D.C. Oct. 31, 2022)).)

---

[50] *Starr*, 592 F.3d at 324 (brackets omitted) (quoting Areeda & Hovenkamp treatise).

### 4.    The Defendants raise prices despite no rise in costs.

Pricing behavior untethered from the cost of doing business is a well-recognized plus factor that, together with parallel pricing behavior, raises an inference of conspiracy. As Judge Posner states in his antitrust treatise, "[s]imultaneous price increases and output reductions unexplained by an increase in cost may [] be good evidence of the initiation of a price-fixing scheme."[51] The courts, including the Second Circuit in *Starr*, confirm that pricing practices with little or no relationship to costs are probative of a conspiracy.[52]

### 5.    The Defendants deliberately mislabeled the parity provisions.

The Report and Recommendation acknowledges that Defendants faced heightened scrutiny from the government because they were barred from including parity provisions (a.k.a. most favored nations clauses or MFNs) in their agreements in 2014 and 2015. (R&R at 47–48; *see also* 2022 R&R at 36.) A government investigation of Amazon by European regulators found that because the Publisher Defendants were prohibited (both in Europe and in the U.S.) from entering into MFNs with an eBook retail platform, the Publisher Defendants and Amazon relied on a notice provision that functioned as an MFN and had the same effect of eliminating retail competition. (SCAC ¶ 89.) The notice provisions

---

[51] Richard A. Posner, Antitrust Law, p. 88 (2d ed. 2001).

[52] *See Starr*, 592 F.3d at 324 (noting as a "plus factor" that defendants raised the price of songs even though earlier in the year the costs of providing digital music had decreased); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 714 (S.D.N.Y. 1995) ("allegations that defendants' pricing bore no reasonable relation to either the operation of defendants' business, or market or economic conditions, was sufficient to create a reasonable inference of conspiracy").

Not surprisingly, Publishing executives acknowledge that the "higher e-book prices, resulting from the Amazon deals, are discouraging purchases." (SCAC ¶ 108.) Book sales data analyzed by Nielsen Book (now known as NPD BookScan) confirms this: the "return of agency pricing by the Big Five trade houses in 2015 raised e-book prices by an average of $3, leveling off at about $8 per book. *That jump in prices coincided with the downturn in e-book sales for traditional publishers.* And while *e-book prices for the Big Five were rising*, prices for self-published books were settling in at about $3." (*Id.*) One market observer, writing in 2018, estimated an average price increase of $5 per title over the preceding few years and concluded that eBook sales were low because "many people find that paying $15.00 to $22 for a Kindle book, is too expensive." (*Id.* at 113.) In that same period, eBook sales declined by 24%. (*Id.*)

prevented "any competitor retail platform from gaining volume and sales through lower prices." (*Id.*) Disguising provisions and calling them something different is exactly the type of conduct that *Starr* said is a plus factor: It goes to Defendants' knowledge that "they would attract antitrust scrutiny."[53] If Defendants had no worry that eliminating retail price competition would attract antitrust scrutiny, they would have called the MFN provisions by name and avoided the effort of disguise.[54]

### 6.   All Publisher Defendants executed their pricing agreements within months.

An "unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."[55] Here, most Publisher Defendants executed their agreements between October and December of 2014, and those agreements all *took effect* simultaneously at the start of the new year. (SCAC ¶¶ 146–153.) That is on par with the facts in *Apple*, where it took two months for five out of the six publishers Apple negotiated with to execute agreements, which also took effect at the same time.[56]

### 7.   The Defendants had the opportunity to collude.

The Magistrate Judge acknowledges that, in *Apple,* the Publisher Defendants not only had the opportunity to collude, but also that they in fact did so. (R&R at 48; *see also* R&R at 41.) Government oversight does not negate this plus factor. Indeed, the Court in *Starr* applied the factor even though a

---

[53] *Starr*, 592 F.3d at 324.

[54] *See, e.g., SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015) ("attempts by the manufacturers to hide their actions could suggest that the defendants knew their actions 'would attract antitrust scrutiny'") (internal citations omitted); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 777 (E.D. Pa. 2017) (recognizing concealment where defendant's document was deliberately written to obfuscate facts); *In re Ethylene Propylene Diene Monomer (EDPM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (attempted concealment "would permit a fact-finder to conclude that the defendants engaged in more than mere conscious parallelism or tacit collusion").

[55] *Interstate Circuit, Inc. v. U.S.*, 306 U.S. 208, 227 (1939).

[56] *Apple*, 952 F. Supp. 2d at 677; *see also id.* at 650–54 (recounting that for nearly a year *before* Apple's involvement, the Publisher Defendants colluded among themselves to control retail pricing).

government investigation resulted in no action against the defendants.[57] This plus factor is further warranted because, in this case, the Publisher Defendants had colluded before and agreed to the blueprint. They needed minimal opportunity to effectuate their conspiracy, and that opportunity presented itself with their dealings with Amazon and statements to the press about these agreements, which afforded the Publisher Defendants the means to again facilitate their conspiratorial goal to raise consumer prices across the entire eBook market.

*        *        *

Plaintiffs adequately allege a horizontal price-fixing conspiracy.

## C.    Plaintiffs Adequately Plead Rule-of-Reason Claims Against The Publisher Defendants

As Plaintiffs' counsel acknowledged, the law on aggregation is less clear with respect to a defendant that entered into just one of multiple vertical agreements. But Plaintiffs respectfully submit that the better rule permits aggregation even when a defendant has entered into just one of a series of allegedly unlawful vertical agreements.[58] And aggregation is particularly appropriate in a case like this— when each participant in the vertical agreements knew about the other vertical agreements and knew that, in the aggregate, the vertical agreements would cause market-wide anticompetitive effects. (SCAC ¶¶ 123–158.)

Thus, Plaintiffs respectfully submit that have adequately pleaded rule-of-reason claims against the Publisher Defendants.

---

[57] *Starr*, 592 F.3d at 325 ("defendants cite no case to support the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the Department of Justice found no evidence of conspiracy").

[58] *See, e.g., Genico, Inc. v. Ethicon, Inc.*, 2006 U.S. Dist. LEXIS 96909, at *1215 (E.D. Tex. Mar. 23, 2006); *Applied Med. Res. Corp. v. Johnson & Johnson*, 2004 U.S. Dist. LEXIS 29409, at *12 (C.D. Cal. Feb. 23, 2004).

## CONCLUSION

The Court should adopt the Magistrate Judge's recommendation that Section 2 claims against Amazon, brought by Plaintiffs who purchased eBooks on Amazon's platform, should not be dismissed. Plaintiffs respectfully object to the Magistrate Judge's conclusions that (a) it is "inappropriate" to aggregate the effects of Amazon's agreements to state a rule-of-reason claim against Amazon under Section 1 of the Sherman Act; (b) Plaintiffs who bought eBooks on platforms that compete with Amazon lack antitrust standing; and (c) Plaintiffs have not adequately pleaded a *per se* horizontal conspiracy or rule-of-reason claims against the Publisher Defendants.

DATED: August 31, 2023                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Barbara A. Mahoney (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
barbaram@hbsslaw.com

*Interim Lead Counsel for the Proposed Class*

Joseph M. Vanek (*pro hac vice*)
Paul E. Slater(*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
Blake Sercye (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile:   (312) 641-6492
jvanek@sperling-law.com
pes@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com
bsercye@sperling-law.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above document was served on ALL DEFENSE

COUNSEL OF RECORD through the Court's electronic filing service on August 31, 2023, which

will send notification of such filing to the e-mail addresses registered.

 /s/ *Steve W. Berman*

Steve W. Berman