# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION ET AL., | CASE NO. 2:23-cv-01495-JHC |
| Plaintiffs, | SEALED ORDER |
| v. | |
| AMAZON.COM, INC., | |
| Defendant. | |

# I
## INTRODUCTION

Before the Court is: (1) Defendant Amazon.com, Inc.'s Motion to Appoint a Special Master (Dkt. # 618); (2) Plaintiffs' Motion for Spoliation Sanctions (Dkt. # 598); and (3) Plaintiffs' Motion to Compel the Production of Documents Concerning Amazon's Manipulation of Evidence (Dkt. # 604). The Court has reviewed the materials filed in connection with the motions, the record, and the governing law. Being fully advised, for the reasons below, the Court DENIES Defendant's Motion (Dkt. # 618) and GRANTS IN PART and DENIES IN PART Plaintiffs' Motions (Dkt. ## 598 & 604).

SEALED ORDER - 1

## II
### DISCUSSION

A.      Defendant's Motion to Appoint a Special Master (Dkt. # 618)

Federal Rule of Civil Procedure 53(a) authorizes a court to appoint a special master to address pretrial matters, including discovery matters, "that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C); *see also Thakur v. Cofiroute USA, LLC*, 2020 WL 10731939, at *4 (C.D. Cal. Aug. 5, 2020) ("Courts may appoint a special master with broad authority to supervise and conduct pretrial matters, including discovery activity[.]") (citation and internal quotation marks omitted). But special master referrals are "the exception and not the rule, and should occur only upon a showing of clear need." *Barnum v. Equifax Info. Servs., LLC*, 2018 WL 1245492, at *3 (D. Nev. Mar. 9, 2018) (citation and internal quotation marks omitted); *see also Highlander Holdings, Inc. v. Fellner*, 2020 WL 3498174, at *9 (S.D. Cal. June 29, 2020) ("Appointment of a discovery referee should not be the first resort.").[1] And the moving party bears the burden of justifying the appointment.[2]

---

[1] Plaintiffs' Response (Dkt. # 634) invokes the wrong standard. Under the current version of Rule 53(a), a special master should be appointed upon a showing of "clear need," not "exceptional circumstances." *Compare* Dkt. # 634 at 6 ("A district court should appoint a special master only in 'exceptional circumstances.'" (quoting *Burlington N. R.R. Co. v. Wash. Dep't of Revenue*, 934 F.2d 1064, 1072 (9th Cir. 1991)), *with Thakur*, 2020 WL 10731939, at *4 ("[The defendants] are incorrect that the Court may only appoint a special master under Rule 53(a)(1)(C) if exceptional circumstances exist."), *and Am. Motorists Ins. Co. v. Club at Hokuli'a, Inc.*, 2011 WL 13593392, at *1 (D. Haw. Sept. 20, 2011) ("Pretrial masters should only be appointed when the need is clear."), *and Ross v. Johnson*, 2023 WL 5333256, at *1 (D. Nev. Aug. 18, 2023) ("The Advisory Committee notes to Rule 53 instruct that a pretrial special master should be appointed only when the need is clear." (citation and internal quotation marks omitted)).

[2] *See, e.g., Barnum*, 2018 WL 1245492, at *3 (denying motion to appoint a special master because the moving party did "not ma[ke] a sufficient showing that appointment of a special master is warranted"); *Johnson v. Dovey*, 2010 WL 1957278, at *3 (E.D. Cal. May 14, 2010) (denying motion to appoint a special master because the moving party "failed to make a showing that requires the appointment of a special master").

SEALED ORDER - 2

Defendant requests that the Court appoint the Honorable Elizabeth D. Laporte to oversee discovery-related disputes, including the issues raised by Plaintiffs' Motions at Dkt. ## 598 & 604. *See generally* Dkt. # 618. Defendant says that a special master is needed because "Plaintiffs ask the Court for an extensive and time-intensive process that would strain judicial resources under real time constraints." *Id*. at 5. And it argues that the Honorable Elizabeth D. Laporte is well suited for this role, as she is already serving as the court-appointed, special master in the "Related Cases"—*De Coster v. Amazon* (No. 2:21-cv-00693-JHC), *Frame-Wilson v. Amazon* (No. 2:20-cv-00424-JHC), and *Brown v. Amazon* (No. 2:22-cv-00965-JHC)—and so could conveniently and cost-effectively serve as a special master in this action as well. *See id*. at 7–8, 10–11.

Plaintiffs respond that Defendant's request should be denied because: (1) "Amazon has not met its burden to show any 'exceptional circumstances' sufficient to overcome Plaintiffs' objection to the appointment of a special master"; (2) Plaintiffs' pending discovery motions (Dkt. ## 598 & 604) "are designed to avoid any undue burden on the Court"; (3) "the Court is much better positioned than Special Master Laporte to efficiently decide the broad, high-level legal issues presented in Plaintiffs' motions"; and (4) "appointing a special master at this time would significantly prejudice Plaintiffs while unfairly benefiting Amazon." Dkt. # 634 at 5–6. They also argue that if the Court appoints a special master, it should not be the Honorable Elizabeth D. Laporte, as Plaintiffs should be given a chance to participate in the selection process. *Id*. at 18–19.

The Court declines to appoint a special master at this time. Although the Court acknowledges Defendant's concerns about the potential for wide-ranging discovery disputes, it does not find that the contents of Plaintiffs' Motions (Dkt. ## 598 & 604) present a "clear need" for a special master, nor has Defendant shown a "clear need" for a special master more generally.

SEALED ORDER - 3

It also agrees with Plaintiffs that before appointing a special master, the Court must first make certain high-level rulings, and also permit Plaintiffs to participate in the selection process. And the Court is confident that the potential burdens on the Court, identified by Defendant at Dkt. # 618 at 5–6, can be appropriately and adequately managed via tailored relief. The Court thus concludes that Defendant has not shown a "clear need," and so it DENIES Defendant's Motion to Appoint a Special Master (Dkt. # 618).[3]

B.      Plaintiffs' Motion for Spoliation Sanctions (Dkt. # 598)

Federal Rule of Civil Procedure 37(e) governs motions for spoliation sanctions concerning electronically stored information (ESI). Under this rule, a party must show, by a preponderance of the evidence, that: (1) the nonmoving party failed to preserve ESI that "should have been preserved in the anticipation or conduct of litigation"; (2) the ESI "is lost" because the nonmoving party "failed to take reasonable steps to preserve it"; and (3) the ESI "cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e); *see also Zunum Aero, Inc. v. Boeing Co.*, 2024 WL 664540, at \*2 (W.D. Wash. Feb. 7, 2024). If this showing is made, and the moving party was prejudiced, the court may order sanctions. *See* Fed. R. Civ. P. 37(e)(1). But under Rule 37(e)(1), such measures may be "no greater than necessary to cure the prejudice[,]" Fed. R. Civ. P. 37(e)(1), and district courts have broad discretion to fashion appropriately curative sanctions.[4] If, however, the court finds that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation[,]" it may

---

[3] The Court notes that nothing in this Order should be read to preclude the parties, either jointly or separately, from moving to appoint a special master later should any new or changed circumstances warrant such a motion.

[4] *See, e.g., Bass Underwriters, Inc. v. Kono*, 2024 WL 4441834, at \*1 (D. Nev. May 15, 2024) ("Federal Rule of Civil Procedure 37 is 'flexible' with respect to sanctions, and district courts have broad discretion to fashion sanctions under Rule 37, when they are appropriate."); *Burton v. Walgreen Co.*, 2015 WL 4228854, at \*2 (D. Nev. July 10, 2015) ("The decision to impose spoliation sanctions is discretionary.").

SEALED ORDER - 4

impose more serious sanctions, such as an adverse inference instruction or dismissal of the entire action. *See* Fed. R. Civ. P. 37(e)(2).

Plaintiffs argue that spoliation sanctions are warranted because: (1) Amazon failed to preserve ESI—raw notes from business meetings and Signal[5] messages among executives—that Amazon had a duty to preserve; (2) the loss of this ESI was due to Amazon's failure to take reasonable steps to preserve evidence; (3) the lost notes and messages cannot be replaced through additional discovery; (4) Plaintiffs are prejudiced by the loss of this information; and (5) Amazon destroyed this evidence to intentionally deprive Plaintiffs of its use in litigation. *See generally* Dkt. # 598. Plaintiffs thus request that the Court: (1) "adopt an adverse inference that spoliated evidence was unfavorable to Amazon on all issues disputed at trial, including market definition, monopoly power, the anticompetitive nature of Amazon's conduct, and the harm from Amazon's conduct"; and (2) "bar Amazon from introducing or relying on, in support of pro-competitive justifications or as rebuttal evidence, evidence regarding meetings or in the sanitized or summarized notes of those meetings where Amazon has been unable to produce and identify 'raw notes' for the meeting." *Id*. at 24. Alternatively, should the Court find that sanctions are premature, Plaintiffs request: (1) "leave to conduct additional discovery into the extent of Amazon's spoliation"; (2) "leave to renew the [sanctions] issue after that discovery"; and (3) an order requiring "Amazon to pay the costs Plaintiffs bear in connection with the additional discovery." *Id*.

Defendant responds that Plaintiffs' "breathtakingly broad" request for sanctions is unwarranted, as "Plaintiffs come nowhere close to meeting the legal standard for the extreme

---

[5] Plaintiffs also sporadically reference WhatsApp in their motion but they do not actually advance any specific arguments about spoliated WhatsApp messages. *See generally* Dkt. # 598; *see also* Dkt. # 651. The Court thus limits its discussion of ephemeral messages in this Order to those sent using Signal.

