UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

IN RE AMAZON.COM. INC. EBOOK ANTITRUST LITIGATION,

REPORT & RECOMMENDATION
21 Civ. 351 (GHW) (GWG)

---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiffs James Piebes, Gina Starr, and Michael Weiss have moved the Court for an order certifying a proposed class.[1] For the reasons stated below, the motion should be granted.

I. BACKGROUND

Defendant Amazon is a retailer of electronic books ("eBooks"). See Wickelgren Rep. ¶ 65. Plaintiffs purchased trade eBooks from defendant. See Declaration of James Piebes, filed

[1] See Notice of Motion, filed Dec. 5, 2025 (Docket # 299) ("Mot."); Memorandum of Law in Support, filed Dec. 5, 2025 (Docket # 300) (redacted version filed at Docket # 348-2) ("Mem."); Declaration of Steve W. Berman, filed Dec. 5, 2025 (Docket # 301) ("Berman Decl."); Report of Dr. Jamie McClave, dated Dec. 5, 2025, annexed as Ex. 1 to Berman Decl. (Docket # 301-1) (redacted version at Docket # 383-2) ("McClave Rep."); Report of Dr. Abraham Wickelgren, dated Dec. 5, 2025, annexed as Ex. 1 to Declaration of Steve W. Berman, filed Dec. 16, 2025 (Docket # 308-1) (redacted version at Docket # 383-3) ("Wickelgren Rep."); Memorandum of Law in Opposition, filed Feb. 18, 2026 (Docket # 328) (redacted version filed at Docket # 348-3) ("Opp."); Declaration of John E. Schmidtlein, filed Feb. 19, 2026 (Docket # 330) ("Schmidtlein Decl."); Report of George Korenko, dated Feb. 18, 2026, annexed as Ex. 1 Schmidtlein Decl. (Docket # 330-1) (redacted version at Docket # 383-41) ("Korenko Rep."); Reply Memorandum of Law in Support, filed Apr. 3, 2026 (Docket # 341) (redacted version filed at Docket # 348-4) ("Reply"); Declaration of Steve W. Berman, filed Apr. 3, 2026 (Docket # 342) ("2d Berman Decl."); Reply Report of Dr. Jamie McClave, dated Apr. 3, 2026, annexed as Ex. 1 to Declaration of Steven W. Berman, filed May 4, 2026 (Docket # 350-1) (redacted version filed at Docket # 383-38) ("McClave Reply"); Reply Report of Dr. Abraham Wickelgren, dated Apr. 3, 2026, annexed as Ex. 37 to 2d Berman Decl. (Docket # 342-2) (redaction version at Docket # 383-39) ("Wickelgren Reply"); Surreply Memorandum of Law in Opposition, filed June 23, 2026 (Docket # 364) (redacted version at Docket # 362) ("Surreply"); Declaration of John E. Schmidtlein, filed June 23, 2026 (Docket # 365) ("2d Schmidtlein Decl."); Reply Report of George Korenko, dated June 23, 2026, annexed as Ex. 17 to 2d Schmidtlein Decl. (Docket # 365-3) (redacted version at Docket # 363-3); Surreply Memorandum of Law in Support, filed July 6, 2026 (Docket # 370) (redacted version at Docket # 369).

The Court cites only to unredacted versions of the foregoing filings (where they exist).

Dec. 5, 2025 (Docket # 303), ¶ 3; Declaration of Gina Starr, filed Dec. 5, 2025 (Docket # 304), ¶ 3; Declaration of Michael Weiss, filed Dec. 5, 2025 (Docket # 305), ¶ 3. Plaintiff alleges that Amazon entered into anti-competitive agreements with the largest publishers of trade eBooks –— Hachette, HarperCollins, Macmillan, Penguin Random House, and Simon & Schuster, see Excerpts from Deposition of David Naggar, dated Nov. 4, 2025, annexed as Ex. 11 to Berman Decl. (Docket # 301-11) ("Naggar Dep."), at 16:15-22 — referred to by the parties as the "Big Five" publishers. Plaintiffs allege that as a result defendant Amazon monopolized (or attempted to monopolize) the U.S. retail market for trade eBooks in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. See In re Amazon.com, Inc. eBook Antitrust Litig., 2023 WL 6006525, at *18-19 (S.D.N.Y. July 31, 2023), adopted by, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024), reconsideration denied, 2025 WL 833390 (S.D.N.Y. Mar. 17, 2025); Fourth Amended Complaint, filed June 27, 2024 (Docket # 256) ("Compl.") ¶¶ 224-43.

Plaintiffs seek to certify a class of "[a]ll persons in the United States who purchased one or more trade eBooks sold by the [Big Five] via an agency model through Amazon.com on or after January 14, 2017, through and including the date of certification, at a purchase price of $4.00 to $49.99."[2] Mem. at 2.

Plaintiffs' putative class action rests on the contention that Amazon "secured agreements" with the Big Five "that foreclose competition from rival platforms." Compl. ¶ 56. In 2015, Amazon entered into Tiered Seller of Record ("TSOR") contracts with the Big Five. Mem. at 1. In plaintiffs' telling, the TSOR contracts "applied the same mechanisms to raise the prices that all members of the proposed class paid for trade eBooks, allowed Amazon to retain its market share

---

[2] Under an agency model, publishers "set the list price of their titles, which also serves as the final retail price paid by customers," unless publisher permit retailers to offer discounts. Wicklegren Rep. ¶ 15.

without having to compete with other eBook sellers on price, and increased Amazon's profits to supracompetitive levels." Id.

We explore the TSOR contracts below — but first, we consider the relevant market which Amazon allegedly monopolized (or tried to): the U.S. retail market for trade eBooks.

A. The U.S. Retail Market for Trade eBooks

Trade books are "general-interest books." Wickelgren Rep. ¶ 61. They span "a broad spectrum of fiction and non-fiction genres, including thrillers, biographies, history, romance, science, and children's literature." Id. They "represent the largest category in the US publishing industry." Id. ¶ 62. "Within this category, eBook revenues have been around $2 billion annually since 2020." Id.

Trade books (in whatever medium) are distinguished from non-trade books, such as "textbooks, research journals, reference materials, and other specialized publications." Id. ¶ 61. "Trade titles are marketed and sold through mass-market consumer platforms (such as Amazon, Apple[,] and Kobo)," whereas "non-trade titles are often supplied through specialist or institutional channels." Id. ¶ 133. These mass-market consumer platforms provide consumers with "a wider selection" of titles, id. ¶ 57, and provide publishers with "access to a large base of potential readers, discoverability tools, pricing infrastructure, and marketing features that . . . niche channels targeting smaller, highly targeted audiences . . . struggle to replicate," id. ¶ 143.

Among trade books, eBooks differ from print books and audiobooks in important ways. For consumers, eBooks "remain more affordable" than print books and "offer unique benefits, such as portability, customizable features, and instant availability," id. ¶ 136, while audiobooks are "typically consumed in situations where reading is impractical." id. ¶ 148. For publishers, "the production and distribution of print books require significant investment in logistics and

warehousing, whereas eBooks are distributed digitally at lower costs." Id. ¶ 141. Meanwhile, audiobooks have a "distinct" audience. Id. ¶ 129.