SEALED ORDER - 5

sanctions they seek." Dkt. # 639 at 5. Defendant argues that Plaintiffs exaggerate the extent of lost evidence and overstate the breadth of Amazon's duty to preserve. *See id*. at 6–9, 12, 15–17, 20–23. It also argues that Amazon has taken reasonable steps to preserve evidence and that Plaintiffs have not been prejudiced by any purportedly "lost" materials. *See id*. at 8–11, 14–17, 19–22. And it says that Plaintiffs' sweeping request for sanctions is unjustified, especially because Amazon did not purposefully destroy any evidence to deprive Plaintiffs of its use in this litigation. *Id*. at 18, 22–23.[6]

The Court addresses each element of Plaintiffs' request for spoliation sanctions below.

1.      Failure to Preserve ESI that Amazon had a Duty to Preserve

A party may not seek sanctions under Rule 37 for *any* destroyed evidence. *See Zunum*, 2024 WL 664540, at *3 ("The duty to preserve [ ] does not extend to every bit of ESI in a defendant's possession[.]") (citation and internal quotation marks omitted). Rather, sanctions are warranted only if the opposing party "spoliated" evidence, i.e., "fail[ed] to preserve relevant evidence once a duty to preserve has been triggered." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334 (D. Ariz. 2022). In the context of government investigations, the duty to preserve is typically triggered upon receipt of notice from the investigating body.[7] But receipt of such notice is not always dispositive: "even if a preservation letter is sent, the duty to preserve evidence may arise earlier." *Aramark Mgmt., LLC v. Borgquist*, 2021 WL 864067, at *4 (C.D. Cal. Jan. 27, 2021), *report and recommendation adopted*, 2021 WL 863746 (C.D. Cal. Mar. 8, 2021).

---

[6] Defendant also repeatedly mentions the millions of records that Amazon has produced. *See generally* Dkt. # 639. But Defendant's past-production is unrelated to the question before the Court: whether Amazon spoliated the raw meeting notes and Signal messages at issue in *this* motion.

[7] *See, e.g.*, *Fed. Trade Comm'n v. Noland*, 2021 WL 3857413, at *9 (D. Ariz. Aug. 30, 2021) (concluding that the defendant's preservation obligations arose upon receipt of an FTC email instructing the defendant and his company to "suspend any ordinary course destruction of documents, communications, and records").

SEALED ORDER - 6

As for its scope, the duty to preserve encompasses all evidence for which the party "knows or reasonably should know is relevant to the action." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006). "This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation" or would have reasonably concluded that such evidence was "relevant to [any] claim or defense[.]" *Dabney v. Wyoming Vapor Co.*, 2020 WL 5731819, at *4 (D. Or. July 10, 2020), *report and recommendation adopted as modified sub nom. Dabney v. Wyoming Vapor Co.*, 2020 WL 4784734 (D. Or. Aug. 18, 2020); *Brannan v. Bank of Am.*, 2017 WL 4031442, at *2 (D. Nev. Sept. 13, 2017), *report and recommendation adopted*, 2018 WL 1002613 (D. Nev. Feb. 20, 2018). Thus, "[w]hen a defendant destroys evidence according to its internal policies or the normal course of business, that defendant has not engaged in the spoliation of evidence if the defendant had no notice of the evidence's potential relevance in future litigation." *Burton*, 2015 WL 4228854, at *3. But when the relevance of certain documents "cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (citation and internal quotation marks omitted). And courts regularly reject attempts by litigants to escape their preservation obligations by maintaining that the destroyed evidence was irrelevant or otherwise unimportant.[8]

---

[8] *See, e.g.*, *Posner v. Hillstone Rest. Grp., Inc.*, 2022 WL 705602, at *4 (E.D. Cal. Mar. 9, 2022) (A party's "unilateral determination that the [destroyed evidence] was not relevant is insufficient to overcome its duty to preserve relevant evidence."); *Stedeford v. Wal-Mart Stores, Inc.*, 2016 WL 3462132, at *8 (D. Nev. June 24, 2016) ("A party guilty of intentional spoliation should not easily be able to excuse the misconduct by claiming that the spoliated evidence was of minimal import.") (citation and internal quotation marks omitted); *Milke v. City of Phoenix*, 2019 WL 11766079, at *16 (D. Ariz. July 19, 2019) ("[T]he duty to preserve documents cannot be evaded merely because a party is willing to represent that it only destroyed documents with no value.").

SEALED ORDER - 7

Here, it is undisputed that Amazon had a duty to preserve all documents that may be relevant to this litigation as of June 17, 2019—the day that Amazon received a document preservation notice from the FTC. *See* Dkt. ## 598 at 5; 639 at 6–7; *see also* Dkt. # 599-1. It is also undisputed that Plaintiffs have identified certain records that were not produced, and that Amazon has said that it cannot produce because they no longer exist. *See* Dkt. ## 598 at 10, 12, 17; 639 at 9–12, 15, 21–22; *see also* Dkt. # 599-23 at 6–7. Such records include raw notes from several business meetings, including the July 2021 ASB business review, the November 2021 ASB leadership team meeting, and an April 2021 CEO meeting. *See* Dkt. # 598 at 10 (citing Dkt. # 599-23 at 6–7); *see also* Dkt. # 651 at 10 (suggesting that the "universe of deleted raw notes" is larger than the three meetings for which Amazon did not identify notes). They also include messages among senior Amazon executives that were sent using Signal's disappearing messages feature. *See* Dkt. # 598 at 10, 12.[9]

The parties' core dispute, then, is whether any of the unavailable evidence identified by Plaintiffs was actually "spoliated," rather than merely rendered unavailable. Plaintiffs say that they have met their burden of showing spoliation because they have shown that: (1) Amazon instructed its employees to "delete/shred" raw notes from relevant meetings, and its employees did in fact destroy such notes; (2) Amazon permitted its executives to use ephemeral messaging on Signal, resulting in the permanent deletion of an "untold number of messages" about relevant business matters; and (3) all of this occurred after Amazon received noticed of the FTC's investigation. *See* Dkt. ## 598 at 7–16; 651 at 5–6. In response, Defendant appears to argue that

---

[9] As explained by Plaintiffs, Signal's disappearing messages feature (referred to as "ephemeral messaging" in this Order) "permanently deletes messages from all participants' phones—sender's and recipients'—after a pre-determined time elapses." Dkt. # 598 at 11 n.5. Once the message(s) are deleted, the "only record of the conversation is the time at which [the feature was manually] toggled on or off" by the user. *Id.*

SEALED ORDER - 8

spoliation sanctions are unwarranted because no actual spoliation occurred. *See generally* Dkt. # 639.[10] It contends that it appropriately responded to Plaintiffs' changing demands (and its corresponding preservation obligations) as the investigation progressed. *Id.* at 6–7. It also suggests that Plaintiffs have mischaracterized both the scope and the contents of the purportedly missing records, *id.* at 7–12, and have otherwise failed to carry their burden on a Rule 37 motion of presenting particularized proof of spoliated evidence. *See id.* at 14–16, 20–22.

The Court concludes that Plaintiffs have met their burden of showing that Amazon failed to preserve at least some evidence that it was under a duty to preserve. As noted above, Amazon received a preservation letter from the FTC on June 17, 2019. *See* Dkt. # 599-1. Amazon thus knew that it was under investigation for "conduct related to online retail sales and distribution" and that it was required to "take the necessary measures to preserve all documents and information and cease all document destruction activities with respect to matters that may be of relevance to this investigation" as of that date. *Id.* at 2. And while Defendant may be able to claim ignorance about the precise nature of this action as of June 17, 2019, it cannot claim that such ignorance persisted, especially after Defendant received the Civil Investigative Demand (CID) and participated in extensive document preservation discussions with the FTC. *See, e.g.,* Dkt. # 639 at 7 (suggesting that Amazon did not receive additional details about the FTC's

---

[10] Plaintiffs contend that Defendant has waived its arguments on this element because its Response "effectively conced[es] the first factor, that [Amazon] had a duty to preserve the relevant ESI at issue." Dkt. # 651 at 7. The Court disagrees. Although Defendant's Response does not include a specific section on the duty to preserve, *see generally* Dkt. # 639, it does repeatedly suggest that Amazon's preservation obligations do not encompass the evidence identified in Plaintiffs' Motion. *See, e.g., id.* at 6, 14, 19 (rejecting Plaintiffs' assertion "that Amazon was obligated to preserve 'all documents' from June 17, 2019, through the present"); *id.* at 8, 15, 17 (suggesting that spoliation cannot be automatically inferred from non-produced meeting notes); *id.* at 10–11, 20–22 (indicating that the disappeared Signal messages were not relevant to this litigation and so were beyond the scope of Amazon's preservation obligations).

claims until it was served with the CID); Dkt. ## 640-1–640-3 (describing some of the parties' "custodian" negotiations).