Plaintiffs' expert Dr. Abraham Wickelgren, an economist at the University of Texas at Austin, id. ¶ 1, routes these considerations through the so-called hypothetical monopolist test, which asks "whether a firm that was the only seller of . . . products or services would find it profitable to raise prices by a significant amount compared to the competitive level, or if sufficient substitution would take place such that the price increase would not be profitable," id. ¶ 122. He reasons that consumers and publishers would have nowhere to turn if a hypothetical firm controlling the distribution of trade eBooks raised prices, given the differences between trade and non-trade books, and the differences between eBooks and print books or audiobooks. See id. ¶¶ 131-52. Therefore, Wickelgren concludes "third-party platforms for the retail distribution of trade eBooks constitute the relevant product market" in this case. Id. ¶ 123.[3]

Further, Wickelgren finds that "the US represents the relevant geographic market," id., because "US consumers can only buy eBooks from retailers licensed to distribute within the US," id. ¶ 154.

Wickelgren then sets out to show that Amazon enjoys monopoly power in this market. He begins with Amazon's market share, "a useful first indication of the market structure and of the relative importance of the various firms in the market." Id. ¶ 176. In 2009, "consumers used Amazon's platform for about 90% of the trade eBook sales in the US retail market." Id. ¶ 69 (footnote omitted). "That figure declined to 60% when Apple entered the eBook market in

[3] Amazon's expert Dr. George Korenko contests this conclusion, claiming, e.g., that publishers could substitute trade audiobooks for trade eBooks. See Korenko Rep. ¶ 141. However, Amazon itself does not challenge this conclusion, so the Court does not address the question of the relevant product market further.

2012," but, under a set of contracts with the Big Five executed at the end of that year (or in early 2013), Amazon "regained some of its market share through aggressive discounting." Id. "In March 2016, for example, Amazon recorded that it had a 68.5% share of the trade eBook market." Id. Wickelgren puts Amazon's market share "consistently within the range of 69-74%" throughout the class period. Id. ¶ 158; see ¶ 182 tbl. 3.

Wickelgren also examines indirect evidence of Amazon's monopoly power, including "network effects," Amazon's "use of proprietary software and eBook reading devices to limit consumer switching," and its "ability to disincentive consumer search outside of Amazon's platform." Mem. at 10-11 (citing Wickelgren Rep. ¶¶ 71, 188-97).

His chief evidence of Amazon's monopoly power is the company's "[p]ersistently high margins." Wickelgren Rep. ¶ 164; see id. ¶¶ 165-68. Wickelgren shows that the profitability of Amazon's eBook business improved markedly as of 2015. See id. ¶ 164. Wickelgren concludes that this improvement "was largely driven by the implementation of [the] TSOR contracts" with the Big Five. Id.

We now turn to these contracts and their impact.

B. Amazon's Agreements with the Big Five

Prior to the execution of the TSOR contracts, Amazon's relationship with the Big Five was governed by Hybrid Seller of Record ("HSOR") contracts.[4]

[4] See Hachette HSOR, effective Dec. 4, 2012, annexed as Ex. 7 to Berman Decl. (Docket # 301-7); HarperCollins HSOR, effective Sept. 10, 2012, annexed as Ex. 8 to Berman Decl. (Docket # 301-8), Macmillan HSOR, effective Apr. 4, 2013, annexed as Ex. 9 to Berman Decl. (Docket # 301-9); Penguin Random House HSOR, effective Sept. 1, 2013, annexed as Ex. 10 to Berman Decl. (Docket # 301-10); Simon & Schuster HSOR, effective Dec. 7, 2012, annexed as Ex. 6 to Berman Decl. (Docket # 301-6).

Under a seller of record contract, as an Amazon representative explained, each eBook publisher "is the seller of record in our store . . . responsible for sales tax to states," Naggar Dep. at 15:14-16, with Amazon serving as a retailing agent, earning commissions on eBook sales, see id. at 15:17-19. As the retailing agent, Amazon does not set the retail price of an eBook; the publisher does. See Wickelgren Rep. ¶ 82. But under an HSOR contract, Amazon could unilaterally discount retail prices of eBooks: it could "offer [an] eBook at a retail price below the Publisher's list price," funding "[th]is discount up to the amount of its own commission." Id. ¶ 87; see Naggar Dep. at 26:14-17.

Amazon made the most of its ability to offer discounts under the HSOR contracts. In 2014, it discounted 80 percent of the eBooks it sold. Wickelgren Rep. ¶ 271 tbl. 6. Amazon offered discounts largely to match competitors' prices: e.g., in February 2014, 73 percent of eBook sales under the HSOR contracts were subject to price-matching. See Naggar Dep. at 63:18-22. That month, approximately 64 percent of Hachette eBooks sold by Amazon were subject to price-matching; 65 percent of HarperCollins eBooks; 64.5 percent of Macmillan eBooks; between 77 and 78 percent of Penguin Random House eBooks; and about 60 percent of Simon & Schuster eBooks. Managed Publisher Profitability Deep Dive, dated Feb. 2014, annexed as Ex. 15 to Berman Decl. (Docket # 301-15) ("Feb. 2014 Deep Dive") at 8. Price-matching cut into Amazon's profits — not least because the HSOR contracts required Amazon to fund any discounts out of its own commission. See Letter from Jeffrey A. Goldberg to Connecticut Attorney General's Office, dated Sept. 4, 2019, annexed as Ex. 12 to Berman Decl. (Docket # 301-12), at 5 (explaining that Amazon "spent almost all of our operating margin offering our customers competitive prices"). Amazon netted between [redacted] and [redacted] percent profit from Big Five eBook sales in February 2014. Feb. 2014 Deep Dive at 8.

This picture changed dramatically the next year as Amazon replaced the HSOR contracts with the TSOR contracts.[5] Amazon virtually stopped price-matching. See Wickelgren Rep. ¶ 271 tbl. 6. According to internal data for that month, only 0.7 percent of Hachette eBooks sold by Amazon were subject to price-matching, 1.9 percent of HarperCollins eBooks, 2 percent of Macmillan eBooks, between 0.1 and 0.2 percent of Penguin Random House eBooks, and 1.9 percent of Simon & Schuster eBooks. See Managed Publisher Profitability Deep Dive, dated Nov. 2015, annexed as Ex. 14 to Berman Decl. (Docket # 301-14) ("Nov. 2015 Deep Dive") at 9. Using "Small Window" and "event study" analyses, see Wickelgren Rep. ¶¶ 356-74, which examine eBook pricing immediately before and after the implementation of the TSOR contracts, Wickelgren shows that "Amazon's prices converged upward with those of the Big Five" right after the TSOR contracts were executed, id. ¶ 267; see Korenko Rep. ¶ 162 (recognizing that Wickelgren "shows that there was a convergence of average eBook prices [on Amazon] and average digital list prices for each publisher after the accused 2015 agreements took effect"). eBook prices on Amazon "have remained closely aligned ever since." Wickelgren Rep. ¶ 267. Consequently, Amazon's "effective commission on eBook sales increased sharply and then stabilized at a materially higher level." Id. ¶ 268. Profits soared: Amazon netted between [redacted] and [redacted] percent profit from Big Five eBook sales as of November 2015. Nov. 2015 Deep Dive at 9. In real terms, Amazon earned approximately 36 cents per Big Five eBook sold in 2014; but