Thus, as of summer 2020, Amazon knew or should have known that a slew of raw meeting notes and Signal messages, spanning the past, present, and future, may be relevant to this action and so must be preserved. Yet despite this knowledge, Amazon instructed its employees to "delete/shred" raw meeting notes and permitted its executives to continue sending ephemeral messages. And Plaintiffs have shown that these policies resulted in raw meeting notes and Signal messages being destroyed *after* summer 2020. Plaintiffs have also shown that raw meeting notes are missing for at least three relevant business meetings in 2021 and, contrary to Defendant's assertions, that Amazon executives did discuss at least some substantive business matters on Signal. And Amazon itself has admitted that some of these deleted records were "potentially responsive." *See* Dkt. ## 599-23 at 5–7 (identifying three meetings for which "a calendar invite, chat record, or notes was produced, but a note-taker may have overwritten or discarded a copy of draft notes" and where Amazon has been unable to identify raw notes); 250-2 at 4 (stating that Amazon is "aware of four relevant custodians who used Signal for substantive work communications potentially responsive to the CID" but for whom "there were no potentially responsive substantive Signal messages available at that time to collect from those custodians' phones"). And based on the nature and scope of this litigation, as well as the contents of the records that were preserved, it follows that at least some of the non-produced, deleted records may have been relevant to this action. The Court is thus convinced that it is more likely than not that Amazon spoliated at least *some* evidence.

The Court also notes that, contrary to Defendant's assertion, it is not Plaintiffs' burden to specifically identify every piece of evidence that was lost and why it was relevant before moving

SEALED ORDER - 10

for spoliation sanctions.[11] Nor does Plaintiffs' purported exaggeration about the scope of spoliated evidence negate the fact that at least *some* evidence was likely spoliated. And while the Court acknowledges that some of the evidence at issue in Plaintiffs' Motion was destroyed by employees who were not designated as "custodians" or who had yet to receive a document preservation notice (DPN) from Amazon, these facts do not resolve the motion, as Amazon's preservation obligations exist irrespective of whether it communicated such obligations to its employees.[12]

Accordingly, the Court concludes that Plaintiffs have shown by a preponderance of the evidence that Amazon failed to preserve at least some ESI that "should have been preserved in the anticipation or conduct of litigation[.]" Fed. R. Civ. P. 37(e). Plaintiffs have thus met their burden on the first element of a Rule 37(e) motion.

2.         Loss of Evidence because of Failure to Take Reasonable Steps

A party seeking sanctions must show that the ESI was "lost because [the nonmoving] party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e). Although there is no definitive list of what steps a party must take, courts have held that "reasonable steps" under Rule 37 typically include "suspend[ing] any existing policies related to deleting or destroying files[,]" implementing "a full litigation hold[,]" and actively engaging with individual employees

---

[11] *See, e.g.*, *Noland*, 2021 WL 3857413, at *7 (concluding that ESI was "lost" based on deleted Signal conversations even though the FTC did not specifically identify any Signal messages that were missing); *Colonies Partners, L.P. v. Cnty. of San Bernardino*, 2020 WL 1496444, at *6 (C.D. Cal. Feb. 27, 2020), *report and recommendation adopted*, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020) (concluding that "there is sufficient information to find that the ESI was lost, under Rule 37(e)" because certain records were not preserved and the custodian admitted that he deliberately deleted text messages and emails); *Leon*, 464 F.3d at 959 (stating that there is no "presumption of irrelevance" as to destroyed evidence).

[12] *See, e.g.*, *Aramark*, 2021 WL 864067, at *4 (explaining that preservation obligations may arise even without a preservation letter); *Colonies*, 2020 WL 1496444, at *7 (explaining that a company may be culpable for spoliation even if its employees were directly responsible for the evidence's destruction) (collecting cases).

SEALED ORDER - 11

"to ensure that [the company's] preservation and retention policies are carried out." *Ramos v. Swatzell*, 2017 WL 2857523, at *5 (C.D. Cal. June 5, 2017), *report and recommendation adopted*, 2017 WL 2841695 (C.D. Cal. June 30, 2017); *MGA Ent., Inc. v. Harris*, 2023 WL 2628225, at *4 (C.D. Cal. Jan. 5, 2023). Courts also typically examine "reasonableness" by looking at the party's efforts with respect to specific kinds of evidence, rather than examining the party's preservation efforts as a whole.[13] The standard, however, "is reasonableness, not perfection." *Est. of Arroyo v. Cnty. of San Diego*, 2025 WL 1914399, at *8 (S.D. Cal. Apr. 14, 2025), *report and recommendation adopted sub nom. Est. of Arroyo by & through Wilson v. Cnty. of San Diego*, 2025 WL 1733194 (S.D. Cal. June 23, 2025). But merely making "'some efforts' to preserve [evidence] does not meet this obligation[.]" *Ramos*, 2017 WL 2857523, at *5.[14] And "[a]ny company that puts the onus on its employees to identify and preserve relevant evidence does so at its own peril." *United States v. Google LLC*, 747 F. Supp. 3d 1, 187 (D.D.C. 2024).

Plaintiffs contend that Amazon did not take "reasonable steps" to preserve evidence. They argue that Amazon failed to take "timely steps to preserve mobile messages[,]" as Amazon did not issue timely instructions on ephemeral messaging and also failed to ensure that its employees actually disabled Signal's disappearing messages function. Dkt. ## 598 at 16–17; 651 at 7–9. They also contend that Amazon did not take reasonable steps to preserve meeting

---

[13] *See, e.g.*, *In re Google Play Store Antitrust Litig.*, 664 F. Supp. 3d 981, 993 (N.D. Cal. 2023) (distinguishing between the reasonableness of the company's efforts to preserve emails versus chat messages); *Am. Career Coll., Inc. v. Medina*, 2022 WL 3452790, at *2–3 (C.D. Cal. July 6, 2022) (determining that the defendant failed to take reasonable measures to preserve three specific email accounts, despite its preservation and production of thousands of other emails).

[14] *See also MGA*, 2023 WL 2628225, at *4 ("A company cannot merely instruct its employees to not delete files and call it a day[.]"); *Google Play*, 664 F. Supp. 3d at 993 (concluding that it was unreasonable for the company to "g[i]ve each employee carte blanche to make his or her own call about what might be relevant in [a] complex antitrust case, and whether a Chat communication should be preserved").

SEALED ORDER - 12

notes, as it was "unreasonable" for Amazon to instruct employees to delete raw meeting notes after receiving notice of the FTC investigation, and for Amazon's counsel to enforce (or at least acquiesce to) such a policy. *Id.*

Defendant responds that Amazon did take reasonable steps to preserve evidence, as shown by the countless meeting notes and Signal messages that Amazon *did* preserve and produce. *See* Dkt. # 639 at 8–9, 11, 14–15, 19. It also argues that Amazon acted reasonably in issuing DPNs to specific employees when it did, as Amazon has consistently worked with the FTC to identify custodians and issue timely DPNs pursuant to Plaintiffs' evolving demands. *Id.* at 6–7, 11, 19–20.

But despite the accuracy of Defendant's assertions, Defendant fails to address Plaintiffs' core argument: Amazon did not take reasonable steps because it was unreasonable for Amazon to both direct its employees to "delete/shred" raw meeting notes and allow its executives to continue sending disappearing messages on Signal after learning about this action. And while Amazon can claim that it took many reasonable steps to preserve documents in general, these general efforts do not negate the unreasonableness of Amazon's decision to implement a "delete/shred" directive for raw meeting notes instead of a full litigation hold. Amazon's general preservation efforts also do not negate the fact that senior Amazon executives continued to communicate about relevant business matters on Signal and use the disappearing messages function *after* being instructed to disable ephemeral messaging and preserve all messages that may be relevant to this litigation.[15] The Court also does not find that Amazon can justify the

---

[15] Amazon's claim that it was unaware that its executives were using Signal to discuss potentially responsive matters until later, *see* Dkt. # 639 at 19, is suspect. *See* Dkt. # 598 at 11 (arguing that Amazon knew, or should have known, of its employees' Signal use before summer 2020 because its CEO and General Counsel began using Signal's disappearing messages feature in April 2019). But even if true, such a fact is immaterial to Amazon's obligation to take reasonable steps to ensure that relevant evidence

SEALED ORDER - 13

timing of its DPNs, and any corresponding failure to preserve evidence before such notice, due to its ignorance about which employees had preservation obligations in relation to this litigation.[16]

Plaintiffs also say, and Defendant does not contest, that Amazon's unreasonable preservation practices resulted in the loss of the ESI at issue in this motion. The Court thus concludes that Plaintiffs have shown by a preponderance of the evidence that relevant ESI was "lost" because Amazon "failed to take reasonable steps to preserve it," Fed. R. Civ. P. 37(e), thereby satisfying their burden on the second element of a Rule 37(e) motion.

3.        Irreplaceability of Lost Evidence

Plaintiffs contend that "[t]he materials at issue here 'cannot be restored or replaced through additional discovery.'" Dkt. # 598 at 17 (quoting Fed. R. Civ. P. 37(e)). Defendant does not meaningfully dispute this contention. *See generally* Dkt. # 639.[17] And the Court is unaware of any technological mechanism that would allow for the recovery of the lost evidence at issue in Plaintiffs' Motion. Plaintiffs have thus satisfied their burden on the third and final element of a Rule 37(e) motion.

---

is preserved, as companies have an affirmative duty to retain discoverable evidence and ensure that all employees are complying with any applicable litigation holds. *See Napster*, 462 F. Supp. 2d at 1070; *Ramos*, 2017 WL 2857523, at *5–6; *MGA*, 2023 WL 2628225, at *4–5; *Google Play*, 664 F. Supp. 3d at 993; *Colonies*, 2020 WL 1496444, at *8.