[5] See Hachette TSOR, effective Feb. 1, 2015, annexed as Ex. 18 to Berman Decl. (Docket # 301-18); Amendment to Hachette TSOR, dated Jan. 14, 2015, annexed as Ex. 19 to Berman Decl. (Docket # 301-19); HarperCollins TSOR, effective Apr. 15, 2015, annexed as Ex. 20 to Berman Decl. (Docket # 301-20), Macmillan TSOR, effective Jan. 5, 2015, annexed as Ex. 17 to Berman Decl. (Docket # 301-17); Penguin Random House TSOR, effective June 5, 2015, annexed as Ex. 20 to Berman Decl. (Docket # 301-21); Simon & Schuster TSOR, effective Jan. 1, 2015, annexed as Ex. 16 to Berman Decl. (Docket # 301-16).

in 2015, it earned about 80 cents per sale, and by 2019, that figure leapt to $1.36 per sale. Wickelgren Rep. ¶ 340 tbl. 15.

The increase in eBook prices on Amazon are reflected in the following graph (from one of plaintiffs' expert's reports):




McClave Rep. at 6 Ex. 1.

Plaintiffs attribute this trend to provisions of the TSOR contracts which allegedly "minimize[ed] how often Amazon needed to discount to match competitors' lower prices," allowing Amazon to "retain[] virtually all of its commission." Mem. at 14. Specifically, plaintiffs blame the following provisions: notification provisions, non-price parity provisions, and above all, discount pool provisions (together, the "Challenged Provisions"). See id. at 17-24. According plaintiffs' theory of the case, the Challenged Provisions operated as an "implicit" (and illicit) platform most-favored nation or "PMFN" clause. Wickelgren Rep. ¶ 209.

We now turn to the Challenged Provisions.

1. Discount Pool Provisions

Under the HSOR contracts, Amazon "was allowed to discount eBooks up to the amount of its commission." Id. ¶ 213. "For example, if an eBook was priced by a Publisher at $10.00, with Amazon receiving a $3.00 commission, the lowest price it could list for the book was $7.00. In other words, whatever discount Amazon chose, it would not change the Publisher's revenues on each eBook sold." Id.

The TSOR contracts shifted to an "agency model" between the Big Five and Amazon. Id. ¶ 15. Pursuant to the agency model, publishers "set the list price of their titles, which also serves as the final retail price paid by customers." Id. Under the TSOR arrangement, Amazon agreed not to discount the prices set by" publishers — "unless it found lower prices for their eBooks on competing platforms." Id. ¶ 214. "Whenever Amazon detected a lower price" elsewhere, a so-called discount pool "accumulated 'credits' based on the price difference with Amazon's price and the volume of Amazon's transactions for the same title (i.e.[,] the cost of price-matching)." Id. Thus, although publishers "had nominal control over the consumer-facing price, Amazon claimed the right to apply its own discounts up to the total value of" a discount pool. Id. Further, "when Amazon applied discounts through the Discount Pool," the parties' "revenue split was based on the discounted price that the customer paid, not the Publisher's list price." Id. ¶ 215. "Discounting therefore reduced Publishers' revenues for each eBook sold." Id.

Faced with the discount pool provisions, one of the Big Five explained that publishers "have no incentive to offer Amazon's rivals better agency prices, and, if anything . . . have a strong incentive not to offer them any discounting ability whatsoever and/or to limit it as much as possible." Letter from HarperCollins to the European Commission, dated Mar. 6, 2014,

annexed as Ex. 26 to Berman Decl. (Docket # 301-26) ¶ 24. If "a rival platform offers an eBook at a lower price than Amazon, then Amazon [could] use the credits in the discount pool to reduce the price of this eBook on Amazon." Wickelgren Rep. ¶ 217. But "even if Amazon did not apply the Discount Pool for price matching, it could still leverage [this provision] to discipline Publishers by discounting other books in their catalogue by a commensurate amount." Id. ¶ 222. "Either way," Wickelgren contends, Amazon deterred the Big Five "from offering discounts on rival platforms." Id. ¶ 217.

During 2020, the TSOR contracts (except Simon & Schuster's) were amended, such that "the credits available to Amazon under the New Discount Pool no longer depend[ed] on identifying better available prices for a Publisher's eBook on another retail platform." Id. ¶ 265. "Instead, for each 12-month period, Amazon [was] provided with a fixed amount for each Publisher that funds Amazon's strategic discounting of eBook prices." Id. (footnote omitted). "Amazon negotiated the 12-month fixed amounts" to be "above the size of the Discount Pool of the previous year." Id. ¶ 266.

2. Notification Provisions

"The Notification Provisions required Publishers to inform Amazon of more favorable or alternative terms and conditions that they agreed to elsewhere, guaranteeing that Amazon was able to start selling the same eBooks as its rivals on the same day." Id. ¶ 233.

As one of the Big Five explained, "This is materially different from Amazon purely relying on its own intelligence such as web-crawlers, to locate lower priced products because, in that case, Amazon would only be made of lower prices and promotions once they went live and not before." Letter from Simon & Schuster to the European Commission, dated Nov. 17, 2014, annexed as Ex. 30 to Berman Decl. (Docket # 301-30) at *62. The notification provisions thus

enabled Amazon to "neutralize, rather than merely respond to, rivals' advantages on prices and commissions." Wickelgren Rep. ¶ 235.

Notably, the HSOR contracts contained similar provisions which required publishers to "notify Amazon when they offered a greater commission (lower price) to another retailer." Korenko Rep. ¶ 36.

In August 2017, after the European Commission concluded that equivalent provisions "harmed competition in eBook sales across the European Economic Area," Amazon decided that it would no longer enforce the notification provisions in the TSOR contracts. Wickelgren Rep. ¶ 261; see Email from Amazon, dated Aug. 3, 2017, annexed as Ex. 33 to Berman Decl. (Docket # 301-33).

According to Wickelgren, "The 2017 change in the TSOR agreements had little practical effect because Amazon continued to systematically track Publishers' eBooks on other platforms and demand under the discount pool provision, that the Publishers sell eBooks on Amazon's platform at terms equal to or better than the best terms available." Wickelgren Rep. ¶ 263 (footnote and internal cross-reference omitted). Amazon had "developed internal infrastructure to monitor competitor prices," employing some [redacted] people as of 2017 to keep tabs on "over 100 competitor sites." Id. ¶ 100.

3. Non-Price Parity Provisions

The TSOR contracts also contained so-called non-price parity provisions.

There were business model parity provisions, which "obligated the Publisher to make eBooks available on the same terms and conditions . . . to Amazon as provided to third party entities using alternative business models," such as subscription-based models. Wickelgren Rep. ¶ 243. Under these provisions, one of the Big Five stated, "no rival e-book distributor [could]

sell e-books in a different way," thus "mak[ing] e-distributors' offerings more homogeneous." Letter from Macmillan to the European Commission, dated Apr. 30, 2014, annexed as Ex. 31 to Berman Decl. (Docket # 301-31) ¶ 1.9.