[16] *See, e.g.*, *Colonies*, 2020 WL 1496444, at *8 (rejecting the party's claim that it was not required to preserve information because "[the custodian] had no idea he was required to preserve" the information until later in the litigation, as "[i]gnorance of this obligation of preservation, especially from sophisticated parties who have the assistance of experienced counsel, is not persuasive"); *Google Play*, 664 F. Supp. 3d at 993 (rejecting the party's claim that it was not required to preserve chat communications because it did "not really know[ ] the issues in [the] litigation"); *Ramos*, 2017 WL 2857523, at *6 (rejecting the party's claim that it was not required to preserve a certain personnel file because the custodian was "unaware of the [litigation] hold" when she destroyed the file).

[17] Defendant argues that any purportedly lost evidence is irrelevant, unimportant, or otherwise non-prejudicial because Plaintiffs can rely on other sources. *See generally* Dkt. # 639. Defendant does not, however, argue that the missing meeting notes and disappeared Signal messages can be digitally recovered or otherwise replaced through additional discovery. *Id*.

SEALED ORDER - 14

4.      Prejudice to Plaintiffs

Under Rule 37(e), "[p]rejudice exists when spoliation prohibits a party from presenting evidence that is relevant to its underlying case." *Fast*, 340 F.R.D. at 339 (quoting *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019)).[18]  But when evidence no longer exists, proving relevance "can be a difficult task[.]" *Id.*  Accordingly, "if spoliation is proven, the burden shifts to the spoliating party to prove [that] the lost information is not prejudicial." *Rehn v. City of Seattle*, 2025 WL 1207668, at *3 (W.D. Wash. Apr. 25, 2025) (quoting *Youngevity Int'l v. Smith*, 2020 WL 7048687, at *3 (S.D. Cal. July 28, 2020)).  And "[i]n the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Id.* at *1 (quoting *Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*, 2009 WL 1949124, at *10 (N.D. Cal. July 2, 2009)); *see also Leon*, 464 F.3d at 959 ("[A] party can hardly assert any presumption of irrelevance as to the destroyed documents.") (citation and internal quotation marks omitted).

Plaintiffs say they were prejudiced because the lost meeting notes and Signal messages "would be the best evidence of decisions made at Amazon and the unfiltered views of senior Amazon executives."  Dkt. # 598 at 10, 20.  They argue that: (1) "Amazon has effectively conceded the relevance of meetings with missing raw notes by producing documents associated with the same meetings, such as pre-reads and sanitized notes"; and (2) "Amazon executives clearly used Signal to discuss some matters relevant to this case" and "it strains credulity to think that even though Amazon's senior leadership used Signal to discuss work-related matters for over three years, they never used ephemeral messaging to discuss matters relevant to this case."

---

[18] *See also Leon*, 464 F.3d at 959 ("The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case.") (cleaned up and citations omitted).

SEALED ORDER - 15

*Id.* at 15.  And they say that they are entitled to sanctions, as "Amazon cannot rebut the presumption that the destroyed evidence was relevant and adverse to Amazon."  *Id*. at 20.

Defendant responds that Plaintiffs have not shown prejudice.  *See generally* Dkt. # 639.  As for the meeting notes, Defendant says that: (1) "[f]or the three instances in which Plaintiffs contend rough draft meeting notes were destroyed, Amazon produced the substantive documents discussed at the meetings and the final meeting notes"; (2) "Plaintiffs deposed meeting attendees [for these three meetings] but did not ask about any discussions that occurred or decisions that were made"; and (3) "isolated comments in three meetings cannot possibly be the key to the antitrust issues in this litigation."  *Id*. at 16.[19]  And for the Signal messages, Defendant argues that "Plaintiffs' speculation that some unavailable [Signal] messages might have been relevant is insufficient to establish prejudice."  *Id*. at 20.  More generally, Defendant asserts that Plaintiffs have misrepresented the extent of spoliated evidence, *see generally id*., thereby implying that any curative sanctions must be narrow in scope.

The Court agrees and disagrees with both parties in part.  On the one hand, the Court agrees with Plaintiffs that Defendant has failed to rebut the presumption that the destroyed meeting notes and Signal messages were relevant to Plaintiffs' claims.  It thus concludes that Plaintiffs have met their burden of showing that curative sanctions are warranted under Rule 37(e).  But on the other hand, the Court agrees with Defendant that it is unclear what comprises the universe of spoliated evidence: Plaintiffs have not specifically identified any missing Signal messages or raw meeting notes (beyond the three identified in this Order) that are relevant to this

---

[19] Defendant also correctly notes that Plaintiffs' Motion contains an inaccurate comparison of meeting notes.  *See* Dkt. # 639 at 17; *see also* Dkt. # 598 at 15–16 (comparing raw notes from a July 2022 meeting to final notes from a July 2021 meeting).  Plaintiffs acknowledge this error in their Reply and provide a corrected comparison.  *See* Dkt. # 651 at 12 n.5; *see also* Dkt. ## 600-16 (raw notes from a July 2022 meeting) & 640-41 (final notes from that same July 2022 meeting).

SEALED ORDER - 16

litigation and the Court is not persuaded that *every* deleted Signal message and business meeting for which no raw notes exist indicates spoliated evidence. Based on the present record, then, the Court cannot determine what measures would be "no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1).

Accordingly, the Court concludes that it would be inappropriate to award Rule 37(e)(1) sanctions at this time. It thus DENIES Plaintiffs' request for spoliation sanctions under Rule 37(e)(1) but GRANTS Plaintiffs leave to conduct additional discovery into the extent of Amazon's spoliation and to renew its request for sanctions, if appropriate, after that discovery has occurred.

### 5. Amazon's Intent

Under Rule 37(e), a party "act[s] with the intent to deprive another party of the information's use in the litigation" if it engages in "the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). This is "a demanding specific-intent standard," which requires more than a showing of negligence or even gross negligence. *Gregory v. State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024). But "[b]ecause intent can rarely be shown directly," courts may rely on circumstantial evidence, such as "the timing of destruction, affirmative steps taken to delete evidence, and selective preservation[,]" to determine whether a party acted with the requisite intent. *Jones*, 95 F.4th at 735.

Here, Plaintiffs have made a strong showing that Amazon willfully destroyed at least some evidence to avoid its discovery obligations. *See* Dkt. # 598 at 7–10, 21–23. But given the lack of clarity regarding the universe of spoliated evidence, *see* part II(B)(4) above, the Court cannot determine exactly what evidence was destroyed, let alone whether it was willfully destroyed to avoid its discovery in *this* action. Based on the present record, then, the Court

SEALED ORDER - 17

cannot find that Defendant acted with the requisite intent to award Rule 37(e)(2) sanctions. The Court thus DENIES Plaintiffs' request for spoliation sanctions under Rule 37(e)(2) but GRANTS Plaintiffs leave to conduct additional discovery on this issue and to renew its request for sanctions, if appropriate, after that discovery has occurred.

C.      Plaintiffs' Motion to Compel the Production of Documents (Dkt. # 604)

When a party refuses discovery, the requesting party may move to compel it under Federal Rule of Civil Procedure 37(a). *See* Fed. R. Civ. P. 37(a); *see also Yates v. Cabrera*, 2025 WL 3473041, at *1 (D. Nev. Dec. 2, 2025). "Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance." *Cooper v. Cnty. of San Luis Obispo*, 350 F.R.D. 625, 630 (C.D. Cal. 2025) (quoting *Nguyen v. Lotus by Johnny Dung Inc*., 2019 WL 3064479, at *2 (C.D. Cal. June 5, 2019)). The party opposing discovery then bears a "heavy burden" to show why such discovery should not be permitted. *Id*.; *see also Yates*, 2025 WL 3473041, at *1. If discovery is refused on privilege grounds, the refusing party must also provide a detailed privilege log that "describe[s] the nature of the documents, communications, or tangible things not produced or disclosed . . . in a manner that . . . will enable other parties to assess [its privilege] claim." Fed. R. Civ. P. 26(b)(5)(A)(ii); *see also In re Meta Pixel Healthcare Litig.*, 2024 WL 3381029, at *2 (N.D. Cal. July 10, 2024).

The same standards apply when a party moves to compel evidence that is being withheld on the basis of work-product protection or attorney-client privilege: "[t]he party asserting the [ ] privilege has the burden of proving that [it] applies to a given set of documents or communications" and "must produce a privilege log that is sufficiently detailed for the opposing party to assess whether the assertion of privilege is justified." *In re Grand Jury Investigation (GJI)*, 974 F.2d 1068, 1070 (9th Cir. 1992); *Rodriguez v. Seabreeze Jetlev LLC*, 620 F. Supp. 3d 1009, 1023 (N.D. Cal. 2022) (quoting *Prado v. Equifax Info. Servs. LLC*, 2019 WL 88140, at *3

SEALED ORDER - 18

(N.D. Cal. Jan. 3, 2019)).  If the party's privilege claim remains disputed, *in camera* review is "an acceptable means to determine whether disputed materials fit within the privilege."  *GJI*, 974 F.2d at 1074.  The threshold for such a review is "not high."  *L.D. v. United Behav. Health*, 2022 WL 3139520, at *11 (N.D. Cal. Aug. 5, 2022).  But "it is an intrusion which must be justified."  *GJI*, 974 F.2d at 1074.[20]  Accordingly, before a court will conduct an *in camera* review, the party requesting it must first "show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged."  *Id*. at 1075.  If this showing is satisfied, the decision to conduct the review then "rests within the discretion of the district court."  *Id*.