There were also selection, availability, and features parity provisions, which, inter alia, "obligated the Publisher to" offer: "eBooks made available to another retailer, on the same date"; "the same promotional material made available to any other third party"; and "a Kindle edition of the title" with "the same features and functionalities as the same titles provided to any other third party." Wickelgren Rep. ¶¶ 253-54.

Notably, the HSOR contracts contained certain non-price parity provisions: specifically, business model and selection parity provisions. See Korenko Rep. ¶ 36.

Amazon decided not to enforce the non-price parity provisions in the TSOR contracts in August 2017 amid European Commission scrutiny. Wickelgren Rep. ¶ 261. This decision changed very little, in Wickelgren's view: "if Publishers did not provide Amazon with eBooks on similar terms, they could . . . be easily punished by Amazon reducing their sales." Id. ¶ 264.

* * *

As noted, the Challenged Provisions did not remain the same across the class period for all publishers. See Korenko Rep. ¶ 37 Ex. 2 (summarizing changes to Amazon's contracts with the Big Five from 2015 onward). However, in Wickelgren's view, the TSOR contracts' anticompetitive effects remained the same "throughout the Class Period, with and without parity provisions other than the Discount Pool and under both versions of the Discount Pool." Wickelgren Rep. ¶ 224. As his "Small Window" and "event study" analyses demonstrate, "following the implementation of the TSOR contracts in 2015, Amazon's prices converged upward with those of the Big Five . . . and have remained closely aligned ever since, despite

ceasing to enforce other parity provisions in August 2017 and modifying the Discount Pool in 2020." Id. ¶ 267. This is demonstrated in the figure below:




Id. ¶ 267 tbl. 5.

C. The Effect of Amazon's Agreements with the Big Five

Plaintiffs' expert Dr. Jamie McClave has assessed "whether and to what extent prices may have been elevated by the alleged conduct," i.e., the Challenged Provisions. McClave Rep. at 4. To make this assessment, McClave built a model using trade eBooks sales data from Amazon for 658 million transactions, covering the period from January 2014 to December 2023. See id. at 5. McClave coded a "TSOR Purchase Indicator variable[]"to "measure the extent, if any, to which prices were elevated for purchases subject to the TSOR contracts at issue after accounting for the effects of . . . market-related explanatory variables," id. at 9, namely, "cost, demand, and product characteristics," id. at 10. The TSOR Purchase Indicator variable is "equal to 1 when the purchase . . . [was] subject to the TSOR contracts for each Publisher, and equal to

0 otherwise."[6] Id. In other words, this variable "flags transactions subject to the alleged challenged behavior, with all others acting as . . . benchmark transactions." Id. at 5. "Including the indicator variable enables [McClave's] model to test for any systematic difference between the benchmark prices and the prices of the transactions subject to the alleged conduct, after controlling for the legitimate factors, to determine how the conduct affected the prices." Id.

McClave ran a multiple regression analysis. See id. at 4. Her model "first determined legitimate economic factors that explain competitive prices for eBooks." McClave Reply at 3. "After adjusting for these factors," it ma[de] an 'apples to apples' comparison of eBook prices in the Benchmark with eBook prices for transactions subject to the [TSOR] contracts." Id. McClave's model found that this variable "did, in fact, indicate that prices were 10% to 26% greater than competitive levels for relevant sales . . . after accounting for the legitimate market factors affecting those prices." McClave Rep. at 10. Of these sales, 93% "ha[d] a positive overcharge," id. at 11 n.37, meaning that the actual price of the trade eBook sold was greater than what McClave determined to be the estimated competitive or "but-for" price, see id. at 4. Ultimately, "97% of the Class members paid at least one elevated price for a relevant eBook purchase during the Class period." Id. at 11.

McClave also "calculate[d] damages to the Class by multiplying the aggregate overcharge estimate for each Publisher by the revenue for the relevant eBook sales for that Publisher during the Class Period." McClave Report at 11. She determined that Amazon customers paid over $740 million more (in aggregate) for trade eBooks published by the Big Five than they would have in a competitive market. See id.

---

[6] Some transactions which occurred after the execution of the TSOR contracts were "governed by [n]on-TSOR agreements, such as Reseller Agreements." McClave Rep. at 7 n.24.

Amazon, through Korenko, questions various aspects of McClave's report (although it does not challenge her report's admissibility). We discuss Amazon's criticisms in Section III.

D. Procedural History

Plaintiffs filed their complaint in January 2021 and amended it the next month. See Complaint, filed Jan. 14, 2021 (Docket # 1); First Amended Complaint, filed Feb. 4, 2021 (Docket # 7). After extensive motion practice, plaintiffs filed a second amended complaint on November 21, 2022. See Second Amended Complaint, filed Nov. 21, 2022 (Docket # 175).

The second amended complaint brought claims against Amazon and the Big Five. See id. On motions to dismiss brought by Amazon and the Big Five, all claims were dismissed except plaintiffs' monopolization and attempted monopolization claims against Amazon. See In re Amazon.com, Inc. eBook Antitrust Litig., 2023 WL 6006525, at *26.

Plaintiffs then filed the operative complaint on June 27, 2024, see Compl., which Amazon answered on March 31, 2025, see Answer, filed Mar. 31, 2025 (Docket # 281). On December 5, 2025, plaintiffs brought the instant motion for class certification. See Mot.

II. LEGAL STANDARDS

The requirements for certifying a class are set forth in Fed. R. Civ. P. 23. First, Rule 23(a) provides that a class may be certified where: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Courts have also read an "implied" requirement of "ascertainability" into Rule 23. Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015) (citation and internal quotation marks omitted).

Second, a class must satisfy Rule 23(b)(1), (2), or (3). See Fed. R. Civ. P. 23(b). Plaintiffs contend the proposed class satisfies Rule 23(b)(3), Mem. at 7, which allows for certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3). Courts treat Rule 23(b)(3) as creating a "predominance" requirement and a "superiority" requirement. See In re Petrobras Sec., 862 F.3d 250, 260 (2d Cir. 2017).

"Rule 23 does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Id. (emphasis in original). A court's analysis must therefore "be rigorous and may entail some overlap with the merits of the plaintiff[s'] underlying claim," but it may consider merits questions only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

The Rule 23 analysis in this case depends heavily on expert evidence. Amazon does not challenge the admissibility of plaintiffs' experts' reports, and plaintiffs do not challenge the admissibility of Amazon's expert's report. As the parties have not asked for a Daubert hearing, and there is no requirement for such a hearing at the class certification stage, see In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 129-30 (2d Cir. 2013), the Court considers these

reports and resolves "disputes between experts . . . if necessary to the Rule 23 analysis," In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018). We must subject expert evidence to a "rigorous analysis," In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d at 129, and it is error to find such evidence "establish[es] a component of a Rule 23 requirement simply by not being fatally flawed," id. (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006)). But our inquiry is limited to whether expert evidence establishes Rule 23's requirements. Whether expert evidence is persuasive, in the sense that it proves or disproves the merits of plaintiffs' case, is a separate inquiry. See City of Phila. v. Banc of Am. Sec. LLC, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025); accord Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 678-79 (9th Cir. 2022). Where an expert report is admissible, a court "can only deny class certification based on the persuasiveness of the expert evidence if 'no reasonable juror could . . . believe[]' the expert evidence." City of Phila., 2025 WL 2180607, at *3 (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 459 (2016)); Edmar Fin. Co., LLC v. Currenex, Inc., 2026 WL 1693853, at *13 (S.D.N.Y. June 11, 2026) ("No challenge to [expert's] analysis under Daubert having been filed here, the Court may deny class certification based on a supposed flaw in his analysis only if it concludes that no reasonable juror could believe it.").