Plaintiffs ask the Court to "order Amazon to produce all withheld documents that describe and implement [Amazon's] P&C Protocol[.]"  Dkt. # 604 at 6.  They say that Amazon has adopted certain corporate communications policies, collectively, the "P&C Protocol," for the purpose of "creat[ing] a sanitized record for government enforcers and, ultimately, the courts" to avoid antitrust liability.  *Id*. at 8.  And they argue that Amazon must produce these documents, as the P&C Protocol's primary purpose is not to provide or receive legal advice, so the attorney-client privilege does not apply.  *See id*. at 6–7.[21]  They also argue that the work-product doctrine does not apply to the challenged documents because such documents "concern business decisions and were not prepared because of anticipated litigation."  *Id*. at 24.  Accordingly, Plaintiffs request that the Court: (1) conduct an *in camera* review of Amazon's clawed-back

---

[20] *See also Hellmann-Blumberg v. Univ. of the Pac.*, 2013 WL 4407267, at *5 (E.D. Cal. Aug. 15, 2013) (rejecting the plaintiff's request for *in camera* review based on a "broad and unfocused challenge to what appears to be an adequate privilege log"); *In re Telescopes Antitrust Litig.*, 2024 WL 1016070, at *3 (N.D. Cal. Feb. 13, 2024) (rejecting the plaintiffs' privilege challenge because they "did not mount a document-or entry-specific challenge to [the defendants'] privilege or work product claims").

[21] In the alternative, Plaintiffs argue that Defendant should be compelled to produce the documents under the crime-fraud exception.  *See* Dkt. # 604 at 7.  But because the Court resolves this motion on attorney-client privilege grounds, *see* part II(C)(2) below, it need not address the parties' crime-fraud exception arguments.

SEALED ORDER - 19

documents; (2) order Amazon to produce all P&C Protocol documents it has withheld on privilege grounds; and (3) order Amazon to conduct a comprehensive privilege re-review, followed by an *in camera* review of a representative sample, to ensure that Amazon has applied the correct privilege standard. *See id*. at 19–20.

Defendant counters that Amazon has properly withheld certain materials on the basis of attorney-client privilege and that Plaintiffs have not satisfied their burden of making particularized showings to overcome these legitimate claims of privilege. *See* Dkt. # 635 at 6. It contends that Plaintiffs' Motion misconstrues the role of in-house counsel and applies the wrong standards to evaluate Defendant's privilege claims. *See id*. at 10–21. And it suggests that Plaintiffs' Motion is baseless because Amazon has already produced thousands of documents, Plaintiffs have not been deprived of any materials necessary to prosecute their case, and many of Plaintiffs' challenges have already been considered (and rejected) in the Related Cases. *Id*. at 6–7, 28.[22]

The Court addresses the parties' arguments below.

---

[22] Defendant also argues that Plaintiffs have improperly reviewed, cited, and submitted seven clawed-back documents to the Court in violation of the Federal Rules of Civil Procedure and this Court's prior Order. *See* Dkt. # 635 at 21. In their Reply, Plaintiffs say that these clawed-back documents are properly presented "'to the court under seal for a determination' on Amazon's privilege claim" under Federal Rule of Civil Procedure 26(b)(5)(B). Dkt. # 655 at 15 n.4 (quoting Fed. R. Civ. P. 26(b)(5)(B)). Plaintiffs also argue that they "were aware of the contents of each of these clawed-back documents before they were clawed back[,]" *see* Dkt. # 604 at 10 n.2, and so they are entitled to use this information to challenge Defendant's privilege claims. *See* Dkt. # 655 at 15 n.4 (citing *In re Keurig Green Mountain Single Serve Coffee Antitrust Litig*., 2019 WL 2003959, at *2–3 (S.D.N.Y. May 7, 2019)). Based on these representations, the Court is not concerned by Plaintiffs' submission of these documents in connection with their request for an *in camera* review, as Plaintiffs are permitted to present such documents to the court under seal for determination of Defendant's claims of privilege. *See id*.; *see also* Fed. R. Civ. P. 26(b)(5)(B). The Court is, however, concerned by Plaintiffs' precise citations to the clawed-back materials throughout their motion, *see generally* Dkt. # 604, as Plaintiffs were required to sequester the clawed-back documents and "take reasonable steps to prevent further use of such information[.]" *See* Dkt. # 256 at 10–11; Fed. R. Civ. P. 26(b)(5)(B). The Court thus declines to consider these materials in connection with its resolution of Plaintiffs' Motion, but it will not strike them from the record.

1.      The P&C Protocol

Plaintiffs refer to the policies and practices that they are challenging as "Amazon's P&C Protocol." *See generally* Dkt. # 604.  Per Plaintiffs, "[t]he P&C Protocol has three parts: (1) rules to avoid creating a written record that could be used against Amazon in investigations or litigation; (2) revisions to documents to implement those rules and support Amazon's legal positions; and (3) a systemic practice of marking documents relating to sensitive topics as privileged so that Amazon can withhold unsanitized or unfavorable documents." *Id*. at 8.  And they say that collectively, these practices and policies operate as a corporate communications policy that is at the heart of Defendant's claims of privilege. *See id.* at 6, 17, 21.

Plaintiffs support their contentions about the existence of the protocol by pointing to many instances of Amazon executives and lawyers instructing employees to avoid creating a written record or to alter language in existing documents to mitigate risk. *See id.* at 8–16.  For example, Plaintiffs note that on various occasions, Amazon and its lawyers directed employees to avoid creating a written record and to delete such records when they exist. *Id*. at 9.[23]  They also contend that many of these directives concerned antitrust-related topics. *Id*. at 9–13.[24]  And

---

[23] *See, e.g*., Dkt. # 605-2 at 2 ("[R]aw notes like in the attached should not be taken. . . Please hold off on making verbatim notes, attributed to individual meeting participants, in the future."); Dkt. # 605-3 at 2 ("The important thing is to leave the legal advice and sensitive details out of the notes[.]"); Dkt. # 605-4 at 3 ("You should also get rid of the raw notes once you complete and distribute the final notes."); Dkt. # 606-8 at 2 ("There's a decent chance they're going to be produced to the government. So don't write anything you don't want a government lawyer reading . . . at a deposition."); Dkt. # 606-10 at 5 (instructing an employee not to send something via email); Dkt. # 607-2 at 5 (telling employees to discuss via P&C-marked emails and to "not discuss via Chime").

[24] *See, e.g*., Dkt. # 605-8 at 3 (providing a "a quick refresher on core principles for thinking and communicating about competition issues"); Dkt. # 605-17 at 5–6 (explaining the "Do's and Don'ts" for drafting a "competitive narrative"); Dkt. # 605-18 at 3 (presenting "communication guidelines to follow when discussing PDP-related initiatives in internal documents"); Dkt. # 605-27 at 6 (listing "Terminology to use and avoid (especially in business documents)"); Dkt. # 605-28 at 3 (advising employees to avoid using "market," "marketplace," and other similar terms); Dkt. # 605-30 at 2 (indicating that use of the term "online share" is "careless" and must be "root[ed] out"); Dkt. # 606-9 at 2 (discussing whether "incentives" is an appropriate term); Dkt. # 606-15 at 2 (directing employees to be "careful" about how

SEALED ORDER - 21

they cite many statements by employees that seem to suggest that Amazon's communications policies were purposefully designed and implemented to avoid antitrust liability.  *See id.*[25]

Plaintiffs also discuss the many ways in which counsel is involved with the production, alteration, and circulation of potentially discoverable documents.  For example, Plaintiffs note that Amazon's associate general counsel is tasked with drafting Amazon's main "Competition OP1s" as well as other potentially sensitive documents.  *Id.* at 11 (citing Dkt. ## 606-1 at 2; 605-16 at 2).  They also say that Amazon's attorneys are tasked with reviewing and revising key documents to "sanitize" them in line with the P&C Protocol, resulting in substantial alterations to

---

they talk about SFP); Dkt. ## 606-2 at 2; 606-3 at 8; 606-4 at 29; 606-6 at 2 (instructing employees to remove references to "price parity"); Dkt. ## 605-25 at 7; 605-27 at 6; 605-28 at 3; 606-7 at 3 (instructing employees to remove references to "Buy Box").

[25] *See, e.g.*, Dkt. # 605-1 at 2 ("[W]e have formed an antitrust working group comprised of teams from legal, economics, public policy, and corporate communications to help identify, align on, and proactively manage competition risks."); Dkt. # 605-2 at 2 ("Clark's office recently issued guidance that detailed, raw notes like in the attached should not be taken. This makes sense as conversations taken out of context can create issues if we end up having to produce notes to a regulator or in litigation. Please hold off on making verbatim notes, attributed to individual meeting participants, in the future."); Dkt. # 605-5 at 2 ("[W]e should consult wiht [sic] legal on the official meeting notes. We may want to write them very purposefully to support any discovery[.]"); Dkt. # 605-6 at 18 ("[O]nce we analyse the information and arrange it in a way that clearly shows we are aware of seller behaviour off Amazon, we lose the ability to tell regulators that we were unaware of those effects."); Dkt. # 605-25 at 4–5 ("These proposals are intended as a branding exercise to change how we talk about our consumer business . . . None of these suggestions will be sufficient (alone or in combination) to stave off regulatory inquiry . . . However, the themes suggested below may help reframe how those actions are perceived and help inoculate against the more extreme forms of regulatory contagion."); Dkt. # 605-28 at 3 ("The purpose of these changes is to better reflect what our consumer business offers in order to emphasize that Amazon is not different from other retailers and thus deflect some regulatory and other scrutiny[.]"); Dkt. # 606 at 3 ("[We] have to be careful in how we phrase due to compettion [sic] legal concerns[.]"); Dkt. # 606-8 at 2 ("That said, it doesn't hurt to be a little paranoid about SFP communications. There's a decent chance they're going to be produced to the government. So don't write anything you don't you don't want a government lawyer reading . . . at a deposition."); Dkt. # 606-15 at 2 ("I know you know this, but we need to tighten up given that [some language around SFP] nearly made it through to broadly being shared which would've been a risk."); Dkt. # 606-16 at 2 ("I don't understand how line 24-28 made it through legal and senior review . . .These kinds of docs . . . have to be written as if someone outside the company were going to read it."); Dkt. # 606-20 at 2 ("From a practical perspective, there may also be internal documents or email communications indicating other motives for this policy change, which would make it difficult to support the procompetitive narrative we are building in the event of an investigation.").