San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc., 349 F.R.D. 606 (S.D.N.Y. 2025), illustrates the distinction between these two inquiries. The first inquiry — the one must make at the class certification stage — might ask if an expert's damages model "leads to different outcomes for different [class members] or reveals that [class members] suffering no injury are intermingled with those properly in the class." Id. at 611. The second inquiry

considers whether the expert's damages model "won't be up to snuff for anyone." Id. "In all but the rare case, that's an argument for summary judgment, not class certification." Id.

## III. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity

The putative class comprises "more than 30 million members." Mem. at 5 (citing McClave Rep. at 3 n.8). As "numerosity is presumed at a level of 40 members," plaintiffs satisfy this requirement. Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995) (citation omitted). Defendants do not contest that plaintiffs have satisfied this requirement.

#### 2. Commonality

"When plaintiffs move for certification of a class pursuant to Rule 23(b)(3), 'Rule 23(a)(2)'s "commonality" requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement' of predominance." Dial Corp. v. News Corp., 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 609 (1997)), amended by, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016). "If the predominance requirement is satisfied, then so will the commonality requirement." In re Namenda Indirect Purchaser Antitrust Litig., 338 F.R.D. 527, 547 (S.D.N.Y. 2021). Because, as explained below, we find the predominance element is met, we do not separately discuss commonality.

#### 3. Typicality

Rule 23(a)(3)'s typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). Plaintiffs assert that they straightforwardly satisfy this requirement because "they

allege the same antitrust violations, and like all other proposed class members, they paid supracompetitive prices for trade eBooks to Amazon." Mem. at 6. This assertion, in Amazon's view, "does not withstand scrutiny." Opp. at 22. It insists that "the proposed class relies upon four distinct factual and legal theories to support their alleged antitrust violation."[7] Id. at 21.

We recognize that putative class members bought trade eBooks under three contractual regimes. First, from the start of the class period to August 2017, the TSOR contracts were in full effect, including the notification provisions and non-price parity provisions. Second, from August 2017 to December 31, 2019, only the original discount pool provisions were operative. Third, starting in 2020, the original discounts pools were converted to fixed discount pools (except in the case of Simon & Schuster's contract).

Amazon argues that these different contractual regimes are "fundamentally different," such that the antitrust claims of a putative class member who purchased a trade eBook in, e.g., March 2017 are not typical of the antitrust claims of a putative class member who purchased an eBook in March 2018, whose antitrust claims are different still from a putative class member who purchased an eBook in March 2020 or later. Id. at 2.

But plaintiffs contend that any modifications to the TSOR contracts did not change their anticompetitive effects, because "by retaining the Discount Pool, Amazon continued its anti-discounting practices and kept eBook prices elevated." Mem. at 1. As Wickelgren opines, the TSOR contracts functioned to "disincentivize competition between platforms . . . throughout the Class Period, with and without parity provisions other than the Discount Pool and under both versions of the Discount Pool." Wickelgren Rep. ¶ 224; see Wickelgren Reply ¶ 11 (reiterating

---

[7] Amazon claims that plaintiffs' fourth "legal and factual theor[y]" of liability is predicated on tiered commission provisions in the TSOR contracts. See Opp. at 24. These provisions are not among the Challenged Provisions, however.

that "no amendments to the agreements after 2015 with the Big Five materially altered the[ir] anticompetitive effects"). Thus, it is appropriate to treat the execution of the TSOR contracts, the August 2017 decision not to enforce the notification provisions and non-price parity provisions, and the conversion of the original discount pools to fixed discount pools as a single "course of events" which produced common anticompetitive effects. In re Drexel Burnham, 960 F.2d at 291. Further, it is uncontested that every agreement plaintiffs challenge contained discount pool provisions. Accordingly, whether putative class members purchased a trade eBook on Amazon in March of 2017, 2018, or 2020, their Sherman Act § 2 claims, as pursued by plaintiffs, are typical of one another's. "When," as here, "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

Amazon also argues that plaintiff cannot satisfy the typicality requirement because "more than a 'de minimis number of class members were uninjured.'" Opp. at 21 (quoting City of Phila. v. Bank of Am. Corp., 2023 WL 6160534, at *8 (S.D.N.Y. Sept. 21, 2023), aff'd, 2025 WL 2180607 (2d Cir. Aug. 1, 2025)). We address this argument in Section III.B.1, our discussion of the predominance requirement.

4. Adequacy

Rule 23(a)(4) contemplates a two-part inquiry "as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). We agree with plaintiffs that they satisfy this inquiry

because "they have identical claims to those of all class members" and because their counsel are "experienced and successful antitrust litigators." Mem. at 7.

5. Ascertainability

"To be ascertainable, a proposed class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." In re Namenda, 338 F.R.D. at 548 (citation and internal quotation marks omitted). Plaintiffs state, "Due to the existence of digital transaction records . . . the class's members in this lawsuit are readily ascertainable." Mem. at 29 (citation and internal quotation marks omitted). Amazon transaction records have been used to administer class action settlements before, see, e.g., In re Elec. Books Antitrust Litig., 2014 WL 1282293, at *24 (S.D.N.Y. Mar. 28, 2014), and we have been given no reason to think transaction records could not be used in this litigation.

B. Rule 23(b) Requirements

1. Predominance

"Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (quoting In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 118 (2d Cir. 2013)).

"Determining whether common questions of law or fact predominate requires specifically evaluating 'the elements of the underlying cause of action,'" namely, plaintiffs' Sherman Act claims. In re Namenda, 338 F.R.D. at 550 (quoting Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011)). "There are three elements for all antitrust claims: (1) a violation of the antitrust laws; (2) injury caused by that violation; and (3) measurable damages." Id. (citing

Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 105 (2d Cir. 2007)). As the first element "focuses on . . . defendant['s] conduct — i.e., whether the conduct alleged would actually violate the antitrust laws — common evidence generally predominates over individualized evidence with regard to this element." Id. at 551. The latter elements, by contrast, "focus[] on how plaintiffs were harmed." Id. Thus, "class certification in . . . antitrust cases often turns on whether common issues predominate in establishing injury, causation, or damages." In re Tether & Bitfinex Crypto Asset Litig., 2026 WL 629826, at *27 (S.D.N.Y. Mar. 6, 2026).