SEALED ORDER - 22

documents before they are distributed to executives and other employees. *See id.* at 13.[26] And they contend that Amazon "directs employees to route business documents through attorneys with boilerplate 'privileged and confidential' markings," thereby "cloaking" various antitrust-related discussions with attorney-client privilege. *Id.* at 13–16.[27]

---

[26] *See, e.g.*, Dkt. # 605-3 at 2 ("I DO believe it is correct to omit the SVPs from the notes circulation."); Dkt. # 606-11 at 2 ("[W]e'd love an opportunity to pre-review the docs from econ before they are circulated to a wider audience."); Dkt. # 606-15 at 2 ("Lauren caught some language around SFP which I think we should try to be more careful to catch and adjust."); Dkt. # 606-16 at 2 ("I don't understand how line 24-28 made it through legal and senior review[.]"); Dkt. # 606-17 at 2 ("If it is going to be broadly distributed or distributed to a high level audience, I would like to review it before it is finalized. There is some language in here that I would change[.]"); Dkt. # 606-18 at 4 ("Don't send it out . . . [b]efore we get the legal approved version[.]"); Dkt. # 606-19 at 2 ("Do NOT include Doug (or an L11+) on meeting note distribution."); Dkt. # 606-24 at 4 ("There are so many proposed deletes in the doc [from legal], while I'm reviewing in detail, it will impact the key messages and recommendations[.]").

[27] *See, e.g.*, Dkt. # 606-8 at 2 ("We should continue to consider SFP 'confidential' for the moment. You can pass this same guidance onward to others, just do it in a P&C email and put [an attorney] on the 'To' line."); Dkt. # 606-13 at 2 ("As a reminder, please do not forward broadly and, if you need to share, please send under P&C cover with your attorney on the 'to' line."); Dkt. # 606-14 at 2 ("Anything regarding financial results from pricing actions or Nessie should be P&C. Please always include [an attorney] on the To: line for such discussions, include 'Privileged and Confidential' in the subject, and begin such threads by requesting legal advice[.]"); Dkt. # 606-25 at 3 ("If you are sending docs to folks in the EU, please include [an attorney] on the to line when marking P&C just like you would for me normally . . . and request advice on the competition implications of this proposal."); Dkt. # 606-27 at 2 ("Most pricing topics are P&C so please CC [an attorney] and maintain P&C practices for any correspondence regarding pricing projects."); Dkt. # 606-28 at 2 ("Marking P&C due to SFP prime badge and regionality[.]"); Dkt. # 606-29 at 3 ("Since this topic touches on sensitive areas of pricing, I want to keep [an attorney] in the loop."); Dkt. # 606-30 at 2 ("[A] lot of our work in ASB is privileged and if it's an email you should add in legal counsel if we are discussing (1) strategy, (2) actions we have/will take on specific cases."); Dkt. # 607 at 2 ("[W]e need to trim the broad distr[ibution] and also mark P&C for sensitive lang[uage]."); Dkt. # 607-1 at 2 ("Moving forward please mark emails related to FMA and this topic as P&C and use legal counsel."); Dkt. # 607-2 at 5 ("As a reminder, this study is P&C. Please include '+ [an attorney] for guidance' for all email communications. The subject line should begin with 'Privileged & Confidential,' as should any meetings. [The attorney] should be on the To line of all communications and is required in all meetings."); Dkt. # 607-6 at 2 ("Would you be open to sharing this response . . . via the P&C meeting doc so we can try to assert privilege over it? . . . It is harder for us to successfully assert privilege over emails that are primarily business in nature, so keeping this in the meeting doc would be more secure."); Dkt. # 607-7 at 2 ("When you add people to a thread without the first line being '[Attorney], seeking legal guidance' you break P&C and this thread becomes discoverable. Please make sure to follow the protocol so our early thinking and feedback from legal does not lead to future misunderstandings."); Dkt. # 607-8 at 3 ("[I]f you wouldn't want the email to be discoverable than best practice is to mark P&C and include [an attorney.]"); Dkt. ## 606-26–28 (examples of business emails with the phrase "seeking your legal guidance" at the beginning, lawyers on the "To" line, and other employees CC'd); Dkt. ## 607-3–5 (examples of employees testifying about how it is their common practice to mark certain topics as P&C and include lawyers on those communications).

SEALED ORDER - 23

Defendant challenges various aspects of Plaintiffs' characterization of the so-called P&C Protocol. *See generally* Dkt. # 635. For example, Defendant argues that Plaintiffs ignore the role of corporate counsel and attempt to portray Defendant's legitimate use of in-house lawyers as something nefarious. *See id*. at 11. Defendant also argues that Plaintiffs "misconstrue the record to construct a 'P&C Protocol'" and "claim that almost all attorney guidance was . . . part of an effort to hide or manipulate evidence[,]" rather than making individualized challenges to specific communications over which Amazon asserted the attorney-client privilege. *Id*. at 10. But despite these points of contention, Defendant does not meaningfully rebut Plaintiffs' claims that Amazon directed its employees to avoid writing certain things down, revise documents to eliminate potentially sensitive terms, and involve counsel in certain kinds of communications. *See generally id*. Nor does Defendant meaningfully contest Plaintiffs' claim that these policies and practices collectively function as a corporate communications policy. *See id*. The Court thus accepts Plaintiffs' claim that Amazon has a corporate communications policy—the P&C Protocol—and adopts Plaintiffs' naming convention and three-part definition for this Order.

2.       Application of the Attorney-Client Privilege

The attorney-client privilege is a critical evidentiary privilege that seeks to "encourage full and frank communication between attorneys and their clients[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). In the Ninth Circuit, attorney-client privilege exists where: "(1) [ ] legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (quoting *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010)). The privilege, however, is "narrowly and strictly construed[,]" and applies "only when necessary to effectuate

SEALED ORDER - 24

its limited purpose of encouraging complete disclosure by the client." *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989) (citations and internal quotation marks omitted); *see also United States v. Christensen*, 828 F.3d 763, 803 (9th Cir. 2015).

In the business context, "[t]he attorney-client privilege extends to confidential communications between employees of a corporation and the corporation's attorney, as well as to confidential communications among corporate employees relating to legal advice obtained from the corporation's attorney." *Skansgaard v. Bank of Am., N.A.*, 2013 WL 828210, at *1 (W.D. Wash. Mar. 6, 2013) (internal citations omitted). But just because a communication involves a lawyer in their professional capacity does not mean that it is privileged. *See United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) ("That a person is a lawyer does not, *ipso facto*, make all communications with that person privileged.").[28] Instead, such a communication is covered by the attorney-client privilege only if the "primary purpose" of the communication "is to give or receive legal advice, as opposed to business or [other non-legal] advice." *Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1224 (9th Cir. 2025) (quoting *In re Grand Jury (GJ)*, 23 F.4th 1088, 1091 (9th Cir. 2021)); *see also Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1179 (9th Cir. 2025). And the party asserting the privilege must "make a clear showing that the speaker made the communication for the purpose of obtaining or providing legal advice" before claiming privilege over some or all of the document. *Oracle Am., Inc. v. Google, Inc.*, 2011 WL 3794892, at *4 (N.D. Cal. Aug. 26, 2011) (cleaned up and citations omitted).[29]

---

[28] *See also United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002) ("Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys.").

[29] *See also Est. of Serna v. Cnty. of San Diego*, 689 F. Supp. 3d 848, 863 (S.D. Cal. 2023), *aff'd sub nom. Est. of Serna by & through Gilliland v. Cnty. of San Diego*, 2024 WL 942368 (S.D. Cal. Mar. 5, 2024) ("[R]edaction is available for documents" that contain both legal and nonlegal advice, where nonlegal advice "is the predominant purpose of the communication.") (citation and internal quotation marks omitted).

SEALED ORDER - 25

As for communications between employees and in-house counsel, "there is no presumption that [the communications] are protected by attorney-client privilege." *Dolby Labs. Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 866 (N.D. Cal. 2019). This is true "[e]ven when an in-house attorney leads a discussion or takes an active role in a meeting," or when the communication is marked "privileged and confidential," is sent to a lawyer, and contains the phrase "seeking legal advice." *De Coster v. Amazon.com*, Inc., 2025 WL 904465, at *5 (W.D. Wash. Mar. 25, 2025).[30] Rather, communications with in-house counsel are privileged only if the primary purpose involves legal matters, such as when an attorney gives their client legal advice on a business decision, explains the possible legal consequences of a proposed text, or provides recommendations on how to avoid future liability-creating events.[31] Communications that predominantly concern "business matters," however, are excluded from the privilege.[32] This includes documents that are prepared and edited by attorneys in their business capacities,[33] as

---

[30] *See also Oracle*, 2011 WL 3794892, at *4 ("Boilerplate designations[, such as 'Attorney Work Product' and 'Confidential,'] do not mechanically confer privilege, nor does merely including an attorney in a communication.") (internal citations omitted); *City of Roseville Emps.' Ret. Sys. v. Apple Inc.*, 2022 WL 3083000, at *14 (N.D. Cal. Aug. 3, 2022) ("Merely copying in-house counsel on an email exchange does not make a communication privileged.").