We now turn to these elements.

a. Antitrust Violation

Amazon makes no argument that common questions of law and fact do not predominate over individual ones as to whether the Challenged Provisions violate the Sherman Act. Plaintiffs explain that they will offer evidence (primarily, Wickelgren's report) about Amazon's conduct to establish that Amazon violated the Sherman Act. See Mem. at 8-25. We have no trouble concluding that "every aspect of plaintiffs' allegations of anticompetitive conduct [could] be proven through common evidence, as these allegations focus exclusively on [defendant's] actions and will not vary among class members." In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., 335 F.R.D. 1, 14 (E.D.N.Y. 2020). Therefore, common issues predominate on the first element of plaintiffs' antitrust claims.

b. Antitrust Injury

"[T]he second element of an antitrust cause of action — 'antitrust injury' — poses two distinct questions." Cordes & Co. Fin. Servs., 502 F.3d 91 at 106. "One is the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-

fact.' The other is the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful.'" Id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). "Because the second question is one of law and is similar to the question of whether there has been a violation of the antitrust laws," we "focus[] on whether plaintiffs have all suffered the same injury-in-fact." In re Namenda, 338 F.R.D. at 551. Plaintiffs offer McClave's report to show that they have. See Mem. at 25-28. Amazon argues that McClave's report fails to do so.

Amazon takes issue with McClave's exclusion of "all transactions resulting in prices below $4.00" and "all sales with 'publisher-sponsored promotions'" from her report. Opp. at 11 (quoting McClave Rep. at 5 n.16). It also attacks McClave's report for "fail[ing] to account for millions of eBook sales that were made at prices reduced by Amazon using the challenged 'discount pools.'" Id. at 15. It further faults her for "analyzing prices at an aggregate publisher level, rather than an individual title or 'ASIN' — Amazon Standard Identification Number — level." Id. at 20. These purported flaws, in Amazon's view, function to obscure that a significant fraction of the proposed class suffered no injury. See id. at 10, 21. "The Supreme Court and Second Circuit . . . have never suggested that a certain percentage . . . of uninjured plaintiffs would automatically bar class certification," but there is a threshold past which a proposed class contains too many uninjured members, such that individual questions regarding injury-in-fact predominate. In re Restasis, 335 F.R.D. at 17; see also Dial Corp., 314 F.R.D. at 120 (noting "that some putative class members may be uninjured does not automatically defeat predominance"). Our analysis of McClave's report convinces us that plaintiffs have not crossed this threshold, however.

Amazon characterizes McClave's decision not to consider sales of trade eBooks priced below $4 as "unjustifiable cherry-picking." Opp. at 14. "Excluding those sales," Amazon argues, "circularly assumes what she took on the burden to prove: that the 'challenged conduct' caused eBook prices to be higher than they would have been without that conduct." Id. at 12. "McClave's model does not genuinely test that proposition, because if the 'challenged conduct' caused a number of eBook prices to fall below $4, her model would simply disregard them rather than weigh them in the balance." Id. We reject this argument, however, because it fails to recognize that if the "challenged conduct" caused eBook prices to fall below $4, that conduct is itself not being challenged. McClave excluded sales of trade eBooks priced below $4. because the proposed class excludes consumers who purchased trade eBooks priced below $4.[8] See McClave Rep. at 3 n.8. If expanding the class definition to include these consumers would sweep uninjured members into the proposed class, as Amazon asserts, see Opp. at 14 (citing Korenko Rep. ¶¶ 83-84), then plaintiffs could properly exclude them, cf. In re Tether, 2026 WL 629826, at *33 (limiting a class to purchasers who "suffered an initial antitrust injury").

Korenko observes that a "disproportionate share" of sales of HarperCollins eBooks occurred below $4, Korenko Rep. ¶ 85, so if McClave had included sales of trade eBooks priced below $4, her model would "fail[] to show overcharges on HarperCollins eBooks" and thereby

[8] In her reply report, McClave explains that "[e]liminating these transactions not only comports with the Class Definition but also solves a problem created by Amazon's insufficient data production." McClave Reply at 7. According to McClave, "Amazon did not identify Publisher promotions consistently throughout the data," and she "identified all transactions with prices below $4.00 as a proxy for Publisher promotions." Id. Amazon's surreply takes issue with McClave's "new explanation[]" for excluding sales of trade eBooks priced below $4. Surreply at 8. Because we do not need to accept McClave's explanation, we do not address Amazon's surreply on this point.

"fail[] to show impact to 8 percent of the class," id. ¶ 9.[9] Thus, Amazon argues, the exclusion of sales of trade eBooks priced below $4 violates a cardinal rule: that "the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger." Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) (quoting Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC, 752 F.3d 82, 89 (1st Cir. 2014)), aff'd, 638 F. App'x 43 (2d Cir. 2016). But we cannot fault plaintiffs for excluding consumers who were not injured from the proposed class. We view their exclusion not as "cherry-picking" and bit rather a solution to the problem defendant now seeks to create: the inclusion of uninjured class members.

It frequently happens that class definitions are narrowed in order to meet Rule 23 requirements. Notably, Amazon made a similar argument in De Coster v. Amazon.com, Inc., 350 F.R.D. 293 (W.D. Wash. 2025). In De Coster, Amazon's expert found that 12.7% of the class would not have been injured by the alleged conduct . . . because they make very few purchases (i.e., below five transactions)." Id. at 312. On this basis, Amazon argued "that the proposed class does not meet the predominance requirement because the challenged conduct did not have a widespread effect — i.e., Plaintiffs' proposed class contains millions of uninjured members." Id. In response, the plaintiffs limited the proposed class to "those who have made five or more purchases on Amazon," in order to exclude these uninjured members. Id. The court certified the class subject to this limitation. See id. at 325. De Coster discerned nothing untoward about the plaintiffs' strategic re-definition of the proposed class, and neither do we. Indeed, if plaintiffs did

[9] This finding only obtains when sales of eBooks over $50 and sales of eBooks subject to publisher-sponsored promotions are also included in McClave's report. See Korenko Rep. ¶ 9. However, Amazon does not appear to challenge the exclusion of sales of eBooks over $50, and as discussed, the exclusion of sales subject to publisher-sponsored promotions does not affect McClave's conclusions.

not limit the proposed class here, the Court might have limited the proposed class itself. "Courts can and often do . . . exclude from a class proposed members who did not suffer injury." In re Namenda, 338 F.R.D. at 568.

Amazon also argues that the existence of publisher-sponsored promotions "contradicts Plaintiffs' theory that the 'discount pools' prevent such behavior" and that excluding these promotions "again cherry-picks the data to omit transactions that would tend to show a weaker, average correlation between the challenged conduct and Plaintiffs' hypothesized effect." Opp. at 13-14. For one thing, Amazon's argument misunderstands plaintiffs' theory of the case, which is that the Challenged Provisions drove up prices by making it uneconomical for the Big Five to run promotions on rival eBook platforms. For another, publisher-sponsored promotions on Amazon's platform are "[i]ndependent of the challenged conduct" by Amazon, so there is a sound reason to exclude them. Reply at 7. More importantly, incorporating the tiny percentage (about 6%) of publisher-sponsored promotions that did not bring prices below $4 does not actually change the predominance analysis. As McClave states, "I tested including transactions with prices over $4.00 that Amazon indicates are Publisher Promotions in my analysis. My conclusions do not change. The overcharge estimates are very similar to my original estimates; 97% of the Class is impacted by the alleged Conduct." McClave Reply at 7 n.31.