[31] *See, e.g.*, *Tsantes v. BioMarin Pharm. Inc.*, 2022 WL 17974487, at *1 (N.D. Cal. Dec. 7, 2022) ("Where an attorney gives a client legal advice on a business decision, that communication is protected by privilege.") (citation and internal quotation marks omitted); *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230, 1242 (D. Or. 2017) ("If underlying edited or redlined documents contain legal advice from counsel, those documents (or at least the edits or redlines) are entitled to protection."); *id.* at 1244 (If "communications were sent to or from counsel seeking or providing actual legal advice, such as about possible legal consequences of proposed text or an action being contemplated by [the company], then such communications would be privileged."); *Greer*, 127 F.4th at 1225 (The attorney-client privilege applies to documents "assessing legal liability for a past event and avoiding legal liability for future similar events.").

[32] *See GJ*, 23 F.4th at 1094 (distinguishing communications for the primary purpose of seeking legal advice from those motivated by "business reasons"); *Dolby*, 402 F. Supp. 3d at 866 ("Communications with in-house counsel may relate to business rather than legal matters, and in-house counsel's business advice is not protected by attorney-client privilege.").

[33] *See, e.g.*, *De Coster*, 2025 WL 904465, at *6 (concluding that "stylistic and grammatical" edits to business memoranda do not constitute "legal analysis or advice"); *Entrata, Inc. v. Yardi Sys., Inc.*, 2018 WL 3055755, at *3 (D. Utah June 20, 2018) ("[S]imple editorial changes . . . do not qualify for attorney-client privilege protection.").

SEALED ORDER - 26

well as documents that are sent to attorneys without a clear legal purpose or an obvious request for legal advice.[34]

There also is no blanket protection for communications that concern corporate policies. While some communications concerning compliance with corporate policies may be protected, others are beyond the scope of the attorney-client privilege. For example, the Ninth Circuit has suggested that an action for the purpose of "comply[ing] with regulatory requirements and corporate policy" can be considered a business matter and thus beyond the scope of the privilege. *See GJ*, 23 F.4th at 1094; *see also Epic*, 161 F.4th at 1179–1180 (rejecting claim of privilege over documents that discussed compliance with a court order). Likewise, while some conversations about the design or adoption of a corporate policy may be protected, the policy itself, even if based on counsel's advice, is typically not protected. *See Stevens v. Corelogic, Inc*, 2016 WL 397936, at *4 (S.D. Cal. Feb. 2, 2016) (citation omitted).

Here, Plaintiffs say that the "[d]ocuments concerning the P&C Protocol are not privileged, because the 'primary purpose' of those documents is not the provision or receipt of legal advice." Dkt. # 604 at 21. They argue that the protocol is a corporate communications policy, not legal advice, and thus is beyond the scope of the attorney-client privilege. *See id.* And they say that Amazon's attorneys (and other employees) are acting in a business capacity,

---

[34] *See, e.g.*, *Oracle*, 2011 WL 3794892, at *5 (rejecting the defendant's privilege claim over an email because the defendant did not show that the email was a "communication related to the purpose of obtaining legal advice from a legal advisor in [their] capacity as such"); *Fed. Trade Comm'n v. Amazon.com, Inc.*, 2025 WL 821890, at *4 (W.D. Wash. Mar. 14, 2025) (rejecting claim of privilege over emails that included an attorney with a "vague request that [they] add 'changes' to the document" because there was "no discernable request for or providing of legal advice"); *Garner v. Amazon.com, Inc.*, 2024 WL 4266665, at *2–3 (W.D. Wash. Sept. 23, 2024) (rejecting claims of privilege over certain communications in which the attorney was "listed as a recipient of the document" and "called out by name with a vague request that he or she 'advise'" but where there was "no discernable request for or giving of legal advice in the communications").

SEALED ORDER - 27

not a legal capacity, when they act to implement and enforce the protocol, and so such documents are non-privileged. *Id*.

Defendant responds that it has appropriately applied the attorney-client privilege. *See generally* Dkt. # 635. It argues that Plaintiffs incorrectly "wield the so-called 'P&C Protocol' to cast suspicion on three commonplace and appropriate in-house lawyer activities: (1) providing legal advice regarding the accurate use of language in business documents, especially for terms having legal meanings; (2) editing documents; and (3) instructing on privilege law, including when to mark documents privileged and seek legal guidance." *Id*. at 11. And it says that all challenged documents have been properly withheld on the basis of Defendant's claims of privilege over these legitimate in-house legal activities. *See id.* at 12–18.

But Defendant's arguments do not sufficiently rebut Plaintiffs' core claim: the primary purpose of the P&C Protocol was to provide business advice, *not* legal advice. As discussed in part II(C)(1) above, the P&C Protocol functions as a corporate communications policy. And corporate policies, as well as the actions taken to enforce them, are typically not privileged (*even if* motivated by legal concerns) because they concern business matters, not legal advice. *See Stevens*, 2016 WL 397936, at \*4; *Epic*, 161 F.4th at 1179–1180.

Plaintiffs also provide many examples that tend to show that Amazon's internal communications concerning the P&C Protocol were not made "for the purpose of obtaining or providing legal advice." *See Oracle*, 2011 WL 3794892, at \*4. For example, Plaintiffs cite many examples of employees indicating that they are copying lawyers on emails or marking certain documents as privileged, despite the email containing no obvious request for legal advice. *See* Dkt. # 604 at 15–16. They also provide various examples of employees (and Defendant itself) saying that such actions are motivated by non-legal reasons. *See, e.g.*, Dkt. ## 605-2 at 2; 606-8 at 2; 607-7 at 2; 607-8 at 3 (indicating that the purpose of the action is to avoid discovery);

SEALED ORDER - 28

Dkt. ## 607-12 at 15, 23; 635 at 12–14 (indicating that in-house counsel helps promote "accuracy" in documents); Dkt. ## 606-11 at 2; 635 at 13 (indicating that in-house counsel helps ensure "common purpose" in documents). Additionally, Plaintiffs have shown, and Defendant does not contest, that the communications guidance was distributed widely and enforced by lawyers and non-lawyers alike. *See* Dkt. # 604 at 21–22. And Amazon's own in-house attorneys have stated that their job requires them to "weigh in on both business and legal issues[,]" meaning they "not only provide legal advice" but also advise on "accuracy," "messaging," and other kinds of "strategic thinking." *See* Dkt. # 607-12 at 23.

The Court is thus convinced that the P&C Protocol itself, as well as certain attempts to ensure compliance with it, are beyond the scope of the attorney-client privilege. Defendant, however, appears to have a very different understanding of the scope of the attorney-client privilege, as well as the extent to which it applies to the communications and policies at issue in Plaintiffs' Motion. *See generally* Dkt. # 635.[35] This would suggest that the privilege was incorrectly applied to at least some of the withheld documents. Additionally, because of Amazon's history of privilege abuse in the Related Cases, *see* Dkt. # 604 at 16–17, the Court is not inclined to unquestioningly accept Defendant's claim that it has properly applied the attorney-client privilege to all withheld documents here.

Plaintiffs have thus met their burden of showing "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in

---

[35] Defendant also seems to suggest that it is Plaintiffs' burden to demonstrate how and why each claim of privilege is improper before the Court should order any relief. *See, e.g.*, Dkt. # 635 at 6 ("[Plaintiffs] do not make the particularized showing required to overcome legitimate claims of privilege."); *id*. at 10 ("Plaintiffs do so to sidestep the necessary individualized determination of whether any specific attorney communication is privileged."). But this is incorrect: it is Defendant's burden to show that each claim of privilege is proper, not the other way around. *See GJI*, 974 F.2d at 1070 ("The party asserting the attorney-client privilege has the burden of proving that the privilege applies to a given set of documents or communications.").

SEALED ORDER - 29

the materials is not privileged." *GJI*, 974 F.2d at 1075. Accordingly, Plaintiffs have sufficiently justified the Court's intrusion into Defendant's claims of attorney-client privilege, *see id.*, and so the Court proceeds in part II(C)(4) below to consider whether it should conduct an *in camera* review.

       3.     Application of the Work-Product Doctrine

"The work-product doctrine is a qualified privilege that protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020) (citations and internal quotation marks omitted). "To qualify for work-product protection, documents must: (1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's representative.'" *Richey*, 632 F.3d at 567 (quoting *In re Grand Jury Subpoena, (Mark Torf/Torf Envtl. Mgmt.*), 357 F.3d 900, 907 (2004)). If a "document serves a dual purpose, that is, where it was not prepared exclusively for litigation," the court applies the "because of" test, which requires the court to "consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation." *Id.* at 568. In applying this test, "[i]t is well established that documents prepared in the ordinary course of business are not protected by the work-product doctrine because they would have been created regardless of the litigation." *Slack v. Swift Transp. Co. of Arizona, LLC*, 2016 WL 11815753, at *2 (W.D. Wash. Nov. 3, 2016).