Next, Amazon argues that McClave's report "fails to account for millions of eBook sales that were made at prices reduced by Amazon using the challenged 'discount pools.'" Id. at 15. But her report does account for sales at prices discounted by Amazon. As she states in her reply, "My analysis includes transactions to which the discount pool was applied," except of course those that involved prices discounted below $4.00. McClave Reply at 35, 35 n.120; see id. at 7 n.29. These transactions comprised 0.9% of the dataset. Id. at 35. For what it is worth,

McClave also demonstrates that "over 79% of transactions discounted under the Discount Pool [were] overcharged." Id. at 36. But the bottom line is that, after accounting for eBook sales made at prices reduced by Amazon, McClave concludes that 97% of the class were injured by Amazon's conduct. McClave Rep. at 11. "District courts in this and other Circuits have held that a class may be certified so long as a 'de minimis' number of class members were uninjured." In re Restasis, 335 F.R.D. at 17 (quoting In re Rail Freight Fuel Surcharge Antitrust Litig., 292 F. Supp. 3d 14, 134-35 (D.D.C. 2017)). Case law holds that "5% to 6% constitutes the outer limits of a de minimis number of uninjured class members." In re Rail Freight Fuel Surcharge, 292 F. Supp. 3d at 137. In other words, "courts routinely certify classes with twice as many uninjured class members as McClave finds." Reply at 6.

Amazon argues that McClave erred in "analyzing prices at an aggregate publisher level, rather than an individual title or 'ASIN' — Amazon Standard Identification Number — level." Opp. at 20. In the context of Rule 23(b)(3), "issues arise when there is a 'meaningful concern that the use of averages masks uninjured class members and individual inquiry is . . . required to establish injury in fact across the class.'" In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 3240044, at *9 (S.D.N.Y. Nov. 20, 2025) (quoting In re Actos Antitrust Litig., 2024 WL 4251891, at *36 (S.D.N.Y. Aug. 9, 2024)). Amazon cites to N. Brevard Cnty. Hosp. Dist. v. C.R. Bard, Inc., 710 F. Supp. 3d 1090 (D. Utah 2023), which found that "a class-wide average is especially inappropriate in a monopolization case based on a differentiated product market with heterogeneous customers and individualized pricing." Id. at 1109 (citation and internal quotation marks omitted). C.R. Bard, Inc. involved a market with "a wide variety of different types of purchasers" who "negotiate[d] . . . to purchase a wide variety of . . . products in unique configurations." Id. at 1111. An "average overcharge" was "inapplicable to this market

because there [was] no reason to assume . . . that [the defendant's] conduct affects purchasers equally and in the same way." Id. Similarly, in In re Keurig, the "prevalence of individual negotiations render[ed] [plaintiffs'] model, which relie[d] on averages, insufficient to demonstrate class-wide antitrust injury." 2025 WL 3240044, at *10.

The Third Circuit has held that "the acceptability of averages [to show antitrust injury] depends largely on the answer to several factual predicates, most importantly . . . whether the market is characterized by individual negotiations." In re Lamictal Direct Purchaser Antitrust Litig., 957 F.3d 184, 194 (3d Cir. 2020). Here, "it is undisputable that consumers pay non-negotiated prices for eBooks." Wickelgren Reply ¶ 48. As a result, McClave's calculation of aggregate overcharge estimates is not inappropriate. In fact, her use of an average is the only way to assess the damage caused by Amazon's conduct. As McClave states, "Calculating overcharges is impossible for 61% of ASINs . . . because there are no transactions for those titles in the pre-Conduct period." Reply at 10 (citing McClave Reply at 28). As for "the remaining 39% of ASINs, many contain insufficient data to accurately measure an overcharge at this granular level." McClave Reply at 29.

In sum, after analyzing McClave's report, and mindful of our standard for reviewing plaintiff's motion and considering her expert reports, we discern no undue risk that the proposed class contains too many uninjured members such that common issues do not predominate in establishing antitrust injury.

Apart from the matter of uninjured class members, Amazon argues that McClave's report paints a misleading picture of antitrust impact. As noted, the HSOR contracts contained notification provisions, along with certain non-price parity provisions. According to Amazon, McClave "fail[s] to recognize" this fact. Opp. at 9. It asserts that her report "includes

challenged conduct in the 'benchmark' period because [these] provisions . . . existed throughout 2014." Id. at 26 n.27; see Korenko Rep. ¶ 135. This oversight, it contends, "frustrates [McClave's] attempt to make a comparison of prices before and after the challenged conduct." Opp. at 9. In response, plaintiffs argue that "retail price competition neutralized the potential effects of Amazon's non-price restraints in the period before" the TSOR contracts. Reply at 3 n.18. Wickelgren elaborates:

> In competition economics, non-price MFNs (Most Favored Nation) clauses that apply to dimensions other than price, such as quality, availability, or contractual conditions, can in principle soften competition by restricting how firms differentiate their offers across platforms or trading partners. However, as long as firms compete on prices, this greatly limits the anticompetitive harm from non-price parity provisions.

Wickelgren Reply ¶ 13.

Plaintiffs' response strikes us as sensible. In any event, "it would create an unworkable and unfair standard to require that any benchmark be completely unaffected by a defendant's anticompetitive conduct." In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., 2025 WL 354671, at *11 (S.D.N.Y. Jan. 30, 2025); accord In re Google Digital Advert. Antitrust Litig., 2025 WL 3562687, at *10 (S.D.N.Y. Dec. 12, 2025). What is more, "assuming that the benchmark period was not perfectly competitive," given the notification provisions and certain non-price parity provisions in the HSOR contracts, McClave's report "actually becomes a more conservative estimate" of antitrust impact. In re Linerboard Antitrust Litig., 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007).

c. Antitrust Damages

In order "to establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)," plaintiffs' damages model "must measure only those damages

attributable to" their "theory of antitrust impact." Comcast Corp. v. Behrend, 569 U.S. 27, 35 (2013).

Plaintiffs' damages model begins with a benchmark, comprising trade eBooks sales before the class period and trade eBook sales during the class period but which were not governed by the TSOR contracts. McClave Rep. at 7. McClave compares the prices of benchmark sales with the prices of trade eBooks sales governed by the TSOR contracts, and where the latter are higher, after controlling for "legitimate factors," she finds what she calls the "overcharge." Id. at 5. This model "calculate[s] damages to the Class by multiplying the aggregate overcharge estimate for each Publisher by the revenue for the relevant eBook sales for that Publisher during the Class Period." Id. at 11.

Amazon argues that this model runs afoul of Comcast:

> [McClave's] use of a single estimated "overcharge" for each Publisher for the entire putative class period, fails to capture how each aspect of the challenged conduct changed over time for each Publisher. If the non-price parities, discount pools, "fixed" pools, and pricing "tiers" all had anti-competitive effects, then it would matter that some existed while others do not, and that some Publishers had them while others did not. [Her] approach waves away all those differences. Her report thus fails to align with Plaintiffs' liability theories at different points in the putative class period, and is inadequate to support class certification as a matter of law. Comcast, 569 U.S. at 36-37 . . . .

Opp. at 25. We are not persuaded by Amazon's argument.