Here, Plaintiffs say that the work-product doctrine does not apply because "Amazon implemented and enforced the P&C Protocol to create broadly applicable communications policies and to alter business documents that *would* have been created independent of litigation." Dkt. # 604 at 24. They also say that the doctrine's protections are overcome by Plaintiffs'

"substantial need" for the withheld materials. *Id.* at 25. But Plaintiffs provide no other argument on this issue, *see generally* Dkt. ## 604 & 655, nor do they develop "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged." *GJI*, 974 F.2d at 1075. The Court thus concludes that Plaintiffs have not justified the Court's intrusion into Defendant's limited claims of work-product protection, *see id.*, and so it need not conduct an *in camera* inspection of such claims.[36]

4.      *In Camera* Review

Once a party has made its showing of "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged[,]" the decision to conduct the review then "rests within the discretion of the district court." *GJI*, 974 F.2d at 1075; *see also United States v. Zolin*, 491 U.S. 554, 572 (1989). "The court's discretion, however, is guided by the factors enumerated in *Zolin*." *GJI*, 974 F.2d at 1075. These factors are: (1) "the volume of materials the district court has been asked to review, [(2)] the relative importance to the case of the alleged privileged information, and [(3)] the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the [privilege does not apply]." *Zolin*, 491 U.S. at 572.

Plaintiffs request that the Court "order Amazon to produce the unredacted, clawed-back versions of Exhibits 8A, 9A, 10A, 11A, 12A, 13A, and 14A, and the documents identified in Exhibit 16"—over 100 documents—and then "conduct an *in camera* review . . . to evaluate Amazon's privilege claims over those documents and the broader universe of P&C Protocol

---

[36] Although the Court declines to review Defendant's claims of work-product protection, nothing in this Order should be read to preclude the Court from considering the scope of such claims in connection with its *in camera* review of any records that were withheld on both work-product protection *and* attorney-client privilege grounds.

SEALED ORDER - 31

documents." Dkt. # 604 at 19, 28. In support of this request, Plaintiffs contend that: (1) they are requesting review of a limited, representative sample of documents; (2) they are prejudiced because "Amazon's sanitization practice conceals important context and unvarnished ordinary course communications around the conduct central to this case"; and (3) they "have presented ample evidence showing the high likelihood that Amazon is improperly withholding non-privileged documents, including its established history of doing so." *See* Dkt. # 655 at 8–9, 16–17.

Defendant responds with a laundry list of reasons for why Plaintiffs are not entitled to the "sweeping relief" they seek. *See generally* Dkt. # 635. For example, Defendant contends that an *in camera* review of more than 100 documents is "extraordinary" and unnecessary, as Plaintiffs already have "ample evidence" to litigate their claims. *See id*. at 8, 18, 28. It also suggests that the Court is unlikely to find that Amazon has incorrectly withheld documents because: (1) Amazon's in-house counsel may legitimately edit business documents, advise employees on language use, and instruct employees on privilege law, and then claim privilege over such activities, without "manipulating" evidence or engaging in discovery abuse; (2) Defendant has produced millions of records, including thousands marked as "privileged" and that include lawyers; and (3) Defendant has already undergone several privilege re-reviews and had many of its privilege claims upheld in the Related Cases. *See id.* at 6–8, 12–18, 23–24.

The Court agrees and disagrees with both parties in part. On the one hand, Defendant is correct that Amazon may legitimately assert attorney-client privilege over a wide array of documents and communications that involve in-house counsel. *See* part II(C)(2) above. Defendant is also correct that its extensive production of documents, as well as the privilege disputes and re-reviews in the Related Cases, make it more likely that Defendant has properly applied the attorney-client privilege to the withheld documents at issue here. And so the Court

SEALED ORDER - 32

agrees with Defendant that there is no basis to assume that the attorney-client privilege has been improperly applied to *all* withheld P&C Protocol-related documents.

On the other hand, Plaintiffs are correct that the proceedings in the Related Cases demonstrate a pattern of discovery abuse by Amazon. Plaintiffs have also shown that there is a high likelihood that at least some of the withheld documents identified in their motion contain non-privileged information. And the Court agrees with Plaintiffs that they will be harmed if they cannot access any improperly withheld P&C Protocol-related documents. The Court also notes that many of Defendant's concerns appear to highlight, rather than negate, the need for *in camera* review: because this discovery dispute involves complex and highly-fact specific questions about the nuanced role of in-house counsel at Amazon, with major implications for Amazon's privilege claims in both this case and the Related Cases, it is appropriate for the Court to conduct an *in camera* review to make certain individualized privilege determinations for a representative sample of documents over which Amazon has asserted the attorney-client privilege.[37] The *Zolin* factors thus appear to favor a limited inspection, and so the Court exercises its discretion to conduct a narrowly-tailored, *in camera* review of Defendant's claims of attorney-client privilege.

Accordingly, the Court GRANTS IN PART Plaintiffs' request to conduct an *in camera* review: the Court will conduct an *in camera* review of 30 documents to evaluate whether Defendant has properly applied the attorney-client privilege. Plaintiffs' request for an *in camera* review is otherwise DENIED.

---

[37] *See, e.g.*, *GJI*, 974 F.2d at 1074 ("*[I]n camera* review is an acceptable means to determine whether disputed materials fit within the privilege."); *Fed. Trade Comm'n v. Amazon.com, Inc.*, 2024 WL 3620467, at *9–10 (W.D. Wash. Aug. 1, 2024) (granting the FTC's request to conduct a limited *in camera* review of Amazon's claims of attorney-client privilege in a similarly complex antitrust case).

### 5.   Other Relief

Plaintiffs also request that the Court order Amazon to "conduct a comprehensive privilege re-review based on the appropriate legal standard" and then produce "*all* P&C Protocol documents it has withheld on privilege grounds, including (1) instructions for writing business documents, (2) documents reflecting the implementation of the P&C Protocol, including lawyers' revisions of business documents, and (3) instructions to privilege cloak or destroy business documents." Dkt. # 604 at 19–20, 28–29. They then ask that the Court conduct a second *in camera* review, this time of "50 assertedly privileged documents chosen by Plaintiffs[,]" to "ensure [that] Amazon is applying the correct privilege standard[.]" *Id*. at 20, 29.

The Court finds Plaintiffs' request for additional relief premature. Although Plaintiffs have met their burden of showing "a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged[,]" *see* part II(C)(2) above (quoting *GJI*, 974 F.2d at 1075), Plaintiffs have not yet proven that documents have been improperly withheld on the basis of attorney-client privilege, let alone that Defendant has committed such widespread abuse that a re-review of more than 39,000 documents is necessary. *See generally* Dkt. ## 604 & 655. There is thus no basis to grant other relief at this time,[38] and so the Court DENIES Plaintiffs' request for additional relief but GRANTS Plaintiffs leave to renew such a request, if appropriate, after the *in camera* review discussed in part II(C)(4) above has occurred.

---

[38] *See, e.g.*, *Zolin*, 491 U.S. at 572 ("[A] lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege."); *In re Uber Techs. Passenger Sexual Assault Litig.*, 2024 WL 4907142, at *8 (N.D. Cal. Nov. 27, 2024) (ordering various measures, including a limited *in camera* review, but declining to order a substantive re-review of all withheld documents "at this time"); *Am. Auto. Ins. Co. v. Hawaii Nut & Bolt, Inc. Moore*, 2017 WL 80248, at *3 (D. Haw. Jan. 9, 2017) (declining to order further production or conduct an *in camera* review of all withheld documents based solely on a party's "speculation" that such documents were improperly designated as privileged).

SEALED ORDER - 34

## III
### CONCLUSION

For these reasons, the Court:

(1) DENIES Defendant's Motion to Appoint a Special Master (Dkt. # 618).

(2) GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Spoliation Sanctions (Dkt. # 598). Plaintiffs' request for Rule 37(e) spoliation sanctions is DENIED. Plaintiffs' request for leave to conduct additional discovery into the extent of Amazon's spoliation is GRANTED. After such additional discovery has occurred, Plaintiffs may renew their request for spoliation sanctions, if appropriate. The Court RESERVES ruling on Plaintiffs' request for Defendant to bear the costs of additional discovery, pending the results of such discovery.

(3) GRANTS IN PART and DENIES IN PART Plaintiffs' Motion to Compel the Production of Documents Concerning Amazon's Manipulation of Evidence (Dkt. # 604). Plaintiffs' request for an *in camera* review is GRANTED IN PART. The Court will conduct an *in camera* review of 30 documents to evaluate whether Defendant has properly applied the attorney-client privilege. Plaintiffs are ORDERED to provide Defendant and the Court with a list of 30 such documents[39] on or before May 15, 2026. For each document on the list, Plaintiffs must also: (1) include a copy of the redacted document that they received from Defendant or specify that the entire document was withheld; (2) provide a copy of Defendant's privilege log entry for the document; and (3) indicate whether the Court or the Special Master in the Related Cases has ruled on the document and if so, provide a short explanation about what the

---

[39] For the avoidance of any doubt, all 30 documents on the list should be selected from the clawed-back and other logged documents that were specifically identified in Plaintiffs' Motion (Dkt. # 604).

SEALED ORDER - 35

ruling was and why it is not dispositive here. Defendant is ORDERED to submit the 30 documents to the Court by May 22, 2026, in unredacted form, for *in camera* review. After the Court has completed its review, Plaintiffs may renew their request for other relief, if appropriate. Plaintiffs' Motion is otherwise DENIED.

(4) PROVISIONALLY FILES this Order under seal. The parties are DIRECTED to file a joint statement, on or before May 15, 2026, indicating what redactions, if any, should be included in the public version of the Order.

Dated this 29th day of April, 2026.

John H. Chun
United States District Judge

SEALED ORDER - 36