First, Amazon assumes that changes to the Challenged Provisions translated to changes in their anticompetitive effects. But Wickelgren concluded that the TSOR contracts functioned to "disincentivize competition between platforms . . . throughout the Class Period, with and without parity provisions other than the Discount Pool and under both versions of the Discount Pool." Wickelgren Rep. ¶ 224. Using "Small Window" and "event study" analyses, he demonstrated that trade eBook prices jumped precipitously when the TSOR contracts were executed in 2015.

See id. ¶¶ 356-74. Wickelgren conducted supplemental "Small Window" analyses "around the 2017 'Other Parities Dropped' event [i.e., the decision not to enforce the notification provisions and non-price parity provisions] and around the introduction of the New Discount Pool in 2020"; he did not "observe a meaningful break or change in the pricing pattern of either publishers or Amazon around the event dates." Wickelgren Reply ¶ 78. "In other words," Wickelgren explains, "the pricing relationship appears to continue through these contractual changes." Id. Accordingly, McClave had a basis to, in Amazon's words, "wave[] away" the changes to the Challenged Provisions. Opp. at 25.

In any event, insofar as Amazon attacks McClave's report for not disaggregating among the various Challenged Provisions when estimating damages, case law is clear that "strict disaggregation and distribution of damages across the various theories of antitrust harm is not required, particularly where . . . the damages are not premised on a dismissed theory of harm." In re Keurig, 2025 WL 354671, at *15; accord In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig., 421 F. Supp. 3d 12, 38-39 (E.D. Pa. 2019), aff'd, 967 F.3d 264 (3d Cir. 2020).

Second, Comcast is distinguishable from this case. Comcast involved an expert who "sought to establish a 'but for' baseline — a figure that would show what the competitive prices would have been if there had been no antitrust violations." 569 U.S. at 36. This baseline was calculated "by assuming a market that contained none of the four distortions that [the plaintiffs] attributed to [the defendant's] actions." Id. Thus, the plaintiffs' model in Comcast "did not attribute damages to any one particular theory of anticompetitive impact." Id. at 37. This model "might have been sound, and might have produced commonality of damages," Comcast observed, "if all four of those alleged distortions remained in the case." Id. However, the district

court had rejected three of the distortions, leaving a single theory of injury in the case. See id. at 31. Accordingly, the plaintiffs' model failed Rule 23(b)(3) because it "failed to measure damages resulting from the particular antitrust injury on which [the defendant's] liability in this action is premised." Id. at 36. Here, plaintiffs' model rests on a baseline (or benchmark) which is used to show what competitive prices for trade eBooks would have been without the TSOR contracts. See McClave Rep. at 5. Therefore, in contrast to the model in Comcast, plaintiffs' model attributes damages to the single antitrust injury on which Amazon's liability in this action is premised: the anticompetitive effects of the TSOR contracts.

Amazon ultimately objects to plaintiff's theory of antitrust impact. It notes that there is more to the TSOR contracts than the Challenged Provisions — and yet McClave's report treats the TSOR contracts as a whole as her indicator variable. That is, she does not specifically analyze whether the Challenged Provisions — as opposed to unchallenged, lawful provisions of the TSOR contracts — explain the rise in trade eBook prices. Therefore, there is the possibility that plaintiffs' model fails to measure damages resulting from the particular antitrust injury alleged in this case. See Opp. at 25-27. This, Amazon asserts, is a problem under Comcast. Id. at 27.

We question whether Comcast requires that an antitrust damages model disaggregate lawful and unlawful conduct. See In re Broiler Chicken Antitrust Litig., 2022 WL 1720468, at *10 (N.D. Ill. May 27, 2022); see also Waggoner v. Barclays PLC, 875 F.3d 79, 106 (2d Cir. 2017) (finding that a model measuring damages by a decline in share price satisfied Comcast "notwithstanding that some of the decline in the price" may have resulted from regulatory scrutiny, not the challenged conduct).

In any event, Amazon has not shown that unchallenged, lawful provisions of the TSOR contracts could explain the rise in trade eBook prices. It points us to two "significant, unchallenged, lawful change[s]" that were implemented in the TSOR contracts. Opp. at 26.

First, it highlights "the change from largely unfettered retailer discounting (up to an overall cap of 30%)" under the HSOR contracts "to largely restricted retailer discounting (except for that allowed by the 'discount pools')" under the TSOR contracts. Id. But this change is precisely what we understand plaintiffs to be challenging. Plaintiffs contend that the Challenged Provisions --- and in particular the discount pool provision --- unlawfully restricted retailer discounting. Amazon may ultimately be right that "the general prohibition on retail discounting contained in" the TSOR contracts is not "intrinsically unlawful," id. at 26 (quoting United States v. Apple, 889 F. Supp. 2d 623, 232 (S.D.N.Y. 2012)), but on the instant motion, we do not adjudicate this legal question. Rather, our task is only to determine if plaintiffs' model comports with the particular antitrust injury alleged in this case.

Second, Amazon suggests that the TSOR contracts' tiered commission provisions could explain the rise in trade eBook prices. See id. But "Amazon's internal documents . . . characterize the tiered pricing structure as incentivizing publishers to set lower digital list prices." Korenko Rep. ¶ 148 (emphasis added). As Amazon's own expert observes, plaintiffs' evidence is "consistent with the idea that tiered payments did not increase digital list prices." Id. ¶ 149. For his part, Wickelgren contends that "the tiered structure typically included in the agreements was not an effective deterrent for higher eBook prices," adding that the tiered commission provisions "either did not work [to lower prices] or was not enough to overcome the other anticompetitive effects of the [TSOR] contracts." Id. ¶¶ 65-66. Because neither side's

expert contends that the tiered commission provisions drove up prices, we exclude the possibility that plaintiffs' model inadvertently attributes damages to them.

In the end, because the antitrust damages model constructed by McClave is consistent with plaintiffs' theory of antitrust impact, plaintiffs have shown that common issues predominate in establishing antitrust damages.

2. Superiority

A class may only be certified under Rule 23(b)(3) if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To make this determination, a court considers: "the class members' interests in individually controlling the prosecution or defense of separate actions"; "the extent and nature of any litigation concerning the controversy already begun by or against class members"; "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "Class relief is superior where . . . class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency." Dial Corp., 314 F.R.D. at 121.

The superiority requirement is easily met here. First, "given the relatively small amount of recovery likely available to most class members, they will generally have little interest in bringing individual actions." Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc., 2026 WL 534287, at *9 (S.D.N.Y. Feb. 26, 2026). Second, it is uncontested that there is "no known related litigation." Mem. at 29. Third, we find that "judicial economy would best be served by concentrating all claims in this forum, as this Court has gained extensive knowledge of the subject matter of this action over the last [five] years." In re Parmalat Sec. Litig., 2008 WL

3895539, at *11 (S.D.N.Y. Aug. 21, 2008). Fourth, we do not foresee any particular difficulties managing this action. Amazon makes no arguments to the contrary.

CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification (Docket # 299) should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rules of Civil Procedure 72(b), the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to Judge Woods. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72; Thomas v. Arn, 474 U.S. 140, 155 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: August 10, 2026
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge